No. 25-1705

# United States Court of Appeals
## For the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs – Appellees

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants – Appellants

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT;

Defendants.

*On appeal from the United States District Court, District of Maine*

---

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs – Appellees,

v.

EQUAL CITIZENS; CARA MCCORMIC; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants – Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

---

**JOINT APPENDIX**

---

AARON M. FREY
Attorney General

Thomas A. Knowlton
Deputy Attorney General

Of Counsel

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov
*Attorneys for Appellants*

# TABLE OF CONTENTS


Docket Report ........ JA1

Plaintiffs' Complaint ........ JA16

Declaration of Alex Titcomb (ECF No. 16-1) ........ JA33

Declaration of Senator Richard A. Bennett (ECF No. 17-1) ........ JA41

Declaration of Cara McCormick (ECF No. 17-2) ........ JA47

Declaration of Jonathan Wayne (ECF No. 45-1) ........ JA53

Exhibit A to Declaration of Jonathan Wayne (ECF No. 45-2) ........ JA61

Exhibit B to Declaration of Jonathan Wayne (ECF No. 45-3) ........ JA62

Declaration of Hilary Braseth (ECF No. 45-4) ........ JA66

Exhibit A to Declaration of Hilary Braseth (ECF No. 45-5) ........ JA69

Declaration of Jonathan Bolton (ECF No. 45-6) ........ JA77

Excerpts of Robert Menendez Indictment (ECF No. 45-7) ........ JA79

Excerpts of Larry Householder Indictment (ECF No. 45-8) ........ JA92

Excerpts of Maine Senate Legislature History of L.D. 2232, An Act to Limit Contribution to Political Action Committees That Make Independent Expenditures (ECF No. 45-9) ........ JA105

Governor's Proclamation (ECF No. 45-10) ........ JA156

Text of Act (I.B. 5-L.D. 2232) (ECF No. 45-11) ........ JA157

Declaration of Jonathan Gienapp (ECF No. 53-1) ........ JA159

Declaration of Jack Rakove (ECF No. 53-2) ........ JA169

Declaration of Christopher Robertson (ECF No. 53-3) ........ JA197

Excerpts of Deposition Transcript of Jonathan Gienapp (ECF No. 61-1) .......... JA265

Excerpts of Deposition Transcript of Jack Rakove (ECF No. 62-2) .......... JA276

Declaration of Seth Barrett Tillman (ECF No. 62-3) .......... JA280

Declaration of David M. Primo (ECF No. 62-4) .......... JA311

Stipulation Regarding Historians' Declarations (ECF No. 64) .......... JA344

Order Granting Plaintiffs' Motion for Permanent Injunction (ECF No. 74) .......... JA346

Judgment (ECF No. 75) .......... JA361

State Defendants' Notice of Appeal (ECF No. 76) .......... JA362

Intervenors Equal Citizens' Notice of Appeal (ECF No. 77) .......... JA363

APPEAL,CLOSED,CONSENTPILOT,STANDARD

# U.S. District Court
# District of Maine (Bangor)
# CIVIL DOCKET FOR CASE #: 1:24−cv−00430−KFW

DINNER TABLE ACTION et al v. SCHNEIDER et al
Assigned to: MAGISTRATE JUDGE KAREN FRINK WOLF
Case in other court: First Circuit Court of Appeals, 25−01705
First Circuit Court of Appeals, 25−01706
Cause: 42:1983 Civil Rights Act

Date Filed: 12/13/2024
Date Terminated: 07/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**DINNER TABLE ACTION** represented by

**CHARLES M. MILLER**
INSTITUTE FOR FREE SPEECH
1150 CONNECTICUT AVENUE NW
SUITE 801
WASHINGTON, DC 20036
202−301−9800
Email: cmiller@ifs.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA D. DUNLAP**
PIERCE ATWOOD LLP
254 COMMERCIAL STREET
PORTLAND, ME 04101
Email: jdunlap@pierceatwood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ERIC J. WYCOFF**
PIERCE ATWOOD LLP
254 COMMERCIAL STREET
PORTLAND, ME 04101
207−791−1100
Email: ewycoff@pierceatwood.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FOR OUR FUTURE** represented by

**CHARLES M. MILLER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA D. DUNLAP**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ERIC J. WYCOFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALEX TITCOMB** represented by

**CHARLES M. MILLER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSHUA D. DUNLAP**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ERIC J. WYCOFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**WILLIAM J SCHNEIDER**
*in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
OFFICE OF THE ATTORNEY GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333−0006
207−626−8551
Email: jonathan.bolton@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID R HASTINGS, III**
*in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SARAH E LECLAIRE**
*in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DENNIS MARBLE**
*in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BETH N AHEARN**
*in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AARON M FREY**
*in his official capacity as Attorney General of Maine*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**EQUALCITIZENS**

represented by **NEAL KUMAR KATYAL**
MILBANK LLP
1101 NEW YORK AVENUE, NW
WASHINGTON, DC 20005
202−835−7505

Email: nkatyal@milbank.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NOLA B. HELLER**
MILBANK LLP
55 HUDSON YARDS
NEW YORK, NY 10001
212−530−5108
Email: nheller@milbank.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ADAM R. COTE**
DRUMMOND WOODSUM
84 MARGINAL WAY
SUITE 600
PORTLAND, ME 04101−2480
207−772−1941
Email: acote@dwmlaw.com
*ATTORNEY TO BE NOTICED*

**DAVID M. KALLIN**
DRUMMOND WOODSUM &
MACMAHON
84 MARGINAL WAY
SUITE 600
PORTLAND, ME 04101
Email: dkallin@dwmlaw.com
*ATTORNEY TO BE NOTICED*

**EZRA P. LOUVIS**
MILBANK LLP
1101 NEW YORK AVENUE, NW
WASHINGTON, DC 20005
202−835−7584
Email: elouvis@milbank.com
*TERMINATED: 08/15/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MACKENZIE AUSTIN**
MILBANK LLP
2029 CENTURY PARK EAST
33RD FLOOR
LOS ANGELES, CA 90067
424−386−4225
Email: maustin@milbank.com
*TERMINATED: 06/09/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**CARA MCCORMICK** represented by **EZRA P. LOUVIS**
(See above for address)
*TERMINATED: 08/15/2025*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NEAL KUMAR KATYAL**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NOLA B. HELLER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ADAM R. COTE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID M. KALLIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MACKENZIE AUSTIN**
(See above for address)
*TERMINATED: 06/09/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**PETER MCCORMICK** represented by **EZRA P. LOUVIS**
(See above for address)
*TERMINATED: 08/15/2025*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NEAL KUMAR KATYAL**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NOLA B. HELLER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ADAM R. COTE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID M. KALLIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MACKENZIE AUSTIN**
(See above for address)
*TERMINATED: 06/09/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**RICHARD A BENNETT** represented by **EZRA P. LOUVIS**
(See above for address)
*TERMINATED: 08/15/2025*
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**NEAL KUMAR KATYAL**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**NOLA B. HELLER**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ADAM R. COTE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID M. KALLIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MACKENZIE AUSTIN**
(See above for address)
*TERMINATED: 06/09/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA** represented by

**ANDREW G. WOODSON**
WILEY REIN LLP
2050 M STREET NW
WASHINGTON, DC 20036
202−719−7465
Email: awoodson@wiley.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**CALEB P. BURNS**
WILEY REIN LLP
2050 M ST. NW
WASHINGTON, DC 20036
202−719−7451
Email: cburns@wiley.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**WILLIAM K. LANE , III**
WILEY REIN LLP
2050 M ST. NW
WASHINGTON, DC 20036
202−719−3349
Email: wlane@wiley.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ASHLEY ELISABETH EILER**
WILEY REIN LLP
2050 M. STREET NW
WASHINGTON, DC 20036
202−719−7565

Email: aeiler@wiley.law
*ATTORNEY TO BE NOTICED*

**Amicus**

**MAINERS FOR WORKING FAMILIES** represented by

**AMIRA MARCELLA MATTAR**
FREE SPEECH FOR PEOPLE
28 S MAIN STREET
SUITE 200
SHARON, MA 02067
617−564−0464
Email: amira@freespeechforpeople.org
*TERMINATED: 07/02/2025*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BEN CLEMENTS**
FREE SPEECH FOR PEOPLE
48 N. PLEASANT ST.
STE 304
AMHERST, MA 01002
617−249−3015
Email: bclements@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**COURTNEY HOSTETLER**
FREE SPEECH FOR PEOPLE
28 S. MAIN ST.
SUITE 200
SHARON, MA 02067
617−244−0234
Email: chostetler@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOHN C. BONIFAZ**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405
NEWTON, MA 02459
617−244−0234
Email: jbonifaz@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**SAGE SNIDER**
FREE SPEECH FOR PEOPLE
28 S. MAIN ST.
SUITE 2000
SHARON, MA 02067
617−244−0234
Email: sage@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PETER J. BRANN**
BRANN & ISAACSON
113 LISBON STREET
P.O. BOX 3070

LEWISTON, ME 04243−3070
207−786−3566
Fax: 207−783−9325
Email: pbrann@brannlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2024 | 1 | COMPLAINT against All Defendants **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET *Case Opening Filing Fee Paid* FOUND IN THE *Complaints and Other Initiating Documents* CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by FOR OUR FUTURE, DINNER TABLE ACTION, ALEX TITCOMB. (Service of Process Deadline 3/13/2025) Fee due by 12/16/2024.(cjd) (Entered: 12/13/2024) |
| 12/13/2024 | 2 | CIVIL COVER SHEET. (cjd) (Entered: 12/13/2024) |
| 12/13/2024 | 3 | RULE 7.1 DISCLOSURE STATEMENT by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB. (cjd) (Entered: 12/13/2024) |
| 12/13/2024 | 4 | Summonses Issued as to All Defendants.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(Attachments: # 1 Summons to David R. Hastings, III, # 2 Summons to Sarah E. Leclaire, # 3 Summons to Dennis Marble, # 4 Summons to Beth Ahearn, # 5 Summons to Aaron M. Frey)(cjd) (Entered: 12/13/2024) |
| 12/13/2024 | 5 | CERTIFICATION for Admission Pro Hac Vice of Charles Miller filed by JOSHUA D. DUNLAP on behalf of All Plaintiffs (Total admission fee $ 200 receipt number AMEDC−3041986.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (DUNLAP, JOSHUA) (Entered: 12/13/2024) |
| 12/13/2024 | 6 | NOTICE of APPROVAL by Clerk's Office re 5 Certification for Admission Pro Hac Vice. Attorney CHARLES M. MILLER for DINNER TABLE ACTION FOR OUR FUTURE, and ALEX TITCOMB added to this specific case only. (lrt) (Entered: 12/13/2024) |
| 12/17/2024 | | Filing Fee Received from DINNER TABLE ACTION, FOR OUR FUTURE: Amount Paid: $405.00. Receipt Number: 3041972. Method of Payment: Credit Card. Purpose of Payment: Filing Fee. Date Paid: 12/13/2024 (nrg) (Entered: 12/17/2024) |
| 12/19/2024 | 7 | NOTICE of Hearing: Conference of Counsel set for 12/19/2024 01:30 PM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 12/19/2024) |
| 12/19/2024 | 8 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Conference of Counsel held. (Court Reporter: Lori Dunbar) (MGW) (Entered: 12/19/2024) |
| 12/19/2024 | 9 | NOTICE of Appearance by JONATHAN R. BOLTON on behalf of All Defendants (BOLTON, JONATHAN) (Entered: 12/19/2024) |
| 12/20/2024 | 10 | AGREEMENT of Acceptance of Service by DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE (Attachments: # 1 Sarah LeClaire, # 2 Dennis Marble, # 3 David R. Hastings, # 4 Beth H. Ahearn, # 5 Aaron M. Frey)(DUNLAP, JOSHUA) (Entered: 12/20/2024) |

| | | |
|---|---|---|
| 12/20/2024 | 11 | DECLARATION Regarding Consent to Magistrate Judge. The Parties CONSENT to the Magistrate Judge. (BOLTON, JONATHAN) (Entered: 12/20/2024) |
| 12/20/2024 | | SET Answer Deadline Regarding Acceptance of Service−State of Maine, for DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE per ECF No. 10: Answer due by 2/18/2025. (nrg) (Entered: 12/20/2024) |
| 12/20/2024 | 12 | REPORT AND ORDER. (Set Deadlines: Plaintiffs' Brief due by 1/15/2025; Defendants' Brief due by 2/14/2025; Plaintiffs' Reply Brief due by 2/28/2025.) By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 12/20/2024) |
| 12/20/2024 | | Reset Answer Deadline: Per Order #12, Defendants' Answer due by 1/6/2025. (MGW) (Entered: 12/20/2024) |
| 01/06/2025 | 13 | ANSWER to 1 Complaint,, by DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE.(BOLTON, JONATHAN) (Entered: 01/06/2025) |
| 01/10/2025 | 14 | Consent MOTION to Extend Time to File Brief by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB Responses due by 1/31/2025. (DUNLAP, JOSHUA) (Entered: 01/10/2025) |
| 01/13/2025 | 15 | ORDER granting 14 Motion to Extend Time By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 01/13/2025) |
| 01/13/2025 | | Reset Deadline Per Order #15: Plaintiffs' Brief due by 1/17/2025. (MGW) (Entered: 01/13/2025) |
| 01/17/2025 | 16 | MOTION for Permanent Injunction by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB Responses due by 2/7/2025. (Attachments: # 1 Declaration of Alex Titcomb)(DUNLAP, JOSHUA) (Entered: 01/17/2025) |
| 01/17/2025 | | RESET Deadlines as to 16 MOTION for Permanent Injunction per ECF No. 12: Responses due by 2/14/2025. (nrg) (Entered: 01/17/2025) |
| 01/24/2025 | 17 | MOTION to Intervene by EqualCitizens, Cara McCormick, Peter McCormick, RICHARD A. BENNETT Responses due by 2/14/2025. (Attachments: # 1 Exhibit Declaration of Senator Richard A. Bennett, # 2 Exhibit Declaration of Cara McCormick, # 3 Exhibit Declaration of Peter McCormick, # 4 Exhibit Declaration of Lawrence Lessig, # 5 Exhibit Intervenors' Answer)(KALLIN, DAVID) (Entered: 01/24/2025) |
| 01/24/2025 | 18 | RULE 7.1 DISCLOSURE STATEMENT by EqualCitizens. (KALLIN, DAVID) (Entered: 01/24/2025) |
| 01/24/2025 | 19 | CERTIFICATION for Admission Pro Hac Vice of Ezra P. Louvis filed by DAVID M. KALLIN on behalf of EqualCitizens, Cara McCormick, Peter McCormick, RICHARD A. BENNETT (Total admission fee $ 200 receipt number AMEDC−3059960.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (KALLIN, DAVID) (Entered: 01/24/2025) |
| 01/24/2025 | 20 | NOTICE of APPROVAL by Clerk's Office re 19 Certification for Admission Pro Hac Vice, Attorney EZRA P. LOUVIS for RICHARD A. BENNETT, EqualCitizens,Cara McCormick, and for Peter McCormick added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Louvis must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 1/31/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 01/24/2025) |
| 01/24/2025 | 21 | CERTIFICATION for Admission Pro Hac Vice of Neal Kumar Katyal filed by DAVID M. KALLIN on behalf of EqualCitizens, Cara McCormick, Peter McCormick, RICHARD A. BENNETT (Total admission fee $ 200 receipt number |

| | | |
|---|---|---|
| | | AMEDC−3060027.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (KALLIN, DAVID) (Entered: 01/24/2025) |
| 01/24/2025 | 22 | NOTICE of APPROVAL by Clerk's Office re 21 Certification for Admission Pro Hac Vice, Attorney NEAL KUMAR KATYAL for RICHARD A. BENNETT EqualCitizens,Cara McCormick, and for Peter McCormick added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Katyal must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 1/31/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 01/24/2025) |
| 01/24/2025 | 23 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA Responses due by 2/14/2025. (Attachments: # 1 Supplement Proposed Amicus Curiae Brief)(EILER, ASHLEY) (Entered: 01/24/2025) |
| 01/24/2025 | 24 | CERTIFICATION for Admission Pro Hac Vice of Andrew Woodson filed by ASHLEY ELISABETH EILER on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Total admission fee $ 200 receipt number AMEDC−3060162.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (EILER, ASHLEY) (Entered: 01/24/2025) |
| 01/24/2025 | 25 | CERTIFICATION for Admission Pro Hac Vice of Caleb Burns filed by ASHLEY ELISABETH EILER on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Total admission fee $ 200 receipt number AMEDC−3060163.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (EILER, ASHLEY) (Entered: 01/24/2025) |
| 01/24/2025 | 26 | CERTIFICATION for Admission Pro Hac Vice of William K. Lane III filed by ASHLEY ELISABETH EILER on behalf of CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA (Total admission fee $ 200 receipt number AMEDC−3060164.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (EILER, ASHLEY) (Entered: 01/24/2025) |
| 01/27/2025 | 27 | NOTICE of APPROVAL by Clerk's Office re 26 Certification for Admission Pro Hac Vice,, 24 Certification for Admission Pro Hac Vice,, 25 Certification for Admission Pro Hac Vice,, Attorney ANDREW G. WOODSON,CALEB BURNS,WILLIAM K. LANE, III for CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Burns and Lane must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 2/3/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 01/27/2025) |

| | | |
|---|---|---|
| 01/27/2025 | 28 | ORDER granting 23 Motion for Leave to File. The Chamber of Commerce for the United States of America shall file its amicus curiae brief on the docket by January 31, 2025. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 01/27/2025) |
| 01/27/2025 | | Set Deadline: Per Order #28, Chamber of Commerce for the United States of America's Amicus Curiae Brief due by 1/31/2025. (MGW) (Entered: 01/27/2025) |
| 01/27/2025 | 29 | BRIEF *of Amicus Curiae in Support of Plaintiffs' Motion for Permanent Injunction* by CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA. (EILER, ASHLEY) Modified on 1/28/2025 to remove duplicate filer text (mlm). (Entered: 01/27/2025) |
| 01/30/2025 | 30 | NOTICE of Hearing: Conference of Counsel set for 2/11/2025 01:00 PM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 01/30/2025) |
| 01/31/2025 | 31 | NOTICE of Appearance by ADAM R. COTE on behalf of EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT (COTE, ADAM) (Entered: 01/31/2025) |
| 02/07/2025 | 32 | Unopposed MOTION for Leave to File *an Amicus Brief* by Mainers for Working Families Responses due by 2/28/2025. (BRANN, PETER) (Entered: 02/07/2025) |
| 02/07/2025 | 33 | ORDER granting 32 Motion for Leave to File. Mainers for Working Families shall file its amicus curiae brief by February 21, 2025. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 02/07/2025) |
| 02/07/2025 | | Set Deadline Per Order #33, Mainers for Work Families' Amicus Curiae Brief due by 2/21/2025. (MGW) (Entered: 02/07/2025) |
| 02/07/2025 | 34 | RULE 7.1 DISCLOSURE STATEMENT by Mainers for Working Families. (BRANN, PETER) (Entered: 02/07/2025) |
| 02/10/2025 | 35 | RESPONSE in Opposition re 17 MOTION to Intervene filed by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB. Reply due by 2/24/2025. (DUNLAP, JOSHUA) (Entered: 02/10/2025) |
| 02/11/2025 | 36 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Conference of Counsel held. (Court Reporter: Lori Dunbar) (MGW) (Entered: 02/11/2025) |
| 02/11/2025 | 37 | ORDER. On February 11, 2025, I held a conference with Attorneys Miller, Dunlap, Bolton, Katyal, Louvis, and Kallin to discuss the schedule in light of the pending motion to intervene (ECF No. 17). At the outset, the Putative Intervenors expressed their desire to avoid any delay and willingness to file an early reply in support of their motion to intervene. They also orally consented to me presiding over this case. Accordingly, I ORDERED the Putative Intervenors to file their written consent to my jurisdiction by February 14, 2025, and their reply in support of their motion to intervene by February 18, 2025. Once the motion to intervene is fully briefed, I will resolve it as quickly as possible. The Putative Intervenors should be ready to file their response to the Plaintiffs' motion for permanent injunction−−whether in the form of a full−fledged opposition or an amicus brief−−shortly thereafter. The Defendants shall still file their opposition to the Plaintiff's motion for a permanent injunction by February 14, 2025, but may move to supplement that opposition, if necessary, after my ruling on the motion to intervene. (Set Deadline: Putative Intervenors' Written Declaration of Consent to Magistrate Judge due by 2/14/2025.) By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 02/11/2025) |
| 02/11/2025 | | Reset Deadline as to 17 MOTION to Intervene: Per Order #37, Reply due by 2/18/2025. (MGW) (Entered: 02/11/2025) |
| 02/13/2025 | 38 | CERTIFICATION for Admission Pro Hac Vice of John C Bonifaz filed by PETER J. BRANN on behalf of MAINERS FOR WORKING FAMILIES (Total admission fee $ 200 receipt number AMEDC−3069623.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: |

| | | |
|---|---|---|
| | | 02/13/2025) |
| 02/13/2025 | 39 | CERTIFICATION for Admission Pro Hac Vice of Ben Clements filed by PETER J. BRANN on behalf of MAINERS FOR WORKING FAMILIES (Total admission fee $ 200 receipt number AMEDC−3069642.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 02/13/2025) |
| 02/13/2025 | 40 | CERTIFICATION for Admission Pro Hac Vice of Courtney Hostetler filed by PETER J. BRANN on behalf of MAINERS FOR WORKING FAMILIES (Total admission fee $ 200 receipt number AMEDC−3069645.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 02/13/2025) |
| 02/13/2025 | 41 | CERTIFICATION for Admission Pro Hac Vice of Amira Mattar filed by PETER J. BRANN on behalf of MAINERS FOR WORKING FAMILIES (Total admission fee $ 200 receipt number AMEDC−3069646.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) Modified on 2/14/2025 to reflect this is an application for Amira Mattar (lrt). (Entered: 02/13/2025) |
| 02/13/2025 | 42 | CERTIFICATION for Admission Pro Hac Vice of Sage Snider filed by PETER J. BRANN on behalf of MAINERS FOR WORKING FAMILIES (Total admission fee $ 200 receipt number AMEDC−3069649.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 02/13/2025) |
| 02/14/2025 | 43 | NOTICE of APPROVAL by Clerk's Office re 38 Certification for Admission Pro Hac Vice,, 42 Certification for Admission Pro Hac Vice,, 41 Certification for Admission Pro Hac Vice,, 39 Certification for Admission Pro Hac Vice,, Attorney JOHN C. BONIFAZ,BEN CLEMENTS,COURTNEY HOSTETLER,AMIRA MARCELLA MATTAR,SAGE SNIDER for MAINERS FOR WORKING FAMILIES added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Snider must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 2/21/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 02/14/2025) |
| 02/14/2025 | 44 | DECLARATION Regarding Consent to Magistrate Judge. The Putative Intervenors CONSENT to the Magistrate Judge. (KALLIN, DAVID) Modified on 2/14/2025 to clarify who is consenting (lcb). (Entered: 02/14/2025) |
| 02/14/2025 | 45 | RESPONSE in Opposition re 16 MOTION for Permanent Injunction filed by DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE. Reply due by 2/28/2025. (Attachments: # 1 Affidavit of Jonathan Wayne, # 2 Exhibit A: Spending Data (2010−2024), # 3 Exhibit B: PAC Data (2022, 2024), # 4 Affidavit of Hilary Braseth, # 5 Exhibit A: Report, # 6 Affidavit of Jonathan Bolton, # 7 Exhibit A: Menendez Indictment, # 8 Exhibit B: Householder Indictment and Verdict, # 9 Exhibit C: LD 2232 Committee File, # 10 Exhibit D: Proclamation, # 11 Exhibit E: Text of Act)(BOLTON, JONATHAN) (Entered: 02/14/2025) |
| 02/18/2025 | 46 | REPLY to Response to Motion re 17 MOTION to Intervene filed by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT. (Attachments: # 1 Exhibit 1)(KALLIN, DAVID) (Entered: 02/18/2025) |

| | | |
|---|---|---|
| 02/19/2025 | 47 | NOTICE of Hearing on Motion 17 MOTION to Intervene: Oral Argument Hearing set for 2/24/2025 11:00 AM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 02/19/2025) |
| 02/21/2025 | 48 | AMICUS BRIEF re 16 MOTION for Permanent Injunction filed by MAINERS FOR WORKING FAMILIES. (BRANN, PETER) Modified on 2/24/2025 to clarify text and remove Reply deadline (jgd). (Entered: 02/21/2025) |
| 02/24/2025 | 49 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Oral Argument Hearing held re 17 MOTION to Intervene filed by RICHARD A BENNETT, CARA MCCORMICK, EQUALCITIZENS, PETER MCCORMICK. (Court Reporter: Lori Dunbar) (nrg) (Entered: 02/24/2025) |
| 02/24/2025 | 50 | NOTICE of Docket Entry Modification regarding 48 Amicus Brief: this docket entry was modified to change text from "Response to Motion" to "Amicus Brief". The parties should disregard the automatically calculated Reply deadline of 3/7/2025 that was set with the filing of ECF No. 48. The Reply deadline to 16 Motion for Permanent Injunction remains 2/28/2025. (jgd) (Entered: 02/24/2025) |
| 02/25/2025 | 51 | ORDER granting 17 Motion to Intervene. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 02/25/2025) |
| 02/25/2025 | | (Set Deadlines: Per Order #51, Intervenor−Defendants' Answer due by 2/26/2025; Intervenor−Defendants' Opposition to Motion for Permanent Injunction due by 2/26/2025; Plaintiff's Status Report due by 3/5/2025.) (MGW) (Entered: 02/25/2025) |
| 02/26/2025 | 52 | *Intervenors'* ANSWER to 1 Complaint,, by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT.(KALLIN, DAVID) (Entered: 02/26/2025) |
| 02/26/2025 | 53 | RESPONSE in Opposition re 16 MOTION for Permanent Injunction filed by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT. Reply due by 3/12/2025. (Attachments: # 1 Exhibit 1 − Jonathan Gienapp Declaration, # 2 Exhibit 2 − Jack Rakove Declaration, # 3 Exhibit 4 − Christopher Robertson Declaration)(KALLIN, DAVID) (Entered: 02/26/2025) |
| 03/05/2025 | 54 | STATUS REPORT by DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE. (BOLTON, JONATHAN) (Entered: 03/05/2025) |
| 03/07/2025 | 55 | ORDER. The deadline for the Plaintiffs' reply in support of their motion for a permanent injunction is extended to April 22, 2025; the Plaintiffs' reply may be up to twenty pages in length. The Defendants and Intervenor−Defendants may file surreplies by May 14, 2025, which shall be limited to seven pages each. The Clerk's Office is requested to schedule a conference of counsel on May 15 or 16, 2025, to discuss the anticipated hearing and other scheduling issues. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 03/07/2025) |
| 03/07/2025 | | Set Deadlines as to 16 MOTION for Permanent Injunction: Per Order #55, Plaintiffs' Reply due by 4/22/2025; Defendants' and Intervenor−Defendants' Surreplies due by 5/14/2025. (MGW) (Entered: 03/07/2025) |
| 03/13/2025 | 56 | NOTICE of Hearing: Conference of Counsel set for 5/15/2025 09:30 AM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 03/13/2025) |
| 04/02/2025 | 57 | CERTIFICATION for Admission Pro Hac Vice of Mackenzie Austin filed by DAVID M. KALLIN on behalf of EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT (Total admission fee $ 200 receipt number AMEDC−3090419.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (KALLIN, DAVID) (Entered: 04/02/2025) |
| 04/02/2025 | 58 | CERTIFICATION for Admission Pro Hac Vice of Nola Heller filed by DAVID M. KALLIN on behalf of EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT (Total admission fee $ 200 receipt number |

| | | |
|---|---|---|
| | | AMEDC−3090435.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (KALLIN, DAVID) (Entered: 04/02/2025) |
| 04/02/2025 | 59 | NOTICE of APPROVAL by Clerk's Office re 58 Certification for Admission Pro Hac Vice,, 57 Certification for Admission Pro Hac Vice,, Attorney MACKENZIE AUSTIN,NOLA B. HELLER for RICHARD A BENNETT,MACKENZIE AUSTIN,NOLA B. HELLER for EQUALCITIZENS,MACKENZIE AUSTIN,NOLA B. HELLER for CARA MCCORMICK,MACKENZIE AUSTIN,NOLA B. HELLER for PETER MCCORMICK added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Austin and Heller must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 4/9/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 04/02/2025) |
| 04/10/2025 | 60 | NOTICE of Hearing on Motion 16 MOTION for Permanent Injunction : Motion Hearing set for 5/22/2025 09:00 AM in Portland Courtroom 1 before MAGISTRATE JUDGE KAREN FRINK WOLF. (lcb) (Entered: 04/10/2025) |
| 04/22/2025 | 61 | REPLY to Response to Motion re 16 MOTION for Permanent Injunction filed by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB. (Attachments: # 1 Exhibit Jonathan Gienapp Transcript)(MILLER, CHARLES) (Entered: 04/22/2025) |
| 04/23/2025 | 62 | ADDITIONAL ATTACHMENTS filed by DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB re 61 Reply to Response to Motion . Main Document: Exhibit 2 Jonathan Wayne Transcript. (Attachments: # 1 Exhibit Hilary Braseth Transcript, # 2 Exhibit Jack Rakove Transcript, # 3 Exhibit Seth Tillman Declaration, # 4 Exhibit David Primo Declaration, # 5 Exhibit Christopher Robertson Transcript)(MILLER, CHARLES) (Entered: 04/23/2025) |
| 04/24/2025 | 63 | NOTICE of RESCHEDULED Hearing (LOCATION CHANGE ONLY) on Motion 16 MOTION for Permanent Injunction : Motion Hearing set for 5/22/2025 09:00 AM in Portland Courtroom 1 before MAGISTRATE JUDGE KAREN FRINK WOLF. (slg) Modified on 5/2/2025 to change back to courtroom 1 (mtm). (Entered: 04/24/2025) |
| 05/05/2025 | 64 | STIPULATION *Regarding Historians Declarations Which May Prove Helpful to the Court in Adjudicating This Case* by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT. (KATYAL, NEAL) (Entered: 05/05/2025) |
| 05/14/2025 | 65 | SUR−REPLY to Motion re 16 MOTION for Permanent Injunction filed by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT. (Attachments: # 1 Exhibit A − Declaration of Christopher Robertson)(KALLIN, DAVID) (Entered: 05/14/2025) |
| 05/14/2025 | 66 | SUR−REPLY to Motion re 16 MOTION for Permanent Injunction filed by DENNIS MARBLE, BETH N AHEARN, AARON M FREY, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE. (BOLTON, JONATHAN) (Entered: 05/14/2025) |
| 05/15/2025 | 67 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Conference of Counsel held. (Court Reporter: Tammy Martell) (MGW) (Entered: 05/15/2025) |
| 05/22/2025 | 68 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Motion Hearing held re 16 MOTION for Permanent Injunction filed by ALEX TITCOMB, FOR OUR FUTURE, DINNER TABLE ACTION. (Court Reporter: Lori Dunbar) (lcb) (Entered: 05/22/2025) |

| | | |
|---|---|---|
| 06/06/2025 | 69 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Oral Argument held on May 22, 2025, before Judge Karen Frink Wolf. Court Reporter/Transcriber: Lori Dunbar, Telephone Number: (207) 749−4072. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 9/4/2025. (DUNBAR, LORI) (Entered: 06/06/2025) |
| 06/06/2025 | 70 | MOTION by Attorney Mackenzie Austin to Withdraw as Attorney by EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A BENNETT Responses due by 6/27/2025. (KALLIN, DAVID) (Entered: 06/06/2025) |
| 06/09/2025 | 71 | ORDER granting 70 Motion of Attorney Austin to Withdraw as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 06/09/2025) |
| 07/01/2025 | 72 | MOTION by Attorney Amira Marcella Mattar to Withdraw as Attorney by MAINERS FOR WORKING FAMILIES Responses due by 7/22/2025. (MATTAR, AMIRA) (Entered: 07/01/2025) |
| 07/02/2025 | 73 | ORDER granting 72 Motion of Attorney Mattar to Withdraw as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 07/02/2025) |
| 07/15/2025 | 74 | ORDER granting 16 Motion for Permanent Injunction By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 07/15/2025) |
| 07/15/2025 | 75 | JUDGMENT By Nicholas Gordon, Deputy Clerk. (nrg) (Entered: 07/15/2025) |
| 07/24/2025 | 76 | NOTICE OF APPEAL by BETH N AHEARN, AARON M FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, DENNIS MARBLE, WILLIAM J SCHNEIDER . ( Filing fee $ 605 receipt number AMEDC−3143553.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (BOLTON, JONATHAN) (Entered: 07/24/2025) |
| 07/24/2025 | 77 | NOTICE OF APPEAL as to 74 Order on Motion for Permanent Injunction, 75 Judgment by RICHARD A BENNETT, EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK . ( Filing fee $ 605 receipt number AMEDC−3143676.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (KATYAL, NEAL) (Entered: 07/24/2025) |
| 07/25/2025 | 78 | APPEAL COVER SHEET Re: 76 Notice of Appeal (clp) (Entered: 07/25/2025) |
| 07/25/2025 | 79 | CLERK'S CERTIFICATE Re: 76 Notice of Appeal. Documents sent to the U.S. Court of Appeals. (clp) (Entered: 07/25/2025) |
| 07/25/2025 | 80 | APPEAL COVER SHEET Re: 77 Notice of Appeal (clp) (Entered: 07/25/2025) |

| | | |
|---|---|---|
| 07/25/2025 | 81 | CLERK'S CERTIFICATE Re: 77 Notice of Appeal. Documents sent to the U.S. Court of Appeals. (clp) (Entered: 07/25/2025) |
| 07/25/2025 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 76 Notice of Appeal, 77 Notice of Appeal, (clp) (Entered: 07/25/2025) |
| 07/25/2025 | 82 | USCA Case Number 24−00430 for 77 Notice of Appeal filed by RICHARD A BENNETT, CARA MCCORMICK, EQUALCITIZENS, PETER MCCORMICK. (slg) (Entered: 07/25/2025) |
| 07/25/2025 | 83 | USCA Case Number 25−1705 for 76 Notice of Appeal filed by DENNIS MARBLE, DAVID R HASTINGS, III, WILLIAM J SCHNEIDER, SARAH E LECLAIRE, BETH N AHEARN, AARON M FREY. (slg) (Entered: 07/25/2025) |
| 08/14/2025 | 84 | MOTION by Attorney Ezra Louvis to Withdraw as Attorney by RICHARD A BENNETT, EQUALCITIZENS, CARA MCCORMICK, PETER MCCORMICK Responses due by 9/4/2025. (LOUVIS, EZRA) (Entered: 08/14/2025) |
| 08/15/2025 | 85 | ORDER granting 84 Motion of Attorney Louvis to Withdraw as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 08/15/2025) |
| 08/25/2025 | 86 | NOTICE of Appearance by ERIC J. WYCOFF on behalf of DINNER TABLE ACTION, FOR OUR FUTURE, ALEX TITCOMB (WYCOFF, ERIC) (Entered: 08/25/2025) |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DINNER TABLE ACTION, FOR OUR FUTURE, and ALEX TITCOMB,

*Plaintiffs.*

v.

WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; and AARON M. FREY, in his official capacity as Attorney General of Maine,

*Defendants.*

Case No. 24-cv-_____

**COMPLAINT**

DECLARATORY AND INJUNCTIVE RELIEF SOUGHT



#17687042v2

## Introduction

Political campaigns matter to everyone. All Americans, not just those running for office, have a fundamental First Amendment right to talk about political campaigns. Their "independent expenditures," payments that fund political expression by those who are *not* running for office but nonetheless have something to say about a campaign, are a vital feature of our democracy.

Maine's just-enacted "Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" suppresses this classic method of speech and association in a manner that has been unanimously rejected by every circuit court to decide the issue. It limits contributions to a political action committee ("PAC") for the purpose of making independent expenditures, 21-A M.R.S. §§ 1015(2-C), 1015(2-D); requires the disclosure of all donors to PACs which make independent expenditures, *id.* § 1019-B(4);and mandates that independent expenditures by PACs only be made from funds raised subject to the contribution limits, *id.* § 1019-B(6). But plaintiff Dinner Table Action and its donors have the right to speak about other people's campaigns without limit, and to associate with each other for those purposes, privately.

There is no argument supporting the Act's validity under existing law. *See Citizens United v. FEC*, 558 U.S. 310 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (*en banc*). Rather, the Act's proponents designed it to prompt a test case, intended to reach the U.S. Supreme Court in the hopes of reversing *Citizens United*. Because the Act is patently (indeed, designedly) unconstitutional, this Court must enjoin it to secure Plaintiffs' fundamental rights.

## Jurisdiction and Venue

1. This Court has jurisdiction under 28 U.S.C. § 1331 over this action arising out of the First and Fourteenth Amendments to the United States Constitution; and under 42 U.S.C. § 1983, because it involves a deprivation of rights secured by the Constitution.



#17687042v2

2. Venue lies in this Court 28 U.S.C. § 1391 because all defendants reside in this judicial district, and the events giving rise to these claims occurred and are occurring here.

THE PARTIES

3. Plaintiff Dinner Table Action is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits. Dinner Table Action seeks to provide a voice for Mainers who believed in advancing limited government, free enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates. Dinner Table Action makes independent expenditures under 21-A M.R.S. § 1019-B.

4. Plaintiff For Our Future is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits. For Our Future seeks to advance conservative causes and candidates. For Our Future makes independent expenditures under 21-A M.R.S. § 1019-B, and contributes to other PACs for the purpose of those PACs making independent expenditures.

5. Plaintiff Alexander Titcomb is the co-founder, principal officer, a primary fundraiser, and Executive Director of Dinner Table Action.

6. Plaintiff Titcomb is also the founder, principal officer, and the primary fundraiser for For Our Future.

7. Defendant William J. Schneider is sued in his official capacity as the Chairman of the Maine Commission on Governmental Ethics and Election Practices, an independent state agency that (1) administers Maine's campaign finance laws, the Maine Clean Election Act, and the state's lobbying disclosure law, and (2) issues advisory opinions and conducts investigations regarding legislative ethics.

8. Defendant David R. Hastings III is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

9. Defendant Sarah E. LeClaire is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

10. Defendant Dennis Marble is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

11. Defendant Beth N. Ahearn is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

12. Defendant Aaron M. Frey is sued in his official capacity as Attorney General of Maine.

## STATEMENT OF FACTS

### *The preexisting regulatory scheme*

13. Maine law defines a "political action committee"("PAC") as "[a]ny separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate too political office," or "[a]ny person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office." *See* 21-A M.R.S. § 1052(5)(A)(1) and (5).

14. In any election, PACs as well as individuals may not contribute over $1950 to a gubernatorial candidate, over $475 to a legislative candidate, over $575 to a municipal candidate,

or over $975 to any other candidate, adjusted for inflation every two years commencing December 1, 2024. 21-A M.R.S. §§ 1015(1) and (2-B).

15. A person or political action committee who knowingly makes or accepts an unlawful contribution commits a Class E crime. 21-A M.R.S. § 1004(1). Such violations are punishable by up to six months' imprisonment, 17-A M.R.S. § 1604(1)(E), and by fines of up to $1,000 for individuals, *id.* § 1704(5), and $10,000 for organizations, *id.* § 1705(5).

16. Additionally, "[a] person that accepts or makes a contribution that exceeds the limitations . . . may be assessed a penalty of no more than the amount by which the contribution exceeded the limitation." 21-A M.R.S. § 1004-A(2).

17. The Commission has the power to "collect the full amount of any penalty . . ." 21-A M.R.S. §1004-B. "[F]ailure to pay the full amount of any penalty assessed by the commission . . . is a civil violation by the candidate, treasurer, party committee, political action committee, or other person." *Id.*

18. The penalized party generally has 30 days to pay the full amount of the penalty. *Id.*

19. If the penalized party fails to pay the penalty within 30 days, the Commission "shall report to the Attorney General the name of any person who has failed to pay the full amount of any penalty . . ." *Id.*

20. The Attorney General "shall enforce the violation in a civil action to collect the full outstanding amount of the penalty. . ." *Id.*



#17687042v2

*The Citizens Initiative*

21. A citizens' initiative entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act") appeared as Question 1 on Maine's November 5, 2024 election ballot, and was approved.

22. Per Article IV, Part Third, Section 19 of the Maine Constitution, the Governor must proclaim election results within ten days of the vote's certification. Legislation enacted by ballot initiative is effective 30 days following such proclamation. The vote on Question 1 was certified on or about November 25, 2024, and the Governor's proclamation followed the same day. Accordingly, the Act will take effect on or about December 25, 2024.

23. The Fiscal Impact Statement prepared by the Office of Fiscal and Program Review assembled by the Maine Secretary of State that appeared in the Maine Citizen's Guide to the Referendum Election of Tuesday, November 5, 2004 correctly noted: "As federal appeals courts have held that limits on contributions to political action committees that engage only in making independent expenditures violate free speech protections, it is possible that if this initiative becomes law the Commission could be a defendant in constitutional challenges by the parties impacted."

24. Section 1 of the Act, codified as 21-A M.R.S. § 1015(2)(C), imposes a limit of $5,000 per year for contributions made by an individual to a PAC for the purpose of making an independent expenditure.

25. Section 2 of the Act, codified as 21-A M.R.S. § 1015(2)(D), imposes a limit of $5,000 per year for contributions made by each PAC or business entity to a PAC for the purpose of making an independent expenditure.

26. Sections 3 of the Act amends 21-A M.R.S. § 1019-B(4)(B) to require any person, party committee, or PAC that makes any independent expenditure exceeding $250 to file reports itemizing the total contributions from each of their contributors.

27. Section 4 of the Act, codified as 21-A M.R.S. 1019-B(6), provides that PACs may only make independent expenditures from funds received subject to the contribution limits for independent expenditures, and to keep an account of all such contributions.

*The Act's Impact*
*on Plaintiffs' speech and association rights*

28. Dinner Table Action raised over $489,880 during the 2022 election cycle—a historic amount for a political action committee in Maine.

29. During the 2024 cycle, Dinner Table Action has raised over $454,000.

30. Over one-third of the value of donations Dinner Table Actions has received thus far in 2024 have been from individuals or entities that have donated in excess of $5,000 in a calendar year.

31. In 2022, the top five individual donors to Dinner Table Action each contributed more than $10,000.00, while the Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to Dinner Table Action.

32. In 2023, Dinner Table Action was subject to a short-lived law that restricted the amount of funds it could raise. The law was quickly repealed after Dinner Table Action sued. Nevertheless, Dinner Table Action still received three individual contributions in excess of $5,000 that year.

33. In 2024, the top six donors to Dinner Table Action each contributed more than $5,000.

34. So far in 2024, Dinner Table Action has raised $291,215.42 in donations for independent expenditures, $168,655 of which came from the top six donors.

35. More than half of Dinner Table Action's receipts for independent expenditures in 2024 came from these six donors.

36. In 2024, Dinner Table Action made over $375,000 in independent expenditures in Maine elections in support of or opposition to candidates for office across the state, including to send mailers, postcards, and hand- written letters; purchase radio and digital advertisements; pay for phone calls and text messages; and to organize door knocking and events.

37. Dinner Table Action regularly receives contributions of less than $50 from individual contributors.

38. Under prior Maine law, the identity of such contributors was not required to be reported.

39. For reasons personal to them, multiple contributors have indicated to Plaintiff Titcomb that they would not contribute to Dinner Table Action if their identities would be publicly disclosed.

40. Because the Act does not contain a threshold below which the identity of a contributor will not be disclosed, at least some of these contributors will stop contributing to Dinner Table Action.

41. Going forward, several donors will contribute over $5,000 per year to Dinner Table Action for the purposes of having Dinner Table Action make independent expenditures, and Dinner Table Action will spend that money make similar expenditures as it has in the past, and to also potentially purchase newspaper and print advertisements.

42. One such donor is Plaintiff For Our Future.



#17687042v2

43. For Our Future donated over $230,000 to other PACs in 2024, including $100,000 to Dinner Table Action, for the recipients to use for independent expenditures.

44. For Our Future will contribute in excess of $5,000 to Dinner Table Action per year for the purpose of independent expenditures in each of the next several years.

45. The Act would severely impair Dinner Table Action's ability to successfully and fully communicate its election-related views, and severely impair Dinner Table Action's ability to associate with its donors, including Plaintiff For Our Future and its donors, as it limits the amount of money that Dinner Table Action has available to speak by limiting and dissuading contributions. It limits Dinner Table Action donors' abilities to associate with each other in making independent expenditures.

46. For Our Future also contributes in excess of $5,000 per year to other Maine PACs for the purpose of the recipient making independent expenditures.

47. For instance, in 2024, For Our Future contributed more than $5,000 to Women's Leadership Fund, Fight for Freedom, and Free Maine Campaign.

48. For Our Future intends to make contributions in excess of $5,000 annually to these or other Maine PACs for the purpose of independent expenditures perpetually into the future.

49. The Act will severely impair For Our Future' ability to associate with the PACs to which it contributes, including Plaintiff Dinner Table Action, and with other donors, as it limits the amount of money that For Our Future can contribute to other PACs for use in making independent expenditures.

50. For Our Future receives donations in excess of $5,000 for the purpose of making independent expenditures.

51. For example, a single contributor contributed well in excess of $5,000 to For Our Future for the purpose of making independent expenditures in each year that For Our Future has existed and is expected to do so again in future years.

52. In 2024, For Our Future made independent expenditures supporting or opposing several candidates for office in Maine. It intends to do so perpetually into the future.

53. Because For Our Future has been exclusively funded by donations in excess of $5,000, the Act will cripple For Our Future's ability to receive anywhere near the level of contributions it currently receives, which in turn would all but eliminate its ability to make independent expenditures or contributions for independent expenditures, thereby stifling its ability to successfully and fully communicate its election related views, and to associate with others for the purpose of making their election related views known.

54. Section 4 of the Act requires a PAC to segregate funds received for independent expenditures and permits a PAC to spend only those funds received in compliance with the Act on independent expenditures. This requirement is based on the date the expenditure is made, not the date that it was received. Accordingly, funds held by a PAC now that were contributions of more than $5,000 will not be permitted to be spent for independent expenditures once the Act takes effect.

55. Dinner Table Action still has on hand over $30,000 available for independent expenditures; $27,224.80 of which is part of a $50,000 contribution from For Our Future made on October 7, 2024.

56. Dinner Table Action raised funds and made independent expenditure in support of local candidates in "off year" elections in the past, and intends to do so again in 2025. Dinner Table Action intends to keep soliciting and accepting contributions exceeding $5,000 for the

purpose of making independent expenditures, and it intends to spend its cash-on-hand already raised in amounts exceeding $5,000, after the Act's effective date. Dinner Table Action will make these independent expenditures to express itself about local races in 2025, and in further campaigns indefinitely going forward as it has done for years.

57. For Our Future has approximately $40,000 on hand, all of which was received from a single contributor. For Our Future intends to use most of these funds to either make independent expenditures or to contribute to other PACs for the purpose of those PACs making independent expenditures in Maine.

58. Thus, Plaintiffs are adversely impacted by the Act.

## COUNT I
## CONTRIBUTION AND EXPENDITURE LIMITS
## RIGHTS OF FREE SPEECH AND ASSOCIATION
## U.S. CONST. AMENDS. I, XIV — 42 U.S.C. § 1983

59. Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 above.

60. The First Amendment protects both political association and political expression. The Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon v. FEC*, 572 U.S. 185, 191–92 (2014) (plurality opinion). Furthermore, "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) (internal quotes omitted).

61. Laws that limit the amount of money a person may give to a political action committee for the purpose of making independent expenditures intrude upon both of those First Amendment interests and infringe on the rights of contributors, as well as on the rights of advocacy groups and the people who operate them.



#17687042v2

62. Government-imposed limits on political contributions must be closely drawn to match a sufficiently important interest. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam).

63. The only governmental interest that can justify limiting political contributions is an interest in preventing quid pro quo corruption or the appearance thereof.

64. Because, by definition, independent expenditures are not coordinated with a candidate, there is no risk of quid pro quo corruption to justify any restriction on contributions for the purpose of making independent expenditures.

65. The Act's limitations on contributions that PACs may receive from individuals, other committees, and business entities for the purpose of making independent expenditures, 21-A M.R.S. §§ 1015(2-C) and (2-D), and its corresponding expenditure restriction, 21-A M.R.S. § 1019-B(6), are not closely drawn to any sufficiently important governmental interest, and thus violate Dinner Table Action's and For Our Future's First Amendment rights to free speech and association, on their face and as applied to the contributions for independent expenditures that Plaintiffs Dinner Table Action and For Our Future would accept from individuals, other committees, and "business entities," including contributions for independent expenditures Dinner Table Action would accept from For Our Future.

66. The Act's contribution limits violate For Our Future's First Amendment rights to free speech and association, on their face and as-applied to the contributions that Plaintiff For Our Future would make to Dinner Table Action and/or to other committees for the purpose of making independent expenditures.

67. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the rights of free speech and association in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs are damaged

in violation of 42 U.S.C. § 1983 and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against the enforcement of Defendants' unconstitutional policies and practices under and owing to the Act.

68. Plaintiffs are also entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### COUNT II
### DISCLOSURE REQUIREMENTS
### RIGHTS OF FREE SPEECH AND ASSOCIATION
### U.S. CONST. AMENDS. I, XIV — 42 U.S.C. § 1983

69. Plaintiffs reallege and incorporate by reference paragraphs 1 through 58 above.

70. The Act's amendment of 21-A M.R.S. § 1019-B(4)(B) adds a requirement that PACs disclose to the Commission the total contributions from each contributor for independent expenditures.

71. Section 1019-B(4)(B) applies to all contributions for independent expenditures, no matter how small.

72. Section 1019-B(4)(B) is not necessary to prevent quid pro quo corruption.

73. Section 1019-B(4)(B) is overly burdensome because it contains no threshold below which disclosure of contributions are not required.

74. Section 1019-B(4)(B) chills speech and associational rights of individuals who wish to remain anonymous.

75. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the rights of free speech and association in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983 and, therefore, they are entitled to declaratory and preliminary

and permanent injunctive relief against the enforcement of Defendants' unconstitutional policies and practices under and owing to the Act.

76. Plaintiffs are also entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### COUNT III
### EQUAL PROTECTION
### U.S. CONST. AMEND. XIV — 42 U.S.C. § 1983

77. Plaintiffs reallege and incorporate by reference paragraphs 1-58.

78. The Fourteenth Amendment secures Plaintiffs' right to the equal protection of the law. The right to equal protection is most salient with respect to the exercise of fundamental rights, including the speech and associational rights protected by the First Amendment.

79. Maine allows for "party committees" under 21-A M.R.S. § 1013-A(3), which can make independent expenditures, *id.* § 1019-B(1). However, party committees are excluded from the definition of "political action committees." *See* 21-A M.R.S. § 1052(5)(B)(3). Accordingly, party committees are not subject to the Act's contribution limits.

80. PACs are similarly situated to party committees. Both make independent expenditures. Yet the Act treats them unequally with respect to contribution limits, based solely on a party committee being associated with a state, district, country or municipal party.

81. This unequal treatment places PACs at a significant competitive disadvantage relative to party committees in the ability to express themselves and associate with others. It tilts the political system in favor of entrenched party leadership, who can continue to raise and spend unlimited funds from unlimited sources in party committees, and against those who may pursue competing political visions.

82. The PAC restrictions also violate nearly every Mainer's right to equal protection because, unlike those who are in party leadership, they cannot fund, direct, or maintain a PAC free of contribution limits. The fund-raising restrictions penalize outsiders by hobbling their abilities to participate in the political process through PACs.

83. Limiting PACs' ability to make independent expenditures entrenches power within political parties.

84. For instance, a candidate who falls out of favor with party leadership might face a primary challenger backed by a party committee, with its unlimited fundraising potential. The disfavored candidate would be at a significant disadvantage because a PAC that would want to support the candidate would have strict limits on fundraising for independent expenditures.

85. No legitimate state interest, let alone a compelling or even important one, justifies such discrimination against PACs and those who would contribute to and otherwise associate with them.

86. Nor is such discrimination a least restrictive, narrowly tailored, direct, proportionate, or rational means of advancing any legitimate state interest.

87. The discrimination is simultaneously over- and underinclusive.

88. It is overinclusive because the restrictions are not necessary.

89. It is underinclusive because any legitimate public interest theoretically served by limiting the ability of PACs to raise funds for the purpose of making independent expenditures cannot be valid so long as party committees, run by political party leaders, are excluded from those limits.

90. The Act's contribution limits and corresponding accounting burdens violate Dinner Table Action's and For Our Future's Fourteenth Amendment right to equal protection, on



#17687042v2

their face and as-applied to the contributions that Plaintiffs Dinner Table Action and For Our Future would accept from individuals, other committees, and business entities for the purpose of making independent expenditures, including Dinner Table Action's ability to accept such contributions from For Our Future.

91. The Act's contribution limits violate For Our Future's Fourteenth Amendment right to equal protection, on their face and as-applied to the contributions that Plaintiff For Our Future would make to Dinner Table Action and to other committees for the purpose of making independent expenditures.

92. By preparing to enforce and enforcing the Act, Defendants, under color of law, deprive Plaintiffs of the right to equal protection in violation of the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983, and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Dinner Table Action, For Our Future, and Alex Titcomb request that judgment be entered in their favor and against Defendants as follows:

A. Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Act, on its face and as against Plaintiffs;

B. Declaratory relief consistent with the injunction;

C. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and



#17687042v2

D. Any other relief this Court may grant in its discretion.

Dated: December 13, 2024

Respectfully submitted,

*<u>/s/ Joshua Dunlap</u>*
Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
207-791-1350
jdunlap@pierceatwood.com
*Counsel of Record for Plaintiffs*

and

Charles Miller*
(**pro hac vice* to be submitted)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, DC 20036
202-301-9800
cmiller@ifs.org
*Counsel for Plaintiffs*



#17687042v2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

DINNER TABLE ACTION, FOR OUR FUTURE, and ALEX TITCOMB,

*Plaintiffs,*

v.

WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; and AARON M. FREY, in his official capacity as Attorney General of Maine,

*Defendants.*

Case No. 24-cv-00430-KFW

Magistrate Judge Karen Frink Wolf

**DECLARATION OF ALEX TITCOMB**

I, Alexander Titcomb, hereby declare the following based on my personal knowledge:

1. I am an adult and am competent to make this declaration.

2. I reside in Bowdoin, Sagadahoc County, Maine.

3. I am a plaintiff in this case.

4. I have been involved in Maine politics since 2012.

#17773832v1

5. After spending years volunteering with national political organizations, I realized that my time was better spent advocating on local Maine races and issues affecting all Mainers.

6. I was thus motivated to found Dinner Table Action in 2021 to provide a voice for Mainers who believed in advancing limited government, free enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates. I serve as the PAC's principal officer.

7. Dinner Table Action also seeks to grow the community and engage the people of Maine through training and various programming, such as hosting Dinner Table Events (DTEs), candidate and grassroots activist trainings, and volunteer nights.

8. Plaintiff Dinner Table Action is a political action committee formed under the laws of the State of Maine and is subject to the challenged fundraising limits.

9. Dinner Table Action seeks to provide a voice for Mainers who believed in advancing limited government, free enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates.

10. Dinner Table Action makes independent expenditures under 21-A MRSA § 1019-B.

11. For Our Future is a political action committee formed under Maine law and is subject to the challenged fundraising limits.

12. For Our Future seeks to advance conservative causes and candidates.

13. For Our Future makes independent expenditures under 21-A M.R.S. § 1019-B, and contributes to other PACs for the purpose of those PACs making independent expenditures.

14. I am the co-founder, principal officer, a primary fundraiser, and Executive Director of Dinner Table Action.

15. I am also the founder, principal officer, and the primary fundraiser for For Our Future.

16. Dinner Table Action raised over $489,880 during the 2022 election cycle—a historic amount for a political action committee in Maine.

17. During the 2024 cycle, Dinner Table Action raised over $454,000.

18. Over one-third of the value of donations Dinner Table Actions received in 2024 were from individuals or entities that donated in excess of $5,000 that year.

19. In 2022, the top five individual donors to Dinner Table Action each contributed more than $10,000.00.

20. The Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to Dinner Table Action.

21. In 2023, Dinner Table Action was subject to a short-lived law that restricted the amount of funds it could raise. The law was quickly repealed after Dinner Table Action sued.

22. Nevertheless, Dinner Table Action still received three individual contributions in excess of $5,000 that year.

23. In 2024, the top six donors to Dinner Table Action each contributed more than $5,000.

24. In 2024, Dinner Table Action raised $291,215.42 in donations for independent expenditures, $168,655 of which came from the top six donors.

25. More than half of Dinner Table Action's receipts for independent expenditures in 2024 came from the six largest donors.

26. In 2024, Dinner Table Action made over $375,000 in independent expenditures in Maine elections to send mailers, postcards, and hand-written letters; purchase digital advertisements; pay for phone calls and text messages, and to organize door knocking and events, in support of or opposition to candidates for office across the state.

27. Dinner Table Action regularly receives contributions of less than $50 from individual contributors.

28. Multiple contributors have indicated to me that they would not contribute to Dinner Table Action if their identities would be publicly disclosed.

29. If their identities must be disclosed, I understand that at least some of these small-dollar contributors will stop contributing to Dinner Table Action.

30. So long as the Act is not enforced, several donors will contribute over $5,000 per year to Dinner Table Action for the purposes of having Dinner Table Action make independent expenditures in the future.

31. Dinner Table Action will spend that money to make similar expenditures as it has in the past, and to also potentially purchase newspaper and print advertisements.

32. One such donor is Plaintiff For Our Future.

33. For Our Future donated over $230,000 to other PACs in 2024, including $100,000 to Dinner Table Action, for the recipients to use for independent expenditures.

34. For Our Future will contribute in excess of $5,000 to Dinner Table Action per year for the purpose of independent expenditures in each of the next several years.

35. The Act would severely impair Dinner Table Action's ability to successfully and fully communicate its election related views, and severely impair Dinner Table Action's ability to associate with its donors, including Plaintiff For Our Future and its donors, as it limits the amount of money that Dinner Table Action has available to speak by limiting and dissuading contributions.

36. The Act limits Dinner Table Action donors' abilities to associate with each other by limiting the amount of speech they can share via independent expenditures.

37. For Our Future also contributes in excess of $5,000 per year to other Maine PACs for the purpose of the recipient making independent expenditures.

38. For instance, in 2024, For Our Future contributed more than $5,000 to Women's Leadership Fund, Fight for Freedom and Free Maine Campaign.

39. For Our Future intends to make contributions in excess of $5,000 annually to these or other Maine PACs for the purpose of independent expenditures perpetually into the future.

40. The Act will severely impair For Our Future's ability to associate with the PACs to which it contributes, including Plaintiff Dinner Table Action, and with other donors, as it limits the amount of money that For Our Future can contribute to other PACs for use in making independent expenditures.

41. For Our Future receives donations in excess of $5,000 for the purpose of making independent expenditures.

42. For example, a single contributor contributed well in excess of $5,000 to For Our Future for the purpose of making independent expenditures in each year that For Our Future has existed and is expected to do so again in future years.

43. In 2024, For Our Future made independent expenditures supporting or opposing several candidates for office in Maine.

44. It intends to do so perpetually into the future.

45. Because For Our Future has been exclusively funded by donations in excess of $5,000, the Act will cripple For Our Future's ability to receive anywhere near the level of contributions it currently receives, which in turn would all but eliminate its ability to make independent expenditures or contributions for independent expenditures, thereby stifling its ability to

successfully and fully communicate its election related views, and to associate with others for the purpose of making their election related views known.

46. Dinner Table Action still has on hand over $30,000 available for independent expenditures; $27,224.80 of which is part of a $50,000 contribution from For Our Future made on October 7, 2024.

47. Dinner Table Action raised funds and made independent expenditures in support of local candidates in "off year" elections in the past, and intends to do so again in 2025.

48. Dinner Table Action intends to keep soliciting and accepting contributions exceeding $5,000 for the purpose of making independent expenditures, and it intends to spend its cash-on-hand already raised in amounts exceeding $5,000, going forward.

49. Dinner Table Action would make these independent expenditures to express itself about local races in 2025, and in further campaigns indefinitely going forward as it has done for years.

50. However, Dinner Table Action will refrain from doing all these things while the law is in effect so as to be in compliance with all laws, and avoid potential civil and criminal liability for itself and those with whom it associates.

51. For Our Future has approximately $20,000 on hand, all of which was received from a single contributor.

52. For Our Future intends to use most of these funds to either make independent expenditures or to contribute to other PACs for the purpose of those PACs making independent expenditures in Maine.

53. However, so long as the Act remains in effect, For Our Future will refrain from doing all these things so that it, and those with whom it would associate remain in compliance with all laws and avoid potential civil and criminal liability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2025.

*/s/ Alexander L Titcomb*
ALEXANDER TITCOMB



#17773832v1

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused a copy of the foregoing pleading to be filed with the Court's ECF filing system, which will cause an electronic notice to be sent to counsel of record.

Dated: January 17, 2025

*/s/ Joshua D. Dunlap*

Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: 207.791.1100
jdunlap@pierceatwood.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER, *et al.*,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF SENATOR RICHARD A. BENNETT**

1. I am a Senator of District 18 of the Maine State Senate. I was born and raised in Maine and my family has roots in Oxford County, Maine going back several generations. My wife Karen and I have two children who were born and raised in Maine, as well.

2. I have served in the Maine State Legislature for more than sixteen years. From 1990 to 1994, I served two terms in the Maine House of Representatives. I then went on to represent western Maine for four terms in the Maine Senate from 1996 to 2004. During that time, I was unanimously elected to serve as the President of the Maine Senate, a position which I held from 2001 to 2002. During my time in public office, I have served most recently on the Housing and Economic Development Committee, Appropriations and Financial Affairs Committee, Environment and Natural Resources Committee, and the Government Oversight Committee. For several years, I held positions on the boards of the Maine Heritage Policy Center and the Maine Conservation Voters. I won reelection to my seat in the Maine Senate in 2020 and 2022. Most recently, I won reelection for my third consecutive term as my District's representative during the November 2024 election cycle.

3. In Maine, politicians have the option to campaign under the Maine Clean Election Act, a voluntary program that places limitations on private contributions. The program is applicable to campaigns for the Maine House, Senate, and Governor. Candidates who run under the Act must demonstrate their grassroots support by collecting $5 qualifying contributions from voters in their district and agree not to raise or spend private money, beyond a limited amount of "seed money." There are limits on anonymous donations under the Maine Clean Election Act, as well. Once the candidate successfully qualifies under the Act, he or she receives a limited amount of public funds from the Maine Clean Election Fund, which the candidate can use to run his or her campaign. I believe this Act prevents quid pro quo corruption and the appearance of such corruption by providing public funding for elections.

4. I have campaigned during nine state election cycles in Maine. Since the voters passed the Maine Clean Election Act through a citizens' initiative in 1996, I have voluntarily chosen to campaign under the Act's limitations on private contributions. It has always been important to me to run a transparent and honest campaign because fair campaigns are the building blocks of fair elections. At most, a State Senate candidate that campaigns under the Maine Clean Election Act spends roughly $75,000 on a local campaign. But not all candidates who run for elected office in Maine choose to voluntarily abide by the Act's regulations. Candidates who choose not to run under the Maine Clean Election Act are not subject to the Act's spending limitations. In my races, I have run against candidates who campaign under the Maine Clean Election Act and those who do not.

5. During my time in elected office, I have been an ardent supporter of fair elections and election transparency. In the 131st Maine Legislature, I was the prime sponsor of a bill that would have required political action committees to disclose the original sources for donors who contribute

more than $5,000 in Maine elections. I have reintroduced that bill for consideration by the current Legislature. I was also the prime sponsor of a bill to prohibit foreign governments and the entities they control from spending money in Maine elections. I am currently the prime sponsor of a bill to expand Maine's Clean Election Act to races for sheriff and district attorney. Finally, I am the prime sponsor of joint resolutions calling for an Article V convention under the U.S. Constitution to allow for reasonable regulations on campaign spending.

6. Over the course of my long career, I have observed that local elections in Maine have changed dramatically. When I started out in politics, candidates for local office depended in large part on donations from their local supporters in Maine. But in the 2010s, the electoral landscape began to change. Large political action committees, or SuperPACs, began to invest heavily in Maine elections. In my experience as a candidate and as a state legislator, anonymous, unregulated contributions to SuperPACs create an appearance of corruption, because they create a risk that politicians who benefit from these SuperPACs' are beholden to the SuperPACs' contributors and will engage in quid-pro-quo corruption.

7. Over the last decade, I have witnessed broader changes to Maine's electoral process that are particularly damaging to the integrity of our democratic processes. SuperPACs spend enormous sums of money to ensure that the issues that their out-of-state supporters find most important take centerstage during election season, to the detriment of local issues that matter to local voters. This spending is possible because of anonymous, unregulated donations to SuperPACs. Through this spending, SuperPACs change the tenor of local races with large-scale advertising campaigns and social media blitzes. The size of this spending in Maine creates the appearance of quid-pro-quo corruption. As a result, Maine citizens are discouraged from donating to candidates, participating in political campaigns, and even from voting, because they do not wish

to participate in a system that they believe is corrupt, or at a minimum, appears to be corrupt. This lack of participation by Maine citizens in turn means that Maine politicians are less likely to engage with the local issues that really matter to Maine citizens, and instead focus on the issues raised by SuperPACs. I believe this fundamentally injures legislators like me who want to engage with local Maine voters and work with other legislators to pass legislation to address local issues.

8. The influence of SuperPACs reaches beyond the election season and into state governance more generally. From my experience serving in the State Legislature, I have personal knowledge that elected officials may flinch in the performance of their duties because any stray remark or vote could attract the ire of an unfriendly SuperPAC, potentially dooming the politician's chances of success in the subsequent election. Legislators are often worried that one misstep could be exploited as a centerpiece of their opponent's next SuperPAC-backed campaign. This enhances the appearance of corruption in Maine's political system, because it means that legislators are not performing their duties to the fullest as a result of SuperPAC-funded advertising campaigns, often paid for by anonymous individuals. This harms legislators like me, who benefit from a robust debate before the passage of new legislation, and individual Maine voters like me, who likewise benefit when the fullest range of viewpoints is aired prior to the passage of legislation.

9. I personally know several Maine citizens who would run for office but choose not to because of the influence of unregulated SuperPAC spending on the system and the appearance of corruption it creates. Potential candidates do not want to run against candidates that appear to benefit from quid-pro-quo corruption as a result of unregulated SuperPAC contributions, and as a result, these citizens choose not to run at all. This hurts me in my role as legislator, because strong candidates who may have won elections never even run for office, so I do not have an opportunity

to collaborate with them to pass legislation to benefit Maine citizens. It also hurts me in my role as a citizen, as I have fewer options when voting for candidates for state office.

10. Based on my experience running campaigns in Maine, I have witnessed first-hand how the system in Maine in particular is susceptible to corruption and the appearance of corruption. In our small state, it does not take much money to move the needle in an election. An out-of-state infusion of $1,000,000 can be a gamechanger in a race against a candidate running under the Maine Clean Election Act that has less than one-tenth the funds with which to compete. An anonymous donation of $500,000 in support of a referendum can be transformational at the local level. I believe unregulated donations to SuperPACs create an appearance of corruption in Maine because they create a risk that a legislator will be beholden to the SuperPAC and its donors once elected to office.

11. Given the negative influence of SuperPACs in Maine, I strongly support the Act to Limit Contributions to Political Action Committees That Make Independent Expenditures. The Act places limits on contributions to SuperPACs and requires disclosure of contributors to such groups. During the November 2024 election cycle, I attended meetings to encourage support for the Act and testified before a Legislative committee during a hearing to determine whether the Legislature should adopt the bill. I feel strongly that the Act will play an important role in restoring faith in Maine elections by decreasing the appearance of corruption from anonymous, unlimited SuperPAC contributions.

12. At bottom, the Act allows candidates to be in control of their campaigns, focus on the issues that are most important to voters, and remain accountable to their constituents. This is essential to reducing the appearance of corruption in Maine elections and the legislative process. If this Act is struck down or otherwise curtailed, I will continue to fight for fair elections in Maine, including

by introducing legislation through my role as a Maine State Senator to promote fair elections and address the appearance of corruption in Maine elections.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of January, 2025.

*s/ Richard A. Bennett*
Richard A. Bennett

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM J. SCHNEIDER, *et al.*,<br><br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF CARA MCCORMICK**

1. I am a resident and voter in the state of Maine. My husband, Peter McCormick, and I moved to Maine over 19 years ago and have lived here ever since. We have two sons who were born and raised in Maine.

2. My husband is a retired master electrician and former volunteer firefighter, and I am a research consultant. Since we became Maine residents, we have been heavily involved in local politics from a grassroots perspective, lending our efforts to campaign and canvass for local politicians and initiatives that we believe in. We have regularly voted in Maine elections since we moved to the state.

3. I have worked professionally on local and national political elections in every election cycle since 1991. In Maine in particular, I served as a senior advisor to Angus King during his first successful independent campaign for the United States Senate. I am the co-founder and co-lead of The Committee for Ranked Choice Voting, the historic campaign that made Maine the first state in the nation to adopt ranked choice voting for its state and federal elections. Until December 31, 2024. I was the CEO of The Chamberlain Project and the volunteer executive director of The Chamberlain Project Foundation, entities that supported ranked choice voting in Maine and around

the nation. My husband and I worked tirelessly to support and promote the ranked choice voting ballot initiative in Maine throughout 2014, 2015, and 2016. In the November 2016 election, Maine voters approved Question 5, the ranked choice voting ballot initiative, with 52% of the vote. In response to the Maine Legislature's attempt to amend the ranked choice voting ballot initiative on October 17, 2017, my husband and I mobilized extensive grassroots efforts to invoke the People's Veto to the proposed amendments. Maine voters approved the People's Veto by 53.88% on June 12, 2018, and ranked choice voting remains in effect for all federal primary and general elections in Maine. In 2019-2020, I also worked to protect ranked choice voting for President in Maine, after the Republican Party mounted an unsuccessful effort to repeal the law. Ranked choice voting has now been used in eight consecutive statewide elections in Maine without interruption.

4. Beginning in 2023, I spearheaded the campaign to secure a position on the ballot for the Act to Limit Contributions to Political Action Committees That Make Independent Expenditures during the November 2024 election cycle. The Act aims to curb the influence of SuperPACs in our local elections and imposes needed transparency requirements on campaign donations. My husband and I became involved in the campaign in support of the Act because we both feel discouraged and disheartened by the influence of SuperPACs on local Maine elections. In particular, we have witnessed how out-of-state money and influence in local elections and initiatives have created the appearance of corruption. In recent elections in particular, this out-of-state money has prevented local campaigns from focusing on local issues, to the detriment of Maine voters like me who care about such local issues and would like to see their legislators focus on them. My voice, and my interests, and the voices and interests of other ordinary Maine citizens who supported the Act, are significantly diluted by unlimited SuperPAC donations.

5. These unrelated, anonymous donations give rise to corruption, or the appearance of corruption, between the donor and the politician whom the SuperPAC supports. Without knowledge of who these donors are, we cannot protect the integrity of our political process, because no one can investigate whether the donations in fact led to corruption. We thus lack crucial information about candidates running for public office, and our elected officials, to ensure they represent the interests of Maine voters and do not make decisions based on corruption. The legislature has failed to adequately protect citizens' interests from the influence of SuperPACs on our elections, so I chose to take the problem into my own hands through the citizens' initiative process, rallying the people of Maine behind the Act.

6. From August 2023 up through the November 2024 election, my husband and I engaged in significant personal efforts to support the adoption of the Act. In total, we spent hundreds of hours on the campaign for the Act, including speaking with neighbors and friends, writing letters to newspaper editors, and enlisting volunteers to spread the word about the petition.

7. In August 2023, my husband and I submitted a petition to the Maine Secretary of State with the text of the proposed legislation and a summary of its purpose. Once the Secretary of State approved our petition, my husband and I collected approximately 800 signatures in a single day. Once the campaign had acquired sufficient signatures, we returned our petitions to the Secretary of State who affirmed the petition's validity.

8. Pursuant to the Constitution of Maine, the initiative was then presented to the Maine Legislature so that members of the Senate and House of Representatives in Maine had the opportunity to enact the bill before it went to a people's vote on the November 2024 ballot. The Joint Committee for Veterans and Legal Affairs held a hearing on the proposed bill. Our eldest son, John Christopher McCormick, his classmate Saga Hart, and several other voters including

Peter Murray, and I all testified at the hearing, describing the importance of the bill to the Maine political process. In particular, I highlighted the risk of corruption absent limits on SuperPAC contributions, the belief of Maine citizens that our political system is broken in light of the potential for SuperPAC-related corruption, and the need for a clear ruling upholding the law. Despite overwhelming public support for the bill, as demonstrated by the almost 70,000 signatures that were collected from registered voters, the Legislature chose to take no action on the bill and thus the Act was sent to a voters' referendum.

9. Per Maine election regulations, the Secretary of State drafted the ballot question and asked for public comment. The initial language the Secretary proposed did not refer to "political action committees" at all, which I found surprising given that the citizens' initiative was intended to regulate SuperPAC donations. Given my and my husband's firm conviction that the influence of SuperPACs must be limited, we submitted a public comment insisting that the Secretary change the language of the initiative to fix her vague wording and directly reference political action committees. The Secretary of State ultimately relented, noting the Act's application to SuperPACs in the "Intent and Content" description of the Act in the official "Maine Citizen's Guide to the Referendum Election."

10. Once the language of the referendum was settled, we began a year-long grassroots campaign to educate and inform Maine voters about the Act. We organized a group of students from our son's high school to get the word out about the initiative. We spoke to our neighbors and encouraged them to speak to others about the Act. We distributed lawn signs, bumper stickers, and mailings to reach Maine voters. We developed a website for interested voters to learn more about the Act's purpose and took to social media to publish regular posts about the Act. We wrote op-eds and letters to the editor for the two major newspapers in Maine: the Portland Press Herald and

the Bangor Daily News. We attended editorial board meetings and successfully convinced the two major newspapers in Maine to endorse and approve of the Act. We also commissioned polling to keep abreast of public opinion on the Act.

11. From my experience speaking and surveying Maine voters over the past 19 years, I have gained personal knowledge of the overwhelming view of Maine voters that both in-state and out-of-state monied interests are creating an appearance of corruption, if not actual corruption, by spending undisclosed and unregulated amounts of money to influence Maine politicians. In my experience, the citizens of Maine are deeply supportive of limiting and requiring disclosure of SuperPAC donations, as demonstrated by the fact that the Act passed with 74.9% approval in the November 2024 election. The initiative received more votes, 600,191, than any citizens' initiative or politician has ever received in any election in the history of the State of Maine.

12. From my experience campaigning for Question 1, I have gained personal knowledge that the citizens of Maine are well aware of the substantial negative impacts of SuperPAC funding on local elections. Ordinary Maine citizens understand why elected officials would choose to curry favor with anonymous megadonors to access their deep coffers and have experience how this dynamic contributes to poorer public policy. As a result, the citizens of Maine are dispirited by our institutions, convinced that the system is broken, and resolved that the root of those issues is the absence of campaign spending limits and donor transparency. For the citizens of Maine, this issue permeates all corners of the electoral process and gives off the appearance of corruption at the heart of our democracy.

13. I will be personally injured if the Act is invalidated. I have dedicated time and effort over many years to fighting for fair elections in Maine, as demonstrated by my work convincing Maine citizens to adopt ranked choice voting and place reasonable limits on contributions to SuperPACs

that make independent expenditures. This effort is substantial: I was the Chair of the campaign and the lead signatory for the effort. I spent hundreds of hours of my personal and professional time advocating for limits on contributions to SuperPACs that make independent expenditures, including by speaking with friends and neighbors, collecting signatures, helping to gather more than 120 endorsements of elected officials and other civic leaders, testifying before the Legislature in Augusta, attending two VLA hearings on LD2232, mailing and emailing letters, putting up "Yes on 1" signs, writing letters to the editor, attending fundraisers, meeting with editorial boards, giving interviews to state and national press outlets, filing regular campaign finance reports detailing our activities, and canvassing for votes. I thus have an interest in upholding the Act that goes far beyond that of an ordinary citizen. If the Act is invalidated, I will begin a new campaign to combat corruption and the appearance of corruption in Maine elections, which will again involve significant personal efforts, including evaluating options for a new citizens' initiative, drafting the initiative, and raising support for the initiative by personally canvassing friends and neighbors. This is time that I would not otherwise spend if the Act is upheld, given my personal belief that the Act is a successful measure to prevent corruption and the appearance of corruption in Maine elections.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of January, 2025.

*s/ Cara McCormick*
Cara McCormick

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION et al.,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER et al.,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF JONATHAN WAYNE**
**(pursuant to 28 U.S.C. § 1746)**

I, Jonathan Wayne, Esq., hereby declare as follows:

1. I am over the age of 18 and reside in Brunswick, Maine.

2. I am the Executive Director of the Maine Commission on Governmental Ethics and Election Practices ("the Commission"). In that capacity, I am also the official custodian of the campaign finance records of the Commission. I direct the day-to-day activities of the six-person staff of the Commission and report to the Commission, which consists of five appointed members who are private citizens. I have served as Executive Director since May 2003.

3. This declaration is based on my personal knowledge, including a review of records maintained by the Commission and data derived from those records. If called to testify, I could and would competently testify to these statements.

4. The Commission is the campaign finance agency for the State of Maine that administers and enforces all of Maine's campaign finance laws, as well as lobbyist registration and disclosure laws. It receives and monitors campaign finance reports filed by party

committees, candidate committees, political action committees (PACs) and ballot question committees.

5. All entities that meet the statutory definition of a PAC under 21-A M.R.S.A. § 1052(5)—which, with some exceptions, includes entities other than candidates or parties that spend more than $2,500 in a calendar year to influence an election for state or county office—are required to file periodic reports with the Commission disclosing information about the PAC's activities during the reporting period, including information about contributions received and expenditures made. *See* 21-A M.R.S.A. § 1060. Candidates for state and county office and political parties are required to file similar reports. *See* 21-A M.R.S.A. §§ 1017; 1017-A. In addition, anyone who makes an independent expenditure (IE) over $250 is required to file a disclosure report on a schedule set forth in Commission rules.

6. The Commission makes all of these reports available to the public at the website https://mainecampaignfinance.com/.

7. At the request of counsel, I worked with Commission employees to compile data from these public campaign finance reports concerning trends in overall campaign spending since 2010 as well as information concerning PACs that have been active in Maine's last two general elections, in 2022 and 2024. I have carefully reviewed the data set forth below and believe it to be an accurate summary of data maintained by the Commission.

*Trends in Maine Campaign Spending, 2010–2024*

8. We compiled data showing the amount of IE spending by PACs, as well as the amount of candidate contributions, in each election cycle since 2010. We separated out gubernatorial campaigns, which occur every four years and involve larger amounts of spending,

from all other state and county election spending. (The Commission does not regulate spending to influence federal elections.)

9. We also separated out spending by candidates participating in the Maine Clean Election Act (MCEA) program from spending by candidates accepting traditional campaign contributions ("trad." in the chart below), since candidates who receive MCEA funding are generally limited to spending only the public funds that are provided to them from the Maine Clean Election Fund, an amount that is capped by statute.

10. In the four gubernatorial races since 2010, the data show that IE spending by PACs in support or opposition to gubernatorial candidates has gone from $3,556,451 in 2010 to $13,651,412 in the 2022 election, a nearly fourfold increase. During the same period, spending by the campaigns themselves dropped, from $15,480,475 in 2010 to $8,465,788 in 2022. These elections varied in the number of candidates that ran in the primary and general election. The following chart, which shows PAC IE spending in orange and candidate spending in blue (traditional) and yellow (MCEA), summarizes the data:



11. In non-gubernatorial races during this period, candidates outspent PACs making IEs in each election. However, PAC IE spending roughly quadrupled during this time, going from $833,643 in 2010 to $3,531,727 in 2024. The chart below, with blue showing PAC IEs, and yellow and grey showing traditional and MCEA spending respectively by candidates, summarizes the data:




12. A true and correct copy of the data set used to create these tables is attached as Exhibit A.

*Recent PAC Spending in Maine*

13. Commission staff also looked in more detail at IE spending by PACs in the 2022 and 2024 elections.

14. In the 2022 election, there were 16 PACs registered with the Commission that made over $100,000 in IEs. Four of these PACs—Better Maine, Maine Families First, Maine Justice & Public Safety PAC, and Maine Strong—were single-candidate PACs in 2022, spending only to influence a single race. Another PAC, Maine Behind the Numbers, spent to influence

two races, with the remaining PACs reporting that they sought to influence between 13 and 69 races.

15. The 16 PACs collectively received $19,401,463 in contributions and spent $16,834,553 in IEs. These PACs collectively received 101 contributions of more than $5,000, ranging from $5,250 to $9,273,216. Forty-six of these contributions were for $25,000 or more, 23 were for $100,000 or more, and two were over $1 million.

16. In the 2024 election, which lacked a gubernatorial race, there were 8 PACs that made over $100,000 in IEs. These PACs reported seeking to influence between 10 and 59 races.

17. The 8 PACs collectively received $4,188,125 in contributions and spent $3,167,891 in IEs. These PACs collectively received 81 contributions of $5,000 or more, ranging from $5,103 to $600,000. Twenty-eight of these contributions were for $25,000 or more, and 10 were for $100,000 or more.

18. Tables showing the data supporting the above paragraphs are attached as Exhibit B.

*Examples of Recent PAC Activities in Maine*
*According to Filings with the Commission*

19. A PAC called Better Maine spent $9,221,777 on IEs to support a single candidate in the 2022 election, the Democratic candidate for Governor. Better Maine was funded in part by a $9,273,216 contribution from the Democratic Governors Association and a $101,001 contribution from the organization EMILY's List Maine.

20. A PAC called Maine Families First spent $2,896,310 on IEs to support a single candidate in the 2022 election, the Republican candidate for Governor. The PAC was funded solely by contributions from a single individual from New York.

21. A PAC called Maine Justice & Public Safety PAC spent $384,345 on IEs in a single district attorney race in 2022. The PAC was funded by contributions from a single entity. The two candidates in that race, Jonathan Sahrbeck and Jacqueline Sartoris, made expenditures in that race of $54,120.13 and $22,657.55 respectively.

22. A PAC called Rebuild Maine spent $244,855 on IEs to support various Democratic legislative candidates. The PAC's largest contributor, the advocacy organization Maine People's Alliance, contributed a total of $265,000 to the PAC during the 2022 election cycle.

23. Dinner Table Action PAC spent $267,929 on IEs in 2022 to influence 25 races. The PAC's largest contributor that year, an individual from Georgia, contributed $50,480 to the PAC during the 2022 election cycle, and the PAC had 5 other contributors who gave more than $5,000.

24. Dinner Table Action PAC spent $377,770.37 on IEs in 2024 to influence 10 races. The PAC's largest contributor that year, an entity, gave $100,000, and the PAC had 5 other contributors who gave more than $5,000.

25. In 2021–2022, according to Dinner Table Action PAC's reports filed with the Commission, $341,129.77 of the PAC's total contributions received of $502,114.77 were from contributors who gave $5,000 or less.

26. In 2023–2024, according to Dinner Table Action PAC's reports filed with the Commission, $274,880.76 of Dinner Table Action PAC's total contributions received of $519,810.76 were from contributors who gave $5,000 or less.

*Party IE Spending*

27. I also directed Commission staff to calculate total IE spending by political party committees during the relevant periods. Commission records show that party IEs have increased in years with gubernatorial elections but remained relatively flat in other years. They also show party IEs in the two most recent elections are significantly below both PAC IEs and expenditures by candidates:

| Year | Total PAC IEs | Total Party IEs | Total Candidate Spending |
|---|---|---|---|
| 2010 | $4,390,094.94 | $1,584,040.03 | $19,345,959.41 |
| 2012 | $1,607,278.62 | $1,762,801.10 | $3,483,002.48 |
| 2014 | $11,502,180.63 | $1,804,717.75 | $12,052,508.46 |
| 2016 | $1,483,275.20 | $1,650,535.65 | $4,711,066.67 |
| 2018 | $9,551,371.37 | $4,582,771.90 | $15,945,273.57 |
| 2020 | $1,354,811.62 | $1,532,604.07 | $5,354,458.66 |
| 2022 | $17,182,245.97 | $9,737,903.27 | $14,812,123.62 |
| 2024 | $3,531,727.89 | $1,885,380.74 | $5,570,632.75 |

*Interpretation of Disclosure Provision*

28. Maine law requires anyone who makes an IE over $250 to report certain information about those IEs on a schedule set forth in Commission rules. *See* 21-A M.R.S.A. § 1019-B(4). Under those rules, all qualifying IEs made more than 60 days before the relevant election must be included in a report filed on the 60th day before the election. Between the 60th day and the 14th day before the election, IEs must be reported within two calendar days of the expenditure. And after the 14th day before the election, IEs must be reported within one day of the expenditure. *See* 94-270 C.M.R. ch. 1, § 10(3).

29. The Act amends the provision of § 1019-B(4) describing the information that must be included in each IE report to add "an itemized account of the total contributions for each contributor." I.B. 5, § 3. The Act does not, however, alter the law's provision that an obligation to file a report is triggered only by the making of an IE of over $250.

30. Because contributions by themselves do not trigger a reporting obligation, Commission staff does not understand the Act to require reporting of contributions that have not yet been used for IEs. Rather, Commission staff's view is that the Act requires reporting of all contributions actually used to finance the IEs that are required to be disclosed in the IE report.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 14, 2025

/s/ Jonathan Wayne
JONATHAN WAYNE
Executive Director
Maine Commission on
Governmental Ethics and
Election Practices

**Total Candidate and PAC IE Spending (2010-2024)**

| | 2010 | 2012 | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|---|
| **Gubernatorial Races** | | | | | | | | |
| *Candidate Spending (MCEA)* | *$ 3,237,764.58* | | *$ -* | | *$ 2,947,792.11* | | *$ -* | |
| *Candidate Spending (Traditional)* | *$ 12,242,710.65* | | *$ 8,198,515.22* | | *$ 7,923,225.76* | | *$ 8,465,788.36* | |
| Total Candidate Spending | $ 15,480,475.23 | | $ 8,198,515.22 | | $ 10,871,017.87 | | $ 8,465,788.36 | |
| PAC IEs | $ 3,556,451.23 | | $ 10,277,526.71 | | $ 8,217,259.65 | | $ 13,651,412.62 | |
| | | | | | | | | |
| **Other State and County Races** | | | | | | | | |
| *Candidate Spending (MCEA)* | *$ 3,204,183.74* | *$ 2,070,398.96* | *$ 1,885,367.50* | *$ 3,209,208.07* | *$ 3,357,717.76* | *$ 3,755,093.22* | *$ 4,570,596.03* | *$ 4,270,418.05* |
| *Candidate Spending (Traditional)* | *$ 661,300.44* | *$ 1,412,603.52* | *$ 1,968,625.74* | *$ 1,501,858.60* | *$ 1,716,537.94* | *$ 1,599,365.44* | *$ 1,775,739.23* | *$ 1,300,214.70* |
| Total Candidate Spending | $ 3,865,484.18 | $ 3,483,002.48 | $ 3,853,993.24 | $ 4,711,066.67 | $ 5,074,255.70 | $ 5,354,458.66 | $ 6,346,335.26 | $ 5,570,632.75 |
| PAC IEs | $ 833,643.71 | $ 1,607,278.62 | $ 1,224,653.92 | $ 1,483,275.20 | $ 1,334,111.72 | $ 1,354,811.62 | $ 3,530,833.35 | $ 3,531,727.89 |

**PACs With Over $100,000 in Independent Expenditures (2022, 2024)**

| Committee Name | Year | Total Contributions | Total Spending | Total IE Spending | 5k+ Contributors | # Races S/O |
|---|---|---|---|---|---|---|
| American Leadership Committee - Maine | 2022 | $396,076.80 | $473,472.80 | $394,104.57 | 1 | 25 |
| Better Maine | 2022 | $9,381,132.68 | $9,381,132.68 | $9,221,777.91 | 3 | 1 |
| Blueprint for Maine's Future | 2022 | $246,500.00 | $246,483.98 | $244,503.98 | 1 | 36 |
| Citizens Who Support Maine's Public Schools | 2022 | $729,000.00 | $757,139.70 | $471,375.16 | 3 | 57 |
| Dinner Table Action | 2022 | $333,948.57 | $433,175.95 | $267,929.11 | 6 | 25 |
| House Republican Fund | 2022 | $522,786.78 | $571,067.84 | $223,529.12 | 11 | 69 |
| Maine Behind the Numbers | 2022 | $119,216.83 | $119,216.83 | $106,509.68 | 3 | 2 |
| MAINE CONSERVATION VOTERS ACTION FUND | 2022 | $1,088,103.00 | $977,575.67 | $817,282.21 | 6 | 36 |
| Maine Families First | 2022 | $2,945,000.00 | $2,930,354.57 | $2,896,310.07 | 2 | 1 |
| Maine Justice & Public Safety PAC | 2022 | $384,810.43 | $384,810.43 | $384,345.43 | 2 | 1 |
| MAINE SENATE REPUBLICAN MAJORITY | 2022 | $833,548.89 | $968,313.27 | $132,160.79 | 27 | 11 |
| Maine Strong | 2022 | $261,959.12 | $261,316.81 | $261,199.46 | 10 | 1 |
| Pine Tree Action PAC | 2022 | $184,029.60 | $183,650.42 | $176,450.80 | 1 | 13 |
| PLANNED PARENTHOOD MAINE ACTION FUND PAC | 2022 | $924,298.92 | $975,155.83 | $836,059.62 | 8 | 39 |
| REBUILD MAINE | 2022 | $894,891.26 | $861,667.66 | $244,854.50 | 16 | 44 |
| U.S. Term Limits | 2022 | $156,160.42 | $156,160.42 | $156,160.42 | 1 | 27 |
| **TOTAL** | | **$19,401,463.30** | **$19,680,694.86** | **$16,834,552.83** | **101** | |
| Citizens Who Support Maine's Public Schools | 2024 | $372,000.00 | $317,432.50 | $217,950.00 | 4 | 33 |
| Dinner Table Action | 2024 | $291,255.42 | $426,441.46 | $377,770.37 | 6 | 10 |
| The House Republican Fund | 2024 | $924,457.50 | $944,475.21 | $559,463.20 | 16 | 38 |
| MAINE CONSERVATION VOTERS ACTION FUND | 2024 | $248,792.29 | $263,461.44 | $204,089.04 | 5 | 24 |
| Maine Senate Republicans | 2024 | $1,115,073.72 | $1,334,266.64 | $961,843.13 | 21 | 14 |
| PLANNED PARENTHOOD MAINE ACTION FUND PAC | 2024 | $261,421.54 | $299,086.82 | $171,329.98 | 8 | 40 |
| REBUILD MAINE | 2024 | $640,750.00 | $693,540.06 | $348,440.06 | 18 | 59 |
| Renew the American Dream | 2024 | $334,375.00 | $329,000.71 | $327,005.62 | 3 | 18 |
| **TOTAL** | | **$4,188,125.47** | **$4,607,704.84** | **$3,167,891.40** | **81** | |

Wayne Declaration, Exhibit B

**Aggregate Contributions over $5,000 to PACs Making Over $100,000 in IEs (2022, 2024)**

| Committee Name | Year | Contributor | Total Contribution | In Kind Contribution |
|---|---|---|---|---|
| American Leadership Committee - Maine | 2022 | Democratic Legislative Campaign Committee | $474,222.80 | |
| Better Maine | 2022 | Democratic Governors Association | $9,273,216.82 | $15,148.91 |
| | 2022 | Emily's List Maine | $101,001.00 | |
| | 2022 | MAINE CONSERVATION VOTERS ACTION FUND | $5,914.86 | |
| Blueprint for Maine's Future | 2022 | Maine Civic Action | $243,500.00 | |
| Citizens Who Support Maine's Public Schools | 2022 | Maine Education Association | $264,000.00 | $10,224.77 |
| | 2022 | National Education Association | $165,000.00 | |
| | 2022 | NEA Advocacy Fund | $300,000.00 | |
| | 2024 | Maine Education Association | $247,000.00 | $2,815.32 |
| | 2024 | Maine Votes | | $8,317.00 |
| | 2024 | National Education Association | $25,000.00 | |
| | 2024 | NEA Advocacy Fund | $100,000.00 | |
| Dinner Table Action | 2022 | Edward Caldwell | $10,005.00 | |
| | 2022 | Norm Elvin | $9,500.00 | |
| | 2022 | Edwin Frost | $50,480.00 | |
| | 2022 | Maine Republican Party | $25,000.00 | |
| | 2022 | Make Liberty Win PAC | $45,000.00 | |
| | 2022 | We the People PAC | $10,000.00 | |
| | 2024 | Cordelia Lane | $8,000.00 | |
| | 2024 | Fight for Freedom | $22,640.00 | |
| | 2024 | For Our Future | $100,000.00 | |
| | 2024 | Free Maine Campaign | $25,000.00 | |
| | 2024 | Sean Burke | $6,015.00 | |
| | 2024 | Women's Leadership Fund | $7,000.00 | |
| House Republican Fund/The House Republican Fund | 2022 | ABC PAC | $10,000.00 | |
| | 2022 | AMERICAN CHEMISTRY COUNCIL | $11,500.00 | |
| | 2022 | Anthem Blue Cross Blue Shield | $7,000.00 | |
| | 2022 | AVANGRID MAINE PAC | $10,000.00 | |
| | 2022 | CHURCHILL DOWNS | $8,000.00 | |
| | 2022 | MAINE ASSOCIATION OF REALTORS PAC | $6,500.00 | |
| | 2022 | MAINE BANKERS ASSOCIATION POLITICAL ACTION COMMITTEE | $5,250.00 | |
| | 2022 | MAINE TRUCK PAC | $25,000.00 | |
| | 2022 | RAI Services Company | $6,000.00 | |
| | 2022 | Republican State Leadership Committee | $325,000.00 | |
| | 2022 | Spectrum Management Services Co LLC | $6,750.00 | |
| | 2024 | Altria Client Services LLC | $6,500.00 | |
| | 2024 | AVANGRID MAINE PAC | $10,500.00 | |
| | 2024 | Bernstein Shur | $5,500.00 | |
| | 2024 | Carrier Capital Group, LLC | $10,000.00 | |
| | 2024 | Charter Communications | $12,000.00 | |
| | 2024 | Churchill Downs | $10,000.00 | |
| | 2024 | Elevance Health, Inc. | $7,500.00 | |
| | 2024 | Faulkinghammer PAC | $21,000.00 | |
| | 2024 | Grover Gaming Inc. | $50,000.00 | |
| | 2024 | MAINE BANKERS ASSOCIATION POLITICAL ACTION COMMITTEE | $10,900.00 | |
| | 2024 | Maine Optometric Association | $5,500.00 | |
| | 2024 | MAINE TRUCK PAC | $15,000.00 | |
| | 2024 | Republican State Leadership Committee (RSLC) | $475,000.00 | |
| | 2024 | The Concord Fund | $100,000.00 | |
| | 2024 | Karleton Ward | $20,000.00 | |
| | 2024 | WOMEN'S LEADERSHIP FUND | $5,500.00 | |
| Maine Behind the Numbers | 2022 | Michael Lambert | $10,000.00 | |
| | 2022 | MECEP Action | $351.10 | $38,495.69 |
| | 2022 | Rebuild Maine | $50,000.00 | $5,000.00 |
| MAINE CONSERVATION VOTERS ACTION FUND | 2022 | Better Maine | | $5,914.86 |
| | 2022 | Sara Gideon | $25,000.00 | |
| | 2022 | League of Conservation Voters Victory Fund | $700,000.00 | |
| | 2022 | MAINE CONSERVATION VOTERS | $200,000.00 | $4,368.96 |
| | 2022 | Rebuild Maine | $110,100.00 | |
| | 2022 | Dan Tishman | $24,500.00 | |
| | 2024 | Daniel Amory | $5,103.45 | |
| | 2024 | Daniel Hildreth | $10,000.00 | |
| | 2024 | LCV Victory Fund | $170,000.00 | |
| | 2024 | Maine Votes | | $8,317.00 |
| | 2024 | Rebuild Maine | $85,000.00 | |
| Maine Families First | 2022 | Thomas Klingenstein | $2,945,000.00 | |
| | 2022 | American Principles Project | | $10,482.59 |
| Maine Justice & Public Safety PAC | 2022 | Democracy PAC II | $384,810.43 | |
| | 2022 | Justice & Public Safety PAC | | $56,121.30 |
| MAINE SENATE REPUBLICAN MAJORITY | 2022 | ABC PAC | $10,000.00 | |
| | 2022 | ALTRIA CLIENT SERVICES LLC | $10,000.00 | |
| | 2022 | AMERICAN CHEMISTRY COUNCIL | $12,500.00 | |
| | 2022 | Anthem Blue Cross Blue Shield | $7,500.00 | |
| | 2022 | AVANGRID MAINE PAC | $20,000.00 | |

| | | | | |
|---|---|---|---|---|
| | 2022 | Bernstein Shur | $5,500.00 | |
| | 2022 | Casella Waste Systems | $7,500.00 | |
| | 2022 | DIRIGO PAC | $7,580.00 | |
| | 2022 | GOPAC | $77,250.00 | |
| | 2022 | GOPAC Election Fund | $6,500.00 | |
| | 2022 | MAINE ASSOCIATION OF REALTORS PAC | $6,500.00 | |
| | 2022 | Maine Bankers Association | $5,250.00 | |
| | 2022 | Maine Beverage Association | $5,580.00 | |
| | 2022 | Maine Energy Marketers Association Energy PAC For Maine | $5,250.00 | |
| | 2022 | Maine Prosperity Alliance | $20,000.00 | |
| | 2022 | MAINE TRUCK PAC | $25,000.00 | |
| | 2022 | On the Road to Maine's Future | $30,000.00 | |
| | 2022 | Pelletier, John | $5,518.50 | |
| | 2022 | Pfizer PAC | $7,500.00 | |
| | 2022 | PhRMA | $10,600.00 | |
| | 2022 | PIERCE ATWOOD LLP | $5,500.00 | |
| | 2022 | Presque Isle Republican Committee | $21,000.00 | |
| | 2022 | PROSPERITY FOR MAINE'S FUTURE | $50,000.00 | |
| | 2022 | Republican State Leadership Committee | $200,000.00 | $22,000.00 |
| | 2022 | Spectrum Management Services | $6,500.00 | |
| | 2022 | STILL FED UP WITH TAXES | $85,000.00 | |
| | 2022 | Versant Power | $7,500.00 | |
| Maine Senate Republicans | 2024 | Altria Client Services LLC | $6,500.00 | |
| | 2024 | AVANGRID MAINE PAC | $10,500.00 | |
| | 2024 | Bernstein Shur | $5,500.00 | |
| | 2024 | Charter Communications | $12,500.00 | |
| | 2024 | Churchill Downs | $17,500.00 | |
| | 2024 | Elevance Health, Inc. | $7,500.00 | |
| | 2024 | Grover Gaming, Inc. | $50,000.00 | |
| | 2024 | James Johnston | $10,000.00 | |
| | 2024 | MAINE BANKERS ASSOCIATION POLITICAL ACTION COMMITTEE | $10,500.00 | |
| | 2024 | MAINE OPTOMETRIC ASSOCIATION PAC | $5,900.00 | |
| | 2024 | MAINE SENATE REPUBLICAN MAJORITY | $27,644.62 | |
| | 2024 | Maine Truck PAC | $15,000.00 | |
| | 2024 | Merck Sharp & Dohme LLC | $6,000.00 | |
| | 2024 | Ocean Associates, LLC | $6,000.00 | |
| | 2024 | On the Road to Maine's Future | $35,000.00 | |
| | 2024 | John Pelletier | $12,500.00 | |
| | 2024 | Republican State Leadership Committee | $600,000.00 | |
| | 2024 | Spectrum Management Services Co. LLC | $6,250.00 | |
| | 2024 | STILL FED UP WITH TAXES | $20,000.00 | |
| | 2024 | UNUM | $6,000.00 | |
| | 2024 | Karleton Ward | $20,000.00 | |
| Maine Strong | 2022 | Action Fund | $57,000.00 | |
| | 2022 | California Nurses Association/National Nurses Organizing Committee | $10,000.00 | |
| | 2022 | Democratic Legislative Campaign Committee | $50,000.00 | |
| | 2022 | MAINE SERVICE EMPLOYEES ASSOCIATION - PASER | $10,000.00 | |
| | 2022 | Painer's & Allied Trades DC #35 PAC | $25,000.00 | |
| | 2022 | Rebuild Maine | $15,000.00 | |
| | 2022 | Michael Sadowsky | $12,500.00 | |
| | 2022 | Nishad Singh | $12,500.00 | |
| | 2022 | Special Election Victory Fund | $6,709.12 | |
| | 2022 | The PAC for America's Future - ME | $50,000.00 | |
| Pine Tree Action PAC | 2022 | Forward Majority Action | $183,029.60 | |
| Planned Parenthood Maine Action Fund | 2022 | Better Maine | $200,000.00 | |
| | 2022 | Jennifer Goodspeed | $5,250.00 | |
| | 2022 | Karen Harris | $10,000.00 | |
| | 2022 | Margot Milliken | $15,000.00 | |
| | 2022 | Planned Parenthood Action Fund | $330,000.00 | |
| | 2022 | Planned Parenthood Votes | $100,000.00 | |
| | 2022 | Rebuild Maine | $221,000.00 | |
| | 2022 | Daniel Tishman | $24,500.00 | |
| | 2024 | John & Linda Coleman | $5,162.70 | |
| | 2024 | Scott Denman | $7,000.00 | |
| | 2024 | Rob Gips | $5,162.70 | |
| | 2024 | Diana Lee | $15,487.70 | |
| | 2024 | Maine Votes | $55,000.00 | $8,317.00 |
| | 2024 | Planned Parenthood Action Fund | $50,000.00 | |
| | 2024 | Rebuild Maine | $90,000.00 | $1,500.00 |
| | 2024 | Sheryl Tishman | $25,000.00 | |
| Rebuild Maine | 2022 | America Votes Action Fund | $90,000.00 | |
| | 2022 | American Federal of State, County, and Municipal Employees - AFSCME | $100,629.64 | $20,000.00 |
| | 2022 | Citizens Who Support Maine's Public Schools | $75,000.00 | |
| | 2022 | Communications Workers of America | $15,000.00 | |
| | 2022 | Daniel Hildreth | $10,000.00 | |
| | 2022 | MAINE CONSERVATION VOTERS | $40,000.00 | $2,387.42 |

| | | | | |
|---|---|---|---|---|
| | 2022 | MAINE DEMOCRATIC STATE COMMITTEE | | $17,540.20 |
| | 2022 | Maine Education Association | | $11,489.83 |
| | 2022 | MAINE PEOPLE'S ALLIANCE | $265,000.00 | $3,030.31 |
| | 2022 | MAINE PEOPLE'S ALLIANCE/MAINE VOTES | $147,500.00 | $38,190.16 |
| | 2022 | MSEA-SEIU LOCAL 1989 | $7,500.00 | $8,022.07 |
| | 2022 | Planned Parenthood Maine Action Fund | $15,000.00 | $3,812.13 |
| | 2022 | Professional Fire Fighters of Maine | $25,000.00 | |
| | 2022 | Sara Gideon for Maine | $25,000.00 | |
| | 2022 | SERVICE EMPLOYEES INTERNATIONAL UNION | $67,500.00 | |
| | 2022 | Waterfront Strategies | $11,261.62 | |
| | 2024 | Justin Alfond | $50,000.00 | |
| | 2024 | American Federal of State, County, and Municipal Employees - AFSCME | | $23,000.00 |
| | 2024 | Daniel Tishman | $65,000.00 | |
| | 2024 | Democratic Legislative Campaign Committee | $100,000.00 | |
| | 2024 | Elizabeth Marie Delucia-Harting | $15,000.00 | |
| | 2024 | Emily's List Maine | $25,000.00 | |
| | 2024 | Frederick "Fritz" Onion | $50,000.00 | |
| | 2024 | Lisa M. Gorman | $10,000.00 | |
| | 2024 | Maine Center for Economic Policy Action | $10,000.00 | |
| | 2024 | MAINE DEMOCRATIC STATE COMMITTEE | | $11,740.70 |
| | 2024 | Maine Votes | $80,000.00 | $18,313.35 |
| | 2024 | Michael Lambert | $20,000.00 | |
| | 2024 | Robert Monks | $25,000.00 | |
| | 2024 | MSEA-SEIU Local 1989 | $115,000.00 | $3,083.39 |
| | 2024 | Peter Milliken | $15,000.00 | |
| | 2024 | Planned Parenthood Maine Action Fund | | $6,550.00 |
| | 2024 | Susanna Weld | $25,000.00 | |
| | 2024 | Virginia and Robert French | $10,000.00 | |
| Renew the American Dream | 2024 | Maine Civic Action | $300,000.00 | |
| | 2024 | Revive Home Town Maine PAC | $7,500.00 | |
| | 2024 | STILL FED UP WITH TAXES | $20,000.00 | |
| U.S. Term Limits | 2022 | U.S. Term Limits | $156,160.42 | |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION et al.,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER et al.,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF HILARY BRASETH**
**(pursuant to 28 U.S.C. § 1746)**

I, Hilary Braseth, hereby declare as follows:

1. I am over the age of 18 and reside in Washington, DC.

2. I am the Executive Director of the organization OpenSecrets. OpenSecrets is a nonpartisan, independent, 501(c)(3) non-profit organization dedicated to providing the public with data and analysis concerning money in American politics. I have served as Executive Director since January 2024.

3. Part of OpenSecrets' mission is to collect, clean and create access to quality and timely data on money in politics. We collect this data from public filings made by candidates, political action committees, and other entities that make filings with the Federal Election Commission, with relevant state agencies, or with other relevant government agencies (like agencies that regulate lobbying). We clean the data, deduplicate it, code it, and integrate it into our database, which includes 600 million historical records that date back forty years. The OpenSecrets website, opensecrets.org, provides journalists, academics, and members of the public with detailed information concerning publicly reported campaign spending in federal

elections, and other financial political information. OpenSecrets data has been cited in tens of thousands of media articles and published works, including academic articles and books. In 2024, our website received 11 million unique visitors.

4. I was asked by defense counsel in this case to summarize data collected by OpenSecrets concerning contributions and expenditures at the federal level since 2010 by entities that make independent expenditures. I am not receiving any compensation from the defendants for this work.

5. I focused on two types of federal entities that make independent expenditures, super PACs and Carey Committees.

6. A super PAC, also known as an independent expenditure-only committee, is a type of political action committee that came into existence in 2010 following a federal court decision in *SpeechNow.org v. Federal Election Commission*. Super PACs may raise and spend unlimited sums of money for the sole purpose of making independent expenditures to support or oppose political candidates so long as they do not coordinate directly.

7. A Carey Committee is a hybrid political action committee that is not affiliated with a candidate and has the ability to operate both as a traditional PAC, contributing funds to a candidate's committee, and as a super PAC, which makes independent expenditures. To do so, Carey Committees must have a separate bank account for each purpose. The committee can collect unlimited contributions from almost any source for its independent expenditure account, but may not use those funds for its traditional PAC contributions. It is possible that a Carey Committee accepts unlimited contributions for its independent expenditure account but does not end up making any independent expenditures.

8. The report attached as Exhibit A compiles and summarizes various data maintained by OpenSecrets regarding trends in contributions to and expenditures by super PACs and Carey Committees since 2010. I oversaw the creation of this report, working with a volunteer and OpenSecrets staff. I have reviewed the data contained in the report and can confirm that it accurately reflects the data maintained by OpenSecrets and originating from the Federal Election Commission. If called to testify, I could and would competently testify to the statements above and in the attached report.

9. The data reported in Exhibit A combine super PAC data and Carey Committee data where noted. The data include all contributions to the super PAC and non-super PAC arms of Carey Committees as reported, regardless of whether the committees made independent expenditures. OpenSecrets makes best efforts to exclude Carey Committees that only received contributions to the non-super PAC arms. The data in the report on spending by super PACs and Carey Committees show only independent expenditures.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 14, 2025

/s/ Hilary Braseth
Hilary Braseth
Executive Director
OpenSecrets

# Exhibit A

### OpenSecrets Campaign Finance Data

### February 2025

The following tables summarize campaign finance data collected by OpenSecrets from federal government agencies. All data pertains to federal elections; this report does not address state or local elections.

## 1 Independent Expenditures by Multi-candidate and Single Candidate Super PACs

The data below show the number of super PACs active in election cycles spanning the last fourteen to fifteen years. Since 2012, the number of active super PACs increased from 280 to 745 in 2024. These groups spent $622.7 million in independent expenditures on elections in 2012 (presidential cycle), and that figure grew to $4.1 billion in 2024 — a 561.9% change. You can view this increase over time in the chart in Figure 2, and across the granular numbers in the tables below.

Table 1: **Number of Active Single-Candidate (SC) vs Multi-Candidate Super PACs per Cycle**

| Cycle | # Super PACs | # SC PACs | SC PAC Ratio | % Spending by SC PACs |
|---|---|---|---|---|
| 2012 | 280 | 101 | 36.1% | 45.8% |
| 2014 | 255 | 94 | 36.9% | 15.7% |
| 2016 | 412 | 161 | 39.1% | 51.4% |
| 2018 | 456 | 149 | 32.7% | 14.1% |
| 2020 | 675 | 250 | 37% | 36.1% |
| 2022 | 704 | 224 | 31.8% | 19.1% |
| 2024 | 745 | 305 | 40.9% | 47.2% |

** Includes Carey Committees. OpenSecrets did not track single-candidate groups as a sub-category in the 2010 cycle.

(See next page for additional figures)

Figure 1




Table 2: **Independent Expenditures by All Active Super PACs and Single-Candidate (SC) Super PACs by Cycle**

| Cycle | Super PACs Total | SC Super PACs Total | % Spending by SC PACs |
|---|---|---|---|
| 2010 | $62,621,749 | n/a | n/a |
| 2012 | $622,685,613 | $285,076,588 | 45.8% |
| 2014 | $347,830,494 | $54,437,263 | 15.7% |
| 2016 | $1,113,639,661 | $571,938,527 | 51.4% |
| 2018 | $894,271,023 | $126,328,636 | 14.1% |
| 2020 | $2,691,227,570 | $972,479,946 | 36.1% |
| 2022 | $1,932,081,813 | $368,731,623 | 19.1% |
| 2024 | $4,121,586,390 | $1,947,125,040 | 47.2% |
| **Total** | $11,785,944,313 | $4,326,117,623 | – |

** Includes Carey Committees. OpenSecrets did not track single-candidate groups as a sub-category in the 2010 cycle.

Figure 2




### 1.1 Summary:

- A total of $11,785,944,313 has been spent by super PACs in independent expenditures since 2010.
- From 2012 to 2024, the number of active registered super PACs increased 2.66-fold.

## 2 Dark Money by Cycle

OpenSecrets tracks the instance of contributions originating from "dark" or undisclosed sources. While super PACs legally must disclose their donors, because super PACs can accept money from 501(c)4 groups and corporations, there are instances of donors disclosed by super PACs that are opaque. OpenSecrets considers a contributor to be "dark" if unable to find evidence connecting a named entity to an identifiable individual or any business activities, or if the contributor is a nonprofit that is not required to disclose its own donors.

The below tables illustrate the instance of "dark" contributions to super PACs from 2010 to 2024. In 2012, 6.0% of the overall receipts to super PACs were from dark sources. That figure grew to 19.2% in 2024. In 2012, the total amount of money given to super PACs by dark sources was $50.1M and in 2024, approximately $1.3B, reflecting a 26-fold increase over those years. In short, the data show that the percentage and amount of super PAC receipts from dark sources has increased significantly over time.

Figure 3




Table 3: **Super PAC Receipts and Dark Super PAC Receipts by Cycle**

| Cycle | Total Super PAC Receipts | Dark Super PAC Receipts | Percentage |
|---|---|---|---|
| 2010 | $86,537,482 | $6,623,404 | 7.7% |
| 2012 | $829,993,699 | $50,054,166 | 6.0% |
| 2014 | $694,417,167 | $39,767,990 | 5.7% |
| 2016 | $1,758,560,611 | $71,674,593 | 4.1% |
| 2018 | $1,615,485,736 | $178,221,289 | 11.0% |
| 2020 | $4,142,070,877 | $651,479,032 | 15.7% |
| 2022 | $3,636,771,096 | $617,557,041 | 17.0% |
| 2024 | $6,872,032,572 | $1,316,592,536 | 19.2% |
| **Total** | $19,635,869,239 | $2,931,970,051 | – |

** Figures through the post-general 2024 FEC reports. Includes Carey Committees.

## 2.1 Summary:

- Since 2010, a total of $2,931,970,051 in dark contributions have been made to super PACs.
- Every election cycle since 2018 has seen an increase in the overall percentage of dark money accounted for in total super PAC receipts per cycle.

## 3 Itemized Super PAC Individual Donors

OpenSecrets assigns unique IDs to all donors, allowing tracking for total contributions across time and recipient. The data in this section highlights how many unique donors gave super PACs $1,000+ and $1 million+, and the percentage of overall donations that these contributions comprise.

In 2012, there were 20,282 unique donors, with 7,633 donors giving $1,000+, and 93 donors giving $1M+. In 2024, there were 302,747 donors (1,392.7% increase), with 76,260 donors giving $1,000+ (899% increase), and 337 donors giving $1M+ (262.4% increase).

The amounts given by $1M+ donors increased from $335M in 2012 to $2.5B in 2024 (654.5% increase). Granular data is shared across the tables and figures.

Table 4: **Unique Individual Donors Giving ≥ $1k to Super PACs per Cycle**

| Cycle | Unique Donors | Unique $1k+ Donors | Total from $1k+ Donors |
|---|---|---|---|
| 2010 | 6,576 | 2,018 | $36,093,280 |
| 2012 | 20,282 | 7,633 | $519,824,185 |
| 2014 | 23,977 | 7,816 | $381,424,816 |
| 2016 | 48,569 | 15,817 | $1,097,020,130 |
| 2018 | 60,917 | 16,687 | $913,655,446 |
| 2020 | 446,963 | 101,381 | $2,137,941,023 |
| 2022 | 167,254 | 49,247 | $1,788,701,614 |
| 2024 | 302,747 | 76,260 | $3,270,724,333 |
| **Total** | – | – | $10,145,384,827 |

** Figures through the post-general 2024 FEC reports. Includes Carey Committees. Amounts are aggregate amounts given by that contributor to super PACs in a cycle. ActBlue and WinRed were excluded from this analysis. These values reflect all individual donors who gave $200+ in aggregate. Organizations are not included.

Table 5: **Unique Individual Donors Giving ≥ $1M to Super PACs per Cycle**

| Cycle | Unique $1M+ Donors | % of Donor Pop | Total from $1M+ Donors | % of $ from $1M+ Donors |
|---|---|---|---|---|
| 2010 | 7 | 0.11% | $17,010,000 | 45% |
| 2012 | 93 | 0.46% | $334,980,465 | 63.9% |
| 2014 | 55 | 0.23% | $242,759,575 | 62.6% |
| 2016 | 146 | 0.30% | $823,382,589 | 74.2% |
| 2018 | 118 | 0.19% | $697,756,074 | 74.9% |
| 2020 | 217 | 0.05% | $1,530,606,012 | 67% |
| 2022 | 201 | 0.12% | $1,337,896,277 | 72.7% |
| 2024 | 337 | 0.11% | $2,527,382,181 | 75.1% |
| **Total** | – | – | $7,511,773,173 | – |

** Figures through the post-general 2024 FEC reports. Includes Carey Committees. Amounts are aggregate amounts given by that contributor to super PACs in a cycle. ActBlue and WinRed were excluded from this analysis. This table reflects the percentage of itemized individual contributions that came from the $1M+ donors, not of all super PAC receipts – which would include non-individual donors and unitemized totals.

Figure 4




(See next page for additional figures)

Figure 5




### 3.1 Summary:

- Since 2016, on average, 72.59% of itemized individual contributions to super PACs came from individuals who contributed $1 million+ to super PACs per cycle on aggregate.
- In the 2024 election cycle, 75.1% of all contributions made by individuals to super PACs came from individuals that donated over $1 million in aggregate that cycle.

## 4 Super PAC Donor Ideological Breakdown

OpenSecrets classifies super PACs based on ideology. The data below illustrate the number of $200+ individual donors to super PACs, and the total amount contributed, by ideology over time. OpenSecrets also tracks the number of $1,000+ donors to super PACs by ideology.

Case 1:24-cv-00430-KFW Document 45-5 Filed 02/14/25 Page 8 of 8 PageID #: 259

Table 6: **Unique Itemized Donors to Super PACs by Ideology**

| Cycle | # Lib Donors | # Consv Donors | # Other Donors |
|---|---|---|---|
| 2010 | 1,847 | 4,722 | 7 |
| 2012 | 4,986 | 14,737 | 420 |
| 2014 | 11,699 | 12,147 | 132 |
| 2016 | 19,049 | 28,587 | 1,058 |
| 2018 | 43,157 | 14,843 | 2,909 |
| 2020 | 407,034 | 36,478 | 3,423 |
| 2022 | 132,353 | 29,426 | 5,892 |
| 2024 | 253,020 | 42,993 | 6,557 |

Table 7: **Contributions from *$1K+* Donors to Super PACs by Ideology**

| Cycle | Total Lib | # Lib Donors | Total Consv | # Consv Donors | Other Total | # Other |
|---|---|---|---|---|---|---|
| 2010 | $7,952,225 | 544 | $28,100,505 | 1,467 | $40,300 | 7 |
| 2012 | $155,343,339 | 2,156 | $359,616,501 | 5,268 | $3,975,632 | 145 |
| 2014 | $218,821,493 | 3,701 | $161,377,405 | 4,066 | $1,196,882 | 57 |
| 2016 | $478,384,872 | 5,219 | $615,472,464 | 10,349 | $3,219,574 | 337 |
| 2018 | $467,604,604 | 10,788 | $413,729,342 | 4,787 | $31,541,276 | 1,095 |
| 2020 | $1,110,043,466 | 89,718 | $1,002,260,250 | 10,247 | $24,231,782 | 1,206 |
| 2022 | $794,273,712 | 37,547 | $916,394,396 | 9,658 | $75,996,454 | 2,089 |
| 2024 | $975,915,543 | 60,083 | $2,012,877,308 | 12,887 | $278,861,532 | 3,217 |
| **Total** | $4,208,339,254 | – | $5,509,828,171 | – | $419,063,432 | – |

** Figures through the post-general 2024 FEC reports. Includes Carey Committees. Amounts are aggregate amounts given by that contributor to super PACs in a cycle. ActBlue and WinRed were excluded from this analysis.

### 4.1 Summary:

- The number of unique individual donors that gave a minimum of $1k to conservative-leaning super PACs per election cycle outnumbered those who gave to liberal-leaning super PACs from 2010-2016. In 2018, the tables flipped, and individual $1k+ donors to liberal super PACs began outnumbering donors to conservative super PACs.
- Since 2012, liberal and conservative super PACs have witnessed an increase in the number of $1k+ donors by 2,686.8% and 144.6% respectively.

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION et al.,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER et al.,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF JONATHAN BOLTON**
**(pursuant to 28 U.S.C. § 1746)**

I, Jonathan Bolton, Esq., hereby declare as follows:

1. I am over the age of 18 and reside in Harpswell, Maine.

2. I am employed by the Office of the Maine Attorney General as an Assistant Attorney General. I am counsel of record for Defendants in this action.

3. I submit this declaration to provide the Court with various official records that support Defendants' opposition to Plaintiffs' motion for a permanent injunction (ECF No. 16).

4. Attached as Exhibit A is a true and correct copy of a Superseding Indictment filed in *United States v. Menendez*, 2:15-cr-00155-WHW (D.N.J.), as maintained on the federal courts' PACER electronic filing system.

5. Attached as Exhibit B is a true and correct copy of an Indictment filed in *United States v. Householder*, 1:20-cr-00077-TSB (S.D. Ohio), together with the verdict form returned in that case concerning Mr. Householder, both as maintained on the federal courts' PACER electronic filing system.

6. Attached as Exhibit C is a true and correct copy of the legislative committee file for L.D. 2232 (131st Legis.), the citizen-initiated legislation that was enacted by voters as Question 1 at the November 2024 election, as was provided to me by the Maine Law and Legislative Reference Library, a nonpartisan office of the Maine State Legislature.

7. Attached as Exhibit D is a true and correct copy of the Governor's Proclamation concerning the November 2024 referendum election, as was provided to me by the Department of Secretary of State.

8. Attached as Exhibit E is a true and correct copy of "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures," as enacted by Maine voters as I.B. 2023, ch. 4, as maintained at the official State of Maine website https://legislature.maine.gov/ros/LawsOfMaine/#Law.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 14, 2025

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General

RECEIVED

OCT 6 - 2016

AT 8:30 ______________M
WILLIAM T. WALSH, CLERK

Case: 25-1705 Document: 00118356807 Page: 83 Date Filed: 10/22/2025 Entry ID: 6759977

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT MENENDEZ<br>(Counts 1, 2, 3, 5, 7, 9, 11, 13, 15, 16, 17, & 18)<br><br>and<br><br>SALOMON MELGEN<br>(Counts 1, 2, 4, 6, 8, 10, 12, 14, 15, 16, & 17),<br><br>Defendants. | **No. 2:15-cr-00155-WHW**<br><br>**Count 1: 18 U.S.C. § 371 (Conspiracy to Commit Bribery and Honest Services Wire Fraud)**<br><br>**Count 2: 18 U.S.C. §§ 1952, 2 (Travel Act)**<br><br>**Counts 3-14: 18 U.S.C. § 201(b) (Bribery)**<br><br>**Counts 15-17: 18 U.S.C. §§ 1341, 1343, 1346, 2 (Honest Services Fraud)**<br><br>**Count 18: 18 U.S.C. § 1001 (False Statements)**<br><br>**Forfeiture Notice** |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE

**18 U.S.C. § 371**
**(Conspiracy to Commit Bribery and Honest Services Wire Fraud)**

1. At all times material to this indictment:

2. Defendant ROBERT MENENDEZ was a United States Senator from the State of New Jersey. He was previously a member of the United States House of Representatives. MENENDEZ was sworn in as a United States Senator on or about January 17, 2006. As a United States Senator, MENENDEZ owed a fiduciary duty to the United States and the citizens of New Jersey to perform the duties and responsibilities of his office free from corrupt influence.

Case: 25-1705 Document: 00118356807 Page: 84 Date Filed: 10/22/2025 Entry ID: 6759977

3. Defendant SALOMON MELGEN was an ophthalmologist who lived and practiced in the State of Florida.

## RELEVANT INDIVIDUALS AND ENTITIES

4. Vitreo-Retinal Consultants of the Palm Beaches, P.A. (VRC) was the company through which MELGEN operated his ophthalmology practice. MELGEN was VRC's sole owner.

5. The Office of Senator Robert Menendez, based in Washington, D.C., and New Jersey, was MENENDEZ's official government office.

6. Menendez for Senate, based in New Jersey, was a MENENDEZ campaign entity.

7. Person A was MELGEN's personal assistant and son-in-law.

8. Staffer 1 was MENENDEZ's Chief of Staff from in or about June 2008 to in or about March 2014.

## THE CONSPIRACY AND ITS OBJECTS

9. From at least in or about January 2006 through in or about January 2013, in the District of New Jersey and elsewhere, the defendants,

**ROBERT MENENDEZ and**
**SALOMON MELGEN,**

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit an offense against the United States; that is:

a. to, directly and indirectly, corruptly give, offer, and promise anything of value to a public official and to any other person and entity, with intent to influence an official act; that is, offering to give to MENENDEZ, a United States Senator, and to other persons and entities, things of value to influence official acts benefitting MELGEN's personal and business interests, in violation of 18 U.S.C. § 201(b)(1)(A);

Case: 25-1705 Document: 00118356807 Page: 85 Date Filed: 10/22/2025 Entry ID: 6759977

37. From on or about September 3, 2010, through on or about September 6, 2010, MENENDEZ and his guest, Guest 3, stayed free of charge in a two-bedroom suite with MELGEN and his wife at the Tortuga Bay Hotel Puntacana Resort and Club. MELGEN paid approximately $769.40 to the Tortuga Bay Hotel Puntacana Resort and Club for the accommodations.

**E. $20,000 to MENENDEZ's Legal Defense Fund**

38. To pay for litigation arising from a recall effort, MENENDEZ created a legal defense fund called The Fund to Uphold the Constitution.

39. On or about April 30, 2012, Staffer 1 sent an email to Person A with the subject line "Humbly Asking," in which he solicited, among other things, a $20,000 donation to MENENDEZ's legal defense fund.

40. That same day, Person A responded:

> Regarding your request . . . don't worry. We will take care of it. Dr. Melgen will be calling you tomorrow to speak further.

41. On or about May 16, 2012, MELGEN and his wife wrote a $20,000 check to MENENDEZ's legal defense fund.

**F. Other Things of Value**

42. On or about October 4, 2008, MELGEN hired a car service company to drive MENENDEZ from Hoboken, New Jersey, to and around New York City, New York, at a cost of $875.12.

43. On or about January 10, 2013, MENENDEZ, MELGEN, and Person A golfed together at the private Banyan Golf Club in West Palm Beach, Florida. MELGEN paid for the greens fees. After the round of golf, Person A paid $356.80 for a meal at the Raindancer Steak House in West Palm Beach, Florida.

Case: 25-1705 Document: 00118356807 Page: 86 Date Filed: 10/22/2025 Entry ID: 6759977

**G. $751,500 in 2012 Campaign Contributions**

44. MENENDEZ ran for and won reelection to the United States Senate in November 2012. From in or about May 2012 through in or about October 2012, MELGEN contributed over $750,000 to entities supporting MENENDEZ's reelection effort.

**i. $143,500 to New Jersey State and County Democratic Party Entities**

45. On or about April 30, 2012, in the same email to Person A described above in paragraph 39, Staffer 1 solicited MELGEN for contributions to the New Jersey Democratic State Committee to benefit MENENDEZ's reelection efforts. In that email, Staffer 1 wrote that "the Senator and I humbly wanted to put a big ask before [MELGEN]," specifying that:

> I am trying to raise money into the New Jersey Democratic State Committee. The Committee is vital to the Senator's efforts as the state party will conduct voter contact and get out the vote activities on behalf of Senator Menendez and other congressional candidates in the state. The account is named New Jersey Democratic State Committee Victory Federal. The limit per individual is $10,000. Could Dr. Melgen and family members consider giving a total of $40,000?

Staffer 1 observed that MELGEN had "been as loyal and helpful as anyone out there" and noted that "there may be bigger opportunities out there for the doctor to join in later this summer that will be beneficial to the Senator's re-election effort."

46. As noted above in paragraph 40, that same day, Person A responded:

> Regarding your request . . . don't worry. We will take care of it. Dr. Melgen will be calling you tomorrow to speak further.

47. Just over ten days later, on or about May 10, 2012, Staffer 1 and MELGEN spoke on the phone. MELGEN told Staffer 1 that he would make the contributions Staffer 1 had requested and that Person A would manage the process. The following day, Staffer 1 emailed Person A to memorialize his conversation with MELGEN and stated, "It would be great if the

Case: 25-1705 Document: 00118356807 Page: 87 Date Filed: 10/22/2025 Entry ID: 6759977

contributions could be sent via Fedex to my home address and I'll distribute them once I receive them."

48. On or about May 16, 2012, MELGEN and his wife wrote a $20,000 check to "New Jersey Democratic State Committee Victory Federal Account." On the check's memo line "MFS Contribution" was written and subsequently crossed out. Person A overnighted the checks to Staffer 1 via Federal Express to his home address.

49. That same day, on or about May 16, 2012, MELGEN's daughter and her husband, Person A, wrote a $20,000 check to "New Jersey Democratic State Committee Victory Federal Account." On the check's memo line "(MFS) Menendez Contribution" was written and subsequently crossed out.

50. Also that same day, on or about May 16, 2012, MELGEN issued a $20,000 check through VRC, his ophthalmology practice, to MELGEN's daughter.

51. In or about September and October 2012, MELGEN issued more than $100,000 in checks through VRC to several New Jersey county Democratic Party committees and organizations that supported MENENDEZ's reelection bid:

a. On or about September 30, 2012, MELGEN, through VRC, gave $16,500 to the Union County Democratic Organization;

b. On or about October 1, 2012, MELGEN, through VRC, gave $37,000 to the Passaic County Democratic Organization;

c. On or about October 12, 2012, MELGEN, through VRC, gave $25,000 to the Camden County Democratic Committee; and

d. On or about October 12, 2012, MELGEN, through VRC, gave $25,000 to the Essex County Democratic Committee.

Case: 25-1705 Document: 00118356807 Page: 88 Date Filed: 10/22/2025 Entry ID: 6759977

### ii. $8,000 Contribution to Satisfy MENENDEZ's Financial Obligation to Another Senator's Campaign

52. During the 2012 election cycle, Senator 1, a United States Senator, raised approximately $25,000 to support MENENDEZ's reelection efforts. MENENDEZ agreed to raise a commensurate amount of money for Senator 1, who was also running for reelection in 2012.

53. On or about July 17, 2012, a MENENDEZ fundraiser emailed Person A soliciting a contribution from MELGEN to Senator 1. Specifically, the fundraiser wrote the following:

> The Senator asked me to write you and ask for your help. We are raising money for Senator [1] because she helped us earlier this Spring. She raised $25k for our campaign and now we are returning the favor because she is facing a primary in August.
>
> Will you and [your wife] help us meet our obligations and contribute $5k each to Senator [1]'s campaign? We feel indebted to Senator [1] and we would really appreciate your help.

54. On or about July 20, 2012, a different MENENDEZ fundraiser emailed MENENDEZ stating that MELGEN would contribute the requested $10,000 to Senator 1, "but you [(MENENDEZ)] have to email him and ask? Will you?" MENENDEZ responded, "Do we need that much? I will but want to make sure we need that much, as I thought we were close on commitments." The fundraiser replied that they had obtained $17,000 in commitments to Senator 1, to which MENENDEZ replied, "Ok so I will ask for 8k."

55. Three days later, on or about July 23, 2012, Person A emailed the fundraiser referenced in paragraph 53, stating, "FYI. $8,000 will be sent tomorrow on Dr. and Mrs. Melgen's behalf."

56. That same day, on or about July 23, 2012, MELGEN and his wife gave $8,000 to the campaign of Senator 1. Prior to this contribution, MELGEN had never given any money to Senator 1's campaign.

### iii. $600,000 to Majority PAC, Earmarked for the New Jersey Senate Race

57. Between on or about June 1, 2012, and on or about October 12, 2012, MELGEN gave $600,000 to Majority PAC, a Super PAC whose purpose was to protect and expand the Democratic majority in the U.S. Senate. The $600,000 was divided into two $300,000 payments, both of which MELGEN made through VRC. MELGEN earmarked both $300,000 payments for the New Jersey Senate race. MENENDEZ was the only Democrat running for the Senate in New Jersey that year.

58. On or about June 1, 2012, MELGEN issued a $300,000 check from VRC to Majority PAC. This occurred on the same day that MELGEN attended and served on the Host Committee for MENENDEZ's annual fundraising event in New Jersey.

59. MELGEN gave this first $300,000 payment to Person B, a close personal friend of MENENDEZ, who also attended and served on the Host Committee for MENENDEZ's annual fundraising event in New Jersey. Person B sent the check to Fundraiser 1, a fundraiser for Majority PAC, via FedEx from New Jersey to Washington, D.C. Upon receiving the check on June 7, 2012, Fundraiser 1 wrote an email to Fundraiser 2, another Majority PAC fundraiser, with the subject line "Majority PAC (not PMUSA): $300,000 earmarked for New Jersey."

60. On or about October 12, 2012, MELGEN issued a second $300,000 check from VRC to Majority PAC.

61. On or about October 16, 2012, Fundraiser 1 wrote Fundraiser 2 an email with the subject line, "Vitreo-Retinal Consultants – Entire $300k to [Majority PAC] is earmarked for New Jersey."

Case: 25-1705 Document: 00118356807 Page: 90 Date Filed: 10/22/2025 Entry ID: 6759977

### vi. MENENDEZ Advocates on MELGEN's Behalf to the Acting Administrator of CMS

196. Approximately six days after MELGEN issued a $300,000 check from VRC to Majority PAC, earmarked for New Jersey, MENENDEZ advocated on behalf of MELGEN's position in his Medicare billing dispute to the Acting Administrator of CMS.

197. On or about June 5, 2012, MENENDEZ and his staff met with Lobbyist 1 to prepare MENENDEZ to advocate on MELGEN's behalf to the Acting Administrator of CMS.

198. On or about June 7, 2012, MENENDEZ met with the Acting Administrator of CMS and raised the issue at the core of MELGEN's Medicare billing dispute. Specifically, MENENDEZ pressed the Acting Administrator of CMS about multi-dosing and Medicare payments, and advocated on behalf of the position favorable to MELGEN in his Medicare billing dispute.

199. On or about June 12, 2012, Lobbyist 1 sent Staffer 1 a memorandum entitled "Talking Points: CMS Policy" for MENENDEZ to use during future advocacy with the Acting Administrator of CMS. Approximately two weeks later, after Lobbyist 1 asked Staffer 1 if there had been "any follow up with respect to the conversation with [the Acting Administrator of CMS]," Staffer 1 emailed Lobbyist 1 the following:

> [Lobbyist 1]:
>
> The Senator is scheduled to receive a call from [the Acting Administrator of CMS] mid-morning this coming Tuesday. I shared you're [sic] your memo with [Staffer 13] that contains arguments to use in response [sic] [the Acting Administrator of CMS] should she try to make the case that other agencies have policies in place that prohibit multi-dosing.
>
> [Staffer 13] is preparing a memo for the Senator that covers your points for the first meeting, a review of the conversation in the first meeting, and your most recent memo with proposed counter-arguments.

Case: 25-1705 Document: 00118356807 Page: 91 Date Filed: 10/22/2025 Entry ID: 6759977

> I am out next week but the Senator may want to do a call to prep for his Tuesday call with [the Acting Administrator of CMS]. Should this be the case, will you be around Monday afternoon or Tuesday morning.
>
> Thanks.
>
> [Staffer 1]

200. On or about June 30, 2012, Staffer 13 prepared the memorandum to MENENDEZ described in Staffer 1's email in the preceding paragraph, and sent it to Lobbyist 1 for his review. That memorandum notes that "[t]he subject of the call [with the Acting Administrator of CMS] is to discuss the issue [of] Medicare reimbursement when a physician multi-doses from a single-dose vial." The memorandum also includes as one of four "Talking Points for the Call" the following argument: "The CDC guidelines, while necessary to ensure patient safety and reduce the number of healthcare-associated infections, has no bearing on Medicare reimbursement policy[.]" Another talking point notes that "[w]e're talking about payments made in 2007-2008," the years in which MELGEN was found to have received approximately $8.9 million in Medicare overpayments. The final talking point argues the following: "It's clear that CMS is taking steps to clarify both multi-dosing from single-dose vials and overfills going forward. This is, in effect, admitting that these policies didn't exist before and don't apply during the 2007-2008 period. Therefore they don't have any bearing on the issue at hand."

201. Lobbyist 1 reviewed the memorandum and sent his edits to Staffer 13 on or about July 1, 2012.

202. The follow-up call between MENENDEZ and the Acting Administrator of CMS occurred on or about July 2, 2012. During the call, the Acting Administrator of CMS told MENENDEZ that CMS would not alter its position regarding billing for vials used for multiple patients. The Acting Administrator of CMS also explained that CMS's enforcement of Medicare

Case: 25-1705 Document: 00118356807 Page: 92 Date Filed: 10/22/2025 Entry ID: 6759977

billing followed the CDC guidelines, which warn that reusing a single-use vial, or harvesting the preservative-free solution to treat more than one patient, increases the risk of infection. In response, MENENDEZ expressed dissatisfaction with the Acting Administrator of CMS's answers and stated that he would speak directly with the Secretary of HHS about the matter.

203. On or about July 2, 2012, Lobbyist 1 emailed Staffer 1 and Staffer 13, "I am eager to learn how the call went today – please advise."

204. On or about July 2, 2012, Staffer 13 responded to Lobbyist 1, "[G]ive me a call tomorrow afternoon and I'll fill you in."

205. On or about July 3, 2012, MENENDEZ emailed Staffer 13, "Followup [sic] yield anything of value?" Staffer 13 responded by summarizing a follow-up conversation he had with CMS regarding multi-dosing and whether overfill could be considered in Medicare payments, while noting that he, Staffer 13, spoke with Lobbyist 1 after the call. Specifically, Staffer 13 noted that Lobbyist 1 is "encouraged, but mainly because he's increasingly confident they won't have a leg to stand on should he litigate. But we're all hopeful it won't come to that."

206. On or about July 16, 2012, Lobbyist 1 responded to an email sent by Staffer 13 with a subject line that read, in part, "CDC report emphasizes importance of adhering to single-dose/single use vial protocols." Lobbyist 1 added Staffer 1 to the email, in which Lobbyist 1 said, "[L]et me know if you hear back from [the Acting Administrator of CMS's] office -- at some point I have to make a decision whether to recommend to the doctor to go to court rather than wait any longer. I did not want to take any action until I knew that other avenues were shut down."

**vii. MENENDEZ Elevates His Advocacy on MELGEN's Behalf to the Secretary of HHS**

207. On or about July 10, 2012, Senator 3's scheduler contacted HHS, stating that "[Senator 3] would like to have a meeting with [the Secretary of HHS] and Senator Menendez sometime in the next couple of weeks."

208. On or about July 13, 2012, Staffer 1 emailed MENENDEZ asking whether he, MENENDEZ, had informed MELGEN that Senator 3 was organizing a meeting with the Secretary of HHS. MENENDEZ responded, "Haven't told Dr Melgen yet. Prefer to know when we r meeting her so that I don't raise expectation just in case it falls apart."

209. On or about July 19, 2012, Person A forwarded to MENENDEZ an email MELGEN received from Lobbyist 1 entitled "CMS recent justification for denial of payment." The email from Lobbyist 1 contained a "summary of the latest information provided by CMS in connection with its denial of reimbursement and subsequent recoupment in connection with claims submitted that reflected the multi-dosing of Lucentis, for the years 2007 – 2008." In his email to MENENDEZ, Person A wrote, "Dr. Melgen had mistakenly sent you the draft version earlier that was not complete. Below please find the final version."

210. On or about July 20, 2012, Person A forwarded to Staffer 1 the same email from Lobbyist 1 described in the preceding paragraph. In his email to Staffer 1, Person A wrote, "Dr. Melgen had asked me to forward you the email below."

211. Also on that same date, HHS 5, the Secretary of HHS's scheduler, emailed Senator 3's scheduler to suggest dates and times for the Secretary of HHS's meeting with MENENDEZ and Senator 3.

212. On or about July 24, 2012, Person A sent an email to MENENDEZ entitled "Dr. Melgen" with an attachment entitled "Letter to [the Acting Administrator of CMS] (7-23-12)." In

the email to MENENDEZ, Person A wrote, "Attached please find the proposed letter that was sent to [Staffer 1] by [Lobbyist 1]. Dr. Melgen wanted me to send it to you as well." The draft letter submitted by MELGEN's lobbyist/lawyer does not mention MELGEN by name, but advocates on behalf of his position and twice references "the Medicare contractor in Florida."

213. MENENDEZ's meeting with the Secretary of HHS occurred on or about August 2, 2012. On or about August 1, MENENDEZ spoke to Lobbyist 1, MELGEN's lobbyist/lawyer, to prepare for the meeting.

214. During MENENDEZ's meeting with the Secretary of HHS, MENENDEZ advocated on behalf of MELGEN's position in his Medicare billing dispute, focusing on MELGEN's specific case and asserting that MELGEN was being treated unfairly. The Secretary of HHS disagreed with MENENDEZ's position, explaining that CMS was not going to pay for the same vial of medicine twice, and emphasizing that CDC guidelines expressly advised against multiple applications from the same vial to prevent potential contamination. The Secretary of HHS also informed MENENDEZ that because MELGEN's case was in the administrative appeals process, she had no power to influence it.

215. After MENENDEZ advocated on behalf of MELGEN directly to the Secretary of HHS, Lobbyist 1 emailed Staffer 1 and Staffer 13, saying, "I have spoken with [the] doctor and understand that the meeting with the Secretary was quite 'lively.'" Lobbyist 1 then asked for "further briefing."

216. On or about September 12, 2012, Lobbyist 1 emailed Staffer 13 asking if he "had heard back from [the Secretary of HHS's] office following the meeting last month." Staffer 13 forwarded the email to Staffer 1, asking what he should tell Lobbyist 1.

Case: 25-1705 Document: 00118356807 Page: 95 Date Filed: 10/22/2025 Entry ID: 6759977

217. On or about September 13, 2012, Staffer 1 replied to Staffer 13, "I think you should try to get some feedback without raising attention."

218. On or about September 19, 2012, Staffer 13 reached out by email to HHS 6, an Assistant Secretary at HHS, to see if "there might be any news from your end on the meeting our boss's [sic] had right before recess." HHS 6 did not respond.

**viii. MELGEN Gives $375,000 to Entities Supporting MENENDEZ's Reelection Efforts to Renew MENENDEZ's Advocacy to the Secretary of HHS in Support of MELGEN's Medicare Billing Dispute**

219. On or about October 19, 2012, one week after MELGEN, through his company, VRC, issued a $300,000 check to Majority PAC, earmarked for New Jersey, and three $25,000 checks to New Jersey Democratic County Committees, MELGEN sent MENENDEZ an email with the subject "MAC Appeal." The email stated, "Here is the latest memo with the most recent developments," and included an attachment entitled "MAC Appeal Update and Recent Developments 10-1-2012." The memorandum was authored by MELGEN's lobbyists/lawyers and addressed to MELGEN. The four-page memorandum is entitled "Status of Medicare Audit and Appeal," and opens with the following introduction: "You have asked for a brief summary of the current status of the pending Medicare Overpayment Determination appeal for Vitreo Retinal Consultants (the 'Practice'). You have also asked us to provide an update on recent developments in other litigation matters relating to drug product overfill." The memorandum concludes with a section entitled "The Secretary's Authority," asserting that "[i]t would be appropriate for the Secretary of the Department of Health and Human Services to intervene during the pendency of the Practice's appeal before the MAC to clarify that, as to the period prior to January 1, 2011, CMS policy permitted physicians and providers to bill for overfill." MELGEN sent this email to MENENDEZ at approximately 5:01 p.m.

FILED
RICHARD W. NAGEL
CLERK OF COURT
2020 JUL 30 AM 8:31
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

LARRY HOUSEHOLDER,
JEFFREY LONGSTRETH,
NEIL CLARK,
MATTHEW BORGES,
JUAN CESPEDES, and
GENERATION NOW,

Defendants.

CASE NO. 1 :20CR 077

JUDGE JUDGE BLACK

INDICTMENT

18 U.S.C. § 1962(d)

FORFEITURE ALLEGATION

---

THE GRAND JURY CHARGES:

COUNT ONE
(RICO CONSPIRACY)

At times relevant to this Indictment:

THE ENTERPRISE

1. Defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown to the Grand Jury constituted an "Enterprise," (hereinafter "**Householder's Enterprise**") as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. **Householder's Enterprise** constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of

achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce.

**Roles of the Conspirators**

2. Defendant **LARRY HOUSEHOLDER** represents the State of Ohio's 72 District in the Ohio House of Representatives and has done so since January 2017. He also is the current Speaker of the Ohio House of Representatives and has served in that capacity since January 7, 2019.

3. Defendant **GENERATION NOW** was a self-titled 501(c)(4), organized under the laws of Delaware, registered in Ohio, and purported to be organized primarily for a social welfare purpose under the Internal Revenue Code. The Internal Revenue Code, Title 26, United States Code, Section 501(c)(4), provides for tax exempt status for social welfare organizations. A "501(c)(4)" social welfare organization may "not [be] organized for profit but operated exclusively for the promotion of social welfare[.]" 26 U.S.C. § 501(c)(4)(A). An entity may not qualify for tax-exempt 501(c)(4) status "unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(4)(B). A 501(c)(4) entity must notify the IRS of its intent to operate as a 501(c)(4) organization. 26 U.S.C. § 506. The names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

4. **GENERATION NOW** maintained offices in Columbus, Ohio, within the Southern District of Ohio. Although registered as a 501(c)(4), in reality, **GENERATION NOW** operated as **HOUSEHOLDER's** slush fund for the benefit of **HOUSEHOLDER** and his coconspirators. From 2017 to present, **GENERATION NOW** received more than $59 million from "Company A Service Co.," "Company A-1," and "Energy Pass-Through."

5. Defendant **JEFFREY LONGSTRETH** was **HOUSEHOLDER's** campaign and political strategist since at least in or about 2016. **LONGSTRETH** opened and is a signor on the **GENERATION NOW** bank accounts. **LONGSTRETH** also owns and operates JPL & Associates LLC and Constant Content Co., in Columbus, Ohio, in the Southern District of Ohio. From 2017 through 2020, JPL & Associates received approximately $10.5 million directly from **GENERATION NOW,** and another $4.4 million indirectly through Front Company (described below). **LONGSTRETH** transferred $1,000,000 of the **GENERATION NOW** money to his brokerage account in 2020.

6. Defendant **NEIL CLARK** owned and operated Grant Street Consultants, a Columbus, Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to starting Grant Street Consultants, **CLARK** served as budget director for the Ohio Senate Republican Caucus. Along with **LONGSTRETH**, **CLARK** served as one of **HOUSEHOLDER's** closest advisors and was **HOUSEHOLDER's** "proxy" in meetings with **Householder's Enterprise** members and associates relating to House Bill 6 (described below) when **HOUSEHOLDER** was unavailable. In 2019, **CLARK** received approximately $290,000 from **GENERATION NOW**, which had been laundered through other accounts.

7. Defendant **MATTHEW BORGES** was a Columbus-based, lobbyist for Company A-1 (defined below). On or about August 5, 2019, **BORGES** registered with the Ohio Secretary of State, "17 Consulting Group LLC" (hereinafter "17 Consulting") as a for-profit limited liability company. Two days later, on or about August 7, 2019, **BORGES** opened a bank account for 17 Consulting Group LLC. **BORGES** listed himself as the President/Owner/CEO of 17 Consulting Group LLC and as the sole signatory on the account. The day after **BORGES** opened the account,

**GENERATION NOW** wired $400,000 into the account. Between in or about August 2019 and October 21, 2019, **Householder's Enterprise** funded the 17 Consulting account with $1.62 million in wire transfers from **GENERATION NOW**. **BORGES** used the bank account to pay himself, pay **CESPEDES**, attempt to bribe an employee and agent of the Ballot Campaign (described below), and pay for other expenses incurred by the Enterprise in defeating the Ballot Campaign.

8. Defendant **JUAN CESPEDES** was an outside lobbyist for Company A-1 who was central to Company A-1's efforts and **Householder's Enterprise** to get the bailout legislation passed in Ohio. **CESPEDES** was paid both by **Householder's Enterprise** and Company A's Service Co. for his efforts and often served as a key middleman. In 2019, **CESPEDES** received $600,000 from **GENERATION NOW** via **BORGES'** account.

**Other Individuals and Entities**

9. "Company A Corp." was an Akron-based public utility holding company. Throughout the start of the relevant period until in or around February 2020, Company A Corp. was the parent company to entities involved in nuclear energy generation, including Company A-1. Company A Service Co. is a principle subsidiary of Company A Corp. According to its 2019 annual report, the President and Chief Executive Officer of Company A Corp. also served as the President and Chief Executive Officer of Company A Service. Co.

10. "Company A Service Co." was a principle subsidiary of Company A Corp., and operated as Company A's service company, providing legal, financial, and other corporate support services to Company A and its affiliates, including Company A-1. Services provided by Company A Service Co. included corporate contributions and advocacy on behalf of Company A and its affiliates at the federal, state, and local levels, among other services. The President and Chief

Executive Officer of Company A Corp., also serves as the President and Chief Executive Officer of Company A Service Co. Company A Service Co. provides services to Company A-1, as described below, including "external affairs," "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local levels." From in or about March 2017 to October 22, 2019, Company A Service Co. wired millions of dollars to **GENERATION NOW**.

11. "Company A-1" was a wholly-owned subsidiary of Company A Corp. involved in nuclear energy generation. Through subsidiaries, Company A-1 owned and operated two nuclear plants in Ohio, "Nuclear Plant 1" and "Nuclear Plant 2" (together, the "Nuclear Plants"). In March 2018, Company A-1 filed for Chapter 11 bankruptcy. As a result of the bankruptcy proceedings, Company A-1 separated from Company A Corp. in or around February 2020.

12. "Energy Pass-Through" was registered as a 501(c)(4) entity in Ohio approximately two days after **GENERATION NOW** registered in Delaware. During the period from its inception in or around February 2017 to October 2019, Energy Pass-Through was funded exclusively by $25 million from Company A Service Co. **GENERATION NOW** then received more than $15 million from Energy Pass-Through between in or around February 2017 through in or around March 2020.

13. "Company A" refers collectively to Company A Corp., Company A Service Co., and Company A-1. Prior to February 2020, both Company A Service Co. and Company A-1 were subsidiaries of Company A Corp. Until February 2020, all three entities shared a common first name, and members and associates often referred generically to the "company" or to the common first name ("Company A") in communications.

14. "Company-A-to-**GENERATION-NOW** payments" refers to money from Company A Corp, Company A-1, Company A Service Co., and Energy Pass-Through that was deposited into **GENERATION NOW's** bank account.

15. "PAC" was a federal Political Action Committee. During the 2018 election cycle, **Householder's Enterprise** laundered at least $1,000,000 from **GENERATION NOW** through PAC to pay for media buys in PAC's name to help elect candidates loyal to defendant **HOUSEHOLDER**. During the 2020 primary election, **Householder's Enterprise** laundered over $1,000,000 from **GENERATION NOW** to PAC, via Coalition, to pay for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER.**

16. "Coalition" was a purported 501(c)(4) entity. In 2020, **Householder's Enterprise** wired over $1,000,000 from **GENERATION NOW** to Coalition, which was then wired to PAC to for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER**. According to **LONGSTRETH**, he oversees political activities for Coalition.

17. "Dark Money Group 1" was incorporated on or about September 21, 2018, less than two months before the 2018 general election. In the weeks before the 2018 general election, **GENERATION NOW** wired $670,000 to Dark Money Group 1, while Energy Pass-Through wired $500,000. Between on or about October 20, 2018 and November 1, 2018, Dark Money Group 1 spent all of this money to pay for television, radio and print advertisements ("media buys") targeting the rivals of **HOUSEHOLDER's** candidates in the name of Dark Money Group 1.

18. **Householder's Enterprise** employed numerous individuals in various capacities, (designated herein as "Associates"), whom **Householder's Enterprise** paid either through **GENERATION NOW** or by funneling **GENERATION NOW** money through **LONGSTRETH's** accounts.

**Householder's Enterprise Received Millions in Bribe Payments from Company A**

75. Between in or around March 2017 and March 2020, **HOUSEHOLDER** and **Householder's Enterprise** received over $64 million in secret payments into **GENERATION NOW**, the vast majority of which—approximately 93%—came from Company A-1, Company A Service Co., and Energy Pass-Through.

76. Between in or around March 2017 and March 2020, **Householder's Enterprise** received from Company A-1, Company A Service Co., and Energy Pass-Through over $59.9 million into **GENERATION NOW** in return for legislation that would save the operation of the Nuclear Plants.

77. During the period of the conspiracy, **Householder's Enterprise** began referring to Company A as their "*bank*" because of the volume of money paid to **HOUSEHOLDER** into **GENERATION NOW**. As **CLARK** explained during a recorded conversation in July 2019: "*We call [Company A] 'the Bank' because they can do, they can do, they can fund these things for 20 years if they want to. . . . They've got too much money, too much power*." **CLARK** remarked that the amount of money from Company A into **GENERATION NOW** was "*unlimited*." **CLARK** further stated that **HOUSEHOLDER** "*gets checks from 'the Bank'; remember, I told you what the 'the Bank' is, you know, $1.5 million dollars, $2 million dollars*."

**Householder's Enterprise Used Company-A-to-GENERATION-NOW Payments to Benefit and Enrich the Enterprise, and its Members and Associates**

78. Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** used the Company-A-to-**GENERATION-NOW** payments to fund the operating costs of **Householder's Enterprise**, including rent for office space, wages to associates and other individuals employed by **Householder's Enterprise**, lodging, meals, and parking.

79. Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** transferred at least $14.9 million in Company-A-to-**GENERATION-NOW** payments to other **LONGSTRETH**-controlled accounts. (Approximately $4.4 million of that total passed through Front Company before being deposited into **LONGSTRETH's** accounts.) **Householder's Enterprise** then used the money transferred into **LONGSTRETH's** accounts to pay additional operating costs of **Householder's Enterprise**, pay third parties, and pay benefits to members and associates of **Householder's Enterprise**.

80. **Householder's Enterprise** funneled payments from **GENERATION NOW** to **LONGSTRETH**-controlled accounts to conceal personal benefits paid to **HOUSEHOLDER**, which **Householder's Enterprise** disguised in the IRS 990 Form for tax year 2017 as "Management Fees" paid to JPL & Associates. For example, in 2017, after transferring money from **GENERATION NOW's** bank account to a JPL & Associates' bank account for what **Householder's Enterprise** characterized to the IRS as "Management Fees," **Householder's Enterprise** paid approximately $60,000 to a law firm that was then representing **HOUSEHOLDER** in a civil lawsuit. Because of JPL & Associate's low bank account balance at the time, **Householder's Enterprise's** $60,000 transfer to the law firm was only possible because of **GENERATION NOW's** infusion of money into the JPL & Associates account.

81. As the payments into **GENERATION NOW** increased, **Householder's Enterprise's** subsequent money transfers from **GENERATION NOW** to JPL & Associates—which, according to the 2017 990 Form, controlled the "Management" of **GENERATION NOW** and was the sole voting member—also increased. For example, in 2018, **GENERATION NOW** received over $3.2 into its bank account and then paid over $1.8 to a JPL & Associates account.

In 2019, **GENERATION NOW** received over $57.3 million into its bank account and then paid over $7.9 a JPL & Associates account.

82. Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** used more than $400,000 in **GENERATION NOW** payments, that account being funded by Company A, which were funneled through **LONGSTRETH**-controlled accounts to benefit **HOUSEHOLDER** personally, including:

A. Approximately $300,000 paid through multiple **LONGSTRETH**-controlled accounts, to settle a lawsuit (mentioned above) and pay legal fees related to a civil judgment against **HOUSEHOLDER** for more than a million dollars;

B. More than $100,000 passed through a **LONGSTRETH**-controlled account to pay for repairs and costs associated with **HOUSEHOLDER's** Florida home;

C. Approximately $20,000 passed through a **LONGSTRETH**-controlled account to pay credit card debt held by **HOUSEHOLDER**; and

D. At least $97,000 spent on campaign expenses for **HOUSEHOLDER** during his 2018 campaign.

83. Between on or about February 6, 2017 and to on or about April 28, 2020, **LONGSTRETH** used for his own benefit at least $2 million in Company-A-to-**GENERATION-NOW** payments that were transferred to accounts that he controlled, including a wire of $1,000,000 to his brokerage account and hundreds of thousands of dollars spent on mortgage payments, car payments, and credit card payments.

84. Between on or about February 6, 2017 and to on or about April 28, 2020, **CLARK** received at least $290,000 in Company-A-to-**GENERATION-NOW** payments, which passed through at least one other account controlled by **Householder's Enterprise** before reaching **CLARK's** bank account.

85. Between on or about February 6, 2017 and to on or about April 28, 2020, **BORGES** received at least $350,000 in Company-A-to-**GENERATION-NOW** payments, which were transferred to him through the 17 Consulting bank account.

86. Between on or about February 6, 2017 and to on or about April 28, 2020, **CESPEDES** received at least $600,000 in Company-A-to-**GENERATION-NOW** payments, which passed through the 17 Consulting bank account before reaching his bank account.

87. Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** paid Associates 1, 3, 4, and 5 a total of at least $725,000 in Company-A-to-**GENERATION-NOW** payments, many of which passed through at least one other account controlled by **Householder's Enterprise** before reaching the associate's bank account.

88. On or about November 13, 2019, **LONGSTRETH** signed under penalty of perjury the IRS Form 990 for the tax year 2017, claiming **GENERATION NOW** was a 501(c)(4). According to the filing, **GENERATION NOW's** largest program service accomplishment, measured by expenditures, was $500 spent on building "a grassroots infrastructure and online campaign to educate the public about the need for clean, reliable energy generation in Ohio."

**The Enterprise Also used Company-A-to-GENERATION-NOW Payments to <u>Obtain, Preserve, and Expand HOUSEHOLDER's Political Power</u>**

89. Throughout the conspiracy, **Householder's Enterprise** used **GENERATION NOW** money to increase **HOUSEHOLDER's** political power by helping **HOUSEHOLDER** become the Ohio Speaker and develop a loyal group of representatives. **CLARK** and

**HOUSEHOLDER** discussed this strategy during a recorded call in or about January 2018. Specifically, **CLARK** and **HOUSEHOLDER** discussed the budget in the context of their plan to "orchestrate (c)(4) checks" to help **HOUSEHOLDER** fund campaigns for House members. **CLARK** estimated that **HOUSEHOLDER** would "*need a hundred and twenty thousand per race*," to which **HOUSEHOLDER** responded, "*I'd say one fifty, but yeah, you're in the ballpark*." They then discussed how to raise the amount they needed in 501(c)(4) checks to fund candidate campaigns. **CLARK** mentioned that, "*some people decided to help [Speaker Candidate 1]*" for Speaker, to which **HOUSEHOLDER** responded, "*yeah, we can fuck them over later*."

90. In 2017, as **Householder's Enterprise** began receiving wires from Company A Service Co., **Householder's Enterprise** built a list of candidates for the 2018 elections—candidates who, at times, **Householder's Enterprise** referred to as "Team Householder," and who **Householder's Enterprise** used **GENERATION NOW** funds to help elect.

91. In or around April 2018, after having received approximately $1.3 million in Company-A-to-**GENERATION-NOW** payments between on or about March 15, 2017 and March 15, 2018, **Householder's Enterprise** sent wires totaling $1 million from **GENERATION NOW** to PAC, which purchased in PAC's name, advertisements benefiting **HOUSEHOLDER** and **Householder's Enterprise** candidates for the May 8, 2018 Ohio primary election.

92. On or about May 8, 2018, **Householder's Enterprise** successfully executed their primary election strategy, as the majority of the candidates supported by **Householder's Enterprise** won their primary elections.

93. Between on or about August 1, 2018 and on or about October 29, 2018, **Householder's Enterprise** received $1 million in Company-A-to-**GENERATION-NOW** payments. Between on or about October 19, 2018 and October 29, 2018, **GENERATION NOW**

wired $670,000 to Dark Money Group 1, which also had received a $500,000 wire directly from Energy Pass-Through. With this money, **Householder's Enterprise** used Dark Money Group 1 to purchase over $1 million in advertisements in the name of Dark Money Group 1 that benefited **Householder's Enterprise's** candidates in the final weeks before the November 2018 general election.

94. Between in or about March 2017 and November 2018, after receiving Company-A-to-**GENERATION-NOW** payments, **Householder's Enterprise** wired and electronically transferred money from **GENERATION NOW** to a **LONGSTRETH**-controlled bank account, which made payments to benefit **Householder's Enterprise** and enrich and benefit its members and associates.

95. On or about November 8, 2018, **Householder's Enterprise** successfully executed its strategy, demonstrated by the election of the majority of the "Team Householder" candidates.

96. On or about January 7, 2019, **HOUSEHOLDER** was elected Speaker, in part, by receiving votes from representatives whose races were supported by **GENERATION NOW**.

97. Between on or about January 22, 2020 and on or about February 7, 2020, after having received approximately $38.7 million in Company-A-to-**GENERATION-NOW** payments between on or about August 2, 2019 and on or about October 22, 2019, **Householder's Enterprise** wired $1,010,000 from **GENERATION NOW** to Coalition, which then wired roughly the same amount to PAC, which then purchased advertisements in PAC's name before the scheduled May 2020 primary. The advertisements purchased by PAC benefitted **Householder's Enterprise** and its candidates.

15B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-77 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| LARRY HOUSEHOLDER, | : | |
| | : | |
| Defendant. | : | |

**VERDICT FORM**

On the charge of Racketeer Influenced and Corrupt Organizations Act Conspiracy, in violation of federal law, WE, THE JURY, find the defendant **LARRY HOUSEHOLDER**:

GUILTY: ✓ NOT GUILTY: ________

Dated this 9th day of March, 2023.

[redacted]

# MAINE STATE LEGISLATURE

The following document is provided by the

**LAW AND LEGISLATIVE DIGITAL LIBRARY**

at the Maine State Law and Legislative Reference Library

http://legislature.maine.gov/lawlib

Reproduced from scanned originals with text recognition applied

(searchable text may contain some errors and/or omissions)

Richard A. Bennett
Senator, District 18

3 State House Station
Augusta, Maine 04333

THE MAINE SENATE
131st Legislature

**Joint Standing Committee on Veterans and Legal Affairs on**
**LD 2232, An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures**
**March 6, 2024**

Senator Hickman, Representative Supica, and esteemed members of the Joint Standing Committee on Veterans and Legal Affairs: I am Senator Rick Bennett of Oxford, and I have the honor of serving 14 communities in Western Maine in the State Senate. I am pleased to speak in favor of LD 2232, "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures."

Our politics is broken. Our government is corrupted by money and large donors. The nation we love is imperiled. Profound changes are needed. LD 2232 could provide one of the solutions to save our country.

As you know from my work on earlier bills before your committee, I am very passionate about reforming our campaign finance system. There are serious issues with money's influence on our democracy. I worry that a small number of people have too much influence on our politics.

The bill before you comes from the people of Maine who overwhelming agree with this sentiment. Indeed, 76,081 Mainers have petitioned their legislature to ask us for action. And act we must.

Voters are tired of the incredible amounts of spending done during election season, increasingly by dark money sources. Maine voters continue to support Clean Elections, which is an attempt to get big money out of our politics. However, despite our Clean Election laws, political action committees are allowed to spend unlimited amounts in support or against Clean Election candidates.

People are fed up and motivated to fix this problem. The petition to get this proposal before you began circulating at the end of last October. It took a mere three months for advocates to collect and turn in 76,081 valid signatures from across the state. The people of Maine deserve and want a political system both free of corruption and the appearance of corruption.

Furthermore, this proposal is popular. According to an October 2023 Pew Research Center, 72% of US adults believe that there should be limits on the amount of money individuals and organizations can spend on political campaigns. Only 11% believe individuals and organizations should be able to spend as much as they want and 16% are unsure. Additionally, 80% of US adults believe people who donate money to political campaigns have too much influence on decisions their elected officials make.

The Legislature should enact this law now. It is one of the best changes we can make to improve the accessibility of our democracy. I have no doubt there will be legal challenges after its enactment – there always are by the monied interests eagerly protecting their entrenched power. But I am confident that we will win that legal battle. Harvard Law School's Lawrence Lessig, who has been spearheading this effort, said, "SuperPACs have been with us for more than 13 years so it is understandable that most lawyers believe the Supreme Court has upheld them. It has not. Likewise, it is understandable that many political organizations, including reform organizations on the Left and Right, have become dependent on the super-wealthy to do their work. Some of them now support SuperPACs, as do many of the most wealthy in America who use SuperPACs to influence American politics. But we know that the vast majority of Americans on both the Left and Right hate the corruption of big money in American politics."

Thank you for your time. I urge you to vote "ought to pass" on LD 2232 to give citizens the chance to get our democracy back.

# Report on Contributions to Super PACs Making Independent Expenditures in Maine *Federal* Elections

Prepared by Maia Cook for the Public Hearing on LD2232:

*An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures*

March 6, 2024

# Report on Contributions to Super PACs Making Independent Expenditures in Maine *Federal* Elections

Prepared by Maia Cook

March 6, 2024

## Facts about the dataset

- The dataset used for this analysis was received from OpenSecrets
- This dataset only looks at contributions greater than or equal to $5,000.
- This dataset look at Maine elections from 2010-2022.
- This dataset looks exclusively at Super PACs. It does not account for hybrid independent-expenditure-only groups, otherwise known as 'Carey Committees.'
- This analysis concerns unlimited contributions to committees that make independent expenditures, not the spending of these PACs.

## Conclusions from the analysis

1. Independent money is playing an increasingly important role in modern elections.
2. The vast majority of independent money is out-of-state money.
3. Candidates are increasingly dependent on money from super PACs.

## Responses to anticipated FAQs:

- Our analysis, and subsequent argument in favor of the proposed initiative, has *nothing* to do with limiting independent expenditures.
- It would be a mistake to infer that our argument opposes *Citizens United v. FEC*. We embrace the logic of *Citizens United v. FEC* to prove that contributions to super PACs should have limits ***because*** there is a risk of quid pro quo corruption.
- We are not challenging the First Amendment.

# 1 Summary Statistics of *Federal* Dataset

Table 1: Number of Contributions over $5,000 to Super PACs per ME Cycle

| Year | # Contributions |
|---|---|
| 2010 | 149 |
| 2012 | 244 |
| 2014 | 1318 |
| 2016 | 775 |
| 2018 | 1922 |
| 2020 | 7143 |
| 2022 | 417 |

Table 2: Total Contributions to Super PACs per ME Cycle

| Cycle | ContribTotal |
|---|---|
| 2010 | $4,919,000 |
| 2012 | $21,162,880 |
| 2014 | $192,267,915 |
| 2016 | $148,501,150 |
| 2018 | $399,825,729 |
| 2020 | $1,478,892,397 |
| 2022 | $58,565,122 |

Table 3: Summary Statistics of Contributions ($5,000+) Spent in ME Federal Elections, 2010-2022

| Statistic | Value |
|---|---|
| Minimum | $5,000 |
| 1st Quartile | $5,000 |
| Median | $20,000 |
| Mean | $192,525 |
| 3rd Quartile | $100,000 |
| Maximum | $27,500,000 |




Figure 1: Density Plot of the 95th Percentile of Contribution Sizes

Note: I took the 95th percentile because the plot is illegible when massive outliers in the top 5% of contributions were included.




Figure 2: Time Series Analysis of Contributions from super PACs in Maine Federal Elections

## 2 Top 25 Contributors to Super PACs Spending in Maine Elections (2010-2022)

Table 4: Top 25 Contributors to Super PACs Spending in Maine Elections (2010-2022)

| Rank | Contributor | Total Contributions |
|---|---|---|
| 1 | STEYER, THOMAS F | $113,860,431 |
| 2 | ADELSON, MIRIAM | $98,750,000 |
| 3 | ONE NATION | $85,065,000 |
| 4 | Senate Leadership Fund | $80,170,000 |
| 5 | ADELSON, SHELDON | $68,750,000 |
| 6 | AMERICAN ACTION NETWORK | $57,716,526 |
| 7 | MAJORITY FORWARD | $53,323,000 |
| 8 | MELLON, TIMOTHY | $50,000,000 |
| 9 | ADELSON, SHELDON G | $40,000,000 |
| 10 | GRIFFIN, KENNETH C | $38,000,000 |
| 11 | SCHWARZMAN, STEPHEN A | $32,950,000 |
| 12 | YASS, JEFF | $32,068,000 |
| 13 | NATIONAL ASSOCIATION OF REALTO | $30,603,098 |
| 14 | UIHLEIN, RICHARD | $27,500,000 |
| 15 | EYCHANER, FRED | $27,000,000 |
| 16 | SIXTEEN THIRTY FUND | $25,998,410 |
| 17 | Working for Working Americans | $24,015,000 |
| 18 | NATIONAL EDUCATION ASSOCIATION | $23,814,149 |
| 19 | AMERICA VOTES | $21,826,500 |
| 20 | LEAGUE OF CONSERVATION VOTERS, INC | $21,550,000 |
| 21 | SUSSMAN, S DONALD | $21,525,000 |
| 22 | Democracy PAC | $19,215,908 |
| 23 | BLOOMBERG, MICHAEL | $18,750,000 |
| 24 | DUTY AND HONOR | $15,900,000 |
| 25 | NATIONAL EDUCATION, ASSOCIATION | $15,000,000 |

## 3 Top 25 Super PACs making the Largest Independent Expenditures, (2010:2022))

Table 5: Top PACs by Total Independent Expenditures (2010-2022)

| Rank | PAC | Total |
|---|---|---|
| 1 | Senate Majority PAC | $27,907,444 |
| 2 | Senate Leadership Fund | $12,614,118 |
| 3 | Congressional Leadership Fund | $12,489,281 |
| 4 | 1820 PAC | $10,387,507 |
| 5 | House Majority PAC | $8,321,477 |
| 6 | Women Vote! | $4,789,414 |
| 7 | Family Friendly Action PAC | $3,571,573 |
| 8 | Maine Way PAC | $3,550,404 |
| 9 | Priorities USA Action | $3,215,025 |
| 10 | American Crossroads | $2,207,856 |
| 11 | National Assn of Realtors Congressional Fund | $2,104,568 |
| 12 | LCV Victory Fund | $1,955,231 |
| 13 | VoteVets.org | $1,867,755 |
| 14 | With Honor Fund | $1,748,351 |
| 15 | Planned Parenthood Votes | $1,680,005 |
| 16 | The Lincoln Project | $1,675,944 |
| 17 | Maine Liberty PAC | $1,432,726 |
| 18 | Change Now PAC | $1,219,705 |
| 19 | America First Action | $1,089,171 |
| 20 | Patients for Affordable Drugs Action | $1,072,839 |
| 21 | Future Forward USA | $1,067,663 |
| 22 | Club for Growth Action | $841,713 |
| 23 | Moderate PAC | $749,160 |
| 24 | Protect Freedom PAC | $737,021 |
| 25 | NEA Advocacy Fund | $645,331 |

Note: *Total* refers to the total independent expenditures made by super PACs from 2010-2022. This is not looking at the total contributions to PACs from individuals, organizations, corporations, or labor unions. Verify this from Andrew

## 4 In vs Out-of-State Contributions

Table 6: Summary of Contribution Totals (2010-2022)

| State | Total | Pct |
|---|---|---|
| In | $7,116,000 | 0.003 |
| Out | $2,006,706,545 | 0.870 |
| Unknown | $290,311,648 | 0.125 |
| **Grand Total** | $2,304,134,193 | 1.000 |

Table 7: Contributions to Super PACs per Cycle

| Cycle | Total Contributions | Pct OutState |
|---|---|---|
| 2010 | $4,919,000 | 0.712 |
| 2012 | $21,162,880 | 0.977 |
| 2014 | $192,267,915 | 0.908 |
| 2016 | $148,501,150 | 0.872 |
| 2018 | $399,825,729 | 0.888 |
| 2020 | $1,478,892,397 | 0.868 |
| 2022 | $58,565,122 | 0.693 |
| **Total** | $2,302,134,193 | - |

Note: The discrepancy in the Grand Total values between Table 6 and Table 7 can be explained by the fact that 9% of the data was not available for Table 7's out-of-state analysis.


Summary of Contribution Totals (2010-2022)
0.00/1.00
0.25
0.50
0.75
x
Pct
State
In
Out
Unknown

Table 8: Contribution Totals per State, 2010-2022

| Rank | State | Contrib Total |
|---|---|---|
| 1 | DC | $355,863,470 |
| 2 | CA | $318,798,954 |
| 3 | NA | $288,726,648 |
| 4 | NV | $235,300,719 |
| 5 | NY | $232,291,112 |
| 6 | IL | $177,609,710 |
| 7 | VA | $96,455,347 |
| 8 | FL | $94,187,692 |
| 9 | TX | $74,213,326 |
| 10 | MA | $61,917,900 |
| 11 | WY | $51,984,776 |
| 12 | PA | $39,909,359 |
| 13 | WA | $35,943,642 |
| 14 | CO | $22,830,503 |
| 15 | AR | $22,725,000 |
| 16 | IN | $21,861,201 |
| 17 | GA | $17,717,165 |
| 18 | CT | $16,976,197 |
| 19 | TN | $15,296,808 |
| 20 | NJ | $15,252,324 |
| 21 | MD | $15,156,965 |
| 22 | OH | $14,882,068 |
| 23 | MI | $12,363,036 |
| 24 | NC | $8,934,533 |
| 25 | OK | $8,812,660 |
| **26** | **ME** | **$7,116,000** |
| 27 | NE | $4,157,500 |
| 28 | KS | $4,130,600 |
| 29 | WI | $3,592,519 |
| 30 | AL | $3,181,900 |
| 31 | MO | $2,806,050 |
| 32 | ID | $2,796,997 |
| 33 | AZ | $2,223,499 |
| 34 | NM | $2,083,000 |
| 35 | KY | $1,804,598 |
| 36 | LA | $1,637,000 |
| 37 | NULL | $1,585,000 |
| 38 | UT | $1,460,000 |
| 39 | MN | $1,435,214 |
| 40 | DE | $1,328,800 |
| 41 | NH | $1,170,000 |
| 42 | SC | $1,070,600 |
| 43 | OR | $1,045,100 |
| 44 | MS | $695,000 |
| 45 | VT | $490,000 |
| 46 | HI | $474,000 |
| 47 | IA | $430,000 |
| 48 | SD | $287,500 |
| 49 | RI | $267,943 |
| 50 | WV | $259,500 |
| 51 | MT | $171,000 |
| 52 | ND | $145,000 |
| 53 | AK | $143,758 |

## 5 Time Series Analysis of Contributions per State




Figure 3: Time series of Maine IN STATE Contributions (> 5k)




Figure 4: Time Series of OUT-OF-STATE Contributions (> 5k) from DC

Note: The large amount of contributions coming from DC can be explained by the fact that a lot of super PAC groups are headquartered in Washington, DC.

## 6 Contributions to Super PACs Organized by Partisanship

Note: The following categorizations were made by a team of researchers at OpenSecrets, the nation's premier research and government transparency group tracking money in politics and its effect on elections and policy.

Note: I do not have a codebook on this dataset, but I infer that viewpt = $X$ means that OpenSecrets was unable to place the Super PAC into strictly binary partisan categories.




Figure 5: Enter Caption

Table 9: Contributions Organized by Partisanship

| Cycle | Pct Consv | Pct Libl | Pct Other | Election Total |
|---|---|---|---|---|
| 2010 | 0.10 | 0.90 | NA | $4,919,000 |
| 2012 | 0.87 | 0.10 | 0.02 | $21,162,880 |
| 2014 | 0.11 | 0.89 | NA | $192,267,915 |
| 2016 | 0.35 | 0.65 | NA | $148,501,150 |
| 2018 | 0.47 | 0.43 | 0.01 | $399,825,729 |
| 2020 | 0.54 | 0.44 | 0.02 | $1,478,892,397 |
| 2022 | 0.30 | 0.60 | 0.11 | $58,565,122 |
| Grand Total | | | | $2,304,133,193 |

# Supplementary Materials

## (1) Information about Super PACs

### (1.1) Routes Contributions take to get to Super PACs

Individual → 501(*c*)(4) → Super PAC
Individual → Super PAC
Corporate Treasury → 501(*c*)(4) → Super PAC
Union Treasury → 501(*c*)(4) → Super PAC
Corporate Treasury → Super PAC
Union Treasury → Super PAC
Super PAC → Super PAC
Ordinary PAC → Super PAC
Super PAC ⇐≠⇒ Campaign Committee

### (1.2) Differences between Super PACs and Ordinary PACs (at the federal level)

| Super PACs | Ordinary PACs |
|---|---|
| Super PACs cannot give directly to campaign committees. Coordination is legally prohibited. | Ordinary PACs can give directly to campaign committees. Coordination is legally permissible. |
| Super PACs have *no limits* on how much they can receive from a contributor. | Ordinary PACs are *limited* in how much they can receive from a contributor. |
| Super PACs can receive contributions from:<br>- Individuals<br>- Corporate Treasuries<br>- Union Treasuries<br>- 501(c)(4)s<br>- Other Super PACs<br>- Ordinary PACs | PACs can receive contributions from:<br>- Individuals<br><br>PACs cannot receive contributions from:<br>- Corporate Treasuries<br>- Union Treasuries |

### (1.3) *Contributions* vs *Expenditures*

Contribution → **Super PAC** → Independent Expenditures
Contribution → **PAC** → Expenditures

A Note on Contributions vs Expenditures:

- *Independent Expenditures*, at the federal level, refers to uncoordinated election spending by super PACs.
- *Contributions*, in this analysis, refers to the contributions made by individuals, organizations, corporations, or unions to super PACs. Our argument in favor of LD2232 concerns contributions, not independent expenditures.
- See 1.2 (above) for an idea of what kinds of paths exist to get contributions to super PACs.

# Report on Contributions to PACs Making Independent Expenditures in Maine *State* Elections

Prepared by Maia Cook for the Public Hearing on LD2232:

*An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures*

March 6, 2024

# Report on Contributions to PACs Making Independent Expenditures in Maine *State* Elections

Prepared by Maia Cook

March 6, 2024

## Facts about the dataset

- This data was pulled from OpenSecrets' sister website: FollowtheMoney.
- This data looks at all contributions greater than or equal to $5,000 – with the exception of the out-of-state section of this report, which will also look at all contributions less than or equal to $5,000.
- This data looks at contributions Maine state elections from 2010-2022.

# 1 Summary Statistics of *State* Dataset

Table 1: Number of Contributions > $5,000 per Cycle

| Cycle | Contributions |
|---|---|
| 2010 | 125 |
| 2011 | 70 |
| 2012 | 188 |
| 2014 | 361 |
| 2016 | 504 |
| 2017 | 37 |
| 2018 | 255 |
| 2020 | 181 |
| 2022 | 336 |

Table 2: Summary Statistics of Contributions > $5,000 (2010:2022)

| Statistic | Value |
|---|---|
| Min. | $5,011 |
| 1st Qu. | $10,000 |
| Median | $20,000 |
| Mean | $59,111 |
| 3rd Qu. | $50,000 |
| Max. | $1,700,000 |




Figure 1: Time Series of IN & OUT-OF-STATE Contributions to Independent Expenditure PACs (2010-2022)

## 2 Total Contributions by Party and ME Election Year

Table 3: Total of *Expressly* Partisan Contributions per ME Election

| Election | Total Democrat/Lib | Total Republican/Cons |
|---|---|---|
| 2010 | $1,899,594.9 | $1,215,793.8 |
| 2011 | $382,961.8 | $571,428.3 |
| 2012 | $3,295,910.7 | $2,387,474.6 |
| 2014 | $8,594,919.8 | $7,366,530.9 |
| 2016 | $4,965,765.7 | $1,598,969.1 |
| 2018 | $6,729,388.6 | $3,733,076.2 |
| 2020 | $3,838,206.0 | $1,424,869.3 |
| 2022 | $6,581,644.8 | $8,458,433.2 |
| **Grand Total** | $36,388,392.3 | $26,756,575.4 |




Figure 2: Total Contributions by Party and ME Election Year

## 3 Top 25 Largest Contributors to Independent Expenditure Groups (2010:2022)

Table 4: Largest Contributors to Independent Expenditure Groups, (2010:2022)

| Rank | CFS Entity | Total Contributions |
|---|---|---|
| 1 | DEMOCRATIC GOVERNORS ASSOCIATION | $16,750,095 |
| 2 | REPUBLICAN GOVERNORS ASSOCIATION | $15,373,742 |
| 3 | SENATE DEMOCRATIC CAMPAIGN CMTE OF MAINE | $8,582,601 |
| 4 | NATIONAL EDUCATION ASSOCIATION | $5,340,483 |
| 5 | HOUSE DEMOCRATIC CAMPAIGN CMTE OF MAINE | $4,590,813 |
| 6 | EVERYTOWN FOR GUN SAFETY | $4,372,908 |
| 7 | SCOTT, LISA | $4,058,965 |
| 8 | DEMOCRATIC LEGISLATIVE CAMPAIGN CMTE | $3,445,571 |
| 9 | LEAGUE OF CONSERVATION VOTERS | $3,385,000 |
| 10 | KLINGENSTEIN, THOMAS | $3,045,000 |
| 11 | NEXTGEN CLIMATE ACTION | $2,795,550 |
| 12 | NEW APPROACH PAC | $2,407,372 |
| 13 | MAINE SENATE REPUBLICAN MAJORITY | $2,156,359 |
| 14 | REPUBLICAN STATE LEADERSHIP CMTE | $2,144,500 |
| 15 | SUSSMAN, SELWYN DONALD (S D) | $2,076,188 |
| 16 | NATIONAL RIFLE ASSOCIATION / NRA | $2,031,551 |
| 17 | MAINE EDUCATION ASSOCIATION | $1,612,105 |
| 18 | UNITEMIZED DONATIONS | $1,143,388 |
| 19 | MAINE PEOPLES ALLIANCE | $1,113,354 |
| 20 | EMILYS LIST | $1,093,000 |
| 21 | PLANNED PARENTHOOD FEDERATION OF AMERICA | $1,031,408 |
| 22 | CITIZENS WHO SUPPORT MAINES PUBLIC SCHOOLS | $886,900 |
| 23 | SERVICE EMPLOYEES INTERNATIONAL UNION / SEIU | $880,000 |
| 24 | BLANK | $850,000 |
| 25 | MAINE REPUBLICAN PARTY | $789,532 |

## 4 In vs Out-of-State Contributions: Maine State Elections

Table 5: In vs Out-of-State Contribution Totals for Contributions OVER $5,000 (2010-2022)

| State | Total | Pct |
|---|---|---|
| Out | $82,386,338 | 67.7% |
| In | $38,142,719 | 31.3% |
| Unknown | $1,062,009 | 0.08% |
| **Grand Total** | **$121,591,066** | **100.0%** |



Table 6: In vs Out-of-State Contribution Totals for Contributions UNDER $5,000 (2010-2022)

| State | Total | Pct |
|---|---|---|
| Out | $4,057,295.00 | 27.7% |
| In | $10,517,740.00 | 71.8% |
| Unknown | $54,196.13 | 0.3% |
| **Grand Total** | $14,629,231.13 | 100.0% |




Based on an analysis in R, we account for more observations by measuring state using an indicator variable from the dataset called CFS_InState instead of a variable called SAT_State.

Table 7: Number of Out-of-State Contributions > $5,000, 2010-2022

| **State** | **Count** |
|---|---|
| DC | 467 |
| **ME** | **1154** |
| NY | 84 |
| FL | 43 |
| *NULL* | 49 |
| PA | 38 |
| MD | 26 |
| CA | 28 |
| VA | 34 |
| CT | 7 |
| GA | 7 |
| IL | 9 |
| MA | 12 |
| NC | 12 |
| OH | 12 |
| NH | 16 |
| CO | 18 |
| MN | 2 |
| TN | 2 |
| VT | 2 |
| WA | 4 |
| KS | 4 |
| KY | 4 |
| MO | 4 |
| TX | 11 |
| AZ | 2 |
| WI | 1 |
| RI | 1 |
| NJ | 1 |
| OK | 1 |
| AK | 1 |
| AR | 1 |

Table 8: Contribution Totals by State (2010-2022)

| Rank | Contrib_State | Total |
|---|---|---|
| 1 | DC | $57,479,818.71 |
| **2** | **ME** | **$36,668,032.49** |
| 3 | NY | $9,690,322.18 |
| 4 | FL | $4,670,275.64 |
| 5 | VA | $3,285,813.78 |
| 6 | PA | $2,115,032.54 |
| 7 | *NULL* | $2,051,033.25 |
| 8 | CO | $1,089,000.00 |
| 9 | MD | $724,235.44 |
| 10 | NC | $698,500.00 |
| 11 | TX | $545,000.00 |
| 12 | CA | $484,075.57 |
| 13 | MA | $408,000.00 |
| 14 | NH | $315,000.00 |
| 15 | IL | $276,006.28 |
| 16 | WA | $233,000.00 |
| 17 | GA | $214,999.00 |
| 18 | AZ | $125,000.00 |
| 19 | CT | $104,000.00 |
| 20 | OH | $84,500.00 |
| 21 | KS | $74,500.00 |
| 22 | MN | $46,920.55 |
| 23 | MO | $41,000.00 |
| 24 | KY | $40,000.00 |
| 25 | VT | $37,500.00 |
| 26 | WI | $25,500.00 |
| 27 | TN | $15,500.00 |
| 28 | OK | $15,300.00 |
| 29 | AK | $10,000.00 |
| 30 | AR | $10,000.00 |
| 31 | RI | $6,700.00 |
| 32 | NJ | $6,500.00 |




Figure 3: Time Series Plot of IN STATE Contributions (> 5k)

Note: The large amount of contributions coming from DC can be explained by the fact that a lot of super PAC groups are headquartered in Washington, DC.




Figure 4: Time Series Plot of DC Contributions (> 5k) to ME Elections

## 5 Contributions by Industry




Figure 5: Total Contributions to Independent Expenditure PACs per Industry in ME elections (2010:2022)

Analyses of contributions by industry are not available for election cycles before 2016.

Table 9: Ranked Industry Contributions in 2016 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Gun Control | $5,693,750.20 |
| 2 | Democratic Party committees | $3,708,329.04 |
| 3 | Drug Legalization Advocates | $3,104,632.28 |
| 4 | Public School Advocates | $2,977,302.08 |
| 5 | Uncoded | $2,178,637.03 |
| 6 | Gun Rights | $2,071,015.93 |
| 7 | Other single-issue or ideological groups | $1,714,474.99 |
| 8 | Republican Party committees | $1,538,969.15 |
| 9 | Democratic/Liberal | $1,257,436.66 |
| 10 | Abortion policy, pro-choice | $186,054.18 |
| 11 | Real estate | $82,903.98 |
| 12 | Environmental policy | $66,000.00 |
| 13 | Republican/Conservative | $60,000.00 |
| 14 | Trucking | $25,560.00 |
| 15 | Hunting & wildlife | $10,000.00 |
| 16 | Restaurants & drinking establishments | $7,500.00 |
| **Grand Total** | | **$24,447,615.92** |

Table 10: Ranked Industry Contributions in 2018 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Uncoded | $5,993,414.20 |
| 2 | Democratic Party committees | $4,610,648.40 |
| 3 | Republican Party committees | $3,733,076.20 |
| 4 | Democratic/Liberal | $2,118,740.20 |
| 5 | Environmental policy | $1,540,000.00 |
| 6 | Abortion policy, pro-choice | $258,000.00 |
| 7 | Real estate | $57,450.00 |
| 8 | Gun Rights | $30,007.90 |
| **Grand Total** | | **$17,341,337.90** |

Table 11: Ranked Industry Contributions in 2020 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Democratic Party committees | $3,313,127.50 |
| 2 | Republican Party committees | $1,424,869.30 |
| 3 | Public School Advocates | $671,000.00 |
| 4 | Democratic/Liberal | $525,078.60 |
| 5 | Uncoded | $464,375.10 |
| 6 | Abortion policy, pro-choice | $355,295.00 |
| 7 | Health & welfare policy | $103,704.00 |
| 8 | Environmental policy | $45,000.00 |
| **Grand Total** | | **$6,902,449.50** |

Table 12: Ranked Industry Contributions in 2022 ME Election Cycle

| Rank | Business | Total Industry |
|---|---|---|
| 1 | Uncoded | $14,825,767.50 |
| 2 | Republican Party committees | $8,458,433.20 |
| 3 | Democratic Party committees | $5,680,844.80 |
| 4 | Environmental policy | $1,065,514.90 |
| 5 | Democratic/Liberal | $900,799.90 |
| 6 | Abortion policy, pro-choice | $895,500.00 |
| 7 | Public School Advocates | $729,000.00 |
| 8 | Term limits | $156,160.40 |
| 9 | Gun Rights | $35,887.50 |
| **Grand Total** | | **$32,647,798.20** |

**TESTIMONY BEFORE THE JOINT STANDING COMMITTEE**

**ON VETERANS AND LEGAL AFFAIRS**

**IN SUPPORT OF**

**LD 2232**

**"AN ACT TO LIMIT CONTRIBUTIONS TO POLITICAL ACTION COMMITTEES THAT MAKE INDEPENDENT EXPENDITURES"**

Good afternoon, Senator Hickman, Representative Supica and distinguished members of the Committee on Veterans and Legal Affairs. My name is Adam Cote, I am an attorney at Drummond Woodsum. I am here to testify in favor of LD 2232, "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures."

I have been working with Professor Larry Lessig and his organization, Equal Citizens, and Cara McCormick's Ballot Question Committee, Citizens to End SuperPACs to get this issue before Maine voters as a referendum in the November election.

As an attorney, I find this bill fascinating because although, from a drafting perspective, it is remarkably simple – limiting to $5,000 per year the amount of contributions by individuals, PACs and businesses to PACs that make independent expenditures – yet this simple bill effectively works to challenge the lower courts' interpretation to the Supreme Court's decisions in *Buckley v Valeo* and *Citizen's United.*

As a former candidate for statewide office, I find this bill enormously important to help limit the disproportionate role single donors have in our election process. This is an issue I dealt with in the most personal of ways having spent the better part of two years trying to raise campaign funds with a $1,600 per donor limit only to have a SuperPAC formed two weeks before the primary election to spend hundreds of thousands of dollars against my campaign.

But the biggest reason I am supportive of this initiative is because I am a citizen of the State and great country and like many of you, I am concerned about our democracy. Democracies are very fragile and, in our country, today – regardless of your political beliefs – I think you can acknowledge that wealthy donors contributing to SuperPACs is one of the most corrupting and truly undemocratic forces that enjoys a grossly disproportionate share of influence over our election process. While this bill does not solve all of those problems, I believe it is a large step forward. And as a final point, I think that this November's election could likely be the most divisive one in our country's history – which is saying a lot. I kind of like the idea of having Mainers going to the polls this November with at least one unifying issue they can all agree upon.

I would be happy to answer any of your questions.

FREE SPEECH FOR PEOPLE .ORG

Senator Craig Hickman, Senate Chair
Representative Laura Supica, House Chair
Committee on Veterans & Legal Affairs
Maine State Legislature

RE: IB 5, LD 2232 (An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures)

March 5, 2024

Dear Chair Hickman and Chair Supica,

I am the Legal Director of Free Speech For People, a national non-partisan non-profit organization that works to renew our democracy and to limit the influence of money in our elections. I write in support of LD 2232, which will limiting contributions to independent expenditure PACs, more commonly known as "super PACs."

Super PACs are political committees that make only "independent" expenditures. Under current law, there are absolutely no limits on contributions to these committees. This creates some unfortunate, illogical, and harmful effects. For example, it is illegal for a wealthy donor to contribute a penny more than $1,950 to a candidate for governor, because the legislature has determined that contributions above that amount pose an unacceptable risk of corruption or the appearance of corruption.[1] Yet that same wealthy donor may contribute $100,000, or $1 million, if not $10 million, to the candidate's super PAC. As just one example, in 2022, a super PAC funded by a single donor spent some $300,000 on the primary in the Cumberland County district attorney's race—four times as much as the total raised by both candidates combined.[2]

This bill amends Title 21-A to impose a contribution limit of $5,000 from any individual or other PAC to a super PAC. This is two-and-a-half times the limit on contributions to gubernatorial candidates, and over ten times the limit on contributions to legislative candidates. It is more than enough to enable contributors to support their favored candidates without posing an unacceptable risk of corruption.

[1] Me. Rev. Stat. ch. 21-A, § 1015.
[2] See David Sharp, *National groups flooding local prosecutor races with money*, NewsCenter Maine, https://www.newscentermaine.com/article/news/nation-world/local-prosecutor-races-get-national-funding/507-5a575486-fff2-469c-b4ca-8f4c65172638 (June 10, 2022).

Some believe that U.S. Supreme Court decisions, including the 2010 *Citizens United* decision, ban limits on contributions to independent expenditure PACs. But that is incorrect. While some federal courts of appeals in other parts of the country, have interpreted *Citizens United* to require this result,[3] as explained in detail below, the reasoning of those decisions is incorrect. In any event, no court with jurisdiction over Maine—neither in the state court system nor any federal court—has ever adopted the reasoning of those courts or otherwise indicated that limits on contributions to super PACs would be unconstitutional.

And since 2010, empirical evidence has mounted against the assumptions underlying that decision. For example, as explained in more detail in two reports by political scientist Stephen Weissman,[4] the actual relationships between "independent" super PACs and their large donors provides ample opportunities for quid pro quo corruption.[5] Recent empirical research shows that, as one might expect, this also leads to the *appearance* of corruption.[6]

LD 2332 would help increase the integrity of Maine's elections by banning deep-pocketed donors from contributing unlimited amounts to super PACs, thus reducing

---

[3] *See, e.g.,* SpeechNow.org v. Fed. Election Comm'n, 599 F.3d 686 (2010).
[4] See Stephen R. Weissman, *The* SpeechNow *Case and the Real World of Campaign Finance* (Oct. 2016), *available at* https://freespeechforpeople.org/wp-content/uploads/2016/10/FSFP-Weissman-Report-final-10-24-16.pdf; Stephen R. Weissman, *The* SpeechNow *Case and the Real World of Campaign Finance: Undermining Federal Limits on Contributions to Political Parties (Part II)* (May 2017), *available at* https://freespeechforpeople.org/wp-content/uploads/2017/05/Research-Report-2017_01.pdf.
[5] Indeed, a federal grand jury indicted a sitting U.S. Senator for bribery for a contribution to a super PAC, and a federal judge upheld the indictment as consistent with *Citizens United*, although the jury later deadlocked and the judge dismissed some of the charges for insufficient evidence. *See* United States v. Menendez, No. CR 15-155, 2018 WL 526746, at *9 (D.N.J. Jan. 24, 2018). Relatedly, in 2011 the U.S. Court of Appeals for the Eleventh Circuit upheld a bribery conviction against Alabama Governor Don Siegelman where the bribe in question was given to a charitable organization that engaged only in issue advocacy. *See* United States v. Siegelman, 640 F.3d 1159, 1175 (11th Cir. 2011). The fact that a federal court found quid pro quo corruption from a contribution to a group that spent only on issue advocacy is striking because courts consider issue advocacy to pose no greater (and probably less) risk of corruption than "independent" expenditures in candidate races.
[6] *See* Christopher Robertson et al., *The Appearance and the Reality of Quid Pro Quo Corruption: An Empirical Investigation,* 8 Journal of Legal Analysis 375 (Winter 2016), *available at* https://academic.oup.com/jla/article/8/2/375/2502553.

the risk of quid pro quo corruption or the appearance of quid pro quo corruption. The remainder of this memorandum provides a detailed legal explanation why the U.S. Supreme Court's campaign finance precedent does not block Maine from protecting its elections in this way.

Thank you for considering LD2332 and I would be happy to discuss it further at your convenience.

Sincerely,
Ron Fein, Legal Director
Free Speech For People
617-244-0234
rfein@freespeechforpeople.org

### I. Limits on contributions to candidates and closely affiliated political actors, including super PACs, are constitutional means of preventing quid pro quo corruption and its appearance.

1. Under U.S. Supreme Court precedent, campaign finance limits must serve "the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Cruz*, 142 S. Ct. 1638, 1652 (2022). But the Court has long held that restrictions on contributions are different in kind from expenditure limits and accordingly are subject to a more deferential constitutional scrutiny.

Expenditure limitations directly restrict communication and are therefore subject to "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 19, 44-48 (1976). But contribution limits are "merely marginal speech restrictions" that "lie closer to the edges than to the core of political expression." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (internal quotation marks and citation omitted). A contribution serves only "as a general expression of support for the candidate and his views." *Buckley*, 424 U.S. at 21. It "does not communicate the underlying basis for the support." *Id.* "[T]he transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* A contribution limit thus moderates only "the symbolic expression of support evidenced by a contribution." *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality opinion) (quoting *Buckley*, 424 U.S. at 21).[7] It does "not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* (quoting *Buckley*, 424 U.S. at 21).

Thus, contribution limits are subject to less rigorous scrutiny than expenditure limits. *Id.* at 196-97. Contribution limits are valid when "closely drawn" to prevent quid pro quo corruption or its appearance. *See id.* at 197-98, 207-08; *Buckley*, 424

[7] All subsequent citations to *McCutcheon* are to the plurality opinion unless otherwise noted.

U.S. at 25-29. This "relatively complaisant" test, *Beaumont*, 539 U.S. at 161, does not permit the public to limit "mere influence or access" to political officials, *McCutcheon*, 572 U.S. at 208. But the public may permissibly limit "'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." *Id.* at 207 (quoting *Buckley*, 424 U.S. at 27).

2. Consequently, the Supreme Court has "routinely struck down limitations on independent expenditures by candidates, other individuals, and groups, while repeatedly upholding contribution limits." *FEC v. Colo. Republican Fed. Campaign Comm. ("Colorado II")*, 533 U.S. 431, 441-42 (2001) (citations omitted). Especially relevant here, the Court has repeatedly upheld statutes limiting the amount of money people may contribute to candidates or third parties with close ties to particular candidates.

First, in *Buckley*, the Court upheld the Federal Election Campaign Act's ("FECA") limits on contributions directly to candidates. 424 U.S. at 28-29. Candidates, the Supreme Court explained, "depend on financial contributions from others to provide the resources necessary to conduct a successful campaign." *Id.* at 26. Absent regulation, therefore, large contributions might be given "to secure a political quid pro quo from current and potential office holders." *Id.* "[T]he opportunities for abuse inherent in a regime of large individual financial contributions" would also create an "appearance of corruption" that could erode "confidence in the system of representative Government." *Id.* at 27 (citation omitted).

In *California Medical Association v. FEC*, 453 U.S. 182 (1981) (*"CalMed"*), the Court applied *Buckley*'s rationale and upheld a limit on contributions to multicandidate political committees that, *inter alia*, made independent expenditures. *Id.* at 184-85. Without these limits, the restrictions on contributions to candidates themselves "could be easily evaded" simply "by channelling funds through a multicandidate political committee." *Id.* at 198 (plurality opinion). Thus, capping contributions to outside groups is "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley*." *Id.* at 199.

In *McConnell v. FEC*, 540 U.S. 93 (2003), the Court similarly applied *Buckley*'s rationale to uphold limits on donations of "soft money"—contributions to national, state, and local political parties for activities that included issue advertising. *Id.* at 122-24, 131, 168. Even assuming that money was not spent in coordination with particular candidates, *see id.* at 152 & 152 n.48, the Court recognized that soft-money contributions "create[d] a significant risk of actual and apparent corruption," *id.* at 168. "[O]fficeholders were well aware of the identities of the donors" who contributed large amounts of soft money to parties. *Id.* at 147. And given the "close

ties" between parties and the parties' candidates, *id.* at 161, the activities funded by soft money "confer[red] substantial benefits on federal candidates," *id.* at 168. Parties, therefore, could serve as "intermediaries" between big donors seeking "to create debt on the part of officeholders" and candidates seeking "to increase their prospects of election." *Id.* at 146.

3. The Supreme Court's cases since 2010, including *Citizens United v. FEC*, 558 U.S. 310 (2010), are in accord. In *Citizens United*, the Court invalidated a federal statute that forbade corporations from making political *expenditures* close to elections. *Id.* at 318-19. Reiterating that expenditures are "political speech," and that "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," the Court reasoned that "[t]he anticorruption interest is not sufficient" to restrict such expenditures. *Id.* at 339-40, 357 (internal quotation marks and citation omitted). "[I]ndependent expenditures," the Court further stated, "do not give rise to corruption or the appearance of corruption." *Id.* at 357. At the same time, the Court emphasized that it had "sustained limits on direct *contributions* in order to ensure against the reality or appearance of corruption." *Id.* at 357 (emphasis added); *see also id.* at 345, 361 (stressing that *Citizens United* dealt only with expenditures).

After *Citizens United*, the Court again recognized that "Congress may regulate campaign contributions to protect against corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 191. In *McCutcheon*, the Court invalidated a statute limiting *aggregate* candidate contributions. *Id.* at 193, 221. But it reiterated *Buckley*'s holding that FECA's "base" limits themselves "serv[e] the permissible objective of combatting corruption." *Id.* at 192-93; *see also id.* at 197-98. The Court also stressed that "*McConnell*'s holding about 'soft money'" was unaffected by its ruling. *Id.* at 209 n.6.

Crucially, the Court in recent years has twice summarily reaffirmed FECA's restrictions on soft money contributions, ***even where the recipients of the prospective donations sought to spend the money independently—i.e., without coordinating with a candidate or campaign***. *See Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 96-97 (D.D.C. 2016), *aff'd*, 137 S. Ct. 2178 (2017); *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 157 (D.D.C. 2010), *aff'd*, 561 U.S. 1040 (2010). In the second of those cases, the Solicitor General's 2017 filing stressed "the distinction between expenditure limits and contribution limits" and agreed that Congress may limit soft-money *contributions* that political parties intend to use exclusively for independent *expenditures*. Mot. to Dismiss or Affirm at 18-22, *Republican Party of La. v. FEC*, 137 S. Ct. 2178 (2017) (No. 16-865), 2017 WL 1352870, at *18, *22. Only two Justices would have set the case for argument. *Republican Party of La.*, 137 S. Ct. at 2178.

Finally, nothing in the Court's most recent campaign finance decision, *FEC v. Cruz*, 142 S. Ct. 1638 (2022), alters this framework.

## II. Contrary to the D.C. Circuit's view, *Citizens United* does not prohibit limits on contributions to independent expenditure groups.

In *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), the D.C. Circuit asserted that *Citizens United* dictates, "as a matter of law," that contributions to committees that make only independent expenditures cannot be limited. *Id.* at 695. The court of appeals reasoned: "[B]ecause *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations." *Id.* at 696.

But *SpeechNow*'s reasoning is fallacious. ***Even when an organization's spending does not corrupt, a contribution to that organization can still corrupt***.

1. Bribery law makes clear that donations to actors other than candidates or organizations under their control can give rise to quid pro quo corruption. Even when the recipient of a donation is independent and incorruptible, the donation can corrupt an actor who is interested in seeing the organization funded and successful—and who may be willing to grant favors in return.

Bribery laws incorporate that commonsense insight. Because a payment can corrupt even when it is directed to an entity the bribed official does not control, the federal bribery statute forbids a public official from corruptly seeking "anything of value personally *or for any other person or entity*" in exchange for official action. 18 U.S.C. § 201(b)(2) (emphasis added); *see, e.g.*, *United States v. Brewster*, 506 F.2d 62, 68-69 (D.C. Cir. 1974) (emphasizing the import of the "any other person or entity" coverage).

For instance, a senator "who agreed to vote in favor of widget subsidies in exchange for a widget maker's donation to the Red Cross" would be guilty of bribery even if he had no connection to the Red Cross or role in determining how the organization spent the funds. Albert W. Alschuler et al., *Why Limits on Contributions to Super PACs Should Survive* Citizens United, 86 Fordham L. Rev. 2299, 2310 (2018). Even though the Red Cross's expenditures would be virtuous, the widget maker's contribution would be corrupt. *Id.*

Bribery through corrupt donations to autonomous third-party entities themselves engaged in non-corrupting spending is not merely a hypothetical concern. Affirming the conviction of a former governor, the Eleventh Circuit has recognized that soliciting a donation to an issue-advocacy foundation—which engages solely in non-corrupting issue advocacy speech—can violate the bribery

statute, even though donations to such organizations "do not financially benefit the individual politician in the same way that a candidate-election campaign contribution does." *United States v. Siegelman*, 640 F.3d 1159, 1169 n.13 (11th Cir. 2011); *see also, e.g., United States v. Gross*, No. 15-cr-769, 2017 WL 4685111, at *42 (S.D.N.Y. Oct. 18, 2017) (bribery through donation to a church).

2. In *Citizens United*, the Supreme Court reiterated that "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.'" 558 U.S. at 357 (quoting *Buckley*, 424 U.S. at 47). It then further stated that "independent expenditures . . . *do not* give rise to corruption or the appearance of corruption." *Id.* (emphasis added).

That statement arose in the context of independent expenditures. In that context, the *spender*—the person(s) involved in selecting, e.g., where to buy TV ads, or how to frame a message about the opponent—is not communicating with the *politician*. But if the *spender* is isolated from the *politician*, then the spender's independent spending ("quid") cannot be connected with favors from the politician ("quo") because they have no opportunity to discuss that exchange (no "pro").

That, however, says nothing about a donor who contributes to the spender at the request of the politician. Even if a super PAC (the spender) does not coordinate its campaign strategy with a supported candidate, a contributor is free to discuss both the "quid" and the "quo" with the candidate. *See* Albert W. Alschuler, *Limiting Political Contributions after* McCutcheon, Citizens United, *and* SpeechNow, 67 Fla. L. Rev. 389, 475 (2015). Interviews with former Members of Congress and political operatives suggest how such quid pro quo agreements could occur. *See* Daniel B. Tokaji & Renata E.B. Strause, *The New Soft Money: Outside Spending in Congressional Elections* (2014). As one campaign operative explained: "So the Member calls and says 'Hey, I know you're maxed out – and I can't take any more money from you – but there's this other group. I'm not allowed to coordinate with them, but can I have someone call you?'" *Id.* at 68. The conversation could then discuss official matters, including an agreement to take official action in exchange for the donor's contributions to the "other group," *i.e.*, the super PAC.

Put another way, the *spender* (e.g., the media consultant running the super PAC) does not want widget subsidies—the *donor* does. A quid pro quo transaction is thus perfectly plausible: The donor and politician agree that the donor will contribute a large sum to the super PAC in exchange for widget subsidies; the politician agrees; the donor makes the corrupt contribution; and the super PAC—which can be isolated from the widget subsidy conversation—spends the money, *non-corruptly*, to buy independent ads in support of the politician. Thus, the condition described in *Citizens United* is maintained (the independent spending

does not corrupt) but the facile syllogism in *SpeechNow* (that money contributed for the purpose of non-corrupt spending cannot be part of a separate corrupt transaction) is refuted.

In fact, Chief Justice Roberts has refuted the idea that independent spending has no value to candidates—that there is no corrupting "quid." He explained, "We have said in the context of independent expenditures that '[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate.' *But probably not by 95 percent*." *McCutcheon*, 572 U.S. at 214 (cleaned up; emphasis added; citation omitted). Thus, independent spending *does* have value to candidates. The reason it can't corrupt is because the independent spender is isolated from the politician and thus has no chance to discuss an exchange. But a super PAC provides a cut-out, leaving the donor and politician free to communicate.

Indeed, the federal government has repeatedly charged individuals with bribery arising from donations to super PACs themselves.[8] In 2020, the federal government convicted insurance magnate Greg Lindberg of "orchestrating a bribery scheme involving independent expenditure accounts and improper campaign contributions." Press Release, U.S. Dep't of Justice, *Federal Jury Convicts Founder and Chairman of a Multinational Investment Company and a Company Consultant of Public Corruption and Bribery Charges* (Mar. 5, 2020), perma.cc/38BH-JD4V. Lindberg funneled $1.5 million to a super PAC he created for the purpose of bribing a state insurance commissioner to replace an official investigating Lindberg's company. Ian Vandewalker, *10 Years of Super PACs Show Courts Were Wrong on Corruption Risks*, Brennan Ctr. for Justice (Mar. 25, 2020), perma.cc/4DJN-DSKT.[9]

---

[8] These examples may appear few, but "'the scope of such pernicious practices can never be reliably ascertained.'" *Citizens United*, 558 U.S. at 356 (quoting *Buckley*, 424 U.S. at 27). Moreover, *SpeechNow* rested on a syllogistic conclusion that such quid pro quo corruption was logically impossible, so the existence of *any* quid pro quo corrupt transaction via a contribution to a super PAC illustrates its fallacy. *Cf. FEC v. Cruz*, 142 S. Ct. 1638, 1653 (2022) (in reviewing a challenge to a different campaign finance statute, noting that "the Government is unable to identify a single case of *quid pro quo* corruption in this context.")

[9] Lindberg was caught on tape telling the commissioner, "I think the play here is to create an independent-expenditure committee for your reelection specifically, with the goal of raising $2 million or something." Ames Alexander, *Watch Secretly Recorded Videos from the Bribery Sting that Targeted Durham Billionaire*, Charlotte Observer, at 00:16-30 (Mar. 10, 2020), bit.ly/35aPKvV (quotation transcribed from first video posted in article). Lindberg emphasized that "the beauty of" such a committee is that it can receive "unlimited" donations. *Id.* at 00:35-45.

In 2015, the Government prosecuted a sitting U.S. Senator and a donor for an alleged bribery scheme involving a $300,000 contribution to a super PAC supporting the Senator's reelection. *See United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015). The case resulted in a hung jury, but the court did not question the validity of prosecutors' theory that contributions to super PACs can corrupt.

If the D.C. Circuit were right that "contributions to groups that make only independent expenditures . . . cannot corrupt or create the appearance of corruption," *SpeechNow*, 599 F.3d at 694, these prosecutions would all have been illegitimate. The quid pro quo corruption the federal government alleged would be impossible. When something theorized to be impossible actually occurs, the theory, not the reality, requires correction.

2. The Supreme Court's campaign finance precedents underscore the impropriety of the D.C. Circuit's leap from the proposition that independent *expenditures* do not corrupt to the conclusion that *contributions* to independent-expenditure-only organizations cannot corrupt. In *Colorado Republican Federal Campaign Committee v. FEC ("Colorado I")*, 518 U.S. 604 (1996), the Court invalidated limits on independent expenditures by political parties as insufficiently justified by a danger of corruption. *See id.* at 617-18. But the opinion recognized a valid interest in limiting *contributions to the very organizations making those independent expenditures* to fight the "danger of corruption" that would inhere in allowing "large financial contributions [to those organizations] for political favors." *Id.* at 615-17 (opinion of Breyer, J.).

In *McConnell*, the Supreme Court likewise explained that, because of the "close connection and alignment of interests" between officeholders and parties, "large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, *regardless of how those funds are ultimately used*." 540 U.S. at 155 (emphasis added). And in *Republican Party of Louisiana*, which the Supreme Court summarily affirmed in 2017, 137 S. Ct. 2178, a three-judge federal court recognized that contributions to political parties can corrupt even when the parties' expenditures do not. 219 F. Supp. 3d at 97. Writing for the panel, Judge Srinivasan reasoned that "the inducement occasioning the prospect of indebtedness on the part of a federal officeholder is not the *spending* of soft money by the political party. The inducement instead comes from the *contribution* of soft money to the party in the first place." *Id.*

That logic applies here. It does not matter whether super PACs' *expenditures* present a risk of corruption. The question instead is whether large *contributions* to these organizations risk corruption or the appearance of corruption. *See McCutcheon*, 572 U.S. at 191.

## III. Limiting contributions to super PACs is a valid means of preventing quid pro quo corruption and its appearance.

Just like the limits on contributions the Supreme Court upheld in *Buckley* and subsequent cases, limits on contributions to super PACs "protect against corruption or the appearance of corruption." *Id.*

1. Many super PACs are functionally alter egos of candidates' campaigns themselves—raising the same prospects of corruption that direct contributions present.[10] This is most obviously true for super PACs that spend the money they receive to promote a single candidate. Many of these super PACs are run by "former staff of candidates who understand what will help the candidate and make expenditures intended to help the candidate, such as funding events about more general issues that feature the candidate." U.S. Gov't Accountability Off., GAO-20-66R, *Campaign Finance: Federal Framework, Agency Roles and Responsibilities, and Perspectives* 52 (2020). Indeed, such super PACs conduct "a wide array of activities typically the province of the candidates"—including "provid[ing] rapid response to charges against their candidate" and "build[ing] lists of persuadable voters." Bipartisan Policy Ctr., *Campaign Finance in the United States: Assessing an Era of Fundamental Change* 39 (2018). Candidates also "often openly support and associate with" such organizations, appearing at their fundraising events and the like. *Id.* at 33. Similarly, super PACs that promote multiple candidates of the same party often function as alter egos for parties.

Donor activity with respect to super PACs confirms that limiting contributions to such organizations is necessary to prevent the limits on contributions to candidates from being "functionally meaningless." Richard Briffault, *Super PACs*, 96 Minn. L. Rev. 1644, 1684 (2012). A small handful of exceptionally wealthy people not only contribute the maximum permissible amount to candidates; they donate huge amounts of money to super PACs supporting those same candidates.[11] And consider the 2021 Boston mayor's race, where the legal contribution limit (i.e., the threshold at which the legislature has found a risk of corruption) for a contribution

---

[10] That applies even to relationships that are *permitted* under anti-coordination rules. Under those rules, donors typically still view a contribution to a super PAC as functionally indistinguishable from a contribution to a candidate himself. The real-world practices described herein do not constitute "coordination" under these rules, and there is no reason to believe that these practices fit within the U.S. Supreme Court's conception of "coordination." The fundamental issue is not the coordination or lack thereof; it is potential for corruption and the appearance of corruption. Accordingly, the only pathway available to prevent the potential corruption—and obvious appearance of corruption—enabled by super PACs is through contribution limits.

[11] See Stephen R. Weissman, *The SpeechNow Case and the Real World of Campaign Finance* (Oct. 2016), https://bit.ly/3MT3FLC.

to a candidate was $1,000. *See* M.G.L. ch. 55, § 7A(a)(1). Notwithstanding this $1,000 limit, one donor (legally) contributed over one *million* dollars to a super PAC that spent 100% of its money supporting a particular candidate.[12] Meanwhile, the super PAC supporting that candidate's opponent received multiple $50,000 contributions (50 times the limit for a direct contribution) and many just under.[13]

In short, the Supreme Court has held that Maine may prohibit a donor from contributing more than $1,950 to candidate Smith because larger contributions would risk actual or apparent corruption. But, under the D.C. Circuit's logic, the Constitution confers upon that same donor the constitutional right to give over one *million* to a super PAC that is dedicated exclusively to Smith's election, and to hold a freewheeling conversation with Smith about both the contribution and what Smith can do for the donor in return. According to the D.C. Circuit, Maine cannot restrict such a massive contribution because it does not raise *any risk of corruption at all.* That cannot be right.

2. Finally, large contributions to super PACs present the *appearance* of quid pro quo corruption. Intuitively, if a contribution directly to a candidate of $1,951 risks the appearance of corruption, then a contribution of $1,950,000 to that candidate's super PAC risks at least the same appearance of corruption.

Elected officials agree. During the 2016 campaign, then-candidate Donald Trump decried super PACs as "[v]ery corrupt." Alschuler et al., *supra*, at 2339. Trump continued: "There is total control of the candidates . . . . I know it so well because I was on both sides of it . . . ." *Id.* Senator Lindsey Graham made a similar observation in 2015, stating that "basically 50 people are running the whole show." *Id.* at 2341. The late Senator John McCain said that super PACs have "made a contribution limit a joke." *Id.* Consistent with these comments from elected officials, surveys show that the general public overwhelmingly perceives that unlimited contributions to super PACs "lead to corruption."[14]

---

[12] See OCPF, *81065 Real Progress Boston Independent Expenditure Political Action Committee*, https://m.ocpf.us/Filers/FilerInfo?q=81065. The donor in question is James Davis.

[13] See OCPF, *81057 Boston Turnout Project Independent Expenditure Political Action Committee*, https://m.ocpf.us/Filers/FilerInfo?q=81057.

[14] Brennan Ctr. for Justice, *National Survey: Super PACs, Corruption, and Democracy* (Apr. 24, 2012), https://bit.ly/3NVKt17 (summary and appendix) (noting that 69% of respondents, including broad supermajorities of both Republicans and Democrats, endorsed this proposition). In the same survey, 75% of Republicans and 78% of Democrats agreed specifically that "there would be less corruption if there were limits on how much could be given to Super PACs." *Id.*

Finally, the aforementioned bribery prosecutions involving super PAC contributions illustrate what these officials openly admit: super PAC contributions can—and do—facilitate quid pro quo arrangements. Of course, bribery prosecutions capture "only the most blatant and specific attempts" to corrupt candidates and public officials. *Buckley*, 424 U.S. at 28. But the fact that they have occurred underscores the reasonableness of a judgment that contributions to independent expenditure political committees should be limited to prevent the appearance, as well as actuality, of quid pro quo corruption.

###

| | |
|---|---|
| TO: | The Honorable Craig Hickman<br>The Honorable Laura Supica, Co-Chairs<br>Members of the Joint Standing Committee on Veterans and Legal Affairs |
| DATE: | March 6, 2024 |
| RE: | LD 2232 - An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures |

---

Good morning Senator Hickman and Representative Supica.

My name is Will Hayward. I am here today as the Advocacy Program Director on behalf of Maine Citizens for Clean Elections (MCCE). I am testifying Neither For Nor Against LD 2232.

Maine Citizens for Clean Elections has been the leading campaign finance organization in Maine for almost thirty years and one of the nation's most respected state-based organizations advocating for democratically funded elections. We are proud of our national reputation. But we are all Mainers, and our nonpartisan mission has always been with and for the people of this state. No one in Maine has lamented the disastrous 2010 Supreme Court decision in *Citizens United v FEC* more strenuously or consistently than MCCE. The Appellate Court decision in *SpeechNow v FEC* followed soon after, and no one has worked harder over all these years to find a way to rein in contributions to PACs, including independent expenditure PACs (aka Super PACs) than MCCE. Even now, we fervently long for reform, even as the U.S. Supreme Court has left precious few grounds for hope.

Today in our country, we have more concentrated wealth and income than at any time since the beginning of the last century. There is nothing more antithetical to the rights of citizens in a democratic republic than concentrated wealth and power. The size of this gap now threatens confidence in capitalism itself.[1]

Research at the federal level shows that legislators and policymakers are vastly more attentive to the interests of the affluent than they are to those of everyone else.[2] Affluent donors get what they want. The rest of us get what we want when, and only when, we want what they want. American democracy is

---

[1] Christopher Zara, "Davos Dialogs," Fast Company, January 11, 2024, https://www.fastcompany.com/91008803/future-capitalism-survey-2024-threat-steakholders-income-inequality [March 3, 2024]

[2] Martin Gilens, "Inequality and Democratic Responsiveness," Russell Sage Foundation, http://www.russellsage.org/research/inequality-and-democratic-responsiveness [March 17 2013]

PO Box 18187, Portland, Maine 04112 | Tel: (207) 831-MCCE (6223)
www.mainecleanelections.org | info@mainecleanelections.org

failing to serve the needs of the vast majority of its citizens. And our people know it.[3] That's why so many of them signed the petition to put this question on the ballot. That's why this measure is sure to pass when put to voters in November.

The most extreme individual example of this recently in Maine – no one else comes close – is Tom Klingenstein, who from 2021 to 2022 single-handedly underwrote over $2.5 million in independent expenditures from the Maine Families First PAC. Yes, that's right. He personally donated almost $3 million to support Maine candidates. It's too much. That's just one example.

And so, we wholeheartedly support the aspirations of this bill and believe the U.S. Constitution could and should be interpreted to sustain a functioning democracy, including allowing states and Congress to regulate money in politics.

Thank you for the opportunity to testify. I would be happy to answer any questions from the Committee.

[3] Katherine J. Cramer and Jonathan D. Cohen, "Many Americans Believe the Economy Is Rigged," New York Times, February 21, 2024, https://www.nytimes.com/2024/02/21/opinion/economy-research-greed-profit.html?unlocked_article_code=1.Z00.7COE.zDq03bGvwKYC&smid=url-share [March 3, 2024]

Testimony of Peter L. Murray in Support of LD 2232 – An Act to Limit Contributions to Political Actions Committees that Make Independent Expenditures.

**Before the 131 Maine Legislature, Committee on Veterans and Legal Affairs**

March 6, 2024

Senator Hickman, Representative Supica, Members of the Veterans and Legal Affairs Committee:

My name is Peter Murray. I have lived and practiced law in Portland, Maine since 1967. Thank you for permitting me to present my testimony via Zoom. My wife underwent a serious foot operation yesterday, which requires me to be at home to take care of her.

My testimony is submitted in support of LD 2232, "An Act to Limit Contributions to Political Action Committees that Make Independent Expenditures." This legislation offers the State of Maine an opportunity to lead our nation in coming to terms with the flood of big money in the form of contributions to SuperPACS that threaten to submerge the will of the Maine electorate in important contested elections.

While contributions to political candidates to support their campaigns are currently regulated in terms of source and amount, contributions to so called SuperPACS that often make massive and unregulated "independent" expenditures in political campaigns have not been effectively regulated either here in Maine or elsewhere in the United States since shortly after the Supreme Court decided *Citizens United v. FEC* in 2010. The result of this lack of regulation has been huge increases in dark money contributions and expenditures designed to influence key races such as the recent Senatorial contest between Susan Collins and Sara Gideon and the Pine Tree Power referendum last year.

For more than a decade since *Citizens United* was decided, it has been generally assumed that the Supreme Court's reasoning in that case would prevent states or the Federal Government from effectively regulating the limitless sums currently being expended to influence political races. Recently, however, some reform-minded legal scholars have taken another hard look at *Citizens United*. Although that decision makes clear that "independent" political expenditures enjoy a high degree of protection under the First Amendment, there may be some room for constitutional regulation of contributions to the political action committees that make the expenditures. It is hard to believe that large contributions to a SuperPAC that then made independent expenditures to influence an election would not affect the behavior of an office holder whose candidacy had been benefited by such contributions. For example, Senator Robert Menendez is alleged to have provided political favors in exchange for contributions to a designated SuperPAC. Under the current system, neither the SuperPAC nor the public would be aware of such an arrangement. Even though large PAC expenditures may be immune from regulation, large contributions to PAC's can raise a sufficient issue of *quid pro quo* corruption or the appearance of this kind of corruption to support regulation according to principles accepted in *Citizens United*.

LD 2232 puts this proposition to the test. The bill sets a $5,000 annual limit on any individual's or corporate entity's contributions to any single political action committee that makes direct expenditures for the purpose of influencing an election. It also requires political action committees that make expenditures to report to the Maine Commission on Governmental Ethics and Election Practices on the total amount of contributions received from each contributor.

The bill does not forbid contributions to PACS that make expenditures, it merely sets a generous limit on the amount of such contributions per contributor per PAC per year and requires that the identify of the contributors and amount of the contributions be reported. It should be noted that this regulation does not apply to those PACS which make regulated contributions to candidates. It only tries to limit, to some extent, the huge flow of unregulated money that is flowing to PACS that make "independent" expenditures directly.

In my opinion, and the opinions of other lawyers who have looked hard at this approach, the regulation incorporated in LD 2232 would not unconstitutionally trammel anyone's First Amendment rights. By focusing on the contributions, rather than the expenditures, the regulation addresses the appearance of corruption that is generated by big contributions to PACs that make expenditures to influence elections. Candidates are strictly limited in the size of contributions they may accept for their campaigns. However, the large contributors who wish to influence a candidate's performance in office need only make their excess contributions to a SuperPAC that will make independent expenditures in support of the favored candidate. The corrupting effect is pretty much the same as if the money had been given to the candidate directly. By limiting a contributor's annual contributions to any one PAC to $5,000, LD 2332 makes it hard for any one contributor to deploy a large enough sum for any candidate that would exercise a corrupting influence.

There is no doubt that the enactment of LD 2232 by the Legislature, or its enactment by referendum if the Legislature does not take its opportunity to step up on this one, will lead to legal challenges by the big money contributors and perhaps by the media purveyors that these contributions enrich. In my judgment, this is a battle that the State of Maine, with the support

of national groups dedicated to reducing the influence of big money in politics, can win. And if it does win, Maine's law will be a model for the nation. We will finally be able to make some progress in regulating and reducing the influence of big money on American elections.

It may be tempting to the Committee and to the Legislature simply to pass on this one, to allow the citizen-initiated bill that is LD 2232 to go out to the people in referendum this fall. However, the results of the last referendum dealing with election finance should give us all a pretty good idea where the people of Maine stand. LD 2232 is a challenge to us all to do anything we can to save our political system. Please report this remarkable piece of legislation "Ought to Pass",

Peter L. Murray

State of Maine

# Proclamation

***An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures***

***WHEREAS,*** *the electors of the State of Maine presented to the One Hundred and Thirty-first Legislature, in the Second Regular Session, the above-entitled initiated bill, under the provisions of Article IV, Part Third, Section 18 of the Constitution of Maine; and*

***WHEREAS,*** *the Legislature failed to enact such initiated bill; and*

***WHEREAS,*** *the initiated bill was submitted to the electors for approval, by proclamation of the Governor, at the election held on the Tuesday following the first Monday in November, 2024; and*

***WHEREAS,*** *it appears by the returns of the votes cast by the electors of the various cities, towns, and plantations voting upon said initiated bill on November 5, 2024, and communicated to the Governor on November 25, 2024, that a majority of said votes were in favor of this initiated bill becoming law; namely,*

*600,191 in favor, and*
*201,034 opposed;*

***NOW, THEREFORE, I, JANET T. MILLS,*** *Governor of the State of Maine, in pursuance of the provisions of the Constitution of Maine in such case provided, declare said measure adopted, to take effect and become law according to the provisions of the Constitution of Maine, in Article IV, Part Third, Section 19.*

***IN TESTIMONY WHEREOF,*** *I have caused the Great Seal of the State to be hereunto affixed given under my hand at Augusta this* 25th *day of* November *in the year Two Thousand and Twenty-four.*

***Janet T. Mills***
***Governor***

***Shenna Bellows***
***Secretary of State***

PUBLIC APPROVAL
NOVEMBER 5, 2024

EFFECTIVE DATE
DECEMBER 25, 2024

CHAPTER
4
INITIATED BILL

## STATE OF MAINE

## IN THE YEAR OF OUR LORD

## TWO THOUSAND TWENTY-FOUR

## I.B. 5 - L.D. 2232

## An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1. 21-A MRSA §1015, sub-§2-C** is enacted to read:

**2-C. Contributions by individuals to political action committees making independent expenditures.** An individual may not make contributions aggregating more than $5,000 in any calendar year to a political action committee for the purpose of making independent expenditures under section 1019-B, subsection 1. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates.

**Sec. 2. 21-A MRSA §1015, sub-§2-D** is enacted to read:

**2-D. Contributions by political action committees and business entities to political action committees making independent expenditures.** A leadership political action committee, a separate segregated fund committee, a caucus political action committee, any other political action committee or any business entity may not make contributions aggregating more than $5,000 in any calendar year to a political action committee for the purpose of making independent expenditures under section 1019-B, subsection 1. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates. For purposes of this subsection, "business entity" includes a firm, partnership, corporation, incorporated association, labor organization or other organization, whether organized as a for-profit or a nonprofit entity.

**Sec. 3. 21-A MRSA §1019-B, sub-§4, ¶B,** as amended by PL 2023, c. 324, §12, is further amended to read:

B. A report required by this subsection must contain an itemized account of the total contributions from each contributor, each expenditure in excess of $250 in any one candidate's election, the date and purpose of each expenditure and the name of each payee or creditor. The report must state whether the expenditure is in support of or in opposition to the candidate and must include, under penalty of unsworn falsification, as provided in Title 17-A, section 453, a statement whether the expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, the candidate or an authorized committee or agent of the candidate.

**Sec. 4. 21-A MRSA §1019-B, sub-§6** is enacted to read:

**6. Segregated contributions required.** A political action committee may use only funds received in compliance with section 1015, subsection 2-C or 2-D when making independent expenditures. A political action committee that makes independent expenditures shall keep an account of any contributions received for the purpose of making those expenditures.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER, *et al.*,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF JONATHAN GIENAPP**

1. My name is Jonathan Gienapp, and I am an Associate Professor of History and Law at Stanford University. I have been appointed in the Stanford History Department since 2015 and at Stanford Law School since 2024. I earned an A.B. in History from Harvard University in 2006 and a Ph.D. in History at Johns Hopkins University in 2013. I am the author of two books on early American constitutionalism, *The Second Creation: Fixing the American Constitution in the Founding Era* (2018), which received multiple prizes, and *Against Constitutional Originalism: A Historical Critique* (2024). I have also written fifteen scholarly articles and chapters and eight scholarly essays, with four more articles and chapters set to appear later this year.

2. For this litigation, I have been asked to discuss the original meaning of the First Amendment as it might relate to campaign finance regulations. I have based my opinion upon the historical research I have done over the last decade-plus into the original understanding of the First Amendment, constitutional rights, and constitutional governance, research that has undergirded several of my scholarly projects, including especially my most recent book.

3. As compensation, I am receiving a flat fee of $12,500 for this declaration, as well as travel expenses for any subsequent testimony that might be required.

4. If this case is to be determined based on an originalist interpretation of the First Amendment's Free Speech Clause in the United States Constitution, then the original understanding of that provision presents no barrier to Maine's Act to Limit Contributions to Political Action Committees That Make Independent Expenditures (the "Act"). While it can be hard to compare past and present, there is no reason to think that the Act violates the speech protections of the First Amendment as originally understood.[1] That conclusion flows from the particular intellectual-legal context in which the amendment was adopted, which this declaration aims to elucidate.

5. When originally conceived, the First Amendment presupposed a distinctive understanding of fundamental rights, how they were protected, and how and when government could reasonably regulate them. It is impossible to understand the First Amendment from an originalist perspective without bringing that once dominant eighteenth-century constitutional perspective back into focus.[2] What exactly the First Amendment's speech protection originally established and permitted was a function of how those who drafted, ratified, and initially interpreted and implemented the amendment understood the relationship between fundamental rights and republican government.[3]

---

[1] On the challenges of comparing past and present in U.S. constitutionalism, see Jonathan Gienapp, *Against Constitutional Originalism: A Historical Critique* (New Haven: Yale University Press, 2024); Jonathan Gienapp, "History, Law, and Constitutional Rupture," *Boston University Law Review* 104 (Sept. 2024): 1350-53, 1360-78; Lawrence Lessig, *Fidelity and Constraint: How the Supreme Court Has Read the Constitution* (New York: Oxford University press, 2019), 49-69.

[2] See Gienapp, *Against Constitutional Originalism*, esp. 39-44, 67-116; Jud Campbell, "Natural Rights and the First Amendment," *Yale Law Journal* 127 (Nov. 2017): 246-321; Stuart Banner, *The Decline of Natural Law: How American Lawyers Once Used Natural Law and Why They Stopped* (New York: Oxford University Press, 2021), 11-45; Larry D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review* (New York: Oxford University Press, 2004); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1998).

[3] *See* Gienapp, *Against Constitutional Originalism*, 49-53, 91-100; Jud Campbell, "Republicanism and Natural Rights at the Founding," *Constitutional Commentary* 32 (Winter

6. Today, it is often assumed that constitutional rights are counter-majoritarian limits on popular government that are meant to be enforced primarily by judges.[4] By codifying certain rights in the written Constitution, it is thought that eighteenth-century Americans created zones of liberty that would be free from onerous governmental interference while empowering judges to enforce those rights against the majoritarian political institutions that might seek to curb them.[5] By this thinking, rights are conceptualized as the inverse of governmental powers.[6] But the Founding generation that adopted the Constitution did not understand rights that way. They did not, by-and-large, see rights as the inverse of governmental powers.[7]

7. At the time of the Founding, constitutional rights and republican governance were not thought to be at odds but instead were understood to work in harmony.[8] The purpose of constitutional government was assuredly to preserve individual and collective liberty, but that was not the same thing as protecting core rights from government interference or regulation.

8. When Founding-era Americans discussed fundamental rights, they regularly did so with the aid of a framework known as social contract theory.[9] It was a thought experiment that helped

---

2017): 87-99; Jud Campbell, "Fundamental Rights at the American Founding," in *The Cambridge History of Rights*, ed. Dan Edelstein and Jennifer Pitts, vol. 4 (New York: Cambridge University Press, 2025), 182-99; Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Knopf, 1996), 330-36.

[4] Jud Campbell, "Determining Rights," *Harvard Law Review* 138 (Feb. 2025), 923-24, 933; Jud Campbell, "Originalism and the Nature of Rights," *The Panorama*, Nov. 27, 2023, https://thepanorama.shear.org/2023/11/27/originalism-and-the-nature-of-rights/.

[5] *Id.*

[6] Campbell, "Determining Rights," 924.

[7] Gienapp, *Against Constitutional Originalism*, 50, 92; Campbell, "Determining Rights," 924.

[8] Gienapp, *Against Constitutional Originalism*, 49-50; Campbell, "Republicanism and Natural Rights at the Founding," 87-99; William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1996).

[9] Campbell, "Republicanism and Natural Rights at the Founding," 87-90; Campbell, "Fundamental Rights at the American Founding," 183-85; Gienapp, *Against Constitutional Originalism*, 93-95; Wood, *The Creation of the American Republic*, 282-93; John Phillip Reid, *Constitutional History of the American Revolution: The Authority to Legislate* (Madison, WI:

people reason through the origins of legitimate government to better understand the proper workings and limits of public power.[10] The framework began by postulating that human beings had once resided in a state of nature that lacked society or government and in which people enjoyed natural freedom constrained by nothing save natural law.[11] Because human beings were inherently social beings who could only fully flourish in a political community, however, it was believed that they left the state of nature to form political society.[12] They did so, the framework posited, through two discrete steps. First, human beings left the state of nature to form a political society (what they called a social compact).[13] As the Massachusetts Constitution of 1780 declared, "The body politic is formed by a voluntary association of individuals. It is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good."[14] Second, the people who had formed that political community then established a government for themselves (or a constitution).[15] Upon entering into political society, the people retained many fundamental rights they had enjoyed prior

---

University of Wisconsin Press, 1991), 112; Thad W. Tate, "The Social Contract in America, 1774-1787: Revolutionary Theory as a Conservative Instrument," *William and Mary Quarterly* 22 (July 1965): 375-91.

[10] Campbell, "Fundamental Rights at the American Founding," 183; Gienapp, *Against Constitutional Originalism*, 93.

[11] Campbell, "Republicanism and Natural Rights at the Founding," 87; Gienapp, *Against Constitutional Originalism*, 93.

[12] Campbell, "Natural Rights and the First Amendment," 271; Campbell, "Determining Rights," 933-34.

[13] Gienapp, *Against Constitutional Originalism*, 93; Campbell, "Republicanism and Natural Rights at the Founding," 88; Campbell, "Fundamental Rights at the American Founding," 183-84.

[14] Massachusetts Constitution of 1780, Preamble.

[15] Gienapp, *Against Constitutional Originalism*, 93; Campbell, "Republicanism and Natural Rights at the Founding," 89-90; Campbell, "Fundamental Rights at the American Founding," 184.

to that point.[16] That included important natural rights such as the freedom of speech that they had enjoyed before entering political society.[17]

9. How exactly natural rights such as these were retained in political society was critically important. Crucially, these rights were not retained as counter-majoritarian trumps that individuals or groups could wield against government to sharply limit the majority's power to control them.[18] Rather, natural rights were retained through republicanism.[19] The government could regulate and constrain natural rights as long as two conditions were met: first, that the political institutions in question (paradigmatically, the legislature, but also juries and militias) genuinely represented the people,[20] and second, that the regulation had been enacted in the interest of the public good.[21]

---

[16] Gienapp, *Against Constitutional Originalism*, 93; Campbell, "Fundamental Rights at the American Founding," 183-97.

[17] Gienapp, *Against Constitutional Originalism*, 93-94; Campbell, "Republicanism and Natural Rights at the Founding," 91-92; Campbell, "Natural Rights and the First Amendment," 268-70.

[18] Campbell, "Originalism and the Nature of Rights."

[19] Campbell, "Originalism and the Nature of Rights" ("At the Founding, however, retained natural rights generally lacked this anti-regulatory character. So long as the people themselves maintained control over these rights through self-governance, their rights were 'retained.'"); Campbell, "Determining Rights," 934; Campbell, "Natural Rights and the First Amendment," 276. On republicanism *see generally*, Wood, *The Creation of the American Republic*, 46-82.

[20] Campbell, "Republicanism and Natural Rights at the Founding," 86-87, 92-98; Campbell, "Fundamental Rights at the American Founding," 190-91; Campbell, "Natural Rights and the First Amendment," 272-73. On the institutions that were believed to best represent the people, see Campbell, "Determining Rights," 935-37; Gienapp, *Against Constitutional Originalism*, 145-46; Kramer, *The People Themselves*, 24-34, 44-57; Gerald Leonard and Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution, 1780s-1830s* (New York: Cambridge University Press, 2019), 13, 94. On the importance of representation generally at the time, see Bernard Bailyn, *The Ideological Origins of the American Revolution* (Cambridge, MA: Harvard University Press, 2017), 161-75; Gordon S. Wood, *Representation in the American Revolution* (Charlottesville: University of Virginia Press, 2008).

[21] Campbell, "Republicanism and Natural Rights at the Founding," 86-87, 92-98; Campbell, "Fundamental Rights at the American Founding," 190-91; Campbell, "Natural Rights and the First Amendment," 272-73; Campbell, "Originalism and the Nature of Rights." On the importance of the public good to Founding-era political and constitutional thought, see Wood, *Creation of the American Republic*, 53-65; James T. Kloppenberg, *Toward Democracy: The Struggle for Self-Rule in European and American Thought* (New York: Oxford University Press,

Preserving most natural rights, including the freedom of speech, was thus not a matter of disabling the government's right to regulate those rights.[22] These rights could be regulated, as George Hay explained in 1799, "as far as the legislative power shall say, the public good requires."[23] Or, as Theophilus Parsons, the Massachusetts jurist, had written in 1778, "Each individual surrenders the power of controuling his natural alienable rights, *Only* When The Good Of The Whole *Requires* it."[24] The rights were "retained" so long as the people themselves maintained control over the regulation of those rights through the power of self-government.[25]

10. Importantly, not all rights were the same.[26] And some rights were thought to place firmer limits on the exercise of governmental power. In addition to retained natural rights, there were so-called inalienable natural rights—such as the freedom of conscience—that individuals could not relinquish.[27] On account of this character, these rights were largely beyond political society's control, even if the political community still enjoyed the right to locate the boundaries of these rights and legislate on them in certain respects.[28] In addition to inalienable rights, there were also fundamental common law rights, or civil rights, which, unlike natural rights, had not been enjoyed

2016), 349-63, 367, 428-30. On how robust legal regulation in the interest of the general welfare was consistent with liberty, see Novak, *The People's Welfare*.

[22] Campbell, "Originalism and the Nature of Rights"; Campbell, "Natural Rights and the First Amendment," 276.

[23] [George Hay], *An Essay on the Liberty of the Press* (Philadelphia, Aurora, 1799), 38.

[24] [Theophilus Parsons], *The Essex Result* (1778), in *American Political Writing During the Founding Era, 1760–1805*, ed. Charles S. Hyneman and Donald S. Lutz, 2 vols. (Indianapolis: Liberty Fund, 1983) 1:487.

[25] Campbell, "Determining Rights," 934 ("it was up to the people to determine their own rights"); Campbell, "Originalism and the Nature of Rights" ("Preserving rights largely meant preserving self-rule"); Gienapp, *Against Constitutional Originalism*, 94 ("retained natural rights were preserved through republicanism—the act of empowering representative institutions to regulate retained natural liberty in the interest of the public good").

[26] Campbell, "Fundamental Rights at the American Founding," 183-97.

[27] Campbell, "Fundamental Rights at the American Founding," 185-88.

[28] Campbell, "Determining Rights," 974.

in the state of nature but were instead the product of political society.[29] These included the right to trial by jury or the right of habeas corpus. Unlike natural rights, common law rights placed clearer limits on governmental power.[30] Though, importantly, these customary limits on the government's power were sanctioned over time by the people themselves—further evidence, that is, of how the people remained in control of their own rights and liberty.[31] The people had decided that certain kinds of regulations of liberty were presumptively problematic, hence making it part of the fundamental common law of the polity; but that also meant that the people could revise their own work and alter the scope and effect of such customary restrictions.[32] Those limits were made by the people, not judges.[33] Despite these important caveats, at the time of the Founding, most fundamental rights remained subject to regulation by the people's representatives in the interest of promoting the public good. And that was certainly true of the retained natural right to free speech that was enshrined in the First Amendment in 1791.[34]

11. This understanding of constitutional rights was predicated on a distinctive understanding of political liberty.[35] Based on deeply rooted assumptions, by-and-large, Founding-era Americans did not understand liberty as non-interference—that is, freedom *from* government coercion.

---

[29] Campbell, "Fundamental Rights at the American Founding," 195-97; Campbell, "Republicanism and Natural Rights at the Founding," 98-99.
[30] Campbell, "Fundamental Rights at the American Founding," 195; Kramer, *The People Themselves*, 9-34. In the context of the First Amendment, see Campbell, "Natural Rights and the First Amendment," 287-90.
[31] Campbell, "Determining Rights," 934-35; Campbell, "Originalism and the Nature of Rights."
[32] Campbell, "Originalism and the Nature of Rights."
[33] Campbell, "Determining Rights," 934-35, 970.
[34] Campbell, "Natural Rights and the First Amendment," 268-70, 76 ("Consequently, even though the Founders broadly acknowledged that speaking, writing, and publishing were among their natural rights, governmental limitations of expressive freedom were commonplace").
[35] Gienapp, *Against Constitutional Originalism*, 49-51; Jonathan Gienapp, "The Foreign Founding: Rights, Fixity, and the Original Constitution," *Texas Law Review Online* 97 (2019): 118–26.

Instead, they defined liberty as freedom from domination—that is, freedom from external control by a will alien to oneself.[36] In the first instance, liberty was a function of how much a person was coerced. In the second instance, by contrast, liberty was measured not by coercion but consent—of whether the government that enacted binding laws legitimately represented those people it regulated.[37] If the government legitimately represented the people, then their liberty was preserved, because *they* would be coercing *themselves*. They would not be subject to an alien will but rather governed by their own will and consent.[38] This is exactly what Levi Hart meant in 1775 when, in a formulation that saturated Revolutionary-era political writing, he declared that "civil liberty doth not consist in a freedom from all law and government,—but in a freedom from unjust law and tyrannical government:—In freedom, to act for the general good."[39] The people's liberty was protected *through* government—government that maximized the general welfare.[40]

12. Based on this understanding of retained natural rights and republican liberty, the original Constitution left regulation of the people's fundamental rights primarily in the hands of the people

---

[36] Quentin Skinner, *Liberty as Independence: The Making and Unmaking of a Political Ideal* (New York: Cambridge University Press, 2025), 1-170; Philip Pettit, *Republicanism: A Theory of Freedom and Government* (New York: Oxford University Press, 1997), 17–79; Annelien de Dijn, *Freedom: An Unruly History* (Cambridge, MA: Harvard University Press, 2020), esp. 1–5; John Phillip Reid, *The Concept of Liberty in the Age of the American Revolution* (Chicago: University of Chicago Press, 1988), 55–59

[37] On the importance of consent at the time of the Founding, see Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (Chapel Hill: University of North Carolina Press, 2005); Barbara Clark Smith, *The Freedoms We Lost: Consent and Resistance in Revolutionary America* (New York: New Press, 2010); James H. Kettner, *The Development of American Citizenship, 1608-1870* (Chapel Hill: University of North Carolina Press, 1978).

[38] Skinner, *Liberty as Independence*, 141-70.

[39] Levi Hart, *Liberty Described and Recommended: in a Sermon Preached to the Corporation of Freemen in Farmington* (1775), in *American Political Writing during the Founding Era*, 1:310.

[40] Novak, *The People's Welfare*; Pamela Brandwein, "The *Slaughter-House* Dissents and the Reconstruction of American Liberalism," *American Political Science Review* 118 (May 2024): 1005-19.

themselves.[41] It certainly did not envision that judges would be the primary guardians of those rights, empowered to protect individuals from political majorities.[42] Judges would have a vital role to play, especially if and when political institutions enacted laws that failed to advance the public good.[43] But that role would be secondary and complementary. It was widely assumed at the Founding and for decades to follow that the people would themselves safeguard their own liberties through their representative institutions.[44] As long as those institutions regulated liberty in the interest of the public good, there would be no cause to question the legitimacy of how they had struck the balance between the good of the whole and the rights of the few.[45]

13. From an originalist perspective, therefore, the First Amendment's protection of free speech presents no barrier to the Act. To violate this standard, one would need to show that the process through which the Act was passed was either not representative of the people or not in the interest of the public good. Short of that, however, nothing about the original First Amendment, or the method for preserving fundamental rights that it presupposed, undermines the people's essential right to regulate their own liberty.

---

[41] Gienapp, *Against Constitutional Originalism*, 145-46, 158-59, 216-17; Campbell, "Originalism and the Nature of Rights"; Kramer, *The People Themselves*.
[42] Campbell, "Originalism and the Nature of Rights"; Campbell, "Determining Rights," 949.
[43] Gienapp, *Against Constitutional Originalism*, 105-08; Campbell, "Fundamental Rights at the American Founding," 187-88, 193-95, 197; Jud Campbell, "Judicial Review and the Enumeration of Rights," *Georgetown Journal of Law & Public Policy* 15 (Summer 2017): 583-91; Campbell, "Determining Rights," 970-73; Campbell, "Natural Rights and the First Amendment," 276 ("Decisions about the public good, however, were left to the people and their representatives—not to judges—thus making natural rights more of a constitutional lodestar than a source of judicially enforceable law").
[44] Campbell, "Determining Rights," 977 ("At the Founding, the task of determining rights belonged to the people themselves").
[45] Gienapp, *Against Constitutional Originalism*, 145-46, 158-59, 216-17; Campbell, "Originalism and the Nature of Rights"; Novak, *The People's Welfare*.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21st day of February 2025 in Palo Alto, California.

/s/Jonathan Gienapp
Jonathan Gienapp

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM J. SCHNEIDER, *et al.*,<br><br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF JACK N. RAKOVE**

**Background**

1. I am the William Robertson Coe Professor of History and American Studies, and Professor of Political Science and (by courtesy) Law, Emeritus at Stanford University, where I taught from 1980 to 2020. I earned an A.B. in History from Haverford College in 1968 and a Ph.D. in History from Harvard University in 1975. I am the author of eight books on the American Revolution and Constitution, including *The Beginnings of National Politics: An Interpretive History of the Continental Congress* (1979); *Original Meanings: Politics and Ideas in the Making of the Constitution* (1996), which received the Pulitzer Prize in History and two other book prizes; *Revolutionaries: A New History of the Invention of America* (2010), which was a finalist for the George Washington Prize; and *A Politician Thinking: The Creative Mind of James Madison* (2017). I have edited another seven books, including *The Cambridge Companion to The Federalist*. I have written over eighty scholarly articles and chapters, and numerous other short essays and op-eds.

2. I have also been the principal author of five *amicus curiae* historians' briefs submitted to the United States Supreme Court in these cases: *Vieth v. Jubelirer* (2003-2004), which dealt with partisan gerrymandering in Pennsylvania; *Hamdan v. Rumsfeld* (2005); *D.C. v. Heller* (2008); *Arizona State Legislature v. Arizona Independent Redistricting Commission* (2015); and *Moore v. Harper* (2022). I also participated in drafting an *amicus curiae* brief on the meaning of the two Emoluments Clauses of the Constitution in *C.R.E.W. v. Trump* (2017) and other briefs relating to Second Amendment litigation. In 1983-1988, I was a consultant to Goodwin, Procter & Hoar and an expert witness in *Oneida Indian Nation v. State of New York*.

3. For this litigation, I have been asked to discuss how issues of governmental corruption were viewed during the Founding era of the American republic, with reference to prevailing political ideas and debates and constitutional and legal provisions that were conceived to deter or limit the impact of corruption on public life. This report is, in effect, a discussion of the concept of political corruption, which has different meanings and connotations in different periods and societies.

**Introduction**

4. How did the Founding generation of the American republic, and more specifically, the framers and ratifiers of the Federal Constitution, think about the problem of political corruption? There is obviously no question that they understood overt forms of bribery to be blatant forms of corruption. The Impeachment Clause of the Constitution identifies bribery as one of three categories of offenses that warrant removal from office. The Foreign Emoluments Clause, which was much in the news during the first presidential term of Donald Trump, was written with well-established historical knowledge of the formerly secret Treaty of Dover of 1670, when Louis XIV had effectively bribed Charles II of England to pursue a pro-French foreign policy and privately

commit himself to support the Church of Rome. Some framers of the Constitution believed that the wartime French embassy to the United States had bribed at least one member of the Continental Congress—John Sullivan of New Hampshire—to support French policy. Back in the 1760s, Virginia politics had been wracked by charges of financial corruption directed against John Robinson, the speaker of the lower house of the Virginia legislature.

5. But was the Founding generation's understanding of corruption limited to bribery alone? The short answer is that while bribery was, by definition, the most obvious form of corruption, it was only one example of the ways in which a political system could be corrupted. As one of the numerous political *concepts* that the American colonists had inherited from European and British writers, the concept of corruption covered a whole array of phenomena. One could use it, as Nicollò Machiavelli did, to describe the civic erosion of an entire political culture. It could also describe a set of relationships between institutions that had befouled the true principles of constitutional government, as eighteenth-century British opposition writers used it to lambaste the Crown's influence over the House of Commons. History provided numerous examples of what corruption had meant in the past, but that did not eliminate the appearance of other forms of corruption in the present or future.

**The concept of political corruption**

6. The practice of corruption is the subject of countless books. Like obscenity, we know corruption when we see it, and cases are easily multiplied. The distinguished American jurist, John T. Noonan, Jr., for example, has written a massive history of *Bribes* that spans several millennia, moving from ancient Egypt to the ABSCAM scandal of the late 1970s and early 1980s.[1] Specific episodes of corruption have their particular histories. The history of the Yazoo land scandal of the

---

[1] John T. Noonan, Jr., *Bribes* (New York, 1984).

late 1790s or the presidencies of Ulysses S. Grant and Warren G. Harding easily generate probing accounts of greedy politics and public malfeasance.

7. Yet a comprehensive history of the *concept* of political corruption has yet to be written. As a political phenomenon, corruption has an intellectual history of its own. The concept of corruption is not reducible to a simple definition or a mere compendium of acts of bribery, embezzlement, or patronage. One could write a history of the concept of corruption that could go as far back as Thucydides' *History of the Peloponnesian War* and Aristotle's *Politics*.[2] The problem of the *corruzione* of a state was a main topic in the political thinking of Niccolò Machiavelli, whom scholars often treat as the first modern student of politics. His chapters on this subject in the *Discourses on Livy* proved fundamental to the development of early modern republican thinking in the sixteenth century. Machiavelli's ideas about republicanism were soon transmitted to English readers in the Tudor and Stuart eras of the sixteenth and seventeenth centuries.[3] A concern with the corruption of an independent and legally supreme Parliament by the Crown then became a major theme in eighteenth-century British opposition thinking. The Scottish philosopher-historian David Hume wrote an influential essay on this subject, and that essay, along with comparable work by other English opposition writers, had a major impact on America's revolutionary founders, notably including James Madison and Alexander Hamilton. Their ideas about separation of powers, checks and balances, and the idea of an extended federal republic were profoundly influenced by their inherited perceptions of the corruption of the eighteenth-century British constitution.

[2] J. Peter Euben, "Corruption," in Terence Ball, James Farr, and Russell L. Hanson, eds., *Political Innovation and Conceptual Change* (Cambridge, UK, 1989), 223-230.

[3] Felix Raab, *The English Face of Machiavelli: A Changing Interpretatiuon, 1500-1700* (London and Toronto, 1964, 2010).

8. One cannot reconstruct the Founding generation's view of corruption, then, simply by examining how the word was defined in eighteenth-century dictionaries. The word *corruption* does not appear in the Revolutionary-era constitutions that were written first at the state and then at the national levels of government. The closest one gets is the presence of the word *bribery* in the impeachment clause of Article II, Sect. 4 and the references to *emoluments* in Article I, Section 9, and Article II, Section 1. Corruption is much more a concept than a mere word, and to grasp its original meaning at the time the Constitution was adopted, one has to ask how the Founding generation thought about the diverse ways in which their polity or government might be corrupted. In a sense, one has to be able to write an intellectual history of how the Founding generation thought about politics in the broadest sense of the term.

**Machiavelli's significance**

9. At first glance, Machiavelli seems an odd figure to place at the start of a report asking how the Founding generation thought about political corruption. We know Machiavelli primarily as the author of *The Prince*, that landmark manual of statecraft that asked how a prince could secure his rule in a new city he had not previously governed. Manuals for princes were a standard element of medieval and early modern political theory, universally couched in terms of Christian morality. Machiavelli broke decisively with that moral tradition. He famously asked whether it is better to be feared or loved, and came down decisively on the side of fear. To his many critics, Machiavelli is cast as a "teacher of evil." When we characterize some political actor or action Machiavellian, it is this calculating, cynical, and even brutal perspective that we have in mind.

10. Yet the Machiavelli who wrote *The Prince* was also working more or less concurrently on his *Discourses on the First Ten Books of Titus Livy*. The *Discourses* is a foundational text of early modern republican thinking, and concepts and arguments that Machiavelli used there resonated

throughout the sixteenth, seventeenth, and eighteenth centuries, with important results in both England and revolutionary America. The problem of corruption was a controlling theme in Machiavelli's thinking. Corruption, as he thought about it, had little to do with prosaic acts of bribery or nepotism or non-bid contracts. It involved forces more essential and corrosive: the emergence of a degraded way of life that would prevent a community from leading a political life (*vivere politico*) or a civil life (*vivere civile*) or from living in *uno stato libero*, a "free state." (This term reappears in the preamble to the Second Amendment of the U.S. Constitution, and one could indeed draw a straight line from Machiavelli's concerns with having a militia of Florentine citizens to the language of that Amendment.) For Machiavelli, the concept of corruption offered an essential way of describing the health—or better, diagnosing the diseases—of a body politic. In his era, and later, the idea that a state had a constitution did not mean, as it later would, that it had a written charter of government; it was rather a metaphor for the organic strength of the body politic, and therefore for the lasting welfare of the whole society.[4]

11. Machiavelli devoted three chapters to the problem of corruption in Book I of the *Discourses*.[5] In Chapter 16, in a preliminary way, he announced that "a people which has become completely corrupted"—which had lost all the attributes of living in liberty—"cannot live free even for a brief time, not even a moment." For that reason, Machiavelli declared that he would limit his "concern [to] those peoples where corruption has not spread too widely and there remains more of the good than the tainted." The prime historical example of this, Machiavelli observed in concluding Chapter 16, was the Roman people after their expulsion of the Tarquin kings and their

[4] There are numerous analyses of Machiavelli's political ideas and, more specifically, his view of corruption. In this report, I rely on J. G. A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republic Tradition* (Princeton, 1975), 183-218, and a recent book by Fabio Raimondi, *Constituting Freedom: Machiavelli and Freedom*, trans. Matthew Armistead (New York, 2018), 1-31. Also very helpful is Quentin Skinner, *Machiavelli: A Very Short Introduction* (Oxford, UK, 1981), 54-87.
[5] In this and the next paragraph I have used the translation by Julia Conaway Bondanella and Peter Bondanella, *Niccolò Machiavelli: Discourses on Livy* (New York, 1997), 62-71.

creation of the republic in 509 b.c.e. In Chapter 17, Machiavelli then argued that "it was Rome's greatest good fortune that its kings quickly became corrupt, so that they were driven out, and long before their corruption had passed into the heart of the city." From this situation Machiavelli concluded "that where the material is not corrupt, disturbances and other disorders can do no harm, and where the material is corrupt, carefully enacted laws do no good," unless they are imposed by an individual—a prince or lawgiver—"in such a way that the material becomes good." When Machiavelli speaks of "material" (as in "*la materia dove la è corrotta*") he is describing the formative qualities and characteristics of a city's citizens and subjects.

12. Machiavelli described the great problem he was raising in the opening sentence of Chapter 18: "to consider whether or not it is possible to maintain a free government [*lo stato libero*] in a corrupt city if one already exists; or whether or not, if one does not already exist, it can be established there." This was, Machiavelli immediately conceded, a truly difficult problem, and he made the challenge even greater by assuming that "the city in question is extremely corrupt." In his accounting, the forms of corrupting *la materia* of the people were many and diverse, and the paths to reform few and difficult. But the end goal for Machiavelli remains the same: to enable a people to lead a political life (*vivere politico*) or a civil life (*vivere civile*) where laws are obeyed; inequalities minimized; all citizens, even the most meritorious, remain subject to the laws when they commit unjust acts; and where ordinary people could participate in public life and be required to defend their republic against its enemies (rather than relying on the mercenary armies that Machiavelli utterly distrusted). In such a republic, the people would have legal devices available to monitor and prosecute the misdeeds of the elite. The great example on which Machiavelli drew was the Roman tribunate, which was elected by the plebeians, and which had the authority to bring legal charges against patricians.

13. All of these practices and institutions instantiated and exemplified "the new modes and orders [*modi ed ordini nuovi*]"[6] that Machiavelli proposed instituting in cities that were not yet too corrupt, where a civil and political life reconstituted on republican principles could still be restored. Machiavelli derived these "new modes and orders" either from the Roman history that he had studied or from his own rich experience. The great attraction of Roman history lay in the centuries-long process whereby the Roman republic had been able to expand and to create a vast empire across Italy and then the Mediterranean. The most important consequence of implementing these new modes and orders would be to create or revive a deep sense of civic *virtú*. Among all the other key words that characterized his thought—*corruzione*, *stato*, *fortuna*, and *materia*—*virtú* was arguably the one that remained most essential to Machiavelli's republican commitments.

14. Just like *corruzione*, the concept of political *virtú* also has a complicated meaning. In *The Prince*, for example, *virtú* embodied the talents that enabled the lone ruler of a community to master all the vicissitudes and contingencies of *fortuna*. In effect, *virtú* and *fortuna* were linked as opposites. *Fortuna*, the chaotic world of human affairs, created the unstable and dangerous political world that the prince had to master; *virtú* identified the talents that the prince needed to wield in order to command it. But in *The Discourses*, Machiavelli's notion of *virtú* takes a different form. Now it involves all those relations—the "new modes and orders"—that collectively enable the citizens of a polity to maintain their republic. *Virtú* connotes a set of civic obligations and attitudes that a people must possess to create a stable republic, one that will resist both the turmoil of *fortuna* and the various sources of *corruzione*.

[6] Machiavelli used this famous phrase in the opening sentence of his preface to the autograph manuscript of *The Discourses*, asserting that the difficulties of explaining how to establish a republic are no less dangerous than the task of exploring "unknown lands and seas." Some translators prefer to say "new methods and institutions," but in my view, *institutions* in contemporary English has too specific a meaning to capture the range of practices Machiavelli had in mind.

15. Foremost among the latter is the underlying ambition of the upper classes and aristocracy (sometimes known as the *grandi* [the great] or the *ottimati* [optimates]). As the historian John Najemy observes, "the unifying theme of the *Discourses* is the precariousness of republics and their vulnerability to the ambition of the noble and elite classes. The motor driving the history of republics, their forms of government, and their capacity for survival, defense, and expansion is the perpetual antagonism between the nobles and the people." In opposition to other writers, who viewed the antagonism between the patricians and plebeians with contempt, Machiavelli boldly and radically argued that the active struggles between the *grandi* and the *populo* made possible by the creation of the tribunate was the real source of Rome's stability. Where the nobility wanted to dominate the people and would happily use corrupt means to attain their ends, the people only wanted to be left alone to govern their own lives and to rely upon the legal system to secure their liberty.[7]

16. Machiavelli's fear of corruption, it can thus be said in conclusion, takes the form of a deep and persisting worry that the wealthy who want to dominate the rest of the population will always look for devices that will enable them to exploit their resources and influence for politically sinister purposes, to the weakening of the free state the republic is conceived to be. The proper answer to this corruption is the preservation of popular *virtú*, which will be especially enhanced both by the people's participation in the militia and by the existence of means to impose justice on the elite. Unlike other writers who perpetually worried about the danger of turmoil, in any form, Machiavelli believed that the active prosecution of civic crimes, even when directed against a society's elite or

[7] John M. Najemy, "Society, Class, and State in Machiavelli's *Discourses on Liberty*," in Najemy, ed., *The Cambridge Companion to Machiavelli* (Cambridge, UK, 2010), 102-104. For a much more extended treatment of these issues, see John P. McCormick, *Machiavellian Democracy* (New York, 2011).

its past heroes (who had gone astray), was one of the "orders" that would maintain the collective *virtú* of the population.

**Corruption in Anglo-American Political Culture**

17. The theme of *virtú*, now translated in pale form into English as virtue,[8] had a prominent place in American republican thinking. "If there is a form of government then, whose principle and foundation is virtue," asked John Adams in his revolutionary pamphlet, *Thoughts on Government* (1776), "will not every sober man acknowledge it better calculated to promote the general happiness than any other form?"[9] Like Machiavelli in the early 1500s, the American revolutionaries believed that the fate of the republican governments they were now forming depended on the people's possession of civic virtue, which they defined primarily as a willingness to subordinate private interest to public good. Republican government required a culture where "each man must somehow be persuaded to submerge his personal wants into the greater good of the whole."[10] Montesquieu had taught that each of the three forms of government (monarchy, aristocracy, republic) had a defining moral characteristic: virtue was the true signifier of republicanism.

18. On the question of political corruption, however, the American revolutionaries accepted a different and much more politically focused definition that was the direct product of British history since the Glorious Revolution of 1688, when the Dutch *stadtholder* William of Orange and his wife, Mary, replaced her father, James II, on the throne. This notion of corruption was not

---

[8] The colloquial use of virtue in contemporary English does not really capture the robust political character of Machiavelli's *virtú*. In their translation of *The Discourses* (p. 361) the Bondanellas, for example, list "ability, skill, merit, ingenuity, strength, [and] sometimes even virtue" as defining synonyms for *virtú*.
[9] Philip Kurland and Ralph Lerner, eds., *The Founders' Constitution* (Chicago, 1987), I, 108.
[10] Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill, N.C., 1969), 65-70 (quotation at 68).

concerned with the decay of the manners and mores of the whole body politic, as Machiavelli's concept had been. It was addressed more specifically to the workings of political institutions.

19. The main constitutional result of the Glorious Revolution, as confirmed by the Declaration of Rights of 1689, was to affirm the legal and constitutional supremacy of Parliament. The Stuart monarchs had previously voiced claims to absolutist authority, and they had periodically attempted to rule either without allowing Parliament to meet at all or by prolonging a single Parliament without holding fresh elections to the House of Commons. After 1689, that disdain for parliamentary consent to acts of government was no longer possible. A Triennial Act adopted in 1694 required that Parliament meet every three years, but equally important, the practice of granting "annual supplies" (appropriations for funding government) and the annual adoption of a Mutiny Act (which evolved into a general statute organizing military activities) made Parliament a standing institution of government.[11]

20. So far, so good: England (or, after the adoption of the Act of Union with Scotland in 1707, the United Kingdom of Great Britain) had become a constitutional monarchy unlike the absolutist monarchies of France, Spain, and Russia. Its "mixed" constitution combined the estates of royalty, aristocracy, and common subjects in one sovereign Parliament, known as the King-in-Parliament. This "boasted" or "vaunted" British constitution became the envy of enlightened Europe. Its virtues were celebrated in a famous section of the Baron of Montesquieu's *The Spirit of the Laws*, arguably the greatest work of eighteenth-century political science, which noted that there was only one nation whose constitution made the preservation of liberty its chief end: Britain.

21. But in the years after the Hanoverian dynasty took the throne in 1714, the practice of British politics evolved in significant ways. Beginning with Sir Robert Walpole, this period marked the

---

[11] For a great survey of this subject, see J. H. Plumb, *The Origins of Political Stability; England, 1675-1725* (Boston, 1967).

beginning of the growth of ministerial government, in which effective control of the executive (the Crown) passed to whichever leader commanded majority support in the House of Commons (as well as the personal favor of the King). British politics became coalitional politics, as leaders gathered coteries of followers and negotiated to form stable coalitions. Other mechanisms worked to make politics more manageable. A Septennial Act extended the period between parliamentary elections from three years to seven. The existence of "pocket" and "rotten" boroughs—parliamentary constituencies respectively either controlled by some dominant government interest or that contain few, easily influenced voters—made it easier for ministries to manage elections. The national electorate contracted, so that an estimated ten thousand voters in a nation of eight million determined who served in the Commons.[12]

22. Perhaps most important, the Crown found reliable techniques to build a steady phalanx of supporters in Parliament. Offices, pensions, sinecures, and other sources of patronage and influence guaranteed the loyalty of backbenchers. If individual ministers occasionally lost the support of the majority of the Commons, requiring new coalitions to form, the Crown was never in the minority. The King retained the right to veto legislation, but its use was abandoned after 1707 because there was never any need to deploy it.

23. This was the form of corruption, by patronage and other forms of influence, that opposition political writers began denouncing in the 1720s and 1730s, and which the American colonists in

[12] There are numerous historical accounts of the creation of the Georgian constitution that evolved between the Glorious Revolution of 1688 and the American decision for independence eight decades later. Plumb, *Origins of Political Stability*, cited in the note above, offers a sophisticated account of how the radical politics of the late seventeenth century was tempered as the Crown passed from the Stuarts to the Havoverian dynasty that came to power in 1714. J. R. Pole, *Political Representation in England and the Origins of the American Republic* (Berkeley, Los Angeles, and London, 1965) is valuable because it explains how dynamic factors in colonial and revolutionary American politics both derived but also departed from English precedents and practices. But for American readers, the most important and influential sources are two seminal books by Bernard Bailyn, *The Ideological Origins of the American Revolution* (Cambridge, MA, 1967, 1992, 2017), especially 33-93 and 161-74, and *The Origins of American Politics* (New York, 1968), chapters I and II. The arguments presented in paragraphs 21-28 of this memorandum largely synthesize the main arguments of these works.

turn absorbed through newspapers and pamphlets. It was a distinctively British form of *corruzione*, in Machiavellian terms, because it violated the true principles of the Glorious Revolution. The idea of parliamentary supremacy rested on the belief that the true duty of the legislature was to check the misuse of the executive power held by the King and his ministers. The concrete exercise of power was the natural work of the Crown; the protection of liberty was the chief responsibility of Parliament. It could fulfill that task only if it preserved the legislative privileges that secured its deliberative independence; only if it accurately represented the feelings and interests of its constituents; and only if its members remained free from the different forms of corrupt influence the Crown could bestow.

24. Drawing upon ideas that went as far back as the 1670s, British politics was often described in terms of a division between "Court" and "Country" parties, the former favoring the policies of the King and his ruling ministers, the latter worrying about all the insidious uses of patronage and influence that were enabling the Crown to sap the independence of a theoretically supreme Parliament. These were not political parties in the modern sense of the term, but rather perspectives that were repeatedly, even tediously, echoed in public debate, yet which also retained a deep hold on contemporary views of how the British constitution was actually working. It was in this sense that the philosopher-historian David Hume referred to "the principles of the *court* and *country* parties, which are the genuine divisions in the BRITISH government."[13] Adherents of the country perspective repeatedly argued for excluding "placemen" from Parliament, and for requiring members of the House of Commons to serve relatively short terms.[14] A House of Commons whose members were habituated to government offices and pensions was constitutionally corrupted. On

---

[13] David Hume, "The Parties of Great Britain," in Eugene F. Miller, ed., *David Hume: Essays Moral, Political, and Literary*, rev. ed. (Indianapolis, 1985, 1987), 71.
[14] Pocock, *Machiavellian Moment*, 406-410.

the other side of the question, advocates of the Court party believed, as party-men always do, that patronage makes government more efficient and decisive; it is something the constitution needs to make it work.

25. Hume addressed this issue incisively in his short essay "Of the Independency of Parliament." The "paradox" of the British constitution, Hume argued, was that although "The share of power, allotted by our constitution to the house of commons, is so great, that it absolutely commands all the powers of government," it nevertheless refused to wield that power to its full extent, but was content to remain "confined with the proper limits" of the constitution. The motivation for that restraint lay in the personal "interest of the majority of its members. The crown has so many offices at its disposal, that, when assisted by the honest and disinterested part of the house," it always had the support it needed to preserve monarchical power within the balanced constitution. "We may call [this] influence by the invidious appellations of *corruption* and *dependence*," Hume wrote; "but some degree and some kind of it are inseparable from the very nature of the constitution, and necessary to the preservation of our mixed government"—and with it the liberty it was boasted to preserve.[15]

26. As forms of corruption go, these ideas of using patronage and pensions to produce reliable legislative majorities hardly seem the most odious threat the liberty of the people might face. As Hume argued, there was a net positive good to the Court party's position: it preserved the balanced constitution of King, Lords, and Commons that Montesquieu and other eighteenth-century observers so admired, and which distinguished Britain from all other regimes. But from the vantage point of English opposition writers and their American colonial readers, the danger remained real nonetheless. A Commons staffed by placemen and party-men would be unable to

[15] Hume, "Of the Independency of Parliament," in Miller, ed., *Essays Moral, Political, and Literary*, 44-45.

check all the forms of aggrandizement and personal enrichment that the King's ministers would assiduously pursue. Perhaps the constitutional settlement of 1688 and its immediate aftermath could be preserved if there was a "king above party," as Henry St. John, the Viscount Bolingbroke, argued—a monarch who would not be the captive of his ministers, but who would instead embody the entire national (or even imperial) interest. But that was not the working reality of British government during the reigns of the first three Georges.

27. For opposition, country-party style writers—like John Trenchard and Thomas Gordon, the co-authors of the influential *Cato's Letters*—the best cure to the forms of corruption that Parliament was now illustrating lay in governing the composition of the House of Commons. There were two basic methods to minimize legislative corruption, *Cato* argued in two essays published in January 1721:

> these deputies must be either so numerous, that there can be no means of corrupting the majority; or so often changed, that there shall be no time to do it so as to answer any end by doing it. Without one of these regulations, or both, I lay it down as a certain maxim in politicks, that it is impossible to preserve a free government long.[16]

28. There were long periods in English history when these ends had not been obtained. In a hilarious sentence, *Cato* described the temptations that had corrupted past parliaments.[17] But the deeper considerations that would prevent the corruption of legislatures lay in narrowing the

[16] "How free Governments are to be framed so as to last, and how they differ from such as are arbitrary," January 13, 1721, in Ronald Hamowy, ed., *Cato's Letters: Or, essays on Liberty, Civil and Religious, and Other Important Subjects* (Indianapolis, 1995), I, 421, echoing a similar passage in "All Government proved to be instituted by Men, and only to intend the general Good of Men," January 6, 1721, *ibid*., 418.

[17] For the record, here is *Cato*'s text on the multiple sources of corrupt "disservice" in the Commons: "What with the promises and expectations given to others, who by court-influence, and often by court-money, carried their elections: What by artful caresses, and the familiar and deceitful addresses of great men to weak men: What with luxurious dinners, and rivers of Burgundy, Champaign, and Tokay, thrown down the throats of gluttons; and what with pensions, and other personal gratifications, bestowed where wind and smoke would not pass for current coin: What with party watch-words and imaginary terrors, spread amongst the drunken 'squires, and the deluded and enthusiastick bigots, of dreadful designs in embryo, to blow up the Church and the Protestant interest; and sometimes with the dread of mighty invasions just ready to break upon us from the man in the moon: I say, by all these corrupt arts, the representatives of the English people, in former reigns, have been brought to betray the people, and to join with their oppressors." *Ibid*., 422.

distance between legislators and subjects through "the frequent fresh elections of the people's deputies," or "what the writers in politicks call rotation of magistracy." Such rules would have two main benefits. First, legislators new to office would "remember what they themselves suffered, with their fellow-subjects, from the abuse of power, and how much they blamed it." In effect, lawmakers who came and went would recall their status as subjects and legislate with the understanding that they would be bound by the same measures they were enacting. Second, because their terms would be short, they would avoid the vices of long-term incumbents, "seeing themselves in magnifying glasses, grow, in conceit, a different species from their fellow-subjects; and so by too sudden degrees become insolent, rapacious and tyrannical."[18]

29. The concern with corruption in eighteenth-century Anglo-American political discourse was primarily institutional in nature. It was a conception of corruption that was much more narrowly drawn than Machiavelli's notions of *corruzione*. Although Machiavelli sometimes focused on specific officials and agencies of government, when he spoke about cities being either irredeemably corrupt or not corrupt enough to lose the possibility of civic reformation, he was contemplating the health of the whole body politic—the *virtú* of its rulers and subjects alike. The opposition writers who influenced eighteenth-century Americans did have some comparable concerns. They worried, for example, about the complicated ways in which the manly *virtú* idealized in Machiavelli's militiaman was being effeminized—that is the best term for it—by the softening habits of commerce, the taste for luxury, and the flourishing of mechanisms of private and public credit that made Britain the Atlantic world's wealthiest and most commercial empire.[19] But the dominant story remained political and constitutional. The concern with corruption was

---

[18] *Ibid.*, 423.
[19] This complex relationship is explored in Pocock, *Machiavellian Moment*, chapter XIV: "The Eighteenth-Century Debate: Virtue, Passion and Commerce," 462-505.

first and foremost a matter of allowing Parliament to play the role that the political turmoil of the seventeenth century had ultimately assigned to it. A Commons controlled by patronage and influence, representing too many pocket and rotten boroughs, serving seven-year terms insulated from the wishes of their constituents, was inherently corrupt. And its corruption would enable power to devolve upon other institutions and enable the real holders of power to strip subjects of their liberty.

**American perceptions**

30. For a wide array of reasons, American colonists were deeply attracted to this image of a corrupted Parliament, and this perception influenced not only their movement toward independence in the decade after the Stamp Act crisis of 1765-66 but also the substance of the new constitutions they began adopting in 1776.

31. In the decades following the Glorious Revolution, Americans repeatedly argued that the legislative privileges that Parliament had secured in 1688 also set the dominant precedents that should define the proper rights of their own provincial assemblies. Those privileges included the right to initiate legislation, to meet regularly, and to enjoy freedom of speech within their legislative chambers. It also meant that colonial acts of legislation, responsive to Americans' own perceptions of their needs and interests, should not be subject to the twin evils of being suspended or vetoed. The American colonists happily imagined their provincial legislatures, housed in small but handsome buildings, evolving into miniature parliaments. Although this comparison seemed preposterous to many imperial officials, who treated the colonists as backwater provincials, Americans found their claims for near-equality wholly convincing.[20]

---

[20] The classic studies include Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* (New Haven, 1943), and Jack P. Greene, *The Quest for Power: The Lower Houses of Assembly in the Southern Royal*

32. Their ability to achieve this result, however, faced several persisting obstacles. First, royal governors were firmly instructed not to treat the colonial assemblies as miniature parliaments. Second, and arguably more important, governors retained aspects of the royal prerogative—powers deemed inherent to the Crown—which had effectively lapsed in Britain. They had the authority, for example, to *veto* or *suspend* legislation (the latter meaning, delaying its enforcement pending further review by the Privy Council). They could also *prorogue* or *dissolve* legislative assemblies (meaning, postponing their meeting until the lawmakers seemed more amenable to imperial preferences, or terminating the existence of one troublesome legislature and calling for the election of another, hopefully more compliant body). Where English judges now enjoyed the tenure during good behavior provided by the Act of Settlement of 1701, which had led to the Hanoverian succession, colonial judges still served at the pleasure of the Crown, making them subject to immediate dismissal.[21]

33. These disparities between English precedent and colonial practice made Americans highly receptive to opposition writings. Because Parliament played no formal role in colonial governance—other than regulating imperial trade through the Navigation Acts—the responsibility for regulating colonial affairs devolved on various ministries in London. In effect the colonists saw themselves as objects or victims of the same cabals of ministerial power-seekers whom English opposition writers (like Trenchard and Gordon) held responsible for the erosion of parliamentary independence and supremacy. As the distinguished historian Bernard Bailyn argued, more than a half-century ago,

> The opposition vision of English politics, conveyed through these popular opposition writers, was determinative of the political understanding of eighteenth-century Americans . . . . Threats to free government, it was believed, lurked

*Colonies, 1689-1776* (Chapel Hill, 1963). Numerous monographs make the same case for the political history of individual colonies.

[21] Bailyn, *Origins of American Politics*, 59-70.

> everywhere, but nowhere more dangerously than in the designs of ministers in office to aggrandize power by the corrupt use of influence, and by this means ultimately to destroy the balance of the constitution. Corruption, especially in the form of the manipulation and bribery of the Commons by the gift of places, pensions, and sinecures, was as universal a cry in the colonies as it was in England, and with it the same sense of despair at the state of the rest of the world, the same belief that tyranny, already dominant over most of the earth, was spreading its menace and was threatening even that greatest bastion of liberty, England itself.[22]

34. Many Americans (certainly Thomas Jefferson and James Madison) had read and understood John Locke; but it was this less famous group of opposition writers who shaped American political thinking much more directly.

35. Yet between Britain and its American colonies two other critical differences remained. First, the techniques of influence that worked so well in Georgian Britain were not readily available to imperial governors in America, simply because they lacked the same resources that Crown ministers "at home" freely wielded. David Hume's analysis of the real sources of political influence in eighteenth-century Britain did not apply to America. In Bailyn's vivid language, "The armory of political weapons so essential to the successful operation of the government of [Sir Robert] Walpole and the [Duke of] Newcastle was reduced in the colonies to a mere quiverful of frail and flawed arrows."[23] Royal governors were themselves only creatures, not manipulators, of eighteenth-century patronage. Lacking offices to bestow on colonial notables, they repeatedly had to reach some kind of working bargain with the provincial assemblies that generally disappointed their superiors in London.

36. Second, and equally important, the use of rotten and pocket boroughs to manage politics did not work in the colonies, where freehold tenure enlarged the electorate and new communities regularly received the right of representation in their provincial legislatures.[24] Even before the

---

[22] Ibid., 56-57.
[23] Ibid., 72.
[24] Ibid., 70-105.

Stamp Act crisis of 1765-66 dramatized these points, the colonists sensed that there were profound differences between how political representation operated in Britain and how it worked in America. The idea that there were "rotten" aspects to the British constitution was not an eighteenth-century discovery. In his *Second Treatise of Government*, for example, John Locke (writing in the early 1680s) had alluded to the existence of parliamentary boroughs lacking any serious number of voters as a sign of rot. Americans expected every community in the land to have a seat in the legislative chamber, and they regarded their delegates, not as distant lawmakers whose first duty was to contemplate the general good of the whole society, but as attorneys for their townships and counties, representatives who could be instructed to follow the directions of their constituents. When the Stamp Act crisis made the question of representation a fundamental point of controversy between Britain and America, colonial writers like James Otis boasted of the superiority of the American insistence on the accountability of lawmakers to their constituents. When British writers asked why the Americans should have a voice in the House of Commons when such prosperous cities as Birmingham and Sheffield held no seats either, Otis simply scoffed in reply. "To what purpose is it to ring everlasting changes to the colonists on the cases of Manchester, Birmingham, and Sheffield, which return no members?" Otis wrote. "If those, now so considerable, places are not represented, they ought to be."[25] Indeed, it was precisely because ideas like these were so powerful—and so potentially embarrassing in Britain—that spokesmen for Parliament's authority over America largely abandoned the argument about representation and relied instead on a simple assertion of Parliament's legal sovereignty over the entire empire.[26]

37. This prevailing perception of the corruption of British politics through the ministerial domination of Parliament thus played a critical role in the American movement toward

[25] James Otis, *Considerations on Behalf of the Colonists* (London, 1765), 9.
[26] Bailyn, *Ideological Origins*, 198-229.

independence by providing a systematic and self-confirming explanation of why the British government was pursuing one measure after another inimical to American rights.[27] That issue does not concern us here. What does matter, however, is the impact this perception had on the new state constitutions that Americans began adopting in 1776. These documents, more than the Federal Constitution of 1787, illustrated the underlying political conceptions and commitments that shaped American constitutionalism in its first, creative phase.

38. In many respects, the constitution writers of 1776 looked backward in defining their underlying concerns. They were naturally more inclined to apply lessons derived from the past than to anticipate problems likely to arise in the future. As James Madison observed in 1785, while denouncing the lack of "*wisdom* and steadiness to legislation" revealed in the separate states, "The want of *fidelity* in administration of power having been the grievance felt under most Governments, and by the American States themselves under the British Government[;] It was natural for them to give too exclusive an attention to this primary attribute."[28] For Madison and his contemporaries, the "administration of power" meant the workings of the executive—that is, the Crown and its officials. With hindsight and his own experience in Virginia's fifth provincial convention, which drafted the commonwealth's new constitution, Madison grasped that the constitution-writers of 1776 were the conceptual prisoners of history.

39. This retrospective attitude deeply informed the first state constitutions. The dominant animus of the first state constitutions was to reconcile the principle of legislative (or parliamentary) supremacy inherited from the Glorious Revolution of 1688 with the criticisms of British politics laid down by opposition writers like Trenchard and Gordon. The whole imperial controversy of

[27] Bailyn, *Ideological Origins*, 94-159; Pauline Maier, *From Resistance to Revolution: Colonial Radicals and the Development of American Opposition to Britain, 1765-1776* (New York, 1972).
[28] James Madison to Caleb Wallace, August 23, 1785, in Jack N. Rakove, ed., *James Madison: Writings* (New York, 1999), 40.

1765-1776 had reminded the colonists that their practice of "actual" representation was superior to the arguments for "virtual" representation that the defenders of parliamentary supremacy over the colonies "in all cases whatsoever" had propounded.[29] The coming of independence only confirmed that position. To secure maximum support for "the cause," the provincial conventions encouraged communities to send representatives to government, and they actively debated whether the franchise should be broadened (but not narrowed). Even more important, every state except South Carolina applied a rule of annual elections to the lower house of their legislature. As John Adams observed in his *Thoughts on Government*, in a widely repeated saying: all elections "should be annual, there not being in the whole circle of the sciences, a maxim more infallible than this, 'Where annual elections end, there slavery begins.'"[30]

40. This commitment to annual elections was arguably the single most important anti-corruption provision of the first state constitutions. It presumed that legislators would recognize that they would soon return to the body of the people, to be governed by the same laws they were framing, with no status higher than that of ordinary citizens; and that virtuous voters would understand the benefits of rotation in office. These views were fully consistent with *Cato*'s argument of 1721, which had assumed that routine turnover in office would minimize the dangers of corruption because it would make no sense to bestow pensions and positions on lawmakers who essentially held office as an avocation. This perception was also fully consistent with the principle articulated in several of the declarations of rights issued by the states as they were adopting their

---

[29] The theory of "virtual" representation argued that Americans who sent no members to the House of Commons were nevertheless legitimately represented in Parliament. The American claims for the superiority of their system of "actual" representation relied on the existence of a broad electorate and the allocation of legislative seats to every community (townships or counties). See Bailyn, *Ideological Origins*, 161-175.

[30] *Founders' Constitution*, I, 109. Adams then added this further observation, drawing on a couplet from Epistle III of Alexander Pope's famous poem, *An Essay on Man*: "These great men, in this respect, should be, once a year

> 'Like bubbles on the sea of matter borne,
> They rise, they break, and to that sea return.'"

first constitutions. As Article 5 of the Virginia Declaration of Rights stated, in order to ensure that members of the legislative and executive branches of government "may be restrained from oppression, by feeling and participating the burdens of the people, they should, at fixed periods, be reduced to a private station, return into that body from which they were originally taken, and the vacancies be supplied by frequent, certain, and regular elections," leaving the legislature free to determine whether these former officials should be made "eligible, or ineligible" for further service.[31] This was (in modern legal analysis) a *standard* rather than a *rule*, a principle that officeholders and voters should honor rather than a mandate that had to be enforced. Term limits in fact were applied only to a few state governors and delegates to the Continental Congress.[32] No legal barriers limited the number of terms that legislators could serve. Yet scholars who have done quantitative studies of legislative service have demonstrated that rates of turnover at both the national and state levels of government remained high well into the nineteenth century. Down to the 1890s, the mean term of service in the House of Representatives was three years, meaning that the vast majority of its members served one or two terms. Rotation in office was thus a working principle of American politics.

41. Lacking a monarch, Americans had no need to worry about the sycophantic behavior of courtiers and royal flatterers. But with the British opposition writers' model of an office- and influence-wielding Crown firmly implanted in their political consciousness, American

---

[31] Virginia Declaration of Rights, *Founders' Constitution*, I, 6. Cf. the corresponding Article VIII of the Massachusetts Declaration of Rights of 1780: "In order to prevent those, who are vested with authority, from becoming oppressors, the people have a right, at such periods and in such manner as they shall establish by their frame of government, to cause their public officers to return to private life; and to fill up vacant places by certain and regular elections and appointments." Ibid., I, 12.

[32] As it happens, James Madison was the first delegate who was term limited out of the Continental Congress following the ratification of the Articles of Confederation. Patrick Henry was term limited out of service as Virginia's governor. But in both cases, the prohibition was limited to restricting service to three years out of six, so that Henry returned to the governorship in the mid-1780s and Madison returned to the Continental Congress in 1787.

constitutionalists wanted to insulate the legislature from manipulation. The idea of annual elections in a society where the pursuit of public office was more an avocation than a career thus seemed the most obvious way to accomplish this. Equally important, the first constitutions minimized the political capacity and influence of the executive. In most states, governors were annually elected by the legislature and (quoting John Adams) "stripped of most of those badges of domination called prerogatives."[33] Executive power became just that: the duty to execute and administer policies enacted by the legislature.

42. The decade separating the adoption of the first state constitutions from the ratification of the Federal Constitution in 1787-88 modified these views in some important ways. The Revolutionary War placed enormous and unprecedented burdens on governance. While legislative assemblies met and adjourned, governors had to respond on a daily basis to the demands of war. Moreover, the idea that experience in office would be a boon to sound governance led some thinkers to challenge the hoary maxim about annual elections, with its expectations of high turnover. Considering this question in 1785, Madison noted that "For one part of the Legislature Annual Elections will I suppose be held indispensably though some of the ablest Statesmen & soundest Republicans in the U States are in favour of triennial."[34] He counted himself in the latter group.

43. Two years later, the framers of the Constitution proved amenable to this claim. In their initial discussion of June 12, 1787, they voted (seven states to four) to give the lower house a term of three years. Nine days later, they reduced the term to two years. Some speakers still favored the "fixed habit" of annual elections, while Madison and Alexander Hamilton, soon to be the co-

[33] *Founders' Constitution*, I, 109. The second-generation constitutions of New York (1777) and Massachusetts (1780) allowed the people to elect the governor, triennially in New York, still annually in Massachusetts. Not surprisingly, George Clinton and John Hancock became revolutionary America's two most powerful governors.
[34] Madison to Wallace, August 23, 1785, *Madison: Writings*, 44.

authors of *The Federalist*, endorsed three years. Madison offered the most balanced account of the reasons for abandoning annual elections. There was, first, a general question of convenience, and the difficulty of enabling members coming from distant corners of the country to go back and forth between their homes and the capital. Secondly, members "from the most distant States" who wished to be reelected and who faced "a Rival candidate" at home would have to "travel backwards & forwards at least as often as the elections should be repeated." Third, and arguably most important to Madison, "Much was to be said also on the time requisite for new members who would always form a large proportion [of the total membership], to acquire that knowledge of the affairs of the States in general without which their trust could not be usefully discharged." As other speakers also noted, the United States was a much larger country than Britain, and it would take each member some time to be educated in the diversity of American affairs.[35] Madison believed that the ideal model of congressional deliberation was one in which each lawmaker—and especially the numerically preponderant newcomers —would learn the business of government only in the course of each Congress, which would meet over several sessions with intervals allowing representatives to visit their constituents at home.[36]

44. The two-year term for members of the House of Representatives predictably became an object of discussion during the ratification debates of 1787-88. But it was arguably another Convention decision, limiting the initial size of the House to sixty-five members (if all thirteen states ratified) that seemed more controversial, when the British House of Commons had fully 558 members. The Anti-Federalist opponents of the Constitution argued that so small a number would

[35] Max Farrand, ed., *Records of the Federal Convention of 1787* (New Haven, 1911, 1937, 1966), I, 214-215, 360-362, 367-368. After this second debate of June 21, the two-year term remained non-controversial for the rest of the Convention.
[36] For a more sustained examination of Madison's ideals of legislative deliberation, see Jack N. Rakove, *A Politician Thinking: The Creative Mind of James Madison* (Norman, Okla., 2017), 54-95.

make the House of Representatives vulnerable to "cabal," and it also violated the British opposition writers' belief that the greater size of a legislative body was also an antidote to its corruption. Madison responded to these arguments in *The Federalist* in multiple ways, not least by arguing that the quality of legislative deliberation would decline if a body grew too numerous. To his way of thinking, the best alternative to legislative corruption involved developing the legislative habits that would encourage representatives to act responsibly. If a body grew too numerous, he worried, that sense of political responsibility would decline, and the danger of corrupt or factious activity would increase.

45. There was one other source of corruption that the framers of the Constitution actively considered. This was the idea that key officials of the national government, in either the legislative or executive departments, could become the targets of bribes from foreign powers. The key word used to describe this danger was *emolument*—a word that seems mysteriously exotic today, but which was commonly used in the eighteenth century to describe a wide array of material payments and benefits. History provided a famous example of the misuse of foreign emoluments that every Framer knew quite well: the secret Treaty of Dover of 1670, in which Louis XIV of France turned Charles II into his ally in his war against Holland, in part by giving him a young French mistress, but also by providing Charles with the additional funds he badly needed. This Treaty was well known to eighteenth-century readers. At the Federal Convention, Gouverneur Morris of Pennsylvania, who is often regarded as a chief architect of the presidency, explicitly invoked it during the July 20, 1787 debate over impeachment:

> Our Executive was not like a Magistrate having a life interest, much less like one having an hereditary interest in his office. He may be bribed by a greater interest to betray his trust; and no one would say that we ought to expose ourselves to the danger of seeing the first Magistrate in foreign pay, without being able to guard agst. it by displacing him. One would think the King of England well secured agst.

> bribery. He has as it were a fee simple in the whole Kingdom. Yet Charles II was bribed by Louis XIV.[37]

46. This idea of overt bribery directed by foreign powers at the president or senators remained part of the ratification discussions of 1787-1788. The Anti-Federalist opponents of the Constitution were inventive advocates, and many of their arguments reflected the deep fear of the self-aggrandizing nature of political power that was embedded in American political thinking well before 1776. In a sense, the Anti-Federalists were deeply loyal to the revolutionary cause of 1776.[38] But from the vantage point of modern views of political corruption, two aspects of these debates remain especially salient.

47. Contrary to our contemporary understanding of the ambitions of politicians—and especially congressmen—the desire to secure re-election was not the driving motive of officeholders. At both the state and national levels of government, rates of legislative turnover remained remarkably high by twentieth- and twenty-first-century standards. Because that was the case, a modern study of the corrupting forces of political behavior remains extremely difficult to apply to the Founding era. Today, we assume as a matter of course that the desire of legislators to serve term after term after term explains the whole nexus of political ambition; it is what leads them to spend enormous amounts of time courting donors and, in the process, feeding a common perception of the underlying corruption of (to borrow a phrase from Madison) "the political system of the United States." There were no real equivalents to this in the world of the Founders. They did not actively campaign for office, though occasionally they might give a public speech or write letters to trusted correspondents or even engage in a debate (as Madison and James Monroe once did during their rival efforts to be elected to the First Congress of 1789). There was little if anything

[37] Farrand, ed., *Records of the Federal Convention*, II, 68-69.
[38] Bailyn, *Ideological Origins*, 331-351.

they could obtain by spending money. Perhaps more important, few of them were active seekers of office or individuals who would have thought or said that politics was their career. Madison was one exception here, serving three-and-a-half uninterrupted years in the Continental Congress and four successive terms in the federal Congress after 1789. Other leading revolutionaries wound up following similar careers, but less from outright ambition than because the Revolution seemed to demand their service.

48. Yet the idea that they would inhabit a political universe in which the continuous solicitation of campaign-related funds had become a norm of daily behavior would have struck them as being wholly improbable and morally offensive. Privately, too, they would have regarded such an existence as a shameful mark of their own political corruption.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of February 2025 in Stanford, California.

/s/ Jack N. Rakove____________________
Jack N. Rakove

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM J. SCHNEIDER, *et al.*,<br><br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**DECLARATION OF CHRISTOPHER ROBERTSON**
**(pursuant to 28 U.S.C. § 1746)**

I, Christopher Robertson, hereby declare as follows:

1. I am over the age of 18 and reside in Cambridge, Massachusetts.

2. I am a social scientist. I hold a juris doctor degree (JD) from Harvard Law School and a doctorate (PhD) in Philosophy from Washington University in St. Louis. I have received training in social science research methodologies, including survey sampling, survey design, and statistical analysis. I have taught social science research methodologies and empirical legal research at the undergraduate and graduate levels at the University of Arizona, Boston University, and the London School of Economics. My research has been accepted through the peer review process in leading journals, conferences, and competitive grants, and I regularly serve as a peer reviewer for leading journals, conferences, and grant funders. While I am a Professor at Boston University School of Law, I worked in my individual capacity for this case.

3. In January 2025, I was retained by EqualCitizens to provide my expert opinion on the effects of campaign contributions of varying dollar amounts on perceptions of *quid pro quo* corruption. To that end, I deployed two surveys that tested the perceptions of various campaign

contribution limits and measured the effects of a $5,000 cap on contributions to independent expenditure committees (IECs). In both survey experiments, I used standard social science research methodologies, just as I use when conducting scholarly work for presentation, publication, or grant funding. I also retained a consulting expert in social science research methodologies, who holds a PhD in Sociology, to help me with the study. Together, we surveyed over 1100 respondents.

4. Exhibit 3-A is a preliminary, consolidated report of the methodology and findings, which we ultimately intend to compile into a scholarly manuscript for future publication. I have reviewed the information contained in the report and can confirm that it accurately reflects our findings. If called to testify, I could and would competently testify to the statements above and in the attached report.

5. Exhibit 3-B is my curriculum vitae.

6. Exhibit 3-C is a copy of my survey instrument.

7. Exhibit 3-D is a methodological appendix.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 19th day of February 2025 in Cambridge, Massachusetts.

*/s/ Christopher Robertson*
Christopher Robertson

Exhibit 3-A

# Expert Report of Christopher T. Robertson, JD, PhD

## Summary

I am a social scientist and used standard social science methodologies for two survey experiments, with over 1100 respondents. We designed the study to measure the effects of campaign contributions of varying dollar amounts on perceptions of *quid pro quo* corruption. We also measured the effects of a $5,000 cap on contributions to independent expenditure committees (IECs). Based on our findings, we concluded that larger financial contributions to committees supporting candidates increase perceptions that *quid pro quo* corruption is likely, and that the perceived risk of *quid pro quo* corruption is substantially higher when contributions are above $4,999 in particular. Further, we found that a $5,000 cap on contributions to IECs has a substantial salutary effect by reducing perceptions that *quid pro quo* corruption is likely, and a $5,000 cap increases broader confidence in the system of representative government, supporting perceptions of democratic legitimacy and effectiveness of government to serve public interests.

## Literature Review

The empirical study of public perceptions of political corruption and the campaign finance system in the United States has not always narrowly focused on "*quid pro quo*" as the particular conception of corruption nor focused on the particular policy mechanism of capping contributions to IECs. We provide only a selective review here, with a focus on more recent and narrowly-relevant works.

In a 2004 study, Persily and Lammie analyzed several decades worth of survey data and found that while perceptions of corruption are widespread, campaign finance reforms did not make substantial impacts on those perceptions (Persily & Lammie 2004). Nonetheless, such cross-sectional research does not support causal inference about the effect of discrete interventions, such as a particular policy change.

In a 2012 national opinion poll, the Brennan Center for Justice found that nearly 70% of Americans believe SuperPAC spending leads to corruption and that concerns over big donors reduce voter participation, particularly among low-income and minority groups Brennan Center for Justice (2012).

In a 2015 study, Brown and Martin used survey vignettes to systematically investigate the relationship between the amounts and types of contributions on the one hand and "faith in democracy" on the other (Brown & Martin 2015). They found that larger contributions had

more harmful effects on those attitudes.

In a 2015 study, Robertson et al. conducted a mock juror experiment and a grand jury simulation. Their findings indicate that people would be willing to indict and convict politicians and donors of bribery, which the authors operationalize as a definition of *quid pro quo* corruption, even when contributions are legal under extant campaign finance laws. This research shows that the extant policy regime is perceived to facilitate *quid pro quo* corruption in donor-candidate relationships (Robertson et al., 2015). Notably, Robertson and colleagues included a "dark money" condition where the recipient of the contribution is nominally independent from the candidate (like an IEC), and the respondents still frequently perceived *quid pro quo* corruption. However, the researchers did not specifically test the effect of a cap on contributions to IECs in particular.

In 2016, Bowler and Donovan also deployed survey experiments and found that both the amount of funding and the source of funds affected perceptions of corruption (Bowler & Donovan 2016). In this research, even "independent" expenditures could create coercive effects.

In a 2016 study, Kristin Kelly notes that the prior studies relied upon by the courts "indicate high levels of perceived governmental corruption among the public" (Kelly 2016). Relying on 2009 survey data, Kelly finds that two-thirds of respondents believe that *quid pro quo* corruption happens "all the time" or "often."

In a 2016 study using survey experiments, Avkiran et al. manipulated whether respondents learned about campaign finance laws to determine whether that knowledge impacted citizens' perceptions of corruption (Avkiran et al., 2016). They found a 7.48 percent higher concern for the corrupting effect of money in politics when campaign financing is not regulated. But respondents remained untrusting of politicians even with campaign finance regulations in place.

In a 2020 study, Spencer and Theodoridis conducted a nationally representative survey and conjoint experiment where participants identified which campaign finance practices seemed corrupt Spencer & Theodoridis (2020). They find that many common campaign finance practices (such as large donations and outside spending) were viewed as corrupt.

In a 2020 book, Primo and Milyo review extensive empirical evidence from 2015-2016 that supports the proposition that the American public views corruption as rampant (Primo & Milyo 2020). In their surveys, however, respondents do not correctly understand the complexities of the extant campaign finance system, and in any case, they express skepticism that reforms will make substantial impact.

In a 2021 book, Shaw, et al. analyzed public opinion data on corruption and campaign finance reforms, finding that most Americans believe corruption is widespread despite little empirical evidence of systematic *quid pro quo* corruption (Shaw et al., 2021). Their study also suggests that disclosure laws have minimal impact on altering corruption perceptions.

In a 2021 study reporting a series of survey experiments, DeBell and Iyengar find that even "independent" contributions can give rise to perceptions of *quid pro quo* corruption (DeBella & Iyengar 2021). Larger contributions raise greater concerns.

In a 2024 study, Goodliffe and Townsend analyze survey data from 2012 to 2020 to track shifts in public attitudes toward campaign finance laws Goodliffe & Townsend (2024). The study finds that Americans consistently view SuperPACs and large campaign donations as corrupting but remain largely resistant to changes in their views even when presented with additional information on regulations.

## Overall Research Method

The literature suggests that there are open questions regarding the effects of contributions to IECs on perceptions of *quid pro quo* corruption and the effects of a $5,000 cap in particular. Accordingly, we conducted two randomized survey experiments. The full survey instrument is attached as Exhibit C. A methodological appendix is attached as Exhibit D.

As shown in Table 1, we used an online population to recruit and secure the informed consent of n=1144 Americans, a sample that was selected to be representative of the U.S. population by age and gender. To avoid a selection bias related to our primary hypotheses, we described the survey task generally as about "perceptions of government." We collected standard demographic covariates. The sample had reasonable geographic representation (spanning 49 states) and with reasonable racial, ethnic, educational, income, and political representation for the United States population.

We understand that this litigation involves the State of Maine, and the perspectives of Mainers may be especially interesting. We therefore over-sampled respondents from Maine (n=115), as shown in Table 1. We do not have any particular hypotheses that Mainers might respond differently, but rather consider this enriched subsample a robustness check, to confirm that our national sample is broadly applicable to this setting. To maximize our statistical power, our primary analyses use the full dataset, but as shown in the appendix, we get similar results when focusing only on the subset of Mainers.

**Table 1.** Descriptive Statistics for U.S. Sample and Maine Sample

| | **U.S. Sample** | **Maine Subsample** |
|---|---|---|
| Age | | |
| 18-34 | 21% | 15% |
| 35-54 | 57% | 61% |
| 65+ | 22% | 24% |
| Male | 46% | 46% |
| Always Vote | 61% | 59% |
| Education | | |
| HS Grad or Less | 16% | 27% |
| Some College/Associate | 35% | 40% |
| Bachelor's Degree | 30% | 22% |
| Post-Graduate | 19% | 11% |
| White | 81% | 98% |
| Democrat | 32% | 30% |
| Independent | 40% | 43% |
| Republican | 27% | 27% |
| Income | | |
| $49,999 or less | 36% | 53% |
| $50,000-$99,999 | 36% | 34% |
| $100,000 or more | 28% | 13% |
| *N* | 1144 | 115 |

As shown in Exhibit C, we used a vignette-based survey research methodology, a standard approach that has been shown to produce valid findings. Vignettes ask respondents to imagine themselves in a setting, and then ask respondents questions about that their attitudes or opinions relating to that vignette setting. Vignettes allow the researcher to systematically manipulate factors about the setting in order to measure the impact of those factors on respondent attitudes and opinions. Among other advantages, this approach allows the researcher to make counterfactual comparisons (i.e., the same policy regime with and without a certain feature), which is almost never directly feasible in the real world, without creating confounds.

One challenge of online survey research is to ensure respondent engagement. We included two attention-check questions (simply asking them to mark a certain response in a Likert-matrix), and in two places during the survey also asked respondents to type out their responses, which allows us to check for junk responses (e.g., mashed keys, irrelevant text copy-and-pasted in, refusal to engage with material). In this report, the data (n=1144) is screened to exclude those who failed the two attention check questions, and to exclude those who provided junk qualitative responses. We conducted these screens

without regard to the respondents' experimental conditions or their responses to our primary quantitative dependent variables (DVs).

We used standard bivariate and multivariate statistics. We consider $p<.05$ as the threshold for statistical significance, and display 95% confidence intervals (similar to a "margin of error"). Our randomized design supports causal inference, by holding observable and unobservable factors constant across conditions, even in bivariate comparisons. In the Appendix, we also use multivariate statistics for robustness, and find no substantial changes to our findings.

We conducted two experiments with each respondent. Experiment 1 looks at the relationship between the dollar-amount of financial contributions to political committees and the perceived risk of *quid pro quo* corruption on officials. Experiment 2 looks at the relationship between a law that caps IEC contributions at $5,000 and the perceived risk of *quid pro quo* corruption. Experiment 2 also looks at perceptions of government legitimacy more broadly, including other conceptions of corruptions that are potentially more capacious than *quid pro quo*.

## Experiment 1 Design

Experiment 1 was designed to assess the relationship between the dollar-amounts of financial contributions and the perceived risk of *quid pro quo* corruption on officials.

As shown below, the vignette was very brief, asking the respondent to consider the likelihood that an elected official would sell a policy outcome in exchange for a contribution to a committee supporting his or her election.

**Experiment 1. Stimulus for All Respondents**

> "Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $X."

We then manipulated the amount of the contribution [X] from $5 to $50 million dollars in a logarithmic scale ($5, $50, $5,000, $50,000, $500,000, $5,000,000 or $50,000,000). Each respondent saw one amount of money as the contribution, making this a 1x7 randomized experiment in between-subjects design.

The outcome was measured on a 7-point Likert scale (from "extremely unlikely" to "extremely likely"). For simplicity of presentation, in the figure for this report, we compress the scale, and report the proportion finding that a sale of the policy outcome was likely, including extremely, very, or somewhat likely. Our regressions utilize the full scale data.

In this first experiment, we wanted to capture at a basic level how people think about this general situation. We had not yet laid out the full legal regime, explaining the difference between direct contributions, independent expenditures, and defining independent expenditure committees. We expect that many Americans are unaware of the legal complexities of campaign finance law, and Experiment 1 arguably has the advantage of being more realistic for low-information voters' attitudes, even if it is not robust in terms of legal technicalities.

## Experiment 1 Results

In Experiment 1, we found a clear relationship between the amount of money contributed and perceived likelihood that the elected official would sell a policy outcome. See Figure 1. This finding is consistent with the prior literature (e.g., Brown & Martin 2015).

**Figure 1.** Percent of Respondents Viewing Sale of Policy Outcomes to be Likely by Level of Contribution to Committee (Experiment 1, n=1144, 95% confidence intervals shown).




The amount of money matters. We can reject the null hypothesis that the amount of money makes no difference to perceptions of *quid pro quo* corruption. Table 2 presents an ordinary least squares (OLS) regression showing that the slope of these points (coefficient of 0.24) is significantly different than zero ($p<.001$), while controlling for key covariates. The subset of Mainers presents substantially similar results.

**Table 2.** OLS Regression on Perception That Politicians Will Sell Policy Outcomes

| | U.S. Sample | | Maine Subsample | |
|---|---|---|---|---|
| Amount of Money | 0.24*** | (0.02) | 0.18** | (0.07) |
| Age | -0.03 | (0.03) | -0.07 | (0.10) |
| Gender | 0.27** | (0.09) | 0.60* | (0.29) |
| Education | -0.03 | (0.03) | -0.01 | (0.10) |
| Politics | -0.07** | (0.03) | -0.17* | (0.09) |
| Income | -0.00 | (0.01) | -0.04 | (0.05) |
| Vote | -0.07+ | (0.04) | 0.01 | (0.13) |
| White | -0.00 | (0.11) | 0.62 | (1.08) |
| Constant | 2.94*** | (0.30) | 2.67+ | (1.39) |
| *N* | 1144 | | 115 | |
| Adj. $R^2$ | 0.134 | | 0.084 | |

Standard errors in parentheses
+ $p < .10$, * $p < .05$, ** $p < .01$, *** $p < .001$

As Figure 1 displays, the relationship between size of contribution and likelihood of selling a policy outcome has a clear discontinuity around $5,000, meaning that respondents perceive contributions below $5,000 to be qualitatively different than contributions at or above that amount. Specifically, below $5,000 about 40% of respondents thought it would be likely for a candidate to sell a policy outcome, while above $5,000 this number rises to about 70% of the respondents. This change is qualitatively dramatic.

Note that at this stage in the survey, respondents were not primed to focus on the $5,000 threshold. That was only mentioned in Experiment 2, and respondents were unable to go back and revisit Experiment 1. Further, the blinded between-subjects design means that each respondent was only presented with one of these dollar amounts; they were not asked to compare or contrast that amount with $5,000. We make such comparisons only in the aggregate data.

In conclusion, Experiment 1 shows that larger financial contributions cause greater perceived risk of *quid pro quo* corruption, and that perceived risk is greater and stable above $4,999. To put it another way, $5,000 appears to be an inflection point in perceptions of quid pro quo corruption.

## Experiment 2 Design

Experiment 2 was designed to assess the relationship between a state law that imposed a $5,000 cap on contributions to IECs and the perceived risk of *quid pro quo* corruption, as well as other attitudes about the state government. In contrast to Experiment 1, we introduced the $5,000 level for half of the respondents, while the other half were assigned to a control condition with no cap on contributions.

In Experiment 2, the vignette provided a set of policies in a given fictional state ("Ames"), which at baseline explained the difference between direct campaign fundraising and spending, versus "independent" expenditures and defined IEPs with reference to SuperPACs.

**Experiment 2. Base Stimulus for All Respondents**

Please consider the following scenario, and then we will ask you about how you feel about it. This scenario involves money and politics. Imagine this scenario, regardless of whatever you may believe about your own state or federal or constitutional law.

**Suppose you live in a U.S. state called "Ames" with the following rules:**

1. Candidates for public office, such as state representative and governor, need lots of money to support their elections and re-elections. They raise and spend money to support their campaigns.

2. Separate from the candidates' own fundraising and spending, individuals and corporations can also spend unlimited amounts of money independently to support or oppose candidates. This spending must be "independent" of the candidate's campaign, not coordinated with any candidate's campaign.

3. Individuals and corporations can also organize their independent spending through entities sometimes called SuperPACs but which we will refer to as "independent expenditure committees," or IECs.

4. Contributions to these IECs may come from major donors who want official actions from elected officials, such as having the state government spend money to support a particular industry or de-regulate a particular industry.

5. IECs may not necessarily know if a candidate directed a donor to make a contribution to the IEC or made any agreement with a donor in exchange for the contribution.

In this between-subjects randomized experiment, we manipulated whether the state had a $5000 cap ("Cap") on contributions to independent expenditure committees (IECs).

**Experiment 2. $5k Cap Condition**

6. The state of Ames has a **cap of $5,000** in contributions to IECs. It is **illegal** for any person or corporation to contribute more than $5,000 to IECs in this state.

**Experiment 2. No Cap Condition**

6. The state of Ames has **no cap** on contributions to IECs. Persons or corporations can contribute any amount of money to IECs in this state.

Given that the respondents are not lawyers trained to analyze policy regimes, in designing the survey materials, the vignettes could be too dense and complex. It could help to provide examples, though we also sought generalizability beyond any particular example. Thus, for each of the two legal regimes (Cap and No Cap), we offered two different examples focusing on officials asking for $1 million or donors offering to give it, as well as conditions with no example, in factorial design. The appendix presents the detailed results, separating out respondent attitudes by presence or absence of example. In our analyses comparing the examples and no-example conditions, we found that the examples did not make a substantial difference in our overall findings. So, for simplicity of presentation, the results presented here aggregate across the example and non-example conditions. We treat this as a background covariate, fully randomized across experimental conditions to avoid confounds.

To improve engagement with the vignette in Experiment 2, we asked all respondents to paraphrase the vignette in their own words and to reflect on the likely impact thereof.

The outcomes were measured as 15 questions in two sets of six-point Likert-scale matrices (from "strongly disagree" to "strongly agree"). For ease of presentation in the figure, we again bifurcate the scale to present the percent disagreeing, regardless of how strong that disagreement may be. The appendix presents the detailed results, and our regressions utilize the full scale data.

Three of these questions were narrowly focused on the perceived risk of *quid pro quo* corruption, while others asked about the perceived legitimacy of the government more generally. The order of the questions (including two attention checks) was randomly assigned.

## Experiment 2 Results

We found that a $5,000 cap on contributions to IECs has a salutary effect on perceptions of *quid pro quo* corruption as well as our other measures of political legitimacy.

Figure 2 focuses on three of our questions that asked more narrowly about *quid pro quo* corruption. We focus on *disagreement,* because we are looking for the frequency that respondents reject perceptions of corruption. We note that at baseline respondents are very cynical about the government, with less than 10% rejecting perceptions of *quid pro quo* corruption. They seem to generally see politics, at least as presented in the vignettes, as being rife with exchanges of value. Such high levels of perceived corruption are consistent with the prior literature (e.g., Kelly 2016).

**Figure 2.** Percent of Respondents Who Disagree with Statement by Experimental Condition (Experiment 2, n=1144, with 95% confidence intervals shown)




As for the first such question, Figure 2 shows that with a $5,000 cap on committee contributions in place, respondents were more likely to disagree that elected officials will provide policy outcomes in exchange for money given to IECs. The chance of disagreeing with the statement more than doubles, from less than 10% with no cap to more than 25%, with a cap in place.

Likewise, Figure 2 shows that with a cap in place, respondents more often disagree that donors would be likely to get policy outcomes in exchange for contributions to their committees. Here again, the chance of disagreeing more than doubles (from less than 10% to more than 20%) once a cap is in place.

Although all three of these questions get to the concept of an exchange of one thing of value for another, in the third question, the phrase "*quid pro quo*" is actually used explicitly. As shown in Figure 2, we see a tripling of the likelihood that respondents will disagree with the claim that *quid pro quo* exchanges are likely in the world they read about (from 9% to 27%) with a cap in place.

For all three of these comparisons, as shown in Table 3, the differences are highly significant statistically ($p < .001$). Table 4 finds similar results for the Maine subsample, also all three statistically significant.

**Table 3.** OLS Regression on Perceptions of *Quid Pro Quo* Corruption (U.S. Sample)

| | Provide Policy Outcomes | | Facilitates "*Quid Pro Quos*" | | Get Policy Outcomes | |
|---|---|---|---|---|---|---|
| 5K Cap | -0.75$^{***}$ | (0.07) | -0.63$^{***}$ | (0.07) | -0.68$^{***}$ | (0.07) |
| Age | 0.04$^{+}$ | (0.02) | 0.04 | (0.02) | 0.07$^{**}$ | (0.02) |
| Gender | 0.03 | (0.07) | 0.04 | (0.07) | 0.05 | (0.07) |
| Education | 0.05$^{*}$ | (0.03) | 0.04 | (0.02) | 0.04 | (0.03) |
| Politics | -0.06$^{**}$ | (0.02) | -0.07$^{***}$ | (0.02) | -0.05$^{**}$ | (0.02) |
| Income | 0.00 | (0.01) | 0.01 | (0.01) | 0.00 | (0.01) |
| Vote | -0.06$^{+}$ | (0.03) | -0.02 | (0.03) | -0.06$^{+}$ | (0.03) |
| White | 0.29$^{**}$ | (0.10) | 0.37$^{***}$ | (0.09) | 0.14 | (0.10) |
| Constant | 4.70$^{***}$ | (0.25) | 4.58$^{***}$ | (0.23) | 4.68$^{***}$ | (0.24) |
| *N* | 1144 | | 1144 | | 1144 | |
| Adj. $R^2$ | 0.112 | | 0.105 | | 0.098 | |

Standard errors in parentheses. $^{+}$ $p < .10$, $^{*}$ $p < .05$, $^{**}$ $p < .01$, $^{***}$ $p < .001$

**Table 4.** OLS Regression on Perceptions of *Quid Pro Quo* Corruption (Maine Subsample)

| | Provide Policy Outcomes | | Facilitates "*Quid Pro Quos*" | | Get Policy Outcomes | |
|---|---|---|---|---|---|---|
| 5K Cap | -0.75$^{**}$ | (0.26) | -0.61$^{*}$ | (0.27) | -0.71$^{**}$ | (0.26) |
| Age | 0.17$^{+}$ | (0.09) | 0.05 | (0.10) | 0.15 | (0.09) |
| Gender | 0.09 | (0.26) | 0.13 | (0.27) | 0.23 | (0.26) |
| Education | 0.06 | (0.09) | 0.08 | (0.10) | 0.17$^{+}$ | (0.09) |
| Politics | -0.06 | (0.08) | -0.03 | (0.08) | -0.00 | (0.08) |
| Income | 0.03 | (0.05) | 0.04 | (0.05) | 0.02 | (0.05) |
| Vote | -0.05 | (0.11) | 0.00 | (0.12) | -0.03 | (0.11) |
| White | 0.93 | (0.97) | 1.43 | (1.01) | -0.09 | (0.97) |
| Constant | 2.99$^{*}$ | (1.22) | 2.67$^{*}$ | (1.27) | 3.28$^{**}$ | (1.22) |
| *N* | 115 | | 115 | | 115 | |
| Adj. $R^2$ | 0.091 | | 0.037 | | 0.100 | |

Standard errors in parentheses. $^{+}$ $p < .10$, $^{*}$ $p < .05$, $^{**}$ $p < .01$, $^{***}$ $p < .001$

Across these three questions, the $5,000 cap on contributions to IECs reduces perceptions that *quid pro quo* corruption is likely to plague the state government. To put the observations another way, the cap substantially and significantly reduces perceptions of *quid pro quo* corruption.

We also asked a range of other questions about perceptions of government legitimacy, democratic representativeness, and effectiveness, using language from leading U.S. Supreme Court decisions, such as *Buckley v. Valeo*. In all these questions, we found that the cap had a salutary, prophylactic effect. *See* the appendix. For example, with a $5,000 cap in place, respondents were significantly *more likely* to *agree* that "people like me are likely to have strong voice in government" (Table A1) and that "government is likely to be effective" (Table A3). And respondents were significantly *less likely* to agree that "government will be controlled by special interests" (Table A4) and "many elected officials will be 'crooked'" (Table A7).

For Experiment 2, we conclude that a $5,000 cap on IEC committee contributions has a significant and substantial effect on perceptions of *quid pro quo* corruption and that the cap supports broader perceptions of democratic legitimacy and effectiveness.

## Qualitative Findings

Twice during the survey experience, we asked respondents to answer open-ended questions. In addition to improving engagement with the vignettes, and allowing us to detect junk data, these answers also provide qualitative data that can supplement the quantitative data analyzed above. We provide a few examples from Mainers in particular, to add color. We did not systematically analyze these responses for themes but exhibit several here. These respondents speak for themselves.

**Mainers in $5,000 Cap Conditions**

- I believe there should be a cap on donations so that people running in elections are not able to be bought
- This system for the State of Ames seems legit. That most candidates will have to fund their own campaigns with private funding. And, that the cap for SuperPac's ensures that. Making it harder for a politician to be [bought] off.
- The state of Ames has an effective cap on political funding contributions from private entities presuming this law is followed. Ames' political candidates are likely more genuine to their constituents rather than business oligarchs. In Ames, elections cannot be bought by the millionaire class and that is better for their society as a whole.
- I feel the government of Ames is what all towns should be like. nobody should be able to buy their seat doesn't matter what position they are going for. its consequences should be removal from that position and not be able to run again.

**Mainers in No-Cap Conditions**

- It sounds like people can buy policy changes. It makes me not trust Ames politicians.
- Elections and policies are being bought in a highly corrupt election system
- This system for the state of Ames would indicate that large corporations can create super Pacs or eics to donate large amounts of money to get government officials to vote or spend money in certain areas for the benefit of their company. This makes me feel that the rich and wealthy are able to manipulate their politicians to do what they want them to do and not necessarily do what's in the best interest of the people of the state.
- It feels like they're corrupt and all about money. It feels like oligarchy.
- Makes me feel disappointed and worried about the future of Ames and the effect it would have on the people

These qualitative comments broadly track the quantitative findings we observe above.

## Strengths and Limitations

Our research study had several strengths as well as limitations. First, to be clear, we measured perceptions of the risk of *quid pro quo* corruption. We do not measure the prevalence of quid pro quo corruption itself.

Ours is not a probability-based survey with random selection, which is increasingly difficult and rare in the modern era of survey research, where people do not have land-line

phones but do screen their calls. Instead, we constructed a sample that was appropriate for the task, selected to be nationally-representative on two key demographic targets (age and gender), which can be otherwise skewed in online convenience samples. We also oversampled in a relevant sub-population of interest (Mainers).

With this sample size (n=1144), we had sufficient statistical power to detect effects that would have real-world interest. Our *p*-values and confidence intervals create no difficulty in ruling out the null hypotheses at standard levels used in social science, even in the smaller subset of Mainers (n=115).

Our randomized experimental design allows us to make valid within-sample comparisons, avoiding confounds with observable and unobservable covariates. Even if, for example, some respondents might have very strong views about political corruption regardless of our manipulation, randomization distributed such people to each experimental condition, washing out such background factors.

Our two experiments complement each other. Experiment 1 allowed respondents to engage broadly with the idea of corruption, before being educated on the specifics of the campaign finance regime. This experiment also allowed us to identify whether the amount of contributions to committees caused changes in the perception of *quid pro quo* corruption, without focusing respondents on any particular threshold amount. This minimal experimental design avoided demand effects, which can plague other sorts of surveys ("push polls").

Experiment 2 is, in contrast, legally-situated. It provided more details about the legal regime in which a $5,000 cap would be implemented, allowing the possibility that a respondent might see such a cap as being superfluous if they perceived the background policies to be sufficient, or immaterial if they perceived the sum of all such laws to be futile. Against this background, our manipulation allows assessment as to whether this one discrete policy change (a $5,000 cap on IEC contributions) makes a difference on the margin.

Together our findings in these two experiments provide convergent validity. Likewise, our qualitative data provides further evidence that coheres with our quantitative findings.

One limitation of our methodology is that it is difficult to theorize exactly what level of real-world respondent attention should be appropriately simulated to answer the relevant legal question. Of course, Americans worry about all sorts of things (e.g., prices, jobs, health, children), and rationally may not spend much time thinking about campaign finance. At any given time, their likelihood of doing so is likely affected by all sorts of cultural, economic, and other situational factors (*e.g.,* whether there is an election pending or a

relevant scandal in the media). Rather than serving as a generalizable public opinion poll, our research project is best understood at a micro, psychological level, exploring how people would react once confronted by the issue either generally (in Experiment 1) or more specifically (in Experiment 2). Contingent on having a certain level of attention and information, how do people think about their government's legitimacy and effectiveness? Our approach might be broadly analogous to the way jurors are selected from the broad population, but then asked to focus their attention on a particular case and to render a verdict thereon, drawing from their background experience and common sense.

Still, even while we designed our study to engage the attention of respondents and took several precautions in designing the study and reviewing the data, with any online research project, a substantial number of respondents may still not be fully attentive. In our final question, we asked respondents to recall the legal regime they read about and answer a question as to whether a given behavior involving a $1.5M contribution to an IEC would be legal or illegal. The correct answer varied, depending on whether the respondent had been assigned to the $5,000 cap or the no-cap control condition. This question can be labelled a "manipulation check" as distinct from the "attention checks" described above, and it must be handled carefully as it begs the question of how important or memorable the manipulation *should* be to the respondent.

In fact, substantial numbers (394) of respondents failed this manipulation check, suggesting that they were inattentive, forgetful, simply did not understand the complex legal regime, or perhaps just did not believe this variation was important. We nonetheless have *not* screened these incorrect respondents out for the purposes of the primary analyses reported above (n=1,144). Nonetheless, as a robustness check, we did also exclude those respondents who failed the manipulation check, and in the reduced sample (n=750), we found even stronger effects, as would be expected. See Table A16 in the appendix.

## Conclusions

Based on my scientific training, my review of the social science literature, and my own standard social science methods detailed herein, I am able to render opinions in this report with a reasonable degree of scientific certainty. Accordingly, it is my opinion to a reasonable degree of scientific certainty, that

a. larger financial contributions to committees supporting candidates increase perceptions that *quid pro quo* corruption is likely,
b. the perceived risk of *quid pro quo* corruption is substantially higher when contributions are above $4,999 in particular,
c. a $5,000 cap on contributions to IECs has a substantial salutary effect by reducing perceptions that *quid pro quo* corruption is likely,
d. a $5,000 cap also increases broader confidence in the system of representative government, supporting perceptions of democratic legitimacy and effectiveness of government to serve public interests.

## Sources Cited

Avkiran, N. K., Kanol, D. K., & Oliver, B. (2016). Knowledge of campaign finance regulation reduces perceptions of corruption. Accounting & Finance, 56(4), 961-984.

Brennan Center for Justice. (2012). National survey: Super PACs, corruption, and democracy. Retrieved from https://www.brennancenter.org/

Bowler, S., & Donovan, T. (2016). Campaign money, congress, and perceptions of corruption. American Politics Research, 44(2), 272-295.

Brown, R. L., & Martin, A. D. (2015). Rhetoric and Reality: Testing the Harm of Campaign Spending. NYUL Rev., 90, 1066.

DeBell, Matthew, & Iyengar, Shanto. (2021). Campaign contributions, independent expenditures, and the appearance of corruption: public opinion vs. the supreme court's assumptions. Election Law Journal, 20(3), 286-300.

Goodliffe, J., & Townsend, K. (2024). Examining public perceptions of US campaign finance over time through survey experiments. Electoral Studies, 90, 102813. https://doi.org/10.1016/j.electstud.2024.102813

Kelly, K. J. (2016). Political quid pro quo and the impact of perceptions of corruption on democratic behavior. Election Law Journal, 15(2), 160-174.

Persily, N., & Lammie, K. (2004). Perceptions of corruption and campaign finance: When public opinion determines constitutional law. U. Pa. L. Rev., 153, 119.

Primo, D. M., & Milyo, J. D. (2020). Campaign finance and American democracy: What the public really thinks and why it matters. University of Chicago Press.

Robertson, C., Winkelman, D. A., Bergstrand, K., & Modzelewski, D. (2016). The appearance and the reality of quid pro quo corruption: An empirical investigation. Journal of Legal Analysis, 8(2), 375-438.

Shaw, D. R., Roberts, B. E., & Baek, M. (2021). The Appearance of Corruption: Testing the Supreme Court's Assumptions about Campaign Finance Reform. Oxford University Press, USA.

Spencer, D. M., & Theodoridis, A. G. (2020). "Appearance of corruption": Linking public opinion and campaign finance reform. Election Law Journal, 19(4), 510-523. https://doi.org/10.1089/elj.2019.0590

# Exhibit 3-B

# CHRISTOPHER T. ROBERTSON

N. Neal Pike Scholar, Professor of Law and Public Health, Associate Dean for Strategic Initiatives (Law), Boston University

765 Commonwealth Avenue,
Boston, MA 02215

email: ctr00@bu.edu
mobile: 617-910-0649
twitter: @ProfCRobertson
orcid: 0000-0001-6188-8005
ssrn: 769387

## I. EDUCATION

**J.D., Harvard Law School**, *magna cum laude* (2007)
- Petrie-Flom Student Fellow in Health Law Policy, Biotechnology and Bioethics
- Hewlett Research Fellow in Law and Negotiation
- Oberman Prize for Health Law and Bioethics
- Health Law Scholar Award

**Ph.D. & M.A., Washington University in St. Louis**, Philosophy (2003)
- Graduate Fellowship and Dissertation Fellowship
- Research assistantship with Social Norms Marketing Research Project (EDC)

**B.A., Southeast Missouri State University**, Philosophy, s*umma cum laude* (4.0 GPA) (1997)
- National Merit, Governor's, and Bright Flight Scholarships
- White House Chief of Staff's Office Internship

## II. ACADEMIC APPOINTMENTS AND TEACHING

**Professor with Tenure and N. Neal Pike Scholar, Boston University School of Law (2020-), Associate Dean for Strategic Initiatives (2022-present).** Secondary appointment at School of Public Health (2022-), Faculty Affiliate within the Center for Innovation in Social Science (CISS) (2021-). Formerly: Associate Dean for Graduate and International Programs (interim, 2021-2022). Teaching: Health Law; Bioethics and Healthcare Decision Making; Torts; Law and Science, with Kevin Outterson.

**Visiting Scholar (JD-Next) (2020-), James E. Rogers College of Law, University of Arizona.** Formerly: Associate Professor (2010-2015), Professor with Tenure (2015-2020), Associate Dean for Research & Innovation (2015-2020). Teaching: Torts; Bioethics and the Law; Health Law; Regulatory Science Colloquium; Distinguished Scholars Colloquium; Law and Behavior Research Lab, with David Yokum; Sex, Drugs, Race, and Power in the Supreme Court; Masters Seminar in Cognitive Science, Ethics, & Law, with Massimo Piattelli-Palmarini.

**Visiting Professor, London School of Economics, Law Department (2018).** Teaching: Graduate workshop on empirical methods.

**Visiting Professor, New York University School of Law (2016).** Teaching: Torts.

**Visiting Professor, Harvard Law School (2013-2014).** Teaching: Torts; Health Law; Workshop in Health Law Policy, Biotechnology and Bioethics, with I. Glenn Cohen.

**Academic Fellow and Lecturer on Law, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics, Harvard Law School (2008-2010).** Teaching: Empirical Approaches to Health Policy Reading Group; Healthcare Reform Seminar, with Allison Hoffman.

**Teaching Fellow, Harvard College Department of Government (2006).** Teaching: Justice (under Michael Sandel); Biotech and Our Genetic Future (under Sandel and Doug Melton).

**Visiting Lecturer, Washington University Philosophy Department (2004).** Teaching: Bioethics; Introduction to Philosophy.

**Adjunct Instructor, Webster University Philosophy Department (2001-2003).** Teaching: Bioethics; Philosophy of War and Terror; Philosophy of Leadership.

## III. SCHOLARSHIP

### Authored Books

Christopher T. Robertson, EXPOSED: WHY OUR HEALTH INSURANCE IS INCOMPLETE AND WHAT CAN BE DONE ABOUT IT (Harvard University Press, 2019) (press page, introduction on SSRN). reviewed: David Orentlicher, *The Failure of Patient Cost Sharing*, JOTWELL (2020) (site); reviewed: Karen Posner, 131 ANESTHESIA AND ANALGESIA, e214-e215 (2020) (journal); reviewed: Isaac Buck, 40 JOURNAL LEGAL MEDICINE, 283-284 (2020) (journal).

### Edited Books

I. Glenn Cohen, Wendy Epstein, Christopher Robertson, Carmel Shachar, Eds. HEALTH LAW AS PRIVATE LAW, Cambridge University Press (forthcoming).

I. Glenn Cohen, Timo Minssen, Nicholson Price, Christopher T. Robertson, & Carmel Shachar, Eds. INNOVATION AND PROTECTION: THE FUTURE OF MEDICAL DEVICE REGULATION (Cambridge University Press, 2022) (press site).

Christopher T. Robertson and Aaron S. Kesselheim, Eds., BLINDING AS A SOLUTION TO BIAS: STRENGTHENING BIOMEDICAL SCIENCE, FORENSIC SCIENCE, AND LAW (Elsevier, 2016) (foreword, introduction, and TOC on SSRN).

I. Glenn Cohen, Holly Fernandez Lynch, and Christopher Robertson, Eds. NUDGING HEALTH: BEHAVIORAL ECONOMICS AND HEALTH LAW (Johns Hopkins University Press, 2016, second printing 2020) (introduction on SSRN). reviewed: Shlomo Cohen, *On Nudging Health*, 48 HASTINGS CENTER REPORT 45 (2018) (journal); reviewed: Elizabeth Weeks Leonard, *A Must-Read on Health Care Nudges*, JOTWELL (2017) (site); reviewed: Yaniv Hanoch, *Nudging Health: Health Law and Behavioral Economics*, 44 HEALTH POLITICS POLICY LAW 80 (2019) (journal).

### Chapters and Parts of Books

Xinping Hu, Christopher Robertson, Alison Bateman-House, & Holly Fernandez Lynch, *Legal Pathways to Promote Access to Safe and Effective Psychedelic Medicines*, in LAW AND POLICY OF PSYCHEDELIC MEDICINE, Glenn Cohen, Mason Marks, Amy Lynn McGuire, Susannah Baruch, Eds. (2024).

Jacqueline Salwa & Christopher Robertson, *The Need for a Strong and Stable Federal Public Health Agency Independent from Politicians*, in COVID-19 POLICY PLAYBOOK: LEGAL RECOMMENDATIONS FOR A SAFER, MORE EQUITABLE FUTURE, Scott Burris, Sarah de Guia, Lance Gable, Donna Levin, Wendy Parmet, & Nicolas Terry, Eds. (2021). (SSRN).

Sarah E. Malanga, Jonathan D. Loe, Christopher Robertson, & Kenneth S. Ramos, *Who's Left out of Big Data? How Big Data Collection, Analysis, and Use Neglect Populations Most in Need of Medical and Public Health Research and Interventions, in* BIG DATA, HEALTH LAW, AND BIOETHICS 98 (I. Glenn Cohen et al. Eds. (2018) (draft on SSRN).

Christopher T. Robertson and David V. Yokum, *Cost-Sharing as Choice-Architecture*, in NUDGING HEALTH: BEHAVIORAL ECONOMICS AND HEALTH LAW, I. Glenn Cohen, Holly Fernandez Lynch, and Christopher Robertson, Eds. (2016).

Christopher T. Robertson, *Deciding for Patients and Letting Patients Decide for Themselves (Introduction to Part VI)*, in NUDGING HEALTH: BEHAVIORAL ECONOMICS AND HEALTH LAW, I. Glenn Cohen, Holly Fernandez Lynch, and Christopher Robertson, Eds. (2016).

Christopher T. Robertson, *Selection Bias and Disclosure Discretion for Blinded Experts*, in BLINDING AS A SOLUTION TO BIAS: STRENGTHENING BIOMEDICAL SCIENCE, FORENSIC SCIENCE, AND LAW, Aaron S. Kesselheim and Christopher T. Robertson, Eds. (2016).

Megan S. Wright, Christopher T. Robertson, and David V. Yokum, *Mock Juror and Jury Assessments of Blinded Expert Witnesses*, in BLINDING AS A SOLUTION TO BIAS: STRENGTHENING BIOMEDICAL SCIENCE, FORENSIC SCIENCE, AND LAW, Aaron S. Kesselheim and Christopher T. Robertson, Eds. (2016).

Christopher T. Robertson, *Why Blinding? And How? A Theory of Blinding Applied to Institutional Corruption*, in BLINDING AS A SOLUTION TO BIAS: STRENGTHENING BIOMEDICAL SCIENCE, FORENSIC SCIENCE, AND LAW, Aaron S. Kesselheim and Christopher T. Robertson, Eds. (2016) (draft on SSRN).

Christopher T. Robertson and Marc Rodwin, *Money Blinding as a Solution to Industry Influence in Biomedical Science*, in BLINDING AS A SOLUTION TO BIAS: STRENGTHENING BIOMEDICAL SCIENCE, FORENSIC SCIENCE, AND LAW, Aaron S. Kesselheim and Christopher T. Robertson, Eds. (2016).

Christopher T. Robertson, *Preserving Public Trust and Demanding Accountability (Introduction to Part II)*, in FDA IN THE 21ST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES, I. Glenn Cohen and Holly Fernandez Lynch, Eds. (2015).

Christopher T. Robertson, *The FDCA as the Test for the Truth of Promotional Claims*, in FDA IN THE 21ST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES, I. Glenn Cohen and Holly Fernandez Lynch, Eds. (2015).

**Peer-Reviewed Papers**

Daniel Aaron, Christopher Robertson, Louise King, and William Sage, *A New Standard for Medical Malpractice*, __ JAMA __ 2025 (forthcoming, special communication).

Christopher Robertson, Kirsten Bibbins-Domingo, and Gregory Curfman, *The US Preventive Services Task Force in Legal Jeopardy*, 332 JAMA 1607 (2024) (journal).

Jess Fishman, Christopher Robertson, Dan Scheitrum, Aleks Schaefer, Dolores Albarricin, *Common Measures of Vaccination Intention Generate Substantially Different Estimates that Can Reduce Predictive Validity*, 14 SCIENTIFIC REPORTS 22843 (2024) (journal).

Katharine Silbaugh, Lis Del Valle, and Christopher Robertson, *Toward a Tobacco-free Generation — A Birth Date–Based Phaseout Approach*, 390 NEW ENGLAND JOURNAL OF MEDICINE 1837 (2024) (journal).

Braman, Anna, Christopher Robertson, and Louise King, *Should Current Laws Be Revised to Address Occupational Hazards Caused by Hand-Tool Size Mismatch Among Surgeons?*159 JAMA SURGERY 359 (2024) (journal).

Steven Holtzman, Jonathan Steinberg, Jonathan Weeks, Christopher Robertson, Jessica Findley, David Klieger, *Validity, Reliability, and Fairness Evidence for the JD-Next Exam*, ETS RESEARCH REPORT NO. RR-24-04 (2024) (report).

Tina Watson and Christopher Robertson, *Silencing the FDA's Voice – Drug Information on Trial*, 389 NEW ENGLAND JOURNAL OF MEDICINE 2312 (2023) (journal).

Christopher Robertson and Anna Braman, *The New Over-the-Counter Oral Contraceptive Pill — Assessing Financial Barriers to Access*, 389 NEW ENGLAND JOURNAL OF MEDICINE 1352 (2023) (journal).

Wendy Epstein, Christopher Robertson, and Hansoo Ko, *The Effects Of Price Transparency And Debt Collection Policies On Intentions To Consume Recommended Health Care: A Randomized Vignette Experiment*, 20 JOURNAL OF EMPIRICAL LEGAL STUDIES 941 (2023) (journal).

Gabriela Khazanov, Rebecca Stewart, Matteo F. Pieri, Candice Huang, Christopher Robertson, K. Aleks Schaefer, Hansoo Ko, Jessica Fishman, *The Effectiveness of Financial Incentives for COVID-19 Vaccination: A Systematic Review*, 172 PREVENTATIVE MEDICINE 107538 (2023) (journal).

Christopher Robertson, Andrew Keane Woods, Kelly Bergstrand, Jessica Findley, Cayley Balser, Marvin Slepian, *Diverse Patients' Attitudes Towards Artificial Intelligence (AI) in Diagnosis*, 2(5) PLOS DIGITAL HEALTH e0000237 (2023) (journal).

Annabel Kupke, Carmel Shachar, & Christopher Robertson, *Pulse Oximeters and Violation of Federal Antidiscrimination Law*, 329 JAMA 365 (2023) (journal).

Heather M. Buzick, Christopher Robertson, Jessica D. Findley, Heidi Legg Burross, Matthew Charles, & David M. Klieger, *The Association of Participating in a Summer Prelaw Training Program and First-Year Law School Students' Grades*, 13 JOURNAL OF EDUCATIONAL RESEARCH AND PRACTICE 181 (2023) (SSRN).

Katherine C. Cheng, Jessica Findley, Adriana Cimetta, Heidi Legg Burross, Matt Charles, Cayley Balser, Ran Li, & Christopher Robertson *JD-Next: A Randomized Experiment of an Online Scalable Program to Prepare Diverse Students for Law School*, 71 JOURNAL OF LEGAL EDUCATION 673 (2022) (SSRN).

Jessica Findley, Adriana Cimetta, Heidi Legg Burross, Katherine C. Cheng, Matt Charles, Cayley Balser, Ran Li, & Christopher Robertson, *JD-Next: A Valid and Reliable Tool to Predict Diverse Students' Success in Law School*, 20 JOURNAL OF EMPIRICAL LEGAL STUDIES 134 (2023) (SSRN).

Wendy Epstein, Christopher Robertson, Hansoo Ko, Kevin H. Wilson, Matthew Lyddon, David Yokum, Monica Ramos, Katherine Kettering, Margaret Houtz, Katherine McCue, Iqra Mushtaq, *Can Moral Framing Drive Insurance Enrollment in the US?*, 19 JOURNAL OF EMPIRICAL LEGAL STUDIES 804 (2022) (SSRN).

Jessica Fishman, Christopher Robertson, Aleks Schaeffer, Dan Scheitrum, *Comparative Effectiveness of Mandates and Financial Policies Targeting COVID-19 Vaccine Hesitancy: A Randomized, Controlled Experiment*, 40 VACCINE 7451 (2022) (journal) (SSRN).

Christopher Robertson, *What the Harm Principle Says About Vaccination and Healthcare Rationing in a Pandemic* 9 JOURNAL OF LAW & BIOSCIENCES 1 (2022) (SSRN).

Christopher Robertson, Aaron S. Kesselheim, Michael Sinha, *Patient Assistance Programs and the Anti-Kickback Statute* 327 JAMA 1231 (2022) (journal).

Christopher Robertson and Margaret Houtz, *When Patients Demand Unproven Treatments – The Battle for Hospital Independence,* 386 NEW ENGLAND JOURNAL OF MEDICINE 1200 (2022)(journal).

Christopher T. Robertson, Mark Rukavina, Erin Fuse Brown, *New State Consumer Protections Against Medical Debt*. 327 JAMA 121 (2022) (journal).

Holly Fernandez Lynch and Christopher T. Robertson, *Challenges in Confirming Drug Effectiveness After Early Approval*, 374 SCIENCE 1205 (2021) (journal).

Jacqueline Salwa and Christopher Robertson, *Designing an Independent Public Health Agency*, NEW ENGLAND JOURNAL OF MEDICINE 1684 (2021) (journal).

Christopher T. Robertson, Daniel Scheitrum, and Aleks Schaefer, *Are Vaccine Lotteries worth the Money?* 209 ECONOMICS LETTERS 1 (2021) (SSRN).

Christopher T. Robertson, Keith Bentele, Beth Meyerson, Alex S.A. Wood, Jackie Salwa, *Effects of political versus expert messaging on vaccination intentions of Trump voters: A randomized survey experiment*, 16(9) PLoSONE e0257988 (2021) (journal).

Christopher T. Robertson, Daniel Scheitrum, Aleks Schaefer, Trey Malone, Brandon McFadden, Paul Ferraro and Kent Messer, *Paying People to Take the Vaccine - Would it Help or Backfire?* 8 JOURNAL OF LAW & BIOSCIENCES 1 (2021) (SSRN).

Jonathan J. Darrow, Christopher T. Robertson, Willard S. Kasoff, *Evidence Supporting Surgical Procedures: Can We Do Better?* 87 THE AMERICAN SURGEON 1352 (2021) (journal).

Christopher Robertson, *The Ethics of Research that May Disadvantage Others*, 43 ETHICS & HUMAN RESEARCH 2 (2021) (SSRN).

Susannah Rose, Sunita Sah, Raed Dweik, Cory Schmidt, MaryBeth Mercer, Ariane Mitchum, Michael Kattan, Matthew Karafa, & Christopher Robertson, *Patient Responses to Physician Disclosures of Industry Conflicts of Interest: A Randomized Field Experiment*, 166 ORGANIZATIONAL BEHAVIOR AND HUMAN DECISION PROCESSES 27 (2021) (journal).

Kelly Bergstrand and Christopher Robertson, *Threat and Emotions: Mobilizing and Attitudinal Outcomes of a Ballistic Missile Scare*, 69 SOCIAL PROBLEMS 184 (2022) (journal).

Christopher T. Robertson, Aleks Schaefer, Daniel Scheitrum, Sergio Puig, Keith Joiner, *Indemnifying Precaution: Economic Insights for Regulation of a Highly-Infectious Disease*, 7 JOURNAL OF LAW & BIOSCIENCES 1 (2020) (journal).

Christopher Robertson, Andy Yuan, Wendan Zhang, Keith Joiner, *Distinguishing Moral Hazard from Access for High-Cost Healthcare under Insurance*, 15 PLoS ONE e0231768 (2020) (journal, open access).

Christopher Robertson, Shima Baradaran Baughman, & Megan S. Wright, *Race and Class: A Randomized Experiment with Prosecutors*, 16 JOURNAL OF EMPIRICAL LEGAL STUDIES 807 (December 2019) (journal).

Tara Sklar & Christopher Robertson, *Affordability Boards — The States' New Fix for Drug Pricing*, 381NEW ENGLAND JOURNAL OF MEDICINE 1301 (2019) (journal).

Christopher T. Robertson, *Will Courts Allow States to Regulate Drug Prices?* 379 NEW ENGLAND JOURNAL OF MEDICINE 1000 (2018) (journal).

Nir Eyal, Paul Romain, & Christopher T. Robertson, *Can Rationing Through Inconvenience Ever Be Ethical?* 48 HASTINGS CENTER REPORT 10 (2018) (journal). reviewed: Carl Coleman, *In Praise of Hassles: Why "Rationing Through Inconvenience" May Be More Ethical Than Other Mechanisms for Allocating Care*, JOTWELL(2020) (site).

Alison Bateman-House and Christopher T. Robertson, *The Federal Right to Try Act of 2017—A Wrong Turn for Access to Investigational Drugs and the Path Forward*, 178 JAMA INTERNAL MEDICINE 321 (2018) (journal).

Christopher T. Robertson and Aaron S. Kesselheim, *Regulating Off-Label Promotion — A Critical Test*, 375 NEW ENGLAND JOURNAL OF MEDICINE 2313 (2016) (journal).

Jonathan D. Loe, D. Alex Winkelman, and Christopher T. Robertson, *An Assessment of the Human Subjects Protection Review Process for Exempt Research*, 44 JOURNAL OF LAW, MEDICINE AND ETHICS 481 (2016) (journal).

Jonathan Loe and Christopher Robertson, *Federal Government's Proposed Expansion of Regulation of Biospecimen Research Should Be Reconsidered*, 14 BIOPRESERVATION AND BIOBANKING 447 (2016) (journal).

Christopher Robertson, Alex Winkelman, Kelly Bergstrand, and Darren Modzelewski, *The Appearance and Reality of Quid Pro Quo Corruption: An Empirical Investigation*, 8 JOURNAL OF LEGAL ANALYSIS 375 (2016) (SSRN).

Christopher Robertson, *Vaccinations and Airline Travel: A Federal Role to Protect the Public Health*, 42 AMERICAN JOURNAL OF LAW & MEDICINE 543 (symposium, 2016) (SSRN).

Christina Cutshaw, Christopher T. Robertson, Steffie Woolhandler, and David Himmelstein, *Medical Causes and Consequences of Home Foreclosures*, 46 INTERNATIONAL JOURNAL OF HEALTH SERVICES 36 (2016) (journal).

Sunita Sah, Christopher Robertson, and Shima Baradaran, *Blinding Prosecutors to Defendants' Race: A Policy Proposal to Reduce Unconscious Bias in the Criminal Justice System*, 1:2 BEHAVIORAL SCIENCE AND POLICY 69 (2015) (SSRN). reprinted in: LEE E. ROSS, Ed., READINGS IN CULTURAL DIVERSITY AND CRIMINAL JUSTICE, (Cognella Academic Publishing, 2020).

Athan Papailiou, David Yokum, & Christopher T. Robertson, *The Novel New Jersey Eyewitness Instruction Induces Skepticism But Not Sensitivity*, 10 (12) PLOS ONE e0142695 (2015) (SSRN).

Christopher Robertson, *New DTCA Guidance — Enough to Empower Consumers?* 373 NEW ENGLAND JOURNAL OF MEDICINE 1085 (Sept 17, 2015) (journal).

Christopher T. Robertson, *Scaling Cost-Sharing to Income: How Employers Can Reduce Healthcare Spending and Provide Greater Economic Security*, 14 YALE JOURNAL OF HEALTH POLICY, LAW, AND ETHICS 239 (2014) (SSRN). reviewed: David Orentlicher, *Making Cost Sharing Fairer and More Effective*, JOTWELL (2015) (site).

Dan Durand, Christopher Robertson, Gautam Agarwal, Richard Duczak, Elizabeth Krupinski, Jason Itri, Anthony Fotenos, Brent Savoie, Alexander Ding, & Jonathan Lewin, *Expert Witness Blinding Strategies to Mitigate Bias in Radiology Malpractice Cases: A Review of the Relevant Scientific, Professional and Legal Literature*, 11 JOURNAL OF THE AMERICAN COLLEGE OF RADIOLOGY 868 (2014) (journal).

Megan S. Wright and Christopher T. Robertson, *Heterogeneity in IRB Policies with Regard to Disclosures about Payment for Participation in Recruitment Materials*, 42 JOURNAL OF LAW, MEDICINE, & ETHICS 375 (2014) (SSRN).

Christopher T. Robertson, David Yokum, Nimish Sheth, & Keith Joiner, *A Randomized Experiment of the Split Benefit Health Insurance Reform To Reduce High-Cost, Low-Value Consumption*, 1 INNOVATION AND ENTREPRENEURSHIP IN HEALTH 5 (2014) (SSRN).

Roy Spece, David Yokum, Andrea-Gale Okoro, and Christopher Robertson, *An Empirical Method for Materiality: Would Conflict of Interest Disclosures Change Patient Decisions?* 40 AMERICAN JOURNAL OF LAW & MEDICINE 253 (2014) (SSRN).

Aaron S. Kesselheim, Christopher T. Robertson, Kent Siri, Puneet Batra, and Jessica M. Franklin, *Distributions of Industry Payments to Massachusetts Physicians*, NEW ENGLAND JOURNAL OF MEDICINE (2013) (SSRN).

Christopher T. Robertson & David V. Yokum, *The Effect of Blinded Experts on Jurors' Verdicts,* 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 765 (2012) (SSRN).

Aaron S. Kesselheim, Christopher T. Robertson, Jessica A. Myers, Susannah L. Rose, Victoria Gillet, Kathryn M. Ross, Robert J. Glynn, Steven Joffe, & Jerry Avorn, *A Randomized Study of How Physicians Interpret Research Funding Disclosures*, 369 NEW ENGLAND JOURNAL OF MEDICINE 1119 (2012) (SSRN).

Christopher T. Robertson, Susannah L. Rose, & Aaron S. Kesselheim, *Effect of Financial Relationships on the Behavior of Healthcare Professionals*, 40 JOURNAL OF LAW, MEDICINE, & ETHICS 452 (2012) (journal).

Christopher T. Robertson, *From Freeriders to Fairness: Towards a Cooperative System for Organ Transplantation*, 48 JURIMETRICS 1 (2007) (SSRN).

**Law Review Articles**

Christopher T. Robertson, Annabel Kupke, Louise P. King, *Structural Sex Discrimination: Why Gynecology Patients Suffer Avoidable Injuries and What the Law Can Do About It*, 74 EMORY LAW JOURNAL 43 (2024) (SSRN).

Christopher Robertson & Michael Shammas, *The Jury Trial Reinvented*, 9 TEXAS A&M LAW REVIEW 109 (2022) (SSRN).

Megan Wright, Shima Baradaran Baughman, Christopher Robertson, *Inside the Black Box of Prosecutor Discretion*, 55 UC DAVIS LAW REVIEW 2133 (2022) (SSRN).

Bernard Chao, Ian Farrell, Christopher Robertson, and Cathy Durso, *Why Courts Fail to Protect Privacy: Race, Age, Bias, and Technology*, 106 CALIFORNIA LAW REVIEW 263 (2018) (SSRN).

Christopher Robertson and Alex Winkelman, *Incentives, Lies, and Disclosure*, 20 JOURNAL OF CONSTITUTIONAL LAW 33 (2017) (SSRN).

John Campbell, Bernard Chao, & Christopher Robertson, *Time is Money? An Empirical Measure of Noneconomic Damages Arguments*, 95 WASHINGTON UNIVERSITY LAW REVIEW 1 (2017) (SSRN).

John E. Campbell, Bernard, Chao, Christopher T. Robertson, and David V. Yokum, *Countering the Plaintiff's Anchor: Jury Simulations to Evaluate Damages Arguments*, 101 IOWA LAW REVIEW 543 (2016) (SSRN).

D. Alex Winkelman, Lisette C. Cole, Shelby C. Thompson, David V. Yokum, & Christopher T. Robertson, *An Empirical Method for Harmless Error*, 46 ARIZONA STATE LAW JOURNAL 1405 (2014) (SSRN).

Christopher T. Robertson, *When Truth Cannot Be Presumed: The Regulation of Drug Promotion Under an Expanding First Amendment*, 94 BOSTON UNIVERSITY LAW REVIEW 545 (2014) (SSRN).

Christopher T. Robertson, *The Split Benefit: The Painless Way to Put Skin Back in the Healthcare Game*, 98 CORNELL LAW REVIEW 921 (2013) (SSRN).

Christopher T. Robertson, *Biased Advice*, 60 EMORY LAW JOURNAL 653 (2011) (accepted by peer review, Conference on Empirical Legal Studies) (SSRN).

Christopher T. Robertson, *Blind Expertise*, 85 NEW YORK UNIVERSITY LAW REVIEW 174 (2010) (SSRN).

Christopher T. Robertson, Richard Egelhof, & Michael Hoke, *Get Sick, Get Out: The Medical Causes of Home Foreclosures*, 18 HEALTH MATRIX 65 (2008) (published as a student) (SSRN).

**Symposia Contributions**

Christopher Robertson, *Is Tort Law the Tool for Fixing Reproductive Wrongs?* 100 BOSTON UNIVERSITY LAW REVIEW ONLINE 143 (2020) (journal).

Christopher Robertson & Tara Sklar, *Telehealth for an Aging Population: How to Influence Adoption Among Providers, Payors, and Patients?* 46 AMERICAN JOURNAL OF LAW & MEDICINE 311 (2020) (repository).

Christopher Robertson, David Yokum, & Matt Palmer, *The Inability of Jurors to Self-Diagnose Bias*, 96 DENVER UNIVERSITY LAW REVIEW 869 (2019) (SSRN). excerpt reprinted: *The Civil Jury Project at NYU School of Law Newsletter* (December 2019) (source). excerpt reprinted: *Voir Dire Magazine*, American Board of Trial Advocates (January 2020).

Elizabeth Hall-Lipsy, Leila Barraza, & Christopher Robertson, *Practice-Based Research Networks and the Mandate for Real World Evidence*, 44 AMERICAN JOURNAL OF LAW & MEDICINE 219 (2018) (SSRN).

Victor Laurion and Christopher Robertson, *Ideology Meets Reality: What Works and What Doesn't in Patient Exposure to Health Care Costs*, 15 INDIANA HEALTH LAW REVIEW 43 (2018) (SSRN).

Christopher Robertson and Victor Laurion, *Tip of the Iceberg II: How the Intended-Uses Principle Produces Medical Knowledge and Protects Liberty*, 11 NYU JOURNAL OF LAW & LIBERTY 770 (2017) (SSRN).

Christopher Robertson, *The Tip of the Iceberg: A First Amendment Right to Promote Drugs Off-Label*, 78 OHIO STATE LAW JOURNAL 1019 (2017) (SSRN).

Christopher T. Robertson, *Should Patient Responsibility for Costs Change the Doctor-Patient Relationship?* 50 WAKE FOREST LAW REVIEW 363 (2015) (SSRN).

Christopher T. Robertson, David V. Yokum, & Megan S. Wright, *Perceptions of Efficacy, Morality, and Politics of Potential Cadaveric Organ Transplantation Reforms*, 77 LAW AND CONTEMPORARY PROBLEMS 101 (2014) (SSRN).

Christopher T. Robertson & David V. Yokum, *The Burden of Deciding for Yourself: The Disutility Caused by Out-of-Pocket Healthcare Spending*, 11 INDIANA HEALTH LAW REVIEW 609 (2014) (SSRN).

Christopher T. Robertson, *The Presumption Against Expensive Healthcare Consumption*, 49 TULSA LAW REVIEW 627 (2014) (SSRN).

Christopher T. Robertson, *Contingent Compensation of Post-Conviction Counsel: A Modest Proposal to Identify Meritorious Claims and Reduce Wasteful Government Spending, 64* MAINE LAW REVIEW 513 (2012) (SSRN).

Christopher T. Robertson, *The Money Blind: How to Stop Industry Bias in Biomedical Science, Without Violating the First Amendment*, 37 AMERICAN JOURNAL OF LAW & MEDICINE 358 (2011) (SSRN).

**Comments, Replies, Dissemination, and Other Works**

Christopher Robertson and Tara Sklar, *The States' Hodgepodge of Physician Licensure Regulations*, 52 JOURNAL OF LAW, MEDICINE, AND ETHICS 419 (2004) (SSRN).

Christopher Robertson, *Harm-Prevention Arguments are Easier to Confuse Than to Rebut*, 24 AMERICAN JOURNAL OF BIOETHICS 100 (2024) (journal).

Bernard Chao, Christopher Robertson, David Yokum, *The Case for Scientific Jury Experiments*, 66 FOR THE DEFENSE 6 (Feb. 2024), syndicated at JDSUPRA (full text).

Annabel Kupke, Christopher T. Robertson, and Carmel Shachar, *Pulse Oximeters and Federal Antidiscrimination Law—Reply*, 321 JAMA 1884 (2023) (journal).

Jess Findley, Andrew Woods, Christopher Robertson, & Marv Slepian, *Keeping the Patient at the Center of Machine Learning in Healthcare*, 20 AMERICAN JOURNAL OF BIOETHICS 54 (2020) (journal).

Victor Laurion and Christopher Robertson, *Why the Duty to Research Falls on Institutions Rather than Individuals*, 19 AMERICAN JOURNAL OF BIOETHICS 44 (2019) (journal).

Bernard Chao, Christopher Robertson, and David Yokum, *Crowdsourcing & Data Analytics: The New Settlement Tools*, 102 JUDICATURE 63 (2018) (journal).

Christopher Robertson and Jamie Cox Robertson, *Reducing Wasteful Incarcerations*, 39:2 REGULATION 20 (2016) (journal).

Sarah Malanga, Ryan Sprissler, Christopher Robertson, & Keith Joiner, *A Problem Not Yet Manifest: Gaps in Insurance Coverage of Medical Interventions After Genetic Testing*, 2 JOURNAL OF LAW AND BIOSCIENCES 1 (2015), doi:10.1093/jlb/lsv043 (journal).

Christopher T. Robertson and Keith A. Joiner, *Scaling and Splitting, New Approaches to Health Insurance*, 38 REGULATION 40 (2015) (journal).

Jonathan Loe, Christopher Robertson, & Alex Winkelman, *Cascading Consent for Research on Biobank Specimens*, 15 AMERICAN JOURNAL OF BIOETHICS 68 (2015) (journal).

Roger Koppl, David Charlton, Irving Kornfield, Dan Krane, Michael Risinger, Christopher Robertson, Michael Saks, & William Thompson, *Do Observer Effects Matter? A Comment on Langenburg, Bochet, and Ford,* 6 FORENSIC SCIENCE POLICY & MANAGEMENT: AN INTERNATIONAL JOURNAL 1 (2015) (journal).

Christopher T. Robertson, *The Problem of Biased Experts, and Blinding as a Solution: A Response to Professor Gelbach*, 81 THE UNIVERSITY OF CHICAGO LAW REVIEW DIALOGUE 61 (2014) (SSRN).

Ameet Sarpatwari, Christopher T. Robertson, David V. Yokum & Keith Joiner, *Crowdsourcing Public Health Experiments: A Response To Jonathan Darrow's "Crowdsourcing Clinical Trials"*, 98 MINNESOTA LAW REVIEW 2326 (2014) (SSRN).

Christopher T. Robertson, *Why Intuitionism and Metaphysics Are Wrong for Health Law*, 11 AMERICAN JOURNAL OF BIOETHICS 18 (2009) (journal).

Christopher T. Robertson, *Making Pragmatism Practicable for the Institutional Review Board*, 8 AMERICAN JOURNAL OF BIOETHICS 49 (2008) (journal).

Christopher T. Robertson, *A Reply to David Undis*, 49 JURIMETRICS 3 (2008) (journal).

Christopher T. Robertson, *The Consequences of Qualified Confidentiality*, 6 AMERICAN JOURNAL OF BIOETHICS 31 (2006) (journal).

Christopher T. Robertson, *Who is Really Hurt Anyway? The Problem of Organ Solicitation*, 5 AMERICAN JOURNAL OF BIOETHICS 15 (2005) (journal).

Christopher T. Robertson, *Recent Developments in Embryonic Stem Cell Policy: Can Science Resolve The Ethical Problems It Creates?* 33 JOURNAL OF LAW, MEDICINE & ETHICS 384 (2005).

Christopher T. Robertson, *Organ Advertising: Desperate Patients Solicit Volunteers*, 33 JOURNAL OF LAW, MEDICINE & ETHICS 170 (2005) (journal).

Christopher T. Robertson, *Framing the Organ Issue: Altruism or Cooperation*, 4 AMERICAN JOURNAL OF BIOETHICS 46 (2004) (journal).

Christopher T. Robertson, *The Notion of Sovereign Exclusive Dominion for Global Political Justice*, 20 SOUTHWEST PHILOSOPHY REVIEW 231 (2004) (journal).

Christopher T. Robertson, *Slote on Ordinary Moral Thought and Theorization*, 19 SOUTHWEST PHILOSOPHY REVIEW 190 (2003) (journal).

**Grants and Support**

Co-Investigator, *'Generosity Framing' to Encourage Young and Healthy Individuals to Purchase Health Insurance,* Robert Wood Johnson Foundation Evidence for Action Program (2021).

Principal Investigator, *JD-Next*, AccessLex Institute (2020, 2021), Co-Investigator, ETS (2021, 2022).

Co-Principal Investigator, *Perspectives of Diverse Patient Populations on AI and Big Data*, National Institute for Heart, Lung, & Blood Disorders (NIH) (2019).

Co-Principal Investigator, *A Randomized Trial of the Novel JD-Exposure, Assessment, Preparation Program*; AccessLex Institute (2019).

Co- Principal Investigator, *Evaluation of the BA in Law and an Intervention for Latinas*, AccessLex Institute (2019).

Co-Principal Investigator, *A Randomized Field Experiment of the Effect of Physician Conflicts of Interest Disclosure on Patient Trust and Reliance*, Greenwall Foundation (via the Cleveland Clinic) (2014).

Principal Investigator, *Experimental Investigations into Institutional Corruption (aka "535 Felons")*, Edmond J. Safra Center for Ethics, Harvard University, collaborative research project (2014).

Consulting Investigator, *Experimental Jury Research on Patent Litigation*, Hughes Program, Denver University (2014).

Consulting Investigator, *Countering the Plaintiff's Anchor: Jury Simulations to Assess Damages Arguments*, Hughes Pilot Project Grant Program, Denver University (2013).

Co-Principal Investigator, *Blinding Science*, Edmond J. Safra Center for Ethics, Harvard University, collaborative research project (2012).

Co-Principal Investigator, *The Impact of Home Foreclosures on Public Health*, Robert Wood Johnson Foundation (2012).

Principal Investigator, *Law and Behavior Research Lab*, University of Arizona Honors College, (2012).

Co-Principal Investigator, *Empirical Research on Physician's Responses to Conflict of Interest Disclosures*, Edmond J. Safra Center for Ethics, Harvard University (2010).

Principal Investigator, *Empirical Research on Juror Decisions in Medical Malpractice Cases*, Petrie Flom Center of Harvard Law School (2009).

Principal Investigator, *Empirical Research on Causes of Home Foreclosures*, Harvard Law School Office of the Dean (2006).

## Working Papers

Jacqueline Salwa, Matt Charles, Jessica Findley, Adriana Cimetta, Heidi Legg Burross, & Christopher Robertson, *Interventions to Increase Adherence in an Academic Support Program: A Randomized Controlled Experiment*.

Bernard Chao and Christopher Robertson, *Law's Punishment Divide*.

## International Presentations

Conference on Experimental Methods in Legal Research, Jerusalem, Israel (2023)
Triennial Invitational Choice Symposium, Fontainebleau, France (2023)
Experimental Methods in Economics Research, Santiago, Chile (2016)
Institutional Corruption Conference, Mexico City, Mexico (2013)
Conference on Ethical, Social, and Legal Implications of Human Research, Cambridge, UK (2012)

## Competitive Peer Reviewed Paper Presentations and Scientific Posters

Conference on Empirical Legal Studies, Chicago (two presentations, 2023)
American Law and Economics Association, Boston (presentation, 2023)
Conference on Empirical Legal Studies, Charlottesville (presentation, 2022)
American Law and Economics Association Annual Meeting, Columbia (presentation and poster, 2022)
Academy Health, New Orleans (poster, 2022)
Conference on Empirical Legal Studies, Toronto (presentation, 2022)
Conference on Empirical Legal Studies, Claremont McKenna (presentation, 2019)
Conference on Empirical Legal Studies, Michigan (presentation, 2018)
Conference on Empirical Legal Studies, Cornell (poster, 2017)
Conference on Empirical Legal Studies, Cornell (presentation, 2017)
Academy Health, New Orleans (poster, 2017)
American Law and Economics Association Annual Meeting, Yale Law School (2017)
American Law and Economics Association Annual Meeting, Harvard Law School (2016)
Conference on Empirical Legal Studies, Washington University in St. Louis (2015)
American Law and Economics Association Annual Meeting, University of Chicago (2014)
Conference on Empirical Legal Studies, University of Pennsylvania (2013)
Junior Faculty Forum, sponsored by Yale, Stanford, and Harvard, at Yale (2013)
Junior Faculty Forum, sponsored by Yale, Stanford, and Harvard, at HLS (2012)
American Law and Economics Association Annual Meeting, Stanford (poster, 2012)
Conference on Empirical Legal Studies, Stanford (2012)

New Voices in Civil Justice Workshop, Vanderbilt Law School (2012)
Conflicts of Interest in the Practice of Medicine, ASLME National Conference at U. of Pittsburgh (2011)
Conference on Empirical Legal Studies, Northwestern University Law School (2011)
Conference on Empirical Legal Studies, University of Southern California (poster, 2009)

**Recorded Talks and Appearances (selected)**

*Vertical Integration in GLP-1 Promotion and Off-Label Use,* Loyola Chicago Symposium (2025) (video).

*JD-Next: A Valid and Reliable Tool to Predict Diverse Students' Success in Law School*, Faculti.net (2024) (video).

*Robophobia: How Aversion to AI Creates Health Risks,* Boston University Research on Tap (2023) (video).

*Moral Framing of Health Insurance,* New Ideas in Health Insurance Series, University of Connecticut Insurance Law Center (2023) (video).

*Mitigating Conflicts of Interest in Healthcare*, New York Academy of Sciences and NYU Grossman School of Medicine (2021) (video).

*Telehealth: How Law Can Spur Its Adoption*, presentation to UNLV Health Law Program (2020) (video).

*Potential Solutions for Reducing Racial Disparities in Attorney Discipline,* presentation to California State Bar Board of Trustees (2020) (video, session IV.A).

*Covid-19 and Preapproval Access to Drug*s (2020) (video, starting at 34:29 on off-label and intended uses).

*Ethical and Regulatory Implications of Recent Events in COVID-19* (2020) (video).

Book talk on *Exposed*, Petrie Flom Center at Harvard Law School (2020) (video).

*If We Cannot Live with the Individual Mandate, Can We Cover Enough Lives Without It?* American Enterprise Institute (2019) (video).

*Driving Value in the U.S. Healthcare System*, University of Nevada Las Vegas (2019) (video).

*Ordeals in Health Care: Ethics & Efficient Delivery*, Harvard Law School – Distributive Ethics Panel (video) and Practical Implications Panel (2019) (video).

*Obviousness and Hindsight Bias in Patent Law*, London School of Economics Department of Law (2019) (audio and slides).

*Corruption in Chains of Epistemic Reliance: The Cases of Doctors and Witnesses*, Edmond J. Safra Center at Harvard University (2017) (video).

*The Need to Accelerate Therapeutic Development — Must Randomized Controlled Trials Give Way?* The New York Academy of Sciences (2017) (video).

*Medical Innovation and the Law*, Classical Liberal Institute, NYU School of Law (2017) (video).

## V. MEDIA

**Essays and Opinion Pieces**

*The Best Way to Convince Healthy People to Get Insurance is Not 'Because It's in Your Financial Interest'*, STAT NEWS, November 3, 2023 (text) (co-authored with Wendy Netter Epstein).

*Trump's Special Treatment in the Courts Highlights Failings in our Legal System*, THE HILL, August 17, 2023 (text) (co-authored with Russell Gold).

*Donald Trump's Right − He is Getting Special Treatment, Far Better than Most Other Criminal Defendants*, THE CONVERSATION (syndicated in SALON and elsewhere), August 9, 2023 (text) (co-authored with Russell Gold).

*A Simple Solution to Regulate AI*, THE HILL, July 21, 2023 (text).

*Arizona's Debt Collection Reform—A Small Step Towards Health Justice*, BMJ, November 23, 2022 (text)(co-authored with David Himmelstein and Steffie Woolhandler).

*It's Time to Repeal the ABA's Law School Testing Mandate,* BLOOMBERG LAW, August 16, 2022 (text) (co-authored with Marc Miller, Robert Williams, John Pierre).

*A New Alzheimer's Drug Shows Why the FDA's Speedy Approval Process is Broken*, WASHINGTON POST, January 10, 2022 (text) (co-authored with Holly Fernandez Lynch).

*Constitution allows Biden to mandate COVID vaccine. Federal government can do even more.* USA TODAY, September 19, 2021 (reprinted on MSN) (text).

*Is it a Crime to Forge a Vaccine Card? And What's the Penalty for Using a Fake?* THE CONVERSATION (reprinted in QUARTZ, SALON, etc), August 30, 2021 (text) (co-authored with Wes Oliver).

*Cruise Ship Vaccine Mandates are Great. The Latest Ruling for Them Wasn't.* WASHINGTON POST, August 11, 2021 (text) (co-authored with I. Glenn Cohen).

*Paying People to Get Vaccinated Might Work – but is it Ethical?* THE CONVERSATION, May 19, 2021 (text).

*Biden's Attempts to Diversify Federal Courts Can't Come Fast Enough*, THE HILL, April 6, 2021 (text)(co-authored with Robert Tsai).

*What are Emergency Use Authorizations, and Do They Guarantee that a Vaccine or Drug is Safe?* THE CONVERSATION, December 3, 2020 (text)*;* also republished on MARKETPLACE (text) as *What you need to know about an emergency use authorization for a COVID-19 vaccine* (co-authored with Jeremy Greene).

*Conservatives Backed the Ideas behind Obamacare, So How Did They Come to Hate It?* THE CONVERSATION, November 10, 2020 (text); also republished on SALON (text), and on NATIONAL INTEREST as *Obamacare Has Republican DNA: So Why the War to Kill It?*(text) (co-authored with Wendy Epstein).

*We Need an Independent Public Health Agency*, THE HILL, July 27, 2020 (text)(co-authored with former Surgeon General Richard Carmona).

*In the Rush to Innovate for COVID-19 Drugs, Sound Science Is Still Essential*, THE CONVERSATION, April 8, 2020 (text); also republished on CBS NEWS as *Scientists weigh in on coronavirus drugs: What we know, what we don't* (text) (co-authored with Alison Bateman House, Holly Ferndandez Lynch, and Keith Joiner).

*Without Obamacare, the COVID-19 Crisis Would Be Far Worse*, CHICAGO TRIBUNE, April 1, 2020 (text) (co-authored with Wendy Epstein).

*Airplanes Spread Diseases Quickly – so Maybe Unvaccinated People Shouldn't be Allowed to Fly*, THE CONVERSATION February 26, 2020 (text); also republished in CHICAGO SUN TIMES (text) and translated to Finnish, Japanese, and Indonesian (co-authored with Keith Joiner).

*Does 'No More Copays, No More Deductibles' Really Represent Radical Health Care Reform?* STAT (Boston Globe Media) January 20, 2020 (text).

*Politicians are Missing the Big Point on Health Care*, CNN ONLINE, January 17, 2020 (text).

*It's Hard to be Economically Rational When You're Sick*, THE HILL, March 21, 2018 (co-authored with Victor Laurion, text).

*Police Shouldn't Access Your Phone's Data Without a Court Order*, ARIZONA REPUBLIC (co-authored with Bernard Chao and Ian Farrell, text).

*It's Time to Rethink the Law School Entrance Exam Monopoly*, THE HILL, October 25, 2017 (co-authored with Marc Miller, text).

*Behavioral Science Suggests that Obamacare May Survive*, co-authored with Holly Fernandez Lynch and Glenn Cohen, STAT (Boston Globe Media) (2017) (text).

*For Fairer Courts, Address Prosecutor Bias*, THE NEW REPUBLIC, October 2016 (co-authored with Shima Baughman and Sunita Sah, text); also republished on PBS NEWSHOUR as *Training Police is Not Enough to Eliminate Racial Bias* (text).

*Wrongful Incarceration*, USA TODAY (MAGAZINE) 262016 WLNR 36854856, January 11, 2016 (co-authored with Jamie Robertson).

*Learning the Wrong Lesson on Privacy from Henrietta Lacks*, WASHINGTON POST, January 8, 2016 (co-authored with Jonathan Loe (text).

**Selected Press Coverage**

Katie Palmer, Senators demand answers on telehealth platforms from Pfizer and Eli Lilly, STAT+ (October 22, 2024) (interviewed).

Theresa Schliep, *Gov't Looks to High Court To Preserve Free Preventive Care*, LAW360.COM (October 1, 2024) (interviewed).

Maia Anderson, *General Catalyst's healthcare plans raise concerns over patient safety*, HEALTHCARE BREW, November 17, 2023 (interviewed).

Elizabeth Lopatto, *Who Wins When Telehealth Companies Push Weight Loss Drugs?* THE VERGE, October 2, 2023 (interviewed).

Adam Reilly, *How Should Media Cover the Trump Indictment?* WGBH NEWS, August 18, 2023 (interviewed in studio).

Jessica Hamzelou, *Who gets to decide who receives experimental medical treatments?* MIT TECHNOLOGY REVIEW, August 10, 2023 (quoted).

Mike Sullivan, *'Gave the world a gift': Henrietta Lacks' family gets justice 70 years after cells taken without consent*, CBS NEWS BOSTON, August 2, 2023 (interviewed on camera).

Joseph Choi, *Drug industry launches furious legal fight against Medicare negotiating powers*, THE HILL, June 23, 2023 (quoted).

Christine Charnofsky, *ABA Approves 'JD-Next' as Admissions Test for UArizona Law, Other Schools With Variance*, ALM LAW.COM, June 7, 2023 (quoted).

Por Felipe Gutierrez, *Nos EUA, falsificação de prova de vacina pode ser punida com até 20 anos de prisão*, G1, May 3, 2023 (quoted).

Shannon Larson, *'Abortionists.' 'Unborn human.' Legal experts blast 'incendiary' rhetoric of Texas ruling on abortion pill*, BOSTON GLOBE, April 10, 2023 (quoted).

Nancy Kisicki, CONFERENCE REPORT: *California Addresses Racial Disparity in Attorney Discipline, Bloomberg News*, June 7 2022 (text).

Claire Savage, *Social media posts push unproven and 'dangerous' Covid-19 treatments,* AFP FACT CHECK, October 25, 2021 (quoted).

Dora Mekour, *Mandates Give Rise to Booming Black Market for Fake Vaccine Cards*, VOICE OF AMERICA (VOA) NEWS, September 23, 2021 (quoted).

*John Howell Show* on WLS-AM 890 in Chicago, September 21, 2021.

Peter Grier, *Vaccines, mandates, and backlash: The long US history*, CHRISTIAN SCIENCE MONITOR, September 14, 2021 (quoted).

Sarah Wood, *An Increasing Number of Higher Ed Institutions Mandating COVID-19 Vaccinations,* DIVERSE: ISSUES IN HIGHER EDUCATION, September 14, 2021 (quoted).

Amanda Kaufman, *A Supreme Court case that originated in Mass. could provide a legal precedent for President Biden's vaccine mandates, experts say,* BOSTON GLOBE, September 10, 2021 (quoted).

Jay Hancock, *Pfizer court fight could legalize Medicare copays and unleash 'gold rush' in sales*, FORTUNE, July 2, 2021 (quoted).

Kat Eschner, *After 600 emergency use authorizations for COVID, experts worry the FDA has gone too far*, FORTUNE, June 7, 2021 (quoted).

Amanda Beland Arun Rath, *Answering Questions About Vaccine Passports, Mandates, Incentives, And More*, WBUR IN IT TOGETHER, May 20, 2021 (text and audio).

*"Receta para el Caos": Falta de un Plan Federal Sobre Tests de Detección Puede Retrasar la Vuelta a la Normalidad*, UNIVISION, April 18, 2020 (quoted).

*Entrepreneurs Trying to Make up For Lost Time in COVID-19 Testing*, VICE NEWS, April 15, 2020 (featured on camera, at 2:50).

*Cómo Afecta la Crisis del Doronavirus la Supervivencia de Obamacare*, UNIVISION, April 1, 2020 (quoted).

*Health Policy in the Presidential Primary,* SKYNEWS (UK), March 2, 2020.

*Trump's Phoenix Rally: What Were the Facts Behind his Major Claims?* USA TODAY, February 20, 2020 (quoted).

*Does Racial Bias Drive Prosecutors to Punish Blacks More Harshly? Top of Mind with Julie Rose*, SIRIUSXM, February 10, 2020 (feature segment).

*Obamacare is Turning 10. But its Cheerleaders are Focused on the Problems it Didn't Fix*, WASHINGTON POST (HEALTH 202), January 6, 2020 (quoted).

*Bad Medicine?* NEW SCIENTIST, November 30, 2019 (quoted).

*Arizona Sues Maker of Oxycontin*, AZPM NEWS, September 20, 2018 (audio).

*Clean Break: Kennedy Supreme Court Exit Could Upend Environmental Safeguards,* SCIENTIFIC AMERICAN, July 3, 2018 (quoted)(text).

*Libertarian Groups Eye Off-Label Drug Promotion Laws*, BLOOMBERGLAW, May 31, 2018 (quoted)(text).

*New Efforts Taking Root to Ease Off-Label Promotion*, MEDSCAPE, May 16, 2018 (quoted)(text).

*House Passes Right-to-Try on Second Try*, POLITICO, March 21, 2018 (text).

*A Big Pharma-funded Charity that Helps Patients Pay for Drugs Just Sued the Government*, WASHINGTON POST, January 8, 2018 (text).

*'Right to Try' Won't Lead to Miracle Cures*, BLOOMBERG VIEW, February 2, 2018 (text).

*How Drug Manufacturers are Fighting to Push Their Drugs for Unapproved Purposes,* SALON.COM October 23, 2017 (text).

*The Case for Giving Health-Care Consumers a 'Nudge'* -- *A law professor argues that people will make better choices if they're asked the right way,* THE WALL STREET JOURNAL, June 25, 2017 (text).

*Cosby Trial Gears Up with Jury Selection in Pennsylvania*, NBC NEWS, May 19, 2017 (text).

*Department of Justice Decision to Allow National Forensic Sciences Commission to Expire*, BLOOMBERG LAW RADIO SHOW AND PODCAST 2017 (audio).

*The Power of Superdelegates and Campaign Contributions*, NPR MARKETPLACE, March 1, 2016 (audio).

*A Judge's Guidance Makes Jurors Suspicious of Any Eyewitness*, NPR MORNING EDITION, January 26, 2016 (research featured, audio).

*The Magic Question: Judges Trust Jurors to Assess Their Own Biases. That Might Not Be Such a Good Idea*, SLATE.COM, January 22, 2015 (research featured, text).

*California Counties Accuse Opioid Makers of Deceptive Marketing*, REUTERS LEGAL, May 23, 2014 (text).

*Lawyers Say Drugmakers May Follow GSK Marketing Overhaul*, REUTERS LEGAL, December 18, 2013.

*Q&A: Off-label drug promotion and the First Amendment*, REUTERS LEGAL, October 1, 2013.

*Foreclosure: Its Not Just About the Money*, CBS NEWS, January 15, 2010 (text).

## Podcasts

*Structural Sex Discrimination in Gynecology and the Law*, JUST ACCESS (2024) (interview).

*RVUs in Gynecologic Surgery: Equity & Reform*, BACKTABLE (2024) (interview).

*Interview on When Desperate Patients Go to Court for Unproven Treatments — The Battle for Hospital Independence*, NEW ENGLAND JOURNAL OF MEDICINE (2022) (interview).

MONEYLIFE WITH CHUCK JAFFE, June 1, 2020 (interview at 16:08).

*Overexposure*, PEERSPECTRUM, April 27, 2020 (interview).

*Christopher Robertson on Health Insurance*, FREEDOM CENTER TODAY 2:09, March 31, 2020 (interview).

*A True Outlook on American Health Insurance*, HEALTH CARE ROUNDS, Episode 93, March 19, 2020 (interview).

*Why is Getting Sick in the US Financially Toxic for Many People?* FACES OF DIGITAL HEALTH, March 14, 2020 (interview).

*Actuarial Value: From Moral Hazard to Cost-Shifting*, THE WEEK IN HEALTH LAW, February 20, 2020 (interview).

*Can They Freaking Do That?* ARM AND A LEG SHOW, Season 3 Episode 5, December 2019 (interview).

*Interview on whether the First Amendment should protect sales pitches by pharmaceutical representatives*, NEW ENGLAND JOURNAL OF MEDICINE (2016) 375:2313-2315 (interview).

*Blinding Experts to Reduce Bias*, JURISDICTION – THE INTERNATIONAL INTELLECTUAL PROPERTY PODCAST (2016) (interview).

*The Double Blind*, THE WEEK IN HEALTH LAW, March 2016 (interview).

*Interview on the FDA's new draft guidelines on direct-to-consumer pharmaceutical advertising*, NEW ENGLAND JOURNAL OF MEDICINE 2015; 373:1085-1087 (interview).

*The Mind and the Law*, co-convenor of lecture series and podcast, 2014 (audio).

*When Less Information is Better: Blinding in Medicine*, Harvard Safra Center podcast, 2013 (interview).

**Selected Blogposts and Other Media**

*Liability versus Full Coverage Car Insurance, Ask the Experts*, WalletHub, 2022 (text).

*In-Flight COVID Transmission: Surveying the Liability Landscape*, Bill of Health Blog (Harvard Law), 2022 (text).

*Liability Car Insurance, Ask the Experts*, WalletHub, 2021 (text).

*Webinar on Pre-Approval Access to Drugs,* Vox Advisors and Compassionate Use and Pre-Approval Access Working Group, 2021 (video).

*Video Explainers on Law in Time of Pandemic: Access to Drugs Before FDA Approval* (video), *Drug Shortages* (video); *Ethical Duty of Care* (video); *Constitutional Law* (video, video, video), 2020.

*Low Rates, Auto-Enroll: What Will Make People Ante Up for Coverage? -- Experts consider new strategies to replace ACA's abolished penalty*, MEDPAGETODAY, September 17, 2019 (text).

*House Right To Try Bill Wouldn't Preempt State Laws' Insurance Limits, Would Expand Liability Shield*, INSIDEHEALTHPOLICY, March 16, 2018 (text).

*Medical Bills are Open-Price Contracts: A Victory for the Little Guy*, Bill of Health Blog (Harvard Law), 2017 (text).

*Is it Legal for Trump to Punish Health Insurers That Do Not Support Repeal of Obamacare?* Bill of Health Blog (Harvard Law), 2017 (text).

*National Survey Suggests that Off-Label Status is Material to Informed Consent,* Bill of Health Blog (Harvard Law), 2017 (text).

*Conflict of Interest Disclosures Come to Pub Med*, Bill of Health Blog (Harvard Law), 2017, (text).

*Open Payments: Early Impact and the Next Wave of Reform*, Health Affairs Forefront, co-authored with Tony Caldwell, 2015 (text).

*To Support Physician Decision-Making, Re-Evaluate Industry Funding of Science*, Health Affairs Forefront, 2015 (text).

*Can Proportionality Distinguish Quid Pro Quo Corruption?* Institutional Corruption Blog, 2015 (text).

*Mello's Medmal 2.0 Study Documents Discordant Outcomes in the Communication-and-Resolution Programs*, Jotwell, 2014 (text).

# VI. SERVICE AND PROFESSIONAL ACTIVITY

**Amicus Briefs and Regulatory Comments**

Letter of Health Law Scholars on the Standard of Care for Medical Malpractice Restatement Project, Council of the American Law Institute (primary drafter) (2023).

Brief of Law Scholars, *Bristol Myers Squibb Co. v. Becerra*, District Court for the District of New Jersey, 3:23-cv-3335-ZNQ-JBD (as amicus) (2023).

Comment by Scholars, *AI Accountability Project*, National Telecommunications and Information Administration, Docket No. 230407-0093 (2023).

Brief of Health Law Scholars, *Food and Drug Administration, et al., v. Alliance for Hippocratic Medicine, et al.*, filed in District, Fifth Circuit, and United States Supreme Court, 23-10362 (2023) (as amicus).

Brief of Empirical Corruption Scholars, *Lieu v. Federal Election Commission*, filed in Court of Appeals for the District of Columbia Circuit, 19-502 (2019), filed in United States Supreme Court 19-1398 (2020) (as amicus).

Brief of Empirical Fourth Amendment Scholars, *Carpenter v. United States*, United States Supreme Court, 16-402 (2017) (as amicus).

Brief of Forensic Science Experts, *Wisconsin v. Brian Avery*, Wisconsin Supreme Court, 2010AP1952 (2012) (as amicus).

Brief for New England Journal of Medicine et al, *IMS v. Sorrell*, United States Supreme Court, 10-779 (2010-11) (as co-counsel).

**Peer Reviewer, Referee, or Commentator**

2024: JAMA (twice), New England Journal of Medicine, Israel Science Foundation, PLoS One, Journal of Empirical Legal Studies, Journal of Law & Biosciences (twice)

2023: Clinical Microbiology and Infection, Current Medical Research & Opinion, PLoS One, New England Journal of Medicine (2x), Journal of Empirical Legal Studies, JAMA, American Law and Economics Association Annual Meeting

2022: BMJ Open, Bioethics, Journal of Pediatrics, Journal of the American Medical Association (JAMA); American Journal of Public Health (AJPH); National Science Foundation Law & Science Program

2021: Journal of Empirical Legal Studies (JELS); Journal of the American Medical Association (JAMA); American Journal of Public Health (AJPH); Journal of Law and Biosciences.

2020: JAMA; Health Affairs; Journal of Law & Biosciences; Behavioral Public Policy; Milbank Quarterly

2019 and prior: University of Arizona Foundation Small Grants Program (six); Journal of General Internal Medicine; American Journal of Public Health; JAMA Network Open; Social Philosophy & Policy (project editor); American Journal of Law & Medicine; New England Journal of Medicine; Stanford Law Review; National Science Foundation, Law and Social Sciences Program; Conference on Empirical Legal Studies; Journal of Law and the Biosciences (twice); JAMA Internal Medicine; Journal of General Internal Medicine; American Psychology-Law Society Grant Program; National Science Center, Poland; PLOS One; Health Affairs; BMJ;

Journal of Law, Medicine, and Ethics; University of Houston Health Law Center Scholars Workshop; Journal of Bioethical Inquiry; Robert Wood Johnson Foundation Public Health Law Research Program; American Society for Bioethics & Humanities Annual Meeting; HLS Petrie Flom Center Annual Conference; BMC Medical Ethics; Review of Law and Economics; Journal of Empirical Legal Studies; Conference on Empirical Legal Studies; Netherlands Organization for Scientific Research (NWO); Canadian Medical Association Journal (CMAJ); Robert Wood Johnson Foundation Public Health Law Research Program; Robert Wood Johnson Foundation Public Health Law Research Program; Wellcome Trust (UK) Fellowship Program (twice); Journal of Social Psychological and Personality Science; Oxford University Press; Blackwell Press.

**Outside Service (selected)**

Science & Technology Entry Program, NYU Langone School of Medicine (2024).

Elected Member, American Law Institute (2023-present), Advisor to the Project on Medical Liability (2023-present).

Affiliated Member, NYU Grossman School of Medicine Working Group on Compassionate Use and Pre-Approval Access (CUPA) (2016-present).

Academic Program Review, University of California (2019, 2022).

Reporter, Committee to Monitor Developments in Health Law, Uniform Law Commission (2018-2020).

Clinical Bioethics Committee, Banner University Medical Center (2010-2020).

Methods Core, Robert Wood Johnson Foundation Public Health Law Research Program (2013-2015).

**College and University Service (selected, since 2020)**

Assessments and Outcomes Committee (2024); Co-Chair, College Governance Committee (2023-24); University Appointments, Promotions, and Tenure Committee (2023-24); Dean Search Committee, Sargent College of Health & Rehabilitation Sciences (2022-23); Co-Convenor, Law and Economics Workshop (2022); Graduate and Foreign Programs Committee Co-Chair (2022-23); Law Lateral Appointments Committee (2022-23); Health Law Program Co-Chair (2020-21); Law Joint Appointments Committee (2020-21, 2021-22); Graduate Programs Committee (2021-22); Pandemic Pedagogy Task Force (2020); Learn from Anywhere coach (2020-21). Philosophy Department Hiring Committee (2021-22).

**Legal and Consulting Experience (selected)**

Consultant, Aspen Publishing (for JD-Next) (2024-present). Consultant, Themis Bar Review (data strategy) (2024-present). Equal Citizens (litigation expert) (2025). Consulting Advisor, California State Bar Board of Trustees (on disparities in attorney discipline, see review here) (2020-2022). Founding Partner, HUGO Analytics – provider of experimental jury research for litigators (2016-2024). Admitted to practice law in Mississippi and Fifth Circuit Court of Appeals (2007). Trial and appellate counsel in national mass torts litigation law firm consortia (2007-2012). Consultant for trial, appellate, and U.S. Supreme Court litigation teams in health care fraud, bribery, honest services fraud, mortgage fraud, First Amendment, *qui tam* (False Claims Act), white collar, stolen minerals, and post-conviction criminal cases (2010-present).

# Exhibit 3-C

**INFORMATION SHEET FOR PARTICIPATION IN RESEARCH STUDY**

**We are conducting a research study to learn more about perceptions of government. If you choose to participate, we will ask some questions, and you will answer these questions via this website. You will not have any direct interactions with the researchers. If there is a question you do not want to answer, you may stop the study.**

**The study should take about 5-7 minutes to complete. Research data collected from you will be anonymous. Since your information is collected online in an anonymous way, we will not be able to link your responses back to you. So, your responses will remain confidential.**

**Your participation is voluntary, which means you can choose not to participate. There will be no negative consequences if you decide not to participate or change your mind later after you begin the study. You can withdraw your participation at any time prior to submitting your survey. If you change your mind later while answering the survey, you may simply exit (or not hand in) the survey.**

**If you have questions, concerns, or complaints about this study or you want to get additional information or provide input about this research, please contact Professor Christopher Robertson (ctr00@bu.edu). If you want to talk to someone besides the research team, you may also contact the Boston University IRB at irb@bu.edu. The IRB Office webpage has information where you can learn more about being a participant in research, and you can also complete a Participant Feedback Survey. You may print this information for your records.**

**Please note that twice during the survey, we will ask you to type out your thoughts.**

**By proceeding to complete the survey you are indicating your agreement to be in the research. If you do not consent, return your submission.**

* What state do you reside in?

* What is your age?

- Under 18
- 18-24
- 25-34
- 35-44
- 45-54
- 55-64
- 65+

* What is your gender?

- Female
- Male
- Other (specify)

* What is the highest level of school you have completed or the highest degree you have received?

- Less than high school degree
- High school graduate (high school diploma or equivalent including GED)
- Some college but no degree
- Associate degree in college (2-year)
- Bachelor's degree in college (4-year)
- Master's degree
- Doctoral degree
- Professional degree (JD, MD)

* Please choose the racial/ethnic categories that you consider yourself to be (select all that apply):

- ☐ White
- ☐ Latino or Hispanic
- ☐ Black or African American
- ☐ American Indian or Alaska Native
- ☐ Asian
- ☐ Native Hawaiian or other Pacific Islander
- ☐ Other

* Here is a 7-point scale on which the political views that people might hold are arranged from extremely liberal (left) to extremely conservative (right). Where would you place yourself on this scale?

1 Liberal 7 Conservative

* Information about income is very important to understand. Would you please give your best guess? Please indicate the answer that includes your entire household income in 2024, before taxes.

- ○ Less than $10,000
- ○ $10,000 to $19,999
- ○ $20,000 to $29,999
- ○ $30,000 to $39,999
- ○ $40,000 to $49,999
- ○ $50,000 to $59,999
- ○ $60,000 to $69,999
- ○ $70,000 to $79,999
- ○ $80,000 to $89,999
- ○ $90,000 to $99,999
- ○ $100,000 to $149,999
- ○ $150,000 or more

* How often do you vote in U.S. elections?

- ○ Always
- ○ Most of the time
- ○ About half the time
- ○ Sometimes
- ○ Never

* Generally speaking, do you usually think of yourself as a Republican, Democrat, or Independent?

- ○ Strong Democrat
- ○ Democrat
- ○ Independent lean Democrat
- ○ Independent
- ○ Independent lean Republican
- ○ Republican
- ○ Strong Republican

A 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $5.

B 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $50.

C 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $500.

D 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $5000.

E 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $50,000.

F 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $500,000.

G 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $5,000,000.

H 12.5% Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $50,000,000.

* How likely do you think a politician would be to sell a policy outcome for that amount?

- ○ Extremely Unlikely
- ○ Very Unlikely
- ○ Somewhat Unlikely
- ○ Somewhat Likely
- ○ Very Likely
- ○ Extremely Likely

Please consider the following scenario, and then we will ask you about how you feel about it. This scenario involves money and politics. Imagine this scenario, regardless of whatever you may believe about your own state or federal or constitutional law.

**Suppose you live in a U.S. state called "Ames" with the following rules:**

1. Candidates for public office, such as state representative and governor, need lots of money to support their elections and re-elections. They raise and spend money to support their campaigns.

2. Separate from the candidates' own fundraising and spending, individuals and corporations can also spend unlimited amounts of money independently to support or oppose candidates. This spending must be "independent" of the candidate's campaign, not coordinated with any candidate's campaign.

3. Individuals and corporations can also organize their independent spending through entities sometimes called SuperPACs but which we will refer to as "independent expenditure committees," or IECs.

4. Contributions to these IECs may come from major donors who want official actions from elected officials, such as having the state government spend money to support a particular industry or de-regulate a particular industry.

5. IECs may not necessarily know if a candidate directed a donor to make a contribution to the IEC or made any agreement with a donor in exchange for the contribution.

A
16.65%

6. The state of Ames has a **cap of $5,000** in contributions to IECs. It is **illegal** for any person or corporation to contribute more than $5,000 to IECs in this state.

7. For example, in Ames, it is **NOT legal** for a sitting governor to tell a lobbyist requesting a policy change for a certain industry that the companies should contribute **$1 million** dollars to a certain IEC that supports his re-election.

B
16.67%

6. The state of Ames has a **cap of $5,000** in contributions to IECs. It is **illegal** for any person or corporation to contribute more than $5,000 to IECs in this state.

7. For example, in Ames, it is **NOT legal** for a group of companies to contribute **$1 million** to create an IEC and announce that it will be spent for whichever candidate for governor expresses the strongest support for eliminating safety regulations that impact those companies.

C
16.67%

6. The state of Ames has a **cap of $5,000** in contributions to IECs. It is **illegal** for any person or corporation to contribute more than $5,000 to IECs in this state.

D
16.67%

6. The state of Ames has **no cap** on contributions to IECs. Persons or corporations can contribute any amount of money to IECs in this state.

7. For example, in Ames, it is **legal** for a sitting governor to tell a lobbyist requesting a policy change for a certain industry that the companies should contribute **$1 million** dollars to a certain IEC that supports his re-election.

E
16.67%

6. The state of Ames has **no cap** on contributions to IECs. Persons or corporations can contribute any amount of money to IECs in this state.

7. For example, in Ames, it is **legal** for a group of companies to contribute **$1 million** to create an IEC and announce that it will be spent for whichever candidate for governor expresses the strongest support for eliminating safety regulations that impact those companies.

F
16.67%

6. The state of Ames has **no cap** on contributions to IECs. Persons or corporations can contribute any amount of money to IECs in this state.

* Please paraphrase in your own words, this system for the State of Ames. What are its likely consequences? How does it make you feel about the government of Ames?

* Would you agree or disagree with the following statements about Ames?

| | Strongly Disagree | Disagree | Somewhat Disagree | Somewhat Agree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| In Ames, people like me are likely to have a strong voice in the government. | | | | | | |
| Major donors in Ames are likely to have a strong voice in the government. | | | | | | |
| The Ames government is likely to be effective. | | | | | | |
| The Ames government is likely to be controlled by special interests. | | | | | | |
| Major donors to IECs in Ames are likely to get policy outcomes from candidates in exchange for their money. | | | | | | |
| Elected officials in Ames are likely to provide policy outcomes in exchange for large contributions to the IECs that support them. | | | | | | |
| Many elected officials in Ames will be “crooked.” | | | | | | |
| I trust that the government of Ames will do what is right. | | | | | | |
| Your attention is important. Please mark "somewhat disagree" on this question. | | | | | | |

* Would you agree or disagree with the following statements about Ames?

| | Strongly Disagree | Disagree | Somewhat Disagree | Somewhat Agree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| Contributions to IECs will likely have a coercive influence on Ames candidates' positions and on their actions if elected to office. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| Contributions to IECs will likely facilitate political quid pro quos (an exchange of one thing for another) between donors and candidates for public office in Ames. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| In Ames there is likely to be corruption and opportunities for abuse. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| There is likely to be improper influence on Ames political officials. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| I would have confidence in the integrity of the Ames system of representative government. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| The Ames elected officials are likely to represent the interests of the voters. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| The Ames elected officials are likely to represent the interests of major donors. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |
| Your attention is important. Please mark "somewhat agree" on this question. | ◯ | ◯ | ◯ | ◯ | ◯ | ◯ |

* On this question, “Elected officials are likely to provide policy outcomes in exchange for large contributions to the IECs that support them,” you said "{{ Q12.R6 }}."

Could you please write a few sentences explaining why you answered in that way, with reference to the Ames scenario?

Case 1:24-cv-00430-KFW    Document 53-3    Filed 02/26/25    Page 50 of 68    PageID #: 630

* In Ames, would it have been legal or illegal for a billionaire to contribute $1.5M to an IEC in support of the re-election of a legislator who chairs a key committee that will decide the future of his company in the state of Ames?

- It would be legal.
- It would NOT be legal.
- It is not clear from the prompt, or I do not recall.

Thank you for your participation!

# Exhibit 3-D

**METHODOLOGICAL APPENDIX**

**Experiment 2: Definition of Experimental Condition Text Used in Random Assignments**

As shown in the main report and the instrument, the base case used five enumerated paragraphs. The following manipulations all start with enumerated paragraph #6, followed by paragraph #7 where applicable. *T*he respondents did not see the condition-labels applied here.

"Cap-Ask" = "6. The state of Ames has a cap of $5,000 in contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state. ¶ 7. For example, in Ames, it is **NOT legal** for a sitting governor to tell a lobbyist requesting a policy change for a certain industry that the companies should contribute **$1 million** dollars to a certain IEC that supports his re-election."

"Cap-Give" = "6. The state of Ames has a cap of $5,000 in contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state. ¶ 7. For example, in Ames, it is **NOT legal** for a group of companies to contribute **$1 million** to create an IEC and announce that it will be spent for whichever candidate for governor expresses the strongest support for eliminating safety regulations that impact those companies.

"Cap" = "6. The state of Ames has a cap of $5,000 in contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state." [No example provided to respondents.]

"No Cap-Ask" = "6. The state of Ames has **no cap** on contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state. ¶ 7. For example, in Ames, it is **legal** for a sitting governor to tell a lobbyist requesting a policy change for a certain industry that the companies should contribute **$1 million** dollars to a certain IEC that supports his re-election."

"No Cap-Give" = "6. The state of Ames has **no cap** on contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state. ¶ 7. For example, in Ames, it is **legal** for a group of companies to contribute **$1 million** to create an IEC and announce that it will be spent for whichever candidate for governor expresses the strongest support for eliminating safety regulations that impact those companies.

"No Cap" = "6. The state of Ames has **no cap** on contributions to IECs. It is illegal for any person or corporation to contribute more than $5,000 to IECs in this state." [No example provided to respondents.]

**Table A1. Crosstabulation of "People like me likely to have strong voice in government" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| People's Voice | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 44<br>23.16 | 42<br>24.14 | 49<br>23.44 | 77<br>40.53 | 65<br>34.76 | 81<br>41.75 | 358<br>31.29 |
| Disagree | 32<br>16.84 | 40<br>22.99 | 43<br>20.57 | 44<br>23.16 | 50<br>26.74 | 52<br>26.80 | 261<br>22.81 |
| Somewhat Disagree | 43<br>22.63 | 27<br>15.52 | 48<br>22.97 | 33<br>17.37 | 30<br>16.04 | 25<br>12.89 | 206<br>18.01 |
| Somewhat Agree | 49<br>25.79 | 42<br>24.14 | 34<br>16.27 | 21<br>11.05 | 20<br>10.70 | 24<br>12.37 | 190<br>16.61 |
| Agree | 15<br>7.89 | 17<br>9.77 | 25<br>11.96 | 9<br>4.74 | 12<br>6.42 | 8<br>4.12 | 86<br>7.52 |
| Strongly Agree | 7<br>3.68 | 6<br>3.45 | 10<br>4.78 | 6<br>3.16 | 10<br>5.35 | 4<br>2.06 | 43<br>3.76 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 79.3403 p < 0.001

**Table A2. Crosstabulation of "Major donors likely to have a strong voice in government" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Donors' Voice | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 6<br>3.16 | 8<br>4.60 | 8<br>3.83 | 2<br>1.05 | 2<br>1.07 | 4<br>2.06 | 30<br>2.62 |
| Disagree | 13<br>6.84 | 16<br>9.20 | 13<br>6.22 | 1<br>0.53 | 3<br>1.60 | 2<br>1.03 | 48<br>4.20 |
| Somewhat Disagree | 37<br>19.47 | 23<br>13.22 | 17<br>8.13 | 14<br>7.37 | 8<br>4.28 | 9<br>4.64 | 108<br>9.44 |
| Somewhat Agree | 49<br>25.79 | 38<br>21.84 | 45<br>21.53 | 17<br>8.95 | 25<br>13.37 | 32<br>16.49 | 206<br>18.01 |
| Agree | 36<br>18.95 | 48<br>27.59 | 61<br>29.19 | 49<br>25.79 | 54<br>28.88 | 41<br>21.13 | 289<br>25.26 |
| Strongly Agree | 49<br>25.79 | 41<br>23.56 | 65<br>31.10 | 107<br>56.32 | 95<br>50.80 | 106<br>54.64 | 463<br>40.47 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 151.7584   p < 0.001

**Table A3. Crosstabulation of "Government is likely to be effective" by Experimental Condition**

```
+-------------------+
| Key               |
|-------------------|
|     frequency     |
| column percentage |
+-------------------+
```

| Effective | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| | Experimental Conditions | | | | | | |
| Strongly Disagree | 27<br>14.21 | 14<br>8.05 | 24<br>11.48 | 45<br>23.68 | 48<br>25.67 | 50<br>25.77 | 208<br>18.18 |
| Disagree | 35<br>18.42 | 41<br>23.56 | 58<br>27.75 | 59<br>31.05 | 47<br>25.13 | 56<br>28.87 | 296<br>25.87 |
| Somewhat Disagree | 42<br>22.11 | 40<br>22.99 | 52<br>24.88 | 49<br>25.79 | 50<br>26.74 | 46<br>23.71 | 279<br>24.39 |
| Somewhat Agree | 60<br>31.58 | 49<br>28.16 | 41<br>19.62 | 25<br>13.16 | 24<br>12.83 | 27<br>13.92 | 226<br>19.76 |
| Agree | 20<br>10.53 | 19<br>10.92 | 26<br>12.44 | 7<br>3.68 | 11<br>5.88 | 10<br>5.15 | 93<br>8.13 |
| Strongly Agree | 6<br>3.16 | 11<br>6.32 | 8<br>3.83 | 5<br>2.63 | 7<br>3.74 | 5<br>2.58 | 42<br>3.67 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 92.3876 p < 0.001

**Table A4. Crosstabulation of "Government is likely to be controlled by special interests" by Experimental Condition**

| Key |
|---|
| frequency<br>column percentage |

Experimental Conditions

| Interests | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 4<br>2.11 | 4<br>2.30 | 7<br>3.35 | 0<br>0.00 | 2<br>1.07 | 1<br>0.52 | 18<br>1.57 |
| Disagree | 14<br>7.37 | 15<br>8.62 | 7<br>3.35 | 2<br>1.05 | 5<br>2.67 | 3<br>1.55 | 46<br>4.02 |
| Somewhat Disagree | 24<br>12.63 | 26<br>14.94 | 25<br>11.96 | 10<br>5.26 | 10<br>5.35 | 13<br>6.70 | 108<br>9.44 |
| Somewhat Agree | 46<br>24.21 | 37<br>21.26 | 47<br>22.49 | 25<br>13.16 | 21<br>11.23 | 31<br>15.98 | 207<br>18.09 |
| Agree | 61<br>32.11 | 39<br>22.41 | 64<br>30.62 | 50<br>26.32 | 53<br>28.34 | 52<br>26.80 | 319<br>27.88 |
| Strongly Agree | 41<br>21.58 | 53<br>30.46 | 59<br>28.23 | 103<br>54.21 | 96<br>51.34 | 94<br>48.45 | 446<br>38.99 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 116.0651 $p < 0.001$

**Table A5. Crosstabulation of "Major donors to IECs likely to get policy outcomes from candidates in exchange for money" by Experimental Condition**

```
+-------------------+
| Key               |
|-------------------|
|     frequency     |
| column percentage |
+-------------------+
```

Experimental Conditions

| Get Policy | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 5<br>2.63 | 7<br>4.02 | 5<br>2.39 | 1<br>0.53 | 1<br>0.53 | 4<br>2.06 | 23<br>2.01 |
| Disagree | 15<br>7.89 | 14<br>8.05 | 9<br>4.31 | 3<br>1.58 | 6<br>3.21 | 5<br>2.58 | 52<br>4.55 |
| Somewhat Disagree | 28<br>14.74 | 23<br>13.22 | 27<br>12.92 | 11<br>5.79 | 9<br>4.81 | 9<br>4.64 | 107<br>9.35 |
| Somewhat Agree | 47<br>24.74 | 45<br>25.86 | 55<br>26.32 | 22<br>11.58 | 32<br>17.11 | 36<br>18.56 | 237<br>20.72 |
| Agree | 56<br>29.47 | 40<br>22.99 | 61<br>29.19 | 55<br>28.95 | 50<br>26.74 | 55<br>28.35 | 317<br>27.71 |
| Strongly Agree | 39<br>20.53 | 45<br>25.86 | 52<br>24.88 | 98<br>51.58 | 89<br>47.59 | 85<br>43.81 | 408<br>35.66 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 112.8129 p < 0.001

**Table A6. Crosstabulation of "Elected officials likely to provide policy outcomes in exchange for large contributions to the IECs that support them" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

| Provide Policy | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| | Experimental Conditions | | | | | | |
| Strongly Disagree | 12 | 5 | 7 | 0 | 1 | 3 | 28 |
| | 6.32 | 2.87 | 3.35 | 0.00 | 0.53 | 1.55 | 2.45 |
| Disagree | 14 | 14 | 15 | 1 | 5 | 6 | 55 |
| | 7.37 | 8.05 | 7.18 | 0.53 | 2.67 | 3.09 | 4.81 |
| Somewhat Disagree | 30 | 29 | 27 | 10 | 11 | 14 | 121 |
| | 15.79 | 16.67 | 12.92 | 5.26 | 5.88 | 7.22 | 10.58 |
| Somewhat Agree | 45 | 42 | 43 | 29 | 27 | 38 | 224 |
| | 23.68 | 24.14 | 20.57 | 15.26 | 14.44 | 19.59 | 19.58 |
| Agree | 56 | 39 | 62 | 55 | 50 | 54 | 316 |
| | 29.47 | 22.41 | 29.67 | 28.95 | 26.74 | 27.84 | 27.62 |
| Strongly Agree | 33 | 45 | 55 | 95 | 93 | 79 | 400 |
| | 17.37 | 25.86 | 26.32 | 50.00 | 49.73 | 40.72 | 34.97 |
| Total | 190 | 174 | 209 | 190 | 187 | 194 | 1,144 |
| | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Pearson chi2(25) = 124.2261   p < 0.001

**Table A7. Crosstabulation of "Many elected officials will be 'crooked'" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Crooked | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 2<br>1.05 | 6<br>3.45 | 5<br>2.39 | 0<br>0.00 | 1<br>0.53 | 2<br>1.03 | 16<br>1.40 |
| Disagree | 12<br>6.32 | 20<br>11.49 | 11<br>5.26 | 3<br>1.58 | 3<br>1.60 | 3<br>1.55 | 52<br>4.55 |
| Somewhat Disagree | 38<br>20.00 | 26<br>14.94 | 31<br>14.83 | 10<br>5.26 | 7<br>3.74 | 14<br>7.22 | 126<br>11.01 |
| Somewhat Agree | 55<br>28.95 | 40<br>22.99 | 54<br>25.84 | 37<br>19.47 | 53<br>28.34 | 44<br>22.68 | 283<br>24.74 |
| Agree | 43<br>22.63 | 43<br>24.71 | 60<br>28.71 | 54<br>28.42 | 51<br>27.27 | 60<br>30.93 | 311<br>27.19 |
| Strongly Agree | 40<br>21.05 | 39<br>22.41 | 48<br>22.97 | 86<br>45.26 | 72<br>38.50 | 71<br>36.60 | 356<br>31.12 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 118.6665 $p < 0.001$

**Table A8. Crosstabulation of "Trust that the government will do what is right" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Trust | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 34<br>17.89 | 36<br>20.69 | 46<br>22.01 | 75<br>39.47 | 70<br>37.43 | 69<br>35.57 | 330<br>28.85 |
| Disagree | 39<br>20.53 | 38<br>21.84 | 49<br>23.44 | 52<br>27.37 | 56<br>29.95 | 59<br>30.41 | 293<br>25.61 |
| Somewhat Disagree | 43<br>22.63 | 35<br>20.11 | 47<br>22.49 | 35<br>18.42 | 35<br>18.72 | 36<br>18.56 | 231<br>20.19 |
| Somewhat Agree | 49<br>25.79 | 44<br>25.29 | 46<br>22.01 | 18<br>9.47 | 15<br>8.02 | 22<br>11.34 | 194<br>16.96 |
| Agree | 18<br>9.47 | 13<br>7.47 | 12<br>5.74 | 5<br>2.63 | 6<br>3.21 | 6<br>3.09 | 60<br>5.24 |
| Strongly Agree | 7<br>3.68 | 8<br>4.60 | 9<br>4.31 | 5<br>2.63 | 5<br>2.67 | 2<br>1.03 | 36<br>3.15 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 95.8976 $p < 0.001$

**Table A9. Crosstabulation of "Contributions to IECs likely have a coercive influence on candidates' positions and actions" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Coercive | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 2<br>1.05 | 5<br>2.87 | 5<br>2.39 | 1<br>0.53 | 3<br>1.60 | 2<br>1.03 | 18<br>1.57 |
| Disagree | 15<br>7.89 | 13<br>7.47 | 15<br>7.18 | 3<br>1.58 | 3<br>1.60 | 6<br>3.09 | 55<br>4.81 |
| Somewhat Disagree | 22<br>11.58 | 29<br>16.67 | 21<br>10.05 | 8<br>4.21 | 12<br>6.42 | 14<br>7.22 | 106<br>9.27 |
| Somewhat Agree | 69<br>36.32 | 42<br>24.14 | 57<br>27.27 | 31<br>16.32 | 31<br>16.58 | 44<br>22.68 | 274<br>23.95 |
| Agree | 48<br>25.26 | 47<br>27.01 | 62<br>29.67 | 70<br>36.84 | 63<br>33.69 | 52<br>26.80 | 342<br>29.90 |
| Strongly Agree | 34<br>17.89 | 38<br>21.84 | 49<br>23.44 | 77<br>40.53 | 75<br>40.11 | 76<br>39.18 | 349<br>30.51 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 104.9479 $p < 0.001$

**Table A10. Crosstabulation of "Contributions to IECs likely facilitate political *quid pro quos* between donors and candidates" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| *Quid pro quo* | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 1<br>0.53 | 6<br>3.45 | 3<br>1.44 | 2<br>1.05 | 1<br>0.53 | 1<br>0.52 | 14<br>1.22 |
| Disagree | 12<br>6.32 | 9<br>5.17 | 17<br>8.13 | 1<br>0.53 | 6<br>3.21 | 6<br>3.09 | 51<br>4.46 |
| Somewhat Disagree | 32<br>16.84 | 29<br>16.67 | 19<br>9.09 | 13<br>6.84 | 4<br>2.14 | 8<br>4.12 | 105<br>9.18 |
| Somewhat Agree | 60<br>31.58 | 40<br>22.99 | 62<br>29.67 | 30<br>15.79 | 34<br>18.18 | 43<br>22.16 | 269<br>23.51 |
| Agree | 50<br>26.32 | 48<br>27.59 | 61<br>29.19 | 57<br>30.00 | 65<br>34.76 | 64<br>32.99 | 345<br>30.16 |
| Strongly Agree | 35<br>18.42 | 42<br>24.14 | 47<br>22.49 | 87<br>45.79 | 77<br>41.18 | 72<br>37.11 | 360<br>31.47 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 122.5425 p < 0.001

**Table A11. Crosstabulation of "Likely to be corruption and opportunities for abuse" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Corruption | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 4<br>2.11 | 4<br>2.30 | 1<br>0.48 | 1<br>0.53 | 1<br>0.53 | 3<br>1.55 | 14<br>1.22 |
| Disagree | 11<br>5.79 | 10<br>5.75 | 12<br>5.74 | 3<br>1.58 | 4<br>2.14 | 4<br>2.06 | 44<br>3.85 |
| Somewhat Disagree | 27<br>14.21 | 25<br>14.37 | 23<br>11.00 | 11<br>5.79 | 2<br>1.07 | 10<br>5.15 | 98<br>8.57 |
| Somewhat Agree | 50<br>26.32 | 40<br>22.99 | 48<br>22.97 | 21<br>11.05 | 26<br>13.90 | 33<br>17.01 | 218<br>19.06 |
| Agree | 53<br>27.89 | 44<br>25.29 | 57<br>27.27 | 44<br>23.16 | 50<br>26.74 | 51<br>26.29 | 299<br>26.14 |
| Strongly Agree | 45<br>23.68 | 51<br>29.31 | 68<br>32.54 | 110<br>57.89 | 104<br>55.61 | 93<br>47.94 | 471<br>41.17 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 115.6198   $p < 0.001$

**Table A12. Crosstabulation of "Likely to be improper influence on political officials" by Experimental Condition**

| Key |
|---|
| frequency<br>column percentage |

Experimental Conditions

| Improper | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 4<br>2.11 | 4<br>2.30 | 5<br>2.39 | 0<br>0.00 | 2<br>1.07 | 3<br>1.55 | 18<br>1.57 |
| Disagree | 12<br>6.32 | 16<br>9.20 | 8<br>3.83 | 2<br>1.05 | 4<br>2.14 | 5<br>2.58 | 47<br>4.11 |
| Somewhat Disagree | 28<br>14.74 | 26<br>14.94 | 19<br>9.09 | 10<br>5.26 | 6<br>3.21 | 7<br>3.61 | 96<br>8.39 |
| Somewhat Agree | 58<br>30.53 | 41<br>23.56 | 51<br>24.40 | 23<br>12.11 | 27<br>14.44 | 36<br>18.56 | 236<br>20.63 |
| Agree | 43<br>22.63 | 38<br>21.84 | 69<br>33.01 | 58<br>30.53 | 61<br>32.62 | 59<br>30.41 | 328<br>28.67 |
| Strongly Agree | 45<br>23.68 | 49<br>28.16 | 57<br>27.27 | 97<br>51.05 | 87<br>46.52 | 84<br>43.30 | 419<br>36.63 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 122.2561 p < 0.001

**Table A13. Crosstabulation of "Have confidence in the integrity of system of representative government" by Experimental Condition**

```
+-------------------+
| Key               |
|-------------------|
|     frequency     |
| column percentage |
+-------------------+
```

Experimental Conditions

| Integrity | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 37<br>19.47 | 39<br>22.41 | 44<br>21.05 | 88<br>46.32 | 82<br>43.85 | 79<br>40.72 | 369<br>32.26 |
| Disagree | 31<br>16.32 | 35<br>20.11 | 59<br>28.23 | 42<br>22.11 | 49<br>26.20 | 55<br>28.35 | 271<br>23.69 |
| Somewhat Disagree | 53<br>27.89 | 30<br>17.24 | 46<br>22.01 | 27<br>14.21 | 29<br>15.51 | 33<br>17.01 | 218<br>19.06 |
| Somewhat Agree | 44<br>23.16 | 38<br>21.84 | 34<br>16.27 | 19<br>10.00 | 15<br>8.02 | 18<br>9.28 | 168<br>14.69 |
| Agree | 16<br>8.42 | 25<br>14.37 | 22<br>10.53 | 6<br>3.16 | 6<br>3.21 | 7<br>3.61 | 82<br>7.17 |
| Strongly Agree | 9<br>4.74 | 7<br>4.02 | 4<br>1.91 | 8<br>4.21 | 6<br>3.21 | 2<br>1.03 | 36<br>3.15 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 131.9189 $p < 0.001$

**Table A14. Crosstabulation of "Elected officials likely to represent the interests of the voters" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Interests Voters | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 28 | 36 | 28 | 63 | 60 | 65 | 280 |
| | 14.74 | 20.69 | 13.40 | 33.16 | 32.09 | 33.51 | 24.48 |
| Disagree | 41 | 30 | 57 | 59 | 52 | 44 | 283 |
| | 21.58 | 17.24 | 27.27 | 31.05 | 27.81 | 22.68 | 24.74 |
| Somewhat Disagree | 33 | 36 | 52 | 29 | 35 | 41 | 226 |
| | 17.37 | 20.69 | 24.88 | 15.26 | 18.72 | 21.13 | 19.76 |
| Somewhat Agree | 66 | 42 | 41 | 27 | 20 | 30 | 226 |
| | 34.74 | 24.14 | 19.62 | 14.21 | 10.70 | 15.46 | 19.76 |
| Agree | 12 | 25 | 20 | 6 | 14 | 11 | 88 |
| | 6.32 | 14.37 | 9.57 | 3.16 | 7.49 | 5.67 | 7.69 |
| Strongly Agree | 10 | 5 | 11 | 6 | 6 | 3 | 41 |
| | 5.26 | 2.87 | 5.26 | 3.16 | 3.21 | 1.55 | 3.58 |
| Total | 190 | 174 | 209 | 190 | 187 | 194 | 1,144 |
| | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Pearson chi2(25) = 109.8458 p < 0.001

**Table A15. Crosstabulation of "Elected officials are likely to represent the interests of major donors" by Experimental Condition**

| Key |
|---|
| frequency |
| column percentage |

Experimental Conditions

| Interests Donors | Cap-Ask | Cap-Give | Cap | No Cap-Ask | No Cap-Give | No Cap | Total |
|---|---|---|---|---|---|---|---|
| Strongly Disagree | 3<br>1.58 | 5<br>2.87 | 6<br>2.87 | 1<br>0.53 | 2<br>1.07 | 3<br>1.55 | 20<br>1.75 |
| Disagree | 15<br>7.89 | 15<br>8.62 | 7<br>3.35 | 3<br>1.58 | 4<br>2.14 | 8<br>4.12 | 52<br>4.55 |
| Somewhat Disagree | 19<br>10.00 | 24<br>13.79 | 22<br>10.53 | 8<br>4.21 | 8<br>4.28 | 8<br>4.12 | 89<br>7.78 |
| Somewhat Agree | 56<br>29.47 | 39<br>22.41 | 51<br>24.40 | 31<br>16.32 | 25<br>13.37 | 29<br>14.95 | 231<br>20.19 |
| Agree | 56<br>29.47 | 46<br>26.44 | 66<br>31.58 | 45<br>23.68 | 61<br>32.62 | 56<br>28.87 | 330<br>28.85 |
| Strongly Agree | 41<br>21.58 | 45<br>25.86 | 57<br>27.27 | 102<br>53.68 | 87<br>46.52 | 90<br>46.39 | 422<br>36.89 |
| Total | 190<br>100.00 | 174<br>100.00 | 209<br>100.00 | 190<br>100.00 | 187<br>100.00 | 194<br>100.00 | 1,144<br>100.00 |

Pearson chi2(25) = 112.8703   p < 0.001

**Table A16. OLS Regression on Perceptions of *Quid pro quo* Corruption in Subsample Limited to Those Who Passed Manipulation Check (n=750).**

| Source | SS | df | MS | | | |
|---|---|---|---|---|---|---|
| Model | 194.830882 | 8 | 24.3538603 | Number of obs | = | 750 |
| Residual | 869.035784 | 741 | 1.17278783 | F(8, 741) | = | 20.77 |
| | | | | Prob > F | = | 0.0000 |
| Total | 1063.86667 | 749 | 1.42038273 | R-squared | = | 0.1831 |
| | | | | Adj R-squared | = | 0.1743 |
| | | | | Root MSE | = | 1.083 |

| quid_pro_quo | Coef. | Std. Err. | t | P>\|t\| | [95% Conf. | Interval] |
|---|---|---|---|---|---|---|
| NoCap | .9604038 | .0801695 | 11.98 | 0.000 | .8030174 | 1.11779 |
| Age | -.0005958 | .0268805 | -0.02 | 0.982 | -.0533668 | .0521753 |
| Gender | -.03931 | .0806441 | -0.49 | 0.626 | -.1976281 | .1190081 |
| Education | .0068179 | .0298422 | 0.23 | 0.819 | -.0517674 | .0654032 |
| Politics | -.0618549 | .02325 | -2.66 | 0.008 | -.1074986 | -.0162112 |
| Income | .0046701 | .0135034 | 0.35 | 0.730 | -.0218393 | .0311794 |
| Vote | -.0300923 | .037562 | -0.80 | 0.423 | -.1038329 | .0436482 |
| White | .2305073 | .1119215 | 2.06 | 0.040 | .0107862 | .4502283 |
| _cons | 4.421443 | .2666564 | 16.58 | 0.000 | 3.897951 | 4.944935 |

*Note:* This robustness check uses CAP as the base case rather than NO-CAP. The contrast is highly significant, and the sign is opposite.

--o0o--

ROUGH DRAFT TRANSCRIPT DISCLAIMER IN THE MATTER OF

DINNER TABLE ACTION

v.

WILLIAM J. SCHNEIDER

This rough draft text is unedited/uncertified and may contain untranslated stenographic symbols, occasional reporter(s) note(s), misspelled proper names, and/or nonsensical word combinations. All such entries will be corrected on the official certified transcript.

This rough draft text is for the purpose of augmenting counsel(s) notes and shall not be recognized as an official transcript, nor shall it be cited or used in any way or at any time to rebut or contradict the official certified transcript of the proceedings, pursuant to Government Code Section 273(b).

--o0o--

NOT OFFICIAL

** ROUGH DRAFT - DO NOT CITE **

Q. Obviously that was a fulsome answer so I don't want to seem like I'm trying to change that at all. But do you view originalism as an overly textualist?

A. Yes.

Q. Okay. And can you explain why?

A. Yes so arguably the foundational premise of modern originalism again speaking in general terms because there are a lot of originalists who do things slightly differently but I think it's a fair characterization of I think the dominant premise of the orientation is to start with the idea that the constitution's distinctive feature is that it is a text and therefore in being a text tells us in a pretty robust way what is in the Constitution and how it acquires and communicates its meaning.

Q. Again, I'm not taking away from your previous answer.

Is there a particular sort of brand of constitutional interpretation an ism that you subscribe to?

A. Not -- there is not an ism that I have been able to settle on to my liking.

Q. That's fair.

Now, do you consider your -- and I know this is a little strange -- but your -- your book says it's

** ROUGH DRAFT - DO NOT CITE **



NOT OFFICIAL

** ROUGH DRAFT - DO NOT CITE **

against constitutional originalism but do you consider your scholarship to be originalist?

A. Other people have told me that they say this is not against historical originalism it is for a better originalism I understand where that comment comes from because what it seems like I'm trying to do in a lot of my scholarship is replace a faulty and anachronistic way of thinking about the American founding with a better and more accurate one I certainly as a historian believe that we can recover you know, imperfectly, as all things are the founding generation's views of constitutionalism and the original Constitution on its own terms but the reason I don't then say this is a defense of a better more historical originalism because I think part of what doing the history properly reveals is the profound differences between past and present and the need for anybody today who's trying to if they are so inclined draw on that history to inform modern constitutional and legal thinking has to do a great deal of work to translate that past into a present that thinks much differently about a lot of things and that requires a lot of discretion and judgment which is not inherently bad but are the precise things that originalism as a movement has always been trying to cabin so in that regard I see it if you do the history properly it

** ROUGH DRAFT - DO NOT CITE **

NOT OFFICIAL

was the meaning.

Q. Okay. And then so it says here in paragraph 2 of your declaration that you've been asked to discuss the original meaning of the First Amendment as it might relate to campaign finance regulation I guess prior to this declaration have you done any work that specifically related to campaign finance regulation?

A. Not -- I've read extensively on the originalist literature on say Citizens United but I don't take up that example for instance in my book though part of what I found attractive here was it was I think it was very easy to take the things that I had thought deeply about in my book and written about and elsewhere and apply them to this particular context.

Q. Do you view Citizens United to be an originalist decision?

A. I do not think it is an originalist decision on the merits it is described as such by defenders but I -- I think that is incorrect.

Q. Okay. By defenders you mean scholars not the justices themselves?

A. I guess I don't know enough about exactly how the justices would just I -- I assume some of the justices would.

Q. Yeah. I'm asking who you mean by defenders?



NOT OFFICIAL

A. Oh. I -- I mean both justices and academics I suppose I was thinking specifically about academics.

Q. Okay. All right. But -- but also just to clarify sitting here today, you can't think of a particular justice who said Citizens United was originalist?

A. No.

Q. Okay. Do you view campaign finance law outside of Citizens United say Buckley to be originalist?

A. I don't have a clear view on that but I would be skeptical.

Q. Okay. You -- you would be skeptical of it being originalist?

A. Yeah.

Q. Okay. What about First Amendment law in general?

A. I think most -- I think a lot of modern First Amendment law is betrays a different way of thinking constitutionalism and rights than predominated at the founding and actually is I think is a really good example of how we should think seriously about how originalist we want to be.

Q. I think betray there was not intended to be a pejorative. Am I correct?



NOT OFFICIAL

** ROUGH DRAFT - DO NOT CITE **

think he also tried to rise above the partisan fray that he correctly recognized was taking shape and it proved his undoing so given that he ended up behaving in a way that directly undercut his ambition I -- I think that is also part of the ledger.

Q. And the reason I -- I asked this is you know, bat or just person or anybody else, it would seem to me that --

(Reporter clarification.)

MR. MILLER: Yeah, I -- I said, you know be it. Yeah I said be that as it may, you know, whether he or Jefferson or someone else you know running for president at the time -- would they have been involved in any way at sort of directing the foot soldiers?

THE WITNESS: Definitely not. That would have been the most grievous political sin imaginable and the mere -- your mere characterization of running for president --

BY MR. MILLER:

Q. Sure.

A. -- if either of them said I am running for president would have immediately in their own eyes and their peer's eyes disqualified them for consideration.

Q. So then all of this activity was done by independent actors then?

** ROUGH DRAFT - DO NOT CITE **

NOT OFFICIAL

people who are modern lawyers looking back at the 18th century who have viewed it differently.

Q. Yeah. And you know maybe I -- I stated that in a poor way but it seems like this is something that -- that you and Mr. Campbell are currently sort of leading the charge on against other things that are out there?

A. I -- I -- I think that's a fair characterization. I think one of the reasons I wrote the book I did against constitutional originalism was precisely because I detected a failure among a great many talented scholars to take seriously the ways in which 18th century Constitution that will thinking was different and I think this is a particularly good example of that so certainly the motivation for it is that there is a certain amount of misunderstanding that has led to some conclusions or I mean people have found themselves tied in knots where they don't know how to square the evidence in part because they're asking the wrong questions.

Q. Okay. You know, earlier we talked a little bit about Federalist 78. Is that in your literature at all that sort of analysis that you gave in?

A. Is -- what? Sorry?

Q. Did you like the analysis that you gave --





NOT OFFICIAL

Why would you have left that phrase out?

A. I think I just did it for space requirements I don't see it as complicating the idea.

Q. All right. But doesn't that make it very clear that it's the individual's freedom to act without fear of censure of law?

A. Well, I think what he's talking about is acting inconsistent with laws of one's own making. Which again.

Q. That would be the definition of civil liberty for a preacher?

A. Yes. I mean, well I think what he's getting at is the idea that the key determination here is whether or not government is tyrannical or not. So you -- I mean I think you're alluding to a context in which people are, you know, this is 1775 in new England. And parliament is really trying to crack down on opposition and resistance.

Q. Have you given any thought to what precedence would be overturned if the originalism would be followed the way that you articulate by the court?

MS. AUSTIN: Objection. Relevance scope expertise.

THE WITNESS: I've given it some thought but it is not my primary focus part of the reason I framed it



NOT OFFICIAL

as I don't think the First Amendment as originally understood would present a barrier to the citizens initiative as I understand it is because I am remaining agnostic on broader questions pertaining to the First Amendment. I certainly appreciate the spirit of your question being that if we were fully originalist it would require thinking about lots of areas of law not just in the First Amendment. Though as a historian part of you know part of what I think that suggests is one should then think about whether they want to be an originalist.

BY MR. MILLER:

Q. So what are some of the cases you've thought of?

MS. AUSTIN: Objection. Relevance scope expertise.

THE WITNESS: I don't necessarily again as I said earlier I'm not an expert on First Amendment law and don't claim to be. So I'm a little wary --

BY MR. MILLER:

Q. Okay. All right?

A. -- weighing on them.

Q. Okay. How would one like determine this?

A. What is -- can you say what this is sorry.

Q. Yeah sure so if we were to follow the





NOT OFFICIAL

** ROUGH DRAFT - DO NOT CITE **

originalist etch approach which I understand you're not advocating, but if we were to follow that, how could we determine when we go and look at a case if it was originalist or not?

A. Well, we would have to -- so if -- if -- there would be the consideration of exactly what we take originalism to be and exactly what kinds of evidence determine the law that originalism succeed to find but assuming that that has something to do with how the public understood the meaning of key constitutional provisions and more importantly the sort of set of constitutional assumptions that sort of gave them meaning and force we would have to recover that reconstruct it we would then have to understand how that worked in its time and then we would then have to understand how that spoke to the issue at hand which could be complex if the issue at hand is not obviously analogous to something from the time we would also potentially have to consider some of those questions you raised earlier about could the meaning and understanding have been one thing at one time and supposedly liquidated it later though then you would need a very clear sense of what it meant to say that meaning is liquidated in one instance and not another you would also presumably have to have a clear understanding of

NOT OFFICIAL

** ROUGH DRAFT - DO NOT CITE **

whether things can be reliquidated you would also given this area need to think about that big question that a lot of people try to ignore sometimes about what exactly the reconstruction amendments did to this. You would I mean to do it faithfully honestly fully I think we'd have to go through all of that but as a starting point you might say is this the kind of activity that was left to the people's representatives to kind of regulate in the public interest or not. And is that at the outer boundary where it's more complex or sort of more comfortably with within the kind of general scope of what I think most people thought was left to the people's representatives and in my estimation in this case it's more the latter. But yes the analysis would then have to follow how exactly do we get from those historical findings to a robust understanding of law which is you know is what the legal decision makers and interpreters have to sort out based on this historical information.

Q. So then regardless of whether that process would result in upholding or overturning the particular precedent it would certainly require a new analysis?

A. Quite possibly it seems to me it would have to take seriously how the 18th century thought about speech.

NOT OFFICIAL

--o0o--

ROUGH DRAFT TRANSCRIPT DISCLAIMER IN THE MATTER OF

DINNER TABLE ACTION

v.

WILLIAM J. SCHNEIDER

This rough draft text is unedited/uncertified and may contain untranslated stenographic symbols, occasional reporter(s) note(s), misspelled proper names, and/or nonsensical word combinations. All such entries will be corrected on the official certified transcript.

This rough draft text is for the purpose of augmenting counsel(s) notes and shall not be recognized as an official transcript, nor shall it be cited or used in any way or at any time to rebut or contradict the official certified transcript of the proceedings, pursuant to Government Code Section 273(b).

--o0o--

NOT OFFICIAL

will have a deleterious impact on their independence and their status as legislators.

BY MR. MILLER:

Q. And were those potential concerns of the founders about that potential political corruption expressed anywhere in the First Amendment?

A. Not directly.

Q. Okay. I'm going to take a step back away from this particular declaration for a moment and just, you know, ask you kind of a question about sort of the nature of what you're offering here. You know, in cases typically, I -- you know, will have witnesses who offer evidence based upon their firsthand knowledge and, you know, perceptions. You know, obviously you weren't at the founding so that's not -- this isn't your firsthand knowledge of what happened then; correct?

A. No. I wasn't at the founding.

Q. Yeah. Sorry for the assumption.

A. I was born in 1947.

Q. Yeah. So sorry for these silly lawyerly questions but we just have to kind of run through it I guess is a conceptual thing; right?

So, then, the nature of what you're providing here is based upon what you as an academic have garnered over the course of your career?



NOT OFFICIAL

Q. Right. But France didn't bribe the Americans during the revolution. They were just --

A. No they gave us a treaty of alliance.

Q. All right. Let's see. At the end of that paragraph you say this is the top of the next page back in the 1760s Virginia politics had been wracked by the charges of financial corruption directed against John Robinson the speaker of the lower house.

How was that manifest?

A. Look, I'd have to go back to the record, which I haven't looked at but it's a -- it's a well known scandal. I mean, Robinson's reputation was ruined and he had been a dominant figure I'd have to go back it may have revolved around land grants.

Q. Okay. Do you know what the case *Buckley v. Valeo* is?

A. I know it roughly but I haven't -- I haven't gone back and looked at it recently.

Q. Okay. Do you know the significance of the term quid pro quo corruption in Buckley?

A. This for that.

Q. Yeah. Right. That's what it means.

But do you know the significance of that term and how it's utilized in campaign finance cases?

A. Well, I haven't studied it directly I -- I







NOT OFFICIAL

A. So they didn't have time to work on the reform of, you know, the Virginia law code so gerrymandering went off to France in 1784 and Madison was actually term limited out of Congress in Congress in 17831785, 86 where he becomes a dominant figure until he's -- you know, until a certain point he's working the other legislators so hard they get upset with him but one of the projects was to get the Statute of Religious Freedom finally enacted.

Q. I'd love to talk about -- I'd love to talk about gerrymandering and his religion but we'll save that for another time?

A. It's a great subject.

Q. So how does the concept of political corruption that you articulate here in this declaration inform the formation and creation of the free speech clause in the First Amendment? If at all?

A. Well, I wouldn't say I mean given any of the circumstances of the drafting of the First Amendment be the brevity of its text as I talked about earlier.

Q. Yeah.

A. I'd say the link would be fairly thin.

Q. Okay.

A. But I think that there's a general concern about -- well, sorry. I'll -- I'll stop there.



NOT OFFICIAL

Exhibit 5

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

DINNER TABLE ACTION, *et al.*,

Plaintiffs,

v.

WILLIAM J. SCHNEIDER, *et al.*,

Defendants.

**Civ. A. No. 1:24-cv-00430-KFW**[1]

**DECLARATION OF PROFESSOR SETH BARRETT TILLMAN**

I, Seth Barrett Tillman, hereby declare as follows:

[1] I am a citizen of the United States, and a resident of the Republic of Ireland.

[2] In 1984, I graduated from the College of the University of Chicago with a BA (*honors*), and, in 2000, I graduated from Harvard Law School with a JD (*cum laude*). After graduating from law school, I practiced law in the United States. I have also been a law clerk for a judge in the United States Court of Appeals for the Third Circuit and in three district courts—for two federal district court judges (in the United States District Court for the Middle District of Alabama and in the United States District Court for the District of New Jersey) and for one federal magistrate judge (in the United States District Court for the Middle District of Pennsylvania).

[3] I have taught as an adjunct in a U.S. law school. Since 2011, I have been part of the full-time faculty in the Maynooth University School of Law and Criminology, Ireland / Scoil an Dlí agus na Coireolaíochta Ollscoil Mhá Nuad. In 2021, I was

[1] Karen Frink Wolf, United State District Court for the District of Maine, Magistrate Judge, sitting by consent.

promoted to associate professor. (*My university affiliation and title are listed for identification purposes only*.)

[4] I have authored or co-authored well over 70 publications since I began actively publishing in 2003.[2] My publications include articles in domestic (that is, U.S.) and foreign, online and print: traditional academic peer reviewed journals,[3] student-edited

[2] *See, e.g.*, Seth Barrett Tillman, *Misconstruing the Electoral Count Act: A Response to Evan A. Davis and David M. Schulte*, 2025 Harv. J.L. & Pub. Pol'y Per Curiam 1, https://tinyurl.com/2925dttn; Seth Barrett Tillman, *A Textualist Defense of Article I, Section 7, Clause 3: Why* Hollingsworth v. Virginia *was Rightly Decided, and Why* INS v. Chadha *was Wrongly Reasoned*, 83 Tex. L. Rev. 1265 (2005) (cited 81 times); Seth Barrett Tillman, The Federalist Papers *as Reliable Historical Source Material for Constitutional Interpretation*, 105 W. Va. L. Rev. 601 (2003) (cited 43 times).

[3] *See, e.g.*, Seth Barrett Tillman, *Understanding Nativist Elements Relating to Immigration Policies and to the American Constitution's Natural Born Citizen Clause*, 32(2) Study on the American Constitution 1 (Aug. 2021) (peer review) (a South Korean journal, publishing in English and Korean), https://tinyurl.com/dhkxfzby; Seth Barrett Tillman, *Ex parte* Merryman*: Myth, History, and Scholarship*, 224(2) Mil. L. Rev. 481 (2016) (peer review) (cited 63 times), http://ssrn.com/abstract=2646888; Seth Barrett Tillman, *Who Can Be President of the United States?: Candidate Hillary Clinton and the Problem of Statutory Qualifications*, 5(1) British J. Am. Leg. Studies 95 (2016) (peer review) (cited 20 times), https://ssrn.com/abstract=2679512.

journals,[4] professional journals,[5] policy-makers' forums,[6] magazines,[7] newspapers (including opinion editorials and letters),[8] etc.

[5] I have won prizes for my publications.[9]

[6] My publications and amicus briefs have elicited over 20 full-length responses by judges,[10] academics,[11] and others.[12]

---

[4] *See, e.g.*, Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President into Section 3*, 28 Tex. Rev. L. & Pol. 350 (2024) (cited 129 times), https://ssrn.com/abstract=4568771; *supra* note 2 (collecting authority).

[5] *See, e.g.*, Seth Barrett Tillman, *COVID-19: Can the Oireachtas Legislate During the Pandemic?*, 38(7) Irish Law Times 94 (2020) (refereed professional journal) (cited 6 times), https://ssrn.com/abstract=3561117; R. Franklin Balotti & Seth Barrett Tillman, *Gazing into the Crystal Ball of Future Developments in Delaware Corporate Law: What if the Past is Not Prologue?*, 15(3) The Corporate Governance Advisor 3 (May/June 2007) (cited 4 times), https://ssrn.com/abstract=986308.

[6] *See, e.g.*, Seth Barrett Tillman, *The Right to a Unanimous Verdict and the Jury Instructions in* People v. Trump, Just Security (June 10, 2024), https://www.justsecurity.org/96654/trump-unanimous-verdict/; Seth Barrett Tillman & Josh Blackman, *Is Robert Mueller an "Officer of the United States" or an "Employee of the United States"?*, Lawfare: Hard National Security Choices (July 23, 2018, 2:50 PM), https://www.lawfaremedia.org/article/robert-mueller-officer-united-states-or-employee-united-states (cited 10 times).

[7] *See, e.g.*, Josh Blackman & Seth Barrett Tillman, *The Weird Scenario That Pits President Pelosi Against Citizen Trump in 2020*, The Atlantic (Nov. 20, 2019, 6:40 AM ET), https://www.theatlantic.com/ideas/archive/2019/11/2020-election-could-pit-pelosi-against-trump/602308/ (cited 5 times); Seth Barrett Tillman, *Advice to the Allies—1945*, 15(2) Claremont Review of Books 13, Spring 2015 (cited 1 time), http://ssrn.com/abstract=2478600.

[8] *See, e.g.*, Josh Blackman & Seth Barrett Tillman, Essay, *Only the Feds Could Disqualify Madison Cawthorn and Marjorie Taylor Greene*, New York Times, Apr. 23, 2022, A22 (cited 14 times), https://tinyurl.com/59s8c6er; Seth Barrett Tillman, Opinion Editorial, *Court of Appeal just a new version of Supreme Court—only more costly*, Irish Times (July 28, 2014, 1:30 AM), Business & Innovation at 7 (cited 7 times), https://www.irishtimes.com/news/crime-and-law/court-of-appeal-just-a-new-version-of-supreme-court-only-more-costly-1.1874746.

[9] *See* Landmark Legal Foundation's 2024 John Locke Liberty Award; North Carolina Society of Historians: 2021 Award of Excellence for Outstanding Contribution to the Preservation and Perpetuation of North Carolina History and Heritage.

[10] *See, e.g.*, Chief Judge Peter J. Eckerstrom, *Yes, the Senate Elevated Partisan Political Goals Over Constitutional Text When It Refused to Consider President Obama's Nominee to Replace Justice Scalia*, 21 U. Penn. J. Const. L. 891 (2019) (replying to a Tillman-authored publication).

[11] *See, e.g.*, Professor Jeremy D. Bailey, *The Traditional View of Hamilton's* Federalist *No. 77 and an Unexpected Challenge: A Response to Seth Barrett Tillman*, 33 Harvard J.L. & Pub. Pol'y 169 (2010), http://ssrn.com/abstract=1473276.

[12] *See, e.g.*, A Government Lawyer, *Yes, Trump's Shakedown of Ukraine Was Impeachable "Bribery,"* Harv. Nat'l Sec. J. Online 1 (Mar. 27, 2020), https://tinyurl.com/rty8r6s (anonymous government attorney responding to a Tillman co-authored publication).

[7] My publications and amicus briefs have elicited multiple retractions from academics and others.[13]

[8] There are over 1400 citations to my publications and amicus briefs in over 1000 sources,[14] including over 150 citations in sources from over 40 foreign countries,[15] including many sources published in languages other than English.[16]

---

[13] *See, e.g.*, *Our correction and apology to Professor Tillman*, Balkinization (Oct. 3, 2017, 8:30 PM), https://balkin.blogspot.ie/2017/10/our-correction-and-apology-to-professor.html (retraction by Professor Jack Rakove and four other academic legal historians based on Tillman's publications and amicus filings); *accord* Letter from Counsel for the Legal Historians to Judge George B. Daniels, Citizens for Responsibility and Ethics in Washington v. Trump, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (Civ. A. No. 1:17-cv-00458-GBD) (letter filed Oct. 3, 2017), ECF No. 96 (retraction filed on behalf of Jack Rakove and four other "Legal Historians"), https://tinyurl.com/ybd783uf; *see also, e.g.*, Steven Calabresi, Letters, *President Trump Can Not Be Disqualified—Prof. Steven Calabresi changes his mind*, Wall Street J. (Sept. 12, 2023, 4:30 pm ET), https://wsj.com/articles/trump-can-not-be-disqualified-14th-amendment-calabresi-16657a1b (retraction by Professor Calabresi based on Tillman's and others' publications); Michael Mukasey, *as reported on* Eugene Volokh, *No, Hillary Clinton wouldn't be legally ineligible for the Presidency even if she had violated government records laws*, Washington Post: Volokh Conspiracy (Aug. 26, 2015, 12:54 PM), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/26/no-hillary-clinton-wouldnt-be-legally-ineligible-for-the-presidency-even-if-she-had-violated-government-records-laws/ (retraction by Michael Mukasey, former Chief Judge (S.D.N.Y.) and former Attorney General of the United States, based on Tillman-authored blog post). *But see* Deposition of Professor Jack Rakove (Apr. 4, 2025) 12:3–12:6 ("Q[uestion]. Have you ever had to make *any* retractions of *any* declaration or anything you said in a declaration or *amicus brief* in any case? A[answer]. No." (emphases added)).

[14] *See, e.g.*, William Baude & Michael Stokes Paulsen, *Sweeping Section Three under the Rug: A Comment on* Trump v. Anderson, 138 Harv. L. Rev. 677, 682 n.34 (2025) (citing a Tillman co-authored publication); Travis Crum, *The Unabridged Fifteenth Amendment*, 133 Yale L.J. 1039, 1140 n.614 (2024) (same).

[15] *See, e.g.*, *Chapter One Foundation Limited v The Attorney General (Re: Article 128 of the Constitution)*, No. 2021-CCZ-0036 (Constitutional Court of Zambia Feb. 25, 2022) (Mulenga, J), slip op. at J2, and J24–25 (citing a Tillman-authored publication), https://media.zambialii.org/files/judgments/zmcc/2022/4/2022-zmcc-4.pdf; Luke Beck, *When Is an Office or Public Trust 'Under the Commonwealth' for the Purposes of the Religious Tests Clause of the Australian Constitution?*, 41(1) Monash U. L. Rev. 17, 35 n.76 (2015) (Austl.) (peer review) (citing Tillman-authored publications).

[16] *See, e.g.*, Rob van der Hulle, Focus, *De verkiesbaarheid van Donald Trump*, Nederlands Juristenblad 22, 27 n.32, 28 n.45 (Jan. 5, 2024) (citing a Tillman co-authored publication), https://www.njb.nl/media/ah3nvnj1/njb01_de-verkiesbaarheid-van-donald-trump.pdf; Shigemoto Suzuki, *Law and politics on judicial supremacy—Based on the Debate in the United States*, 74(4–6) Hokkaido University Law Review 269, 273 n.16 (2024) (peer review) (citing a Tillman-authored publication in an article published in Japanese),

[9] I have also participated as an amicus or co-amicus in over 35 briefs and motions, in federal and state courts, in both civil[17] and criminal cases.[18] While in private practice, I submitted declarations on behalf of clients. As an amicus, I submitted one declaration in a prior judicial proceeding.[19]

[10] My publications and amicus briefs have been cited by domestic and foreign courts of record, justices and judges,[20] by named parties in litigation,[21] by other amicus

---

https://eprints.lib.hokudai.ac.jp/dspace/bitstream/2115/91455/1/lawreview_74_4%E3%83%BB5%E3%83%BB6_all.pdf.

[17] *See, e.g.*, Brief Submitted for Professor Seth Barrett Tillman as Amicus Curiae in Support of Petitioner, Trump v. Anderson, 601 U.S. 100 (2024) (No. 23-719) (brief filed Jan. 9, 2024) (cited 23 times), 2024 WL 184282, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/23-719.html.

[18] *See, e.g.*, Brief of Professor Seth Barrett Tillman et al. as Amici Curiae in Support of Defendant Trump's Motion to Dismiss the Indictment, United States of America v. Trump, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) (Crim. No. 9:23-cr-80101-AMC-BER) (brief filed Mar. 21, 2024), ECF No. 410 (citied 15 times), 2024 WL 1214430, https://ssrn.com/abstract=4755563.

[19] *See* Declaration of Seth Barrett Tillman, Lecturer (Exhibit D), *in Amicus Curiae* Scholar Seth Barrett Tillman's and Proposed *Amicus Curiae* Judicial Education Project's Response to *Amici Curiae* by Certain Legal Historians, Citizens for Responsibility and Ethics in Washington v. Trump, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (Civ. A. No. 1:17-cv-00458-GBD) (declaration filed Sept. 19, 2017), ECF No. 85-5 (cited 3 times), 2017 WL 7795997, https://ssrn.com/abstract=3037107.

[20] *See, e.g.*, *Citizens for Responsibility and Ethics in Washington v. Trump*, 971 F.3d 102, 111 n.16 (2d Cir. 2020) (Menashi, J., dissenting from denial of en banc review) (citing Tillman co-authored amicus appellate brief); *see also, e.g.*, *Anderson v. Griswold*, Civ. A. No. 2023CV32577, 2023 WL 7017745, at *9 (Dist. Ct., City and County of Denver, Colo. Oct. 25, 2023) (Wallace, J.) (citing Tillman co-authored publication); *accord id.*, 2023 WL 8006216, *43–46 (Dist. Ct., City and County of Denver, Colo. Nov. 17, 2023) (Wallace, J.) (holding that the President is neither an "officer of the United States" nor holds an "office under the United States" as those phrases are used in Section 3 of the Fourteenth Amendment), *rev'd*, 543 P.3d 283 (Colo. 2023) (per curiam), *rev'd*, *Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam); *Anderson*, 543 P.3d at 348, 351 & n.7, 356 (Samour, J., dissenting) (citing Tillman co-authored publication); *Senator Ivana Bacik & Ors v An Taoiseach, Ireland and the Attorney General* [2020] IEHC 313 [70] (High Court of Ireland) (Irvine, President Judge) (citing a Tillman-authored publication); *supra* note 15 (listing a decision of the Constitutional Court of Zambia citing a Tillman-authored publication); [Justice] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 113, 504, 563 (2012) (citing Tillman co-authored publication).

[21] *See, e.g.*, Government's Response to Professor Seth Barrett Tillman, et al., Amici Curiae Brief in Support of Donald J. Trump's Motion to Dismiss Based on the Appointment of the Special Counsel at 1, 3, 5–7, United States of America v. Donald J. Trump, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) (Crim. No. 9:23-80101-CR-CANNON) (brief filed Apr. 4, 2024 by Special Counsel Jack Smith), ECF No. 432 (responding to Tillman co-authored amicus brief),

filings,[22] in filings before quasi-judicial or executive or administrative bodies,[23] in filings by the United States Department of Justice and it officers[24] and by analogous state-level departments and their officers,[25] in Congressional Research Service and

---

2024 WL 1490604, https://tinyurl.com/3kju33w4; Opening Brief of Donald J. Trump at 50 n.115, Trump v. Bellows, 2024 WL 989060 (Superior Court, Kennebec County, Me. Jan. 17, 2024) (No. AP-24-01) (brief filed Jan. 8, 2024) (citing a Tillman co-authored amicus brief), 2024 WL 989427.

[22] *See, e.g.*, Brief of Amicus Curiae Landmark Legal Foundation in Support of Petitioner at 14, 15, Trump v. Anderson, 601 U.S. 100 (2024) (No. 23-719) (brief filed Jan. 11, 2024) (citing Tillman co-authored amicus brief and Tillman co-authored publication), 2024 WL 184284; Brief of Amicus Curiae by Certain Legal Historians on Behalf of Plaintiffs at 22 nn.81 & 82, Citizens for Responsibility and Ethics in Washington v. Donald J. Trump, in his official capacity as President of the United States of America (S.D.N.Y 2017) (Civ. A. No. 1:17-cv-00458-GBD) (brief filed Aug. 11, 2017), ECF No. 70-1 (citing Tillman co-authored amicus brief), 2017 WL 5483629.

[23] *See, e.g.*, President Donald J. Trump's Hearing Brief at 12 n.3, *In re*: Challenge to Primary Nomination Petition of Donald J. Trump, Republican Candidate for President of the United States (Me., Dep't of the Sec. of State 2023) (brief filed Dec. 14, 2023) (citing multiple Tillman co-authored publications) (on file with Maine's Secretary of State); President Donald J. Trump's Closing Argument Brief at 20, 22, *In re*: Challenge to Primary Nomination Petition of Donald J. Trump, Republican Candidate for President of the United States (Me., Dep't of the Sec. of State 2023) (brief filed Dec. 19, 2023) (citing a Tillman co-authored Colorado Supreme Court amicus brief) (on file with Maine's Secretary of State); *see also* Motion to Dismiss Objectors' Petition at 15 n.9, Steven Daniel Anderson v. Trump, 24 SOEB GP 517 (Ill. State Bd. of Elections 2024) (brief filed Jan. 19, 2024) (citing Tillman co-authored publication), https://news.wttw.com/sites/default/files/article/file-attachments/Election_Board_Agenda_013024.pdf; *cf.* Environmental NGO Partners to the Environmental Law Implementation Group–Aarhus Submission at 31 n.43, 37, Irish Department of Environment, Community and Local Government (submission filed Sept. 26, 2014) (citing Tillman-authored publications).

[24] *See, e.g.*, Reply Brief for the Respondent at 10, Seila Law LLC v. Consumer Finan. Protection Bureau, 591 U.S. 197 (2020) (No. 19-7) (brief filed Feb. 14, 2020 by Noel Francisco, Solicitor General) (citing Tillman-authored publication), 2020 WL 774433, https://www.justice.gov/brief/file/1249666/download.

[25] *See, e.g.*, State of West Virginia's Memorandum of Law in Support of its Motion to Dismiss at 14–15, Castro v. Secretary of State Andrew Warner and Donald John Trump (S.D. W. Va. 2023) (Civ. A. No. 2:23-cv-00598) (brief filed Oct. 12, 2023 by Patrick Morrisey, A.G.), ECF No. 44 (citing multiple Tillman-authored and Tillman co-authored publications), 2023 WL 7001813, https://ago.wv.gov/Documents/Motion%20to%20Dismiss.pdf.

other congressional documents,[26] in Ph.D. dissertations,[27] and in articles in academic and professional journals.[28]

[11] My amicus filings, and the debate and retractions associated with them, have even been considered newsworthy by newspapers of record.[29]

[12] I frequently write on constitutional law, Founding-era, Framing-era, and Early Republic-era history and legal history, and the original public mean of constitutional provisions.

[13] In preparation for this declaration, the primary publications, sources, and litigation-related documents I consulted included:

> Declaration of Jonathan Gienapp (filed Feb. 26, 2025).
>
> Deposition of Jonathan Gienapp (Apr. 4, 2025) (rough draft).
>
> Jonathan Gienapp, The Transformation of the American Constitution (2013) (unpublished Ph.D. dissertation, Johns Hopkins University Dep't of History) (on file with ProQuest Dissertations & Theses Global).
>
> Declaration of Jack N. Rakove (filed Feb. 26, 2025).
>
> Deposition of Jack N. Rakove (Apr. 4, 2025) (rough draft).

…

> *The Federalist 1787–1788* (New York, Heritage Press 1945).

---

[26] *See, e.g.*, T.J. Halstead, Cong. Research Serv., RL 33009, Recess Appointments: A Legal Overview CRS-11 n.74 (updated July 11, 2007) (citing multiple Tillman-authored publications), https://tinyurl.com/4cb2z45n.

[27] *See, e.g.*, [Professor] David Bradley Froomkin, Structuring Democracy 51 n.88, 243 (2024) (unpublished Ph.D. dissertation, Yale University Dep't of Political Science) (citing Tillman-authored publication) (on file with author); Vipat Rujipavesana, The Role of the Court of Justice in Protecting the Rights and Liberties of the People Due to the Coup 213 n.8, 215 n.11, 273 (2022) (unpublished Ph.D. dissertation, Thammasat University Dep't of Justice Administration, Bangkok, Thailand) (citing Tillman-authored publication), http://ethesisarchive.library.tu.ac.th/thesis/2022/TU_2022_6001305090_17590_27112.pdf.

[28] *See, e.g.*, Rachel A. Shelden, *The* Griffin's Case *Phenomenon and the Problem of Historical Knowledge in Legal Arguments*, 33 Wm. & Mary Bill Rts. J. 397, 399 n.12, 403 n.34 (2024) (citing Tillman co-authored amicus brief and publications); Kyle L. Greene, *National Security Rules: America's Constitution of Law and War*, 73 Maine L. Rev. 271, 294 n.131 (2021) (citing a Tillman-authored publication); *supra* notes 14–16 (collecting authority).

[29] *See, e.g.*, Adam Liptak, *'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal Storm*, N.Y. Times, Sept. 26, 2017, Section A, page 17 (discussing Tillman co-authored amicus filings and publications), https://www.nytimes.com/2017/09/25/us/politics/trump-emoluments-clause-alexander-hamilton.html?mtrref=Undefined.

Akhil Amar, *America's Constitution: A Biography* (Random House Trade Paperbacks 2006).

F.H. Buckley, *The Republic of Virtue* (Encounter Books 2017).

Josh Chafetz, *Democracy's Privileged Few* (Yale University Press 2007).

Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* (Da Capo Press 1971) (1943).

Paul Einzig, *The Control of the Purse* (London, Secker & Warburg 1959).

…

Seth Barrett Tillman, Opening Statement, Citizens United *and the Scope of Professor Teachout's Anti-Corruption Principle*, 107 Nw. U. L. Rev. 399–421 (2012), https://ssrn.com/abstract=2182078.

Seth Barrett Tillman, Closing Statement, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. U. L. Rev. Colloquy 180–208 (April 2, 2013), https://ssrn.com/abstract=2012803.

Seth Barrett Tillman, *Why Professor Lessig's "Dependence Corruption" Is Not a Founding-Era Concept*, 13(2) Election L.J. 336–45 (June 2014) (peer review), https://ssrn.com/abstract=2342945.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part I: An Introduction*, 61(3) S. Tex. L. Rev. 309–19 (2021), https://ssrn.com/abstract=3890400.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part II: The Four Approaches*, 61(3) S. Tex. L. Rev. 321–429 (2021), https://ssrn.com/abstract=4021548.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part III: The Appointments, Impeachment, Commissions, and Oath or Affirmation Clauses*, 62(4) S. Tex. L. Rev. 349–454 (2023), https://ssrn.com/abstract=4432164.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part IV: The "Office . . . under the United States" Drafting Convention*, 62(4) S. Tex. L. Rev. 455–532 (2023), https://ssrn.com/abstract=4432246.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part V: The Elector Incompatibility, Impeachment Disqualification, Incompatibility, and Foreign Emoluments Clauses*, 63(3) S. Tex. L. Rev. 237–425 (2024), https://ssrn.com/abstract=4527680.

Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part VI: The Ineligibility Clause*, 64(3) S. Tex. L. Rev. 209–56 (forth. circa May 2025), https://ssrn.com/abstract=5198712 (final version available on SSRN).

[14] I have not asked for, negotiated, received, or accepted any fee, emoluments, or any other compensation for my participating in the instant litigation.[30] Should my future participation in this litigation incur any significant out-of-pocket expenses, at that juncture, I will ask plaintiffs to cover my expenses. To date, I have incurred no such expenses.

[15] I have been asked: [i] to opine on the concept of "corruption" as it was used circa 1787–1788 when the original Constitution was drafted by the members of the Constitutional Convention, debated by the public, and ratified by state conventions, and [ii] to expound on my views as to how useful the concept of corruption is in regard to understanding the Constitution today. I have had more than one occasion in the past to opine on these and closely related issues, and I have done so in publications prior to Trump-47 and prior to Trump-45.[31] My view is that discussion of the concept corruption, albeit useful in understanding the broad motivations of members of the Constitutional Convention and their contemporaries, is not useful in regard to understanding the contours or meaning of specific constitutional provisions. Indeed, a corruption-focused discourse is likely to confuse the substantive issues and lead the fair-minded judge or interpreter astray.

[16] To be sure, I am not commenting on the discussion of corruption in *Buckley v. Valeo*, 424 U.S. 1 (1976) and its progeny. My discussion relates to whether Founding-era, Framing-era, and Early Republic-era discussions of corruption are useful in order to understand the specific language and original public meaning of the original Constitution's provisions. Modern understandings of corruption and how those modern understandings of corruption should be used to interpret the Constitution is a different

---

[30] *See* Complaint, Dinner Table Action v. Schneider, Civ. A. No. 1:24-cv-00430-KFW (D. Me. 2023).

[31] *See, e.g.*, Seth Barrett Tillman, *Why Professor Lessig's "Dependence Corruption" Is Not a Founding-Era Concept*, 13(2) Election L.J. 336 (June 2014) (peer review) (cited 15 times), https://ssrn.com/abstract=2342945; Seth Barrett Tillman, Opening Statement, Citizens United *and the Scope of Professor Teachout's Anti-Corruption Principle*, 107 Nw. U. L. Rev. 399 (2012) (cited 80 times), https://ssrn.com/abstract=2182078; Seth Barrett Tillman, Closing Statement, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. U. L. Rev. Colloquy 180 (2013) (cited 63 times), https://ssrn.com/abstract=2012803.

set of issues. Certainly, Founding-era, Framing-era, and Early Republic-era discussions of corruption may inform modern understandings. Although the two issues (that is, 18th century understandings and modern understandings) are related, they are not the same.

[17] In 2009, in *Cornell Law Review*, Professor Zephyr Teachout published *The Anti-Corruption Principle*,[32] and in 2011, Professor Lawrence Lessig published a book: *Republic Lost: How Money Corrupts Congress—And a Plan to Stop it*.[33] These publications were enormously influential: they were cited in a partial concurrence/partial dissent by Justice Stevens,[34] and in a separate concurrence by Justice Scalia,[35] in decisions by courts of record, in briefs, and in 100s of books and academic articles. Both publications discussed debates in the Constitutional Convention where limiting corruption was the order of the day, and both publications also discussed constitutional provisions which were intended to limit corruption. Both publications focused on the Foreign Emoluments Clause as *a* (if not *the*) lead constitutional provision whose purpose was to limit corruption involving elected United States officials—such as the President and members of Congress. According to Teachout and Lessig, these convention debates and constitutional provisions illustrated the Framers' and ratifiers' deep purpose to limit corruption among the leading officials of the new government created by the Constitution of 1788. Teachout and Lessig were not alone or the first to take the position that the Foreign Emoluments Clause applied to the Presidency: the

---

[32] *See, e.g.*, Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 361–66 (2009).

[33] *See, e.g.*, Lawrence Lessig, *How Money Corrupts Congress—And a Plan to Stop it* 18 (2011).

[34] *See Citizens United v. FEC*, 130 S. Ct. 876, 929, 948 n.51, 963–4 (2010) (Stevens, J., concurring in part and dissenting in part) (citing Teachout's *Anti-Corruption Principle* favorably).

[35] *See id.* at 925, 928 (Scalia, J., concurring) (citing Teachout's *Anti-Corruption Principle* unfavorably). Scalia would repeat this point in private correspondence with me. I reproduced that correspondence posthumously on my blog. *See* Seth Barrett Tillman, *How Seth Barrett Tillman Has From Time To Time Been The Recipient Of Undeserved Goodwill For Being Irish*, The New Reform Club (May 10, 2017, 6:12 AM), http://tinyurl.com/kd5v2wo (Scalia to Tillman (Mar. 30, 2012): "I applaud[] your responses to [Professor] Teachout. With respect to the question of what constitutes an 'Office,' I find it alone enough to carry the point that other constitutional provisions plainly exclude from that term the Members of Congress.").

Office of Legal Counsel also has taken that position.[36] As I explain below, the oddity of these discussions involving the Foreign Emoluments Clause is that they uniformly failed to cite pre-Jackson historical precedents or to discuss the clause's specific text.

[18] As I understand their position, Teachout and Lessig argue that the Framers' and ratifiers' abstract anti-corruption concern was the purpose behind and effected the meaning and scope of the Foreign Emoluments Clause. This purpose becomes a rationale or free-standing interpretive position of constitutional dimension supporting the constitutionality of statutes aimed at limiting the role of money in politics, including campaign contributions. Indeed, Teachout has argued that the Framers were "obsessed" with corruption. My own view is that this is an oversimplification: corruption was just one of many policy concerns which occupied Framers', ratifiers', and the wider public's political mind and imagination.

[19] My view is that the second step in the Teachout-Lessig framework, per [18], *supra*, is undercut because the first step, per [17], *supra*, is in not supportable as a matter of original public meaning. Although it is contestable, the better view is that the text of the Foreign Emoluments Clause applies only to *appointed* or *subordinate* federal officers, and it does not apply either to any *elected* or *apex* federal officials or to any (elected or appointed) state officials or officers. (Generally, a position is an apex position if it is not subject to appointment and removal in the ordinary course of its duties, and if its decisions are not subject to reversal in the ordinary course of its duties—or, if it presides over a branch or department of the constitutionally-established government, e.g., the Vice President presides over the Senate.)

[20] The Foreign Emoluments Clause states: "[N]o Person holding any Office of Profit or Trust under them [i.e., the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." This provision covers those holding an "office

---

[36] *See* Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, O.L.C., 2009 WL 6365082, at *4 (2009) (prelim. print) (Acting Assistant Attorney General David J. Barron announcing in *ipse dixit* that "[t]he President surely 'hold[s] an[] Office of Profit or Trust' . . . ." (quoting U.S. Const. art. I, § 9, cl. 8)).

. . . under the United States." Positions that are not offices . . . under the United States" are not covered by the clause. The clause has metes and bounds; indeed, the Foreign Emoluments Clause's scope is less than the scope of the Religious Test Clause, which extends to any "office or *public trust* under the United States." U.S. Const. art. VI, cl. 3 (emphasis added). The question for the fair-minded interpreter who is aiming to determine the Foreign Emoluments Clause's original public meaning is to understand the provision's "Office . . . under the United States"-language.

[21] Does the Foreign Emoluments Clause's "Office . . . under the United States"-language extend to members of Congress? Neither Lessig in his 2011 book, nor Teachout in her 2009 *Cornell Law Review* article offers any affirmative support for the proposition that the provision covers members of Congress. It appears that prior to my publications they had not actively considered the issue. Contra their unsupported assumption that the clause extends to members of Congress is the plain text of the Constitution. For example, the Electoral Incompatibility Clause states: "[N]o Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. Const. art. II, § 1, cl. 2. This provision lists "Office[s] . . . under the United States," and it separately lists the positions of Senator and Representative as distinct. One might suggest that the provision's general "Office . . . under the United States"-language includes the positions of Senator and Representative, and that this provision lists the latter positions (that is, Senator and Representative) to be redundant. But if redundancy was necessary for this provision, then we are left wondering: Why other constitutional provisions, such as the Foreign Emoluments Clause, do not also expressly include Senators and Representatives in a similar fashion? The simpler view, the better view, applying Occam's Razor, is that Senators and Representatives were listed in the Elector Incompatibility Clause precisely because these *elected* or *apex* positions are not covered by the Constitution's "Office . . . under the United States"-language. And if that is the case, then the Foreign Emoluments Clause does not apply to members of Congress. Likewise, the Incompatibility Clause states: "[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." U.S. Const. art. I, § 6, cl. 2. Again, if the position of Senator or Representative (that is, a "Member of

either House") is properly characterized as an "Office under the United States," then this provision states: "No Senator or Representative shall be a member of either House," and plainly, that cannot be correct. Here too, the simpler view, the better view, applying Occam's Razor, is that in 1788, the phrase "Office . . . under the United States" simply did not reach members of Congress.[37]

[22] Early historical practice during the administration of President George Washington aligns with the view that the phrase "Office . . . under the United States" does not extend to members of Congress. For example, in 1792, the Senate ordered Secretary of the Treasury Alexander Hamilton to draft a financial statement listing "*every* person holding *any* civil office or employment under the United States" and their compensation.[38] Hamilton took more than nine months to draft a response. His 1793 response was some ninety manuscript-sized pages. In that response, Hamilton included *appointed* or *subordinate* legislative branch officers and other personnel, e.g., the

---

[37] In discussing the Incompatibility Clause, Professor Buckley has written:

> The goal was to prevent the kind of corruption that the delegates [to the Constitutional Convention] saw in the British government, where the king could build a group of supporters in Parliament with the promise of lucrative executive offices. The principal effect of the Incompatibility Clause is to close the door to parliamentary government by making it impossible for a congressman to accept a cabinet position *or serve as President at the same time.*

F.H. Buckley, The Republic of Virtue 72 (2017) (italics added) (underscore added) (footnote omitted). The underscored language is entirely correct, and it is supported by Buckley's citations. *Id.* at 222 n.4. By contrast, the italicized language is not supported by Buckley's citations. This illustrates that the term "corruption" is amorphous, and this vessel can be filled with any idea or ideal that the reader already agrees with (or can be persuaded to agree to). *See generally* Seth Barrett Tillman & Steven G. Calabresi, Debate, *The Great Divorce: The Current Understanding of Separation of Powers and the Original Meaning of the Incompatibility Clause*, 157 U. Penn. L. Rev. PENNumbra 134, 135–40, 141–45, 146–53, 154–59 (2008) (cited 44 times), http://ssrn.com/abstract=1292359. To be sure, I do not doubt that many other modern commentators agree with Professor Buckley. *See also supra* note 36 (quoting Office of Legal Counsel memorandum).

[38] *See* 1 Journal of the Senate of the United States of America 441 (Washington, Gales & Seaton 1820) (reproducing the Senate's May 7, 1792 entry and order) (emphases added); Alexander Hamilton, *Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the United States* (Feb. 26, 1793), *in* 14 Papers of Alexander Hamilton 157, 157–59 (Harold C. Syrett & Jacob E. Cooke eds., 1969) (reproducing Hamilton's 1793 response to the Senate's order). *See generally* Tillman, Opening Statement, Citizens United *and the Scope of Professor Teachout's Anti-Corruption Principle*, *supra* note 31, at 414–15.

Secretary of the Senate and the Clerk of the House,[39] but he did not list the members of Congress and their compensation. (Unlike *appointed* or *subordinate* officers, members of Congress are better characterized as *elected* or *apex* officials.) By contrast, on other occasions, a house of Congress requested that Hamilton report on the nation's financial information, but those requests did not use any limiting "Office . . . under the United States"-language. In those documents, Hamilton reported the "Civil List," and under that heading, Hamilton included members of Congress and their compensation.[40] In short, when the language of *Office . . . under the United States* was used, Hamilton and the Treasury gave every indication that that language did not extend to members of Congress.

[23] This view was not unique to Secretary Hamilton. There is good reason to believe that this was also Congress's view. In 1790, Congress enacted an anti-bribery statute; it was signed by President Washington. The statute declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold *any office of honor, trust, or profit under the United States*."[41] This language is at least as wide as the "Office of trust or profit under" the United States-language in the Foreign Emoluments Clause. If this statute's "office . . . under the United States"-language extends to members of Congress, then this anti-bribery statute purports to add a new qualification for members

[39] *See also, e.g.*, Tench Coxe, An Examination of the Constitution for the United States of America 13 (Philadelphia, Zachariah Poulson 1788) ("The house of representatives is not, as the senate, to have a president chosen for them from without their body, but are to *elect* their speaker from their own number—They will also *appoint t* all their other officers." (emphases added)).

[40] *See* H.R. Journal, 1st Cong., 1st Sess. 113 (Sept. 17, 1789) (that the Secretary of the Treasury report the expenses "of the civil list, and of the Department of War"); Report on the Estimate of the Expenditure for the Civil List and the War Department to the End of the Present Year (Sept. 19, 1789), Founders Online, https://founders.archives.gov/documents/Hamilton/01-05-02-0162-0001 [https://perma.cc/EY2C-867F]. The President and Vice President were also included in the Civil List.

[41] Act of Apr. 30, 1790, ch. 9, § 21, 1 Stat. 112, 117 (emphasis added); *id.* at 119 (signed by President Washington on April 30, 1790). The 1790 anti-bribery statute was hardly unique. *See De Veau v. Braisted*, 363 U.S. 144, 158–59 (1960) (Frankfurter, J., plurality opinion) ("Barring convicted felons from certain employments is a familiar legislative device to insure against corruption in specified, vital areas. Federal law has frequently and of old utilized this type of disqualification. . . . In addition, a large group of federal statutes disqualify persons 'from holding any office . . . under the United States' because of their conviction of certain crimes, generally involving official misconduct.").

of Congress. However, Congress does not have the power to add, by statute, new qualifications for members of Congress. In *Federalist No. 60*, Hamilton wrote, "The qualifications of the persons who may choose or be chosen [for Congress], as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the [national] legislature."[42] The better view, the simpler view, applying Occam's Razor, is not that Congress passed an unconstitutional statute, but that the statute's "Office"-language simply does not reach members of Congress. And if the "Office"-language in the statute does not reach members of Congress, than that is a substantial reason to believe that the Foreign Emoluments Clause's "Office"-language does not reach members of Congress. *See Powell v. McCormack*, 395 U.S. 486 (1969) (holding that Congress cannot create new qualifications for members of Congress); *see also US Term Limits, Inc. v. Thornton*, 514 US 779 (1995) (holding that States cannot impose new qualifications for members of Congress).

[24] Indeed, the position that the Constitution's "Office"-language does not extend to members of Congress is so overwhelming that Professor Akhil and Professor Vikram Amar would state:

> Article VI explicitly distinguishes between "Members of the several State Legislatures," on the one hand, and "executive and judicial Officers . . . of the several States" on the other. So too, it distinguishes "Senators and Representatives" from "Officers . . . of the United States." This carefully chosen language strongly reinforces the Constitution's *global officer/legislator distinction.*

Akhil Reed Amar & Vikram David Amar, *Is the Presidential Succession Law Constitutional?*, 48 Stan. L. Rev. 113, 117 (1995) (emphasis added); *id.* at 117 n.28 (explaining that the global officer/legislator distinction also extends to Section 3 of the

---

[42] *Federalist No. 60* (1788) (Hamilton). Madison took the same position at the Constitutional Convention. Madison stated:

> Mr <Madison> was opposed to the Section as vesting an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution.

James Madison, *Notes*, *in* 2 The Records of the Federal Convention of 1787, at 249–50 (Max Farrand ed., 1911) (reproducing August 10, 1787 entry).

Fourteenth Amendment); *see also* Josh Chafetz, Democracy's Privileged Few 280 n.68 (Yale University Press 2007). Finally, Kenneth Bowling, a leading period historian, explained: "In [Alexander] Hamilton's day . . . Office under the United States did not extend to elected officials."[43]

[25] Indeed, the predecessor of the Constitution of 1788's Foreign Emoluments Clause was a coordinate Foreign Emoluments Clause in the Articles of Confederation (1781). Article VI of the Articles of Confederation provided: "[N]or shall any person holding any office of profit or trust under the United States, or any of them [i.e., any State], accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State . . . ." Although Articles of Confederation provision is similar to the 1788 Constitution's Foreign Emoluments Clause, the two provisions are not identical. First, the earlier confederation provision precluded holders of "office . . . under the United States" and holders of "office . . . under . . . any . . . [State]" from accepting gifts from foreign governments. By contrast, the Foreign Emoluments Clause of 1788 only restricts those holding an "Office . . . under [the United States]" from accepting gifts from foreign governments. Second, the Article VI provision of the Articles of Confederation, on its face, appears to be a mandatory provision not subject to congressional control or waiver. By contrast, the Foreign Emoluments Clause expressly permits covered federal officers to accept foreign government gifts if Congress consents. Contra Teachout, if the Framers had been "obsessed" by the potential for foreign corruption vis-à-vis *elected* or *apex* federal officials, then they would have made use of the more expansive language from the already extant Article VI of the Articles. They did not. Instead, the modern clause represents a reform and a significant relaxation of the strictures of the older clause. Article VI precluded holders of offices under any State from receiving gifts from foreign governments, not so the modern (that is, the Constitution of 1788's) Foreign Emoluments Clause. Moreover, the Foreign Emoluments Clause's exclusion of state officials from its scope is no small thing. In 1788 (and, to some lesser extent, today) state officials had (and have)

[43] Declaration of Professor Kenneth R. Bowling, Ph.D. (Exhibit H) at 4, Citizens for Responsibility and Ethics in Washington v. Donald J. Trump, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (Civ. A. No. 1:17-cv-00458-GBD) (filed Sept. 19, 2017), ECF No. 85-9.

significant powers over the federal government. For example, state legislatures had the power to directly choose presidential electors, and some state legislatures exercised that power. Likewise, state legislatures chose United States Senators (state governors now exercise a similar power, subject to state law, in the event of a Senate vacancy). State legislatures call Article V national conventions, and state legislatures ratify proposed federal constitutional amendments, when that power is not vested in state conventions. To put it a different way, one can freely admit at a certain abstract level of analysis that the purpose of the Foreign Emoluments Clause was to limit corruption. But the actual provision, on its face, did not limit corruption vis-à-vis *all* federal officials or vis-à-vis *any* state officials. The Constitution's Foreign Emoluments Clause's corruption-related effects were attenuated in comparison with its predecessor under the Articles of Confederation. Our Foreign Emoluments Clause, from 1788, did not extend to members of Congress or to any state positions. If that is correct, then I do not believe that the Framers' and ratifiers' more abstract corruption-related concerns, untethered to the Foreign Emoluments Clause or to other constitutional text, can supply a rationale or a free-standing interpretative principle permitting, rationalizing, or justifying the regulation of otherwise protected political speech or association.

[26] Does the Foreign Emoluments Clause's "Office . . . under the United States"-language extend to the presidency? Again, although it is contestable, the better view is that the text of the Foreign Emoluments Clause applies only to *appointed* or *subordinate* federal officers, not to any *elected* or *apex* federal or state officials. Many of the arguments made above, which illustrated that the Foreign Emoluments Clause does not apply to members of Congress also go far to establish that the clause's "Office . . . under the United States"-language does not reach the presidency.

[27] Again, Professor Bowling, a leading period historian, explained: "In [Alexander] Hamilton's day . . . Office under the United States did not extend to elected officials."[44] The presidency is an *elected* (or *apex*) position, not an *appointed* (or *subordinate*) one. *See* U.S. Const. art. II, *amended by id.* amend. XII. Again, in 1790, Congress enacted an anti-bribery statute; it was signed by President Washington. The statute declared that

[44] *See supra* note 43 (quoting Kenneth Bowling).

a defendant convicted of bribing a federal judge "shall forever be disqualified to hold *any office of honor, trust, or profit under the United States*."[45] Just as this statute cannot create a new qualification for members of Congress, Congress cannot create new qualifications for the presidency. The principles announced in *Federalist No. 60*, *Powell v. McCormack*, and *US Term Limits, Inc. v. Thornton* apply equally to all elected federal positions. As Chief Judge Posner explained:

> The democratic presumption is that any adult member of the polity . . . is eligible to run for office . . . . The requirement in the U.S. Constitution that the President be at least 35 years old and Senators at least 30 is unusual and reflects the felt importance of mature judgment to the effective discharge of the duties of these important offices; nor . . . may Congress or the states supplement these requirements.[46]

The list of other federal courts, state courts, and academic authority announcing the same position is lengthy.[47]

[28] Again, in 1792, the Senate ordered Secretary of the Treasury Alexander Hamilton to draft a financial statement listing "*every* person holding *any* civil office or employment under the United States" and their salaries.[48] Hamilton took more than nine months to draft a response. His 1793 response was some ninety manuscript-sized pages. In that response, Hamilton included *appointed* or *subordinate* officers and other personnel in each of three branches, e.g., the Secretary of the Senate and the Clerk of the House,[49] cabinet members, and clerks of the federal courts, but he did not list: the President and his compensation, and the Vice President and his compensation. (Unlike *appointed* or *subordinate* officers, the President and Vice President are better characterized as *elected* or *apex* officials.) By contrast, on other occasions, a house of Congress requested that Hamilton report on the nation's financial information, but those

---

[45] *See supra* note 41 (citing 1790 statute and related authority).

[46] Herman v. Local 1011, United Steelworkers of Am., AFL-CIO, CLC, 207 F.3d 924, 925 (7th Cir. 2000) (Posner, C.J.) (citing *Powell v. McCormack* and *U.S. Term Limits, Inc. v. Thornton*); *see also* Derek T. Muller, *Scrutinizing Federal Electoral Qualifications*, 90 Ind. L.J. 559, 564, 571 (2015).

[47] *See* Tillman, *Who Can Be President of the United States?*, *supra* note 3, at 114 & n.57, 115 & nn.58 & 59 (collecting authority).

[48] *See supra* note 38 (collecting authority).

[49] *See also supra* note 39 (quoting Tench Coxe).

requests did not use any limiting "Office . . . under the United States"-language. In those documents, Hamilton reported the "Civil List," which included the President, Vice President, and their compensation.[50] In short, when the language of *Office . . . under the United States* was used, Hamilton and the Treasury gave every indication that that language did not extend to the President, Vice President, and members of Congress. For these reasons, and others, I conclude that the Constitution of 1788's "Office . . . under the United States"-language extended to *appointed* or *subordinate* federal officers, and not to *elected* or *apex* federal officials, and not to any state positions.

[29] In 2023, Judge Wallace, presiding over a state trial court of record, held that the President is neither an "officer of the United States," nor holds an "office under the United States" as those phrases are used in Section 3 of the Fourteenth Amendment.[51] That decision remains good law.[52] Judge Wallace is not alone. In 1833, in his celebrated *Commentaries on the Constitution*, Justice Story announced a closely similar position in regard to the antebellum Constitution's "Office . . . under the United States"-language.[53] Likewise, David A. McKnight, a nineteenth century legal commentator, explained: "It is *obvious* that . . . the President is not regarded as 'an officer *of*, or *under*, the United States,' but as one branch of 'the Government.'"[54]

---

[50] *See* H.R. Journal, 1st Cong., 1st Sess. 113 (Sept. 17, 1789) (that the Secretary of the Treasury report the expenses "of the civil list, and of the Department of War"); Report on the Estimate of the Expenditure for the Civil List and the War Department to the End of the Present Year (Sept. 19, 1789), Founders Online, https://founders.archives.gov/documents/Hamilton/01-05-02-0162-0001 [https://perma.cc/EY2C-867F].

[51] *See* U.S. Const. amend. XIV (1868); *Anderson v. Griswold*, Civ. A. No. 2023CV32577, 2023 WL 8006216, *43–46 (Dist. Ct., City and County of Denver, Colo. Nov. 17, 2023) (Wallace, J.) (holding that the President is neither an "officer of the United States" nor holds an "office under the United States" as those phrases are used in Section 3 of the Fourteenth Amendment), *rev'd*, 543 P.3d 283 (Colo. 2023) (per curiam), *rev'd*, *Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam).

[52] *See* Seth Barrett Tillman, *The Law of the Case:* Trump v. Anderson, New Reform Club (Mar. 5, 2024, 2:37 AM), https://reformclub.blogspot.com/2024/03/the-law-of-case-trump-v-anderson.html.

[53] *See* 2 Joseph Story, Commentaries on the Constitution of the United States § 791, at 259–60 (Boston, Hilliard, Gray, & Co. 1833).

[54] David A. McKnight, The Electoral System of the United States 346 (Philadelphia, J.B. Lippincott & Co. 1878) (emphases added).

[30] There is an additional reason to conclude that the Constitution's and the Foreign Emoluments Clause's "Office . . . under the United States"-language does not apply to the President. On December 22, 1791, the French ambassador to the United States, Jean-Baptiste, chevalier de Ternant, sent President George Washington a letter and a gift. The letter stated: "Permit me to present you with a new print of the [K]ing of the [F]rench—I shall feel a very great Satisfaction if you will consider that feeble mark of my lively and respectful attachment for your person, as worthy your kind acceptance."[55] President Washington replied the same day. He wrote:

> Philadelphia Decr 22nd 1791.
>
> Dear Sir,
>
> I *accept*, with great pleasure, the new and elegant print of the King of the French, which you have been so obliging as to send to me this morning as a mark of your attachment to my person. You will believe me, Sir, when I assure you, that I have a grateful and lively sense of the personal respect and friendship expressed in your favor which accompanied the Print, and that I am, with sentiments of sincere esteem and regard, Dear Sir, your most obedt Servt
>
> Go: Washington.[56]

Washington *accepted* the ambassador's gift (the print and its frame), he *kept* the gift, and he *never* asked for congressional consent to *accept* or to *keep* the gift. This gift was not one of *de minimis* value,[57] nor was it a gift from a close personal friend or relative

---

[55] *See* Letter from George Washington to Ambassador Ternant (Dec. 22, 1791), *in* 9 The Papers of George Washington 306 (Mark A. Mastromarino & Jack D. Warren, Jr., eds., 2000).

[56] *See* William Adair, *George Washington's Frames: A Study in Contrasts*, Picture Framing Magazine, June 1992, at 34, 34–35; Wendy Wick Reaves, *The Prints*, Antiques, Feb. 1989, at 502, 502–03; *Louis Seize, Roi de Français, Restaurateur de la Liberté, 1790*, George Washington's Mount Vernon: Estate, Museum & Gardens, https://emuseum.mountvernon.org/objects/1324/louis-seize-roi-des-francais-restaurateur-de-la-liberte (last visited April 21, 2025).

[57] *See* Declaration of William Adair (June 21, 2023), https://reason.com/wp-content/uploads/2024/07/2023-06-21-Adair.pdf [https://perma.cc/DC3H-JRW6]. Professor Josh Blackman, my regular co-author, and I asked Adair to provide an affidavit to summarize his scholarship, including studies of French archival materials, on which he had not yet published. *Id.* ¶ 15 ("Ambassador Ternant's [full-length] framed portrait print by Bervic of Louis XVI . . . is extremely valuable today and was very valuable in 1791 when Ambassador de Ternant gave the portrait, on behalf of France, to George Washington, President of the United States.") And Adair reached this conclusion "with a high degree of confidence." Adair estimated that in 1791, the frame "would have, at the very least, commanded a price in excess of $1000." *Id.* ¶ 17. This "value would be based on the quality of the frame's gold leaf and

of Washington's. *It was an official or diplomatic gift from a foreign ambassador to our head of state*.[58] Similarly, in 1790, President Washington received the main key to the Bastille, along with a picture of the Bastille, from the Marquis de Lafayette.[59] At the time, Lafayette was a French government official.[60] Here again, Washington kept LaFayette's gifts, but he never asked for congressional consent to accept or keep these gifts. These gifts were not considered personal gifts from friends. There were diplomatic or state gifts, and they were discussed in contemporaneous British and French administrative and diplomatic correspondence.[61] Moreover, these gifts were on public display for all to see.[62]

[31] Again, these gifts were on public display for all to see. I have yet to discover any contemporaneous record in the press, in Congress, in private correspondence, or

---

specialized re-carving of the gesso." *Id.* ¶ 21. $1000 was a significant amount of money. At this period of time, senior cabinet members' compensation, such as Jefferson as Secretary of State and Hamilton as Secretary of the Treasury, was $3500 per year. *See* 1 American State Papers: Miscellaneous 57, 57 (Walter Lowrie & Walter S. Franklin eds., Washington, Gales and Seaton 1834).

[58] *See* William B. Adair, *A Masterpiece of Artisanship*, Picture Framing Magazine, Aug. 2010, at 28, 28 (describing the print and frame as "an official diplomatic gift"); *id.* at 32 ("The history of this Royal Palace frame is clear, having been an official gift to Washington."); *cf. Gifts of State*, National Archives, http://tinyurl.com/7nk9cvs (last visited Mar. 4, 2012) ("[I]ndeed, every President since George Washington has received gifts of state.").

[59] *See* The Letters of Lafayette to Washington 1777–1799, at 347, 348 (Louis Gottschalk ed., 1976) (reproducing March 17, 1790 letter stating: "Give me leave, my dear General, to present you with a picture of the Bastille just as it looked a few days after I had ordered its demolition, with the main kea [sic] of that fortress of despotism . . . ."); *Extract of a Letter from a Gentleman in Barbadoes to His Friend in Philadelphia* (July 20, 1790), *in* Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790, at 2, https://reason.com/wp-content/uploads/2023/01/1790-08-12-Fed-Gazette-Phila-Daily-Advertiser.pdf [https://perma.cc/KMD3-3QUE]; *America, New-York, August 10*, Pa. Packet, & Daily Advertiser, Aug. 13, 1790, at 2, https://reason.com/wp-content/uploads/2023/01/1790-08-13-Pa-Packet-Daily-Advertiser.pdf [https://perma.cc/8CK6-BBEQ].

[60] *See, e.g.*, André Maurois, Adrienne: The Life of the Marquise de La Fayette 178–82 (Gerard Hopkins trans., 1961) [https://perma.cc/L4LG-VY53]; An Officer in the Late Army, A Complete History Of The Marquis De Lafayette 193–94 (New York, Robert Lowry 1826), https://archive.org/details/completehistoryo00lowr/page/192/mode/2up.

[61] Seth Barrett Tillman & Josh Blackman, *Offices and Officers of the Constitution, Part V: The Elector Incompatibility, Impeachment Disqualification, Incompatibility, and Foreign Emoluments Clauses*, 63 S. Tex. L. Rev. 237, 310–13 (2024) (cited 1 time), https://ssrn.com/abstract=4527680 (discussing administrative and diplomatic correspondence).

[62] *Id.*

anywhere else indicating that Washington's accepting these gifts amounted to a constitutional wrong or a violation of the Foreign Emoluments Clause. The First and Second Congress had 33 and 37 anti-administration Representatives and Senators.[63] If the Foreign Emoluments was understood in the 1790s as applying to the President, then the members of this anti-administration faction surely had the ability to raise their voices and to be heard. But they did not do so.

[32] Historical practices arising in connection with President Washington and his administration are generally considered good evidence of the Constitution's original pubic meaning and superior to that of evidence arising in connection with later administrations. Why? First, Washington's administration was contemporaneous with the Constitution's ratification. Second, the President was a Framer and his cabinet (and administration) contained other prominent Framers and ratifiers. Indeed, between the President and his nine cabinet members (over the course of two terms), half of the group were either Framers or ratifiers or both. Third, the President saw himself above party or faction; indeed, active partisan federal electoral politics did not arise until after Washington announced that he would not run for a third term. Fourth, Washington both valued his reputation for probity and acted under the assumption that his conduct was closely monitored by political opponents and opportunists. Fifth, Washington understood that his personal and his administration's conduct were precedent-setting in regard not only to significant deeds, but even in regard to what might appear to be minor events and conduct.[64] As Professor Akhil Amar explained: "Washington defined the archetypical presidential role," and "[a]s America's first 'first man,' [he] set precedents from his earliest moments on the job." Amar added, "constitutional understandings that crystallized during the Washington administration have enjoyed special authority on a wide range of issues, especially those concerning presidential power and presidential etiquette."[65]

---

[63] *See* Biographical Directory of the United States Congress, https://bioguide.congress.gov/search.

[64] *See* Tillman, *Who Can Be President of the United States?*, *supra* note 3, at 105–08.

[65] Akhil Reed Amar, America's Unwritten Constitution: The Precedents and Principles We Live By 290, 307, 309 (2012); *see also* Martin S. Lederman, *Of Spies, Saboteurs, and Enemy*

[33] Again, I have yet to discover any *contemporaneous* record in the press, in Congress, in private correspondence, or anywhere else indicating that Washington's accepting these gifts amounted to a constitutional wrong or a violation of the Foreign Emoluments Clause. Moreover, I have found no *subsequent* antebellum record by any Justice, Judge, lawyer, historian, political scientist, academic, journalist, or anyone else—writing in public or in private—suggesting that Washington's public conduct in regard to these diplomatic or state gifts violated the Constitution or the Foreign Emoluments Clause. Indeed, as far as I know, no such critique of Washington's conduct emerged until plaintiffs, their attorneys, and supporting amici began litigation (and began preparing for litigation) against Trump-45 asserting that President Trump's private commercial dealings violated the Foreign Emoluments Clause[66] and the Domestic (Presidential) Emoluments Clause.[67] Only then did efforts emerge to rewrite the historical past. The absence of any contemporaneous or antebellum critique of President Washington's conduct is a strong reason to believe that no one believed his conduct amounted to a constitutional wrong or a violation of the Foreign Emoluments Clause. Again, if that is correct, if the Foreign Emoluments Clause's "Office . . . under the United States"-language does not apply to the President and does not apply to members of Congress,[68] then I do not believe that the Framers' and ratifiers' more abstract corruption-related concerns, untethered to the Foreign Emoluments Clause or

---

*Accomplices*, 105 Geo. L.J. 1529, 1543 (2017) ("Washington's example [as President], in particular, has frequently been a touchstone for constitutional understandings.").

[66] *See* U.S. Const. art. I, § 9, cl. 8.

[67] *See* U.S. Const. art. II, § I, cl. 7.

[68] *See, e.g.*, Proceedings on the Impeachment of William Blount, A Senator of the United States from the State of Tennessee, for High Crimes and Misdemeanors 34 (Philadelphia, Joseph Gales 1799) (Rep. James A. Bayard Sr.: "The officers, properly speaking *under* the United States are all appointed . . . ." (emphasis added)); *id.* at 35 (Bayard: "Now it is clear that a Senator is not an officer under the Government. The Government consists of the President, the Senate and House of Representatives; and they who constitute the Government, cannot be said to be under it."); *see also, e.g.*, *Attorney General* ex rel. *Bashford v. Barstow*, 4 Wisc. 567, 652 (1855) (explaining that in the Senate's *Blount* trial proceedings, the Senate held that the Impeachment Clause's controlling "officer of the United States"-language "did not embrace members of the [S]enate, but *only* [embraced] *the subordinate civil officers* of the government who were appointed and commissioned by the president" (emphasis added) (reporting an attorney's argument)). *Elected* or *apex* positions in the federal government are not *subordinate* positions.

to other constitutional text, can supply a rationale or a free-standing interpretative principle permitting, rationalizing, or justifying the regulation of otherwise protected political speech or association.

[34] We might also ask: Do the anti-corruption concerns of the Framers and ratifiers, apart from constitutional text, supply a free-standing interpretive principle through which we could understand the Constitution? I believe the answer to this question is "no." Where there is genuine ambiguity in a constitutional provision, a fair-minded interpreter who is aiming to determine a clause's original public meaning can look to purpose, background assumptions, and policy concerns (such as limiting corruption) to determine the meaning and scope of a provision's text. But where there is no genuine ambiguity, the agreed text should control. Likewise, a fair-minded interpreter should not look to Framers' and ratifiers' purposes, background assumptions, and policy concerns to generate interpretive principles abstracted from constitutional text. Why? First, no one agreed to purpose, background assumptions, and policy concerns. What was agreed to was the Constitution's text. The Constitution nowhere uses the language of "corruption." Thus, our injecting "corruption" into the interpretive process risks displacing other purposes, background assumptions, and policy concerns which were in play in 1787–1788. Second, we should not confuse a widely shared policy concern (e.g., limiting corruption) with widespread agreement as to what that policy entails. I do not doubt that every member of the Constitutional Convention sought to limit corruption. Corruption-discourse was widespread in the 18th century, at the Constitutional Convention, and in public debate on the Constitution during 1787–1788. But a shared use of corruption-related language in political debate does not mean that the participants in that debate had any widely shared understanding of what corruption was, or what policies would effectively limit corruption, or what level of corruption (if any) should be risked to facilitate accomplishing *other* important and widely shared policy goals. It is precisely because such questions are, in my view, unanswerable that our understanding of the law of the Constitution should be tethered to constitutional text. Finally, "corruption" is an amorphous term, as is "virtue" or the "common good." In my opinion, the idea that specific substantial legal issues should be decided by reference to such amorphous terms, abstracted from constitutional text, is fundamentally unsound.

[35] Corruption in the form of *quid-pro-quo* bribery is relatively easy to identify. When an elected official solicits or accepts a bribe in the form of cash or property for performing or promising to perform some public act (or some inaction), all the benefits flow to the recipient, and none to the public. The transaction is usually hidden from public view, and the money or property may be secreted in a closet or under an assumed name or false identity. And the recipient is unlikely to pay taxes on his "earnings." Perhaps, this relative ease in regard to identifying such transactions is one reason why this wrong, that is, *quid-pro-quo* bribery, is among the three charges which will support a conviction under the Constitution's Impeachment Clause.[69] By contrast where a public official trades an official action for another public act, it is much less clear if the public official's conduct is a bribe or corrupt. On *Lawfare*, my co-author and I wrote:

> Judge Frank Easterbrook stated this principle in even stronger terms regarding the conviction and sentencing of Illinois Governor Rod Blagojevich, who offered to appoint Valerie Jarrett, a close associate of President-elect Obama, to a vacant U.S. Senate seat, in exchange for Blagojevich's receiving an appointment to the Obama cabinet. Blagojevich was convicted on multiple counts. On appeal, in *U.S. v. Blagojevich* (2015), the U.S. Court of Appeals for the Seventh Circuit found that particular counts of his conviction could not stand. Judge Easterbrook explained that "a proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a **private** payment." He added that "[g]overnance would hardly be possible without" political log-rolling, "which allow[s] each public official to achieve more of his principal objective while surrendering something about which he cares less, but the other politician cares more strongly."
>
> Thus, according to Easterbrook, in such circumstances, even mixed motives are irrelevant. Such acts are presumptively lawful, and should not be investigated, let alone be considered for indictment or impeachment. If there is any evidence that there was some sort of secret benefit (such as a suitcase full of cash), then the government can investigate and, if warranted, prosecute that additional act. The secretness of the benefit is evidence of corrupt intent. Where one public official act is traded for another public official act, there has not been any illegal conduct.

---

[69] *See* U.S. Const. art. II, § 4 ("The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, *Treason, Bribery, or other high Crimes and Misdemeanors*." (emphasis added)).

> We can think of one high-profile and far more brazen effort by a president to improve his party's prospects through the use of official communications. In 1864, during the height of the Civil War, President Lincoln encouraged Gen. William Tecumseh Sherman to allow soldiers in the field to return to Indiana to vote. What was *his* primary motivation? It was to make sure that the government of Indiana remained in the hands of Republican loyalists who wished to continue the war until victory. This action risked [temporarily] undercutting the military effort by depleting the ranks. Lincoln had dueling motives. Privately, he sought to secure a victory for his party. This personal interest should not impugn his public motive: win the war and secure the nation.[70]

A common definition, but by no means universal definition, for "corruption," is using public power or resources for private gain or ends. Using this definition, the key problem for deciding what is or is not corrupt would depend on what is considered "private gain or ends" as opposed to legitimate public ends.[71] In his PhD dissertation, Professor Jonathan Gienapp wrote:

> In the wake of several political defeats (including the dispute over the [B]ank [of the United States]), Madison began spending more time with [his] old friend Jefferson. The two began more consciously recognizing the connection between their relationship and the political fate of the nation. In the spring of 1791 the two Virginians took a fateful "botanizing" tour north to New York and New England during which time they contemplated opposition and forged political alliances. From their perspective, the situation was too dire, Hamilton's schemes too pernicious, and Washington's innocence too unreliable not to take more drastic steps.

---

[70] Josh Blackman & Seth Barrett Tillman, *Defining a Theory of "Bribery" for Impeachment*, Lawfare: Hard National Security Choices (Dec. 6, 2019, 12:43 PM), https://www.lawfaremedia.org/article/defining-theory-bribery-impeachment (bold added) (cited 6 times).

[71] There will always be borderline and other hardcases. For example, where a public official intentionally spends public funds absent legislative (or other necessary) authorization, such actions may be done for the best motives even if they are not strictly legal. But are such actions corrupt? Lincoln, for example, at the outbreak of Civil War hostilities, spent public funds to arm and protect the Union at a time when Congress was out of session and had not authorized such actions. *See* Note, *Recent Emergency Legislation in West Germany*, 82 Harv. L. Rev. 1704, 1708–09 (1969). *But see* Paul Einzig, The Control of the Purse 166 (1959) (noting a House of Commons 1784 resolution "to the effect that public officers responsible for paying out public money without the authority of an Appropriation Act would be guilty of [a] 'high crime and misdemeanour, a daring breach of public trust, derogatory to the fundamental privileges of Parliament, and subversive to the Constitution.'" (quoting the resolution)).

> The critical move was to bring Philip Freneau, who had acquired a reputation through his earlier newspaper work, to Philadelphia. Just days after Washington signed the bank bill into law, [Secretary of State] Jefferson offered Freneau a position as translating clerk in the State [D]epartment in the hope that he would establish a newspaper to challenge John Fenno's strongly pro-administration *Gazette of the United States.* Freneau agreed and in October began publishing the *National Gazette*, a paper which while at first tame would explode in anti-Hamiltonian hysteria the next spring in the wake of the financial speculations that had begun to unsettle the nation. With rival newspapers unleashed, before long open partisanship would consume the infant republic.[72]

I do not doubt Gienapp's report of the history here. What is interesting about this passage is that it does not address whether or not, given all the circumstances, and then prevailing norms, Jefferson's appointing Freneau to a public post was corrupt. Sometimes seeing the issue, and its complexity, is more important than identifying an answer (or, better, what one believes to be the answer).[73]

A corruption-minimalist would argue that Jefferson was not seizing Freneau's public salary, and that (as far as we know) Freneau, like other potential candidates for the State Department translator position, was capable and, in fact, did his job. The public was not meaningfully disadvantaged by the appointment and the public received the primary benefits for which Congress authorized the creation of that position and its compensation with a salary drawn on the public treasury. Using that narrow framework, Jefferson's conduct was not wrongful or corrupt. Furthermore, Jefferson subjectively

---

[72] Jonathan Gienapp, The Transformation of the American Constitution 305–06 (2013) (footnotes omitted) (unpublished Ph.D. dissertation, Johns Hopkins University Dep't of History) (on file with ProQuest Dissertations & Theses Global) (footnotes omitted).

[73] *Compare* Jonathan Gienapp, *Removal and the Changing Debate over Executive Power at the Founding*, 63 Am. J. Legal Hist. 229, 237–38 (2023) (arguing that Hamilton's "The consent of that body would be necessary to displace as well as to appoint"-language in *Federalist No. 77* referred to removal, and not to replacement), *with* 3 Joseph Story, Commentaries on the Constitution of the United States §§ 1532–1533 (Boston, Hilliard, Gray, & Co. 1833) (explaining that presidential "removal takes place in virtue of the new appointment [that is, by replacement], by mere operation of law" and that this was Hamilton's position in *Federalist No. 77*). *See generally* Seth Barrett Tillman, *The Puzzle of Hamilton's* Federalist *No. 77*, 33 Harv. J.L. & Pub. Pol'y 149 (2010) (cited 51 times) (explaining that Hamilton's use of "displace" in *Federalist No. 77* is ambiguous, but remaining generally supportive of Justice Story's position).

believed that his faction's winning seats in Congress and his prevailing in a future contest for the presidency was in the public interest.

By contrast, a corruption-maximalist would argue that Jefferson was not choosing the candidate most fit for the job. He was not using his control over a public position entirely for the ends for which Congress authorized the position and authorized its compensation with a salary drawn on the public treasury. Rather, he was using the position to facilitate an arguably private interest: *his* and *his* faction's prevailing in contested elections. He was using public power, at least in part, for private ends. And in arriving at that conclusion, Jefferson's subjective and self-interested beliefs as to what constitutes good policy and who is best capable of bringing that about (that is, himself or his political opponents) should play no role.

So who is correct? The corruption-minimalist or the corruption-maximalist? Honestly, I do not think this question has anything like a clear answer. Furthermore, I do not think there is any way to determine if the Framers, ratifiers, and the public circa 1788 were, systematically as a group, closer to one of these two views or to the other. We do not have information in regard to their views at this level of specificity.[74] All we have is the language they agreed to in the as-ratified Constitution. It is the meaning of that language which should be our central focus.

The real issue is something else entirely. Had Jefferson been impeached by the House or had a prosecutor sought to try Jefferson for (non-*quid-pro-quo*) criminal bribery or extortion, would the merits have been decided by any particular 18th conception of corruption? I think not. Rather corruption would have become a vehicle casually used to decide the political contest between the Hamiltonian and Jeffersonian factions—the incipient factions which gave birth to our first political parties as the Washington administration dragged on and came to a close.[75] And that's the point:

[74] *See, e.g.*, *supra* note 37 (criticizing Professor Buckley's position for extending well-grounded and historically-rooted corruption concerns relating to the *executive*'s "bribing" members of the *legislature* by *appointing* members to lucrative office . . . to other factual circumstances relating to a member of the *legislature*'s holding a second *elected* position absent intervention by the executive).

[75] One might say that Hamilton predicted all this in *Federalist No. 65*. In discussing impeachment, Hamilton wrote:

corruption, as that term was used in the late 18th century, is conceptually too amorphous to determine concrete legal questions involving the Constitution, and where that concept is given room, it merely provides an awkward arrow in the quiver held by partisans in naked contests for political power. Finally, it is worth noting that the Framers had actually included "corruption" as an impeachable offense in the draft constitution reported by the Committee of Detail, but it was subsequently dropped out.[76] As a result, the Framers did not include term "corruption" in any provision of the Constitution of 1788—so, whatever they meant by that term, they left it out, apparently deliberately after having considered including it, and for that reason, among others, we should not inject *their* understanding of that term back into *our* (and *their*) Constitution.

(***continued***)

> A well-constituted court for the trial of impeachments is an object not more to be desired than difficult to be obtained in a government wholly elective. The subjects of its jurisdiction are those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself. The prosecution of them, for this reason, will seldom fail to agitate the passions of the whole community, and to divide it into parties more or less friendly or inimical to the accused. In many cases it will connect itself with the pre-existing factions, and will enlist all their animosities, partialities, influence, and interest on one side or on the other; and *in such cases there will always be the greatest danger that the decision will be regulated more by the comparative strength of parties, than by the real demonstrations of innocence or guilt.*

*Federalist No. 65* (1788) (Hamilton) (italics added).

[76] *See* Madison, *Notes*, *supra* note 42, at 186 (reproducing August 6, 1787 report of the Committee of Detail); *Journal*, *id.* at 422 (approving, August 27, 1787, "treason, bribery, or corruption" language); Madison, *Notes*, *id.* at 550 (reporting September 8, 1787 debate where "mal-administration" was considered, but not voted upon, and "corruption" was apparently dropped in favor of "other high crimes & misdemeanors"); *supra* note 42, at 600 (reproducing, from September 12, 1787, the Committee of Style's proposed draft impeachment provision, which did not make use of any "corruption" language).

I declare under the penalty of perjury that the above is true and correct to the best of my knowledge, information, and belief. Executed on this 21st day of April 2025 in Dublin, Ireland.

/s/ Seth Barrett Tillman
Seth Barrett Tillman

Exhibit 6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

<table>
<tr>
<td>DINNER TABLE ACTION, et al.,<br><br>Plaintiffs.<br><br>v.<br><br>WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices, et al.,<br><br>Defendants.</td>
<td>Case No. 24-cv-00430-KFW<br><br>Magistrate Judge<br>Karen Frink Wolf<br><br><u>DECLARATION OF<br>DAVID M. PRIMO</u></td>
</tr>
</table>

I, David M. Primo, Ph.D., hereby declare as follows:

1. I am over the age of 18 and reside in Rochester, New York.

2. I am a professor of political science, with tenure, in the School of Arts and Sciences at the University of Rochester, where I also hold a joint appointment as a professor of business administration at the Simon Business School.

3. In 2012, I was named the inaugural holder of the Ani and Mark Gabrellian Professorship, which was created to recognize “a multidisciplinary scholar and teacher whose work bridges two or more academic fields” with the goal of “better understand[ing] the most vital political and economic issues of our era.” I joined the Rochester faculty in 2002 after receiving my Ph.D. in Political Science from Stanford University. I also have an MA in Economics from Stanford, an MA in Political Science from Brown University, and a BA in Economics and Honors Political Science from Brown.

4. My research in campaign finance is primarily quantitative and focuses on the impact of campaign finance laws and campaign spending on features of democracy such as

perceptions of government and electoral competitiveness. This research is widely cited in academic publications and in policy debates, and I am nationally recognized for my work in this area. In 2015 I was invited to serve on a task force of scholars charged with preparing a report on the state of scholarly knowledge about campaign finance. Jeffrey Milyo and I subsequently co-authored *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters*, a book-length treatment of the interrelationship between public opinion and campaign finance. This peer-reviewed book was published by a leading press in American politics, the University of Chicago Press.

5. I have been asked by the attorneys for the plaintiffs in *Dinner Table Action, et al. v. Schneider, et al.* to evaluate the expert testimony of Christopher Robertson, an expert witness retained by EqualCitizens. I reviewed his report and his deposition transcript. I also was either already acquainted with the literature he cited, or reviewed the same. I am being compensated for my work on this case on a flat fee basis: $12,000 for the preparation of this report; $3,000 for participation in a deposition and deposition preparation (if I am deposed); and $3,000 for attendance at trial (if I am called to testify). In addition, I will be reimbursed for travel and other out-of-pocket expenses.

6. In my report, attached hereto as Exhibit 1, I explain the problems with Robertson's literature review, experimental design, and statistical analyses. Based on the expert opinions expressed in my report, I conclude that Robertson's report and deposition do not support the conclusions he reaches. I authored my report. If called to testify, I could and would competently testify to the statements herein and in my report.

7. I conclude that the survey experiments conducted by Robertson are flawed both in their design and in how he interprets the results. These experiments do not establish that a

$5,000 contribution is an "inflection point" for corruption risk, and they do not show that implementing a $5,000 contribution limit on Super PAC contributions will reduce the appearance of corruption.

8. These experiments instead show that respondents think contributions at the contribution limit at issue in this case—$5,000—are as corrupting as a $50 million contribution.

9. They also show that if you provide respondents with no information about a fictional state except that it is filled with corporations seeking to buy venal politicians, then they will prefer less money in that system.

10. In my opinion, the experiments conducted by Christopher Robertson for this case do not advance the scientific literature on campaign finance and public opinion. If I were reviewing his report as an article submission for a peer-reviewed scientific journal, I would recommend rejection.

* * *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 22nd day of April, 2025 in Rochester, New York.

*/s/ David M. Primo*
David M. Primo, Ph.D.

**EXPERT REPORT**
***Dinner Table Action, et al. v. Schneider, et al.***
**David M. Primo, Ph.D.**

**INTRODUCTION**

I am a professor of political science, with tenure, in the School of Arts and Sciences at the University of Rochester, where I also hold a joint appointment as a professor of business administration at the Simon Business School. In 2012, I was named the inaugural holder of the Ani and Mark Gabrellian Professorship, which was created to recognize "a multidisciplinary scholar and teacher whose work bridges two or more academic fields" with the goal of "better understand[ing] the most vital political and economic issues of our era." I joined the Rochester faculty in 2002 after receiving my Ph.D. in Political Science from Stanford University. I also have an MA in Economics from Stanford, an MA in Political Science from Brown University, and a BA in Economics and Honors Political Science from Brown.

My research in American politics, campaign finance, corporate strategy beyond markets, fiscal policy, statistical methods, and political bargaining has been published in peer-reviewed journals including *American Journal of Political Science*; *Business and Politics*; *Economics and Politics*; *Election Law Journal*; *Journal of Law, Economics, and Organization*; *Journal of Politics*; *Journal of Theoretical Politics*; and *Strategic Management Journal*. I have also published four peer-reviewed books: *The Plane Truth: Airline Crashes, the Media, and Transportation Policy* (co-authored with Roger W. Cobb, Brookings Institution Press, 2003); *Rules and Restraint: Government Spending and the Design of Institutions* (University of Chicago Press, 2007); *A Model Discipline: Political Science and the Logic of Representations* (co-authored with Kevin A. Clarke, Oxford University Press, 2012); and *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters* (co-authored with Jeffrey D. Milyo, University of Chicago Press, 2020). *Rules and Restraint* was awarded the 2008 Alan Rosenthal Prize by the Legislative Studies Section of the American Political Science Association. This award is given annually

for the best publication in legislative studies by a young scholar of importance to legislators and legislative staff and of merit in strengthening the practice of representative democracy. I have received numerous grants to support my research, including from the National Science Foundation.

At the University of Rochester, I teach courses in the Political Science Department's PhD program, the Simon Business School's MBA and other graduate programs, and at the undergraduate level. I have received three teaching awards at the University of Rochester: the 2005 Goergen Award for Distinguished Achievement and Artistry in Undergraduate Education; the 2005 Undergraduate Professor of the Year Award, given by the University of Rochester Students' Association; and the 2018 Edward Peck Curtis Award for Excellence in Undergraduate Teaching, a university-wide teaching prize.

My research in campaign finance is primarily quantitative and focuses on the impact of campaign finance laws and campaign spending on features of democracy such as perceptions of government and electoral competitiveness. This research is widely cited in academic publications and in policy debates, and I am nationally recognized for my work in this area. In 2015 I was invited to serve on a task force of scholars charged with preparing a report on the state of scholarly knowledge about campaign finance. Jeffrey Milyo and I subsequently co-authored *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters*, a book-length treatment of the interrelationship between public opinion and campaign finance. This peer-reviewed book was published by a leading press in American politics, the University of Chicago Press.

I have served as an expert in several campaign finance cases, including *McConnell v. FEC*, and signed on to amicus briefs in others, including *Citizens United v. FEC*. Research I conducted as part of expert work in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett* was cited by US Supreme Court Chief Justice John Roberts in his majority opinion for that case. A full list of the cases in which I was retained as an expert appears in my curriculum vitae, which is attached and is incorporated into this expert report by reference.

For this rebuttal report, I have been asked by the attorneys for the plaintiffs in *Dinner Table Action, et al. v. Schneider, et al.* to evaluate the expert testimony of Christopher Robertson, an expert witness retained by EqualCitizens. I am being compensated for my work on this case on a flat fee basis: $12,000 for the preparation of this report; $3,000 for participation in a deposition and deposition preparation (if I am deposed); and $3,000 for attendance at trial (if I am called to testify). In addition, I will be reimbursed for travel and other out-of-pocket expenses.

In this report, I will discuss the problems with Robertson's literature review, the design of his two experiments (denoted Experiment 1 and Experiment 2 below), and interpretation of his statistical results. Based on this analysis, I conclude that Robertson's report and deposition do not support the conclusions he reaches. Specifically:

- Studies using real-world data do not find that contribution limits reduce the appearance of corruption or improve perceptions of government. These studies are cited by Robertson—so he is aware of them—but he fails to address their important findings in his report.
- Robertson's design of Experiment 1 fails to take into account the prior literature, he misinterprets his own findings, and his results actually show that respondents think a $5,000 contribution creates the same risk of corruption as a $50,000,000 contribution. This experiment suggests the $5,000 contribution limit at issue in this case will have no effect on the appearance of corruption.
- Robertson's Experiment 2 lacks external validity (meaning it does not apply to real-world situations) and is designed, intentionally or not, to generate a particular set of findings.

This report proceeds as follows. In the next section, I show that Robertson's literature review fails to discuss crucial findings in the literature regarding campaign finance laws and the appearance of

corruption—results that are at odds with his conclusions. Then, I analyze each of his experiments, discussing the limitations of his experimental designs—including a failure to build on the previous literature—and the analyses he conducts.

**STUDIES USING REAL-WORLD DATA DO NOT FIND THAT CONTRIBUTION LIMITS REDUCE THE APPEARANCE OF CORRUPTION OR IMPROVE PERCEPTIONS OF GOVERNMENT.**

Robertson cites relevant scholarly work in his literature review, but the review veers between summarizing a paper in some cases and assessing a paper in others. Most importantly, he fails to discuss crucial findings in these sources that are at odds with his findings.

First, Robertson, in discussing Shaw et al. (2021), fails to discuss two key findings in their book. These authors find, using survey data matched to state campaign finance laws, that “more restrictive [state] campaign finance regulations are associated with *higher* levels of perceived corruption” (Shaw et al. 2021, 79). They also show that state campaign finance laws do not affect trust in government by altering perceptions of corruption (Shaw et al. 2021, ch. 4). These are not cherry-picked findings. Rather, they are fleshed out *in an entire chapter of the book.*

Second, Robertson, in citing my book with Jeffrey Milyo (mentioned earlier in my report), fails to address what we write is “*perhaps the most important finding in this book*, which in practical terms calls into question four decades of legal justifications for campaign finance reform” (Milyo and Primo 2020, 145, emphasis added). Specifically, we devote an entire chapter to utilizing decades of survey data to assess the effect of state campaign finance laws on trust or confidence in state government, with the appearance of corruption as a mechanism linking the two. Our dataset spans the years 1987 to 2017 and includes nearly 60,000 individual-level observations from more than fifty surveys. These individual-level observations are matched to state-level variables including, importantly, campaign finance laws. We use the fact that state laws change over time and vary across states to estimate the effects of campaign finance laws on perceptions of government. We study several types of policies, including campaign

contribution limits for individuals and corporations, and measure the yearly presence or absence of such restrictions or regulations in each state.

Using regression analysis, Milyo and I find no substantively meaningful effects of campaign finance laws, including bans on corporate independent expenditures, on trust in government. In addition, we find that limits on corporate campaign contributions *reduce* trust in government, albeit by a small amount. These results are summarized Table 8.4 from our book, reproduced below.

TABLE 8.4 **The effect of state campaign finance laws on trust in state government, 1987–2017**

| | (1) | (2) |
|---|---|---|
| CF law count | −.26 (.28) | |
| Regime 1: corp cont lim | | −1.88** (.75) |
| Regime 2: (corp + ind) cont lim | | −1.74*** (.45) |
| Regime 3: (corp + ind) cont lim + gub pub fund | | −.23 (1.13) |
| Regime 4: (corp + ind) cont lim + (gub + leg) pub fund | | .08 (1.47) |
| Corporate independent expenditure bans | | .37 (.75) |
| Legislative term limits | −.66 (.64) | −.63 (.59) |
| Unified Democratic govt | −1.86** (.69) | −1.84** (.68) |
| Unified Republican govt | −.65 (.71) | −.59 (.71) |
| Resp pty same as unified govt pty | 5.27*** (.44) | 5.27*** (.44) |
| Resp pty diff than unified govt pty | −3.37*** (.58) | −3.36*** (.58) |
| Unemployment rate | −.79*** (.19) | −.80*** (.20) |
| Ln state per capita income | 12.65* (6.92) | 13.55* (7.06) |
| Ln state per capita govt spending | −5.22** (2.46) | −4.91** (2.33) |
| Ln state population | 3.46 (3.17) | 3.30 (2.87) |
| $R^2$ | .20 | .20 |
| *N* | 59,117 | 59,117 |

*Note*: Robust standard errors clustered by state are in parentheses. All specifications include state fixed effects; indicator variables for year and party, as well as interaction terms for respondent party and year; demographic variables as specified in table 8.1; indicator variables for missing income, party, and party concordance; and indicator variables for question version and number of possible responses. $***p < .01$; $**p < .05$; $*p < .10$.

In our book, we also conduct supplementary analyses focusing on the effect of *Citizens United*, with similarly statistically insignificant results. See the third column at the bottom of Table 8.6 below, also reproduced from our book. The results in Table 8.6 show that there are no before and after changes in trust levels for individuals living in states whose laws were affected by *Citizens United* (i.e., states which had a ban on corporate independent expenditures). If corporate independent expenditure bans were so harmful to perceptions of government, we should have seen a downward shift in trust in states where bans were “turned off” by *Citizens United*.

TABLE 8.6 **The effect of Clean Elections and *Citizens United* on trust in state government**

| | Clean Elections (Arizona, Connecticut, Maine) | | |
|---|---|---|---|
| | Before Clean Elections | After Clean Elections | Effect of Clean Elections on state trust |
| Democrat | 5.41*** (1.89) | 1.41 (2.73) | −4.00** |
| Republican | 3.10 (3.81) | 4.00** (1.61) | +.90 |
| Independent | 5.58*** (1.87) | 3.28*** (1.18) | −2.30 |
| | *Citizens United* (twenty-three state-level laws affected) | | |
| | Before *Citizens United* | After *Citizens United* | Effect of *Citizens United* on state trust |
| Democrat | 2.87** (1.31) | .96 (1.38) | −1.91 |
| Republican | .79 (1.72) | 2.52** (1.22) | +1.73 |
| Independent | 2.78** (1.36) | 1.97 (1.39) | −.81 |

*Note*: The first two columns of cells include coefficients and robust standard errors clustered by state for a regression identical to the regimes regression from table 8.4, with the following changes. In both the *Citizens United* and Clean Elections regressions, we include a new set of interaction terms for states affected by *Citizens United* or a Clean Elections reform, respectively. *Before* reflects an interaction term for (party *X* pre-event) for six years prior to the event, and *after* refers to an interaction term for (party *X* postevent) for the years after the event. The third column reports the differences in the coefficients for each group, with statistical significance based on *F*-tests of whether the two coefficients are the same. $N = 59{,}117$ for both regressions. In the *Citizens United* regression, there are 6,998 observations in the treatment group prior to the event, and 7,405 after the event. For the Clean Elections regression, the comparable figures are 410 and 1,227. ***$p < .01$; **$p < .05$; *$p < .10$.

As another way to get at this question, we also look at trends in trust before-and-after the *Citizens United* decision and find that *Citizens United* did not have the predicted negative effects on perceptions of government that many believed it would. See the lower right of Figure 8.1 below, reproduced from our book, where the trends in trust pre-and-post *Citizens United* are essentially a flat line.




FIGURE 8.1. Trends in state-level trust, before and after campaign finance reform

*Note*: Solid lines depict the estimates of trends in trust before and after the respective reforms, with the 95 percent confidence intervals plotted with dotted lines. The range of the *y* axis approximates a ±1 standard deviation change in the state trust measure.

My book-length analysis of the effects of campaign finance laws on public opinion, therefore, strongly suggests that the Maine law at issue in this case will not have a meaningful effect on attitudes toward government. Robertson's report, in failing to discuss these findings, offers a misleading account of the state of the academic literature on this question.

Other scholars have reached similar conclusions about the limited effects of laws on perceptions. Recent research on perceptions of Super PACs cited by Robertson (Goodliffe and Townsend 2024) supports the view that campaign finance laws are unlikely to affect perceptions. These authors write, "Given our results, we expect that future policy changes focused on reducing distrust are unlikely to be successful in their aim" (Goodliffe and Towsend 2024, 7). This matches the assessment of Persily and Lammie (2004, 174), also cited by Robertson. After studying decades of public opinion data, they conclude, "For those who would look to campaign finance reform to restore 'confidence in the system of representative [g]overnment,' they may be disappointed by the intractability and psychological roots of that lack of confidence."

Robertson, in discussing Persily and Lammie (2004), states that he prefers the experimental research he conducts to the observational work reflected in their research (and, by extension, in Shaw et al. and Primo and Milyo, discussed earlier) because it is more difficult to make causal claims from observational research. This position, however, fails to acknowledge the external validity problems that plague improperly designed experiments. Specifically, survey experiments, by necessity, create artificial environments, and to the extent that the artificial environments deviate markedly from real-world conditions, we should not expect the results to apply in real-world settings. This will be a major issue in Robertson's second experiment, discussed below.

There is another reason why observational research focused on *actual* changes in *actual* laws — like that of Persily and Lammie (2004), Primo and Milyo (2020), and Shaw et al. (2021)—is an important part of understanding public attitudes toward campaign finance: Americans believe that politics is fundamentally corrupt. In original survey research we conducted for our book, Milyo and I found that Americans perceived everyday political activities to be corrupt. For instance, about two-thirds of the Americans we surveyed believed that a politician taking a position due to pressure from party leaders, to secure favorable media coverage, or to make the other party look bad was likely to be corrupt behavior. Since Americans see corruption everywhere they look, it is no surprise that 80% of Americans we surveyed for our book thought that "the campaign finance system is corrupt" (Primo and Milyo 2020, 8).

It would be a mistake, however, to take a data point like this (or any of Robertson's results) and conclude that contribution limits, whether on direct contributions to candidates or to Super PACs, will help improve the situation. Simply *asking* people if they believe a contribution is corrupt or if politics is corrupt *does not tell you if laws restricting contributions will improve attitudes toward government.* Why? First, perceptions of corruption and attitudes toward government more generally are driven by a multitude of factors. Money in politics may be an easy target, but it may not be the root cause of Americans' mistrust of politicians. Second, restricting campaign contributions will not do much if

Americans believe even small contributions are potentially corrupting. Third, Americans are woefully misinformed about campaign finance laws, so the effects of these laws on attitudes will be indirect: campaign finance laws impact the legislative process and elections, and Americans update their beliefs about the role of money in politics accordingly. These indirect effects, to the extent they exist, will be difficult, if not impossible, to measure in an experimental setting.

To summarize: *I am aware of no published research of real-world changes in campaign finance laws that has found those laws to have meaningful effects on perceptions of corruption or attitudes toward government.* To the contrary, multiple studies—including my own—that have examined decades of public opinion data find that these laws simply do not shift attitudes toward government.

The next step in my report is to show that the two experiments detailed in Robertson's report do not establish what he claims they establish. In other words, even if one views an experimental approach as superior to studying the real-world effects of campaign finance laws, one still should not have confidence in his findings.

**ROBERTSON'S DESIGN OF EXPERIMENT 1 FAILS TO TAKE INTO ACCOUNT THE PRIOR LITERATURE, HE MISINTERPRETS HIS OWN FINDINGS, AND HIS RESULTS ACTUALLY SHOW THAT RESPONDENTS THINK A $5,000 CONTRIBUTION CREATES THE SAME RISK OF CORRUPTION AS A $50,000,000 CONTRIBUTION.**

In the first experiment, Robertson provided respondents with the following stimulus: "Please think about the risk that a politician would sell a policy outcome, like a vote on a bill, in exchange for a financial contribution to a committee supporting his or her re-election. Doing so violates his or her oath and creates a risk of prosecution, if discovered. Suppose the contribution was $X" (Robertson 2025a, 5). Respondents were randomly assigned to different treatment conditions varying X: $5, $50, $500, $5,000, $50,000, $500,000, $5,000,000, and $50,000,000. They were asked how likely they thought it was that a politician sell a policy outcome for that amount. (Implied in the question is that the contributions in question are legal, though the experiment would have been more precise had it stated

that explicitly.) Robertson's expert report offers no explanation for why he picked these amounts, and in a deposition he explained, "So I decided this logarithmic scale where you multiply it by ten each time would provide a big enough range that … if there was a discontinuity … that we could see it" (Robertson 2025b, 29). This choice, however, leaves out a range of values corresponding to many existing contribution limits (i.e., limits between $500 and $5,000). This turns out to have important implications for the conclusions he can draw from his experiment.

The choice is particularly odd given Robertson's citation to DeBell and Iyengar (2021). These authors' public opinion research—which is very similar in structure to Robertson's first experiment—shows that "[mean perceptions of corruption] rose sharply from .34 to .44 as contributions increased from $50 to $1,000, but then increased only slightly from .44 to .48 as contributions increased from $1,000 to $5,000. This indicates that perceptions of corruption are relatively inelastic within the $1,000 to $5,000 range" (DeBell and Iyengar 2021, 294). (Inelastic is a technical term meaning that a change in one value produces no change in another value. For instance, we say that demand for a product is relatively inelastic if it takes a huge price increase before sales of that product begin to decline.) Given that he included this paper in his literature review, it is strange that Robertson did not choose values between $500 and $5,000 in his experiment or at least address why he chose not to, given previous research. What's more, it is not clear to me how Robertson's experiment is an advance over DeBell and Iyengar's work.

Robertson not only fails to set up his experiment in a sensible way, but he also misinterprets his own findings. Robertson writes, "we found a clear relationship between the amount of money contributed and perceived likelihood that the elected official would sell a policy outcome. … As Figure 1 displays, the relationship between size of contribution and likelihood of selling a policy outcome has a clear discontinuity around $5,000, meaning that respondents perceive contributions below $5,000 to be qualitatively different than contributions at or above that amount. … Experiment 1 shows that larger

financial contributions cause greater perceived risk of *quid pro quo* corruption, and that perceived risk is greater and stable above $4,999. To put it another way, $5,000 appears to be an inflection point in perceptions of quid pro quo corruption" (Robertson 2025a, 6-7). Robertson elaborated in a deposition, arguing that "respondents implicitly came up with that [$5,000] threshold themselves" (Robertson 2025b, 13). Neither of these statements regarding the $5,000 treatment condition is a reasonable interpretation of his results.

*Simply put, Robertson's research does not support the conclusion that $5,000 is an inflection point where voters start to become concerned about corruption. At best, his research suggests that the amount could be anywhere from $501 to $5,000.* Here's why. If respondents were given the choice to pick any value for a contribution that would be the magic number for inducing corruption, and if Robertson noticed a major jump at $5,000, then he could make an argument for $5,000 being an inflection point. But all he shows is that there is a statistically significant difference (i.e., the difference is not due to chance) between $5,000 and three lower values: $5, $50, and $500. He does not include any values between $500 and $5,000 in his experiment, so we cannot know whether those values in between are, in fact, the inflection point. Robertson does not have enough evidence to conclude that $5,000 is that magic number.

Here is an analogy. Imagine that researchers conducted a study where they randomly assigned people to consume 1, 2, 3, 14, 15, 16, 17, or 18 alcoholic drinks per week and found higher levels of a particular illness in individuals who consumed 14, 15, 16, 17, or 18 drinks per week compared with individuals who consumed 1, 2, or 3 drinks per week. The researchers then announced that 14 drinks per week is an inflection point at which disease risk increases. It does not take methodological expertise to see why that conclusion would be unwarranted.

This misinterpretation, important as it is, is not even the most remarkable part of his experiment. Rather, this is: Figure 1 of his report shows that respondents believe *a $50,000,000*

*contribution creates the same risk of corruption as a $5,000 contribution*. (Table 1 in his report can be disregarded because he assumes linearity in the treatment condition effects, when it is clear from the figure that the effects are nonlinear. In technical terms, his regression model is misspecified.) Even if we were to make the erroneous logical leap described earlier—that if somebody views a contribution of $X as corrupt, then that justifies limiting contributions to below $X—the $5,000 contribution limit at issue in this case would have no effect on the appearance of corruption because a legal $5,000 contribution is viewed as equally likely to be corrupting as a $50,000,000 contribution. Robertson acknowledged this fact in a deposition, stating that “there’s not a significant difference” between the estimates because the confidence intervals overlap (which, in layman’s terms, means that we can’t rule out that the differences are due to chance) (Robertson 2025b, 51). He went on to say that his study “wasn’t really designed” to “make those particular distinctions” between amounts of $5,000 and above (Robertson 2025b, 51). But that seems to be *exactly* what he claimed his study could do: distinguish among competing contribution amounts and their corruption risk.

**ROBERTSON’S EXPERIMENT 2 LACKS EXTERNAL VALIDITY AND IS DESIGNED, INTENTIONALLY OR NOT, TO GENERATE A PARTICULAR SET OF FINDINGS.**

Experiment 2 creates a dystopian state known as Ames that we know very little about, except that donors want something from elected officials, such as having the state government “spend money to support a particular industry or de-regulate [sic] a particular industry” (Robertson 2025a, 8). The results are unsurprising because, as one respondent commented during the survey, “It feels like they're corrupt and all about money. It feels like oligarchy” (Robertson 2025a, 12). Of course it does, because that is all the respondents are told about Ames. It is hardly surprising that voters don’t think very highly of Ames or its politicians. It is also not surprising that they would want to see fewer contributions in Ames, since all they know about it is that a bunch of greedy corporations are out there trying to buy favors from politicians—maybe even after being directed to do so by the politicians themselves.

One wonders how the results would have changed if, for instance, this description—"Contributions to these IECs may come from major donors who want official actions from elected officials, such as having the state government spend money to support a particular industry or de-regulate [sic] a particular industry"—were replaced by this description—"Contributions to these IECs may come from public-spirited donors who want to help elected officials make government more effective, preserve the environment while also promoting a vibrant and innovative economy where small businesses can thrive, and make the public education system work for all students."

Robertson's vignettes about Ames and my rewriting of those vignettes are examples of what survey researchers call framing effects. Chong and Druckman define "framing effects" as occurring "when (often small) changes in the presentation of an issue or an event produce (sometimes large) changes of opinion" (Chong and Druckman 2007, 104). Framing effects are well-documented in studies of money in politics. For instance, in Primo and Milyo (2020), we conduct a survey experiment where half the sample is given a question about Super PACs that reads as follows: "Do you think campaign contributions to political groups that are independent of candidates or political parties should be protected by the rights that are guaranteed in the First Amendment?" (Primo and Milyo 2020, 186). The other half is given this prompt: "Do you think the ability of individuals to provide financial support to political groups that are independent of candidates or political parties should be protected by the rights that are guaranteed in the First Amendment?" (Primo and Milyo 2020, 186). When framed in terms of "campaign contributions," 30% support protections for Super PAC contributions. When framed in terms of "financial support," 64% support these protections (Primo and Milyo 2020, 63). Similarly stark differences are seen for lobbying and other forms of money in politics.

To give just one more example in the campaign finance context, Druckman and Nelson (2003) show that when asked to read an article about the McCain-Feingold campaign finance bill—which strengthened campaign finance restrictions, especially with regard to "soft money" contributions to

political parties—respondents who read an article framing the bill around free speech considerations were much less favorable to the bill than respondents who read an article framing the bill around managing special interest influence.

It might be said that Robertson picked a "bribery frame" in his experiment, leading respondents to latch on to that consideration in their replies. Robertson's bribery frame explains why nearly 80% of respondents saw corruption in independent expenditures even when they were capped at $5,000 (i.e., at Maine's current legal limit). It explains why they saw even more potential for corruption when those contributions were not capped.

Robertson made other questionable choices in both the design and analysis of this second experiment. By reporting the results in terms of the people who *disagree* that politicians will be corrupted by independent expenditures, Robertson makes the effects in Figure 2 look much more impressive than they are. A reader quickly glancing at the figure could be forgiven for thinking, "Whoa, limits make a huge difference!" The reality is that in both scenarios, voters think the whole operation in Ames is suspect, consistent with the bribery frame Robertson constructed. It is also puzzling that Robertson chose to ask respondents in the second experiment about just one limit—$5,000—when in the first experiment he created many more treatment groups. The lack of parallel structure makes it hard to argue, as Robertson does, that the two experiments "complement each other" (Robertson 2025a, 13).

The most concerning aspect of the second experiment is that it lacks any context about the candidates, the donors, or the overall political system—and therefore lacks external validity for the purposes the author has laid out for the experiment. Robertson claims he could "have fairly called this a conjoint experiment" (Robertson 2025b, 79). It is surprising he thinks this, because one of the papers he cites, Spencer and Theodoridis (2020), presents the results from an actual conjoint experiment. The authors write, "A conjoint experiment randomly manipulates multiple variables simultaneously, thus

leveraging the randomization to 'hold other conditions constant' by design" (Spencer and Theodoridis 2020, 518). Why set up an experiment about campaign finance in this way? "The inclusion of this range of factors [such as candidate gender], some of which directly relate to campaign finance and others of which may not, is intended to increase the verisimilitude of the task and, thus, the external validity of our results … [This] makes our task more similar to the real-world information environment in which voters evaluate candidates" (Spencer and Theodoridis 2020, 519). Robertson's work is *not* a conjoint experiment.

While a conjoint experiment is not the only way to create external validity in an experiment, *some* real-world verisimilitude is important. Robertson's context-free scenario is a far cry from "the real-world information environment" in which voters operate. The experiment lacks external validity and is not a reliable gauge of how voters will assess the impact of campaign finance laws in a real-world setting.

**CONCLUSION**

In conclusion, Christopher Robertson's expert report provides a misleading summary of the literature on campaign finance and public opinion, and the experiments he conducts are flawed in several fundamental respects.

The existing literature studying real-world campaign finance laws finds that contribution limits have virtually no effect on Americans' perception of government. Research I conducted for a book-length treatment of this question also shows that *Citizens United*, which eliminated limits on independent expenditures by corporations and opened the door for the creation of Super PACs, similarly had no effect on Americans' perceptions of government. Robertson failed to address these findings in his expert report—a crucial oversight.

The survey experiments conducted by Robertson are flawed both in their design and in how he interprets the results. These experiments do *not* establish that a $5,000 contribution is an "inflection

point" for corruption risk, and they do *not* establish that implementing a $5,000 contribution limit on Super PAC contributions will reduce the appearance of corruption. These experiments instead show that respondents think contributions made at the contribution limit at issue in this case—$5,000—are as corrupting as a $50 million contribution. These experiments also show that if you provide respondents with no information about a fictional state except that it is filled with corporations seeking to buy venal politicians, then they will prefer less money in that system.

In my opinion, the experiments conducted by Christopher Robertson for this case do not advance the scientific literature on campaign finance and public opinion. If I were reviewing his report as an article submission for a peer-reviewed scientific journal, I would recommend rejection.

**REFERENCES**

Chong, Dennis, and James N. Druckman. 2007. "Framing Theory." *Annual Review of Political Science* 10:103-126.

DeBell, Matthew, and Shanto Iyengar. 2021. "Campaign Contributions, Independent Expenditures, and the Appearance of Corruption: Public Opinion vs. the Supreme Court's Assumptions." *Election Law Journal* 20(3):286-300.

Druckman, James N., and Kjersten R. Nelson. 2003. "Framing and Deliberation: How Citizens' Conversations Limit Elite Influence." *American Journal of Political Science* 47(4):729-745.

Goodliffe, Jay, and Kesley Townsend. 2024. "Examining Public Perceptions of US Campaign Finance Over Time Through Survey Experiments." *Electoral Studies* 90.

Persily, Nathaniel, and Kelli Lammie. 2004. "Perceptions of Corruption and Campaign Finance: When Public Opinion Determines Constitutional Law." *Pennsylvania Law Review* 153(1):119-180.

Primo, David M., and Jeffrey D. Milyo. 2020. *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters.* Chicago, IL: University of Chicago Press.

Robertson, Christopher. 2025a. "Declaration of Chirstopher Robertson, Exhibit 3-A." *Dinner Table Action, et al., v. William J. Schneider, et al.*

Robertson Christopher. 2025b. "Unedited Rough Draft: Deposition of Christopher Robertson." *Dinner Table Action, et al., v. William J. Schneider, et al.*

Shaw, Daron R., Brian E. Roberts, and Mijeong Baek. 2021. *The Appearance of Corruption: Testing the Supreme Court's Assumptions about Campaign Finance Reform.* New York: Oxford University Press.

Spencer, Douglas M., and Alexander G. Theodoridis. 2020. "'Appearance of Corruption': Linking Public Opinion and Campaign Finance Reform." *Election Law Journal* 19(4):510-523.

# DAVID M. PRIMO

**Ani and Mark Gabrellian Professor**

Department of Political Science
University of Rochester
Harkness Hall 318
Rochester, NY 14627-0146

Phone: 585.273.4779
david.primo@rochester.edu
www.sas.rochester.edu/psc/primo

## ACADEMIC APPOINTMENTS

University of Rochester

- Current Appointments
  - Ani and Mark Gabrellian Professor, Oct. 2012 – Present
  - Professor of Political Science (with tenure), Department of Political Science, Feb. 2020 – Present
  - Professor of Business Administration (joint appointment), Simon Business School, Feb. 2020 – Present
  - Associate Department Chair and Director of Graduate Studies, Department of Political Science, July 2022 – Present
- Previous Appointments
  - Associate Professor (with tenure), Department of Political Science, Sept. 2008 – Jan. 2020
  - Associate Professor (joint appointment), Simon Business School, July 2011– Jan. 2020
  - Associate Department Chair and Director of Graduate Studies, Department of Political Science, July 2010 – June 2017 (on leave July 2011– June 2012)
  - Assistant Professor, Department of Political Science, July 2002 – Aug. 2008

Stanford University

- Acting Instructor, Department of Public Policy, April 2002 - June 2002

## EDUCATION

Stanford University

- PhD, Political Science, June 2002
- MA, Economics, January 2001

Brown University

- MA, Political Science, May 1998
- BA with highest degree distinction, Economics and Honors Political Science, May 1998
- Phi Beta Kappa, 1997

## BOOKS

Primo, David M., and Jeffrey D. Milyo. 2020. *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters*. Chicago, IL: University of Chicago Press.

Clarke, Kevin A., and David M. Primo. 2012. *A Model Discipline: Political Science and the Logic of Representations*. New York, NY: Oxford University Press.

Primo, David M. 2007. *Rules and Restraint: Government Spending and the Design of Institutions.* American Politics and Political Economy Series. Chicago, IL: University of Chicago Press.

Cobb, Roger W., and David M. Primo. 2003. *The Plane Truth: Airline Crashes, the Media, and Transportation Policy*. Washington, DC: Brookings Institution Press.

## JOURNAL PUBLICATIONS

Prabhat, Saumya, and David M. Primo. 2019. "Risky Business: Do Disclosure and Shareholder Approval of Corporate Political Contributions Affect Firm Performance?" *Business and Politics* 21(2):205-239.

**JOURNAL PUBLICATIONS (cont.)**

Jo, Jinhee, David M. Primo, and Yoji Sekiya. 2017. "Policy Dynamics and Electoral Uncertainty in the Appointments Process." *Journal of Theoretical Politics* 29(1):124-148.

Carroll, Robert J., David M. Primo, and Brian K. Richter. 2016. "Using Item Response Theory to Improve Measurement in Strategic Management Research: An Application to Corporate Social Responsibility." *Strategic Management Journal* 37(1):66-85.

Carpenter, Dick M., David M. Primo, Pavel Tendetnik, and Sandy Ho. 2014. "Disclosing Disclosure: Lessons from a 'Failed' Field Experiment." *The Forum: A Journal of Applied Research in Contemporary Politics* 12(2):343-356.

Primo, David M. 2013. "Information at the Margin: Campaign Finance Disclosure Laws, Ballot Issues, and Voter Knowledge." *Election Law Journal* 12(2):114-129.

Primo, David M., and Wm Scott Green. 2011. "Bankruptcy Law and Entrepreneurship." *Entrepreneurship Research Journal* 1(2):Art. 5.

Primo, David M., and James M. Snyder, Jr. 2010. "Party Strength, the Personal Vote, and Government Spending." *American Journal of Political Science* 54(2):354-370.

Primo, David M. 2010. "The Effect of Initiatives on Local Government Spending." *Journal of Theoretical Politics* 22(1):6-25.

Primo, David M., Sarah A. Binder, and Forrest Maltzman. 2008. "Who Consents? Competing Pivots in Federal Judicial Selection." *American Journal of Political Science* 52(3):471-489.

Primo, David M., and James M. Snyder, Jr. 2008. "Distributive Politics and the Law of 1/n." *Journal of Politics* 70(2):477-486.

Clarke, Kevin A., and David M. Primo. 2007. "Modernizing Political Science: A Model-Based Approach" *Perspectives on Politics* 5(4):741-753.

Primo, David M., Matthew L. Jacobsmeier, and Jeffrey Milyo. 2007. "Estimating the Impact of State Policies and Institutions with Mixed-Level Data." *State Politics & Policy Quarterly* 7(4):446-459.

Primo, David M. 2007. "A Comment on Baron and Ferejohn (1989): The Open Rule Equilibrium and Coalition Formation." *Public Choice* 130(1):129-135.

Primo, David M. 2006. "Stop Us Before We Spend Again: Institutional Constraints on Government Spending." *Economics & Politics* 18(3):269-312.

Primo, David M., and Jeffrey Milyo. 2006. "Campaign Finance Laws and Political Efficacy: Evidence from the States." *Election Law Journal* 5(1):23-39.

Primo, David M. 2002. "Rethinking Political Bargaining: Policymaking with a Single Proposer." *Journal of Law, Economics, & Organization* 18(2):411-427.

Primo, David M. 2002. "Public Opinion and Campaign Finance: Reformers Versus Reality." *The Independent Review* 7(2):207-219.

**JOURNAL PUBLICATIONS (cont.)**

Primo, David M. 2002. "Budgetary Reform and Formal Modeling: A Comment on Gabel and Hager." *Public Choice* 113(1-2):225-230.

Milyo, Jeffrey, David Primo, and Timothy Groseclose. 2000. "Corporate PAC Campaign Contributions in Perspective." *Business and Politics* 2(1):75-88.

**PAPERS UNDER REVIEW AND WORK IN PROGRESS**

"The Ideological Sorting Behavior of the Managerial Elite" (under review, with Jake Jares, David Gaddis Ross, and Seo Eun Yang)

"Are Businesspeople Effective Legislators?" (under review, with Jason Altmire and David Gaddis Ross)

"A Longitudinal Analysis of Trust in Higher Education" (with Henry Brady and Jamie Druckman)

"Independent Expenditures and Trust in Government" (with Jeff Milyo)

**PUBLICATIONS IN EDITED VOLUMES AND TEXTBOOKS**

Primo, David M. 2017. "Analyzing the Evidence: Why Congress Can't Make Ends Meet." In *American Government: Power and Purpose*, 14th ed., Theodore J. Lowi, Benjamin Ginsberg, Kenneth A. Shepsle, and Stephen Ansolabehere. New York: W.W. Norton & Co., pages vary depending on version.

Primo, David M. 2013. "Pro: Resolved, the United States Should Adopt a Balanced Budget Amendment." In *Debating Reform: Conflicting Perspectives on How to Fix the American Political System*, 2nd ed., eds. Richard J. Ellis and Michael Nelson. Washington, DC: CQ Press, 333-343.

Milyo, Jeffrey, David M. Primo, and Matthew L. Jacobsmeier. 2011. "Does Public Financing of State Election Campaigns Increase Voter Turnout?" In *Public Financing in American Elections*, ed. Costas Panagopoulos. Philadelphia, PA: Temple University Press, 225-237.

Primo, David M., Jeffrey Milyo, and Tim Groseclose. 2006. "State Campaign Finance Reform, Competitiveness, and Party Advantage in Gubernatorial Elections." In *The Marketplace of Democracy: Electoral Competition and American Politics*, eds. Michael P. McDonald and John Samples. Washington, DC: Brookings Institution Press, 268-285.

Milyo, Jeffrey, and David Primo. 2005. "Reform without Reason? The Scientific Method and Campaign Finance." In *Welfare for Politicians? Taxpayer Financing of Campaigns*, ed. John Samples. Washington, DC: Cato, 197-211.

Primo, David M. 2004. "Campaign Finance Reform." *Public Opinion and Polling around the World: A Historical Encyclopedia*, ed. John G. Geer. Santa Barbara, CA: ABC-CLIO, 165-171.

Primo, David M. 2003. "Campaign Contributions, the Appearance of Corruption, and Trust in Government." In *Inside the Campaign Finance Battle: Court Testimony on the New Reforms,* eds. Anthony Corrado, Thomas E. Mann, and Trevor Potter. Washington, DC: Brookings Institution Press, 285-296.

**POLICY PAPERS, REPORTS, AMICUS BRIEFS, AND TESTIMONY**

Primo, David M., and Jeffrey D. Milyo. 2024. Amicus Brief in *No on E v. Chiu* (filed with the US Supreme Court).

Primo, David M. 2024. "What Social Science Tells Us About Forced Donor Disclosure." Special Report, Philanthropy Roundtable.

**POLICY PAPERS, REPORTS, AMICUS BRIEFS, AND TESTIMONY (cont.)**

Primo, David M. 2023. "Constitutional Restraints on the Federal Budget." Testimony prepared for a hearing of the US House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, September 19.

Contributor to Persily, Nathaniel, Robert F. Bauer, and Benjamin L. Ginsberg. 2018. "Campaign Finance in the United States: Assessing an Era of Fundamental Change." Report, Bipartisan Policy Center.

Milyo, Jeffrey D., and David M. Primo. 2017. "Public Attitudes and Campaign Finance: Report for the Campaign Finance Task Force." Distributed by the Bipartisan Policy Center as a companion to the 2018 report cited above.

Primo, David M. 2017. "The Need for Constitutional Budget Reform." Testimony prepared for a hearing of the US House Committee on the Judiciary, July 27.

Primo, David M., and Jake Jares. 2017. Series of "Mercatus on Policy" Reports regarding state constitutions and fiscal policy. Mercatus Center at George Mason University.

- "Education Innovation, Fiscal Policy, and State Constitutions"
- "Education Policymaking from the Bench: Lessons from New Jersey and Connecticut"
- "Florida, High-Speed Rail, and the Perils of Policymaking by Constitution"
- "Illinois's Constitutional Pension Protections, with Lessons for New Jersey"
- "Too Much of a Good Thing? Initiatives and the 'Cluttered' Colorado Constitution"
- "Unfunded Mandates and State Constitutions: Lessons from Florida"

Primo, David M. 2016. "State Constitutions and Fiscal Policy." Mercatus Research, Mercatus Center at George Mason University.

Primo, David M. 2015. "First Principles of Congressional Budgeting." Testimony prepared for a hearing of the US House Committee on the Budget, July 28.

Primo, David M. 2014. "Constitutional Solutions to Our Escalating National Debt: Examining Balanced Budget Amendments." Testimony prepared for a hearing of the US House Committee on the Judiciary, July 24.

Primo, David M. 2014. "The Uses and Misuses of Budget Data." Mercatus Research, Mercatus Center at George Mason University.

Primo, David M. 2014. "Making Budget Rules Work: 2014 Edition." Mercatus Research, Mercatus Center at George Mason University.

Primo, David M., and Jeffrey D. Milyo. 2013. Amicus Brief in *Iowa Right to Life, Inc. v. Tooker* (filed with the US Supreme Court).

Primo, David M., and Jeffrey D. Milyo. 2012. Amicus Brief in *US v. Danielczyk* (filed with the US 4th Circuit Court of Appeals and the US Supreme Court).

Primo, David M. 2011. "Full Disclosure: How Campaign Finance Disclosure Laws Fail to Inform Voters and Stifle Public Debate." Research Report, Institute for Justice.

Primo, David M. 2011. "Should the Constitution Be Amended to Address the Federal Deficit?" Testimony prepared for a hearing of the US House Committee on the Judiciary, Subcommittee on the Constitution, May 13.

## POLICY PAPERS, REPORTS, AMICUS BRIEFS, AND TESTIMONY (cont.)

Primo, David M. 2010. "Making Budget Rules Work." Working Paper No. 10-62, Mercatus Center at George Mason University.

Primo, David M. 2010. "What Does Research Say About Public Funding for Political Campaigns?" Institute for Justice Research Brief, published online at http://www.ij.org/about/3466. Reprinted in *Opposing Viewpoints: Election Spending*, ed. Nancy Dziedzic, Greenhaven Press, 74-83.

Primo, David M. 2010. "Making Budget Rules Bite." Mercatus on Policy No. 72, Mercatus Center at George Mason University.

Primo, David M. 2001. "Public Opinion and Campaign Finance: A Skeptical Look at Senator McCain's Claims." Briefing Paper No. 60, Cato Institute.

## PUBLISHED BUSINESS SCHOOL CASES (ORIGINALLY STANFORD GSB CASES)

Primo, David, and Romain Wacziarg. 2002. "CSN and Steel Antidumping (A)." In *Business and Its Environment,* 4th ed., by David P. Baron. Upper Saddle River, NJ: Prentice Hall, 215-217.

Primo, David, and Romain Wacziarg. 2002. "CSN and Steel Antidumping (B)." In *Business and Its Environment Instructor's Manual with Test Item File*, 4th ed., by David P. Baron and Anne Cowden. Upper Saddle River, NJ: Prentice Hall, 138-139.

## OTHER PUBLICATIONS

Clarke, Kevin A., and David M. Primo. 2012. "The Modeling Enterprise in Comparative Politics." *APSA Comparative Politics Section Newsletter* 22(2):8-9. Adapted version appeared as "The Modeling Enterprise in International Relations" in e-International Relations (www.e-ir.info), June 2013.

Primo, David M., and Jeffrey Milyo. 2007. "Public Financing of Campaigns: A Statistical Analysis." *Engage* 8:96-100.

## HONORS (2003-Present)

Finalist, Educational Innovation Award (Online/Hybrid Design), Simon Business School, University of Rochester, 2022

Edward Peck Curtis Award for Excellence in Undergraduate Teaching, University of Rochester, 2018

Honorable Mention (one of the top 5 papers), Best Paper Prize, 34th Annual International Conference of the Strategic Management Society, 2014, for "Using Item Response Theory to Improve Measurement in Strategic Management Research: An Application to Corporate Social Responsibility" (with Rob Carroll and Brian Richter)

Alan Rosenthal Prize for *Rules and Restraint* (best publication in legislative studies by a young scholar during 2007 of importance to legislators and legislative staff and of merit in strengthening the practice of representative democracy), Legislative Studies Section, American Political Science Association, 2008

Goergen Award for Distinguished Achievement and Artistry in Undergraduate Education, University of Rochester, 2005

Undergraduate Professor of the Year, University of Rochester Students' Association Award, 2005

## GRANTS

The Paul E. Singer Foundation, Politics and Markets Project, 2013-Present.

Institute for Humane Studies, "A Longitudinal Analysis of Trust in Higher Education," 2025.

Charles G. Koch Charitable Foundation, Guest Speakers Grant, 2010.

University of Rochester, Kauffman Course Development Grant, "Politics and Markets: Innovation and the Global Business Environment," 2009.

National Science Foundation, Award SES-0314786, "The Design and Enforcement of Legislative Budget Rules," 2003-07.

University of Rochester Center for Entrepreneurship, Research Grant, "Tolerance for Failure, Entrepreneurship, and Economic Performance," 2006-07.

Initiative and Referendum Institute at USC and USC-Caltech Center for the Study of Law and Politics, Research Stipend, "The Effect of Local Initiatives on State and Local Finance," 2006-07.

Earhart Foundation, Fellowship Research Grant, "Rules and Restraint: Government Spending and the Design of Institutions," 2006.

Smith Richardson Foundation, Domestic Public Policy Research Fellowship, "Rules and Restraint: Government Budgets and the Enforcement Problem," 2005-06.

## CONFERENCE PAPERS (2004-Present)

"Does the Political Engagement of Top Managers Affect Firm Performance?" Co-authored with Jake Jares, David Gaddis Ross, and Seoeun Yang. Presented by Primo at the 18th Annual Strategy and the Business Environment (SBE) Conference, April 20-21, 2018.

"Risky Business: Do Disclosure and Shareholder Approval of Corporate Political Spending Affect Stock Volatility and Value?" Co-authored with Saumya Prabhat. Presented by Primo and Prabhat at the 2016 Annual Meeting of the American Law and Economics Association, May 20-21, 2016, by Prabhat at the 2015 MIT Asia Conference in Accounting, July 13-14, 2015, and by Primo (remotely) at the Annual Meeting of the American Political Science Association, August 28-31, 2014, with various titles.

"Corporate Social and Financial Performance Revisited: On Measures, Methods, and Interpretations." Co-authored with Robert J. Carroll and Brian Kelleher Richter. Presented by Richter at the 15th Annual Strategy and the Business Environment (SBE) Conference, May 1-2, 2015, and the 2015 International Association of Business and Society, March 12-15, 2015.

"Using Item Response Theory to Improve Measurement in Strategic Management Research: An Application to Corporate Social Responsibility." Co-authored with Robert J. Carroll and Brian Kelleher Richter. Presented by Richter at the Annual International Conference of the Strategic Management Society, September 20-23, 2014 and at the Annual Meeting of the Academy of Management, August 1-5, 2014, and by Primo at the Annual Strategy and the Business Environment (SBE) Conference, April 21-22, 2014.

"Earmarks and Representation." Co-authored with Gary Hollibaugh, Larry Rothenberg, and Kristin Rulison. Presented by Hollibaugh at the Annual Meeting of the Midwest Political Science Association, April 11-14, 2013.

**CONFERENCE PAPERS (2004-Present) (cont.)**

"Distributive Politics and Primary Elections." Co-authored with Chris Berry and Jim Snyder. Presented by Berry at the Annual Meeting of the Midwest Political Science Association, April 12-15, 2012.

"Voter ID Laws and Turnout." Co-authored with Jonathan Klingler and Jeff Milyo. Presented by Klingler and Primo at the Annual Meeting of the Midwest Political Science Association, March 31-April 3, 2011.

A Dynamic Model of Judicial Appointments." Co-authored with Yoji Sekiya. Presented by Primo at the Annual Meeting of the Midwest Political Science Association, April 2-5, 2009, and by Primo and Sekiya at the Annual Meeting of the American Political Science Association, September 3-6, 2009.

"The Bad News About 'Going Public.'" Co-authored with Stu Jordan. Presented by Jordan and Primo at the Annual Meeting of the American Political Science Association, August 28-31, 2008.

"The Effect of Initiatives on Local Government Spending." Presented at the Annual Meeting of the Midwest Political Science Association, April 12-15, 2007, and at the Annual Meeting of the American Political Science Association, August 30 - September 2, 2007.

"Tolerance for Failure, Entrepreneurship, and Economic Performance." Co-authored with Bill Green. Presented by Primo at the Annual Meeting of the Midwest Political Science Association, April 12-15, 2007.

"The Effects of Campaign Finance Laws on Turnout, 1950-2000." Co-authored with Jeff Milyo. Presented by Primo at the Annual Meeting of the American Political Science Association, August 31-September 3, 2006.

"Party Strength, the Personal Vote, and Government Spending." Co-authored with Jim Snyder. Presented by Primo at the Annual Meeting of the Midwest Political Science Association, April 20-23, 2006.

"Party Strength and State Government Spending." Co-authored with Jim Snyder. Presented by Primo at the Annual Meeting of the American Political Science Association, September 1-4, 2005.

"Modernizing Political Science: A Model-Based Approach." Co-authored with Kevin Clarke. Presented by Clarke at the Annual Meeting of the Midwest Political Science Association, April 7-10, 2005, and by Clarke and Primo at the Annual Conference of the Canadian Political Science Association, June 2-4, 2005.

"Public Goods and the Law of 1/n." Co-authored with Jim Snyder. Presented by Primo at the Annual Meeting of the Midwest Political Science Association, April 7-10, 2005.

"Restrictive Rules, Restrained Spending: The Endogenous Enforcement of Budget Rules in Legislatures." Presented at the Annual Meeting of the American Political Science Association, September 2-5, 2004.

"The Theoretical Implications of the Empirical Implications of Theoretical Models." Co-authored with Kevin Clarke. Presented by Clarke at the Annual Meeting of the American Political Science Association, September 2-5, 2004.

"Open vs. Closed Rules in Budget Legislation: A Result and an Application." Presented at the Annual Meeting of the Public Choice Society, March 11-14, 2004, and at the Annual Meeting of the Midwest Political Science Association, April 15-18, 2004.

"State Campaign Finance Laws and the Turnout Decision." Co-authored with Jeff Milyo. Presented by Primo at the Annual Meeting of the Public Choice Society, March 11-14, 2004, and by Milyo at the Annual Meeting of the Midwest Political Science Association, April 15-18, 2004.

## INVITED UNIVERSITY PRESENTATIONS (2004-Present)

Western University, Ivey Business School, Ivey Research Series, May 15, 2018

University of Southern California, Marshall School of Business, Applied Economics Workshop, March 27, 2015

University of Texas at Austin, McCombs School of Business, March 26, 2015

George Washington University, School of Business, February 20, 2015

Yale University, Institution for Social and Policy Studies, Show Me the Money: How Transparency in Political Donations Could Change American Elections, November 10, 2014

Yale University, Institution for Social and Policy Studies, Purchasing Power: Money, Politics and Inequality Conference, May 6, 2013

George Mason University, Economic Liberty Lecture Series, April 1, 2013

Washington University in St. Louis, Political Science Department Seminar, March 19, 2009

George Mason University, Economics Department Seminar, November 6, 2008

Kauffman Foundation, Summer Legal Institute, July 10-13, 2008

London School of Economics, PSPE Conference on Designing Democratic Institutions, May 13-14, 2008

University of Maryland, Economics Department Seminar, May 5, 2008

University of Chicago, The Harris School's American Politics Workshop, May 14, 2007

University of Southern California Conference, When Voters Make Laws: How Direct Democracy is Reshaping American Cities, April 6-7, 2007

University of Miami, Joint Political Science and Economics Seminar, February 22, 2007

Brookings Institution and Cato Institute Conference, The Marketplace of Democracy, March 9, 2006

University of Wisconsin, Madison, Conference on Public Election Funding, January 28-29, 2006

Cornell University, Joint Government and Economics Workshop, November 4, 2004

## COURSES TAUGHT

**University of Rochester (undergraduate unless otherwise specified)**

American Political Institutions (PhD), Spring 2023

American Politics Field Seminar (PhD), Fall 2009, Fall 2007, Fall 2003

Business and Politics, Spring 2024, Spring 2022, Spring 2020, Fall 2015, Fall 2014, Fall 2013, Fall 2012, Fall 2009, Spring 2009, Spring 2008, Spring 2007, Spring 2005, Spring 2004, Fall 2002

Corporate Political Strategy (PhD), Fall 2016, Spring 2014

**COURSES TAUGHT (cont.)**

**University of Rochester (undergraduate unless otherwise specified)(cont.)**

Disagreement in a Democratic Society, Fall 2024, Spring 2024, Fall 2022, Spring 2022, Spring 2020

Ethics & Policy in Tech (MSBA), Spring 2023

Experience Simon Module: Corporate Strategy and Politics (MBA/MS), Fall 2012

Introduction to Positive Political Theory, Fall 2008, Fall 2007, Fall 2004, Spring 2004, Fall 2002

Models in American Politics: Theory & Data (PhD), Fall 2010, Fall 2008, Fall 2006

Money in Politics, Fall 2004, Fall 2003

The Nature of Entrepreneurship, Spring 2010, Spring 2008, Spring 2007, Spring 2005

Pandemic Politics, Fall 2023, Fall 2021

Politics and Markets: Innovation and the Global Business Environment, Spring 2025, Spring 2023, Spring 2021, Spring 2019, Fall 2016, Spring 2013, Fall 2010, Spring 2010

Strategy Beyond Markets (MBA), Fall 2024, Fall 2023, Fall 2022, Fall 2021, Fall 2020, Fall 2019, Fall 2018

**Stanford University**: Business and Public Policy (undergraduate), Spring 2002

**PROFESSIONAL ACTIVITIES**

**Additional Appointments and Affiliations**

Senior Affiliated Scholar, The Mercatus Center at George Mason University, 2010-Present

Editorial Board, *American Politics Research*, 2006-Present

Board of Academic Advisors, Institute for Free Speech (formerly Center for Competitive Politics), 2006-Present

Rochester Center for Economic Research, University of Rochester, 2003-Present

W. Allen Wallis Institute of Political Economy, University of Rochester, 2002-19

**Additional Conference Participation (2006-Present, also see Conference Papers and Invited Presentations)**

"Measurement Issues in the Study of Corporate Political Activity," Corporate America and Partisan Divisions Conference Sponsored by the Institute for Humane Studies, 2024

Authors Meet Critics Panel for *Campaign Finance and American Democracy: What the Public Really Thinks and Why It Matters*, APSA Meeting, 2023

Discussant, Strategy and the Business Environment Conference, 2020

Plenary Session Presentation, "(Budget) Rules Are Made to Be Broken: Can We Fix Them?," Public Choice Conference, 2018

Discussant, Conference on "How Incomplete Is the Theory of the Firm?," Stigler Center at the University of Chicago Booth School of Business, 2017

**PROFESSIONAL ACTIVITIES (cont.)**

**Additional Conference Participation (2006-Present, also see Conference Papers and Invited Presentations) (cont.)**

Roundtable Participant, US Federal Campaign Finance in a Time of Transition, APSA Meeting, 2016

Discussant, Cornell Political Economy Conference, 2016

Discussant, Campaign Finance Law and Politics after Citizens United v. FEC, APSA Meeting, 2010

Discussant, Influences on Congressional Voting, APSA Meeting, 2010

Discussant, Washington University in St. Louis, Federal Budget and Tax Policy for a Sound Fiscal Future Conference, 2009.

Discussant, Partisanship and Bipartisanship in the US Congress, APSA Meeting, 2009

Discussant, Strategic Choices in Comparative Legislatures, APSA Meeting, 2008

Chair and Discussant, Lobbyists and Legislatures, Midwest Meeting, 2008

Chair and Discussant, The Political Economy of Legislatures, APSA Meeting, 2007

Discussant, The Effects of Institutions and Rules on State and Local Politics, Midwest Meeting, 2007

Roundtable Participant, The Marketplace of Democracy: Electoral Competition in the United States, APSA Meeting, 2006

**Selected Department and University Service (University of Rochester)**

Director of Graduate Placement, 2018-22, 2023-24, 2024-25

Member, Undergraduate Business Program Advisory Board, Feb. 2017-Present

Member, Methods/American Politics Search Committee, 2014-15

Member, Applied Political Economy Search Committee, 2010-11, 2009-10, 2006-07

Chair, American Politics and Methodology Search Committee, 2004-05

Chair, American Politics Search Committee, 2003-04

Co-Chair, Graduate Admissions, Incoming 2010 Class

Co-organizer (with John Duggan and Tasos Kalandrakis), Wallis Institute 14th and 17th Annual Conferences on Political Economy, 2007 and 2010

Co-organizer (with Gretchen Helmke and Stu Jordan), Wallis Institute Mini-Conference on Positive Political Theory and the Law, 2009

Organizer, American Politics Working Group, 2007-09

Faculty Ambassador, Office of Advancement, 2012-14

**PROFESSIONAL ACTIVITIES (cont.)**

**Other Professional Service**

Secretary-Treasurer, Political Economy Section, American Political Science Association, 2016-18

Program Committee, 20th – 24th Annual Strategy and the Business Environment Conference, 2020-24

Co-organizer (with Mark Zupan), 16th Annual Strategy and the Business Environment Conference, 2016

Member, Alan Rosenthal Prize Committee, APSA Legislative Studies Section, 2009 award

Member, Best Paper Prize Committee, APSA Political Economy Section, 2011 award

Peer Reviewing: American Journal of Political Science, American Political Science Review, American Politics Research, British Journal of Political Science, Economics & Politics, Election Law Journal, Electoral Studies, European Journal of Political Economy, Independent Review, Journal of Business Ethics, Journal of Legal Studies, Journal of Political Institutions and Political Economy, Journal of Politics, Journal of Public Administration Research and Theory, Journal of Public Economic Theory, Journal of Public Economics, Journal of Theoretical Politics, Legislative Studies Quarterly, Management Science, Mercatus Center at George Mason University, National Tax Journal, Operations Research, Oxford University Press, Party Politics, Political Analysis, Political Behavior, Political Research Quarterly, Political Science Research and Methods, Princeton University Press, PS: Political Science & Politics, Public Choice, Public Opinion Quarterly, Quarterly Journal of Political Science, SAGE Publications, Social Choice and Welfare, Social Science Quarterly, Southern Economic Journal, State Politics & Policy Quarterly, Strategic Management Journal, Strategy Science, Time-Sharing Experiments in the Social Sciences (TESS)

**Legal Consulting (*indicates deposition given or testified at trial)**

*Lopez v. Griswold (United States District Court, District of Colorado, Case 1:22-cv-00247-SKC)

*Ostrewich v. Hollins (United States District Court, Southern District of Texas, Case 4:19-cv-715)

Upstate Jobs Party v. Kosinski (United States District Court, New York Northern District, Case 6:18-cv-00459)

*State of Washington v. Grocery Manufacturers Association (Thurston County Superior Court, Washington State, Case 13-2-02156-8)

Seaton v. Wiener (United States District Court, District of Minnesota, Case 14-CV-1016 DWF/JSM)

Justice v. Hosemann (United States District Court, Northern District of Mississippi, Case 13-60754)

Worley v. Detzner (United States District Court, Northern District of Florida, Tallahassee Division, Case 4:10cv423-RH/CAS)

*McComish v. Bennett (United States District Court, District of Arizona, Case CV08-1550-PHX-ROS)

*McConnell v. FEC (United States District Court, District of Columbia, Case 02-CV-582 (CKK, KLH, RJL), Consolidated Action)

**Other Consulting**

Facebook

**PROFESSIONAL ACTIVITIES (cont.)**

**Media Appearances, Quotations, Citations, and Op-eds (National and International)**

1A, ABC Radio (Australia), AFP, Associated Press, Bloomberg Brazil, Bloomberg News, Bloomberg Radio, Bloomberg TV, Chicago Tribune, Christian Science Monitor, Chronicle of Higher Education, CNBC.com, CNN.com, Cointelegraph, Computerworld, CQ Today, CQ Researcher, CQ Weekly Report, Credit Union Journal, Fast Company, Forbes.com, The Hill, Huffington Post, Inside Higher Ed, International Business Times, Law360, Los Angeles Times, El Nacional (Venezuela), NPR's Marketplace, National Public Radio, The National Desk, National Review, NBC's Today Show, New Republic, New Statesman America, News Italia Press, NewsNation Now, Newsweek, New York Magazine, New York Times, PolitiFact, Quartz, RealClearMarkets, Reason, Reuters, Roll Call, SiriusXM Radio, The Takeaway, Times (London), USA Today, US News & World Report, Voice of America, Wall Street Journal, WalletHub, Washington Examiner, Washington Free Beacon

**Media Appearances, Quotations, and Op-eds (Local and Regional)**

Print and Online: Albany Times Union, Baltimore Sun, Boston Globe, Boston Herald, Buffalo News, Capital News Service (MD), Cincinnati Enquirer, Colorado Springs Gazette, Cook County (IL) Record, Dallas Morning News, Delaware News Journal, Houston Chronicle, Las Vegas Sun, Newsday (New York), New York Daily Record, Oklahoman, Orlando Sentinel, Pittsburgh Tribune-Review, Rochester Business Journal, Rochester Democrat and Chronicle

TV and Radio: NBC 10 TV (Rochester), 13 WHAM TV (Rochester), R News/YNN TV (Rochester), KCBS Radio (San Francisco), KHOW Radio (Denver), WHAM Radio (Rochester), WCNY Radio (Syracuse), WNYC Radio (New York Public Radio), WPR Radio (Wisconsin Public Radio), WWL Radio (New Orleans), WXXI Radio (Rochester)

**(Updated March 25, 2025)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER, *et al.*,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**STIPULATION REGARDING HISTORIANS' DECLARATIONS**

The Parties having met and conferred hereby stipulate to the following:

1. The Parties offer the declarations of Jack Rakove, Jonathan Gienapp, and Seth Tillman, (Dkt. Nos. 53-1, 53-2, 62-3), as the testimony of witnesses who supply scholarly opinion which may prove helpful to the Court in adjudicating this case. *See* Fed. R. Evid. 201 advisory committee's note ("Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process").

2. The matters therein should not be viewed as adjudicative facts that supersede the Court's independent analysis of the relevant legal issues. Neither should the declarations be viewed as precluding the Parties or the Court itself from relying upon other scholarship.

3. The declarations should not be considered superior to other scholarship merely because of the form of presentation.

4. To the extent the declarations contain legal arguments, those portions of the declaration should be viewed as argument and not testimony. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997).

Respectfully submitted,

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street Merrill's Wharf
Portland, ME 04101
Tel: (207) 791-1350
jdunlap@pierceatwood.com

Charles Miller
Institute for Free Speech
1150 Connecticut Ave., NW Suite 801
Washington, DC 20036
Tel: (202) 301-9800
cmiller@ifs.org

*Counsel for Plaintiffs*

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal*
Ezra P. Louvis*
Milbank LLP
1850 K St., N.W.
Washington, D.C. 20006
Tel: (202) 835-7500
nkatyal@milbank.com
elouvis@milbank.com

David M. Kallin, Bar No. 4558
Adam R. Cote, Bar No. 9213
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Tel: (207) 772-1941
dkallin@dwmlaw.com
acote@dwmlaw.com

* *Pro hac vice*

*Counsel for Defendant Intervenors Richard Bennett, Cara McCormick, Peter McCormick, and EqualCitizens*

*/s/ Jonathan R. Bolton*
Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: (207) 626-8800
jonathan.bolton@maine.gov

*Counsel for State Defendants*

May 5, 2025

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **DINNER TABLE ACTION et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:24-cv-00430-KFW** |
| | ) | |
| **WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER[1]

The Supreme Court has recognized only one constitutional basis for restricting political speech: preventing quid pro quo corruption or its appearance. *See FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). Along those lines, the Court has struck down restrictions on independent political expenditures made without any candidate coordination after concluding that such expenditures—unlike direct campaign contributions—"do not give rise to corruption or the appearance of corruption." *Citizens United v. FEC*, 558 U.S. 310, 357 (2010). The primary question in this case is whether Maine's recently enacted law limiting contributions to political action committees (PACs) that make independent expenditures (often referred to as super PACs) is a constitutional means of preventing quid pro quo corruption or whether it runs afoul of the Court's First Amendment jurisprudence.

[1] The parties have consented to me presiding over this case. *See* ECF Nos. 11, 44.

## I. Background

In November 2024, a record number of Maine voters passed by ballot initiative "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act"). *See* ECF Nos. 45-10 to 45-11. The Act restricts individuals and entities from contributing more than $5,000 per year to any given PAC "for the purpose of making independent expenditures" supporting or opposing a clearly identified candidate for local or state office. 21-A M.R.S.A. §§ 1015(2-C)-(2-D), 1019-B(1)(A)-(B).[2] The Act correspondingly prohibits PACs from using funds contributed in excess of the limit to make independent expenditures. *See id.* § 1019-B(6). And finally, the Act requires PACs to disclose "the total contributions from each contributor" to an independent expenditure. *Id.* § 1019-B(4)(B).

Dinner Table Action and For Our Future are Maine PACs that make independent expenditures. *See* Declaration of Alex Titcomb (ECF No. 16-1) ¶¶ 8, 10-11, 13. Both PACs receive a substantial amount of their funding from contributions that exceed the new limit, and For Our Future regularly contributes amounts exceeding the limit to other PACs such as Dinner Table Action. *See id.* ¶¶ 18-19, 25, 37, 45. The Act will severely curtail the ability of both PACs to raise and spend money to communicate their election views through independent expenditures or donations to other PACs making independent expenditures. *See id.* ¶¶ 35-36, 45.

[2] Citations to the Maine Revised Statutes Annotated are to the version available on Westlaw, which, as of the date of this order, was current through emergency legislation Chapter 433 of the 2025 First Regular and First Special Sessions of the 132nd Legislature of Maine.

In December 2024, Dinner Table Action and For Our Future—along with their founder Alex Titcomb—filed a complaint against the members of the Maine Commission on Governmental Ethics and Election Practices[3] and Maine Attorney General Aaron M. Frey in their official capacities asserting that the Act violates the First and Fourteenth Amendments. *See* Complaint (ECF No. 1). They seek a declaration that the Act is unconstitutional on its face and/or as applied to them as well as a permanent injunction barring enforcement of the Act. *See id.* at 16.

At a conference early in the case, the parties proposed an abbreviated briefing schedule on the Plaintiffs' anticipated motion for a permanent injunction. *See* ECF No. 12. The State Defendants agreed to delay enforcement of the Act, which went into effect on December 25, 2024, until May 30, 2025, to allow time to resolve the case. *See id.* After the Plaintiffs had filed their motion (ECF No. 16), I permitted the nonpartisan fair elections organization EqualCitizens, ballot initiative proponents Cara and Peter McCormick, and Maine State Senator Richard A. Bennett to intervene and defend the Act. *See* ECF No. 51. The parties ultimately agreed that an evidentiary hearing was unnecessary to resolve the Plaintiffs' motion and that the matter was ready for final judgment on the merits. I held oral argument on May 22, 2025, *see* ECF No. 68, at which time the State Defendants agreed to further delay enforcement of the Act through July 15, 2025, *see* ECF No. 69 at 94.

---

[3] Namely, Chair William J. Schneider and members David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn. *See* Complaint at 1.

## II. Discussion

### A. Contribution Limit

Because free debate of public issues and candidates is critical to our democratic system of governance, the First Amendment provides robust protections for political speech, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011), and "the financing and spending necessary to enable political speech," *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).

When evaluating the constitutionality of laws restraining political speech, the Supreme Court distinguishes between limits on political expenditures and limits on political contributions. *See Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976). Limits on expenditures must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," while limits on contributions will be upheld so long as they are closely drawn to further a sufficiently important state interest. *Id.* The only state interest important enough to outweigh the First Amendment's political speech protections is the state's interest in preventing quid pro quo corruption or its appearance. *Ted Cruz for Senate*, 596 U.S. at 305.

Applying this framework, the Supreme Court struck down a limit on independent expenditures in *Citizens United*, holding that such expenditures "do not give rise to corruption or the appearance of corruption." 558 U.S. at 357. The Court explained, "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid*

*pro quo* for improper commitments from the candidate." *Id.* (cleaned up); *see also Buckley*, 424 U.S. at 47 (noting that "independent advocacy" has a "substantially diminished potential for abuse"); *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 751 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." (cleaned up)).

The question in this case is whether the Supreme Court's decision in *Citizens United* forecloses a state's ability to limit contributions to political groups making independent expenditures. Although this is an issue of first impression in the First Circuit, other courts have—as the Plaintiffs point out, *see* Motion at 10-11—been seemingly unanimous in holding that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to" independent expenditure groups. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *see Wisc. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537-38 (5th Cir. 2013) ("[E]very federal court that has

considered the implications of *Citizens United* on independent [expenditure] groups . . . has been in agreement: There is no difference in principle—at least where the only asserted state interest is in preventing apparent or actual corruption—between banning an [independent expenditure] organization . . . from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or giving funds to other organizations to allow them to engage in advocacy on its behalf)."); *Republican Party of N.M.*, 741 F.3d at 1103 ("[T]he question before us is whether political committees that are not formally affiliated with a political party or candidate may receive unlimited contributions for independent expenditures. On this question the answer is yes. . . . The Supreme Court has held that independent expenditures do not invoke the anti-corruption rationale . . . ."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013) ("The Supreme Court held in *Citizens United v. FEC* that the government has no anti-corruption interest in limiting independent expenditures. It follows that a donor to an independent expenditure committee . . . is even further removed from political candidates and may not be limited in his ability to contribute to such committees." (cleaned up)); *Alaska Pub. Offices Comm'n v. Patrick*, 494 P.3d 53, 58 (Alaska 2021) ("Given the Supreme Court's holding that preventing quid pro corruption and its appearance is the only legitimate governmental interest for campaign finance regulations and its holding that independent expenditures do not give rise to quid pro quo corruption or its appearance, there is no logical rationale for limiting contributions to independent expenditure groups."); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293

(4th Cir. 2008) (holding, prior to *Citizens United*, that "it is implausible that contributions to independent expenditure political committees are corrupting" and declaring unconstitutional a limit on such contributions (cleaned up)).

Notwithstanding the fact that "[f]ew contested legal questions" have been "answered so consistently by so many courts and judges," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, the Defendants maintain that these cases "were wrongly decided." State Defendants' Opposition (ECF No. 45) at 13; Intervenor Defendants' Opposition (ECF No. 53) at 5. They insist that *Citizens United* is inapposite because it involved a limit on expenditures that was subject to more intense scrutiny than the limit on contributions at issue here.

The Defendants' primary argument is that the Act is constitutional because it is closely drawn to serve "Maine's interest in stopping quid pro quo corruption by preventing candidates from trading official acts for contributions to Super PACs aligned with their campaigns." State Defendants' Opposition at 8. They point to two criminal cases involving political "candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements." *Id.* at 9; ECF Nos. 45-6 to 45-8. And they emphasize that just because "SuperPACs *make* 'independent expenditures' does not ensure that they *receive* independent contributions free from quid-pro-quo corruption." Intervenor Defendants' Opposition at 5.

Even accepting that contributions to independent expenditure PACs can serve as the quid in a quid pro quo arrangement, however, I am not persuaded that the Defendants' arguments on this point can be squared with *Citizens United*. I do not

read the Supreme Court as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is "substantially diminished" to the point that the government's "anticorruption interest is not sufficient to displace" First Amendment protections. *Citizens United*, 558 U.S. at 357 (cleaned up). Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still. That being the case, there "is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Alaska Pub. Offices Comm'n*, 494 P.3d at 58.

The Defendants also suggest that the Act is closely drawn to further Maine's interest in preventing the appearance of corruption. They contend that "the Maine electorate's overwhelming" approval of the Act supports the notion that the public perceives large contributions to independent expenditure PACs as corrupting. Intervenor Defendants' Opposition at 7; *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 394 (2000) ("[A]lthough majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied on here: An overwhelming 74 percent of the voters of Missouri determined that [campaign] contributions limits are necessary to combat corruption and the appearance thereof." (cleaned up)). They also provide the results of a survey that, according to them, shows "a clear majority" of citizens "believe that quid-pro-quo

corruption is likely to occur" when such contributions exceed $5,000. Intervenor Defendants' Opposition at 6-7; ECF No. 53-3.

Justice Stevens made similar points in *Citizens United* when dissenting from the majority's opinion striking down limits on corporate independent expenditures. He criticized the majority for ignoring the "significant evidence" that such expenditures were, at the very least, susceptible to the appearance of corruption and warned that the Court's holding would result in "cynicism and disenchantment" among voters and "and an increased perception that large spenders call the tune." *Citizens United*, 558 U.S. at 457, 470 (Stevens, J., dissenting) (cleaned up). The majority, however, was unmoved, saying,

> By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker.

*Id.* at 360 (cleaned up).

If the government's interest in combatting the appearance of corruption was not enough to justify limits on independent expenditures, it stands to reason that the same interest is not enough to justify limits on contributions to independent expenditures. Thus, even accepting the Defendants' assertions about public perception, their arguments on this point once again fail under the Supreme Court's reasoning in *Citizens United*.

Finally, the Defendants argue that the Act is constitutional because it is closely

drawn to further Maine's interest in preventing dependence corruption—that is, the risk that elected officials will become dependent on constituencies disconnected from the electorate. *See* Intervenor Defendants' Opposition at 8-17. They assert that the First Amendment, as it was originally understood by the Framers, allows for the regulation of dependence corruption in addition to quid pro quo corruption. *See id.* I need not address this argument further or resolve the disagreements of the parties' competing constitutional historians because, as discussed, the Supreme Court has been clear that the only interest it recognizes as sufficient to justify limits on political speech is the government's interest in preventing quid pro quo corruption. *See Ted Cruz for Senate*, 596 U.S. at 305. Even the Defendants acknowledge that I am bound to follow Supreme Court precedent on this point and admit that their argument is primarily intended to preserve the issue for subsequent levels of review. *See* Intervenor Defendants' Opposition at 9-10 n.3.

At bottom, I agree with other courts that, regardless of whether strict or intermediate scrutiny applies, *Citizens United* forecloses limits on contributions to independent expenditure groups. *See, e.g.*, *SpeechNow.org*, 599 F.3d at 696 (holding that no "matter which standard of review governs contributions limits," contribution limits on independent expenditure groups "cannot stand" under *Citizens United*). The portions of the Act limiting contributions to PACs for the purposes of making independent expenditures—21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6)—violate the First Amendment on their face because there is no set of circumstances

where they could be applied constitutionally. *See Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168 (1st Cir. 2024).

That leaves the question of injunctive relief. Granting a permanent injunction requires a court "to find that (1) plaintiffs prevail on the merits, (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

The Plaintiffs readily satisfy each of these factors.[4] They are prevailing on the merits; the loss of their First Amendment freedoms absent an injunction would be an irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976); the harm the Plaintiffs would face in losing their First Amendment freedoms outweighs the harm the Defendants will suffer from an injunction where the Defendants have failed to demonstrate a compelling state interest in limiting those freedoms; and, finally, the public's interest is served—rather than harmed—by enforcing the First Amendment, *see P.R. Assoc. of Mayors v. Vélez-Martínez*, 480 F. Supp. 3d 377, 379 (D.P.R. 2020).

[4] The Defendants suggest in passing that the Plaintiffs "cannot possibly be entitled to an injunction" because they did not specifically address all four of these factors in their motion. Intervenor Defendants' Opposition at 4. Where this case has focused almost entirely on the merits of the underlying constitutional issue and the Plaintiffs' entitlement to a permanent injunction is readily apparent, I decline to find that they waived their request.

Accordingly, I will permanently enjoin enforcement of 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), which are the portions of the Act limiting contributions to PACs for the purpose of making independent expenditures.

**B. Disclosure Requirements**

The Plaintiffs also challenge the Act's separate requirement that a "person, party committee, or [PAC] that makes any independent expenditure in excess of $250 during any one candidate's election" disclose "the total contributions from each contributor" regardless of the amount of the contribution. 21-A M.R.S.A. § 1019-B(4)(B). Because Maine law did not previously require the disclosure of PAC contributions less than $50, *see* 21-A M.R.S.A. § 1060(6), Dinner Table Action avers that multiple of its smaller dollar amount contributors have indicated that they will not contribute as they have done in the past if their identities will be publicly revealed. *See* Declaration of Alex Titcomb ¶¶ 27-29.

Although disclaimer "and disclosure requirements may burden the ability to speak" and associate, they "impose no ceiling on campaign-related activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366 (cleaned up). Accordingly, such requirements are not subject to strict scrutiny but instead "to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (cleaned up). In this context, the government's interest is not limited just to preventing quid pro quo corruption—rather, the Supreme Court has said that the government has an important interest "in provid[ing] the electorate with information

and insur[ing] that the voters are fully informed about the person or group who is speaking." *Id.* at 368 (cleaned up). Nevertheless, disclosure requirements must be narrowly tailored to this informational interest, which requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

Maine's "interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021).[5] That leaves the question of whether the Act's disclosure requirement is narrowly tailored to that interest.

On this point, the First Circuit's decision in *Gaspee Project* is instructive. The Rhode Island law at issue in that case required, among other things, that covered organizations disclose donors of over $1,000. *See id.* at 83. The First Circuit found that the law was "narrowly tailored enough to avoid any First Amendment infirmity" because it was limited to organizations that spent $1,000 or more on independent expenditures within one calendar year and "provide[d] off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution." *Id.* at 88-90. Those off-ramps included "choos[ing] to contribute less than $1,000" or taking advantage of the law's provision allowing donors "to opt out of their monies being used for independent expenditures." *Id.* at 89. "Taken together," the First

[5] The Defendants also argue that the disclosure requirement is sufficiently related to Maine's interest in preventing corruption. *See* State Defendants' Opposition at 18. But as discussed above, Maine's anticorruption interest is not sufficient to displace First Amendment protections in the context of independent expenditures. As such, I will focus on Maine's informational interest.

Circuit concluded, "these limitations on the [law's] reach only require disclosure of relatively large donors who choose to engage in election-related speech." *Id.*

The disclosure requirement here is not nearly so constrained. Although the Act is somewhat limited by the fact that it only requires disclosure of contributions to an independent expenditure if the expenditure exceeds $250, it has no explicit opt out provision for contributors who do not wish to fund independent expenditures, and, most importantly, it requires the disclosure of contributors who give even very small amounts of money. *Cf. Wy. Gun Owners v. Gray*, 83 F.4th 1224, 1249 (10th Cir. 2023) ("[T]he First Circuit's suggestion [in *Gaspee Project*] that wary donors should just contribute less than $1,000 strikes us as an unacceptable ask here, where the disclosure requirements trigger at a *$100* donation.").

Where the Act's disclosure requirement sweeps so broadly and provides no meaningful opportunity for anonymous contributions, it cannot be described as narrowly tailored to Maine's informational interest.[6] In such circumstances, the disclosure requirement is facially unconstitutional because it risks chilling contributors' rights to speak and associate, and that risk "is enough because First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found.*, 594 U.S. at 618-19 (cleaned up); *see id.* at 617-18 (concluding that a disclosure

[6] I offer no general opinion as to what constitutes a reasonable dollar amount threshold for disclosure requirements, only that, in the specific circumstances of this case, the zero dollar threshold is not narrowly tailored to further Maine's informational interest.

requirement that "indiscriminately swe[pt] up information" of donors who might wish to remain anonymous was "facially unconstitutional"). [7]

Accordingly, under the same permanent injunction analysis outlined above, I will enjoin enforcement of the portion of 21-A M.R.S.A. § 1019-B(4)(B) that requires an itemized account of "the total contributions from each contributor." (This quoted language is the language that the Act added to section 1019-B(4)(B)—the State Defendants remain free to enforce the remaining portions of the statute.)

## III. Conclusion

In summary, the Plaintiffs' motion (ECF No. 16) is **GRANTED**. "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" is declared unconstitutional on its face. As such, the State Defendants are permanently enjoined from enforcing 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), and the portion of 21-A M.R.S.A. § 1019-B(4)(B) requiring an itemized account of "the total contributions from each contributor." Judgment shall enter for the Plaintiffs.

**SO ORDERED**.

Dated: July 15, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

[7] In light of my conclusion that the Act violates the First Amendment, I need not address the Plaintiffs' alternative argument that it also violates the Fourteenth Amendment's Equal Protection Clause. *See* Motion at 12-15.

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DINNER TABLE ACTION, et al., )
)
Plaintiffs, )
)
v. ) CIVIL NO. 1:24-cv-00430-KFW
)
WILLIAM J. SCHNEIDER, et al., )
)
Defendants, )

JUDGMENT

In accordance with the Order granting Motion for Permanent Injunction (ECF No. 74) entered by Magistrate Judge Karen Frink Wolf on July 15, 2025,

JUDGMENT is hereby entered for the Plaintiffs and against the Defendants.

ERIC M. STORMS
ACTING CLERK

By: /s/ Nicholas Gordon
Deputy Clerk

Dated: July 15, 2025

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION, et al.,<br>Plaintiffs,<br>v.<br>WILLIAM J. SCHNEIDER, et al.,<br>Defendants. | Docket No. 1:24-cv-00430-KFW |

**STATE DEFENDANTS' NOTICE OF APPEAL**

Please take notice that State Defendants, William J. Schneider, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn, in their official capacities as Members of the Maine Commission on Governmental Ethics and Election Practices; and Aaron M. Frey, in his official capacity as Attorney General of Maine, hereby appeal to the United States Court of Appeals for the First Circuit from the Judgment of the District Court, dated July 15, 2025 (ECF No. 75).

Dated: July 24, 2025

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

*Attorney for State Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| DINNER TABLE ACTION, *et al.*,<br>Plaintiffs,<br>v.<br>SCHNEIDER, *et al.*,<br>Defendants, | Case No. 1:24-CV-00430-KFW |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Intervenors Richard Bennett, Cara McCormick, Peter McCormick, and EqualCitizens hereby appeal to the United States Court of Appeals for the First Circuit from this Court's Order granting Plaintiffs' Motion for Permanent Injunction and its subsequent entry of Judgment for Plaintiffs. *See* ECF Nos. 74, 75.

Dated: July 24, 2025

Respectfully submitted,

*/s/ Neal Kumar Katyal*

Neal Kumar Katyal (*pro hac vice*)
Ezra P. Louvis (*pro hac vice*)
MILBANK LLP
1850 K St., N.W.
Washington, D.C. 20006
Tel: (202) 835-7500
nkatyal@milbank.com

Nola Heller (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
Tel: (212) 530-5108
nheller@milbank.com

David M. Kallin, Bar No. 4558
Adam R. Cote, Bar No. 9213
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101-2480
(207) 772-1941
dkallin@dwmlaw.com
acote@dwmlaw.com

*Counsel for Richard Bennett, Cara McCormick, Peter McCormick, and EqualCitizens*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 24, 2025, I electronically filed the foregoing using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties of record.

*<u>/s/ Neal Kumar Katyal</u>*
Neal Kumar Katyal

**CERTIFICATE OF SERVICE**

I, Jonathan R. Bolton, hereby certify that on October 22, 2025, I electronically filed the Joint Appendix with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov