No. 25-1705

# United States Court of Appeals
## For the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs – Appellees

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices;
DAVID R. HASTINGS, III, in the official capacity as a Member of the
Maine Commission on Governmental Ethics and Election Practices;
DENNIS MARBLE, in the official capacity as Member of the Maine
Commission on Governmental Ethics and Election Practices; BETH N.
AHEARN, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices; AARON
M. FREY, in the official capacity as Attorney General of Maine; SARAH
E. LECLAIRE, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices,

Defendants – Appellants

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT;

Defendants.

*On appeal from the United States District Court, District of Maine*

_____

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs – Appellees,

v.

EQUAL CITIZENS; CARA MCCORMIC; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants – Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

---

**BRIEF OF DEFENDANTS-APPELLANTS WILLIAM J. SCHNEIDER, DAVID R. HASTINGS, III, DENNIS MARBLE, AARON M. FREY, and SARAH E. LECLAIRE**

---

AARON M. FREY
Attorney General

Thomas A. Knowlton
Deputy Attorney General

Of Counsel

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov
*Attorneys for Appellants*

# Table of Contents

Table of Contents ................................................................................i

Table of Authorities.............................................................................ii

Jurisdictional Statement....................................................................1

Statement of the Issues Presented for Review ........................................2

Statement of the Case ........................................................................3

    Introduction.................................................................................3

    Statement of Facts ........................................................................7

        The Act ..................................................................................7

        Post-2010 Growth of Super PACs.........................................10

        Recent Corruption Scandals Involving Super PACs............12

    Procedural History .....................................................................14

Summary of the Argument ................................................................19

Argument........................................................................................23

I.     The district court erred in concluding that the Act's contribution limits are unconstitutional as a matter of law. .............................23

    A.    The Act's contribution limits are not subject to strict scrutiny..............................................................................23

    B.    *Citizens United* does not control the outcome of this case. ..26

    C.    The Act's contribution limits otherwise satisfy closely drawn scrutiny..............................................................................35

II.    The district court erred in concluding that the Act's disclosure requirement was unconstitutional.................................................42

III.   Any portions of the Act determined to be unconstitutional should be severed. ...............................................................................52

Conclusion .....................................................................................54

Certificate of Compliance with Rule 32(a)............................................55

Certificate of Service Form for Electronic Filing....................................56

Addendum ...........................................................................Add. 1–18

## Table of Authorities

CASES

*Alaska Pub. Offs. Comm' v. Patrick*, 494 P.3d 53 (Alaska 2021) ........... 32

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ...... 48, 50

*Bluman v. FEC,* 800 F. Supp. 2d 281 (D.D.C. 2011) ............................. 26

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................... 20, 24

*California Medical Ass'n v. FEC*, 453 U.S. 182 (1981) ..................... 19, 25

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290 (1981) ..................................................................... 47

*Citizens United v. FEC*, 558 U.S. 310 (2010) ... 4, 6, 19, 20, 24, 26, 27, 28, 29, 30, 33, 34, 35, 38, 40

*Doe v. Rhode Island Interscholastic League*, 137 F.4th 34 (1st Cir. 2025) ................................................................ 23

*Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136 (1st Cir. 2008) .. 23

*Fam. PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) ........................... 48

*FEC  v. Beaumont*, 539 U.S. 146 (2003) ......................................... 19, 24

*FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) ..................................................................... 35

*FEC v. Cruz*, 596 U.S. 289 (2022) ......................................................... 26

*FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985) ............................................................................. 27

*FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) ...................... 28

*FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007) ................... 28

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ........................................ 50

*Gaspee Project v. Mederos,*
13 F.4th 79 (1st Cir. 2021) .................................... 42, 44, 45, 46, 47, 50

*Healey v. Spencer,* 765 F.3d 65 (1st Cir. 2014) .......................................23

*Homans v. City of Albuquerque,* 366 F.3d 900 (10th Cir. 2004)............37

*Kittery Retail Ventures, LLC v. Town of Kittery,*
2004 ME 65, 856 A.2d 1183 ................................................................52

*McConnell v. FEC,* 540 U.S. 93 (2003).................................................35

*McCutcheon v. FEC,* 572 U.S. 185 (2014) .............................................27

*Munro v. Socialist Workers Party,* 479 U.S. 189 (1986) ........................36

*Nat'l Fire Adjustment Co., Inc. v. Cioppa,*
357 F. Supp. 3d 38 (D. Me. 2019) ......................................................52

*Nat'l Org. for Marriage v. McKee,*
649 F.3d 34 (1st Cir. 2011) .........................................................43, 48

*Nat'l Org. for Marriage v. McKee,*
765 F. Supp. 2d 38 (D. Me. 2011) ......................................................49

*Nat'l Org. for Marriage, Inc. v. McKee,*
669 F.3d 34 (1st Cir. 2012) .........................................................48, 49

*New York Progress & Prot. PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013) .........................................................30, 32

*Ognibene v. Parkes,* 671 F.3d 174 (2d Cir. 2011)...................................35

*Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.,*
324 F. Supp. 2d 71 (D. Me. 2004) ......................................................52

*Pub. Int. Legal Found., Inc. v. Bellows,* 92 F.4th 36 (1st Cir. 2024)......48

*Republican Party of New Mexico v. King,*
741 F.3d 1089 (10th Cir. 2013) ..........................................................30

*SpeechNow.org v. FEC,*
599 F.3d 686 (D.C. Cir. 2010) ....................... 3, 5, 10, 21, 29, 30, 33, 34

*United States v. Evans*, 504 U.S. 255 (1992) .......................................... 27

*United States v. Householder*, 137 F.4th 454 (6th Cir. 2025) .......... 14, 33

*United States v. Lindberg*, No. 519-CR-00022MOCDSC,
    2020 WL 520948 (W.D.N.C. Jan. 31, 2020) ........................................ 33

*United States v. Menendez*, 132 F. Supp. 3d 635 (D.N.J. 2015) ............. 33

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018) ....... 13, 27

*United States v. Wanda Vazquez-Garced*, Crim. No. 22-342 (SCC),
    CF No. 498 (D.P.R. Mar. 7, 2024) ....................................................... 33

*Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir.1993) ................... 43, 48

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ................................... 26

*Wisconsin Right to Life State Pol. Action Comm. v. Barland*,
    664 F.3d 139 (7th Cir. 2011) ............................................................... 30

*Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013) ................ 47

## STATUTES

1 M.R.S.A. § 71 ..................................................................................... 22, 52

18 U.S.C.A. § 201 ........................................................................................ 27

21-A M.R.S.A. § 1001 .................................................................................... 9

21-A M.R.S.A. § 1015 ................................................................................ 8, 36

21-A M.R.S.A. § 1017-A .............................................................................. 43

21-A M.R.S.A. § 1019-B ................................. 9, 10, 43, 44, 45, 46, 51, 52

21-A M.R.S.A. § 1052 .................................................................................... 9

21-A M.R.S.A. § 1060 .............................................................................. 43, 51

21-A M.R.S.A. § 907 ...................................................................................... 7

28 U.S.C.A. § 1291 ........................................................................................ 1

iv

52 U.S.C.A. § 30104..............................................................................45

## OTHER AUTHORITIES

Maine State Legislature, Legislative History Collection, Citizen
    Initiated Legislation, 1911–Present, available at https://
    legislature.maine.gov/legis/lawlib/lldl/citizeninitiated/ .......................8

*Ohio v. Firstenergy Corp.*, Complaint, *available at*
    https://tinyurl.com/47x2ru7x ...........................................................14

## RULES

94-270 C.M.R. ch. 1 ..........................................................................43

Fed. R. App. P. 43...............................................................................1

## CONSTITUTIONAL PROVISIONS

Me. Const., art. IV, pt. 3, § 18.............................................................7

## LEGISLATIVE DOCUMENTS

I.B. 2023, ch. 4...........................................................................8, 10

P.L. 2025, ch. 22 ................................................................................9

## Jurisdictional Statement

This appeal is from a final judgment of the district court, dated July 15, 2025 (ECF No. 75), in favor of Plaintiffs-Appellees Dinner Table Action, For Our Future, and Alex Titcomb.  Defendants-Appellants William J. Schneider, David R. Hastings, III, Dennis Marble, Beth N. Ahearn,[1] and Sarah E. LeClaire, sued in their official capacities as members of the Commission on Governmental Ethics and Election Practices ("Commission") and Aaron M. Frey, sued in his official capacity as Attorney General of Maine (together with the other defendants, "Maine") filed a timely notice of appeal on July 24, 2025. This Court therefore has jurisdiction over this appeal under 28 U.S.C.A. § 1291.

---

[1]  Beth N. Ahearn, who was a party in her official capacity only, is no longer a member of the Commission on Governmental Ethics and Election Practices. Defendants will file an appropriate motion to amend the caption to remove her name and add the name of her successor once a successor is appointed and confirmed.  *See* Fed. R. App. P. 43(c)(2).

## Statement of the Issues Presented for Review

1.     Did the district court err in concluding that Maine's voter-enacted law that seeks to combat quid pro quo corruption and its appearance by setting an annual limit for contributing to a single political action committee for the purpose of making independent expenditures violates the First Amendment?

2.     Did the district court err in concluding that the same law's separate requirement that entities making independent expenditures exceeding $250 disclose in their campaign-finance filings a list of total contributions from all contributors used to fund those independent expenditures violates the First Amendment?

## Statement of the Case

### *Introduction*

In November 2024, a record number of Maine voters—over 600,000—voted to approve a citizen-initiated bill, "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" (the "Act").  The Act limits annual contributions by an individual or entity to any single political action committee (PAC) to the substantial sum of $5,000 when those contributions are for the purpose of funding independent expenditures ("IEs")—i.e., independent communications purchased by the PAC that expressly advocate for the election or defeat of a clearly identified candidate.  The Act further requires PACs and others to disclose all donors and donations used to fund their IEs if and when they trigger Maine's existing IE reporting requirement.

The voters' overwhelming approval of the Act at the ballot box reflects significant and growing concern about the potential for corruption presented by what are now known as super PACs.  A 2010 decision by the Court of Appeals for the District of Columbia, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc) (*"SpeechNow"*), striking down federal limits on contributions to groups

3

that make independent expenditures paved the way for the proliferation of these PACs. *SpeechNow* allowed for the creation of entities that can focus on supporting a specific candidate or group of candidates through IEs and, further, can accept unlimited contributions from those who may have maxed out their ability to make direct contributions to the candidate. The result is an alternative, unregulated channel for individuals and entities wishing to financially support a candidate.

The potential for quid pro quo corruption involving such contributions is obvious. Even if a receiving super PAC makes IEs completely independently of a candidate—as *Citizens United v. FEC*, 558 U.S. 310 (2010), presumed in striking down a federal law banning IEs by corporations and unions—the ability of wealthy donors with business before the government to funnel unlimited sums to entities dedicated to the support of a particular candidate (or willing to honor the donor's request to spend the donation on supporting a particular candidate) creates a direct opportunity for bribery: official acts by the grateful candidate in exchange for monetary support for their election or reelection.

In concluding otherwise, the district court erred.  The district court overread *Citizens United*—a decision applying strict scrutiny to strike down a categorical ban on speech—as forbidding any limits on mere monetary donations to organizations engaged in such speech.  It did so despite the more relaxed level of First Amendment scrutiny applicable to contribution limits under binding Supreme Court precedent as well as the greater risk of quid pro quo corruption and its appearance in allowing unlimited contributions to super PACs, as illustrated by recent criminal cases in which such quid pro quo arrangements were alleged or proven.

The district court further erred by adopting the reasoning of out-of-jurisdiction decisions striking down similar contribution limits.  Those cases did not bind the district court, just as they do not bind this Court.  Moreover, they make the same error of relying on language in *Citizens United* about the inability of IEs to corrupt as answering the question of whether unlimited *contributions* to groups that make IEs pose corruption risks.  The district court should have recognized that the changed campaign landscape in Maine and the United States unleashed by *SpeechNow* supports Maine's important interest in

imposing modest limits on the ability of donors to effectively circumvent candidate contribution limits by making unlimited contributions to these now ubiquitous entities. Such limits are closely drawn to further Maine's compelling interest in preventing both quid pro quo corruption and its appearance.

Finally, the district court erred in concluding that the Act's disclosure requirements were unconstitutional. Even if it were correct that the Act's contribution limits do not sufficiently further Maine's interest in preventing quid pro quo corruption and its appearance, disclosure requirements need not further such interests to satisfy constitutional scrutiny. As several courts have recognized, requiring disclosure of even very small contributions can serve important governmental interests in providing information to voters.

Because the Act is not inconsistent with *Citizens United* and otherwise constitutional, the Court should reverse the decision of the district court and order that the permanent injunction be vacated. Alternatively, the Court should vacate the decision of the district court that *Citizens United* controls the outcome of this case and remand the case for further proceedings.

6

*Statement of Facts*

*The Act*

Maine is a direct democracy state.  Under the Maine Constitution, Me. Const., art. IV, pt. 3, § 18, voters may directly seek the enactment of legislation by referendum vote.  Proponents of legislation that gather the required number of voter signatures (currently 67,682) in support of that legislation may submit that legislation to the Maine Legislature for enactment.  *Id.*  Unless the Legislature enacts the legislation as written, it is placed on the ballot that November and becomes law if approved by a majority of voters.  *Id.*

The Act was enacted by Maine voters under this process.  JA156. During the public hearing on the Act held by the relevant legislative committee, *see* 21-A M.R.S.A. § 907 (Westlaw Oct. 22, 2025) (requiring a public hearing on all direct initiatives), witnesses testified to their concern about the potential for unlimited contributions to super PACs to cause corruption.  JA106, 136, 139–40, 153–54.  One witness cited examples of bribery indictments or convictions of public officials involving contributions to super PACs or other third parties.  JA139 n.5.  The same witness pointed to a district attorney race in Maine in which a super PAC funded by a single donor spent four times as much

as both candidates combined to support one of the candidates.  JA138.

Another witness submitted a report with statistics showing the growth

of contributions to PACs that make IEs in Maine's state and federal

elections since 2010.  JA125 (contributions in state campaigns); JA111

(contributions in federal campaigns).

The Act was placed on the November 2024 statewide ballot after

the Legislature ultimately declined to enact it.  Voters approved the

initiative by a vote of 600,191 in favor and 201,034 opposed, or 74.9% to

25.1%.  JA156.  The Act received more votes in favor than any citizen's

initiative in Maine history.[2]

The Act prohibits individuals and entities from contributing more

than $5,000 to a given PAC in a calendar year "for the purpose of

making [IEs]."  I.B. 2023, ch. 4, §§ 1–2 (codified at 21-A M.R.S.A.

§ 1015(2-C) & (2-D)) (reproduced at Add. 17–18).  A PAC is defined,

with certain exceptions, to include any person other than an individual

(as well as any separate or segregated fund established by a corporation

---

[2]  *See* Maine State Legislature, Legislative History Collection, Citizen Initiated Legislation, 1911–Present, available at https://legislature.maine.gov/legis/lawlib/lldl/citizeninitiated/ (last visited Oct. 16, 2025).

or other entity) that "receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate to political office."[3] 21-A M.R.S.A. § 1052(5) (Westlaw Oct. 22, 2025). An IE is generally defined to mean an expenditure made to "design, produce or disseminate any public communication that expressly advocates the election or defeat of a clearly identified candidate." *Id.* § 1019-B(1)(A).[4] In the period shortly before an election, the definition is slightly broader, covering public communications that name or depict a clearly identified candidate unless the spender demonstrates that the expenditure does not have the purpose or effect of influencing an election. *Id.* § 1019-B(1)(B).

The Act requires PACs that make IEs to keep an account of any contributions received for the purpose of making those expenditures.

---

[3]  State law, including the Act, regulates PACs only to the extent they seek to influence state, county, and municipal elections. *See* 21-A M.R.S.A. § 1011 (Westlaw Oct. 16, 2025). Campaign spending to influence federal elections is regulated exclusively by federal law. *See* 52 U.S.C.A. § 30143.

[4]  The Legislature added the word "public" to the quoted statutory language effective September 24, 2025, after the district court's decision. *See* P.L. 2025, ch. 224 §§ 11. The change was part of the creation of a uniform definition of "public communication" across campaign-finance laws. *See* 21-A M.R.S.A. § 1001(4). Maine does not regard the change as having any impact on the questions in this appeal.

I.B. 2023, ch. 4, § 4 (codified at 21-A M.R.S.A. § 1019-B(6)); *see* Add. at 18. To the extent a PAC might receive contributions from a single source exceeding the $5,000 limit, the Act prohibits the PAC from using the excess for IEs. *Id.*

Finally, PACs making IEs must include in their IE reports "the total contributions from each contributor." I.B. 2023, ch. 4, § 3 (codified at 21-A M.R.S.A. § 1019-B(4)(B)). Maine interprets this provision as requiring PACs to disclose all contributions used to fund the IEs disclosed in the report. JA60 ¶ 30.

### *Post-2010 Growth of Super PACs*

As noted above, the Act was enacted against a background of a huge increase in independent election spending occurring over the last 15 years. In 2010, the D.C. Circuit in *SpeechNow* concluded that federal contribution limits in the Federal Election Campaign Act were unconstitutional as applied to entities that make independent expenditures. This decision allowed for the creation at the federal level of super PACs and related entities called Carey committees. Super PACs are limited to making IEs and can raise unlimited sums to do so. JA67 ¶ 6. Carey committees are hybrid entities that make both IEs and

contributions to candidates and can raise unlimited funds for their IE spending. *Id.* ¶ 7.

Evidence submitted to the district court shows that, since 2010, contributions to federal super PACs and Carey committees have gone from $86.5 million to $6.9 billion. JA72. Similarly, IEs by super PACs and Carey committees have gone from $62 million in 2010 to $4.1 billion in 2024. JA70. In 2024, nearly half (47.2%) of these IEs were made by super PACs and Carey committees dedicated to single candidates. *Id.* Donors on both sides of the political spectrum have made billions in contributions. JA76. And these PACs are increasingly funded by large contributions: in 2024 super PACs and Carey committees raised over $2 billion in individual contributions of $1 million or more, made by a mere 337 donors. JA73.

Although *SpeechNow* did not directly impact Maine state elections, both because it was issued in a different jurisdiction and because Maine at the time did not place general limits on contributions to state PACs, the data maintained by the Commission show that state and county elections have followed the federal trend. In the gubernatorial elections from 2010 to 2022, IEs by PACs have roughly

quadrupled from $3.5 million to $13.6 million, while candidate spending fell. JA55 ¶ 10. Other state and county races saw similar changes, with IE PAC spending quadrupling from $833,000 in 2010 to $3.5 million in 2024, and candidate spending rising more slowly, from $3.9 million in 2010 to $5.6 million in 2024. JA56 ¶ 11.

In 2022, Maine's last election with a gubernatorial race, 16 PACs made more than $100,000 in IEs. JA56 ¶ 14. These PACs collectively received $19.4 million in contributions and spent $16.8 million in IEs. JA57 ¶ 15. Some of these PACs received large contributions, with 101 contributions of $5,000 or more, 46 contributions of $25,000 or more, 23 contributions of $100,000 or more, and two contributions of over $1 million. *Id.* Four of these 15 PACs focused on a single race. JA 56 ¶ 14.

### *Recent Corruption Scandals Involving Super PACs*

Although super PACs have existed only since 2010, public court filings and reported decisions show corruption scandals in which contributions to them played a prominent role. In 2015, the U.S. Department of Justice charged New Jersey Senator Robert Menendez with a variety of corruption-based crimes, including bribery, for

allegedly soliciting contributions to a super PAC, among other things, in exchange for official acts. JA79–91. Specifically, Sen. Menendez was alleged (among other things) to have solicited $600,000 in contributions to a super PAC, earmarked to support his campaign, in exchange for intervening on the contributor's behalf in a federal administrative proceeding alleging that the contributor had overbilled the Medicare program by millions of dollars. JA84–85 ¶¶ 57–61; JA86–91 ¶¶ 196–218.

Sen. Menendez took the position in the ensuing criminal case that a contribution to a super PAC cannot support a bribery charge. The district court twice rejected this argument, holding that *Citizens United* did not preclude prosecution for bribery based on an exchange of an official act for a super PAC contribution. *United States v. Menendez*, 291 F. Supp. 3d 606, 621 (D.N.J. 2018). The resulting trial ended with a hung jury.

A similar scandal recently unfolded in Ohio, where the former speaker of the Ohio House of Representatives, Larry Householder, was convicted on federal racketeering charges for exchanging support for a state bailout of a nuclear plant for financial campaign support for

himself and allied candidates, routed through a super PAC. JA92–103. The indictment describes the conspirators' funneling of payments to an unnamed PAC, which used the money to benefit Householder and allied candidates. JA97, 102–03 ¶¶ 15–16, 91, 97. A related civil complaint by the Ohio Attorney General identifies the PAC as the Growth & Opportunity PAC, a federal super PAC. *Ohio v. Firstenergy Corp.*, Complaint ¶ 51, *available at* https://tinyurl.com/47x2ru7x (last visited Oct 16, 2025). Householder's conviction was recently affirmed by the Sixth Circuit, which described in its opinion Householder's funneling of bribes into "several other 501(c)(4) entities that, in turn, spent on these [allied] candidates." *United States v. Householder*, 137 F.4th 454, 465 n.1 (6th Cir. 2025).

*Procedural History*

Plaintiffs (collectively, "Dinner Table") filed their complaint challenging the constitutionality of the Act on December 13, 2024. JA7. The three plaintiffs consisted of a Maine PAC that makes IEs in state races (Dinner Table Action), a second Maine PAC that makes IEs in state races and contributes to other PACs that make IEs (For Our Future), and the principal officer of those two PACs (Alex Titcomb).

14

JA18. The named defendants were the five (now four, *see* n.1) members of the Commission, who collectively oversee civil enforcement of Maine's campaign finance laws, and the Maine Attorney General, who oversees any criminal enforcement of those laws. JA18–19. All were named in their official capacities only. *Id.*

The complaint alleged that the Act's contribution limits violated the First Amendment, that the Act's disclosure limits violated the First Amendment, and that the Act violated equal protection on grounds of alleged disparate treatment between political action committees and political parties. JA26–31. The complaint sought a preliminary and permanent injunction against enforcement of the Act as well as declaratory relief. JA31.

On January 24, 2025, several parties moved to intervene in the action as defendants: State Senator Richard A. Bennett, two Maine voters who initiated the citizen's initiative, Cara and Peter McCormick, and the nonprofit EqualCitizens (collectively, "Initiators"). JA8. The district court granted intervenor status to those parties on February 25, 2025. JA12.

15

Agreeing that the issues raised by the complaint were largely legal in nature, the parties agreed to an expedited schedule to resolve Dinner Table's request for a permanent injunction. ECF No. 12. Maine agreed to abstain from enforcing the Act until a fixed date, so that the court could rule on the permanent injunction request without the need for a separate preliminary injunction proceeding. Dinner Table filed a motion for permanent injunction on January 17, 2025. JA8. The parties then briefed the motion, with all parties supplementing their legal arguments with accompanying declarations and deposition transcripts. In a joint status report to the Court the parties represented that they were considering whether a hearing with live testimony was needed or whether the hearing could be limited to oral argument "based on stipulations and submissions which may include deposition transcripts." ECF No. 54. Ultimately, the parties opted to proceed on the existing written submissions to the court and not to request a testimonial hearing. Oral argument was held on May 22, 2025. JA13.

On July 15, 2025, the court issued an order concluding that the Act was unconstitutional. JA14. The court framed the issue in the case as "whether the Supreme Court's decision in *Citizens United* forecloses

a state's ability to limit contributions to political groups making independent expenditures." Add. at 6.  The court, relying on cases from other jurisdictions, concluded that *Citizens United* precluded arguments that limiting contributions to groups that make IEs could be justified by either Maine's interest in preventing quid pro quo corruption or its interest in avoiding the appearance of quid pro quo corruption.  Add. at 8–10.  It also rejected Initiators' argument that the Act is consistent with the original understanding of the First Amendment, which allowed for regulation of "dependence" corruption.  Add. at 10–11.  The court further concluded that Dinner Table had satisfied the other factors necessary to secure a permanent injunction of the Act.  Add. at 12–13.

The court then separately considered the constitutionality of the Act's disclosure requirements.  Add. 13–16.  Although the court recognized that disclosure requirements are not subject to strict scrutiny, it nevertheless concluded that the Act was not "narrowly tailored to Maine's informational interest" because it did not contain an exemption for contributions below a certain dollar threshold.  Add at 15.

Concluding that the law was "unconstitutional on its face," the court permanently enjoined enforcement of the law.  Add. at 16.  The

court did not address Dinner Table's argument that the Act violated its equal protection rights. Add. at 16 n.7.

Both Maine and the Initiators timely appealed. JA362–65.

## Summary of the Argument

The district court erred by concluding as a matter of law that the Act's $5,000 annual limit on making contributions to a specific PAC for the purpose of making IEs cannot be squared with *Citizens United*. Unlike the categorical ban on speech struck down in *Citizens United* under a strict scrutiny analysis, the Act only limits contributions. As a result, the Act's limits impose merely marginal speech restrictions subject to "relatively complaisant review under the First Amendment." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003). This more relaxed review applies even though the Act limits contributions to entities rather than candidates. *California Medical Ass'n v. FEC*, 453 U.S. 182, 195 (1981).

Given the lower level of scrutiny applicable here, *Citizens United* does not answer whether the Act's limits are constitutional. *Citizens United* does not hold that any regulation affecting IEs, even indirectly, is unconstitutional. To the contrary, it contains language indicating that its analysis was limited to context of the categorical speech ban that it was considering, noting, for example, that Congress had chosen a remedy that was "asymmetrical" to its interest. 558 U.S. at 361.

The out-of-jurisdiction decisions relied upon by the district court that struck down contribution limits similar to the Act's were wrongly decided because they overread *Citizens United*'s reasoning as applicable to any regulation affecting IEs, as opposed to the outright speech ban the court was considering. They thus fail to properly consider how the lower level of constitutional scrutiny applicable to contribution limits should affect the analysis.

These decisions also wrongly conclude that, under the logic of *Citizens United*, the danger of quid pro quo corruption or its appearance from unlimited contributions to entities that make IEs is necessarily the same or less than any danger that might arise from the making of the IEs themselves. In fact, the opportunity to make unlimited monetary payments to super PACs aligned with specific candidates creates a risk of quid pro quo corruption comparable to the risk created by unlimited direct contributions, which the Supreme Court has confirmed is sufficient to support monetary limits. *See Buckley v. Valeo*, 424 U.S. 1, 26 (1976).

Because *Citizens United* does not control the outcome here, the Court should conclude that Maine has shown that the Act is closely

drawn to combat Maine's interest in combating quid pro quo corruption and its appearance. Nationally and in Maine, super PACs have become major players in the financing of campaigns for office since the D.C. Circuit allowed for their creation at the federal level in the *SpeechNow* decision. As a result, there are bountiful opportunities for quid pro quo arrangements between candidates and donors to contribute to PACs that will make IEs to benefit the candidate. Scandals in other jurisdictions involving alleged quid pro quo arrangements for super PAC contributions illustrate the corruption risk within Maine. Moreover, the Act's legislative history and overwhelming approval by voters in the November 2025 election demonstrate that the Act is needed to address a real perception of corruption among the electorate.

The district court also erred in concluding that the Act's disclosure provision was separately unconstitutional because it failed to provide sufficient opportunities for anonymous contributions. In fact, the Act allows donors to effectively opt out of disclosure by directing that their donations not be used for IEs. And, as the district court recognized, Maine law contains an IE reporting threshold of $250 that exempts from disclosures contributions that lead to only a small amount of

electioneering activity. In any event, courts including this one have upheld low disclosure thresholds as consistent with the government's interest in informing voters and several have further held or suggested that anonymous contributions may be disallowed completely. The disclosure provision in the Act is thus well supported by Maine's interest in an informed electorate, even if the contribution limits are determined to be unconstitutional. What is more, even if the disclosure requirement is unconstitutional as applied to plaintiffs, the district court erred by effectively striking it down as facially unconstitutional, given its myriad constitutional applications.

Finally, if only part of the Act is deemed invalid, that portion of the Act can properly be severed under state law, which expressly provides for the severability of statutes when a portion is invalidated. *See* 1 M.R.S.A. § 71(8).

**Argument**

**I.    The district court erred in concluding that the Act's contribution limits are unconstitutional as a matter of law.**

In reviewing the grant of a permanent injunction, different standards of review apply to different components of the district court's decision. *Doe v. Rhode Island Interscholastic League*, 137 F.4th 34, 39 (1st Cir. 2025). Specifically, "'questions of law are reviewed de novo,' 'the scope of the injunction is reviewed for abuse of discretion,' . . . and '[f]actual findings are reviewed for clear error.'" *Id.* (quoting *Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136, 142 (1st Cir. 2008) and *Healey v. Spencer*, 765 F.3d 65, 73 (1st Cir. 2014)). Here, the district court's conclusion that the Act's contribution limits are unconstitutional as a matter of law should be reviewed de novo.

**A.    The Act's contribution limits are not subject to strict scrutiny.**

The core of the Act is its provisions limiting to $5,000 the maximum annual dollar amount that individuals and entities may give to a specific political action committee for the purpose of making IEs. *See* Add. at 17. These provisions limit only monetary contributions made to other entities; they do not purport to dictate what the receiving

23

entities can or cannot do with legally contributed funds. In short, these provisions establish a contribution limit.

The Supreme Court has long distinguished between laws limiting campaign contributions and those—such as the ban on corporate IE spending struck down in *Citizens United*—that limit expenditures. It has explained that, unlike expenditure limits, contribution limits do not meaningfully restrain speech because "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).

This analytical distinction remains good law. In *Beaumont*, the Court explained that while expenditure limits are subject to strict scrutiny, "restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." 539 U.S. at 161. Under this more deferential standard, a contribution limit must be "closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tuned." *Daggett v. Comm'n*

*on Govtl. Ethics & Election Pracs.*, 205 F.3d 445, 454 (1st Cir. 2000)

(quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 385 (2000)

("*Shrink Mo.*")) (cleaned up).

Although *Beaumont* involved direct contributions to candidates, it

is irrelevant to the level of scrutiny that the Act's contribution limit

applies to PAC contributions rather than candidate contributions.  In

*California Medical Association*, the Supreme Court considered whether

California's limit of contributions to political committees should be

treated like an expenditure restriction.  453 U.S. at 195.  Plaintiffs

there argued that the limit was akin to an expenditure restriction

because "it restricts the ability of [the plaintiff] to engage in political

speech through a political committee" and because "the danger of actual

or apparent corruption" arising from such contributions was not

present.  *Id.* at 195.  The Supreme Court rejected these arguments.  It

observed that contributions to political committees still involved the

sort of "speech by proxy" that is "not the sort of political advocacy that

[*Buckley*] found entitled to full First Amendment protection."  *Id.* at

196.  It therefore concluded that the same analysis applicable to

candidate contribution limits should apply.  *Id.*  The Act's contribution

limits are indistinguishable from those found subject to closely drawn scrutiny in *California Medical Association.*

The district court did not decide whether strict or immediate scrutiny applies to the Act's contribution limits, concluding that *Citizens United* controlled the outcome of the case either way.  Add. at 11.  But because, as argued below, *Citizens United* does not control the outcome of this case, the correct level of scrutiny becomes potentially outcome determinative.

In short, this Court should recognize that because the Act merely limits large contributions to PACs that fund IEs and places no restrictions on the ability of PACs to "speak" through expenditures, it is subject to "closely drawn" rather than strict scrutiny.

### B.    *Citizens United* does not control the outcome of this case.

Under closely drawn scrutiny, a limit on campaign spending generally must further the state's interest in combatting quid pro quo corruption or its appearance.  *See FEC v. Cruz*, 596 U.S. 289, 305 (2022).[5]  Such corruption involves "a direct exchange of an official act

---

[5]  *But see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (upholding campaign finance law based on compelling interest in "public confidence in the integrity of the

for money" or "dollars for political favors." *McCutcheon v. FEC*, 572
U.S. 185, 192 (2014) (quoting *FEC v. Nat'l Conservative Political Action
Comm.*, 470 U.S. 480, 497 (1985)).  Under federal criminal law, an
illegal quid can be "anything of value" given to the candidate in
exchange for an official act, including otherwise legal campaign
contributions.  18 U.S.C.A. § 201(b); *see United States v. Evans*, 504
U.S. 255 (1992).  Contributions to super PACs can thus be crimes if they
are made in exchange for official acts.  *See Menendez*, 291 F. Supp. 3d at
622.

The district court's conclusion that the Act's contribution limits
are unconstitutional was premised largely on its conclusion that
Maine's proffered rationale for those limits—that they directly further
its interests in stopping quid pro quo corruption and its appearance—
cannot "be squared with *Citizens United*."  Add. at 8.  This was error.

*Citizens United* was not a challenge to contribution limits.
Rather, it challenged federal law's "outright ban" on corporations and

---

judiciary"); *Bluman v. FEC,* 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (upholding
campaign finance law based on governmental interest in "preventing foreign
influence over U.S. elections."), *aff'd,* 565 U.S. 1104 (2012).

unions making any IEs to support or oppose federal candidates for office within certain time periods before an election. *Citizens United*, 558 U.S. at 337. As a direct restriction on political speech, the challenged provisions were subject to strict scrutiny, requiring the government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 340 (quoting *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). Indeed, the Supreme Court expressly contrasted the ban on IEs with contribution limits, "which, unlike limits on independent expenditures, have been an accepted means to prevent quid pro quo corruption." *Id.* at 359 (citing *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206 (1982)).

The district court's interpretation of *Citizens United* illustrates the significance of this distinction. According to the court's analysis, *Citizens United* does not "suggest[] that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is 'substantially diminished' to the point that the government's 'anticorruption interest is not sufficient to displace' First Amendment protections." Add. at 9

28

(quoting *Citizens United*, 558 U.S. at 357). Indeed, *Citizens United* elsewhere uses language indicating that the problem with federal law's "outright ban" on IEs was that it was a remedy that was "asymmetrical" to preventing quid pro quo corruption. *Id.* at 361. *Citizens United*'s use of phrases such as "not sufficient" and "asymmetrical" to describe the government's interest in a particularly onerous speech restriction subject to strict scrutiny is inconsistent with an interpretation of that decision as categorically foreclosing *all* regulation even indirectly affecting IEs, including those subject to more relaxed scrutiny.

Indeed, it is precisely this mistaken categorical reading of *Citizens United* that drives the decisions from other courts relied upon by the district court. *See* Add. at 6–7. In *SpeechNow*, the most well-known of these cases, the D.C. Circuit considered the constitutionality of federal contribution limits to political committees that make independent expenditures, including a $5,000 limit per calendar year on contributions to a single committee. 599 F.3d at 691. The court concluded that, "[i]n light of [*Citizens United*'s] holding as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption, contributions to groups that

make only independent expenditures also cannot corrupt or create the appearance of corruption." *Id.* *SpeeechNow* failed to grapple with the language in *Citizens United* indicating that it was conducting a more context-specific analysis of a particularly onerous IE restriction—an "outright ban on corporate political speech during the critical preelection period," as the Court put it. *Citizens United*, 558 U.S. at 361.

The other decisions relied upon by the district court—most of which were decided shortly after *SpeechNow* and thus before the full rise of the super PACs made possible by that decision—reflect a similar overreading of *Citizens United.* *See, e.g.*, *Wisconsin Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("*Citizens United* thus held as a categorical matter that 'independent expenditures do not lead to, or create the appearance of, quid pro quo corruption.'" (quoting *Citizens United*, 558 U.S. at 360)); *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013) ("The Supreme Court has held that independent expenditures do not invoke the anti-corruption rationale"); *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013) (characterizing *Citizens United*

as holding that the "government has no anti-corruption interest in limiting independent expenditures"). These decisions fail to recognize that *Citizens United*'s own reasoning leaves open the possibility that a regulation that less directly affects IEs and that is subject to more relaxed constitutional scrutiny may not be "asymmetric" to the government's anticorruption interest.

But even if *Citizens United* must be read as creating an unassailable syllogism that IEs themselves cannot corrupt, it would not resolve the question here. The Act targets a different nexus of potential corruption than the one considered by *Citizens United*: quid pro quo arrangements between candidates and *donors* to entities that make IEs. The decisions relied on by the district court erroneously conclude that the risk of quid pro quo corruption and its appearance arising from wealthy donors contributing to super PACs is necessarily lower than corruption risk from the super PAC spending those contributions. Indeed, the district court relied on a particularly stark expression of this theory by the Alaska Supreme Court, which held that there "is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption that

the expenditure itself."  Order at 8 (quoting *Alaska Pub. Offs. Comm' v. Patrick*, 494 P.3d 53, 58 (Alaska 2021)); *see also New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013) ("It follows that a donor to an independent expenditure committee . . . is even further removed from political candidates").

This analysis is backwards.  While a private citizen or entity wishing to bribe a candidate or elected official could conceivably conspire with the candidate to develop and run apparently independent advertisements in exchange for official favors, that is not a very likely scenario.  Among other things, in order for the IE to have meaningful value for the candidate, the briber would need the expertise to make IEs powerful enough to influence voters.  Far more likely is a scheme in which the briber can simply make a payment of money that will benefit the candidate.  Super PACs that can accept unlimited contributions offer a perfect conduit for such a transaction.  The briber need not have any experience or expertise in making IEs.  All that is needed is for the briber to have the financial means and for the candidate and the briber to agree on which particular PAC supporting the candidate should

receive the funds.  As the district court recognized, there are real-world

examples of such alleged conduct.[6]  Add. at 8.

This failure of imagination in the decisions relied upon by the

district court may be attributable to their timing.  Most issued within a

few years of *Citizens United* and before super PACs had come to

dominate campaign spending.  *See* Add. at 6–7.  For example,

*SpeechNow* itself involved not a single-candidate super PAC accepting

million-dollar contributions, but rather a nonprofit association that

wished to make IEs supporting or opposing candidates based on their

perceived support for the First Amendment.  599 F.3d at 689.  Such an

organization is a far cry from modern super PACs.  While it may have

seemed implausible to the *SpeechNow* court that a candidate would

---

[6]    *See United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015) (declining to dismiss bribery indictment of U.S. Senator for exchanging official acts for an earmarked contribution to a super PAC); *United States v. Householder*, 137 F.4th 454, 465 & n.1 (6th Cir. 2025) (affirming conviction of former Ohio Speaker of the House for bribery scheme in which money was funneled into "501(c)(4) entities" that supported candidates aligned with the Speaker); *see also United States v. Wanda Vazquez-Garced*, Crim. No. 22-342 (SCC), ECF No. 498 at 20 (D.P.R. Mar. 7, 2024) (declining to dismiss bribery indictment alleging official acts in exchange for an agreement to fund a super PAC that was to be created and managed by a political consultant); *United States v. Lindberg*, No. 519-CR-00022MOCDSC, 2020 WL 520948, at *2 (W.D.N.C. Jan. 31, 2020) (declining to dismiss bribery indictment alleging an exchange of official acts for forming and contributing $1.5 million to an "independent expenditure committee" to support the candidate as well as a $500,000 contribution to a political party).

trade official acts in exchange for a $5,500 contribution to a policy-focused nonprofit, the same cannot be said about, say, a $50 million contribution to an entity that exists for the sole purpose of electing the candidate.

It is understandable that *SpeechNow* and the decisions following shortly after may not have anticipated the rise of such entities. But the district court, in deciding whether it agreed with *SpeechNow*'s reasoning that quid pro quo corruption between candidates and contributors to super PACs is too improbable to justify contribution limits, had the benefit of considering the changes to campaign financing wrought by those decisions and the resulting opportunities for quid pro quo corruption and its appearance. *See* JA53–76. It should have recognized that these new corruption risks justify the Act's limits on contributions.

In short, the district court erred by failing to recognize that the more relaxed level of scrutiny applicable here allows for a different outcome than in *Citizens United*. The government's anticorruption interest in limiting contributions to super PACs is stronger than the interest in limiting those PACs' IEs. And the burden on First

Amendment rights resulting from a modest contribution limit of $5,000 per PAC per year—well beyond the means of most ordinary voters—is substantially less than the burden of the categorical ban on IEs considered in *Citizens United*. Unlike the law at issue there, the modest remedy chosen by Maine voters of limiting contributions is symmetrical to the corruption problem posed by unlimited super PAC contributions.

### C.  The Act's contribution limits otherwise satisfy closely drawn scrutiny.

If the Court recognizes that *Citizens United* does not control the outcome here, the Act's contribution limits easily satisfy closely drawn scrutiny. In demonstrating that a challenged law combats quid pro quo corruption or its appearance, "[i]t is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption." *Ognibene v. Parkes*, 671 F.3d 174, 183 (2d Cir. 2011) (citing *McConnell v. FEC*, 540 U.S. 93, 150 (2003) *overruled in part by Citizens United*, 558 U.S. at 365). Legislatures may take into account that "candidates, donors, and parties test the limits of the current law." *McConnell*, 540 U.S. at 144 (quoting *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S.

35

431, 457 (2001)); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights"). Thus, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Mo.*, 528 U.S. at 391.

Both the legislative history of the Act and the evidence submitted to the district court show that PACs that make IEs are now major players in campaigns, both in Maine and nationally. JA54–59; 69–76. While super PACs cannot legally collaborate with candidates they support,[7] candidates are not blind; they can be expected to know based on the PAC's stated purpose, personnel, and previous expenditures whether a contribution to the super PAC will provide a reliable and

_____

[7] Or, more precisely, if they collaborate, any resulting expenditures by the PAC are treated as contributions to the candidate subject to contribution limits. *See* 21-A M.R.S.A. § 1015(5) (Westlaw Oct. 16, 2025).

effective benefit to the candidate's election prospects. A candidate with an effective super PAC supporting them wishing to trade "dollars for political favors" thus need not demand direct campaign contributions; securing contributions to the aligned super PAC accomplishes the same end. Maine has just as strong an interest in barring such quid pro quos as it does in barring arrangements when the money goes directly to the candidate. Both are corrupt under any reasonable definition of the term.

The scandals discussed above—the 2015 bribery indictment of Robert Menendez for allegedly trading favors for super PAC contributions and the 2023 conviction of Larry Householder for a conspiracy that involved trading official acts for campaign support funneled through a super PAC—confirm that the corruption risks addressed by the Act are neither novel nor implausible. *See Shrink Mo.*, 528 U.S. at 391. While Maine has not yet had a similar scandal, it is "entitled to rely on evidence from other jurisdictions to justify campaign-finance reform measures, . . . if the evidence relied upon is 'reasonably believed to be relevant to the problem.'" *Homans v. City of*

*Albuquerque*, 366 F.3d 900, 909 (10th Cir. 2004) (quoting *Shrink Mo.*, 528 U.S. at 394 & n.6).

The evidence submitted to the district court shows that such corrupt arrangements could easily occur. A number of PACs in Maine accept large contributions and spend them on IEs to influence a small number of races. *See* JA57–58. Among others, Appellee Dinner Table Action PAC accepted a number of large contributions in 2024 from individuals and entities to support 10 legislative candidates with nearly a million dollars in IEs. JA58 ¶ 24; JA63.

The point is not that any of these contributions was necessarily part of a quid pro quo. Contribution limits are, by their nature, prophylactic, preventing non-corrupt transactions to better protect against the corrupt ones. *See Citizens United*, 558 U.S. at 357 (explaining that contribution limits are preventative since "few if any contributions to candidates will involve quid pro quo arrangements"). But the existence of high-spending PACs focused on IEs and funded by large contributions collectively shows that there is fertile ground in Maine for contributors and candidates to execute the sort of corrupt

38

arrangements alleged in the Menendez case and proven in the Householder case.

The Act is also closely drawn to combat the appearance of quid pro quo corruption. Such an appearance is of "almost equal concern as the danger of actual quid pro quo arrangements," *Buckley*, 424 U.S. at 27, as it risks "the eroding of public confidence in the electoral process." *McConnell*, 540 U.S. at 136. "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Shrink Mo.*, 528 U.S. at 390.

The legislative history of the Act repeatedly mentions corruption risks. JA106, 136, 139–40, 153–54. The record-breaking vote total and huge margin of victory for the Act at the ballot box, JA156, show that Maine voters overwhelmingly view large contributions to super PACs as a pernicious force. *See Shrink Mo.*, 528 U.S. at 394 (citing 74% approval of contribution-limits referendum as "attest[ing] to the perception" by voters of corruption); *Daggett*, 205 F.3d at 458 (citing approval of bill at referendum as "indicative of [Maine voters'] perception of corruption"). The record also includes the testimony of a

sitting Maine legislator that super PACs "create a risk that politicians who benefit from these super PACs' are beholden to the SuperPACs' contributors and will engage in quid-pro-quo corruption."  JA43.

The district court rejected Maine's argument that unlimited super PAC contributions create an appearance of corruption by pointing to language in *Citizens United* opining that the willingness of entities to make IEs "presupposes that the people have the ultimate influence over elected officials," which is "inconsistent with any suggestion that the electorate will refuse to take part in democratic governance . . . ."  Add. at 10 (quoting *Citizens United*, 558 U.S. at 360).  But while this rationale may explain why an IE seeking to influence voters cannot itself create an appearance of corruption, it falls short of establishing that large payments of money to entities making IEs also cannot create such an appearance.  Even if voters understand IEs themselves as good-faith attempts to persuade, that understanding does not rule out voters also viewing large, unregulated contributions by donors to super PACs aligned with particular candidates as avenues for corrupt arrangements between candidate and the donor.

Indeed, more applicable than the *Citizens United* passage quoted by the district court is the reasoning that *Buckley* uses to justify limits on direct candidate contributions:

> a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign. The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy.

424 U.S. at 26. Whether or not candidates are actively colluding with donors to contribute to aligned super PACs in exchange for official acts on a widespread basis, the incentives for them to do so are virtually indistinguishable from the incentives that candidates have to seek contributions directly. If the latter can create an appearance of corruption if left unregulated—as *Buckley* holds, 424 U.S. at 26–29—it follows that the former can as well.

Because the district court concluded as a matter of law that *Citizens United* required invalidation of the Act's contribution limits, it largely did not consider the evidence discussed above. If this Court concludes that the district court's legal conclusion was erroneous, it

should conclude that the Act is closely drawn to Maine's interest in preventing quid pro quo corruption and its appearance. Alternatively, it should remand the case to the district court for further consideration.[8]

## II.  The district court erred in concluding that the Act's disclosure requirement was unconstitutional.

The district court also separately erred by enjoining the Act's provision requiring PACs making IEs to disclose contributors and contributions in their existing IE reports. Add. at 13–16.

Because disclosure requirements do not limit campaign-related activities or prevent anyone from speaking, they are subject to a "less intense standard of constitutional review" known as "exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021). Under exacting scrutiny "a law or regulation must be narrowly tailored to serve a sufficiently important governmental interest." *Id.* Disclosure requirements "need not reflect the least restrictive means available to

---

[8]  The Initiators advance additional arguments supporting the constitutionality of the Act based on an originalist understanding of the First Amendment. *See* Intervenors' Opposition to Mot. for Permanent Inj., ECF No. 53 at 8–17; JA159–198. Maine supports these arguments to the extent they support upholding the Act as furthering Maine's interest in combatting dependence corruption.

achieve the [state's] goals, but they need to achieve a reasonable fit."
*Id.* at 88.  When a reporting threshold is challenged, this Court gives
"judicial deference to plausible legislative judgments as to the
appropriate location of a reporting threshold," and upholds such
determinations "unless they are wholly without rationality."  *Nat'l Org.
for Marriage v. McKee*, 649 F.3d 34, 60 (1st Cir. 2011) (quoting *Vote
Choice, Inc. v. DiStefano*, 4 F.3d 26, 32–33 (1st Cir.1993)) (cleaned up).

As the district court recognized, Add. at 13, preventing quid pro
quo corruption is not the only permissible state interest that disclosure
requirements can further.  Other valid governmental interests include
"providing the electorate with information as to who supports a
candidate and where political funding comes from," "keeping the
electorate informed about which constituencies may command a
candidate's loyalties," and "gathering data essential to detect violations
of contribution limits."  *Daggett*, 205 F.3d at 465–66.

Maine law has long required PACs to publicly disclose received
contributions over $50, *see* 21-A M.R.S.A. § 1060(6) (Westlaw Oct. 16,
2025).  Maine law also requires parties to report contributions over
$200, 21-A M.R.S.A. § 1017-A(1) (Westlaw Oct. 16, 2025), and anyone

43

who makes IEs over $250, whether an individual, PAC, or party, to report them to the Commission. *See* 21-A M.R.S.A. § 1019-B; 94-270 C.M.R. ch. 1, § 10(3). Against this regulatory backdrop, the Act adds a requirement that these IE reports list, in addition to the other itemized information about the disclosable IEs, "the total contributions from each contributor." Add. at 18 (codified at 21-A M.R.S.A. § 1019-B(4)(B)).

The district court agreed in evaluating the Act's disclosure requirement that "Maine's 'interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny.'" Add. at 14 (quoting *Gaspee Project*, 13 F.4th at 99). But it went on to conclude that the requirement nevertheless failed exacting scrutiny because the scope of the disclosure requirement was not sufficiently tailored to that interest. This was error.

The district court based its reasoning largely on this Court's discussion of disclosure requirements in *Gaspee Project*, which *upheld* the constitutionality of a similar Rhode Island disclosure provision. Add. at 15. Specifically, the district court pointed to *Gaspee Project*'s discussion of "off-ramps" in the Rhode Island law that allowed donors to avoid disclosure by either choosing to contribute less than a monetary

44

threshold of $1,000 or by specifying that their money not be used for independent expenditures.  Add. at 14 (citing *Gaspee Project*, 13 F.4th at 88–90).  The district court concluded that the lack of similar "off-ramps" in the Act means that it is overinclusive and thus not sufficiently tailored to survive exacting scrutiny.  *Id.*

But *Gaspee Project* does not support the district court's holding.  The discussion in *Gaspee Project* concerning "off-ramps" was to address the plaintiffs' arguments that the law at issue was overinclusive because it required disclosure of "general-fund donors"—donors who may not have intended to "endorse all of an organization's election-related expenditures."  13 F.4th at 89.  The Court contrasted this requirement to other disclosure regimes that allowed entities to avoid such disclosure by establishing "segregated bank accounts to avoid disclosure of individual names."  *Id.* (citing 52 U.S.C.A. § 30104(f)(2)(E)–(F)).  This Court ultimately rejected the argument that the Rhode Island law was overinclusive in part because it contained an "opt-out" provision that allowed a donor to avoid disclosure by specifying that their contribution was not be used for IEs.  *Id.*

45

The Act's disclosure requirement works basically the same way. The Act requires PACs that engage in IE spending to "keep an account of any contributions received for the purpose of making [IEs]." Add. at 18 (codified at 21-A M.R.S.A. § 1019-B(6)). Moreover, the obligation to file an IE report listing contributors is not triggered unless and until the spender makes an expenditure of $250 or more on IEs. At that point, under Maine's interpretation of the Act, only those contributors whose donations were actually spent on the reported IEs must be disclosed. 21-A M.R.S.A. § 1019-B(4)(B) (Westlaw Oct. 16, 2025); *see* JA60 ¶ 30.

Thus, donors can prevent disclosure of their PAC contributions simply by specifying to the receiving PAC that their contribution is not "for the purpose of making [IEs]." Donors can similarly prevent disclosure of any contributions to entities that do not qualify as PACs by obtaining the recipient's agreement not to use the contribution for IEs. In either case, the Act, just like the Rhode Island law, protects from disclosure "those who engage in political speech outside the election context." *Gaspee Project*, 13 F.4th at 89.

The Act is narrowly tailored for another reason.  As the district court recognized, Add. at 15, the reports required by the Act are triggered only if the entity receiving the contribution spends $250 or more on IEs.  21-A M.R.S.A. § 1019-B(4).  Thus, those contributions that result only in small-scale electioneering activity are entirely excluded from the disclosure regime.

Indeed, the only significant difference between the Act's disclosure provision and the Rhode Island law at issue in *Gaspee Project* is that the latter did not require reporting of contributions of under $1,000, while the Act requires reporting of all contributions used for a given IE if the $250 threshold for filing an IE report is triggered.  The district court concluded that this lack of an opportunity for "anonymous contributions" rendered the Act overbroad.  Add. at 15.  But there is no categorical First Amendment principle requiring the government to allow anonymous contributions.  To the contrary, the Supreme Court has stated (in dicta) that "if it is thought wise, legislation can outlaw anonymous contributions."  *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 300 (1981).  Following this dicta, at least one federal court of appeals has upheld the

constitutionality of a zero-dollar disclosure threshold. *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1251 (11th Cir. 2013).

Moreover, courts, including this one, have also upheld thresholds far lower than the $1,000 threshold at issue in *Gaspee Project*. In *National Organization for Marriage v. McKee*, 649 F.3d 34, 58 (1st Cir. 2011), *abrogation recognized Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51 (1st Cir. 2024)), this Court called Maine's $50 threshold for reporting contributions to PACs "well tailored to Maine's informational interest."[9] And the Ninth Circuit has upheld thresholds as low as $25, while observing that "[i]t is far from clear . . . that even a zero-dollar disclosure threshold would succumb to exacting scrutiny." *Fam. PAC v. McKenna*, 685 F.3d 800, 809 (9th Cir. 2012).

And there can be no doubt that disclosure of small contributions can provide useful information to voters. As *McKenna* observes, even if information on any particular such contribution provides little useful information, they can still provide useful information "when considered

---

[9] The Supreme Court in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), later clarified the exacting scrutiny standard applied in *National Organization for Maine*. But there is no reason to think that the clarified standard would have produced a different outcome in that case.

in the aggregate." *Fam. PAC*, 685 F.3d at 810.  Voters can learn

information "about which constituencies may command a candidate's

loyalties." *Daggett*, 205 F.3d at 466 (quoting *Vote Choice, Inc. v.

DiStefano*, 4 F.3d 26, 32 (1st Cir. 1993)).  Voters can also assess, for

example, whether IE expenditures are financed primarily by

contributors who are located out of the electoral district or out of state

entirely.  *Id.*  As this Court affirmed in discussing disclosure of

referenda-related contributions: "the issue is thus not whether voters

clamor for information about each 'Hank Jones' who gave $100 to

support an initiative.  Rather, the issue is whether the "cumulative

effect of disclosure ensures that the electorate will have access to

information regarding the driving forces backing and opposing each

bill." *Nat'l Org. for Marriage, Inc.*, 669 F.3d at 41 (quoting *Nat'l Org.

for Marriage v. McKee*, 765 F. Supp. 2d 38, 52 (D. Me. 2011)).  Voters

have an identical interest in understanding "the driving forces" backing

candidates for office.

Additionally, to the extent that the contribution limits themselves

are upheld, the disclosure requirement also furthers Maine's interest in

"gathering data essential to detect violations of contribution limits."

49

*Daggett*, 205 F.3d at 466.  If smaller contributions may be omitted from IE reports, those reports in the aggregate may not reflect that a particular contributor has exceeded the overall annual contribution limit.  Maine has an interest in collecting and publishing the data both to deter violations of the contribution limits and to promote their effective enforcement.

Finally, even if the disclosure requirements are unconstitutional as applied to Dinner Table, the district court nevertheless erred in enjoining *any* enforcement of the disclosure provision.  By doing so, the district court effectively concluded that the disclosure provision is facially unconstitutional.  But facial challenges "are disfavored because they often rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short circuit the democratic process."  *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (cleaned up).  "Generally speaking, facial challenges leave no room for particularized considerations and must fail as long as the challenged regulation has any legitimate application."  *Gaspee Project*, 13 F.4th at 92 (1st Cir. 2021).  And, even if Dinner Table's challenge is a First Amendment overbreadth challenge, it must show that "a substantial

number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Americans for Prosperity Found.*, 594 U.S. at 614).

Here, the district court found fault with the disclosure provision because it "requires the disclosure of contributors who give even very small amounts of money." Add. at 15. But that is only a small subset of contributions subject to the reporting requirement. Dinner Table concedes that it receives and makes more than just small contributions. JA36–37 ¶¶ 30, 33, 37, 38, 41, 42 (describing multiple contributions of $5,000 or more). Plaintiff For Our Future is "exclusively funded by donations in excess of $5,000." JA37 ¶ 45. Indeed, many Maine PACs that make IEs receive large contributions from donors. JA62–65.

Even assuming *arguendo* that disclosure of very small contributions for the purpose of IEs is not sufficiently tailored to Maine's interests, the same cannot be said for disclosure of larger contributions. And while PACs must separately report contributions over $50 in their periodic filings, *see* 21-A M.R.S.A. § 1060(6), the new reporting requirement is not redundant: there is informational value to voters reviewing the IE reports required under 21-A M.R.S.A. § 1019-B,

so that they can see contributions associated with the particular IEs being reported.  Plus, the PAC reports will not reflect all contributions for purposes of making IEs, since entities who do not qualify as PACs are still required to file IE reports if they exceed the $250 threshold.  *See* 21-A M.R.S.A. § 1019-B(4).  In short, even if Dinner Table demonstrated that the disclosure requirement is unconstitutional as applied to the plaintiffs, it failed to meet the high standard necessary for facial invalidation of that requirement.

## III.   Any portions of the Act determined to be unconstitutional should be severed.

Whether the Act is severable is a question of state law.  *Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.*, 324 F. Supp. 2d 71, 72 (D. Me. 2004).  And Maine law expressly provides that Maine statutes are severable.  *See* 1 M.R.S.A. § 71(8).  Thus, under Maine law "[a]n invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole."  *Nat'l Fire Adjustment Co., Inc. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019) (quoting *Kittery*

*Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183).

The Act contains two interrelated yet distinct requirements: (A) the limits on contributions (and subsidiary limit on spending illegal contributions) and (B) the contribution disclosure requirement. While both serve the purpose of combatting quid pro quo corruption, the disclosure provision also serves the entirely distinct purpose of providing information to the electorate about who is supporting and opposing candidates for office. There is no reason to think that the voters who approved the Act would wish for the disclosure provisions to be struck down if only the limits are found unconstitutional, or vice versa. The Court should therefore follow Maine's presumption of severability and save the remainder of the Act if it concludes that a portion of it is unconstitutional.

## Conclusion

For the foregoing reasons, the order of the district court granting judgment to Plaintiffs should be reversed and the case remanded with instructions to vacate the permanent injunction and enter judgment for Maine.

DATED:  October 22, 2025

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
_____

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorneys for Defendants-Appellants*

## Certificate of Compliance with Rule 32(a)

1.    This brief contains 10,058 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendants-Appellants*

**Certificate of Service Form
for Electronic Filing**

I hereby certify that on October 22, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

# ADDENDUM

Judgment (ECF No. 75) ...................................................... Add. 1

Order (ECF No. 74) .......................................................... Add. 2

I.B. 5 – L.D. 2232, An Act to Limit Contributions to
    Political Action Committees That Make Independent
    Expenditures (ECF 45-11)....................................... Add. 17

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


DINNER TABLE ACTION, et al.,      )
                                  )
          Plaintiffs,             )
                                  )
v.                                )     CIVIL NO. 1:24-cv-00430-KFW
                                  )
WILLIAM J. SCHNEIDER, et al.,     )
                                  )
          Defendants,             )


<u>JUDGMENT</u>


     In accordance with the Order granting Motion for Permanent Injunction (ECF No.

74) entered by Magistrate Judge Karen Frink Wolf on July 15, 2025,

     JUDGMENT is hereby entered for the Plaintiffs and against the Defendants.



                              ERIC M. STORMS
                              ACTING CLERK



                              By: /s/ Nicholas Gordon
                              Deputy Clerk


Dated: July 15, 2025

# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| DINNER TABLE ACTION et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:24-cv-00430-KFW |
| ) | |
| WILLIAM J. SCHNEIDER, ) | |
| in his official capacity as Chairman ) | |
| of the Maine Commission on ) | |
| Governmental Ethics and Election ) | |
| Practices, et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER[1]

The Supreme Court has recognized only one constitutional basis for restricting political speech: preventing quid pro quo corruption or its appearance. *See FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). Along those lines, the Court has struck down restrictions on independent political expenditures made without any candidate coordination after concluding that such expenditures—unlike direct campaign contributions—"do not give rise to corruption or the appearance of corruption." *Citizens United v. FEC*, 558 U.S. 310, 357 (2010). The primary question in this case is whether Maine's recently enacted law limiting contributions to political action committees (PACs) that make independent expenditures (often referred to as super PACs) is a constitutional means of preventing quid pro quo corruption or whether it runs afoul of the Court's First Amendment jurisprudence.

---

[1] The parties have consented to me presiding over this case. *See* ECF Nos. 11, 44.

## I. Background

In November 2024, a record number of Maine voters passed by ballot initiative "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act"). *See* ECF Nos. 45-10 to 45-11. The Act restricts individuals and entities from contributing more than $5,000 per year to any given PAC "for the purpose of making independent expenditures" supporting or opposing a clearly identified candidate for local or state office. 21-A M.R.S.A. §§ 1015(2-C)-(2-D), 1019-B(1)(A)-(B).[2] The Act correspondingly prohibits PACs from using funds contributed in excess of the limit to make independent expenditures. *See id.* § 1019-B(6). And finally, the Act requires PACs to disclose "the total contributions from each contributor" to an independent expenditure. *Id.* § 1019-B(4)(B).

Dinner Table Action and For Our Future are Maine PACs that make independent expenditures. *See* Declaration of Alex Titcomb (ECF No. 16-1) ¶¶ 8, 10-11, 13. Both PACs receive a substantial amount of their funding from contributions that exceed the new limit, and For Our Future regularly contributes amounts exceeding the limit to other PACs such as Dinner Table Action. *See id.* ¶¶ 18-19, 25, 37, 45. The Act will severely curtail the ability of both PACs to raise and spend money to communicate their election views through independent expenditures or donations to other PACs making independent expenditures. *See id.* ¶¶ 35-36, 45.

---

[2] Citations to the Maine Revised Statutes Annotated are to the version available on Westlaw, which, as of the date of this order, was current through emergency legislation Chapter 433 of the 2025 First Regular and First Special Sessions of the 132nd Legislature of Maine.

In December 2024, Dinner Table Action and For Our Future—along with their founder Alex Titcomb—filed a complaint against the members of the Maine Commission on Governmental Ethics and Election Practices[3] and Maine Attorney General Aaron M. Frey in their official capacities asserting that the Act violates the First and Fourteenth Amendments.  *See* Complaint (ECF No. 1). They seek a declaration that the Act is unconstitutional on its face and/or as applied to them as well as a permanent injunction barring enforcement of the Act.  *See id.* at 16.

At a conference early in the case, the parties proposed an abbreviated briefing schedule on the Plaintiffs' anticipated motion for a permanent injunction.  *See* ECF No. 12.  The State Defendants agreed to delay enforcement of the Act, which went into effect on December 25, 2024, until May 30, 2025, to allow time to resolve the case.  *See id.*  After the Plaintiffs had filed their motion (ECF No. 16), I permitted the nonpartisan fair elections organization EqualCitizens, ballot initiative proponents Cara and Peter McCormick, and Maine State Senator Richard A. Bennett to intervene and defend the Act.  *See* ECF No. 51.  The parties ultimately agreed that an evidentiary hearing was unnecessary to resolve the Plaintiffs' motion and that the matter was ready for final judgment on the merits.  I held oral argument on May 22, 2025, *see* ECF No. 68, at which time the State Defendants agreed to further delay enforcement of the Act through July 15, 2025, *see* ECF No. 69 at 94.

---

[3] Namely, Chair William J. Schneider and members David R. Hastings III, Sarah E. LeClaire, Dennis Marble, and Beth N. Ahearn.  *See* Complaint at 1.

## II. Discussion

### A. Contribution Limit

Because free debate of public issues and candidates is critical to our democratic system of governance, the First Amendment provides robust protections for political speech, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011), and "the financing and spending necessary to enable political speech," *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).

When evaluating the constitutionality of laws restraining political speech, the Supreme Court distinguishes between limits on political expenditures and limits on political contributions. *See Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976). Limits on expenditures must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," while limits on contributions will be upheld so long as they are closely drawn to further a sufficiently important state interest. *Id.* The only state interest important enough to outweigh the First Amendment's political speech protections is the state's interest in preventing quid pro quo corruption or its appearance. *Ted Cruz for Senate*, 596 U.S. at 305.

Applying this framework, the Supreme Court struck down a limit on independent expenditures in *Citizens United*, holding that such expenditures "do not give rise to corruption or the appearance of corruption." 558 U.S. at 357. The Court explained, "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid*

4

*pro quo* for improper commitments from the candidate." *Id.* (cleaned up); *see also Buckley*, 424 U.S. at 47 (noting that "independent advocacy" has a "substantially diminished potential for abuse"); *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 751 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." (cleaned up)).

The question in this case is whether the Supreme Court's decision in *Citizens United* forecloses a state's ability to limit contributions to political groups making independent expenditures. Although this is an issue of first impression in the First Circuit, other courts have—as the Plaintiffs point out, *see* Motion at 10-11—been seemingly unanimous in holding that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to" independent expenditure groups. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *see Wisc. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537-38 (5th Cir. 2013) ("[E]very federal court that has

considered the implications of *Citizens United* on independent [expenditure] groups

. . . has been in agreement: There is no difference in principle—at least where the

only asserted state interest is in preventing apparent or actual corruption—between

banning an [independent expenditure] organization . . . from engaging in advocacy

and banning it from seeking funds to engage in that advocacy (or giving funds to other

organizations to allow them to engage in advocacy on its behalf).”); *Republican Party

of N.M.*, 741 F.3d at 1103 (“[T]he question before us is whether political committees

that are not formally affiliated with a political party or candidate may receive

unlimited contributions for independent expenditures.  On this question the answer

is yes. . . . The Supreme Court has held that independent expenditures do not invoke

the anti-corruption rationale . . . .”); *N.Y. Progress & Prot. PAC v. Walsh*,

733 F.3d 483, 487 (2d Cir. 2013) (“The Supreme Court held in *Citizens United v. FEC*

that the government has no anti-corruption interest in limiting independent

expenditures.  It follows that a donor to an independent expenditure committee . . .

is even further removed from political candidates and may not be limited in his ability

to contribute to such committees.” (cleaned up)); *Alaska Pub. Offices Comm'n v.

Patrick*, 494 P.3d 53, 58 (Alaska 2021) (“Given the Supreme Court's holding that

preventing quid pro corruption and its appearance is the only legitimate

governmental interest for campaign finance regulations and its holding that

independent expenditures do not give rise to quid pro quo corruption or its

appearance, there is no logical rationale for limiting contributions to independent

expenditure groups.”); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293

(4th Cir. 2008) (holding, prior to *Citizens United*, that "it is implausible that contributions to independent expenditure political committees are corrupting" and declaring unconstitutional a limit on such contributions (cleaned up)).

Notwithstanding the fact that "[f]ew contested legal questions" have been "answered so consistently by so many courts and judges," *N.Y. Progress & Prot. PAC*, 733 F.3d at 488, the Defendants maintain that these cases "were wrongly decided." State Defendants' Opposition (ECF No. 45) at 13; Intervenor Defendants' Opposition (ECF No. 53) at 5. They insist that *Citizens United* is inapposite because it involved a limit on expenditures that was subject to more intense scrutiny than the limit on contributions at issue here.

The Defendants' primary argument is that the Act is constitutional because it is closely drawn to serve "Maine's interest in stopping quid pro quo corruption by preventing candidates from trading official acts for contributions to Super PACs aligned with their campaigns." State Defendants' Opposition at 8. They point to two criminal cases involving political "candidates and contributors allegedly using a Super PAC to further illegal quid pro quo arrangements." *Id.* at 9; ECF Nos. 45-6 to 45-8. And they emphasize that just because "SuperPACs *make* 'independent expenditures' does not ensure that they *receive* independent contributions free from quid-pro-quo corruption." Intervenor Defendants' Opposition at 5.

Even accepting that contributions to independent expenditure PACs can serve as the quid in a quid pro quo arrangement, however, I am not persuaded that the Defendants' arguments on this point can be squared with *Citizens United*. I do not

read the Supreme Court as suggesting that independent expenditures are wholly incorruptible, but rather that they are sufficiently removed from the candidate so that the danger of such corruption is "substantially diminished" to the point that the government's "anticorruption interest is not sufficient to displace" First Amendment protections. *Citizens United*, 558 U.S. at 357 (cleaned up). Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still. That being the case, there "is no logical scenario in which making a contribution to a group that will then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Alaska Pub. Offices Comm'n*, 494 P.3d at 58.

The Defendants also suggest that the Act is closely drawn to further Maine's interest in preventing the appearance of corruption. They contend that "the Maine electorate's overwhelming" approval of the Act supports the notion that the public perceives large contributions to independent expenditure PACs as corrupting. Intervenor Defendants' Opposition at 7; *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 394 (2000) ("[A]lthough majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied on here: An overwhelming 74 percent of the voters of Missouri determined that [campaign] contributions limits are necessary to combat corruption and the appearance thereof." (cleaned up)). They also provide the results of a survey that, according to them, shows "a clear majority" of citizens "believe that quid-pro-quo

corruption is likely to occur" when such contributions exceed $5,000. Intervenor Defendants' Opposition at 6-7; ECF No. 53-3.

Justice Stevens made similar points in *Citizens United* when dissenting from the majority's opinion striking down limits on corporate independent expenditures. He criticized the majority for ignoring the "significant evidence" that such expenditures were, at the very least, susceptible to the appearance of corruption and warned that the Court's holding would result in "cynicism and disenchantment" among voters and "and an increased perception that large spenders call the tune." *Citizens United*, 558 U.S. at 457, 470 (Stevens, J., dissenting) (cleaned up). The majority, however, was unmoved, saying,

> By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker.

*Id.* at 360 (cleaned up).

If the government's interest in combatting the appearance of corruption was not enough to justify limits on independent expenditures, it stands to reason that the same interest is not enough to justify limits on contributions to independent expenditures. Thus, even accepting the Defendants' assertions about public perception, their arguments on this point once again fail under the Supreme Court's reasoning in *Citizens United*.

Finally, the Defendants argue that the Act is constitutional because it is closely

drawn to further Maine's interest in preventing dependence corruption—that is, the risk that elected officials will become dependent on constituencies disconnected from the electorate. *See* Intervenor Defendants' Opposition at 8-17. They assert that the First Amendment, as it was originally understood by the Framers, allows for the regulation of dependence corruption in addition to quid pro quo corruption. *See id.* I need not address this argument further or resolve the disagreements of the parties' competing constitutional historians because, as discussed, the Supreme Court has been clear that the only interest it recognizes as sufficient to justify limits on political speech is the government's interest in preventing quid pro quo corruption. *See Ted Cruz for Senate*, 596 U.S. at 305. Even the Defendants acknowledge that I am bound to follow Supreme Court precedent on this point and admit that their argument is primarily intended to preserve the issue for subsequent levels of review. *See* Intervenor Defendants' Opposition at 9-10 n.3.

At bottom, I agree with other courts that, regardless of whether strict or intermediate scrutiny applies, *Citizens United* forecloses limits on contributions to independent expenditure groups. *See, e.g.*, *SpeechNow.org*, 599 F.3d at 696 (holding that no "matter which standard of review governs contributions limits," contribution limits on independent expenditure groups "cannot stand" under *Citizens United*). The portions of the Act limiting contributions to PACs for the purposes of making independent expenditures—21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6)— violate the First Amendment on their face because there is no set of circumstances

where they could be applied constitutionally. *See Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 168 (1st Cir. 2024).

That leaves the question of injunctive relief. Granting a permanent injunction requires a court "to find that (1) plaintiffs prevail on the merits, (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

The Plaintiffs readily satisfy each of these factors.[4] They are prevailing on the merits; the loss of their First Amendment freedoms absent an injunction would be an irreparable injury, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976); the harm the Plaintiffs would face in losing their First Amendment freedoms outweighs the harm the Defendants will suffer from an injunction where the Defendants have failed to demonstrate a compelling state interest in limiting those freedoms; and, finally, the public's interest is served—rather than harmed—by enforcing the First Amendment, *see P.R. Assoc. of Mayors v. Vélez-Martínez*, 480 F. Supp. 3d 377, 379 (D.P.R. 2020).

---

[4] The Defendants suggest in passing that the Plaintiffs "cannot possibly be entitled to an injunction" because they did not specifically address all four of these factors in their motion. Intervenor Defendants' Opposition at 4. Where this case has focused almost entirely on the merits of the underlying constitutional issue and the Plaintiffs' entitlement to a permanent injunction is readily apparent, I decline to find that they waived their request.

Accordingly, I will permanently enjoin enforcement of 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), which are the portions of the Act limiting contributions to PACs for the purpose of making independent expenditures.

## B. Disclosure Requirements

The Plaintiffs also challenge the Act's separate requirement that a "person, party committee, or [PAC] that makes any independent expenditure in excess of $250 during any one candidate's election" disclose "the total contributions from each contributor" regardless of the amount of the contribution. 21-A M.R.S.A. § 1019-B(4)(B). Because Maine law did not previously require the disclosure of PAC contributions less than $50, *see* 21-A M.R.S.A. § 1060(6), Dinner Table Action avers that multiple of its smaller dollar amount contributors have indicated that they will not contribute as they have done in the past if their identities will be publicly revealed. *See* Declaration of Alex Titcomb ¶¶ 27-29.

Although disclaimer "and disclosure requirements may burden the ability to speak" and associate, they "impose no ceiling on campaign-related activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366 (cleaned up). Accordingly, such requirements are not subject to strict scrutiny but instead "to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (cleaned up). In this context, the government's interest is not limited just to preventing quid pro quo corruption—rather, the Supreme Court has said that the government has an important interest "in provid[ing] the electorate with information

and insur[ing] that the voters are fully informed about the person or group who is speaking." *Id.* at 368 (cleaned up). Nevertheless, disclosure requirements must be narrowly tailored to this informational interest, which requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

Maine's "interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny." *Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021).[5] That leaves the question of whether the Act's disclosure requirement is narrowly tailored to that interest.

On this point, the First Circuit's decision in *Gaspee Project* is instructive. The Rhode Island law at issue in that case required, among other things, that covered organizations disclose donors of over $1,000. *See id.* at 83. The First Circuit found that the law was "narrowly tailored enough to avoid any First Amendment infirmity" because it was limited to organizations that spent $1,000 or more on independent expenditures within one calendar year and "provide[d] off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution." *Id.* at 88-90. Those off-ramps included "choos[ing] to contribute less than $1,000" or taking advantage of the law's provision allowing donors "to opt out of their monies being used for independent expenditures." *Id.* at 89. "Taken together," the First

---

[5] The Defendants also argue that the disclosure requirement is sufficiently related to Maine's interest in preventing corruption. *See* State Defendants' Opposition at 18. But as discussed above, Maine's anticorruption interest is not sufficient to displace First Amendment protections in the context of independent expenditures. As such, I will focus on Maine's informational interest.

Circuit concluded, "these limitations on the [law's] reach only require disclosure of relatively large donors who choose to engage in election-related speech." *Id.*

The disclosure requirement here is not nearly so constrained. Although the Act is somewhat limited by the fact that it only requires disclosure of contributions to an independent expenditure if the expenditure exceeds $250, it has no explicit opt out provision for contributors who do not wish to fund independent expenditures, and, most importantly, it requires the disclosure of contributors who give even very small amounts of money. *Cf. Wy. Gun Owners v. Gray*, 83 F.4th 1224, 1249 (10th Cir. 2023) ("[T]he First Circuit's suggestion [in *Gaspee Project*] that wary donors should just contribute less than $1,000 strikes us as an unacceptable ask here, where the disclosure requirements trigger at a *$100* donation.").

Where the Act's disclosure requirement sweeps so broadly and provides no meaningful opportunity for anonymous contributions, it cannot be described as narrowly tailored to Maine's informational interest.[6] In such circumstances, the disclosure requirement is facially unconstitutional because it risks chilling contributors' rights to speak and associate, and that risk "is enough because First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found.*, 594 U.S. at 618-19 (cleaned up); *see id.* at 617-18 (concluding that a disclosure

---

[6] I offer no general opinion as to what constitutes a reasonable dollar amount threshold for disclosure requirements, only that, in the specific circumstances of this case, the zero dollar threshold is not narrowly tailored to further Maine's informational interest.

requirement that "indiscriminately swe[pt] up information" of donors who might wish to remain anonymous was "facially unconstitutional"). [7]

Accordingly, under the same permanent injunction analysis outlined above, I will enjoin enforcement of the portion of 21-A M.R.S.A. § 1019-B(4)(B) that requires an itemized account of "the total contributions from each contributor." (This quoted language is the language that the Act added to section 1019-B(4)(B)—the State Defendants remain free to enforce the remaining portions of the statute.)

### III. Conclusion

In summary, the Plaintiffs' motion (ECF No. 16) is **GRANTED**. "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" is declared unconstitutional on its face. As such, the State Defendants are permanently enjoined from enforcing 21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), and the portion of 21-A M.R.S.A. § 1019-B(4)(B) requiring an itemized account of "the total contributions from each contributor." Judgment shall enter for the Plaintiffs.

**SO ORDERED**.

Dated: July 15, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

---

[7] In light of my conclusion that the Act violates the First Amendment, I need not address the Plaintiffs' alternative argument that it also violates the Fourteenth Amendment's Equal Protection Clause. *See* Motion at 12-15.

PUBLIC APPROVAL
NOVEMBER 5, 2024

EFFECTIVE DATE
DECEMBER 25, 2024

CHAPTER

4

INITIATED BILL

## STATE OF MAINE

_____

### IN THE YEAR OF OUR LORD

### TWO THOUSAND TWENTY-FOUR

_____

### I.B. 5 - L.D. 2232

### An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1. 21-A MRSA §1015, sub-§2-C** is enacted to read:

**2-C. Contributions by individuals to political action committees making independent expenditures.** An individual may not make contributions aggregating more than $5,000 in any calendar year to a political action committee for the purpose of making independent expenditures under section 1019-B, subsection 1. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates.

**Sec. 2. 21-A MRSA §1015, sub-§2-D** is enacted to read:

**2-D. Contributions by political action committees and business entities to political action committees making independent expenditures.** A leadership political action committee, a separate segregated fund committee, a caucus political action committee, any other political action committee or any business entity may not make contributions aggregating more than $5,000 in any calendar year to a political action committee for the purpose of making independent expenditures under section 1019-B, subsection 1. Beginning December 1, 2024, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates. For purposes of this subsection, "business entity" includes a firm, partnership, corporation, incorporated association, labor organization or other organization, whether organized as a for-profit or a nonprofit entity.

Sec. 3. **21-A MRSA §1019-B, sub-§4, ¶B,** as amended by PL 2023, c. 324, §12, is further amended to read:

B. A report required by this subsection must contain an itemized account of <u>the total contributions from each contributor,</u> each expenditure in excess of $250 in any one candidate's election, the date and purpose of each expenditure and the name of each payee or creditor. The report must state whether the expenditure is in support of or in opposition to the candidate and must include, under penalty of unsworn falsification, as provided in Title 17-A, section 453, a statement whether the expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, the candidate or an authorized committee or agent of the candidate.

Sec. 4. **21-A MRSA §1019-B, sub-§6** is enacted to read:

**6. Segregated contributions required.** <u>A political action committee may use only funds received in compliance with section 1015, subsection 2-C or 2-D when making independent expenditures. A political action committee that makes independent expenditures shall keep an account of any contributions received for the purpose of making those expenditures.</u>