Nos. 25-1705, 25-1706
# United States Court of Appeals
# for the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs - Appellees,

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of
the Maine Commission on Governmental Ethics and Election
Practices; DAVID R. HASTINGS, III, in the official capacity as a
Member of the Maine Commission on Governmental Ethics and
Election Practices; DENNIS MARBLE, in the official capacity as a
Member of the Maine Commission on Governmental Ethics and
Election Practices; BETH N. AHEARN, in the official capacity as a
Member of the Maine Commission on Governmental Ethics and
Election Practices; AARON M. FREY, in the official capacity as
Attorney General of Maine; SARAH E. LECLAIRE, in the official
capacity as a Member of the Maine Commission on Governmental
Ethics and Election Practices,
Defendants - Appellants,

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT,
Defendants.

No. 25-1706

_____

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs -Appellees,

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK;
RICHARD A. BENNETT,
Defendants - Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices;
DAVID R. HASTINGS, III, in the official capacity as a Member of the
Maine Commission on Governmental Ethics and Election Practices;
DENNIS MARBLE, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices; BETH N.
AHEARN, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices; AARON
M. FREY, in the official capacity as Attorney General of Maine; SARAH
E. LECLAIRE, in the official capacity as a Member of the Maine
Commission on Governmental Ethics and Election Practices,
Defendants.

_____

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-00430-KFW

_____

**PLAINTIFFS-APPELLEES' RESPONSE BRIEF**

Charles Miller (1129194)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, D.C. 20036
Tel: (202) 301-9800
Fax: (202) 301-3399
cmiller@ifs.org

*Counsel for Plaintiffs-Appellees*

DISCLOSURE STATEMENT

Plaintiff-Appellee Dinner Table Action is a political action committee formed under the law of the State of Maine, has no parent corporation, and no entity has a ten percent or greater ownership in it.

Plaintiff-Appellee For Our Future is a political action committee formed under the law of the State of Maine, has no parent corporation, and no entity has a ten percent or greater ownership in it.

# TABLE OF CONTENTS

Disclosure Statement.................................................................. i

Table of Contents ..................................................................... ii

Table of Authorities ................................................................. iii

Introduction ........................................................................... 1

Statement of the Issues ............................................................. 2

Statement of the Case ............................................................... 2

Summary of the Argument ......................................................... 16

Argument .............................................................................. 24

I.  LIMITS ON CONTRIBUTIONS FOR INDEPENDENT EXPENDITURES VIOLATE
    THE RIGHTS OF FREE SPEECH AND ASSOCIATION ................................. 24

II.  THE ACT IS INCOMPATIBLE WITH THE FIRST AMENDMENT'S ORIGINAL
     PUBLIC MEANING.................................................................. 37

III. THE ZERO-DOLLAR DISCLOSURE THRESHOLD FOR INDEPENDENT
     EXPENDITURE CONTRIBUTIONS ALSO VIOLATES THE FIRST AND
     FOURTEENTH AMENDMENTS. ................................................... 47

Conclusion............................................................................. 52

Certificate of Compliance........................................................... 53

Certificate of Service................................................................ 53

Addendum

TABLE OF AUTHORITIES

CASES

*Americans for Prosperity Foundation v. Bonta*,
   594 U.S. 595 (2021) ........................................................ 24, 48, 49, 50

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011) ................................................................ 22, 33, 41

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ......................................................................... passim

*Cal. Med. Ass'n v. FEC*,
   453 U.S. 182 (1981) ................................................................................ 26

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics*,
   144 F.4th 9 (1st Cir. 2025) .................................................................. 25

*Colorado Republican Fed. Campaign Comm. v. FEC*,
   518 U.S. 604 (1996) ............................................................................... 44

*FEC v. Nat'l Conservative PAC*,
   470 U.S. 480 (1985) ............................................................................... 31

*FEC v. Nat'l Right to Work Comm.*,
   459 U.S. 197 (1982) ............................................................................... 24

*FEC v. Ted Cruz for Senate*,
   596 U.S. 289 (2022) .......................................................................... 25, 47

*FEC v. Wis. Right to Life, Inc.*,
   551 U.S. 449 (2007) ............................................................................... 35

*Free & Fair Election Fund v. Mo. Ethics Comm'n,*
   903 F.3d 759 (8th Cir. 2018) .............................................................. 27

*Gaspee Project v. Mederos*,
   13 F.4th 79 (1st Cir. 2021) ................................................................. 48

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
   603 F.3d 684 (9th Cir. 2010) .............................................................. 27

*McCoy v. Mass. Ins. of Tech.*,
   950 F.2d 13 (1st Cir. 1991) ................................................................ 33

*McCutcheon v. FEC,*
 572 U.S. 185 (2014) ....................................................................24, 32

*McIntyre v. Ohio Elections Comm'n,*
 514 U.S. 334 (1995) ....................................................................24, 50

*N.C. Right to Life, Inc. v. Leake,*
 525 F.3d 274 (4th Cir. 2008) ............................................................27

*N.H. Right to Life Pol. Action Comm. v. Gardner,*
 99 F.3d 8 (1st Cir. 1996) ..................................................................47

*N.Y. Progress & Prot. PAC v. Walsh,*
 733 F.3d 483 (2nd Cir. 2013) ......................................................27, 28

*Republican Party of N.M. v. King,*
 741 F.3d 1089 (10th Cir. 2013) ..........................................................28

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
 490 U.S. 477 (1989) ...........................................................................16

*SpeechNow.org v. FEC,*
 599 F.3d 686 (D.C. Cir. 2010) ............................................ 19, 26, 32, 51

*Texans for Free Enter. v. Texas Ethics Comm'n,*
 732 F.3d 535 (5th Cir. 2013) ............................................................27

*United States v. Householder,*
 137 F.4th 454 (6th Cir. 2025)............................................................34

*Wisc. Right to Life State PAC v. Barland,*
 664 F.3d 139 (7th Cir. 2011) ............................................................27

## STATUTES

21-A M.R.S.A. § 1013-A ...........................................................................36

21-A M.R.S.A. §1015..........................................................................passim

21-A M.R.S.A. § 1017 ......................................................................4, 47

21-A M.R.S.A. § 1019-B ........................................................................48

21-A M.R.S.A. § 1052 ...................................................................3, 4, 36

21-A M.R.S.A. § 1060 ......................................................................4, 47

## ARTICLES

"The Past Is Not a Foreign Country: How a Historical Critique of
  Originalism Misses That the Past Is Prologue,"
  26 Fed. Soc. R. 134 (March 19, 2025) ...................................................42

Emma Davis, "Effort to regulate super PACs stems from Harvard Law
  professor and political activist Lawrence Lessig,"
  Maine Morning Star (Nov. 10, 2023) ...................................................15

Gaughn, *James Madison, Citizens United, and the Constitutional
  Problem of Corruption,*
  69 Am. U. L. Rev. 1485 (2020) .....................................................45, 46

John O. McGinnis & Mike Rappaport, "The Finished Constitution",
  Law & Liberty (Sept. 28, 2023)..........................................................42

Porter, David, *New Jersey senator's bribery trial ends in a hung jury*,
  Associated Press (Nov. 16, 2017) ......................................................34

Randy Barnett, "Challenging the priesthood of professional historians,"
  *The Washington Post (The Volokh Conspiracy)* (Mar 28, 2017) ..........43

Seth Barrett Tillman, *Why Professor Lessig's "Dependence Corruption"
  Is Not a Founding-Era Concept,*
  13 ELECTION L.J. 336 (2014) .........................................................40

Introduction

Maine's law limiting donations for independent expenditures violates the First Amendment. As every other appellate court to consider the issue has unanimously found, limits on independent donations for independent expenditures do not serve a sufficiently compelling governmental interest needed to override the First Amendment's protection of core political speech. These limits run directly counter to controlling First Amendment principles set forth in a long line of Supreme Court campaign finance precedent.

The disclosure requirement demands disclosure of very small contributions that lack any corruption potential. This requirement too heavily burden core political speech to stand.

STATEMENT OF THE ISSUES

1. Whether the First Amendment bars Maine from infringing political speech rights by limiting independent donations for independent expenditures.

2. Whether Maine can require disclosure of small dollar donors who donate towards independent expenditures.

STATEMENT OF THE CASE

Political campaigns matter to everyone. All Americans, not just those running for office, have a fundamental First Amendment right to talk about political campaigns. Their independent donations—gifts that fund payments for independent political expression by those who are *not* running for office but nonetheless have something to say about a campaign—are a vital feature of our democracy that deserve the highest First Amendment protection.

A Maine law enacted by ballot initiative in November 2024 would have improperly limited Mainers' right to make these independent donations. The district court enjoined the law as required by the First Amendment and controlling Supreme Court precedent, and in line with unanimous decisions from every circuit court to decide the issue.

The district court also properly enjoined the disclosure requirements of the law, which would have required disclosing donor information for independent expenditures no matter how small, even though candidate and PAC contributions are not reportable below $50, evidencing a lack of adequate tailoring of the law.

*The regulatory regime*

Maine law defines a "political action committee"("PAC") as "[a]ny separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization," or "[a]ny person, including any corporation or association, other than an individual, that receives contributions or  makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate to political office." 21-A M.R.S. § 1052(5)(A)(1) and (5).

In any election, PACs and individuals may not contribute over $1,950 to a gubernatorial candidate, $475 to a legislative candidate, $575 to a municipal candidate, or $975 to any other candidate, adjusted for inflation every two years commencing December 1, 2024. 21-A M.R.S.A. §§ 1015(1) and (2-B).

Maine's statutes treat contributions to single-candidate PACs requested by a candidate, and any other expenditure requested by a candidate, as a contribution to the candidate. 21-A M.R.S.A. §§ 1015(4)-(5).

Maine also allows for "party committees." Party committees can make independent expenditures, *id.* § 1019-B(1), and are not considered "political action committees." *See id.* § 1052(5)(B)(3). Accordingly, party committees are not subject to the Act's contribution limits.

Unlike independent expenditure committees, candidates and PACs are not required to report the identity of donors of less than $50. 21-A M.R.S.A. §§ 1017(5), 1060(6). Party committees are not required to report the identity of donors of less than $200. *Id.* § 1017-A(1).

*The Citizens Initiative*

In the November 5, 2024, election, Maine voters approved Question 1, a citizens' initiative entitled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act").

Section 1 of the Act, codified as 21-A M.R.S. § 1015(2)(C), imposes a limit of $5,000 per year for contributions made by an individual to a

PAC for the purpose of making an independent expenditure. Section 2 of the Act, codified as 21-A M.R.S. § 1015(2)(D), imposes a limit of $5,000 per year for contributions made by each PAC or business entity to a PAC for the purpose of making an independent expenditure. Sections 3 of the Act amends Maine's existing independent expenditure reporting provision, 21-A M.R.S. § 1019-B(4)(B), to require any person, party committee, or PAC that makes any independent expenditure exceeding $250 to include in reports itemizations of the total contributions from each contributor. Section 4 of the Act, codified as 21-A M.R.S. 1019-B(6), mandates that PACs may only make independent expenditures from funds received within these limits, and to keep an account of all such contributions.

*Potential Criminal and Civil Liability*

A person or PAC who knowingly makes or accepts an unlawful contribution, including under the Act, commits a Class E crime. 21-A M.R.S. § 1004(1). Such violations are punishable by up to six months' imprisonment, 17-A M.R.S. § 1604(1)(E), and by fines of up to $1,000 for individuals, *id.* § 1704(5), and $10,000 for organizations, *id.* § 1705(5).

Additionally, "[a] person that accepts or makes a contribution that exceeds the limitations . . . may be assessed a penalty of no more than the amount by which the contribution exceeded the limitation." 21-A M.R.S. § 1004-A(2). The Commission has the power to "collect the full amount of any penalty . . ." *Id.* §1004-B. "[F]ailure to pay the full amount of any penalty assessed by the commission . . . is a civil violation by the candidate, treasurer, party committee, political action committee, or other person." *Id.* The penalized party generally has 30 days to pay the full amount of the penalty. *Id.* If the penalized party fails to pay the penalty within 30 days, the Commission "shall report to the Attorney General the name of any person who has failed to pay the full amount of any penalty . . ." *Id.* The Attorney General "shall enforce the violation in a civil action to collect the full outstanding amount of the penalty . . ." *Id.*

*The Act's Impact on Plaintiffs' Speech and Association Rights*

Plaintiff Dinner Table Action, a political action committee formed under the laws of the State of Maine, is subject to the challenged fundraising limits. JA34. Dinner Table Action seeks to provide a voice for Mainers who believe in advancing limited government, free

enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates. *Id*. Dinner Table Action makes independent expenditures under 21-A M.R.S. § 1019-B. *Id*.

Plaintiff For Our Future is also a political action committee formed under Maine law and is subject to the challenged fundraising limits. *Id*. For Our Future seeks to advance conservative causes and candidates. *Id*. For Our Future makes independent expenditures under 21-A M.R.S. § 1019-B, and contributes to other PACs for the purpose of those PACs making independent expenditures. *Id*. Plaintiff Alexander Titcomb is the co-founder, principal officer, a primary fundraiser, and Executive Director of Dinner Table Action. *Id*. Plaintiff Titcomb is also the founder, principal officer, and the primary fundraiser for For Our Future.[1] *Id*.

Dinner Table Action raised approximately $489,880 during the 2022 election cycle. JA35. During the 2024 cycle, Dinner Table Action raised approximately $454,000. *Id*. Over one-third of the value of donations

---

[1] This brief will collectively refer to Plaintiffs as "Dinner Table."

Dinner Table Actions received in 2024 were from individuals or entities that donated more than $5,000 that year. *Id.*

In 2022, the top five individual donors to Dinner Table Action each contributed more than $10,000.00. *Id.* Additionally, the Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to Dinner Table Action. *Id.* In 2023, Dinner Table Action was subject to a short-lived law that restricted the amount of funds it could raise. The law was quickly repealed after Dinner Table Action sued. *Id.* Nevertheless, Dinner Table Action still received three individual contributions more than $5,000 that year. *Id.*

In 2024, the top six donors to Dinner Table Action each contributed more than $5,000. *Id.* Dinner Table Action raised $291,215.42 in donations for independent expenditures, $168,655 of which came from the top six donors. *Id.* More than half of Dinner Table Action's receipts for independent expenditures in 2024 came from these six donors. *Id.*

In 2024, Dinner Table Action made over $375,000 in independent expenditures in Maine elections to send mailers, postcards, and hand-written letters; purchase digital advertisements; pay for phone calls and

text messages, and to organize door knocking and events, in support of or opposition to candidates for office across the state. *Id.*

Dinner Table Action regularly receives contributions of less than $50 from individual contributors. JA36. Maine law previously did not require the identity of such contributors to be reported. For reasons personal to them, multiple contributors have indicated to Plaintiff Titcomb that they would not contribute to Dinner Table Action if their identities would be publicly disclosed. *Id.* Because the Act does not contain a threshold below which the identity of a contributor will not be disclosed, at least some of these contributors will stop contributing to Dinner Table Action. *Id.*

Going forward, several donors will contribute over $5,000 per year to Dinner Table Action for the purposes of having Dinner Table Action make independent expenditures, and Dinner Table Action will spend that money to make similar expenditures to those it has made in the past, and to also potentially purchase newspaper and print advertisements. *Id.* One such donor is Plaintiff For Our Future. *Id.*

For Our Future donated over $230,000 to other PACs in 2024, including $100,000 to Dinner Table Action, for the recipients to use for

independent expenditures. *Id*. For Our Future will contribute in excess of $5,000 to Dinner Table Action per year for the purpose of independent expenditures in each of the next several years. *Id*. The Act would severely impair Dinner Table Action's ability to successfully and fully communicate its election related views, and severely impair Dinner Table Action's ability to associate with its donors, including Plaintiff For Our Future and its donors, as it limits the amount of money that Dinner Table Action has available to speak by limiting and dissuading contributions. *Id*. It limits Dinner Table Action donors' abilities to associate with each other by limiting the amount of speech they can share via independent expenditures. *Id*.

For Our Future also contributes in excess of $5,000 per year to other Maine PACs for the purpose of the recipient making independent expenditures. JA37. For instance, in 2024, For Our Future contributed more than $5,000 to Women's Leadership Fund, Fight for Freedom, and Free Maine Campaign. *Id*. For Our Future intends to make contributions in excess of $5,000 annually to these or other Maine PACs for the purpose of independent expenditures perpetually into the future. *Id*. The Act will severely impair For Our Future' ability to associate

with the PACs to which it contributes, including Plaintiff Dinner Table
Action, and with other donors, as it limits the amount of money that For
Our Future can contribute to other PACs for use in making independent
expenditures. *Id.*

For Our Future receives donations in excess of $5,000 for the purpose
of making independent expenditures. *Id.* For example, a single
contributor contributed well in excess of $5,000 to For Our Future for
the purpose of making independent expenditures in each year that For
Our Future has existed and is expected to do so again in future years.
*Id.* In 2024, For Our Future made independent expenditures supporting
or opposing several candidates for office in Maine. *Id.* It intends to do so
perpetually into the future. *Id.*

Because For Our Future has been exclusively funded by donations in
excess of $5,000, the Act will cripple For Our Future's ability to receive
anywhere near the level of contributions it currently receives, which in
turn would all but eliminate its ability to make independent
expenditures or contributions for independent expenditures, thereby
stifling its ability to successfully and fully communicate its election

related views, and to associate with others for the purpose of making their election related views known. *Id.*

Section 4 of the Act requires a PAC to segregate funds received for independent expenditures and permits a PAC to spend only those funds received in compliance with the Act on independent expenditures. This requirement is based on the date the expenditure is made, not the date that a contribution was received. Accordingly, funds held by a PAC now that were contributions of more than $5,000 will not be permitted to be spent for independent expenditures once the Act takes effect. Dinner Table Action still has on hand over $30,000 available for independent expenditures; $27,224.80 of which is part of a $50,000 contribution from For Our Future made on October 7, 2024. JA38.

Dinner Table Action raised funds and made independent expenditures in support of local candidates in "off year" elections in the past, and intends to do so again in 2025 *Id*. Dinner Table Action intends to keep soliciting and accepting contributions exceeding $5,000 for the purpose of making independent expenditures, and it intends to spend its cash-on-hand already raised in amounts exceeding $5,000, after the Act's effective date. *Id*. Dinner Table Action would make these

independent expenditures to express itself about local races in 2025, and in further campaigns indefinitely going forward as it has done for years. *Id*. However, Dinner Table Action will refrain from doing all these things because while the law is effect, so as to be in compliance with all laws, and avoid potential civil and criminal liability for itself and those with whom it associates. *Id*.

For Our Future has approximately $20,000 on hand, all of which was received from a single contributor. *Id*. For Our Future intends to use most of these funds to either make independent expenditures or to contribute to other PACs for the purpose of those PACs making independent expenditures in Maine. *Id*. However, so long as the Act remains in effect, For Our Future will refrain from doing all these things because so that it, and those with whom it would associate remain in compliance with all laws and avoid potential civil and criminal liability. JA39.

*Lack of Evidence of Quid Pro Quo Corruption*

Defendants did not enter evidence of any actual quid pro quo corruption ever occurring in Maine or through independent expenditures. Equal Citizens submitted evidence containing generalized

13

complaints and conjecture that independent expenditures can shape elections and be used to hold politicians accountable to the voters, and that elected officials might be responsive to the interests expressed in independent expenditures.

For example, one candidate complained that "As a former candidate for statewide office, I find this bill enormously important to help limit the disproportionate role single donors have in our election process. This is an issue I dealt with in the most personal of ways having spent the better part of two years trying to raise campaign funds with a $1,600 per donor limit only to have a SuperPAC formed two weeks before the primary election to spend hundreds of thousands of dollars against my campaign." JA136. Intervenor Senator Bennett concluded his declaration with his real concern: "At bottom, the Act allows candidates to be in control of their campaigns… ." JA45.

*Reducing Money in Politics Motivated Voters*

Equal Citizens submitted a national survey showing 35% of respondents thought that even a $5 donation for an independent expenditure is corrupting. JA205; and ECF 62-5, 52:4-10 ("Well, here, 35 percent of the people seem to agree with a very small donation could

14

create a risk of corruption."). Even Equal Citizens' expert in charge of the study agreed it proved too much. "[P]eople just react to the entire private funding of elections, I don't know what else to say about it." *Id.* According to Dinner Table's expert, the survey results do not evidence quid pro quo corruption or its appearance as courts use the terms. JA314.

Contemporary news coverage shows the goal of Mainers involved in passing the proposal was to combat "unmitigated spending in elections by the billionaire big business interests" and to "limit how much money is coming into our elections in Maine." Emma Davis, "Effort to regulate super PACs stems from Harvard Law professor and political activist Lawrence Lessig," Maine Morning Star (Nov. 10, 2023), available at https://tinyurl.com/enw3hjuc. Campaign videos and ads urged voters to "get big money out of politics." https://tinyurl.com/m84jtzmp. Silencing speakers, not combatting quid pro quos was the public intent behind the Act.

*Procedural history*

The Defendants' opening briefs adequately recount the procedural history and will not be restated here.

SUMMARY OF THE ARGUMENT

> On the logic of your theory, if one person spends a million dollars to take out an ad, that's constitutionally protected. … But if five people get together and contribute $6,000 each to a nonprofit to support an ad, that is corrupting. What sense does that make?
>
> -Kavanaugh, J., Oral Argument *Speechnow.org v. FEC*, No. 08-5223, at 32:20 (D.C. Cir. 2010) (addressing the FEC's argument for limiting donations to independent expenditure committees).[2]

This Court cannot overrule the Supreme Court.

It cannot overrule a single Supreme Court case from yesterday, let alone decades of precedent. Plaintiffs appreciate that many people, earnestly and in good faith, disagree with *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) and *Citizens United v. FEC*, 559 U.S. 310 (2010).[3] But these controlling holdings bar Defendants' theories of the case. Even had the Supreme Court signaled some discomfort with *Buckley* and *Citizens United*—and to be sure, it has not—this Court would remain duty-bound to apply these decisions. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). Defendants'

---

[2] Available at https://bit.ly/4pSJMYZ
[3] Plaintiffs, too, disagree with aspects of these decisions, not relevant here.

claim that a ruling in their favor would not require overruling Supreme Court precedent is specious.

1. *Buckley* upheld contribution limits, while striking down expenditure limits, because contribution limits "prevent attempts [at] circumvent[ion] through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, 424 U.S. at 47. *Citizens United* confirmed that the First Amendment protects all citizens' rights to advocate for or against a candidate, and to spend money doing so. Maine seeks to bypass these fundamental First Amendment holdings and limit independent donations for independent expenditures on top of the coordination restrictions it already imposes.

But Maine cannot limit *independent* donations for *independent* expenditures out of concern that some donations may be solicited by a candidate. Speech restrictions to prevent circumvention and quid pro quo corruption must target circumvention and quid pro quo schemes, not core political speech and associational rights.

Maine already limits candidate-solicited donations. 21-A M.R.S.A. §1015(4) & (5). These coordination restrictions prevent circumvention of direct contribution limits and quid pro quo corruption. Limits on

17

independent giving, on the other hand, do not target quid pro quo corruption, and impermissibly restricts political speech.

The Supreme Court has repeatedly held that independent expenditures cannot be limited. An independent donation for an independent expenditure is itself an independent expenditure by the donor. A donor decides to engage in election related protected speech in association with other independent speakers by pooling resources in an entity that will do the speaking. Thus, the donor "expends" her funds by donating. The First Amendment right to associate gives donors the ability to collectively make their voices heard in the marketplace of ideas containing competing messages from all the other candidates, organizations and individuals exercising their rights to speak. The First Amendment fully protects this independent donation-expense, regardless of the amount, because her donation-expense is fully independent of a candidate. "The absence of prearrangement and coordination . . . alleviates the danger that expenditure will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S., at 47.

Beginning with the D.C. Circuit's seminal, unanimous *en banc* decision in *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010), every Court of Appeals—indeed every circuit judge—to hear a similar case has unanimously held that because an independent donation is an additional step removed from a candidate than the independent expenditure it funds, the First Amendment, per *Buckley* and *Citizens United* protect the independent donation.

Maine argues that "even if *Citizens United* must be read as creating an unassailable syllogism that IEs themselves cannot corrupt," it should still prevail because Question One "targets a different nexus of potential corruption than the one considered by *Citizens United*." Schneider Br. at 31. But "unassailable" means just that—unassailable. First as a matter of logic, and in any event as a matter of vertical stare decisis. And the syllogism Maine posits is indeed unassailable. Independent donations are a form of independent expenditures. Because independent expenditures cannot be limited, neither can independent donations to fund independent expenditures. There is no room to hold otherwise. "*Buckley* might well have been the last word on

19

limitations on independent expenditures." *Citizens United* at 346. This precedent binds.

Equal Citizens mischaracterizes the district court opinion, claiming that the district court "held that there can be quid pro quo corruption infecting our election processes, but that the people are powerless to address it." Equal Citizens Br. at 2-3. To the contrary, the district court found that independent donations for independent expenditures are sufficiently removed from candidates to not be a likely enough source of quid pro quo corruption sufficient to override the First Amendment protected breathing space afforded to core political speech. JA352. "Given that contributions to independent expenditures are one step further removed from the candidate, the logic of *Citizens United* dictates that the danger of corruption is smaller still." JA353. The district court's holding follows *Citizen United* and tracks the *Speechnow.com* line of cases. It does not break any new ground.

Defendants claim to present "new" facts and arguments that change the result. They don't. Neither of the out-of-state cases they point to involved contributions for independent expenditures as a quid or a quo. Moreover, the Supreme Court has rejected the argument that the

potential for illicit coordination can justify limiting independent donations. *Citizens United*, 558 U.S. at 360.

Defendants simply ignore the independence inherent in independent donations. Instead, they presume coordination. Equal Citizens Br. at 30 ("nothing blocks a contributor to a SuperPAC from coordinating with a candidate about the contribution, thereby creating an enormous opportunity for quid pro quo corruption").

2. Facing a wall of opposing Supreme Court precedent, Equal Citizens argues that the precedent is wrong. Equal Citizens argue that if originalist justices truly understood originalism, they would only enjoin a campaign finance restriction if the process used to enact the law was undemocratic, or if the law did not "serve the public good." Equal Citizens Br. at 44. Under this version of originalism, the Act survives: it was "approved by an overwhelming majority of Maine voters, and the contribution limit serves the interest of the public good by" ensuring officials respond to "ordinary Mainers" rather than "megadonors." *Id.* (quoting JA 51).

At times, Equal Citizens echoes their expert in appearing to posit another version of this test, wherein a judge's concern with the so-called

21

"public good" relates only to the process of enacting the law, *id.* at 43-44 (quoting JA 167), though it's unclear what fair, democratic legislative process could itself contradict the public good.

Of course, contrary to Equal Citizens' arguments, the Supreme Court has invalidated campaign finance ballot initiatives that substantively violate the Free Speech Clause without questioning the manner of their enactment or any free-wheeling concept of the "public good." *See, e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011) (striking down campaign finance matching funds provision enacted by referendum).

Under either version of Equal Citizens' originalism, not only does *SpeechNow.org* fall, but *Citizens United* and *Buckley* fall as well. Judicial review of all Free Speech claims, and maybe all First Amendment claims, would be limited to asking whether an enactment was made pursuant to a democratic process and serves the public good, or whether a democratic process inherently advanced the public good. Equal Citizens cited Justice Thomas's opinions to make its originalism argument without mentioning that Justice Thomas has concluded that originalism leads to robust protections of all campaign donations. *Nixon*

*v. Shrink Mo. Gov't Pac*, 528 U.S. 377, 410 (2000) (Thomas, J. dissenting) ("I would subject campaign contribution limitations to strict scrutiny").

The wholesale gutting of the Free Speech Clause that Equal Citizens seeks runs counter to First Amendment text, doctrine, and original meaning. This Court is not empowered to make such a doctrinal change.

3. The zero-dollar disclosure threshold for independent expenditure donations falls because it was enacted merely to enforce the contribution limits. The disclosure mandate falls in its own right because it affords no room for even de minimus anonymous speech. The so-called "informational interest" in knowing who supports a candidate breaks down for small dollar donations for independent expenditures.

First, the law applies to donations to independent expenditure committees ("IECs"),[4] like Dinner Table, that support multiple candidates. One cannot say that a particular small dollar donor to an IEC supports every candidate the IEC chooses to support.

Second, Defendants cannot justify an informational interest in knowing the identity of every small dollar donor. Small-dollar donor

---

[4] An IEC is a PAC that make independent expenditures.

23

identities do not convey meaningful material information. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348-49 (1995).

Third, small-dollar donors have justifications to remain anonymous that outweigh any information interest. *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 616 (2021) ("AFPF") ("The disclosure requirement creates an unnecessary risk of chilling in violation of the First Amendment.").

ARGUMENT

I.    LIMITS ON CONTRIBUTIONS FOR INDEPENDENT EXPENDITURES VIOLATE THE RIGHTS OF FREE SPEECH AND ASSOCIATION

The First Amendment protects both political association and political expression. The Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon v. FEC*, 572 U.S. 185, 191–92 (2014) (plurality opinion). And "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) (internal quotes omitted).

Laws that limit the amount of money a person may give to a political action committee or IEC for the purpose of making independent

expenditures intrude upon both of those First Amendment interests and infringe on the rights of contributors, the rights of advocacy groups, and the people who operate them. Government-imposed limits on political contributions must be closely drawn to match a sufficiently important interest. *Buckley*, 424 U.S. at 25 (per curiam).

"In general, laws that burden political speech ordinarily are subject to strict scrutiny, requiring the government to prove that any restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics*, 144 F.4th 9, 19 (1st Cir. 2025) (quoting *Citizens United*, 558 U.S. at 340). Strict scrutiny should be used to strike down the donation limits because a donation for an independent expenditure is an independent expenditure. However, as discussed below, the donation limits fail even exacting scrutiny. *Id.* at 20; *SpeechNow.org* at 696.

The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). Because, by definition, independent donations are not

coordinated with a candidate, insufficient risk of quid pro quo corruption exists to justify any restriction on donations expended to fund independent expenditures. *Citizens United*, 558 U.S. at 357 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption").

Three months after *Citizens United*, the en banc D.C. Circuit squarely addressed the same issue raised here and found that *Citizens United* controls. "In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." *SpeechNow.org*, 599 F.3d at 694. "The Court has effectively held that there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'" *Id*. at 694-695. As Justice Blackmun had previously explained, "[C]ontributions to a committee that makes only independent expenditures pose no such threat [of actual or potential corruption]." *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (Blackmun, J concurring).

The Second, Fourth, Fifth, Seventh, Eighth, Ninth and Tenth Circuits have all followed suit. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (holding a law unconstitutional to the extent it limited the "use of the contributions . . . for independent expenditures"); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th Cir. 2008) (independent expenditure groups are "furthest removed" from candidates); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 537-40 (5th Cir. 2013) (holding limiting contributions to independent expenditure groups to be "incompatible with the First Amendment"); *Wisc. Right to Life State PAC v. Barland*, 664 F.3d 139, 155 (7th Cir. 2011) (holding a contribution limit unconstitutional as applied to independent expenditure committees); *Free & Fair Election Fund v. Mo. Ethics Comm'n,* 903 F.3d 759, 766 (8th Cir. 2018) ("A State does not have a sufficiently important interest in preventing contributions to a PAC that makes only independent expenditures"); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010) ("[C]ontributions … for use as independent expenditures [do not] raise the specter of corruption or the appearance thereof."); *Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th

Cir. 2013) (holding that independent committees "may receive unlimited contributions for independent expenditures").

The eight circuits to consider the issue have not only ruled uniformly, but unanimously. Every federal appellate judge to consider the issue has concluded that limitations on independent-expenditure contributions are unconstitutional. The Second Circuit noted the remarkableness of the uniform agreement: "Few contested legal questions are answered so consistently by so many courts and judges." *Walsh*, 733 F.3d at 489. This Court should join its sister circuits by acknowledging that *Buckley* and *Citizens United* forbid governments from limiting independent donations for independent expenditures.

The Alaska Supreme Court stated the reason for the uniformity well. "There is no logical rationale for limiting contributions to independent expenditure groups. If anything, contributions to such groups are more attenuated from the possibility of quid pro quo corruption than the expenditures themselves." *Patrick*, 494 P.3d at 58. *Patrick* concluded with the unassailable syllogism that Maine acknowledges in its brief. "There is no logical scenario in which contributing to a group that will

then make an expenditure is more prone to quid pro quo corruption than the expenditure itself." *Id*.

While this Court cannot second-guess the Constitution's wisdom, it bears noting that enforcing the First Amendment is also good and just. Political speech is at the core of the First Amendment because public, open discussion about government and elections is necessary for a republic to fully function. When governments can limit people's political speech, that power will be used to silence critics and opponents of the government.

IECs serve a laudatory, democratizing purpose. They allow people to combine to engage in independent speech. Billionaires, like *amici curiae* supporting reversal, Mark Cuban, William von Mueffling, Steve Jervestson, Vin Ryan, and Reid Hoffman, do not need IECs to make independent expenditures. *Buckley* and *Citizens United* made clear they can do so on their own or through companies they own. IECs allow non-billionaires to associate to get their own messages out, whether in competition or harmony with billionaires. IECs are used across the political spectrum to allow Americans to participate in the political dialog. JA53-65. They are not one-sided weapons. JA76.

29

The district court carefully hued to *Buckley, Citizens United, and Speechnow*.org in declining to "read the Supreme Court as suggesting that independent expenditures are wholly incorruptible," but instead finding that independent expenditures "are sufficiently removed from the candidate so that the danger of such corruption is 'substantially diminished' to the point that the government's 'anticorruption interest is not sufficient to displace' First Amendment protections." JA352. Contrary to Equal Citizens' argument, this was a careful statement of the law, not a factual finding of corruption.

Defendants' arguments against these precedents have repeatedly been rejected, starting in *Buckley* itself. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S., at 47.

The Court expanded upon *Buckley's* reasoning nine years later:

> The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by the PACs can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate

> of varying points of view. It is of course hypothetically possible here, as in the case of the independent expenditures forbidden in *Buckley*, that candidates may take notice of and reward those responsible for PAC expenditures by giving official favors to the latter in exchange for the supporting messages. But here, as in *Buckley*, the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.

*FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 498 (1985). Because a donation for an IE is further removed from a candidate than an IE itself, as a matter of law, there is insufficient risk of quid pro quo corruption for Maine to regulate these donations. The size of the expenditure doesn't matter. "It is irrelevant for purposes of the First Amendment that [the amount expended] may have little or no correlation to the public's support for the [expressed] political ideas." *Citizens United*, 558 U.S., at 351.

   *Buckley* did not approve limiting any contribution to any entity (which might include a "contribution" to a retirement plan, a favorite charity, a literary anthology, or anything else). The limit was for contributions to a candidate's campaign, directly under the candidate's control; or to political parties and traditional PACs, which could, in turn, legally contribute the funds to the candidate's campaign. These

were the only contributions that could be regulated under *Buckley*.

Simply put: only direct or indirect contributions to a candidate can be

regulated under *Buckley*. The constitutional constraints on campaign

finance regulations recognized in *Buckley* cannot be avoided through a

semantic game of calling anything the government wants to regulate a

"contribution."

Then-Judge Kavanaugh made this point in the *Speechnow.org* oral

argument:

> The Supreme Court in *Citizens United* was very careful to phrase
> it as contributions to candidates or direct contributions to
> candidates throughout the opinion. When it characterized
> *Buckley*, it talked about contributions to candidates. It wasn't
> some kind of free-floating contributions to other groups that it was
> talking about there. I guess the larger question is if an unlimited
> independent expenditure is not corrupting how can a group of
> people getting together to make an independent expenditure
> suddenly become corrupting?

Kavanaugh, J., Oral Argument *Speechnow.org v. FEC*, D.C. Cir. No. 08-

5223, at 28:40, available at https://bit.ly/4pSJMYZ. The answer is: it

cannot.

The Supreme Court has approvingly cited *Speechnow.org*. "The base

and aggregate limits govern contributions to traditional PACs, but not

to independent expenditure PACs." *McCutcheon*, 572 U.S. at 193 n.2

(citing *SpeechNow.org*, 599 F.3d at 696). While this statement was dictum, "federal [ ] courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings." *McCoy v. Mass. Ins. of Tech*., 950 F.2d 13, 19 (1st Cir. 1991). *McCutcheon* did not hedge the statement or give any indication of potential disapproval or disagreement with *SpeechNow.org*.

The *McCutcheon* dictum tracks the Supreme Court's holding that where independent expenditures are concerned, "[t]he candidate-funding circuit is broken. The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which our case law is concerned." *Ariz. Free Enter. Club*, 564 U.S., at 751. An independent donation for an independent expenditure falls on the independent expenditure side of the broken circuit. *Citizens United* controls this case.

Maine includes in its factual recitation a discussion of out of circuit cases that is typically reserved for argument. The "evidentiary" submission consists of two criminal complaints that they claim evidence quid pro quo corruption associated with Super PACs. Neither does.

The first, a trial against U.S. Senator Menendez resulted in jury hung 2-10, with 10 jurors voting to acquit of all charges—even the counts alleging that elaborate vacations and private jet travel were direct bribes. Porter, David, *New Jersey senator's bribery trial ends in a hung jury*, Associated Press (Nov. 16, 2017) available at: https://bit.ly/42I5vss. That case does not support Defendants' contention that contributions for independent expenditures are sources of quid pro quo corruption.[5]

The second case, which resulted in a conviction against Larry Householder, a former speaker of the Ohio House of Representatives, did not involve a third-party giving money to a super-PAC. Rather, Householder created and controlled a 501(c)(4) organization through which he received bribes. *United States v. Householder*, 137 F.4th 454, 464 (6th Cir. 2025). *See also "Former Ohio House Speaker sentenced to 20 years in prison for leading racketeering conspiracy involving $60 million in bribes,"* U.S. Attorney's Office, Southern District of Ohio (June 29, 2023) available at: https://bit.ly/3GmP5hH. The direct bribes

---

[5] Menendez was subsequently convicted on unrelated charges 2024. Defendants do not allege that conviction is relevant here.

to a Householder controlled 501(c)(4) were the very opposite of independent expenditures. A public utility gave money to an entity Householder controlled. That was traditional, direct bribery. Had this bribery occurred in Maine, the gifts to Householder would have been subject to Maine's direct contribution limits which apply to any "direct or indirect" contributions "that are in any way . . . directed through an intermediary or conduit" to a candidate. 21-A M.R.S.A. § 1015(4).

To the extent Defendants justify the law based on concerns over candidate-solicited donations to IECs, Maine law already subjects solicited donations to candidate contribution limits. *See* 21-A M.R.S.A. § 1015(4) & (5). These provisions subject contributions to single-candidate PACs that were solicited by the candidate, and expenditures made by any person at a candidate's request or suggestion, to the contribution limits applicable to that candidate. *Id*. These anti-circumvention provisions already prevent donations for independent expenditures being used to circumvent candidate contribution limits, rendering limits on donations for independent expenditures redundant. "[A] prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 479

(2007). The anti-circumvention provisions also show laws can be tailored to target actual corrupting activities.

Unlike the anti-circumvention provisions, the Act was not tailored to limit candidate-solicited donations to single-candidate IECs. Instead, the Act targets truly independent donations. These independent expenditure limitations "cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations." *Buckley,* 424 U.S., at 44.

The exclusion of party committees from the Act's coverage shows a lack of adequate tailoring. PACs are similarly situated to party committees, which can receive unlimited contributions for independent expenditures. 21-A M.R.S.A. §§ 1013-A(3), 1019-B(1). Thus, party committees would seem equally susceptible to receiving donations that, unbeknownst to them, were solicited by candidates. Yet party committees are not subject to the Act's contribution limits. *See id.* § 1052(5)(B)(3). This discrepancy suggests that the Act's proponents were motivated by a desire to reduce the influence of IECs, not any interest in preventing quid pro quo corruption.

The Act's limitations on independent contributions to PACs, 21-A M.R.S. §§ 1015(2-C) and (2-D), and its corresponding expenditure restriction, *id.* § 1019-B(6), are not closely drawn to any sufficiently important governmental interest. Thus, they violate Dinner Table Action's First Amendment rights to free speech and association on their face, and as-applied to the contributions for independent expenditures that Dinner Table Action and For Our Future would accept from individuals, other committees, and "business entities," including contributions from For Our Future to Dinner Table Action.

These same limits violate For Our Future's First Amendment rights as a contributor of such donations, on their face and as-applied to the contributions that For Our Future would make to Dinner Table Action and other committees for the purpose of making independent expenditures.

**II.** THE ACT IS INCOMPATIBLE WITH THE FIRST AMENDMENT'S ORIGINAL PUBLIC MEANING.

Equal Citizens ultimately stakes its case on convincing the Supreme Court that originalism requires upholding the Act. It argues that the founders were concerned with "influence corruption" and "institutional corruption" by cobbling together historic bits unrelated to the First

37

Amendment. From there, defendants jump to an unsupportable conclusion that any law passed by a democratic process for "the public good" is effectively immune from substantive judicial review. Equal Citizens Br. at 43-44.

If course, even if these arguments were convincing, it would be for the Supreme Court, not this Court, to adopt them. *Rodriguez de Quijas*, 490 U.S. at 484. But Dinner Table is constrained to point out that the arguments lack merit.

The only justification for limiting election-related speech is the prevention of quid pro quo corruption. When the Court articulated this principle, it did not use language from the 1700s. Nor did it discuss an exhaustive list of forms of corruption addressed at the founding. Nor did it lay out all the various uses of the term "corruption" in the Constitution—because the term isn't in the Constitution.

Rather, *Buckley* employed modern parlance to express the protections afford by the First Amendment and the only basis for regulating political speech. Other forms of corruption that existed in the early days, or the meaning of the term "corruption" at that time wasn't

relevant to *Buckley's* use of the term "corruption," and it isn't relevant now.

Equal Citizens nonetheless go on a detour with historian Jack Rakove's recounting of the British Stuarts, "rotten boroughs" in England, the genius of Machiavelli, and other historical tidbits. However, Rakove admits, his recounting of political corruption has nothing to do with the First Amendment. JA277:4-7 ("Q. And were those potential concerns of the founders about that potential political corruption expressed anywhere in the First Amendment? A. Not directly."); JA279:14-22 ("Q. So how does the concept of political corruption that you articulate here in this declaration inform the formation and creation of the free speech clause in the First Amendment? If at all? … A. I'd say the link would be fairly thin.").

Nor does Rakove have anything to say about the Court's holding that preventing quid pro quo corruption is the only justification for restricting election related speech. JA278:19-24. Rakove offers no support for the argument that the First Amendment should be narrowed to allow for the government to regulate political speech for a reason other than the prevention of quid pro quo corruption.

As originalist legal scholar Seth Barrett Tillman explains in his counter-declaration, "the Framers did not include the term 'corruption' in any provision of the Constitution of 1788—so, whatever they meant by that term, they left it out, apparently deliberately after having considered including it, and for that reason, among others, we should not inject their understanding of that term back into our (and their) Constitution." JA309; *see also* Seth Barrett Tillman, *Why Professor Lessig's "Dependence Corruption" Is Not a Founding-Era Concept*, 13 Election L.J. 336, 343 (2014) ("Lessig and Teachout are asking us to embrace corruption as the key concept espoused by the Framers of the Constitution (and of the subsequent Bill of Rights). But when the Framers had a chance (actually, multiple chances) to give this concept prominence in the Constitution's actual text, the Framers chose not to do so"). Thus, Rakove's view on the meaning of the term 'corruption' in the 18th Century provides no guidance in this case.

The Founders addressed issues of corruption by providing for an electoral college, frequent House elections, an emoluments clause, and other provisions. The Founders did not allow the government to limit speech as a means of combatting corruption. They did the opposite. The

Free Speech Clause is itself an anti-corruption device: It prevents those in power from silencing critics—particularly during elections.

Equal Citizens also submits the declaration of self-proclaimed anti-originalist historian Jonathan Gienapp. Gienapp argues that although he isn't an originalist, and does not advocate using originalism to interpret and apply the Free Speech clause, originalism done correctly would lead to the conclusion that the Free Speech Clause affords no protections at all. He argues the only protection the Free Speech Clause affords is that if speech is to be curtailed, it must be curtailed by either popular vote or an elected government. According to Geinapp, "one would need to show that the process through which the Act was passed was either not representative of the people or not in the interest of the public good." JA167. "Short of that," he continued, "nothing about the original First Amendment, or the method for preserving fundamental rights that it presupposed, undermines the people's essential right to regulate their own liberty." *Id.* Cold comfort there, and unsurprisingly contrary to First Amendment text and jurisprudence. *See, e.g., Ariz. Free Enter.,* 564 U.S., at 721 (striking down campaign finance matching funds provision enacted by referendum).

Gienapp is a historian engaged in an academic battle against originalist legal scholars. JA274:9-14. Gienapp finds originalism to be too text-based. JA266:1-4. Unsurprisingly, originalists reject Gienapp's views on how originalism should be done. In countering the declarations of Rakove and Gienapp, Tillman writes: "where there is no genuine ambiguity, the agreed text should control. Likewise, a fair-minded interpreter should not look to Framers' and ratifiers' purposes, background assumptions, and policy concerns to generate interpretive principles abstracted from constitutional text. Why? First, no one agreed to purpose, background assumptions, and policy concerns. What was agreed to was the Constitution's text." JA304. "It is precisely because such questions are, in my view, unanswerable that our understanding of the law of the Constitution should be tethered to constitutional text." *Id*.

In addition to Tillman, a bevy of originalist scholars disagree with Gienapp's conclusions. *See* John O. McGinnis & Mike Rappaport, "The Finished Constitution," Law & Liberty (Sept. 28, 2023) ("[I]f a book by a historian of Gienapp's caliber often seems wrongheaded to constitutional lawyers, it may suggest the disagreement between

42

historians and lawyers about constitutional meaning may be as intractable as the ancient one between philosophers and poets"); Stephen Presser, "The Past Is Not a Foreign Country: How a Historical Critique of Originalism Misses That the Past Is Prologue," 26 Fed. Soc. R. 134, 140 (March 19, 2025) ("Gienapp appears to believe, however, that the fact that those in the late 18th century believed that the Constitution did not do away with older sources of fundamental law—the law of nations, the social compact, inalienable rights—and that these sources informed their reading of the document shows how different they were from us, as we now allegedly rely only on the text."); Randy Barnett, "Challenging the priesthood of professional historians," *The Washington Post (The Volokh Conspiracy)* (Mar 28, 2017) (Critiquing Gienapp's critique of originalism) available at https://bit.ly/3KG1P5y.

Thus Equal Citizens is left with Gienapp, an avowed critic of originalism, arguing that the consensus view of the originalist scholars who have addressed this specific issue are wrong. He argues that applying his version of originalism would render the Free Speech Clause to not be enforceable against laws democratically enacted to

further "the public good," or in a process that serves the public good. JA163-164 at ¶ 9; JA166-167 ¶¶ 12-13. However, he does not endorse interpreting the Free Speech Clause this way, and instead recommends abandoning originalism. JA273.

In addition to its experts, Equal Citizens focuses on Justice Thomas's originalism as supposedly supporting its theory, even splicing a Thomas quote with a Gienapp quote to give the impression Justice Thomas endorses their approach. Equal Citizens Br. at 44.

Asserting that argument takes chutzpah. Justice Thomas has repeatedly made clear his belief that *all* contribution limits are unconstitutional unless they can survive strict scrutiny. "[O]ur decision in *Buckley* was in error, and I would overrule it. I would subject campaign contribution limitations to strict scrutiny." *Nixon v. Shrink Mo. Gov't Pac*, 528 U.S., at 410 (Thomas, J. dissenting); *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 636 (1996) (Thomas, J. concurring in judgment) ("the distinction [between contributions and expenditures] lacks constitutional significance, and I would not adhere to it"). To be clear, Thomas relied on original sources, such as the Federalist Papers, to conclude that the Free Speech Clause

44

would not allow any contribution limits. *Id.*, n.9 (Thomas, J. dissenting) ("Contribution caps are an example of the first method [destroying liberty], which Madison contemptuously dismissed.") Justice Thomas's originalism supports affirmance.

Independent expenditures were the default manner of campaigning for president at the founding. As Equal Citizen's historian testified, the earliest campaigns for President were not conducted by the candidates themselves. JA270. Rather, others campaigned on their behalf, using independent dollars to fund partisan newspapers, pamphlets, and personal letters. *Id.* The candidates remained aloof from the campaigns, not wanting to appear personally ambitious. *Id.* In this way, the original campaigns can be viewed as being conducted exclusively by independent expenditures.

Research has shown that "[t]he threat posed by corruption was not lost on James Madison." Anthony Gaughn*, James Madison, Citizens United, and the Constitutional Problem of Corruption,* 69 Am. U. L. Rev. 1485 (2020). Madison and Jefferson formed the Republican Party and "developed innovative electioneering tactics that dramatically increased the cost of campaigns. … Yet, during his long career in office,

Madison gave no indication that he thought that campaign contributions or expenditures constituted a form of corruption that could be banned or restricted under the Constitution." *Id*. at 1538-39. "His support for a broad and sweeping freedom of expression extended to all speakers, including politicians, business leaders, journalists, voters, and ordinary citizens alike." *Id*. at 1539.

Thus, the resurgence of independent expenditures, which reduce the power of factions, *i.e.* political parties, takes us closer to the style of campaigning at the founding. "There are no easy answers, but the Constitution relies on one: open, robust, honest, unfettered speech that the voters can examine and assess in an ever-changing and more complex environment." *Nixon*, 528 U.S. at 409 (Kennedy, J., dissenting). This was true at the founding and remains true now. Any concern about "undue influence" generated by a speaker's large expenditures or contributions is outweighed "by the loss for democratic processes resulting from the restrictions upon free and full public discussion." *Citizens United*, 558 U.S. at 344.

In any event, even if Equal Citizens' historians had something important to say about the First Amendment, this Court must adhere to

Supreme Court precent that there is "only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *Ted Cruz for Senate*, 596 U.S. at 305.

III.    THE ZERO-DOLLAR DISCLOSURE THRESHOLD FOR INDEPENDENT EXPENDITURE CONTRIBUTIONS ALSO VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS.

The Act's amendment of 21-A M.R.S. § 1019-B(4)(B) adds a requirement that PACs disclose to the Commission the total contributions from each contributor for independent expenditures, no matter how small. This provision exists only because of the contribution limits imposed by the Act. When those provisions are stricken, the reporting is unnecessary, and the entire Act should fall. *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 19 (1st Cir. 1996).

Additionally, the zero-dollar threshold for reporting contributions for independent expenditures fails on its own account. Maine permits aggregate reporting of donations to candidates, party committees, and PACs that use the funds for donations or coordinated activity. Candidates and PACs are not required to report the identity of donors of less than $50. 21-A M.R.S.A. §§ 1017(5), 1060(6). Party committees

are not required to report the identity of donors of less than $200. *Id.* §
1017-A(1).

A disclosure regime must survive exacting scrutiny with narrow
tailoring. *AFPF*, 594 U.S. at 607. Under this elevated exacting scrutiny
standard, "there must be a substantial relation between the disclosure
requirement and a sufficiently important governmental interest." *Id.*
"To withstand this scrutiny, the strength of the governmental interest
must reflect the seriousness of the actual burden on First Amendment
rights." *Id.* "Narrow tailoring is crucial where First Amendment activity
is chilled—even if indirectly—because First Amendment freedoms need
breathing space to survive." *Id.* at 609; *see also Gaspee Project v.
Mederos*, 13 F.4th 79, 88 (1st Cir. 2021) (applying *Bonta* narrow
tailoring to election-related disclosures).

Section 1019-B(4)(B) is not necessary to prevent quid pro quo
corruption. It violates the First Amendment by requiring disclosure and
reporting of contributor identities and information at levels lower than
those at which candidates and PACs must report money given to a
candidate, and far below the $200 threshold for reporting contributions
to party committees, which can make donations to candidates,

48

expenditures in coordination with candidates, and independent expenditures. Because independent expenditures are not tied to a candidate, and are not likely to corrupt, Maine has less justification for requiring their disclosure and no justification for a more burdensome disclosure of independent donor information.

"Governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" *Buckley*, 424 U.S. at 25 (*quoting NAACP*, 357 U.S. at 460-461). The Court applied its *NAACP v. Alabama* holding recently in a donor disclosure case. "We have also noted that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action. … [A]nd we noted 'the vital relationship between freedom to associate and privacy in one's associations,'" *AFPF,* 594 U.S., at 606-07 (*quoting NAACP*, 357 U.S. at 462).

As noted supra, disclosure regimes are subject to exacting scrutiny—an analysis that demands narrow tailoring. *Id.* at 607. "Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of

49

achieving that end." *Id*. at 609-610. "[A] reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 611.

Section 1019-B(4)(B) fails narrow tailoring because it lacks a threshold below which disclosure of contributions are not required. Section 1019-B(4)(B) chills speech and associational rights of individuals who wish to remain anonymous in their associations. *See McIntyre*, 514 U.S., at 341-42, 348-49 (recognizing the importance of anonymity in political speech). Any arguable need for the government to be told the identity of a contributor is at its nadir for small dollar donations, which do not corrupt when given directly to a candidate, and certainly do not corrupt when given to an independent expenditure committee. There simply is no government interest in knowing the smallest of donations to an independent expenditure group which, by definition, cannot lead to quid pro quo corruption.

When weighing the fundamental rights of donors and committees to associate anonymously, against Maine's lack of any legitimate interest in the disclosure of the small-dollar independent-expenditure donations,

the analysis becomes simplified. "Something outweighs nothing every time." *SpeechNow.org*, 599 F.3d at 695 (cleaned up). "The First Amendment cannot be encroached upon for naught." *Id.*

Additionally, the underinclusive nature of Section 1019-B(4)(B)—in that it does not apply equally to candidate donations, donations to traditional PACs, or donations to party committees—demonstrates both that the law is not appropriately tailored and that the disclosure requirement does not advance a legitimate state interest. A party committee faces a $200 reporting threshold and can make independent expenditures. The dichotomy between donations for independent expenditures to PACs and party committees cannot be justified.

Section 1019-B(4)(B) thus cannot survive any level of heightened scrutiny. It is not narrowly tailored. It is both over- and under-inclusive. It is over-inclusive because small-dollar donations for independent expenditures that have no likelihood to corrupt are subject to full reporting. It is underinclusive because candidate donations and donations to party committees are not similarly reported. Section 1019-B(4)(B) does not advance any valid governmental interest. It does not prevent corruption or the appearance of corruption. Reporting

requirements already exist for contributions to PACs of more than $50. Requiring heightened reporting for independent expenditures serves no logical end. Rather, it serves solely to limit the political participation and association rights of individuals who desire to make small donations for the express purpose of not having their identities revealed. The district court was right to enjoin its enforcement.

CONCLUSION

The judgment of the District Court should be affirmed.


Dated: December 22, 2025          Respectfully submitted,

                                  /s/ *Charles Miller*
                                  Charles Miller (1129194)
                                  INSTITUTE FOR FREE SPEECH
                                  1150 Connecticut Ave., NW, Suite 801
                                  Washington, D.C. 20036
                                  Tel: (202) 301-9800
                                  Fax: (202) 301-3399
                                  cmiller@ifs.org

                                  *Counsel for Plaintiffs-Appellees*

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 9,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)(7)(B)(iii), which complies with the requirements in Fed R. App. P. 32(a)(7)(B)(i). I further certify that his brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point typeface and Century Schoolbook type style.

*/s/ Charles Miller*
Charles Miller   (1129194)

CERTIFICATE OF SERVICE

I certify that this brief has been electronically filed with the Clerk of the Court on December 22, 2024. All attorneys in this matter are ECF filers and will receive service by electronic means pursuant to Rule 4 of this Court's Rules Governing Electronic Filing.

*/s/ Charles Miller*
Charles Miller   (1129194)

# Addendum

<u>Statutes</u>

21-A M.R.S.A. § 1013-A ...................................................................A-2

21-A M.R.S.A. §1015 .......................................................................A-5

21-A M.R.S.A. § 1017 ......................................................................A-8

21-A M.R.S.A. § 1019-B ................................................................A-14

21-A M.R.S.A. § 1052 ....................................................................A-17

21-A M.R.S.A. § 1060 ....................................................................A-21

### *21-A M.R.S. § 1013-A*

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis® > TITLE 21-A. Elections (Chs. 1 — 17) > CHAPTER 13. Campaign Reports and Finances (Subchs. 1 — 5) > SUBCHAPTER 2. Reports on Campaigns for Office (§§ 1011 — 1020-A)*

## § 1013-A. Registration

**1. Candidates, their treasurers and political committees.** A candidate shall register the candidate's name and the name of a treasurer with the commission at least once in each legislative biennium, as provided in this section. A candidate may have only one treasurer, who must be appointed pursuant to paragraph A or B. For purposes of this section, "legislative biennium" means the term of office a person is elected to serve in the Legislature.

A. No later than 10 days after becoming a candidate and before accepting contributions, making expenditures or incurring obligations, a candidate for state or county office or a candidate for municipal office who has not filed a written notice in accordance with section 1011, subsection 4, paragraph A shall appoint a treasurer. The candidate may serve as treasurer, except that a participating candidate, as defined in section 1122, subsection 6, or a candidate certified in accordance with section 1125 may not serve as treasurer, except that the candidate may serve as treasurer or deputy treasurer for up to 14 days after declaring an intention to qualify for campaign financing under chapter 14 until the candidate identifies another person to serve as treasurer. The candidate may have only one treasurer, who is responsible for the filing of campaign finance reports under this chapter. A candidate shall register the candidate's name and address and the name and address of the treasurer appointed under this section no later than 10 days after the appointment of the treasurer. A candidate may accept contributions personally or make or authorize expenditures personally, as long as the candidate reports all contributions and expenditures to the treasurer. The treasurer shall make a consolidated report of all income and expenditures and provide this report to the commission.

(1) A candidate may appoint a deputy treasurer to act in the absence of the treasurer. The deputy treasurer, when acting in the absence of the treasurer, has the same powers and responsibilities as the treasurer. A candidate certified in accordance with section 1125 may not serve as deputy treasurer. When a treasurer dies or resigns, the deputy treasurer may not assume the position of treasurer unless the candidate appoints the deputy treasurer to the position of treasurer. The candidate shall report the name and address of the deputy treasurer to the commission no later than 10 days after the deputy treasurer has been appointed.

B. A candidate may authorize one political committee to promote the candidate's election. No later than 10 days after appointing a political committee and before accepting contributions, making expenditures or incurring obligations, a candidate for state, county or municipal office shall appoint a treasurer of the political committee. The treasurer of the political committee is

responsible for filing campaign finance reports under this chapter. No later than 10 days after appointing a political committee, the candidate shall register with the commission the following information regarding the political committee:

> (1) The name of the committee;
>
> (2) The name and address of the committee's treasurer;
>
> (3) The name of the candidate who authorized the committee; and
>
> (4) The names and addresses of the committee's officers.

**C.** No later than 10 days after becoming a candidate, as defined in section 1, subsection 5, a candidate for the office of State House of Representatives or Senate may file in writing a statement declaring that the candidate agrees to accept voluntary limits on political expenditures or that the candidate does not agree to accept voluntary limits on political expenditures, as specified in section 1015, subsections 7 to 9. A candidate who has filed a declaration of intent to become certified as a candidate under the Maine Clean Election Act is not required to file the written statement described in this paragraph.

The statement filed by a candidate who voluntarily agrees to limit spending must state that the candidate knows the voluntary expenditure limitations as set out in section 1015, subsection 8 and that the candidate is voluntarily agreeing to limit the candidate's political expenditures and those made on behalf of the candidate by the candidate's political committee or committees, the candidate's party and the candidate's immediate family to the amount set by law. The statement must further state that the candidate does not condone and will not solicit any independent expenditures made on behalf of the candidate.

The statement filed by a candidate who does not agree to voluntarily limit political expenditures must state that the candidate does not accept the voluntary expenditure limits as set out in section 1015, subsection 8.

**2. Authorized political committees.**  Repealed

**3. Party committees.**  The district, county and municipal committees of parties shall submit to their state party committees the names, mailing addresses and e-mail addresses of all their officers and of their treasurers and the name and address of the principal paid employee, if any, within 10 days after the appointment, election and hiring of these persons. Municipal committees shall file copies of the same information with the municipal clerk. No later than June 15th of each year, the state party committee shall submit to the commission a consolidated report of the names, mailing addresses and e-mail addresses of the chair and treasurer of the district, county and municipal committees of that party or of another officer if a chair or treasurer has not been appointed.

**4. Reporting by registered treasurers.**  Any contribution accepted and any expenditure made or authorized by or on behalf of a candidate registered under this section or qualified under sections 335 and 336 or sections 354 and 355 must be recorded and reported as provided in sections 1016 and 1017.

**5. Changes in registration information.**  Every change in information required by this section to be reported to the commission shall be reported within 10 days of the date of the change.

# History

**Section History**

*PL 1989, c. 504*, §§4,31 (NEW). PL 1989, c. 833, §1 (AMD). PL 1991, c. 839, §§4-6 (AMD). PL 1991, c. 839, §34 (AFF). RR *1995, c. 2*, §35 (COR). *PL 1995, c. 384*, §1 (AMD). *PL 1995, c. 483*, §§4,5 (AMD). PL 1999, c. 729, §1 (AMD). *PL 2007, c. 443*, Pt. A, §7 (AMD). *PL 2007, c. 642*, §9 (AMD). *PL 2007, c. 642*, §14 (AFF). *PL 2009, c. 366*, §2 (AMD). *PL 2009, c. 366*, §12 (AFF). *PL 2011, c. 389*, §9 (AMD). *PL 2011, c. 389*, §62 (AFF). *PL 2015, c. 350*, §4 (AMD). *PL 2019, c. 323*, §4 (AMD). *PL 2021, c. 132*, §4 (AMD).

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

---

**End of Document**

## *21-A M.R.S. § 1015*

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis®  >  Title 21-A. Elections  >  Chapter 13. Campaign Reports and Finances  >  Subchapter 2. Reports on Campaigns for Office*

## Notice

⚑ This section has more than one version with varying effective dates.

## § 1015. Limitations on contributions and expenditures [Effective January 1, 2023]

**1. Contributions by individuals.**   An individual may not make contributions to a candidate in support of the candidacy of one person aggregating more than $1,500 in any election for a gubernatorial candidate, more than $350 for a legislative candidate, more than $500 for a candidate for municipal office and beginning January 1, 2012 more than $750 in any election for any other candidate. This limitation does not apply to contributions in support of a candidate by that candidate or that candidate's spouse or domestic partner. Beginning December 1, 2010, contribution limits in accordance with this subsection are adjusted every 2 years based on the Consumer Price Index as reported by the United States Department of Labor, Bureau of Labor Statistics and rounded to the nearest amount divisible by $25. The commission shall post the current contribution limit and the amount of the next adjustment and the date that it will become effective on its publicly accessible website and include this information with any publication to be used as a guide for candidates.

**2. Contributions by party committees and political action committees.**   Except as  provided in paragraph A, a party committee under section 1013-A, subsection 3, a political  action committee and any other committee may not make contributions to a candidate.

    **A.**  A party committee under section 1013-A, subsection 3, a leadership political action committee, a separate segregated fund committee, a caucus political action committee  and any other political action committee may make contributions to a candidate in  support of the candidacy of one person aggregating no more than the amount that an  individual may contribute to that candidate under subsection 1, except that the  committee may not make any monetary contributions to a candidate using funds that  derive, in whole or in part, from a business entity. Nothing in this paragraph prohibits  a separate segregated fund committee that receives nonmonetary contributions from a  business entity under section 1056-D, subsection 2, paragraph A from making  monetary contributions to a candidate within the limits described in this paragraph.

**2–A Contributions by business entities.**   A business entity may not make contributions to a candidate.

**3. Aggregate contributions.**  No individual may make contributions to candidates aggregating more than $25,000 in any calendar year. This limitation does not apply to contributions in support of a candidate by that candidate or that candidate's spouse or domestic partner.

**4. Political committees; intermediaries.**  For the purpose of the limitations imposed by this section, contributions made to any political committee authorized by a candidate to accept contributions on the candidate's behalf are considered to be contributions made to that candidate. If the campaign activities of a political action committee within a calendar year primarily promote or support the nomination or election of a single candidate, contributions to the committee that were solicited by the candidate are considered to be contributions made to the candidate for purposes of the limitations in this section. For purposes of this subsection, solicitation of contributions includes but is not limited to the candidate's appearing at a fundraising event organized by or on behalf of the political action committee or suggesting that a donor make a contribution to that committee.

For the purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, that are in any way earmarked or otherwise directed through an intermediary or conduit to the candidate are considered to be contributions from that person to the candidate. The intermediary or conduit shall report the original source and the intended recipient of the contribution to the commission and to the intended recipient.

**5. Other contributions and expenditures.**  Any expenditure made by any person in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's political committee or their agents is considered to be a contribution to that candidate.

The financing by any person of the dissemination, distribution or republication, in whole or in part, of any broadcast or any written or other campaign materials prepared by the candidate, the candidate's political committee or committees or their authorized agents is considered to be a contribution to that candidate.

**6. Prohibited expenditures.**  A candidate, a treasurer, a political committee, a party or party committee, a person required to file a report under this subchapter or their authorized agents may not make any expenditures for liquor to be distributed to or consumed by voters while the polls are open on election day.

**7. Voluntary limitations on political expenditures.**  A candidate may voluntarily agree to limit the total expenditures made on behalf of that candidate's campaign as specified in section 1013-A, subsection 1, paragraph C and subsections 8 and 9.

**8. Political expenditure limitation amounts.**  Total expenditures in any election for legislative office by a candidate who voluntarily agrees to limit campaign expenditures as provided in subsection 7 are as follows:

    **A.**  For State Senator, $25,000; and

    **B.**  For State Representative, $5,000.

    **C.**  [2007, c. 443, § A-14 (RP).]

Expenditure limits are per election and may not be carried forward from one election to another. For calculation and reporting purposes, the reporting periods established in section 1017 apply.

**9. Publication of list.** The commission shall publish a list of the candidates for State Representative and State Senator who have agreed to voluntarily limit total expenditures for their campaigns as provided in section 1013-A, subsection 1, paragraph C.

For the purposes of subsections 7 and 8 and this subsection, "total expenditures" means the sum of all expenditures made to influence a single election that are made by a candidate or made on the candidate's behalf by the candidate's political committee or committees, the candidate's party or the candidate's immediate family.

**10. Business entity defined.** For purposes of this section, "business entity" includes a firm, partnership, corporation, incorporated association, labor organization or other organization, whether organized as a for-profit or a nonprofit entity.

## History

1985, c. 161, § 6 (NEW); 1989, c. 504, §§ 7, 31 (AMD); 1991, c. 839, § 11 (AMD); 1995, c. 384, § 2 (AMD); 1999, c. 729, §§ 2, 3 (AMD); 2007, c. 443, Pt. A, §§ 10-14 (AMD); IB 1995, c. 1, § 11 (AMD); *2009 ch. 286*, §§ 2, 3 (AMD); *2011 ch. 382*, §§ 1, 2 (AMD); *2011 ch. 389*, § 14 (AMD); *2019 ch. 51*, § 1, 2, effective January 1, 2020; *2021 ch. 274*, § 4, 5, 6, 7, effective January 1, 2023.

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

## *21-A M.R.S. § 1017*

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis® > TITLE 21-A. Elections (Chs. 1 — 17) > CHAPTER 13. Campaign Reports and Finances (Subchs. 1 — 5) > SUBCHAPTER 2. Reports on Campaigns for Office (§§ 1011 — 1020-A)*

## § 1017. Reports by candidates

**1. Federal candidates.** [*2007, ch. 443*, § A-16 (RP).]

**2. Gubernatorial candidates.** A treasurer of a candidate for the office of Governor shall file reports with the commission as follows. Once the first required report has been filed, each subsequent report must cover the period from the end date of the prior report filed.

**A.** In any calendar year, other than a gubernatorial election year, in which the candidate or the candidate's political committee has received contributions in excess of $1,000 or made or authorized expenditures in excess of $1,000, reports must be filed no later than 11:59 p.m. on July 15th of that year and January 15th of the following calendar year. These reports must include all contributions made to and all expenditures made or authorized by or on behalf of the candidate or the candidate's treasurer as of the end of the preceding month, except those covered by a previous report.

**B.** Reports must be filed no later than 11:59 p.m. on the 42nd day before the date on which an election is held and must be complete as of the 49th day before that date. If a report was not filed under paragraph A, the report required under this paragraph must cover all contributions and expenditures through the 49th day before the election.

**C.** Reports must be filed no later than 11:59 p.m. on the 11th day before the date on which an election is held and must be complete as of the 14th day before that date.

**D.** If the candidate has an opponent who is on the ballot or who is a declared write-in candidate, any single contribution of $1,000 or more received or any single expenditure of $1,000 or more made after the 14th day before the election and more than 24 hours before 11:59 p.m. on the day of the election must be reported within 24 hours of that contribution or expenditure. The candidate or treasurer is not required to include in this report expenditures for overhead expenses or compensation paid to an employee or other member of the campaign staff who has received payments at regular intervals that have been disclosed in previously filed campaign finance reports. As used in this paragraph, "overhead expenses" includes, but is not limited to, rent, utility payments, taxes, insurance premiums or similar administrative expenses.

**E.** Reports must be filed no later than 11:59 p.m. on the 42nd day after the date on which an election is held and must be complete for the filing period as of the 35th day after that date.

**F.** Unless further reports will be filed in relation to a later election in the same calendar year, the disposition of any surplus or deficit in excess of $100 shown in the reports described in paragraph

E must be reported as provided in this paragraph. The treasurer of a candidate or political committee with a surplus or deficit in excess of $100 shall file reports semiannually with the commission within 15 days following the end of the 2nd and 4th quarters of the State's fiscal year, complete as of the last day of the quarter, until the surplus is disposed of or the deficit is liquidated. The first report under this paragraph is not required until the 15th day of the period beginning at least 90 days from the date of the election. The reports will be considered timely if filed electronically or in person with the commission on that date or postmarked on that date. The reports must set forth any contributions for the purpose of liquidating the deficit, in the same manner as contributions are set forth in other reports required in this section.

**G.** Unless otherwise specified in this subsection, reports must be complete back to the end date of the previous report filing period. The reports described in paragraph E, if filed with respect to a primary election, are considered previous reports in relation to reports concerning a general election.

**H.** Reports with respect to a candidate who seeks nomination by petition for the office of Governor must be filed on the same dates that reports must be filed with respect to a candidate who seeks that nomination by primary election.

**3. Other candidates.** [*1989, ch. 504*, §§ 13, 31 (RP).]

**3-A. Other candidates.** A treasurer of a candidate for state or county office other than the office of Governor shall file reports with the commission and municipal candidates shall file reports with the municipal clerk as follows. Once the first required report has been filed, each subsequent report must cover the period from the end date of the prior report filed.

**A.** In any calendar year in which an election for the candidate's particular office is not scheduled, when any candidate or candidate's political committee has received contributions in excess of $500 or made or authorized expenditures in excess of $500, reports must be filed no later than 11:59 p.m. on July 15th of that year and January 15th of the following calendar year. These reports must include all contributions made to and all expenditures made or authorized by or on behalf of the candidate or the treasurer of the candidate as of the end of the preceding month, except those covered by a previous report.

**B.** Reports must be filed no later than 11:59 p.m. on the 11th day before the date on which an election is held and must be complete as of the 14th day before that date. If a report was not filed under paragraph A, the report required under this paragraph must cover all contributions and expenditures through the 14th day before the election.

**C.** If the candidate has an opponent who is on the ballot or who is a declared write-in candidate, any single contribution of $1,000 or more received or any single expenditure of $1,000 or more made after the 14th day before any election and more than 24 hours before 11:59 p.m. on the day of any election must be reported within 24 hours of that contribution or expenditure. The candidate or treasurer is not required to include in this report expenditures for overhead expenses or compensation paid to an employee or other member of the campaign staff who has received payments at regular intervals that have been disclosed in previously filed campaign finance reports. As used in this paragraph, "overhead expenses" includes, but is not limited to, rent, utility payments, taxes, insurance premiums or similar administrative expenses.

**D.** Reports must be filed no later than 11:59 p.m. on the 42nd day after the date on which an election is held and must be complete for the filing period as of the 35th day after that date.

**D-1.** Reports must be filed no later than 11:59 p.m. on the 42nd day before the date on which an election is held and must be complete as of the 49th day before that date, except that this report is not required for candidates for municipal office, unless required by the municipality. Certified candidates and participating candidates, as defined under section 1122, subsections 1 and 6, respectively, are not required to file a report on the 42nd day before a primary election pursuant to this section.

**E.** Unless further reports will be filed in relation to a later election in the same calendar year, the disposition of any surplus or deficit in excess of $100 shown in the reports described in paragraph D must be reported as provided by this paragraph. The treasurer of a candidate with a surplus or deficit in excess of $100 shall file reports semiannually with the commission within 15 days following the end of the 2nd and 4th quarters of the State's fiscal year, complete as of the last day of the quarter, until the surplus is disposed of or the deficit is liquidated. The first report under this paragraph is not required until the 15th day of the period beginning at least 90 days from the date of the election. The reports will be considered timely if filed electronically or in person with the commission on that date or postmarked on that date. The reports must set forth any contributions for the purpose of liquidating the deficit, in the same manner as contributions are set forth in other reports required in this section.

**F.** Reports with respect to a candidate who seeks nomination by petition must be filed on the same dates that reports must be filed by a candidate for the same office who seeks that nomination by primary election.

**3-B. Accelerated reporting schedule.** [*2011, ch. 558*, § 1 (RP).]

**4. New candidate or nominee.** A candidate for nomination or a nominee chosen to fill a vacancy under chapter 5, subchapter 3 is subject to section 1013-A, subsection 1, except that the candidate shall register the name of a treasurer or political committee and all other information required in section 1013-A, subsection 1, paragraphs A and B within 7 days after the candidate's appointment or at least 6 days before the election, whichever is earlier. The commission shall send notification of this registration requirement and report forms and schedules to the candidate and the candidate's treasurer immediately upon notice of the candidate's and treasurer's appointments.

**5. Content.** A report required under this section must contain the itemized accounts of contributions received during that report filing period, including the date a contribution was received, and the name, address, occupation, principal place of business, if any, and the amount of the contribution of each person who has made a contribution or contributions aggregating in excess of $50. The report must contain the itemized expenditures made or authorized during the report filing period, the date and purpose of each expenditure and the name and address of each payee and creditor and any refund that a payee has made to the candidate or an agent of the candidate. If the payee is a member of the candidate's household or immediate family, the candidate shall disclose the candidate's relationship to the payee in a manner prescribed by the commission. The report must contain a statement of any loan to a candidate by a financial institution in connection with that candidate's candidacy that is made during the period covered by the report, whether or not the loan is defined as a contribution under section 1012, subsection 2, paragraph A. The candidate and the treasurer are jointly and severally responsible for the timely and accurate filing of each required report.

**5-A. Valuation of contributions sold at auction.** Any contribution received by a candidate that is later sold at auction must be reported in the following manner.

**A.** If the contribution is sold at auction before the commencement of the appropriate reporting period specified in subsections 2 to 4, or during that period, the value of the contribution is deemed to be the amount of the purchase price paid at auction.

**B.** If the contribution is sold after the termination of the appropriate reporting period specified in subsections 2 to 4, the value of the contribution is the difference between the value of the contribution as originally reported by the treasurer and the amount of the purchase price paid at auction. Unless further reports are filed in relation to a later election in the same calendar year, the disposition of any net surplus or deficit in excess of $100 resulting from the difference between the auction price and the original contribution value must be reported in the same manner as provided in subsection 2, paragraph F or subsection 3-A, paragraph E, as appropriate.

**6. Forms.** Reports required by this section not filed electronically must be on forms prescribed, prepared and sent by the commission to the treasurer of each registered candidate at least 7 days before the filing date for the report. Establishment of or amendments to the campaign report filing forms required by this section must be by rule. Persons filing reports may use additional pages if necessary, but the pages must be the same size as the pages of the form. Although the commission mails the forms for required reports to candidates who are exempt from filing electronically, failure to receive forms by mail does not excuse treasurers, committees and other persons who must file reports from otherwise obtaining the forms or from late filing penalties.

Rules of the commission establishing campaign report filing forms for candidates are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A.

**7. Reporting exemption.** [1991, ch. 839, § 20 (RP).]

**7-A. Reporting exemption.** A candidate seeking election to a county or municipal office or a legislative candidate seeking the nomination of a party in an uncontested primary election is exempt from reporting as provided by this subsection.

**A.** A candidate seeking election to a county or municipal office may, at the time the candidate registers under section 1013-A, notify the commission that the candidate and the candidate's agents, if any, will not personally accept contributions, make expenditures or incur obligations associated with that candidate's candidacy. The notification must be made through an online or written form prescribed by the commission. A candidate who provides this notice to the commission is not required to appoint a treasurer and is not subject to the filing requirements of this subchapter if the statement is true.

**A-1.** A legislative candidate seeking the nomination of a party in an uncontested primary election may, at the time the candidate registers under section 1013-A, notify the commission that the candidate and the candidate's agents, if any, will not personally accept contributions, make expenditures or incur obligations associated with that candidate's candidacy through the 35th day after the primary election. The notification must be made through an online or written form prescribed by the commission. A candidate who provides this notice to the commission is not required to appoint a treasurer or to file the campaign finance reports under subsection 3-A, paragraphs B and D with respect to the primary election.

**B.** The notice provided to the commission under paragraph A or A-1 may be revoked. Prior to revocation, the candidate must appoint a treasurer. The candidate may not accept contributions, make expenditures or incur obligations before the appointment of a treasurer and the filing of a revocation notice are accomplished. A revocation notice must be in the form of an amended

registration, which must be filed with the commission no later than 10 days after the appointment of a treasurer. The candidate and the candidate's treasurer, as of the date the revocation notice is filed with the commission, may accept contributions, make expenditures and incur obligations associated with the candidate's candidacy. Any candidate who fails to file a timely revocation notice is subject to the penalties prescribed in section 1020-A, subsection 4-A, up to a maximum of $5,000. Lateness is calculated from the day a contribution is received, an expenditure is made or an obligation is incurred, whichever is earliest.

**8. Disposition of surplus.**  A candidate or treasurer of a candidate registered under section 1013-A or qualified under sections 335 and 336 or sections 354 and 355 shall dispose of a surplus exceeding $100 within 4 years of the election for which the contributions were received by:

**A.**  Returning contributions to the candidate's or candidate's authorized political committee's contributors, as long as no contributor receives more than the amount contributed;

**B.**  A gift to a qualified political party within the State, including any county or municipal subdivision of such a party;

**C.**  An unrestricted gift to the State. A candidate for municipal office may dispose of a surplus by making a restricted or unrestricted gift to the municipality;

**D.**  Carrying forward the surplus balance to a political committee established to promote the same candidate for a subsequent election;

**D-1.**  Carrying forward the surplus balance for use by the candidate for a subsequent election;

**E.**  Transferring the surplus balance to one or more other candidates registered under section 1013-A or qualified under sections 335 and 336 or sections 354 and 355, or to political committees established to promote the election of those candidates, provided that the amount transferred does not exceed the contribution limits established by section 1015;

**F.**  Repaying any loans or retiring any other debts incurred in the course of the candidate's campaign activity;

**G.**  Paying for any expense incurred in the proper performance of the office to which the candidate is elected, as long as each expenditure is itemized on expenditure reports; and

**H.**  A gift to a charitable or educational organization that is not prohibited, for tax reasons, from receiving such a gift.

The choice must be made by the candidate for whose benefit the contributions were made.

**9. Campaign termination report forms.**  The commission shall provide each candidate required to report campaign contributions and expenditures with a campaign termination report form. A candidate shall file the campaign termination report with the commission as required in this subsection. The campaign termination report must be complete as of June 30th of the year following the campaign of the previous year. This form must show any deficits or surpluses to be carried over to the next campaign. Funds not carried forward to the next campaign must be disposed of as provided in subsection 8. Campaign reporting is as follows.

**A.**  Candidates with surplus campaign funds following an election shall file termination reports no later than July 15th of the year following the campaign of the previous year.

**B.** Candidates with a campaign deficit following an election shall file termination reports no later than July 15th of the year following the campaign of the previous year.

**C.** Candidates with a deficit who will not participate in the next election for the same office shall file semiannual reports until the deficit is liquidated.

**D.** Candidates who collect funds subsequent to an election for purposes other than retiring campaign debt shall register with the commission pursuant to section 1013-A.

**10. Electronic filing.** The treasurer of a candidate or committee that has receipts or expects to have receipts of more than $1,500 shall file each report required by this section through an electronic filing system developed by the commission. The commission may make an exception to this electronic filing requirement if a candidate or committee submits a written request that states that the candidate or committee lacks access to the technology or the technological ability to file reports electronically. The request for an exception must be submitted by April 15th of the election year, except that a candidate registered according to subsection 4 has 10 business days from the date of registration to submit a request to the commission. The commission shall grant all reasonable requests for exceptions.

# History

### Section History

PL 1985, c. 161, §6 (NEW). PL 1985, c. 383, §14 (AMD). PL 1985, c. 566, §§1,2 (AMD). PL 1987, c. 726, §§1,2 (AMD). *PL 1989, c. 166*, §10 (AMD). *PL 1989, c. 504*, §§11-17,31 (AMD). PL 1989, c. 833, §§2-7,21 (AMD). PL 1989, c. 878, §§A49,50 (AMD). PL 1991, c. 839, §§14-22 (AMD). PL 1991, c. 839, §34 (AFF). IB *1995, c. 1*, §12 (AMD). RR *1995, c. 2*, §36 (COR). *PL 1995, c. 193*, §§1-3 (AMD). *PL 1995, c. 483*, §§7,8 (AMD). PL 1999, c. 157, §1 (AMD). PL 1999, c. 729, §4 (AMD). RR *2001, c. 1*, §25 (COR). *PL 2001, c. 470*, §6 (AMD). PL 2001, c. 589, §§1,2 (AMD). *PL 2003, c. 628*, §§B1-3 (AMD). *PL 2005, c. 301*, §§13-17 (AMD). *PL 2005, c. 542*, §2 (AMD). *PL 2007, c. 443*, Pt. A, §16 (AMD). *PL 2007, c. 567*, §1 (AMD). *PL 2007, c. 642*, §10 (AMD). RR *2009, c. 2*, §46 (COR). *PL 2009, c. 138*, §1 (AMD). *PL 2009, c. 190*, Pt. A, §§5-7 (AMD). *PL 2009, c. 302*, §4 (AMD). *PL 2009, c. 366*, §3 (AMD). *PL 2009, c. 366*, §12 (AFF). *PL 2009, c. 524*, §5 (AMD). *PL 2011, c. 389*, §15 (AMD). *PL 2011, c. 389*, §62 (AFF). *PL 2011, c. 522*, §1 (AMD). *PL 2011, c. 558*, §1 (AMD). *PL 2013, c. 334*, §§10, 11 (AMD). *PL 2015, c. 350*, §5 (AMD). *PL 2019, c. 323*, §§7-10 (AMD).; *2023 1st Sp. Sess. ch. 273*, § 1, effective October 25, 2023; *2025 1st Sp. Sess. ch. 224*, §§ 8–10, effective September 24, 2025.

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

End of Document

### *21-A M.R.S. § 1019-B*

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis® > TITLE 21-A. Elections (Chs. 1 — 17) > CHAPTER 13. Campaign Reports and Finances (Subchs. 1 — 5) > SUBCHAPTER 2. Reports on Campaigns for Office (§§ 1011 — 1020-A)*

## § 1019-B. Reports of independent expenditures

**1. Independent expenditures; definition.** For the purposes of this section, an "independent expenditure" means any expenditure made by a person, party committee or political action committee that is not made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized political committee or an agent of either and that:

**A.** Is made to design, produce or disseminate any public communication that expressly advocates the election or defeat of a clearly identified candidate; or

**B.** Unless the person, party committee or political action committee making the expenditure demonstrates under subsection 2 that the expenditure did not have a purpose or effect of influencing the nomination, election or defeat of the candidate, is made to design, produce or disseminate a public communication that names or depicts a clearly identified candidate and is disseminated during the 28 days, including election day, before a primary election; during the 35 days, including election day, before a special election; or from Labor Day to a general election day.

**2. Commission determination.** A person, party committee or political action committee may request a determination that an expenditure that otherwise meets the definition of an independent expenditure under subsection 1, paragraph B is not an independent expenditure by filing a signed written statement with the commission within 7 days of disseminating the communication stating that the cost was not incurred with a purpose of influencing the nomination, election or defeat of a candidate, supported by any additional evidence the person, party committee or political action committee chooses to submit. The commission may gather any additional evidence it determines relevant and material. The commission shall determine by a preponderance of the evidence whether the cost was incurred with a purpose of, or had the effect of, influencing the nomination, election or defeat of a candidate. In order to make this determination, the commission shall consider whether the language and other elements of the communication would lead a reasonable person to conclude that the communication had a purpose of, or had the effect of, influencing an election. The commission may consider other factors, including, but not limited to, the timing of the communication, the recipients of the communication or, if the communication is a digital communication, any links to publicly accessible websites related to the nomination, election or defeat of a candidate. The commission's executive director shall make an initial determination on the request, which must be posted on the commission's publicly accessible website. Any person may appeal the initial determination, which must be considered by the commission at the next public meeting that is feasible.

**3. Report required; content; rules.**  [*2009, ch. 524*, § 6 (RPR); MRSA T. 21-A § 1019-B, sub-§3 (RP).]

**4. Report required; content; rules.**  A person, party committee or political action committee that makes any independent expenditure in excess of $250 during any one candidate's election shall file a report with the commission. In the case of a municipal election, the report must be filed with the municipal clerk.

> **A.**  A report required by this subsection must be filed with the commission according to a reporting schedule that the commission shall establish by rule that takes into consideration existing campaign finance reporting requirements. Rules adopted pursuant to this paragraph are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A.

> **B.**  A report required by this subsection must contain an itemized account of the total contributions from each contributor, each expenditure in excess of $250 in any one candidate's election, the date and purpose of each expenditure and the name of each payee or creditor. The report must state whether the expenditure is in support of or in opposition to the candidate and must include, under penalty of unsworn falsification, as provided in *Title 17-A, section 453*, a statement whether the expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, the candidate or an authorized committee or agent of the candidate.

> **C.**  A report required by this subsection must be on a form prescribed and prepared by the commission. A person filing this report may use additional pages if necessary, but the pages must be the same size as the pages of the form. The commission may adopt procedures requiring the electronic filing of an independent expenditure report, as long as the commission adopts an exception for persons who lack access to the required technology or the technological ability to file reports electronically.

**5. Exclusions.**  An independent expenditure does not include:

> **A.**  [*2021, ch. 132*, § 9 (RP).]

> **B.**  A telephone survey that meets generally accepted standards for polling research and that is not conducted for the purpose of changing the voting position of the call recipients or discouraging them from voting;

> **C.**  A telephone call naming a clearly identified candidate that identifies an individual's position on a candidate, ballot question or political party for the purpose of encouraging the individual to vote, as long as the call contains no advocacy for or against any candidate; and

> **D.**  A voter guide that consists primarily of candidates' responses to surveys and questionnaires and that contains no advocacy for or against any candidate.

**6. Segregated contributions required.**  A political action committee may use only funds received in compliance with section 1015, subsection 2-C or 2-D when making independent expenditures. A political action committee that makes independent expenditures shall keep an account of any contributions received for the purpose of making those expenditures.

# History

**Section History**

*PL 2003, c. 448*, §3 (NEW). *PL 2007, c. 443*, Pt. A, §20 (AMD). *PL 2009, c. 366*, §5 (AMD). *PL 2009, c. 366*, §12 (AFF). *PL 2009, c. 524*, §§6, 7 (AMD). *PL 2011, c. 389*, §§20, 21 (AMD). *PL 2011, c. 389*, §62 (AFF). *PL 2011, c. 558*, §2 (AMD). *PL 2013, c. 334*, §§15, 16 (AMD). IB *2015, c. 1*, §§5, 6 (AMD). *PL 2015, c. 350*, §6 (AMD). *PL 2019, c. 323*, §§15-17 (AMD). *PL 2021, c. 132*, §§7-9 (AMD).; *2023 1st Sp. Sess. ch. 324*, §§ 10–13, effective October 25, 2023; *2025 1st Sp. Sess. ch. 224*, §§ 11, 12, effective September 24, 2025.

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

---

**End of Document**

## *21-A M.R.S. § 1052*

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis® > TITLE 21-A. Elections (Chs. 1 — 17) > CHAPTER 13. Campaign Reports and Finances (Subchs. 1 — 5) > SUBCHAPTER 4. Reports by Political Action Committees and Ballot Question Committees (§§ 1051 — 1064)*

## § 1052. Definitions

As used in this subchapter, unless the context otherwise indicates, the following terms have the following meanings.

**1. Campaign.** "Campaign" means any course of activities to influence the nomination or election of a candidate or to initiate or influence any of the following ballot measures:

**A.** A people's veto referendum under the Constitution of Maine, Article IV, Part Third, Section 17;

**B.** A direct initiative of legislation under the Constitution of Maine, Article IV, Part Third, Section 18;

**C.** An amendment to the Constitution of Maine under Article X, Section 4;

**D.** A referendum vote on a measure enacted by the Legislature and expressly conditioned upon ratification by a referendum vote under the Constitution of Maine, Article IV, Part Third, Section 19;

**E.** The ratification of the issue of bonds by the State or any agency thereof; and

**F.** Any county or municipal referendum.

**2. Committee.** "Committee" means any political action committee or ballot question committee and includes any agent of a political action committee or ballot question committee.

**2-A. Ballot question committee.** "Ballot question committee" means a person that receives contributions or makes expenditures aggregating in excess of $5,000 for the purpose of initiating or influencing a campaign, other than a campaign for the nomination or election of a candidate. The term "ballot question committee" does not include a political action committee or an exempt donor.

**3. Contribution.** "Contribution" includes:

**A.** A gift, subscription, loan, advance or deposit of money or anything of value made to or received by a committee for the purpose of initiating or influencing a campaign, including but not limited to:

**(1)** Funds that the contributor specified were given, in whole or in part, in connection with a campaign;

**(2)** Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically, in whole or in part, for the purpose of initiating or influencing a campaign; and

**(3)** Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating or influencing a campaign when viewed in the context of the contribution and the recipient committee's activities regarding a campaign;

**A-1.** Any funds deposited or transferred into the campaign account described in section 1054;

**B.** [*2025, ch. 224*, § 17 (RP).]

**C.** Any funds received by a committee that are to be transferred to any candidate, committee, campaign or organization for the purpose of initiating or influencing a campaign; or

**D.** The payment, by any person or organization, of compensation for the personal services of other persons provided to a committee that is used by the committee to initiate or influence a campaign.

"Contribution" does not include a loan of money by a financial institution made in accordance with applicable banking laws and regulations and in the ordinary course of business.

**3-A. Exempt donor.** "Exempt donor" means a person that has not received contributions for the purpose of influencing a campaign in the prior 2 years and whose only payments of money to influence a campaign in the prior 2 years are:

**A.** Contributions of money to candidates, party committees, political action committees or ballot question committees registered with the commission or a municipality; or

**B.** Payments for goods or services with an aggregate value of no more than $100,000 contributed to candidates, party committees, political action committees or ballot question committees registered with the commission or a municipality.

**4. Expenditure.** The term "expenditure":

**A.** Includes:

**(1)** A purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value, made for the purpose of initiating or influencing a campaign;

**(1-A)** Any purchase, payment, distribution, loan, advance, deposit or gift of money made from the campaign account described in section 1054;

**(2)** A contract, promise or agreement, expressed or implied, whether or not legally enforceable, to make any expenditure for the purposes set forth in this paragraph; and

**(3)** The transfer of funds by a political action committee to another candidate or political committee; and

**B.** Does not include:

**(1)** Any news story, commentary or editorial distributed through the facilities of any broadcasting station, cable television system, newspaper, magazine or other periodical publication, unless these facilities are owned or controlled by any political party, political committee, candidate or the spouse or domestic partner of a candidate;

**(2)** Activity designed to encourage individuals to register to vote or to vote, if that activity or communication does not mention a clearly identified candidate;

**(3)** Any communication by any membership organization or corporation to its members or stockholders, if that membership organization or corporation is not organized primarily for the purpose of influencing the nomination or election of any person to state or county office;

**(4)** The use of real or personal property and the cost of invitations, food and beverages, voluntarily provided by a political action committee in rendering voluntary personal services for candidate-related activities, if the cumulative value of these activities by the political action committee on behalf of any candidate does not exceed $250 with respect to any election;

**(5)** Any unreimbursed travel expenses incurred and paid for by a political action committee that volunteers personal services to a candidate, if the cumulative amount of these expenses does not exceed $100 with respect to any election;

**(6)** Any communication by a committee that is not made for the purpose of influencing the nomination or election of any person to state or county office; and

**(7)** Any payments to initiate a people's veto referendum or the direct initiative of legislation made prior to the submission of an application to the Department of the Secretary of State as provided in section 901.

**4-A. Influence.** "Influence" means to promote, support, oppose or defeat.

**4-B. Initiate.** "Initiate" includes the collection of signatures on petitions and related activities to qualify a state or local initiative or referendum for the ballot.

**4-C. Leadership political action committee.** [*2023, ch. 244*, § 11 (RP).]

**5. Political action committee.** The term "political action committee":

**A.** Includes:

**(1)** Any separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of a candidate to political office; and

**(5)** Any person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office; and

**B.** Does not include:

**(1)** A candidate or a candidate's treasurer under section 1013-A, subsection 1;

**(2)** A candidate's authorized political committee under section 1013-A, subsection 1, paragraph B;

**(3)** A party committee under section 1013-A, subsection 3; or

**(4)** An exempt donor.

**6. Separate segregated fund committee.**  [*2023, ch. 244*, § 12 (RP).]

# History

**Section History**

PL 1985, c. 161, §6 (NEW). PL 1985, c. 614, §23 (AMD). *PL 1989, c. 504*, §§21-23,31 (AMD). PL 1989, c. 833, §§13,21 (AMD). PL 1991, c. 839, §27 (AMD). PL 1991, c. 839, §33 (AFF). *PL 1995, c. 483*, §17 (AMD). PL 1997, c. 683, §A12 (AMD). PL 1999, c. 729, §6 (AMD). RR *2005, c. 2*, §14 (COR). *PL 2005, c. 301*, §22 (AMD). *PL 2005, c. 575*, §§3-5 (AMD). *PL 2007, c. 443*, Pt. A, §§27, 28 (AMD). *PL 2007, c. 477*, §2 (AMD). *PL 2009, c. 190*, Pt. A, §16 (AMD). *PL 2011, c. 389*, §§26-32 (AMD). *PL 2013, c. 334*, §18 (AMD). *PL 2015, c. 408*, §1 (AMD). *PL 2019, c. 563*, §3 (AMD). *PL 2021, c. 217*, §3 (AMD). *PL 2021, c. 274*, §§9, 10 (AMD). *PL 2021, c. 274*, §13 (AFF).; *2023 1st Sp. Sess. ch. 244*, §§ 11, 12, effective June 22, 2023; *2025 1st Sp. Sess. ch. 224*, §§ 17, 18, effective September 24, 2025.

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

## 21-A M.R.S. § 1060

Current through the 2025 First Regular and First Special Sessions of the 132nd Maine Legislature, including Chapter 1 of the Revisor's Report, and the ballot measures approved on November 4, 2025.

*Maine Revised Statutes Annotated by LexisNexis® > TITLE 21-A. Elections (Chs. 1 — 17) > CHAPTER 13. Campaign Reports and Finances (Subchs. 1 — 5) > SUBCHAPTER 4. Reports by Political Action Committees and Ballot Question Committees (§§ 1051 — 1064)*

## § 1060. Content of reports

The reports must contain the following information and any additional information required by the commission to monitor the activities of committees:

**1. Identification of candidates.** The names of and offices sought by all candidates whose campaigns the committee supports or intends to influence;

**2. Identification of committees; parties.** The names of all political committees or party committees supported in any way by the committee;

**3. Identification of ballot question campaigns.** The ballot question campaigns that the committee intends to initiate or influence;

**4. Itemized expenditures.** An itemization of each expenditure made to initiate or influence any campaign, including the date, payee and purpose of the expenditure and the name of each candidate, and each referendum or initiated petition supported or opposed by the expenditure. If expenditures were made to a person described in section 1012, subsection 3, paragraph A, subparagraph (4), the report must contain the name of the person; the amount spent by that person on behalf of the committee, including, but not limited to, expenditures made during the signature gathering phase; the reason for the expenditure; and the date of the expenditure. The commission may specify the categories of expenditures that are to be reported to enable the commission to closely monitor the activities of committees;

**5. Aggregate expenditures.** Repealed

**6. Identification of contributions.** An itemization of each contribution of more than $50 made to or received by the committee for the purpose of initiating or influencing a campaign, including the name, occupation, places of business and mailing address of each contributor and the amount and date of the contribution;

**6-A. Funds deposited into campaign account.** Any funds deposited into or transferred into the campaign account described in section 1054, including but not limited to funds from the general treasury of an organization that is required to establish a committee; and

**7. Other payments.** Operational expenses and any other payments made from the campaign account described in section 1054.

## History

21-A M.R.S. § 1060

**Section History**

PL 1985, c. 161, §6 (NEW). PL 1991, c. 839, §§30,31 (AMD). PL 1991, c. 839, §33 (AFF). *PL 2003, c. 615*, §§3,4 (AMD). *PL 2005, c. 301*, §27 (AMD). *PL 2005, c. 575*, §8 (AMD). *PL 2007, c. 443*, Pt. A, §36 (AMD). *PL 2007, c. 477*, §§6, 7 (AMD). *PL 2009, c. 190*, Pt. A, §§25, 26 (AMD). *PL 2011, c. 389*, §§46-48 (AMD). *PL 2015, c. 408*, §6 (AMD). *PL 2019, c. 563*, §§14-16 (AMD). *PL 2021, c. 217*, §11 (AMD).

Maine Revised Statutes Annotated by LexisNexis®

Copyright © 2025 All rights reserved.

---

End of Document