Nos. 25-1705, 25-1706

IN THE

# United States Court of Appeals
# for the First Circuit

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees*,

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

*Defendants-Appellants*,

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

*Defendants.*

---

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees*,

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

*Defendants-Appellants*,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine

Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

*Defendants.*

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-00430-KFW (Karen Frink Wolf, J.)

**REPLY BRIEF FOR DEFENDANTS-APPELLANTS EQUAL CITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A. BENNETT**

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
JESSICA C. HUANG
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

January 30, 2026

*Counsel for Defendants-Appellants
Equal Citizens, Cara McCormick,
Peter McCormick, Richard A. Bennett*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................... 5

I.   THE ACT'S CONTRIBUTION LIMIT COMPORTS WITH THE FIRST
     AMENDMENT ........................................................................................ 5

     A.   Because SuperPAC Contributions Are Not
          "Independent," *Citizens United* Does Not Control .................... 6

     B.   Plaintiffs' Argument Also Conflicts With Supreme
          Court Precedent Distinguishing Between
          Contributions And Expenditures ............................................... 10

     C.   Plaintiffs Improperly Ignore The Mountain Of
          Evidence Establishing That SuperPAC Contributions
          Can Give Rise To Quid-Pro-Quo Corruption ........................... 14

     D.   Plaintiffs' Reliance On Out-Of-Circuit Precedents
          Is Misguided ............................................................................... 17

II.  ORIGINALIST PRINCIPLES STRONGLY SUPPORT THE ACT'S
     CONSTITUTIONALITY ........................................................................... 18

     A.   Combatting Dependence Corruption Is A Compelling
          Interest That Can Justify Campaign-Contribution Limits
          Under *Buckley* ........................................................................... 20

     B.   The Act's Constitutionality Is Further Confirmed
          By The Framers' Recognition That Enactments
          Like Maine's Are Compatible With The
          First Amendment ........................................................................ 22

III. THE ACT'S DISCLOSURE REQUIREMENT IS CONSTITUTIONAL .................... 26

     A.   The Act's Disclosure Requirement Is Not Underinclusive ....... 27

     B.   The Act's Disclosure Requirement Is Not Overinclusive ......... 28

i

## TABLE OF CONTENTS—Continued

C.    The Constitutionality Of The Act's Disclosure Requirement Does Not Depend Upon The Constitutionality Of The Act's Contribution Limit ................... 30

CONCLUSION ....................................................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**CASES:**                                                                                                          Page(s)

*Biden v. Knight First Amend. Inst. at Colum. Univ.*,
  141 S. Ct. 1220 (2021) ......................................................... 22, 23

*Brown v. Socialist Workers '74 Campaign Comm'n (Ohio)*,
  459 U.S. 87 (1982) ............................................................... 29, 30

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ......................................1, 11, 12, 13, 14, 20, 29

*Cal. Med. Ass'n v. FEC*,
  453 U.S. 182 (1981) .................................................................... 8

*Citizens Against Rent Control/Coal. for Fair Housing v. City of
  Berkeley*,
  454 U.S. 290 (1981) ............................................................. 29, 30

*Citizens United v. FEC*,
  558 U.S. 310 (2010) .............................................. 1, 5, 6, 7, 8

*Dist. of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................. 26

*FEC v. Colo. Republican Fed. Campaign Comm.*,
  533 U.S. 431 (2001) ..................................................................17

*FEC v. Cruz*,
  596 U.S. 289 (2022) ...................................................................21

*Long Beach Area Chamber of Com. v. City of Long Beach*,
  603 F.3d 684 (9th Cir. 2010)....................................................18

*McConnell v. FEC*,
  540 U.S. 93 (2003) ..................................................................... 9

*McCutcheon v. FEC*,
  572 U.S. 185 (2014).......................................................... 1, 11, 17

iii

## TABLE OF AUTHORITIES—Continued

Page(s)

*McKee v. Cosby,*
586 U.S. 1172 (2019) ....................................................................... 23, 25

*N.H. Right to Life Pol. Action Comm. v. Gardner,*
99 F.3d 8 (1st Cir. 1996) .................................................................31, 32

*Parker v. Dist. of Columbia,*
478 F.3d 370 (D.C. Cir. 2007) ............................................................. 26

*SpeechNow.org v. FEC,*
599 F.3d 686 (D.C. Cir. 2010) (en banc) ...................................... 9, 17, 18

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
732 F.3d 535 (5th Cir. 2013) ...................................................................18

*United States v. Householder,*
137 F.4th 454 (6th Cir. 2025) ..................................................................15

*United States v. Lindberg,*
No. 5:19-CR-00022-MOC-DSC,
2020 WL 520948 (W.D.N.C. Jan. 31, 2020) .........................................15

*United States v. Menendez,*
132 F. Supp. 3d 635 (D.N.J. 2015) .........................................................15

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) .................................................................. 23, 24, 25

*United States v. Zannino,*
895 F.2d 1 (1st Cir. 1990) ..................................................................... 27

*Vote Choice, Inc. v. DiStefano,*
4 F.3d 26 (1st Cir. 1993)....................................................................... 29

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

**STATUTES:**

52 U.S.C.

§ 30109(d)........................................................................................7

§ 30116 ............................................................................................7

§ 30118 ............................................................................................7

ME. STAT. tit. 21-A

§ 1004-A..........................................................................................7

§ 1015(4).........................................................................................10

§ 1015(5)...........................................................................................7

§ 1017-A(1) ................................................................................. 28

§ 1017(2)(A)................................................................................ 28

§ 1017(3-A)(A).............................................................................. 28

§ 1019-B(4)(B)........................................................................ 28, 32

§ 1060(6)...................................................................................... 28

**REGULATIONS:**

11 C.F.R. § 109.21 ..............................................................................7

11 C.F.R. § 110.1(c)(5) ................................................................ 16, 17

11 C.F.R. § 110.3(b)(3) ................................................................ 16, 17

# TABLE OF AUTHORITIES—Continued

Page(s)

**OTHER AUTHORITIES:**

Ian Vandewalker, *10 Years of Super PACs Show Courts were Wrong on Corruption Risks*, Brennan Ctr. for Just. (Mar. 25, 2020), https://www.brennancenter.org/our-work/analysis-opinion/10-years-super-pacs-show-courts-were-wrong-corruption-risks [https://perma.cc/6SMZ-VYGD] ................................16

Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246 (2017) ....................................................................... 24, 25

## INTRODUCTION

For at least half a century, the Supreme Court has held that restrictions on campaign contributions are compatible with the First Amendment when they are "closely drawn" to serve the state's compelling interest in combatting the occurrence or appearance of quid-pro-quo corruption. *Buckley v. Valeo*, 424 U.S. 1, 25, 44-46 (1976) (per curiam); *see McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality opinion). The Maine Act—which passed the Maine electorate by *74.9%*—does precisely that. It establishes a sensible limit on SuperPAC contributions based on evidence that, if left uncapped, these contributions will create the appearance and reality of quid-pro-quo corruption. Maine's citizens feared that without these restrictions, wealthy donors could contribute untold sums to SuperPACs of a candidate's choice in exchange for favorable treatment from that candidate once he is in office. The Act therefore easily passes muster under *Buckley* and its progeny. The court below, however, struck down the Act, despite assuming that SuperPAC contributions can give rise to quid-pro-quo corruption.

Plaintiffs' efforts to defend that result center on *Citizens United v. FEC*, a case that held that limits on independent *expenditures* are unconstitutional because those expenditures are—"[b]y definition"—independent. 558 U.S. 310, 360 (2010). That holding about *expenditures* simply does not apply to

SuperPAC *contributions*, which are not limited by the same intricate web of restrictions on coordination that make independent expenditures definitionally independent. While Plaintiffs try to evade this difficulty by misleadingly rechristening contributions to SuperPACs "independent donations," that effort fails because SuperPAC contributions are *not* independent. Resp. Br. 25-26. The law does not—and could not—make "donations" "independent," which is why Maine is free to limit them to avoid the risk of quid-pro-quo corruption. Resp. Br. 25. There are no restrictions on donors that prevent their coordination with candidates, and even if there were, SuperPACs have no means of enforcing them. Further, while Plaintiffs invoke solicitation limits on candidates, those are easily skirted, and the relevant solicitation laws do not even reach most SuperPAC contributions.

Plaintiffs' argument also rests on the erroneous proposition that contributions are no different from expenditures because contributions are used to fund expenditures. But that reasoning would undo the Supreme Court's firmly established distinction between contributions and expenditures. *Buckley* recognized that contribution limits impose a lesser burden on speech than restrictions on expenditures, and that contributions are more likely to target quid-pro-quo corruption. It therefore applied a lower standard of review to contributions and affirmed the constitutionality

of contribution limits even while striking down analogous independent-expenditure restrictions. That reasoning, which is at the heart of *Buckley*, squarely applies here.

Nor can Plaintiffs hide behind other courts-of-appeals decisions striking down SuperPAC contribution limits. As Equal Citizens explained in its opening brief, those decisions erroneously assumed that, like independent expenditures, contributions to independent political action committees create no risk of quid-pro-quo corruption. But that assumption is simply false. Independent expenditures cannot give rise to quid-pro-quo corruption because the absence of coordination means there is no opportunity for a nefarious agreement between the candidate and the entity making the independent expenditure. But there *can* be coordination between candidates and contributors, meaning SuperPAC contributions can be—and indeed *are*—used for bribes. No court-of-appeals decision acknowledges this important distinction, so none is persuasive.

Further, Plaintiffs simply ignore the mountain of evidence supplied by Equal Citizens and its *amici* proving the existence of quid-pro-quo corruption with respect to SuperPAC contributions. That evidence confirms what common sense already establishes: limits on SuperPAC contributions

3

are a tailored means of combatting quid-pro-quo corruption and are thus compatible with the First Amendment.

Moreover, upholding Maine's contribution limit accords with the original view of the First Amendment. Equal Citizens's opening brief explained that the Framers would have recognized that a law like this—which was enacted through a representative process to serve the public good—accords with the First Amendment. Plaintiffs denigrate this argument as the product of an anti-originalist scholar, ignoring that the argument closely tracks that of a renowned originalist scholar cited favorably by Justice Thomas. Further, Plaintiffs have no meaningful response to Equal Citizens's distinct argument that history establishes another compelling interest that may be served by contribution limits—combatting dependence corruption. Under *Buckley*'s framework, this Court can and should recognize that laws—like the Act's contribution limit—that serve this additional compelling interest are constitutional.

Finally, Plaintiffs conspicuously ignore the numerous cases from this Court that support the constitutionality of Maine's disclosure requirement. Instead of addressing this binding precedent, they broadly assert that the requirement must be unconstitutional because it is over- and under-inclusive. It is neither. The Act merely requires the disclosure of contributors

4

to independent expenditures that are over $250. That modest requirement is well in line with Maine's pre-existing disclosure requirements as well as those this Court has found constitutional in the past.

Accordingly, the District Court's decision invalidating the Act's contribution limit and disclosure requirement should be reversed entirely.

## ARGUMENT

### I. THE ACT'S CONTRIBUTION LIMIT COMPORTS WITH THE FIRST AMENDMENT.

The whole of Plaintiffs' brief boils down to a single argument: *Citizens United* requires this Court to hold that *contribution* limits to SuperPACs violate the First Amendment because *independent-expenditure* limits violate the First Amendment. That argument fails because *Citizens United* did nothing to disturb *Buckley*'s longstanding recognition that campaign-contribution limits are constitutional where—as here—they serve the state's compelling interest in combatting the occurrence and appearance of quid-pro-quo corruption. That truth is unsurprising: the law at issue in *Citizens United* did not limit contributions; it limited expenditures. And following *Buckley*, the Court in *Citizens United* held that limits on "independent expenditures" are unconstitutional because those expenditures are definitionally "independent"—that is, uncoordinated—and therefore cannot give rise to quid-pro-quo corruption. *Id.* at 356-357, 360.

That holding cannot be extended to SuperPAC contributions because they are (1) not independent, (2) not expenditures, and (3) demonstrably capable of giving rise to quid-pro-quo corruption. Plaintiffs' efforts to disprove each of these propositions are wholly unpersuasive. And their invitation for this Court to blindly adopt the position of its sister circuits disregards that each of these courts erroneously assumed that SuperPAC contributions cannot give rise to quid-pro-quo corruption. For the first time in the history of federal courts, the court below refused to adopt this obvious fallacy, instead assuming that SuperPAC contributions *do* produce quid-pro-quo corruption. Yet the District Court still held that the First Amendment bars the state from regulating the limits. Because that holding was wrong, this Court should reverse.

A.    **Because SuperPAC Contributions Are Not "Independent," *Citizens United* Does Not Control.**

*Citizens United* held that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption" because such expenditures are "[b]y definition" independent and therefore incapable of giving rise to quid-pro-quo corruption. *Id.* at 357, 360. Plaintiffs try to apply that holding to SuperPAC contributions through a slight of hand, laundering contributions as "independent *donations.*" Resp. Br. 25 (emphasis added). But that rebranding ignores the important

6

regulatory distinctions between contributions and independent expenditures, distinctions that mean that contributions cannot be rendered "independent." Resp. Br. 25.

**1.** Start with the definition of "independent expenditures." *Id.* at 360. That term applies solely to an expenditure that complies with stringent non-coordination regulations that prevent any expenditure-related interaction between the candidate and the entity making the expenditure. *See generally, e.g.*, 52 U.S.C. §§ 30116, 30118; ME. STAT. tit. 21-A, § 1015(5); 11 C.F.R. § 109.21. *See also* 52 U.S.C. § 30109(d). By preventing any coordination between candidates and SuperPACs, these regulations remove the opportunity for quid pro quos to occur. A SuperPAC can't bribe a candidate if it can't even speak to him. And SuperPACs have every incentive to ensure their employees adhere to these coordination restrictions because engaging in any coordination makes a SuperPAC liable for the penalties following from candidate contributions that exceed contribution limits. Those penalties include hefty fines and potential criminal prosecution. *See id.* §§ 30109(d), 30116, 30118; ME. STAT. tit. 21-A, § 1004-A. That is why *Citizens United* said that independent expenditures are "[b]y definition" incapable of giving rise to quid-pro-quo corruption. 558 U.S. at 360; *see* Opening Br. 35-39.

7

None of this is true of SuperPAC contributions. There is no such thing as an "independent donation[ ]," Resp. Br. 25, because there are *no*—and could be no—effective regulations preventing a donor from coordinating with a candidate. That means that there is ample opportunity for quid-pro-quo corruption to occur. And even assuming there could be robust restrictions on candidate-donor coordination, SuperPACs would have no meaningful way to police such regulations because they cannot know what pre-contribution communications a donor had with the candidate.

In other words, while a SuperPAC's independent expenditures are, "[b]y definition," incapable of giving rise to quid-pro-quo corruption, SuperPAC contributions could *not* be similarly regulated and therefore could not be similarly independent. *Id.* To the contrary, the possibility of unlimited SuperPAC contributions opens the door to quid-pro-quo corruption, as donors can buy political favors through multi-million-dollar donations to a candidate's favored SuperPAC.[1]

---

[1] Plaintiffs misleadingly quote Justice Blackmun's concurrence in *California Medical Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (Blackmun, J., concurring), to suggest that he believed SuperPAC contributions pose no threat of actual or apparent corruption. Resp. Br. 26. Justice Blackmun said no such thing. The quote was comparing the risk of actual or apparent corruption from contributions to SuperPACs to the risk of actual or apparent corruption from contributions to multicandidate political committees. *Id.* at 203-204. Instead of stating that SuperPAC contributions cannot corrupt or have the

**2.** Plaintiffs suggest that regulations restricting candidates' ability to solicit funds resolve any risk of corruption, and that anything more would be superfluous. Resp. Br. 35-36. Neither the District Court nor any of the other courts of appeals to address this issue have relied on this argument. *E.g.*, *SpeechNow.org v. FEC*, 599 F.3d 686, 695 (D.C. Cir. 2010) (en banc). That is for good reason. Solicitation restrictions limit candidates' ability to request donations outright. But they do not, and could not, impose the sort of flat bar on coordination that exists with respect to independent expenditures. That means the threat of quid-pro-quo corruption facilitated by coordination fully persists.

Indeed, the Supreme Court has already recognized that contribution limits and solicitation restrictions can coexist. *McConnell v. FEC* upheld both a limit on soft-money contributions to national party committees *and* a restriction on candidates' ability to solicit those same funds. 540 U.S. 93, 145-146, 182-183 (2003). The contribution limits addressed the risk and appearance of corruption, and "restrictions on solicitations" were "valid anticircumvention measures." *Id.* at 145, 182. So too here.

---

appearance of corruption, Justice Blackmun emphasized his belief that SuperPAC contributions can still "be limited" "if those contributions implicate the governmental interest in preventing actual or potential corruption, and if the limitation is no broader than necessary to achieve that interest." *Id.* at 203. That is precisely Equal Citizens's point.

In any event, while Maine law contains a solicitation provision for state candidates, it is very limited. Maine provides that contributions to PACs "*primarily promot[ing] . . . a single candidate*" are subject to the limits on contributions directly to a candidate when the contributions "were solicited by the candidate." ME. STAT. tit. 21-A, § 1015(4) (emphasis added). But as Plaintiffs acknowledged below, those PACs account for less than half of all SuperPAC activity. *See* D. Ct. Dkt. No. 61 at 6; JA 70. That regulatory gap contributes to the risk and appearance of corruption in Maine elections—something Maine voters and legislators acutely perceive. JA 43-44, 51-52. And again, even if Maine were to extend this solicitation restriction to apply to all PACs, Maine is allowed to recognize that there is no meaningful way to police that limit, given the ubiquity of candidate-supporter communications and a SuperPAC's inability to know about or restrict their donors' coordination with candidates. The simpler and more effective remedy to avoid such corruption is the remedy recognized in *Buckley* and affirmed in *Citizens United*: limits on the size of contributions.

## B.    Plaintiffs' Argument Also Conflicts With Supreme Court Precedent Distinguishing Between Contributions And Expenditures.

In addition to their misguided effort to convert contributions into "independent donations," Resp. Br. 25, Plaintiffs ask this Court to elide the

10

distinction between expenditures and contributions that the Supreme Court has recognized for over fifty years. Since *Buckley*, the Supreme Court has recognized that contribution limits place less of a burden on speech than expenditure limits. The Supreme Court has therefore held that while independent-expenditure limits are subject to strict scrutiny, campaign-contribution limits "may be sustained" so long as they are "closely drawn" to serve a "sufficiently important" state interest. *Buckley*, 424 U.S. at 25; *see, e.g.*, *McCutcheon*, 572 U.S. at 199. Yet Plaintiffs ask this Court to change that standard, and boldly assert that "[s]trict scrutiny should be used to strike down the donation limits because a donation for an independent expenditure *is* an independent expenditure." Resp. Br. 25 (emphasis added). That is wrong.

Independent-expenditure limits must withstand strict scrutiny because independent expenditures are turned directly into speech, and the person who spends the money controls the content and format of that speech. For those reasons, "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. "By contrast," the Court has explained that

11

"[a] limitation on the amount of money a person may give" to a candidate or campaign "involves little direct restraint on his political communication" because "it permits the symbolic expression of support evidenced by a contribution" without "infring[ing] the contributor's freedom to discuss candidates and issues." *Id.* at 21. And because contribution caps place less of a burden on speech than independent-expenditure limits, they are subject to a lower standard of constitutional scrutiny. *Id.* at 23, 25, 44-45.

Plaintiffs assert that the rule should be different for contributions made to SuperPACs, reasoning that those contributions should be treated like independent expenditures because the SuperPAC will eventually use the contributions to make its own independent expenditures. But the Supreme Court already rejected that argument in *Buckley* in connection with contributions to candidates and campaigns. The Supreme Court acknowledged that such "contributions may result in political expression if spent by a candidate or an association to present views to the voters," but it nonetheless found that contributions are subject to lesser scrutiny than expenditures because "the transformation of contributions into political debate *involves speech by someone other than the contributor*." *Id.* at 21 (emphasis added).

12

Plaintiffs appear to believe that this language in *Buckley* is irrelevant because the contribution limit in *Buckley* "was for contributions to a candidate's campaign, directly under the candidate's control; or to political parties and traditional PACs, which could, in turn, legally contribute the funds to the candidate's campaign." Resp. Br. 31. But Plaintiffs cannot explain why that distinction matters. *Buckley* reasoned that giving money to another person or group who will then decide how to spend that money on speech implicates the First Amendment less than paying for speech yourself. That logic fully applies to SuperPAC contributions; while a donor's money may be used by SuperPACs to pay for political speech, "the transformation of [donations] into political debate involves speech by someone other than the contributor." *Id.*

Plaintiffs also suggest that the Act will "cripple" their abilities to receive contributions, thereby "stifling" their ability to communicate their election-related views. Resp. Br. 11. But as *Buckley* recognized, "[t]here is no indication" that contribution limits "have any dramatic adverse effect on the funding of campaigns and political associations," and all contribution ceilings do is require entities "to raise funds from a greater number of persons." *Id.* at 21-22. They do not "reduce the total amount of money potentially available to promote political expression." *Id.* at 22. Rather than

13

stifle election-related speech, contribution limits promote political dialogue by encouraging entities to engage *more* people and "to raise funds from a greater number of persons." *Id.*

That is not to say that Maine's law is constitutionally compelled. But a law with these salutary effects on speech is plainly not barred by the First Amendment. And states, in the exercise of their powers, can function as laboratories. The Constitution gives them the freedom to decide whether to adopt a law like Maine's, or to eschew it.

### C.    Plaintiffs Improperly Ignore The Mountain Of Evidence Establishing That SuperPAC Contributions Can Give Rise To Quid-Pro-Quo Corruption.

Plaintiffs suggest there is no real-world evidence of quid-pro-quo corruption following from the rise of SuperPACs. The assertion beggars belief. The rise in the view that politicians are corrupt because of the explosion of money is well documented. *See* Ctr. for Am. Progress Br. 3-4. And as Equal Citizens's expert demonstrated, that rise is tied directly to the absence of limits on SuperPAC contributions. JA 197-264.

Plaintiffs suggest there are defects in the two real-world examples Equal Citizens put forth, observing that Senator Menendez—who was indicted for taking bribes through SuperPACs—was ultimately acquitted, and that Larry Householder's conviction is somehow distinguishable. Resp.

14

Br. 33-35; *see* Opening Br. 31-33. But the point of Senator Menendez's indictment is not whether he was ultimately guilty, but rather that both the federal government and the court recognized that SuperPAC contributions can be part of a quid-pro-quo exchange. *United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015). And Larry Householder's conviction for accepting bribes through a corporation that could receive "unlimited contributions" similarly demonstrates the possibility for channeling bribes through separate entities capable of accepting unlimited donations. *United States v. Householder*, 137 F.4th 454, 464 (6th Cir. 2025) (citation omitted).

Moreover, Plaintiffs simply ignore the many other examples of the corrupting influence of SuperPACs offered to this Court by Equal Citizens and its *amici* to demonstrate that SuperPAC contributions give rise to both the appearance and occurrence of quid-pro-quo corruption. *See, e.g.*, Opening Br. 33; *United States v. Lindberg*, No. 5:19-CR-00022-MOC-DSC, 2020 WL 520948, at *2 (W.D.N.C. Jan. 31, 2020); Op. & Order, Dkt. No. 498, *United States v. Vázquez-Garced*, No. 3:22-CR-342, at 12-23 (D.P.R. Mar. 7, 2024); Dēmos & Common Cause Br. 25-26, 27-28 (detailing the cases of José Susumo Azano Matsura and Senator Susan Collins); Former Members of Cong. & Former Governors Br. 28-30 (detailing the case of Anaheim, California Mayor Harry Sidhu); Campaign Legal Ctr. Br. 15-16

15

(detailing the cases of Lev Parnas, Igor Fruman, and Zekelman Industries (MUR 7613)); Brennan Ctr. for Just. at N.Y.U. Sch. of L. Br. 9-10 (detailing additional cases); Ian Vandewalker, *10 Years of Super PACs Show Courts were Wrong on Corruption Risks*, Brennan Ctr. for Just. (Mar. 25, 2020), https://www.brennancenter.org/our-work/analysis-opinion/10-years-super-pacs-show-courts-were-wrong-corruption-risks [https://perma.cc/6SMZ-VYGD] (detailing additional cases).

These examples, which Plaintiffs do not even acknowledge, prove that SuperPAC contributions have repeatedly served as the basis for real-world quid-pro-quo corruption. And Equal Citizens has also set forth additional survey evidence establishing that citizens are aware of this corruption and believe that it results from unlimited SuperPAC contributions. JA 200-215. These facts should put to bed any suggestion that limits on SuperPAC contributions are unconstitutional or do not serve a compelling state interest in addressing quid-pro-quo corruption.

Plaintiffs assert, however, that in all events the Act is not adequately tailored to address quid-pro-quo corruption because it does not expressly apply to contributions to "party committees," which should be similarly susceptible to quid-pro-quo corruption. Resp. Br. 36. But state party committees and "subordinate" entities are *already* subject to an extensive

16

array of federal regulations, including contribution limits. 11 C.F.R. § 110.3(b)(3); *see id.* § 110.1(c)(5) ("[N]o person shall make contributions to a political committee established and maintained by a State committee of a political party in any calendar year that, in the aggregate, exceed $10,000."). The existence of those limits is strong evidence that the Act does not exceed "the outer limit of acceptable tailoring" in applying similar restrictions to SuperPACs. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 462 (2001).

### D. Plaintiffs' Reliance On Out-Of-Circuit Precedents Is Misguided.

Unable to defend their position on the merits, Plaintiffs rely heavily on *SpeechNow.org*, 599 F.3d 686, and other court-of-appeals decisions holding that SuperPAC contributions must be unconstitutional under *Citizens United.*[2] But all those decisions have the same root flaw: an erroneous assumption that "because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting

---

[2] The Supreme Court obviously has not adopted *SpeechNow*'s holding. *Contra* Resp. Br. 32. Rather, the Court has merely cited *SpeechNow* for the straightforward *factual* proposition that the "base and aggregate limits [in the Federal Election Campaign Act] govern contributions to traditional PACs, but not to independent expenditure PACs." *McCutcheon*, 572 U.S. at 193 n.2.

contributions to independent expenditure-only organizations." *Id.* at 696. The courts reason that donations that are "one step removed" from independent expenditures cannot give rise to corruption if it is impossible for the expenditures themselves to do so. *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013); *see also, e.g.*, *Long Beach Area Chamber of Com. v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010).

That logic fails, however, because a SuperPAC's independent expenditures are, well, independent. SuperPAC contributions are not. That means coordination with respect to independent expenditures is banned by regulation, but coordination with respect to donations is not, and could not be. Because no courts of appeals even recognized this point, their views are not persuasive. Rather, the Court should adhere to *Buckley*'s fundamental holding that contribution limits are constitutionally distinct from independent-expenditure limits, and where—as here—a contribution limit serves a compelling interest in combatting quid-pro-quo corruption, it survives First Amendment scrutiny.

## II. ORIGINALIST PRINCIPLES STRONGLY SUPPORT THE ACT'S CONSTITUTIONALITY.

From the outset, Equal Citizens has argued that the constitutionality of the Act is confirmed by two distinct originalist arguments. First, the Framers

18

would have found a law compatible with the First Amendment so long as it was enacted through a representative process to serve the public good, and Maine's Act easily satisfies that standard. Second, because the Framers recognized that dependence corruption is one of the greatest threats to a republic, combatting dependence corruption is a compelling state interest sufficient to justify contribution limits under *Buckley*. Maine's Act serves that compelling interest.

Equal Citizens has also been clear about the extent to which this Court could rely on these arguments to uphold the Act. Because the first originalist argument departs from the *Buckley* framework, it is useful in showing that the Act is consistent with the original understanding of the First Amendment, but it cannot serve as an independent basis for upholding the Act. The second argument, by contrast, is different: the Court can rely on it because it assumes the *Buckley* framework applies and offers a separate compelling justification that the Supreme Court has not yet had an opportunity to consider.

Plaintiffs make a hash of all this. They run the two separate arguments together, treating them as a single general contention, and then erroneously assert that this Court cannot consider any of it. On the merits, they misunderstand Equal Citizens's argument about the significance of

19

dependence corruption and then lob unfounded criticisms at Equal Citizens's historical experts. Once these errors are cleared away, the originalist arguments are left standing as powerful support for the constitutionality of the Act.

### A. Combatting Dependence Corruption Is A Compelling Interest That Can Justify Campaign-Contribution Limits Under *Buckley*.

Plaintiffs begin their discussion of the originalist arguments with an error: they contend that these arguments "would be for the Supreme Court, not this Court, to adopt." Resp. Br. 38. It is true that this Court cannot rest its holding on Equal Citizens's first originalist argument because it is grounded on different principles than *Buckley*. But the Court is free to rest its conclusion on the second originalist argument, which is consistent with the *Buckley* framework.

*Buckley* held that contribution limits "may be sustained" so long as they are "closely drawn" to serve a "sufficiently important" state interest. 424 U.S. at 25. Equal Citizens's opening brief catalogued the wide array of historical evidence demonstrating that the Framers were focused on the problem of dependence corruption, such that combatting that form of corruption constitutes another compelling state interest that can sustain a law under the *Buckley* framework.

In arguing the contrary, Plaintiffs assert that the Supreme Court has held that combatting quid-pro-quo corruption is the *only* compelling interest that can support contribution limits. But that misreads the Court's statements. The Court has explained that it has so far "recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance," *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted), but it has not foreclosed the possibility of recognizing additional interests in the future. And as parties have not yet presented the Supreme Court with originalist evidence demonstrating the Framers' focus on dependence corruption, the Court has never had occasion to consider whether that evidence supports complementing its focus on quid-pro-quo corruption with a second kind of corruption—dependence corruption—that was if anything more salient and important to the Framers. JA 169-196.

The originalist case for doing so is strong. Dependence corruption—the improper dependence of public officials on deep-pocket interests—was viewed as anathema to our republic. Founding-era history, the text of the Constitution, and tradition and precedent all demonstrate the Framers' deep concern with dependence corruption. *See* Opening Br. 45-55. Indeed, Plaintiffs do not meaningfully dispute the ample evidence that the Framers

were deeply concerned with this threat. Instead, their primary contention is that the Framers' concern with dependence corruption is not enshrined in the First Amendment, asserting that even Equal Citizens's expert did not see a tight link between dependence corruption and the creation of the First Amendment.

That misses the point: Equal Citizens's argument is not that dependence corruption prompted the Framers to enact the First Amendment, any more than quid-pro-quo corruption prompted that Amendment. But that isn't relevant under *Buckley*. The question is whether combatting dependence corruption is a compelling state interest on par with combatting quid-pro-quo corruption. And the Framers' recognition that dependence corruption is, if anything, more of a threat to our democracy than quid-pro-quo corruption demonstrates that combatting dependence corruption is indeed a compelling interest.

**B.    The Act's Constitutionality Is Further Confirmed By The Framers' Recognition That Enactments Like Maine's Are Compatible With The First Amendment.**

Equal Citizens's other originalist argument also demonstrates the Act's constitutionality. Justice Thomas has stated that "regulations that might affect speech are valid if they would have been permissible at the time of the founding," *Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct.

22

1220, 1223-24 (2021) (Thomas, J., concurring), and Equal Citizens has submitted an expert declaration establishing that the Framers would have found a regulation of speech constitutional if it was adopted by the people through a representative process as a means of advancing the public good, JA 159-168. The Act, which was adopted by a ballot initiative supported by 74.9% of Maine voters, plainly satisfies those requirements, and Plaintiffs do not contend otherwise. JA 51.

Plaintiffs seek to undermine this argument by observing that Justice Thomas has sometimes stated that contribution limits do not appear to be constitutional under originalist principles. But Equal Citizens is relying on Justice Thomas's articulation of the appropriate originalist methodology for understanding the First Amendment, not his specific views on campaign contributions. With respect to methodology, Justice Thomas has explained that courts "should carefully examine the original meaning of the First" Amendment by applying it "as it was understood by the people who ratified it." *McKee v. Cosby*, 586 U.S. 1172, 1173 (2019) (Thomas, J., concurring in the denial of certiorari). And Justice Thomas has criticized modern First Amendment doctrine as "driven by a *judicial* determination of what serves the public good." *United States v. Sineneng-Smith*, 590 U.S. 371, 385 (2020) (Thomas, J., concurring) (emphasis added). He has contended—citing

23

approvingly to Stanford Professor Jud Campbell's seminal article *Natural Rights and the First Amendment*—that "there is 'no evidence [from the founding] indicat[ing] that the First Amendment empowered *judges* to determine whether particular restrictions of speech promoted the general welfare.'" *Id.* (emphasis added) (citing Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 259 (2017)). And Justice Thomas has opined that "[t]his makes sense given that the Founders viewed value judgments and policy considerations to be the work of legislatures, not unelected judges." *Id.*

Equal Citizens has applied these principles to this case through the aid of an expert historical declaration from Campbell's Stanford colleague, Professor Gienapp, who has explained that the Framers viewed laws enacted through a representative process for the public good as compatible with the First Amendment. JA 159-168. Because Maine's Act was adopted through a ballot initiative aimed at advancing the public good, it is constitutional.

Plaintiffs decline to engage Professor Gienapp's historical argument on the merits, instead *ad hominem*-ing his opinions on originalism as a mode of constitutional interpretation. Resp. Br. 41-43. They suggest that his understanding of the Framers' approach to the First Amendment should be rejected because he is not a real originalist. But they ignore that Professor

24

Gienapp's understanding reflects the principles articulated in the Campbell article that Justice Thomas has cited approvingly. In the article, Campbell concludes that, at the Founding, "Americans typically viewed natural rights as aspects of natural liberty that governments should help protect against private interference . . . and that governments themselves could restrain only to promote the public good and only so long as the people or their representatives consented." Campbell, *supra*, at 253. And, Campbell continues, "assessing the public good . . . was almost entirely a legislative task, leaving very little room for judicial involvement." *Id.*; *see, e.g.*, *Sineneng-Smith*, 590 U.S. at 385 (Thomas, J., concurring); *McKee*, 586 U.S. at 1173, 1182 (Thomas, J., concurring in the denial of certiorari).

In other words, Campbell's historical analysis shows that the Founders thought "that governments" could restrain speech and other natural rights only through a representative process and only for the public good, and that the task of "assessing the public good" was "almost entirely a legislative task, leaving very little room for judicial involvement." Campbell, *supra*, at 253. That is precisely Gienapp's point. For the Framers, whether a law complied with the First Amendment depended on whether it was truly a product of a representative process, enacted to advance the public good as understood by

the people and their elected representatives—not judges. Maine's law satisfies that standard.

*　　*　　*

None of this is to say that this Court is obliged to reach the originalist arguments. The fact that the Act serves Maine's compelling interest in combatting quid-pro-quo corruption is more than sufficient to uphold the law on its own. But the originalist evidence, at the very least, may be helpful to subsequent courts as they evaluate the First Amendment questions surrounding campaign-finance regulation, especially over SuperPACs. *Cf. Parker v. Dist. of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) (Silberman, J.) (assessing the originalist evidence regarding the Second Amendment in considering the constitutionality of a gun-control law), *aff'd sub nom., Dist. of Columbia v. Heller*, 554 U.S. 570 (2008).

## III.   THE ACT'S DISCLOSURE REQUIREMENT IS CONSTITUTIONAL.

In its opening brief, Equal Citizens described the numerous precedents from this Court and the Supreme Court that require reversing the District Court's erroneous determination that the Act's disclosure requirement is unconstitutional. Plaintiffs barely address these precedents in arguing that

26

the disclosure requirement violates the First Amendment.[3] Instead, they largely repeat their assertions from below that the disclosure requirement is (1) "over-inclusive because small-dollar donations for independent expenditures that have no likelihood to corrupt are subject to full reporting," and (2) "underinclusive because candidate donations and donations to party committees are not similarly reported."[4] Resp. Br. 51. These arguments are unavailing.

## A.    The Act's Disclosure Requirement Is Not Underinclusive.

Plaintiffs misapprehend the Act's disclosure provision, asserting that it is "underinclusive" because it does not apply "equally to candidate donations, donations to traditional PACs, or donations to party committees." Resp. Br. 51. In fact, the disclosure requirement for SuperPACs is well in line

---

[3] The title of Plaintiffs' Part III—which addresses the constitutionality of the Act's disclosure requirement—states that the disclosure requirement "[v]iolates the First and Fourteenth Amendments." Resp Br. 47. But the entire substance of Part III addresses the First Amendment. Plaintiffs never advance any distinct Fourteenth Amendment argument, and the District Court did not opine on any Fourteenth Amendment argument. JA 360 n.7. Any Fourteenth Amendment argument is therefore waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[4] Notably, Plaintiffs do not even attempt to justify the District Court's holding that the Act is unconstitutional in part because it does not have an opt-out provision. *See* JA 359; Opening Br. 60.

with the requirements that already apply to these entities under existing Maine law.

Contrary to Plaintiffs' suggestion, the Act does not require disclosure for all donations to SuperPACs; it provides that where a SuperPAC makes an expenditure above $250, it must disclose the "total contributions from each contributor" to that expenditure. ME. STAT. tit. 21-A, § 1019-B(4)(B). That requirement accords with Maine's requirement that all PACs must disclose details regarding any contribution greater than $50, *id.* § 1060(6), and that all party committees must report "all contributions" from "a single contributor" that total more than $200. *Id.* § 1017-A(1). The SuperPAC disclosure rule likewise comports with the requirement that donations directly to candidates must be disclosed once the relevant contribution or expenditure threshold is met. *Id.* §§ 1017(2)(A), 1017(3-A)(A).

Accordingly, the Act's disclosure requirement does not inject a new provision in the election code that treats entities differently; it just lays on a generally applicable and particularized disclosure requirement for independent expenditures.

## B.    The Act's Disclosure Requirement Is Not Overinclusive.

Plaintiffs further contend that the Act's disclosure requirement is over-inclusive because it "lacks a threshold below which disclosure of

28

contributions [is] not required," even though "small-dollar donations for independent expenditures" "have no likelihood to corrupt." Resp. Br. 50, 51. Plaintiffs therefore appear to be making an argument that the Act is *per se* unconstitutional simply because it requires SuperPACs to disclose the names of all contributors once it makes an expenditure of more than $250.

But as Equal Citizens already observed, *see* Opening Br. 58-59, this Court has held that a disclosure requirement may not be deemed *per se* unconstitutional merely because it is triggered by low-dollar value contributions. *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993). In *Vote Choice*, this Court rejected the contention that there is a *per se* bar on "first dollar disclosure," explaining that a state's informational interest may justify such a requirement because the "ideological interests" of a candidate "may often be discerned as clearly" from the identity of the individuals contributing $1 to him "as from a $100 contribution." *Id.* at 32.

*Vote Choice*'s discussion of the constitutionality of first-dollar disclosure requirements aligns with Supreme Court precedents. *Buckley* explained that policy decisions, such as the dollar amount that triggers a disclosure requirement, are left to legislative discretion, and a legislature need not "establish that it has chosen the highest reasonable threshold." 424 U.S. at 83-85 (upholding a $10 disclosure threshold); *see, e.g., Brown v.*

29

*Socialist Workers '74 Campaign Comm'n (Ohio)*, 459 U.S. 87, 89 & n.2 (1982); *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 300 (1981).

Plaintiffs ignore *Vote Choice* and related Supreme Court precedent, relying instead on the conclusory assertion that "[t]here simply is no government interest in knowing the smallest of donations to an independent expenditure group." Resp. Br. 50. Because that reliance on an unsupported *per se* argument is foreclosed by precedent, and because Plaintiffs offer no other compelling reason to hold the disclosure requirement unconstitutional, the District Court's decision invalidating that requirement should be reversed.

**C. The Constitutionality Of The Act's Disclosure Requirement Does Not Depend Upon The Constitutionality Of The Act's Contribution Limit.**

Finally, it is worth reiterating, for all the reasons Equal Citizens detailed previously, *see* Opening Br. 61-62, that the disclosure requirement does not rise or fall with the constitutionality of the Act's contribution limit. Plaintiffs completely ignore that Equal Citizens set forth three independent governmental interests that justify the Act's disclosure requirement (informational, enforcement, and combatting corruption), Opening Br. 57-58, 61-62, instead addressing only whether the disclosure requirement is

30

justified by Maine's anticorruption interest, Resp. Br. 47-52. But even the District Court recognized that Maine's informational interest is sufficiently important to independently justify the disclosure requirement, striking down the requirement only because it erroneously determined that the disclosure requirement was not narrowly tailored to that interest. JA 358-360.

Plaintiffs assert in a single sentence that if the Court strikes the Act's contribution limit, the disclosure requirement "is unnecessary, and the entire Act should fall." Resp. Br. 47. Plaintiffs cite only one inapposite case for this proposition, *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8 (1st Cir. 1996). In *Gardner*, this Court struck down a New Hampshire statute capping independent political expenditures at $1,000 per election. *Id.* at 10. In doing so, the Court also struck down two other provisions that "complement[ed] the general restriction on independent expenditures"—one requiring "a political committee to file a declaration with the Secretary of State pledging that it" would not exceed the now-unconstitutional independent-expenditure limit, and another providing that only political committees that had filed such declarations "may make such expenditures." *Id.* at 11 (citation omitted). The Court struck down the declaration requirement and the "proviso

31

conditioning the making of *any* independent expenditures on the filing of [such] a declaration" because "[o]ne cannot be compelled to state that one will comply with an unconstitutional statute." *Id.* at 19.

The disclosure requirement here is not so tied to the contribution limit. It simply requires an individual or entity "that makes any independent expenditure in excess of $250 during any one candidate's election" to disclose the identity of each contributor who funded the independent expenditure. ME. STAT. tit. 21-A, § 1019-B(4)(B). Even if this Court finds the contribution limit unconstitutional, this requirement would not compel any entity "to state that [it] will comply with an unconstitutional statute." *Gardner*, 99 F.3d at 19. The disclosure requirement can therefore stand regardless of the Court's holding with respect to the contribution limit.

## CONCLUSION

For the foregoing reasons, the District Court's decision granting a permanent injunction should be reversed.

Respectfully submitted,

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
JESSICA C. HUANG
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

January 30, 2026                  *Counsel for Defendants-Appellants*
                                  *Equal Citizens, Cara McCormick,*
                                  *Peter McCormick, Richard A. Bennett*

33

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B) because it contains 6,498 words, excluding the parts of the brief exempted by FRAP 32(f).

2. This brief also complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Georgia) using Microsoft Word, the same program used to calculate the word count.

Dated: January 30, 2026                    By: */s/ Neal Kumar Katyal*
                                                Neal Kumar Katyal

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 30, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.


Dated: January 30, 2026                    By:  */s/ Neal Kumar Katyal*
                                                Neal Kumar Katyal