# United States Court of Appeals
## For the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs - Appellees,

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants- Appellants,

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants.

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs - Appellees,

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants - Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in the official capacity

as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; BETH N. AHEARN, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

_____

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

_____

**ORDER OF COURT**

Entered: August 10, 2026

Defendants have appealed the district court's judgment finding the Maine law titled "An Act to Limit Contributions to Political Action Committees That Make Independent Expenditures" ("the Act") facially unconstitutional under the First Amendment and permanently enjoining the enforcement of "21-A M.R.S.A. §§ 1015(2-C), (2-D), and 1019-B(6), and the portion of 21-A M.R.S.A. § 1019-B(4)(B) requiring an itemized account of 'the total contributions from each contributor.'" See Dinner Table Action v. Schneider, No. 1:24-CV-00430, 2025 WL 1939946, 1*, *6 (D. Me. July 15, 2025) (quoting 21-A M.R.S.A. § 1019-B(4)(B)). The "Act restricts individuals and entities from contributing more than $5,000 per year to any given PAC 'for the purpose of making independent expenditures' supporting or opposing a clearly identified candidate for local or state office." Id. at *1 (quoting 21-A M.R.S.A. §§ 1015(2-C)-(2-D)). The Act also "prohibits PACs from using funds contributed in excess of the limit to make independent expenditures" and requires PACs to disclose a contributor's total contributions when the PAC makes any independent expenditure above a set amount. Id.; 21-A M.R.S.A. § 1019-B(4)(B).

On June 30, 2026, the Supreme Court decided National Republican Senatorial Committee v. Federal Election Commission ("NRSC"), 146 S. Ct. 2404 (2026). The decision held that the Federal Election Campaign Act's limits on political-party coordinated expenditures was unconstitutional under the First Amendment. Id. at 2413. In response to the decision, the parties submitted letters pursuant to Rule 28(j) of Federal Rules of Appellate Procedure. However, due to the limits of Rule 28(j), the parties have not had an opportunity to thoroughly discuss NRSC's potential effect on this appeal. Accordingly, this Court requests supplemental briefing. The parties should address what they view as the implications of NRSC, with an emphasis on the following passages:

- **"Standard of Review."** "The Court has held that statutory limits on contributions to candidates or parties—as distinct from limits on expenditures—are subject to 'closely drawn'

scrutiny, a nominally 'lesser but still rigorous standard of review.' <u>Ibid.</u> (quotation marks omitted). The Government must demonstrate 'a sufficiently important interest' and employ means 'closely drawn' to that interest." <u>NRSC</u>, 146 S. Ct. at 2417.

- **"Constitutionally permissible objective."** "In short, under the Court's more recent First Amendment precedents, the Government's desire to prevent or reduce influence, ingratiation, gratitude, access, or the like for those who spend in support of, or contribute to, political parties or candidates is not a constitutionally permissible objective for campaign finance restrictions." <u>Id.</u> at 2419.

- **"Interests are broader and more dispersed."** "[T]he donor gives money to a political party, not to the candidate. That distinction is significant: <u>McCutcheon</u> recognized that there 'is not the same risk of <u>quid pro quo</u> corruption . . . when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly.' 572 U.S. at 210. After the donor has contributed to the party, the party is legally and practically free to use the funds as it sees fit—presumably supporting the candidates who have the best chance of success, are locked in the closest races, or align the most with the party, among other possibilities. The party need not spend the money on the candidate of the donor's choice.

  It is of course true that parties and their candidates often work closely together, as detailed above. That is the nature of political parties and campaigns. But their interests are not identical. The party's interests are broader and more dispersed. Often, the party will simultaneously focus on numerous candidates, policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like—not simply the campaign of one candidate. If the donor's contributions to a political party are 'subsequently rerouted to a particular candidate, such action occurs at the initial recipient's discretion'—namely, the political party's, 'not the donor's.' <u>Id.</u> at 211. 'As a consequence, the chain of attribution grows longer, and any credit must be shared among the various actors along the way.' <u>Ibid</u>." <u>Id.</u> at 2419.

- **"Earmarking."** "[A] donor might specifically direct or require the party to use the donor's monetary contribution to the party in order to support a particular candidate—a practice referred to as 'earmarking.'

  That is a serious argument. This Court has recognized the risk of <u>quid pro quo</u> corruption or its appearance when a donor's contributions are earmarked—that is, 'are directed, in some manner, to a candidate or officeholder.' <u>Ibid</u>. (quotation marks omitted). Indeed, plaintiffs do not dispute that the Government possesses a constitutionally sufficient interest in restricting earmarking of funds over the contribution limits. Brief for Petitioners 21–24; Tr. of Oral Arg. 37.

  So the First Amendment question in this case ultimately boils down to: Whether FECA's limits on political-party coordinated expenditures are permissible in order to prevent circumvention of the base limits on contributions to candidates via large contributions to parties that are earmarked (i.e., directed) to a candidate?
  . . .

As for earmarking rules, <u>amicus</u> and intervenors contend that they leave a gap 'where a donor simply expects that his donation will go to a particular candidate, without actively directing his funds.' Brief for Court-Appointed <u>Amicus Curiae</u> 43. But under this Court's current precedents, a mere expectation or hope does not itself equate to circumvention or rise to the level of <u>quid pro quo</u> corruption or its appearance, especially given a donor's lack of control over the funds once contributed to the party. <u>McCutcheon</u>, 572 U.S. at 210–211. The possibility that a political party <u>might</u> act in accordance with a contributor's expectations or hopes—or is even likely to do so—is not enough to override the First Amendment and justify limits on political party speech." <u>Id.</u> at 2420-21.

- **"Relative Power."** "But since 2001, political parties' relative power has substantially diminished in comparison to outside groups. <u>Colorado II</u> contributed in part to that shift: The political-party coordinated-expenditure limits impose a 'stifling effect on the ability of the party to do what it exists to do.' <u>Colorado Republican Federal Campaign Comm.</u> v. <u>Federal Election Comm'n</u>, 518 U.S. 604, 630 (1996) (<u>Colorado I</u>) (opinion of Kennedy, J.); <u>see</u> R. Pildes, Romanticizing Democracy, Political Fragmentation, and the Decline of American Government, 124 Yale L. J. 804, 838–839 (2014)." <u>Id.</u> at 2425-26.

- **"Statutory limits on coordinated expenditures by outside groups."** "To be clear, the Court's decision does not address the statutory limits on coordinated expenditures by outside groups. As the Government explained at oral argument, political parties possess an especially strong First Amendment interest in working together with their candidates and making expenditures on political speech in coordination with their candidates. <u>See</u> Tr. of Oral Arg. 65–66." <u>Id.</u> at 2426 n.6.

The parties should also address the relevance, if any, of the Supreme Court's citation to <u>SpeechNow.org</u> v. <u>Federal Election Commission</u> in the following passage:

- "Meanwhile, donors can and do send their funds to Super PACs and other outside groups that have a First Amendment right to receive and spend unlimited money to support their independent political speech. <u>See</u> <u>SpeechNow.org</u> v. <u>Federal Election Comm'n</u>, 599 F.3d 686 (CADC 2010) (en banc); <u>see also</u> <u>Emily's List</u> v. <u>Federal Election Comm'n</u>, 581 F.3d 1 (CADC 2009). In the 2024 election cycle, PACs raised over $15.7 billion, as compared to $2.7 billion by political parties. Federal Election Comm'n, Statistical Summary of 24-Month Campaign Activity of the 2023–2024 Election Cycle Press Release (Apr. 23, 2025)." <u>Id.</u> at 2426.

Finally, we note that following the briefing in this case, the Maine legislature appears to have amended 21-A M.R.S.A. § 1019-B(4)(B), substituting the threshold independent expenditure required to trigger an itemized account of the total contributions from each contributor from "$250" to "$1,000." <u>See</u> 21-A M.R.S.A. § 1019-B(4)(B) (amended April 3, 2026). The parties should address the impact, if any, of this amendment on this appeal.

Neither Defendants' brief nor Plaintiffs' briefs shall exceed twenty (20) pages in length. Both briefs shall be due on August 24, 2026, at 5:00 p.m. The parties may file reply briefs not to exceed seven (7) pages in length on or before, August 24, 2026, at 5:00 p.m.

Amici are welcome to file amicus briefs, not to exceed ten (10) pages per brief, no later than seven (7) days after the supplemental reply briefs are filed, but must seek prior leave of court.

By the Court:

Anastasia Dubrovsky, Clerk

cc:
Charles M. Miller, Eric J. Wycoff, David M. Kallin, Neal Kumar Katyal, Nola Breglio Heller, Jonathan Richard Bolton, Christopher Jay Walker, Andrew G. Woodson, John C. Bonifaz, Ben T. Clements, Peter J. Brann, Courtney M. Hostetler, Jason Harrow, Stuart McPhail, Jonah M. Knobler, Ruth M. Greenwood, Evan Noller Bianchi, Megan Patricia McAllen, Robert G. Jones, Thomas Hampson Moore, Colleen E. Roh Sinzdak, Jessica Changlu Huang, Samantha Kinsella Ilagan