No. 25-1705

# United States Court of Appeals
## For the First Circuit

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs – Appellees

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants – Appellants

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants.

*On appeal from the United States District Court, District of Maine*

---

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

Plaintiffs – Appellees,

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

Defendants – Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

---

**SUPPLEMENTAL BRIEF OF DEFENDANTS-APPELLANTS WILLIAM J. SCHNEIDER, BROOKE J. BAILEY, COLTON GROSS, AARON M. FREY and SARAH E. LECLAIRE**

---

AARON M. FREY
Attorney General

Kelly L. Morrell
Deputy Attorney General

Of Counsel

Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov

*Attorney for Appellants*

## Table of Contents


Table of Contents ........ i

Table of Authorities ........ ii

Preliminary Statement ........ 1

Argument ........ 2

I. To the extent *NRSC* is relevant, it supports reversal. ........ 2

  A. *NRSC* confirms that the Act is not subject to strict scrutiny. 2

  B. The Act targets the constitutionally permissible objective of combating quid pro quo corruption and its appearance. ........ 6

  C. *NRSC*'s observation that parties have "broader and more dispersed" interests does not apply to PACs. ........ 8

  D. *NRSC*'s analysis of federal earmarking restrictions applicable to political parties does not apply here. ........ 9

  E. *NRSC*'s discussion of parties' diminished power underscores the inapplicability of its reasoning. ........ 12

  F. *NRSC*'s cabining of its holding to political parties further underscores the inapplicability of its reasoning. ........ 13

  G. *NRSC*'s passing mention of *SpeechNow*'s holding is not binding on this Court. ........ 15

II. The Maine Legislature's raising of the monetary threshold triggering an IE report lessens any First Amendment burden of the disclosure requirement. ........ 17

  A. Background. ........ 17

  B. The increased threshold eases any First Amendment burden associated with the Act. ........ 19

Conclusion ........ 20

Certificate of Compliance ........ 22

Certificate of Service Form for Electronic Filing ........ 23

## Table of Authorities

CASES


*Buckley v. Valeo*, 424 U.S. 1, 21 (1976) ........ 3, 4, 6, 7

*FEC v. Beaumont*, 539 U.S. 146 (2003) ........ 3

*FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431 (2001) ........ 12

*FEC v. Cruz*, 596 U.S. 289 (2022) ........ 6

*Igartua v. United States*, 626 F.3d 592 (1st Cir. 2010) ........ 16, 17

*Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113 (N.D. Ill. 2012) ........ 14

*In re Bateman*, 515 F.3d 272 (4th Cir. 2008) ........ 17

*Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825 (1988) 17

*Mass. Citizens for Life v. FEC*, 479 U.S. 238 (1986) ........ 3

*McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13 (1st Cir. 1991) ........ 16

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ........ 4

*National Republican Senatorial Committee v. FEC*, 609 U.S. __, 146 S. Ct. 2404 (2026) ........ passim

*Randall v. Sorrell*, 548 U.S. 230 (2006) ........ 14

*Rossiter v. Potter*, 357 F.3d 26 (1st Cir. 2004) ........ 16

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) ........ 15

*United States v. Householder*, No. 1:20-CR-77, 2023 WL 24090 (S.D. Ohio Jan. 3, 2023) ........ 6

*United States v. Lindberg*, No. 5:19-CR-00022, 2020 WL 520948 (W.D.N.C. Jan. 31, 2020) ........ 7

*Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013) ........ 20

STATUTES

21-A M.R.S.A. § 1015 .................................................... 2, 10, 14

21-A M.R.S.A. § 1019-B .................................................... 18

52 U.S.C. § 30116 .................................................... 10

P.L. 2015, ch. 350 .................................................... 18

P.L. 2025, ch. 600 .................................................... 18

REGULATIONS

94-270 C.M.R. ch. 1, § 10 .................................................... 18

LEGISLATIVE DOCUMENTS

*An Act to Update the Campaign Finance Laws: Hearing on L.D. 2000 Before the J. Standing Comm. on Veterans and Legal Affairs*, 132nd Legis. (2026) (testimony of Jonathan Wayne) .................................... 19

SECONDARY SOURCES

FEC, *Contribution limits for 2025–2026 federal elections* (last visited Aug. 19, 2026) .................................................... 11

Press Release, Department of Justice, "Chairman Of Multinational Investment Company And Company Consultant Convicted Of Bribery Scheme At Retrial" (May 15, 2024) .................................... 7

ADVISORY OPINIONS

FEC Advisory Op. 2010-09, 2010 WL 3184267 (July 22, 2010) ............ 10

FEC Advisory Op. 2010-11, 2010 WL 3184269 (July 22, 2010) ............ 16

## Preliminary Statement

The Supreme Court's decision in *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404 (2026) ("*NRSC*"), does not help Appellees Dinner Table Action, For Our Future, and Alex Titcomb ("Dinner Table") in their challenge to Maine's voter-enacted law (the "Act") setting limits on contributions to political action committees that make independent expenditures ("super PACs"). The regulated conduct is different: the federal law in *NRSC* regulated coordinated expenditures, not contributions. The subjects of regulation are different: the law in *NRSC* targeted political parties, which are less useful than super PACs as a nexus for corrupt transactions. And the underlying campaign-finance regimes are different: the coordination limits in *NRSC* existed together with hard limits on contributions to parties while Maine has been prevented by the district court's injunction from implementing any comparable limits for super PACs.

These key differences make *NRSC* relevant to this case mostly as a study in contrasts: nearly all of the factors that led the Supreme Court to strike down the party-coordination limits are absent—or cut the other way—in the context of the Act. *NRSC* therefore does not

change the correct outcome of this appeal, which is that this Court should reverse the decision of the district court and allow the Act to go into effect.

## Argument

### I. To the extent *NRSC* is relevant, it supports reversal.

The Court's order requesting supplemental briefing identified seven passages in *NRSC* for the parties to address. The sections that follow discuss each of those passages in turn.

#### A. *NRSC* confirms that the Act is not subject to strict scrutiny.

*NRSC* confirms that the Supreme Court's longstanding distinction between limits on political *contributions* and limits on political *expenditures* remains good law. Under that distinction, contribution limits "are subject to 'closely drawn' scrutiny," while expenditure limits are subject to strict scrutiny. *NRSC*, 146 S. Ct. at 2417.

The Act limits how much individuals and entities can contribute to a particular PAC in a calendar year for independent expenditures ("IEs") but imposes no limits on how much the PAC can spend. *See* 21-A M.R.S.A. § 1015(2-C) & (2-D). As Maine argued in its principal brief and *NRSC* now confirms, the Act is a contribution limit and

closely drawn scrutiny thus applies. *See* Maine Br. at 23–26.

That *NRSC* refers to limits on contributions to "candidates or parties" as subject to closely drawn scrutiny, 146 S. Ct. at 2417, does not suggest otherwise. Nothing in *NRSC*'s reasoning suggests departure from the Supreme Court's long-recognized "basic premise" that the correct standard of review for political spending limits is determined "based on the importance of the 'political activity at issue' to effective speech or political association." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (quoting *Mass. Citizens for Life v. FEC*, 479 U.S. 238, 259 (1986)). Under that premise, contribution limits are subject to "more complaisant" First Amendment scrutiny because they are "merely 'marginal' speech restrictions" that regulate conduct "closer to the edges than to the core of political expression." *Id.*; *see Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (observing that a contribution limit "involves little direct restraint on [the contributor's] political communication").

These decisions collectively stand for the proposition that contribution limits are subject to a lower level of scrutiny not because of the nature of the entity regulated, but because contributions contain

less expressive content. In light of this precedent, *NRSC*'s reference to contribution limits for "candidates or parties" is best understood as a reference to the specific limits relevant to the question to be decided in that case and not any sort of implicit overruling of precedent.

Finally, while *NRSC* describes the closely drawn standard as "still rigorous," 146 S. Ct. at 2417 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014)); *see Buckley*, 424 U.S. at 29 (upholding contribution limits under "the rigorous standard of review established by our prior decisions"), it is considerably less rigorous than strict scrutiny. There is, for example, no requirement for the government to establish that the challenged law is the "least restrictive means to further the articulated interest." *NRSC*, 146 S. Ct. at 2417 (quoting *McCutcheon*, 572 U.S. at 210). Rather, it suffices under closely drawn scrutiny to show that the law is narrowly tailored, necessary, and proportionate to the government's interest. *Id.*

As Maine demonstrated in its principal and reply briefs, *see* Maine Br. at 26–41; Maine R. Br. at 4–14, the Act satisfies these requirements. The $5,000 contribution limit is necessary to address the risk of quid pro quo corruption and its appearance arising from the risk that donors

will contribute to a super PAC working to elect a candidate in exchange for official acts by the benefiting candidate. Maine's evidence showing multiple examples of actual and alleged corruption involving super PACs, Maine Br. at 12–14 & 33 n.6; JA77–104, shows that existing hard-to-enforce measures like criminal bribery laws are, by themselves, not up to the task of protecting Maine elections against the threat of quid pro quo corruption and its appearance posed by unlimited contributions to super PACs.

Moreover, the Act's generous contribution limits of $5,000—well beyond the means of most Mainers—make the Act's restrictions proportionate to Maine's anti-corruption goals. Those limits allow donors to give large sums and PACs to amass considerable capital to make IEs while still preventing the sorts of massive contributions that can lead to quid pro quo corruption and its appearance. Indeed, the record shows that Mainers' perception of corruption risk grows substantially when contributions over $5,000 are permitted, further confirming the Act's proportionality to the targeted problem. JA214.

### B. The Act targets the constitutionally permissible objective of combating quid pro quo corruption and its appearance.

*NRSC*'s assertion that the government may not regulate to prevent or reduce "influence, ingratiation, gratitude, access, or the like," 146 S. Ct. at 2419, is nothing new. *See, e.g.*, *Buckley*, 424 U.S. at 17 (rejecting government interest in "equalizing the relative ability of individuals and groups to influence the outcome of elections"). Maine is not asking this Court to reverse the district court based on such justifications. Rather, Maine contends that the Act is necessary to combat quid pro quo corruption and its appearance—a goal that the Supreme Court continues to affirm as a compelling governmental interest that can justify limitations on political financing. *FEC v. Cruz*, 596 U.S. 289, 305 (2022).

Indeed, the examples cited by Maine, the Intervenors, and amici, involve such actual or alleged quid pro quo corruption. For example, Larry Householder was convicted of a bribery scheme that involved exchanging legislative favors for a stream of funding to various entities, including a super PAC, to support allied state legislative candidates. *See* JA92–105; Maine Br. at 13–14; Maine R. Br. at 13; *see* Amicus Br.

of Campaign Legal Center at 13–14. Greg Lindberg was similarly convicted of a bribery scheme that involved funneling money to a super PAC in exchange for removal of an insurance regulator hostile to his business interests. *United States v. Lindberg*, No. 5:19-CR-00022, 2020 WL 520948, at *2 (W.D.N.C. Jan. 31, 2020); *see* Press Release, Department of Justice, "Chairman Of Multinational Investment Company And Company Consultant Convicted Of Bribery Scheme At Retrial" (May 16, 2024) *at* https://tinyurl.com/4afvk8pm.

These are not examples of currying "influence" or "ingratiation"; they are examples of quid pro quo bribes. They are precisely the sort of "deeply disturbing examples" that led *Buckley* to conclude in a similar context that the problem of corruption "is not an illusory one." 424 U.S. at 27. And since "the scope of such pernicious practices can never be reliably ascertained," *id.*, these examples are almost certainly just the tip of the iceberg. If nothing else, they contribute to "public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" that creates an appearance of corruption that may be properly regulated. *Id.*

### C. *NRSC*'s observation that parties have "broader and more dispersed" interests does not apply to PACs.

*NRSC*'s reasoning in striking down limits on coordinated expenditures by parties is based in part on its observation that political parties have interests that are "broader and more dispersed" than those of a particular candidate. 146 S. Ct. at 2419. *NRSC* reasons that, given these potentially divergent interests, a contribution to a political party is a poor conduit for quid pro quo corruption. *Id.*

*NRSC*'s observation about parties only highlights why its analysis is inapplicable to super PACs. *NRSC* explains that political parties will often "focus on numerous candidates, policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like." *Id.* As a result, a party's interests will necessarily diverge from those of any particular candidate.

Not so with super PACs. In the case of the single-candidate super PAC, the interests of PAC and candidate are virtually identical. And even in the case of super PACs that support more than one candidate, their interests will still be more aligned with the bespoke group of candidates they choose to support than a political party, which exists to seek election of *all* candidates affiliated with that party. Notably, some

of Maine's corruption examples involved multicandidate PACs. *See, e.g.*, JA85 (Menendez indictment). Super PACs' narrower focus makes large contributions to super PACs a far more likely vector for quid pro quo corruption than a large contribution to a political party. While a donor to a party may "expect[]" or "hope" that their donation will be used to benefit a specific candidate, 146 S. Ct. at 2421, in the case of many super PACs, both the donor and the candidate can *know with certainty* that any contribution will benefit the candidate.

### D. ***NRSC*'s analysis of federal earmarking restrictions applicable to political parties does not apply here.**

In holding unconstitutional federal limits on coordinated expenditures by political parties, *NRSC* pointed to the existence of other prophylaxes within federal campaign law to ensure that parties are not used as a conduit to make contributions directly to candidates. One of these was federal law's treatment of a contribution to a party "in any way earmarked or otherwise directed through an intermediary or conduit" to a federal candidate as a contribution directly to the candidate. *NRSC*, 146 S. Ct. at 2421–22 (quoting 52 U.S.C.

§ 30116(a)(8)).[1]

*NRSC*'s earmarking discussion is largely not germane to this appeal. First, the purpose of the earmarking prohibition is to "prohibit circumvention of the base limits on contributions to candidates." *NRSC*, 146 S. Ct. at 2421. The Act, in contrast, is not an anti-circumvention measure aimed at ensuring super PACs do not act as illegal "conduits" to route donor funds to specified candidates. *See* 21-A M.R.S.A. § 1015(4). Rather, it recognizes that unlimited contributions to super PACs are *in and of themselves* highly valuable to candidates—and can thus be the basis for a quid pro quo arrangement—even if the candidate never acquires control over the funds' usage.

Second, *NRSC* was considering a federal statutory framework that already imposed limits on contributions to political parties. Under federal law, individual donors are limited to contributing $10,000 combined to state and local party committees and $44,300 to a national

---

[1] Maine's earmarking provision mirrors the one in federal law. *Compare* 21-A M.R.S.A. § 1015(4) *with* 52 U.S.C. § 30116(a)(8). Like federal law, it does not regulate contributions to PACs earmarked to support a specific candidate if that support comes solely through the PAC's IEs. *See* FEC Advisory Op. 2010-09, 2010 WL 3184267 (July 22, 2010).

committee. *See* FEC, *Contribution limits for 2025–2026 federal elections*, at https://tinyurl.com/2pzefsz9 (last visited Aug. 24, 2026). Nothing in *NRSC* suggests that these base limits on contributions to party committees are unconstitutional. The Act simply seeks to impose limits on contributions to super PACs analogous to the party-contribution limits left untouched by *NRSC*.

Third, *NRSC* supports its analysis of the efficacy of earmarking restrictions by pointing to the absence of any evidence of quid pro quo corruption in states lacking the challenged coordination limit. 146 S. Ct. at 2422. It calls this lack of evidence a "strong sign that the concern is too speculative to support such a restriction." *Id.* Here, as detailed above, Maine, Intervenors, and amici have pointed to numerous examples of alleged and proven quid pro quo corruption arising from contributions to super PACs.

Finally, in its earmarking discussion, *NRSC* points to the donor's "lack of control over the funds once contributed to the party." 146 S. Ct. at 2421. But while that lack of control, coupled with the party's "dispersed" interests, *id.* at 2419, may make it unlikely that a donor's contribution to a party would serve as a "quid" for a candidate's "quo" of

an official act, that reasoning does not extend to super PACs. As discussed above, candidates and donors have a great deal more assurance—and, in the cases of single-candidate super PACs, certainty—that contributions to super PACs will be used to the candidate's benefit.

### E. *NRSC*'s discussion of parties' diminished power underscores the inapplicability of its reasoning.

*NRSC*'s holding that party coordinated-expenditure limits are unconstitutional overruled *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431 (2001) ("*Colorado II*"). In discussing why *Colorado II* was wrong, *NRSC* points out that *Colorado II*'s description of parties as wielding "outsized influence" in campaigns is no longer accurate, as parties now wield "substantially diminished" power in comparison to "outside groups." *NRSC*, 146 S. Ct. at 2425. *NRSC* further blames *Colorado II*'s holding in part for this shift and worries that failing to overturn *Colorado II* could "help consign political parties to continued second-tier status as compared to outside groups." *Id.* at 2426.

The Act targets Maine's compelling interest of stopping quid pro quo corruption and its appearance, not any goal of altering the relative

influence of PACs versus party committees. That said, the record shows that IE spending by PACs has dwarfed party spending on IEs in Maine gubernatorial races in 2010, 2014, 2018, and 2022. JA59. To the extent the Act might have any effect on this disparity between PAC and party spending going forward, it is unlikely to add to it. The Act thus does not in any way run afoul of *NRSC*'s concern about the diminishing power of political parties.

What is more, while *Colorado II*'s analysis may have proven less than prescient when it comes to the power of political parties, super PACs now largely wield the power that decision wrongly ascribed to parties. The record shows that federal super PAC spending nationwide has gone from $62 million to $4.1 *billion* between 2010 and 2024. JA72. Maine has likewise seen a sharp upward trend in IE spending by state-level PACs. JA55–56. It is now super PACs, not parties, that offer the most inviting means for corrupt deals between donor and candidate.

### F. *NRSC*'s cabining of its holding to political parties further underscores the inapplicability of its reasoning.

*NRSC* makes a point of cabining its holding to political parties, noting that it is not calling into question "statutory limits on

coordinated expenditures by outside groups." 146 S. Ct. at 2426 n.6. *NRSC* distinguishes limits on outside groups by noting that "political parties possess an especially strong First Amendment interest in working together with their candidates and making expenditures on political speech in coordination with their candidates." *Id.*; *see also Randall v. Sorrell*, 548 U.S. 230, 256 (2006) (plurality op.) (recognizing the right to associate with a political party as a "particularly important political right"); *Ill. Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1123 (N.D. Ill. 2012) (synthesizing Supreme Court decisions as suggesting that "the First Amendment *requires* that political parties be treated more favorably than non-party contributors").

Although the Act did not change Maine's existing law on coordinated expenditures, *see* 21-A M.R.S.A. § 1015(5), *NRSC*'s observation about the "especially strong" interests of parties further demonstrates that *NRSC*'s reasoning cannot be imported wholesale into the super PAC context. Super PACs—which did not meaningfully exist at the federal level until 2010—occupy no similarly important place in America's democratic process.

This important difference between PACs and parties goes directly

to the issue of whether the Act's means are "disproportionate" to Maine's ends of combating quid pro quo corruption and its appearance. *NRSC*, 146 S. Ct. at 2417. Even if *NRSC* could be read to suggest that contribution limits applicable to parties are disproportionate to the government's anti-corruption interest—and, again, *NRSC* in no way suggests as much given that it leaves federal party-contribution limits untouched—the weaker First Amendment interests of super PACs in receiving unlimited contributions would make the Act a proportionate response to the demonstrated instances of corruption arising from contributions to those entities.

### G. *NRSC*'s passing mention of *SpeechNow*'s holding is not binding on this Court.

Finally, the Court should read nothing into *NRSC*'s references to *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). The Court cited *SpeechNow* to support its point that super PACs have become the dominant political spenders at the federal level, "substantially diminish[ing]" the power of parties. *NRSC*, 146 S. Ct. at 2425–26. By concluding that federal contribution limits for PACs were unconstitutional for PACs that make IEs, *SpeechNow* caused this transformation of the campaign finance landscape, leading the Federal

Election Commission to cease enforcing contribution limits to IE-only PACs at the federal level. *See, e.g.*, FEC Advisory Op. 2010-11, 2010 WL 3184269, at *2 (July 22, 2010). *NRSC* thus appropriately cited *SpeechNow* for the proposition that the federal law has been fundamentally altered in a manner that disadvantaged political parties.

Moreover, *NRSC*'s inclusion in its description of *SpeechNow* of a declarative statement of the First Amendment rights of "Super PACs and other outside groups" was entirely unnecessary to its factual point about the diminished power of parties and thus cannot be considered a holding of *NRSC*. *See Rossiter v. Potter*, 357 F.3d 26, 31 (1st Cir. 2004) (observing that a statement in a decision must be "essential to the result reached in the case" to be considered a holding).

Nor is the reference the sort of "[c]arefully considered Supreme Court dicta," to which this Court gives great weight. *Igartua v. United States*, 626 F.3d 592, 605 n.15 (1st Cir. 2010). In *McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13 (1st Cir. 1991), for example, this Court gave weight to a Supreme Court dictum that not only stated an interpretation of ERISA but explained its reasoning for that interpretation. *See id.* at 19 (discussing *Mackey v. Lanier*

*Collection Agency & Serv., Inc.*, 486 U.S. 825, 838 n.12 (1988)). In contrast, bare statements unaccompanied by analysis are not entitled to such weight. *See, e.g.*, *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008).

*NRSC*'s statement about the First Amendment rights of super PAC contributors falls into the latter category. It was made in passing and contains no analysis of the relevant legal question. Rather, it merely restates *SpeechNow*'s holding with no elaboration and then moves immediately to the more relevant factual point that PACs in 2024 raised a staggering amount of money compared to parties. 146 S. Ct. at 2426. In short, *NRSC*'s statement is not "carefully considered" and should therefore be given no weight. *Igartua*, 626 F.3d at 605 n.15.

## II. The Maine Legislature's raising of the monetary threshold triggering an IE report lessens any First Amendment burden of the disclosure requirement.

The Court also requested briefing on the Maine Legislature's decision during the pendency of this appeal to raise the monetary threshold triggering an IE disclosure report from $250 to $1,000. This change reduces the impact of the disclosure requirement on small contributors, enhancing the fit between the Act's ends and means.

### A. Background.

The Act did not create a new stand-alone reporting requirement.

JA157–58. Rather, it inserted language into Maine's existing statute requiring certain persons making IEs to file reports with the Commission on Governmental Ethics and Election Practices (the "Commission") in the period within 60 days of an election. *See* 21-A M.R.S.A. § 1019-B(4); 94-270 C.M.R. ch. 1, § 10(3). Specifically, the Act amended the provision dictating the contents of those reports, adding a requirement that the report include an itemized account of "the total contributions from each contributor." JA158 (codified at 21-A M.R.S.A. § 1019-B(4)(B)).

Under the pre-existing IE reporting statute, the obligation to file an IE report was only triggered if the spender made IEs exceeding $250. 21-A M.R.S.A. § 1019-B(4), *amended by* P.L. 2025, ch. 600, § 6 (effective Apr. 3, 2026). That threshold had been in effect since 2015, when it was increased from $100. *See* P.L. 2015, ch. 350.

The Legislature's subsequent increase in the threshold from $250 to $1,000 earlier this year was p*art of a larger overhaul of reporting rules As the Commission's Executive Director explained in testimony to the Legislature, it was one of several recommendations of an "informal working group" of stakeholders seeking to simplify reporting rules for

candidates, parties, and PACs.[2] Notably, the new law does not modify the express provisions of the Act in any way, since the Act did not alter the existing statutory threshold triggering an IE report.

### B. The increased threshold eases any First Amendment burden associated with the Act.

The practical effect of the new threshold will be to exempt more IE spenders engaged in small-scale spending (i.e., less than $1,000 per candidate) from having to file IE reports and thus disclose their contributors. That effect undermines the district court's already flawed analysis that the disclosure requirement violates the First Amendment. Key to the district court's reasoning that the disclosure requirement was not narrowly tailored was its conclusion that the Act's disclosure requirement "provides no meaningful opportunity for anonymous contributions." JA359. The district court noted the old $250 threshold but found it to be insufficient to render the disclosure requirement narrowly tailored. *Id.*

Even under the $250 disclosure threshold, the district court's First

---

[2] *An Act to Update the Campaign Finance Laws: Hearing on L.D. 2000 Before the J. Standing Comm. on Veterans and Legal Affairs*, 132nd Legis. (2026) (testimony of Jonathan Wayne), *at* https://tinyurl.com/crkvd4jp.

Amendment analysis was flawed for the reasons argued in Maine's principal and reply briefs. *See* Maine Br. at 42–51; Maine R. Br. at 19–23. Most notably, the district court overlooked persuasive authority upholding low- or zero-dollar disclosure thresholds. *See, e.g.*, *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1250–51 (11th Cir. 2013).

However, to the extent the Court might find the disclosure requirement's constitutionality to be a close call, the Legislature's decision to raise the triggering threshold to $1,000 should assuage any First Amendment concerns. Under this higher threshold, citizens can now contribute to organizations engaged in small-scale IE spending of up to $1,000 per candidate without having their contributions publicly disclosed. That increased threshold expands the space in which contributors can make anonymous political contributions, thus directly addressing the district court's concern.

## Conclusion

For the foregoing reasons, as well as those set forth in Maine's principal and reply briefs, the Court should reverse the district court.

DATED: August 24, 2026

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorneys for Defendants-Appellants*

## Certificate of Compliance

1. This brief is 20 pages long, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendants-Appellants*

**Certificate of Service Form**
**for Electronic Filing**

I hereby certify that on August 24, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov