Nos. 25-1705, 25-1706

IN THE

# United States Court of Appeals for the First Circuit

---

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees*,

v.

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

*Defendants-Appellants*,

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

*Defendants*.

---

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,

*Plaintiffs-Appellees*,

v.

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,

*Defendants-Appellants*,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as a Member of the Maine Commission on

Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

*Defendants*.

---

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-430-KFW (Karen Frink Wolf, J.)

---

**SUPPLEMENTAL BRIEF FOR DEFENDANTS-APPELLANTS EQUAL CITIZENS, CARA MCCORMICK, PETER MCCORMICK, RICHARD A. BENNETT**

---


NEAL KUMAR KATYAL
*Counsel of Record*
COLLEEN E. ROH SINZDAK
JESSICA C. HUANG
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com


August 24, 2026


*Counsel for Defendants-Appellants Equal Citizens, Cara McCormick, Peter McCormick, Richard A. Bennett*

**TABLE OF CONTENTS**

Page


INTRODUCTION .......... 1

ARGUMENT .......... 5

I. THE PASSAGES THIS COURT SINGLED OUT FROM *NRSC* SUPPORT REVERSAL .......... 5

A. "Standard Of Review" .......... 5

B. "Constitutionally Permissible Objective" .......... 6

C. "Interests Are Broader And More Dispersed" .......... 7

D. "Earmarking" .......... 10

E. "Relative Power" .......... 14

F. "Statutory Limits On Coordinated Expenditures By Outside Groups" .......... 16

G. *SpeechNow* .......... 17

II. THE $1,000 DISCLOSURE THRESHOLD FURTHER REINFORCES THE CONSTITUTIONALITY OF THE DISCLOSURE REQUIREMENT .......... 19

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES:** Page(s)

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ 1, 6, 13, 15

*Cal. Med. Ass'n v. FEC*,
453 U.S. 182 (1981) ........ 16

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........ 7

*Gaspee Project v. Mederos*,
13 F.4th 79 (1st Cir. 2021) ........ 20

*McConnell v. FEC*,
540 U.S. 93 (2003) ........ 16

*McCutcheon v. FEC*,
572 U.S. 185 (2014) ........ 17

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 9

*Nat'l Republican Senatorial Comm. v. FEC*,
146 S. Ct. 2404 (2026) ........ *passim*

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) ........ 4, 5

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ........ 7

*United States v. Tinklenberg*,
563 U.S. 647 (2011) ........ 18

**STATUTES:**

52 U.S.C. § 30116(a)(7)(A) ........ 12

52 U.S.C. § 30116(a)(8) ........ 12

Page(s)

ME. STAT. tit. 21-A, §§

1015(2-C) .......... 2, 6, 8, 9, 10

1015(2-D) .......... 2, 6, 8, 9, 10

1015(4) .......... 11, 12

1019-B(1)(A) .......... 8, 9, 10

1019-B(4)(B) .......... 4, 19

**OTHER AUTHORITIES:**

Aaron-Andrew P. Bruhl, *Following Lower-Court Precedent*, 81 U. CHI. L. REV. 851 (2014) .......... 18

*Carol A. Laham, Esq.*, Advisory Op. No. 2010-09, 2010 WL 3184267 (Fed. Elec. Comm'n July 22, 2010) .......... 12

Richard H. Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American Government*, 124 YALE L.J. 804 (2014) .......... 14, 15

# INTRODUCTION

The Supreme Court did not and could not decide the question presented in this case in its recent decision in *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404 (2026) ("*NRSC*"). The issues that the Court did decide, however, provide strong support for upholding the constitutionality of Maine's Act.

Start with the obvious: *NRSC* does not decide this case because it addressed the entirely distinct question whether the First Amendment permits statutory limits on coordinated *expenditures* by *political parties*. This case, by contrast, asks whether the First Amendment permits limits on *contributions* to *SuperPACs*. As the questions from the bench at oral argument in this case highlighted, both the contribution-expenditure and political party-SuperPAC distinctions are crucial. *NRSC* reiterated the well-established holding of *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam): while expenditure limits are permitted only in "exceedingly rare circumstances," contribution limits are typically permitted so long as they are "closely drawn" to the government's interest in preventing the occurrence or appearance of quid pro quo corruption. 146 S. Ct. at 2417. And *NRSC* similarly emphasized the key differences between political parties—which play a special, First-Amendment-protected role—and "outside groups" like SuperPACs, which

have contributed to the "diminished" role political parties currently play in our system. *Id.* at 2425-26. *NRSC* therefore made "clear" that it "d[id] not address" the constitutionality of "limits on coordinated expenditures by [non-political-party] outside groups," *id.* at 2426 n.6; still less did it decide the constitutionality of *contribution* limits for those groups.

*NRSC* does, however, articulate several principles that strongly support the constitutionality of the Act's $5,000 limit on contributions to PACs " 'for the purpose of making independent expenditures' supporting or opposing a clearly identified candidate for local or state office." JA 347 (quoting ME. STAT. tit. 21-A, §§ 1015(2-C), (2-D)). In addition to reiterating the longstanding distinction between expenditures and contributions, the Court emphasized that the government may adopt contribution limits to address the sort of quid pro quo corruption Maine's Act targets. *Id.* at 2417, 2419. Indeed, the Court repeatedly mentioned the contribution limits that apply to political parties and candidates, never once questioning their constitutionality. *Id.*

The Court also described several factors that diminish the risks of quid pro quo corruption with respect to political parties that are entirely absent with respect to the SuperPAC contributions that Maine's Act limits. The Court observed, for example, that political parties are less attractive conduits

for quid pro quo corruption because they have "broad[ ]" and "dispersed" interests—such that a donation may be used not just for a particular candidate, but also for "policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like." *Id.* at 2419. The same is not true for donations to candidate-focused SuperPACs, where the donor and the candidate can be certain a contribution will support the candidate's election, creating an attractive mechanism for quid pro quo corruption.

The Court further observed that contributions to political parties are subject to "earmarking rules" that help to prevent the "recognized" "risk of *quid pro quo* corruption or its appearance" that occurs "when a donor's contributions are earmarked—that is, 'are directed, in some manner, to a candidate or officeholder.' " *Id.* at 2420-21 (citation omitted). Contributions to candidate-focused SuperPACs obviously present the same risk of quid pro quo corruption, yet Maine's (and the federal government's) earmarking rules have no application to donations to SuperPACs. *See infra* pp. 10-14. As a result, a donor who wants to buy favors from a candidate cannot do so by giving a $100,000 donation to a political party and directing that it go towards supporting that candidate, but—absent Maine's Act—the same donor could give $100,000 (or $100 *million*) to a SuperPAC devoted exclusively to supporting that candidate's reelection. The Act therefore closes

a loophole in the very earmarking rules that *NRSC* embraced.

By contrast, *NRSC* contains almost nothing to help Plaintiffs' cause. The Court cited *SpeechNow*, but it did so only while describing the current legal landscape and lamenting the ballooning growth of SuperPACs at the expense of political parties. *Id.* at 2426. That is hardly an endorsement. And the Court struck down the federal coordinated-expenditure limits in *NRSC*, but based on rationales that—if anything—reinforce the constitutionality of the Act's targeted contribution limit for candidate-focused SuperPACs.

Meanwhile, another recent development shores up the constitutionality of the Act's disclosure requirement: the Maine Legislature amended ME. STAT. tit. 21-A, § 1019-B(4)(B) to raise the disclosure threshold from $250 to $1,000, further reducing any burden on First Amendment rights and eliminating the District Court's rationale for striking down that aspect of the law.

Accordingly, this Court should reverse the District Court's erroneous decision and lift the injunction of a law that is consistent with the longstanding jurisprudence of the Supreme Court and supported by the vast majority of Maine voters as vital to improving the integrity of Maine elections. *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 394 (2000) ("[T]he statewide vote . . . certainly attested to the perception . . . that

contribution limits are necessary to combat corruption and the appearance thereof." (citation modified)); JA 156.

## ARGUMENT

### I. THE PASSAGES THIS COURT SINGLED OUT FROM *NRSC* SUPPORT REVERSAL.

#### A. "Standard Of Review."

*NRSC* reiterates the fundamental distinction between contributions and expenditures that the Supreme Court has drawn for over half a century. Plaintiffs simply ignore this distinction. *See* Resp. Br. 19 ("[D]onations are a form of independent expenditures."). *NRSC* makes clear that is wrong by emphasizing that "statutory limits on *contributions*" are "distinct from limits on *expenditures*" and therefore subject to "a nominally lesser but still rigorous standard of review" than limits on expenditures. 146 S. Ct. at 2417 (emphasis added) (citation modified). The Court explained the longstanding distinction, first articulated in *Buckley*, under which "[r]estrictions on campaign *expenditures* . . . are permitted only in the exceedingly rare circumstances where they promote a compelling interest and are the 'least restrictive means'" for furthering that interest. *Id.* (citation omitted). By contrast, contribution limits survive scrutiny so long as the government "demonstrate[s] 'a sufficiently important interest' and employ[s] means 'closely drawn' to that interest." *Id.* (citations omitted).

The Act readily satisfies this closely drawn standard based on the robust record of the appearance and occurrence of quid pro quo corruption in association with contributions to SuperPACs. *See* Equal Citizens Opening Br. 31-34; Equal Citizens Reply Br. 14-17; Dēmos & Common Cause Br. 24-28; Former Members of Cong. & Former Governors Br. 24-30; Campaign Legal Ctr. Br. 9-17; Brennan Ctr. Br. 9-10; *cf. Buckley*, 424 U.S. at 27 & n.28 (upholding contribution limits based on a record describing three examples of related corruption). The Act's $5,000 annual limit on contributions to a PAC " 'for the purpose of making independent expenditures' supporting or opposing a clearly identified candidate for local or state office," JA 347 (quoting ME. STAT. tit. 21-A, §§ 1015(2-C), (2-D)), is "closely drawn" to serve the government's indisputably important interest in preventing this corruption, *NRSC*, 146 S. Ct. at 2417.

**B. "Constitutionally Permissible Objective."**

*NRSC* explains that the Court's "more recent First Amendment precedents" have found that "the Government's desire to prevent or reduce influence, ingratiation, gratitude, access, or the like" "is not a constitutionally permissible objective for campaign finance restrictions," but Congress may target "*quid pro quo* corruption." 146 S. Ct. at 2418-19. This aspect of *NRSC* has no effect on Equal Citizens's primary argument: Maine's Act is

constitutional in light of the robust evidence of the appearance and occurrence of quid pro quo corruption in connection with contributions to SuperPACs. Equal Citizens Opening Br. 20-39.

It is true that this language casts doubt on this Court's ability to uphold the Act's contribution limit based on Equal Citizens's originalist argument against "dependence corruption." *See* Equal Citizens Opening Br. 45-55. But as Equal Citizens explained, its dependence-corruption argument is based on originalist evidence that the Supreme Court has not yet had an opportunity to consider. Thus, while this Court cannot rely on it exclusively, it could follow the path set by the D.C. Circuit in *Heller*, upholding the Maine law under the Supreme Court's existing framework but analyzing and discussing the strong originalist case for upholding it based on dependence corruption as well. *See Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) (Silberman, J.) (considering the gun regulation at issue not only under the existing Second Amendment precedent, but also under the original meaning of the Second Amendment), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008). Equal Citizens maintains that this Court can and should still consider the strong originalist case for dependence corruption.

## C. "Interests Are Broader And More Dispersed."

In striking down the coordinated expenditures in *NRSC*, the Supreme Court found that the risk of quid pro quo corruption was diminished by certain features of political parties that are wholly absent here. The Court explained that political parties have "broader" and "more dispersed" interests than individual candidates, focusing on "numerous candidates, policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like—not simply the campaign of one candidate." *NRSC*, 146 S. Ct. at 2419. As a result, contributions to political parties may be "rerouted" at the party's "discretion," meaning that the "chain of attribution grows longer," and "any credit must be shared among the various actors along the way"—reducing the appearance or occurrence of quid pro quo corruption. *Id.* (citation omitted).

That characterization does not describe the SuperPAC contributions capped by Maine's Act. Those contributions must be "for the purpose of making independent expenditures," ME. STAT. tit. 21-A, §§ 1015(2-C), (2-D), "that expressly advocate[] the election or defeat of a clearly identified candidate," *id.* § 1019-B(1)(A). The Act therefore does not reach contributions for the purpose of funding "policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like." *NRSC*, 146 S. Ct.

at 2419. And because the contributions must be targeted at supporting candidate-specific expenditures, the possibility of "rerout[ing]" and blurring the lines of "attribution" is greatly reduced, *id.* (citations omitted)—thus increasing the appearance and occurrence of quid pro quo corruption.

Moreover, unlike political parties—which necessarily divide their resources across "numerous" candidates—many SuperPACs are devoted to a single individual. *Id.* In 2024 alone, single-candidate SuperPAC expenditures accounted for $1.947 billion of the $4.122 billion in total SuperPAC independent expenditures—or 47.2% of the total. JA 70. Contributions to these candidate-specific SuperPACs—often run by "political operatives from candidates' inner circles"—are closely analogous to direct donations to the candidate's own campaign, creating the same corruption risk that *Buckley* recognized justifies contribution limits. Campaign Legal Ctr. Br. 6. And even multicandidate SuperPACs often focus on only two or three candidates. *See* JA 56-57, 62 (detailing the case of a two-candidate Maine SuperPAC that spent over $100,000 in the 2022 election).

That is fatal to Plaintiffs' facial challenge, which requires showing that the Act "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 743-744 (2024) (citation omitted). *NRSC*'s discussion of political parties establishes

one reason Plaintiffs cannot make that showing here: the Act targets contributions "for the purpose of" expenditures, ME. STAT. tit. 21-A, §§ 1015(2-C), (2-D), that support a "clearly identified candidate," *id.* § 1019-B(1)(A), and a substantial number of those contributions will go to SuperPACs supporting only one or two candidates—making it clear exactly where those contributions are going and creating precisely the sort of quid pro quo corruption risk that attends donations directly to a candidate.

### D. "Earmarking."

*NRSC*'s discussion of earmarking strongly supports the Act's constitutionality because the Act closes a loophole in the very earmarking rules *NRSC* embraces. The Court recognized that there is a "risk of *quid pro quo* corruption or its appearance when a donor's contributions" to a political party "are earmarked—that is, 'are directed, in some manner, to a candidate or officeholder.'" *NRSC*, 146 S. Ct. at 2420 (citation omitted). In those instances, large donations to political parties can "circumvent[ ]" limits on contributions to individual candidates. *Id.* But the Court found that this risk did not justify limits on political-party coordinated expenditures because the threat of quid pro quo corruption in that context was already mitigated by other measures—including specific "earmarking rules." *Id.* at 2422. And the Court held that the adequacy of these measures was demonstrated by "the

current record" because there was "no evidence of corruption" through coordinated expenditures by political parties even though most states had long given parties "free rein" in this respect. *Id.* (citation modified).

If anything, the risk of quid pro quo corruption through large donations to candidate-focused SuperPACs is much higher than the risk with respect to earmarked donations to political parties. The SuperPAC donor (and the candidate) can be completely certain that contributions to a single-candidate SuperPAC will be spent on electing that candidate. Indeed, the *NRSC* plaintiffs themselves argued that political-party coordinated-expenditure limits were unnecessary because "there's no need for [them] since a would-be briber *would be better off just giving a massive donation to the candidate's favorite super PAC*." Tr. of Oral Argument at 5, *NRSC*, No. 24-621 (U.S. Dec. 9, 2025) (emphasis added). The federal government agreed. *See* Reply Br. for the Federal Respondents at 21, *NRSC*, No. 24-621 (U.S. Oct. 29, 2025) (arguing that would-be bribers "are likely to simply make unlimited contributions to Super PACs" instead of making "conduit contributions through parties" (citation modified)).

Yet Maine's (and the federal government's) earmarking rules typically do not apply to contributions to SuperPACs—even single-candidate SuperPACs. Maine's earmarking rules apply only where a donation is made

to an entity authorized by a candidate "to accept contributions on [his] behalf," "solicit[ed] by the candidate," or "directed through an intermediary" "to the candidate" himself, ME. STAT. tit. 21-A, § 1015(4)—which means they do not apply to SuperPACs. The federal government's earmarking rules are narrower still, *see* 52 U.S.C. §§ 30116(a)(7)(A), (8), and typically do not apply to SuperPACs at all, *Carol A. Laham, Esq.*, Advisory Op. No. 2010-09, 2010 WL 3184267, at *3-4 (Fed. Elec. Comm'n July 22, 2010).

Maine's Act therefore simply closes a giant loophole for precisely the purpose permitted by the Court—to address quid pro quo corruption and the appearance thereof. The earmarking rules prevent donors from giving a candidate-"directed" $10,000 contribution to political parties, but *nothing* prevents donors from giving $10,000 or even *$10 million* donations to single-candidate SuperPACs—even though those donations are just as obviously "directed" at a particular candidate. *NRSC*, 146 S. Ct. at 2420.

Nor can there be any dispute that this additional measure is necessary: there are numerous examples of Maine single-candidate SuperPACs accepting huge donations that could never be given to political parties or the candidates themselves. *See, e.g.*, JA 57 (detailing the case of a Maine single-candidate SuperPAC that received a $9.27 million contribution from a single donor); JA 57 (detailing the case of a Maine single-candidate SuperPAC that

was funded entirely by one out-of-state individual). Thus, unlike in *NRSC*, where the "current record" showed "no evidence" of quid pro quo corruption with respect to political-party coordinated expenditures, *id.* at 2422 (citation modified), the record here is replete with such evidence, *see* Equal Citizens Opening Br. 31-34; Equal Citizens Reply Br. 14-17.

Such a record is hardly surprising: by interposing an independent entity between donor and candidate, SuperPACs make potentially corrupt arrangements substantially harder to detect than in the case of the direct donor-to-candidate contributions at issue in *Buckley*. And that enforcement difficulty is only magnified by the "dark money" problem unique to SuperPACs: "billion[s]" in SuperPAC contributions have been routed over the past decade through nonprofits and shell companies that obscure the identity of the ultimate source of the funds. Brennan Ctr. Br. 12.

Moreover, nothing in *NRSC* retreats from *Buckley*'s holding that earmarking rules alone cannot safeguard against the appearance and reality of quid pro quo corruption in the contribution context. *See* 424 U.S. at 29-30 (rejecting the proposition that targeted anti-circumvention devices make prophylactic contribution limits unnecessary because it is "difficult to isolate suspect contributions" and, "more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of

impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated”). Indeed, the thinner corruption record in *NRSC* is unsurprising given that federal law caps contributions to parties. 146 S. Ct. at 2432 (Kagan, J., dissenting). Under the rule Plaintiffs advance, contributions to SuperPACs are unlimited.

Nor can Plaintiffs draw support from *NRSC*'s statement that a donor's mere “expectation or hope” does not itself equal quid pro quo corruption. *Id.* at 2421. That statement addressed a donor who gives to a political party whose broader institutional agenda may or may not align with the donor's. It does not describe a donor who gives a seven- or eight-figure sum to a candidate-focused SuperPAC. In that context, the relevant inference is not a “mere expectation or hope” about what the recipient might do; it is the practical reality that the funds will benefit the candidate the SuperPAC exists to elect. *Id.*

### E. “Relative Power.”

*NRSC*'s discussion of the “substantially diminished” power of political parties in comparison with “outside groups” also strongly supports the constitutionality of the Act. 146 S. Ct. at 2425-26. The Court explained that political-party coordinated-expenditure limits had curbed speech by political parties while outside groups were ballooning because of decisions like

*SpeechNow*. *See id*. at 2426 ("In the 2024 election cycle, PACs raised over $15.7 billion, as compared to $2.7 billion by political parties."). The Court observed that many believe this imbalance has "increased political polarization and fragmentation," *id*., and it cited an article specifically attributing these problems to SuperPACs, *see* Richard H. Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American Government*, 124 YALE L.J. 804, 830 (2014) ("[SuperPACs] have much narrower ideological and policy interests than the parties as a whole."). The Court therefore held that striking down the political-party coordinated-expenditure limits would help ensure that political parties were not "consign[ed]" "to continued second-tier status as compared to outside groups." *NRSC*, 146 S. Ct. at 2426.

The same rationale supports upholding the Act's limits on SuperPAC contributions. Maine's Act helps improve the party-SuperPAC imbalance without unconstitutionally curbing speech: it modestly regulates contributions to outside groups while leaving those groups free to make unlimited independent expenditures and donors free to speak independently. *See Buckley*, 424 U.S. at 21 (stating that contribution limits involve "little direct restraint" on political communication because they "permit[ ] the symbolic expression of support evidenced by a contribution

but do[ ] not in any way infringe the contributor's freedom to discuss candidates and issues").

### F. "Statutory Limits On Coordinated Expenditures By Outside Groups."

*NRSC*'s discussion of "coordinated expenditures by outside groups" further reinforces the distinction between the political parties at issue in *NRSC* and the SuperPACs at the core of this case. 146 S. Ct. at 2426 n.6. The Court pointedly said that *NRSC* "does not address the statutory limits on coordinated expenditures by outside groups." *Id.* And it emphasized that there are very different First Amendment concerns at play with respect to the two types of entities because—unlike outside groups like SuperPACs—"political parties possess an especially strong First Amendment interest in working together with their candidates and making" coordinated "expenditures on political speech." *Id.*

In light of that footnote, Plaintiffs cannot possibly argue that *NRSC* somehow requires deciding this case in their favor. If *NRSC* does not decide the constitutionality of coordinated-expenditure limits for outside groups, it necessarily does not decide the constitutionality of contribution limits for those same groups. Indeed, the Court never questioned the constitutionality of contribution limits to outside groups—or even to parties. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 193-199 (1981) (plurality op.) (upholding a

$5,000 contribution limit to multicandidate PACs); *McConnell v. FEC*, 540 U.S. 93, 144-145 (2003) (upholding contribution limits to parties).

Further, footnote 6 emphasizes that *NRSC* was predicated on the "unique" status of political parties, which have " 'a special relationship and unity of interest' with candidates." 146 S. Ct. at 2425 (citation modified). "[O]nly parties 'select slates of candidates,' and 'party affiliation is the primary way by which voters identify candidates.' " *Id.* (citations omitted). SuperPACs perform no such constitutional function; they instead serve as a more direct channel for large donors to give money to identifiable candidates. *See McCutcheon v. FEC*, 572 U.S. 185, 214 & n.9 (2014) (plurality op.) (stating that the rise of SuperPACs makes it less likely that donors will make "conduit contributions directly to campaign committees or parties"; instead, donors "are likely to simply make unlimited contributions to Super PACs" (citation omitted)).

### G. *SpeechNow.*

*NRSC*'s citation to *SpeechNow* supports that position. The Court cited *SpeechNow* in describing the current legal landscape—one in which SuperPACs can receive and spend unlimited funds at parties' expense. *NRSC*, 146 S. Ct. at 2426. This is no different than the Court's previous citation of *SpeechNow* in *McCutcheon*. 572 U.S. at 193 n.2. But this time, the

Court did even less: instead of merely reporting *SpeechNow*'s holding, *NRSC* laments the extent to which *SpeechNow* and the unchecked growth of SuperPAC fundraising have "[w]eakened political parties" and thereby "distort[ed] the political system." 146 S. Ct. at 2426. The Court was therefore citing *SpeechNow* to explain where we are; it was not elevating that circuit-court decision to a Supreme Court holding.

Indeed, when the Court wants to cite lower-court authority for the purpose of endorsing the position it reflects, it will often cite the line of cases supporting that proposition, expressly characterize the consensus those cases represent, and make that consensus part of the reason for its conclusion. In *United States v. Tinklenberg*, 563 U.S. 647 (2011), for example, the Court canvassed eleven courts of appeals, emphasized their unanimity, and treated that unanimity as "entitled to strong consideration." *Id.* at 657. By contrast, an isolated citation to one lower-court decision, unaccompanied by any language of agreement, any reference to the broader line of authority, or any explanation of why the lower court's view matters, does not by itself show that the Court considered and embraced the proposition. *See* Aaron-Andrew P. Bruhl, *Following Lower-Court Precedent*, 81 U. CHI. L. REV. 851, 915 (2014) (stating that "brief and unelaborated" citations "do not necessarily reflect that the opinion even

purports to give lower-court views any weight as authority").

If anything, the *SpeechNow* citation undermines Plaintiffs' consistent contention that "*Citizens United* controls this case." Resp. Br. 33. By citing *SpeechNow*, the Court recognized that *Citizens United* did not create the modern-day SuperPAC. *SpeechNow* did. But *SpeechNow* does not bind this Court, and a descriptive citation in a case about political-party coordinated expenditures is neither a *sub silentio* overruling of *Buckley*'s contribution-limit framework nor a holding on a question not presented. The better reading is that *NRSC* was describing—and criticizing—the legal landscape *SpeechNow* helped create.

## II. THE $1,000 DISCLOSURE THRESHOLD FURTHER REINFORCES THE CONSTITUTIONALITY OF THE DISCLOSURE REQUIREMENT.

The Maine Legislature recently amended ME. STAT. tit. 21-A, § 1019-B(4)(B), raising the independent-expenditure disclosure trigger from $250 to $1,000. This change narrows the disclosure provision and further reduces any claimed First Amendment burden. Indeed, the District Court *agreed* that Maine's informational interest was sufficiently important to justify the Act's disclosure requirement; it struck down the provision only because it erroneously concluded that the prior version was not narrowly tailored to that interest. JA 358-360; *accord NRSC*, 146 S. Ct. at 2422 (stating that disclosure "offers a particularly effective means of arming the voting public

with information" (citation omitted)).

The $1,000 trigger makes the disclosure requirement *more* tailored, further undermining the District Court's rationale. Indeed, the District Court found Maine's prior disclosure requirement unconstitutional solely because this Court's decision in *Gaspee Project* upheld a Rhode Island disclosure law that (1) was "limited to organizations that spent $1,000 or more on independent expenditures," and (2) "provide[d] off-ramps for individuals who wish to engage in some form of political speech but prefer to avoid attribution"—features the District Court believed Maine's Act lacked. JA 358 (quoting *Gaspee Project v. Mederos*, 13 F.4th 79, 88-90 (1st Cir. 2021)).

As Equal Citizens previously explained, the Act's disclosure requirement *does* allow donors to opt out of contributing to independent expenditures above the relevant threshold and to thereby avoid attribution. *See* Equal Citizens Opening Br. 60. And now, Maine's Act is also "limited to organizations that spen[d] $1,000 or more on independent expenditures." JA 358 (citation omitted). None of the District Court's grounds for distinguishing *Gaspee Project* remains valid.

## CONCLUSION

For the foregoing reasons, the Court should reverse.

Respectfully submitted,

*/s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
JESSICA C. HUANG
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

August 24, 2026

*Counsel for Defendants-Appellants Equal Citizens, Cara McCormick, Peter McCormick, Richard A. Bennett*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of this Court's Corrected Order, issued August 10, 2026, because it does not exceed twenty pages in length, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Georgia) using Microsoft Word.

Dated: August 24, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on August 24, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Dated: August 24, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal