Nos. 25-1705, 25-1706

# United States Court of Appeals for the First Circuit

---

No. 25-1705

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs - Appellees,
v.
WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants - Appellants,

EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,
Defendants.

---

No. 25-1706

DINNER TABLE ACTION; FOR OUR FUTURE; ALEX TITCOMB,
Plaintiffs -Appellees,
v.
EQUAL CITIZENS; CARA MCCORMICK; PETER MCCORMICK; RICHARD A. BENNETT,
Defendants - Appellants,

WILLIAM J. SCHNEIDER, in the official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; BROOKE J. BAILEY, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; COLTON GROSS, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in the official capacity as Attorney General of Maine; SARAH E. LECLAIRE, in the official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices,

Defendants.

---

On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-00430-KFW

---

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL BRIEF**

Charles Miller (1129194)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste. 801
Washington, D.C. 20036
Tel: (202) 301-9800
Fax: (202) 301-3399
cmiller@ifs.org

*Counsel for Plaintiffs-Appellees*

# DISCLOSURE STATEMENT

Plaintiff-Appellee Dinner Table Action is a political action committee formed under the law of the State of Maine, has no parent corporation, and no entity has a ten percent or greater ownership in it.

Plaintiff-Appellee For Our Future is a political action committee formed under the law of the State of Maine, has no parent corporation, and no entity has a ten percent or greater ownership in it.

## TABLE OF CONTENTS

Disclosure Statement ........ i

Table of Contents ........ ii

Table of Authorities ........ iii

Introduction ........ 1

Understanding *NRSC* ........ 2

Responses to the Court's Requests ........ 8

I. IECs have a First Amendment Right to Receive Unlimited Contributions ........ 8

II. *NRSC's* Statement on the Standard of Review ........ 9

III. "Constitutionally Permissible Objective" ........ 10

IV. "Interests are broader and more dispersed." ........ 11

V. Earmarking ........ 12

VI. Relative Power ........ 13

VII. "Statutory limits on coordinated expenditures by outside groups" ........ 15

VIII. The increased reporting threshold ........ 18

Conclusion ........ 18

Certificate of Compliance ........ 19

TABLE OF AUTHORITIES

**CASES**

*Buckley v. Valeo*,
424 U.S. 1, 83 (1976) .......... 2, 6
*Cal. Med. Ass'n v. FEC*,
453 U.S. 182 (1981) .......... 10, 14
*Citizens Against Rent Control v. Berkeley,*
454 U.S. 290 (1981) .......... 15
*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 6, 7
*Colorado Rep. Fed. Campaign Comm. v. FEC,*
518 U.S. 604 (1996) .......... 3, 4
*Emily's List v. FEC*,
581 F.3d 1 (D.C. Cir. 2009) .......... 14
*FEC v. Ted Cruz for Senate*,
596 U.S. 289 (2022) .......... 8
*FEC v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 5, 6, 11
*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 2
*McConnell v. FEC*,
540 U.S. 93 (2003) .......... 5
*McCutcheon v. FEC*,
572 U.S. 185 (2014) .......... 7, 10-12
*Nat'l Conservative PAC*,
470 U.S. 480 (1985) .......... 7
*Nat'l. Rep. Sen. Comm. v. FEC*,
609 U.S. ___, 225 L.Ed.2d 998, 1025 (2026) .......... 1, 3, 8-17
*SpeechNow.org v. FEC*,
599 F.3d 686 (D.C. Cir. 2010) .......... 1, 8

**STATUTE**

21-A M.R.S.A. § 1019-B ........................................................................2, 18

**OTHER AUTHORITY**

Richard Briffault, *WRTL II*: The Sharpest Turn in Campaign Finance's Long and Winding Road, 1 Alb. Gov't L. Red. 101, 105 (2008)..............5

## Introduction

Just two months ago, the Supreme Court stated, "Super PACs and other outside groups [] have a First Amendment right to receive and spend unlimited money to support their independent political speech." *Nat'l. Rep. Sen. Comm. v. FEC*, 609 U.S. ___, 225 L.Ed.2d 998, 1025 (2026) ("*NRSC*") (*citing SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc)). As stated in Plaintiffs' 28(j) letter, this unequivocal statement of law binds this court and signals "game over" for Maine's effort to limit donations for independent expenditures ("IEs").

*NRSC* points to *Speechnow.org* to make unambiguous that the "right to receive and spend unlimited money" includes the right to receive unlimited donations from a single source. *NRSC's* reasoning unsurprisingly leads to the same conclusion.

*NRSC* held that multiple other prophylaxes adequately reduce the likelihood of actual and apparent quid pro quo corruption, rendering political party coordination limits unnecessary and thus unconstitutional. *Id.* at 1021-22. The three prophylaxes *NRSC* found adequate—candidate contribution limits, earmarking rules, and disclosure requirements—also operate for IEs. IEs face two additional

prophylaxes: solicitation limits that prohibit a candidate from soliciting more than the direct contribution limits for IE groups, and coordination prohibitions. Given these five prophylaxes, donation limits are unnecessary and unconstitutional.

As for the statutory update, the increase from $250 to $1,000 to trigger expenditure reporting in 21-A M.R.S.A. § 1019-B(4) does not alter the contribution reporting threshold in § 1019-B(4)(B). The zero-dollar contribution reporting threshold remains facially unconstitutional because it leaves no room for small-dollar anonymous donations. *Buckley v. Valeo*, 424 U.S. 1, 83 (1976) (per curiam). The informational interest disappears for small-dollar donations, so no government interest exists to adequately offset the chilling effect of public disclosure. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1130 (2026).

## UNDERSTANDING *NRSC*

*NRSC* is the latest, and most definitive statement yet in a line of cases confirming the right to free political speech.

Throughout our nation's history, federal campaign fundraising and spending had been largely unrestricted. To this day, a dozen states

permit unlimited candidate contributions. Even though *Buckley* made some overreaches (that have sense been corrected), *Buckley* steadfastly protected the ability of Americans to make independent expenditures. *Buckley*, 424 U.S. at 48. As discussed below, IEs have been protected many times over in later decisions. *NRSC* is the latest case to reiterate this constitutional protection, expressly stating the Constitution protects the unlimited IE donations Maine tries to curtail. *NRSC,* 225 L.Ed.2d at 1025. Before turning to *NRSC*, a brief recounting of some campaign finance decisions will provide useful context.

In 1996, the Court held that limits on independent expenditures by political parties are unconstitutional. *Colorado Rep. Fed. Campaign Comm. v. FEC,* 518 U.S. 604 (1996) (*Colorado I*). The three-justice plurality rejected the government's attempt to bypass constitutional protections through labeling. "An agency's simply calling an independent expenditure a 'coordinated expenditure' cannot (for constitutional purposes) make it one." *Id*. at 622 (plurality opinion) (parenthetical in original). Moreover, the Free Speech Clause protects speech even where the speech could be part of a quid pro quo. *Id*. at 616 ("the absence of prearrangement and coordination does not eliminate,

but it does help to alleviate, any danger that a candidate will understand the expenditure as an effort to obtain a quid pro quo”).

In his three-justice concurrence, Justice Kennedy agreed with the lead opinion’s conclusions that a “presumption that all political party spending relating to identified candidates is ‘coordinated’ cannot be squared with the First Amendment,” and that the government merely labeling something a “contribution” does not automatically subject it to the candidate contribution limits. *Id*. at 627-628 (Kennedy, J., concurring).

Justice Thomas, also writing for three justices, explained why the Free Speech Clause protects speech that could be part of a quid pro quo. “Under *Buckley* and its progeny, a *substantial threat* of corruption must exist before a law purportedly aimed at the prevention of corruption will be sustained against First Amendment attack.” *Id*. at 644-645 (Thomas, J., concurring). Political speech must pose a great danger before the First Amendment will tolerate its restriction.

*Colorado I* strengthened the protection of IEs, even for political parties, which were also permitted to donate to, and coordinate expenditures with, candidates.

In 2007, the Court effectively struck a prohibition on issue ads during the runup to an election. *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL II*"). This prohibition, enacted in the Bipartisan Campaign Reform Act ("BCRA"), had been upheld just a few years before. *See McConnell v. FEC*, 540 U.S. 93 (2003). *WRTL II* also failed to produce a majority opinion because of "the division within the majority between the three concurring justices who would have overturned *McConnell,* outright, and the two justices in the lead opinion who voted to preserve the shell of *McConnell* while eviscerating it." Richard Briffault, *WRTL II*: The Sharpest Turn in Campaign Finance's Long and Winding Road, 1 Alb. Gov't L. Red. 101, 105 (2008).

Although the concurring justices would have gone further, the strongly worded lead opinion by Chief Justice Roberts marked the path that has carried forward in campaign finance cases to this day.

"Enough is enough," he famously wrote about government efforts to control more and more election-related speech when decrying the regulation of issue ads. *WRTL II*, 551 U.S. at 478. His plurality opinion marked the first use of the "prophylaxis-upon-prophylaxis" framework the Court now uses to analyze cumulative campaign finance

regulations. *Id.* at 479 ("a prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny"). It also announced the Court's modern theme in these cases: "we give the benefit of the doubt to speech, not censorship." *Id.* at 482.

Three years later, the Supreme Court held that corporate electioneering expenditures are constitutionally protected IEs. *Citizens United v. FEC*, 558 U.S. 310 (2010). *Citizens United* reinforced that only contributions that a candidate can touch or control can be regulated. *Id.* at 357 ("The absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate") (*quoting Buckley*, 424 U.S., at 47).

*Citizens United* emphasized that "independent expenditures . . . do not give rise to corruption or the appearance of corruption." *Id.* "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Id.* at 360. The candidate-funding circuit is broken, reducing the possibility that IEs will result in quid pro quo corruption. *Id.* at 357-361. The Court thus determined that *McConnell* upholding the limits on corporate expenditures "was a significant departure from ancient First

Amendment principles," and overruled that aspect of the earlier decision. *Id*. at 319.

In 2014, the Court restored more speech liberties when it struck aggregate contribution limits that had been upheld in *Buckley*. *McCutcheon v. FEC*, 572 U.S. 185 (2014). "Money in politics may at times seem repugnant to some, but so too does much of what the First Amendment vigorously protects." *Id.* at 191 (plurality). However, "constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id*. at 192. Aggregate contribution limits were an unnecessary additional prophylaxis because individual candidate contribution limits adequately protect the anticorruption interest. *Id*. at 221.

Justice Thomas supplied the fifth vote to form a majority, noting that after *Buckley*, "we have since rejected the 'proxy speech' approach as affording insufficient First Amendment protection to 'the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources.'" *Id*. at 229 (quoting *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 495 (1985)).

In 2022, the Court struck down a $250,000 cap on the amount of post-election contributions a campaign could use to repay a candidate's personal loans to his campaign. *FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022). Even where a contribution is given to a candidate's committee after an election with the knowledge that the money will be used to repay the candidate's personal loan to the committee, base contribution limits and disclosure requirements adequately prevent quid pro quo corruption, rendering limits on loan repayments to the candidate unnecessary. *Id*. at 306.

*NRSC* builds on the restoration of First Amendment liberties in this line of cases that has seen the Court be skeptical of election-related speech restrictions that burden core political speech without targeting bribery.

## RESPONSES TO THE COURT'S REQUESTS

### I. IECs have a First Amendment Right to Receive Unlimited Contributions

"SuperPACs and other outside groups [ ] have a First Amendment right to *receive* and spend *unlimited money* to support their independent political speech." *NRSC*, 225 L.Ed.2d at 1025 (emphasis added) (citing *Speechnow.org v. FEC*, 599 F.3d 686). *NRSC* did not qualify this

statement with phrases such as "some circuits have held," or "we have yet to visit the question." This was an unequivocal statement of law material to the Court's analysis.

*NRSC* relied upon the right of IECs to receive and spend unlimited amounts to support the right of political parties to unlimitedly coordinate with candidates. *Id*. ("To uphold the political-party coordinated-expenditure limits here could therefore help consign political parties to continued second-tier status as compared to outside groups"). *SpeechNow.org's* statement that its result was dictated by *Citizens United* is foundational to *NRSC's* holding.

## II. *NRSC's* Statement on the Standard of Review

Two insights can be gained from *NRSC's* statement of the standard of review. First, its delineation of "contributions to candidates and parties" for receiving only closely drawn scrutiny highlights that contributions to those entities alone are subject to the slightly lower standard of review. *NRSC* artfully and carefully identified the contributions being delineated as those "to candidates and parties" because those contributions can be put under a candidate's control. IEs, in contrast, are subject to strict scrutiny. *NRSC*, 225 L.Ed.2d at 1014.

Donations for IEs are entitled to the same strict scrutiny protection as IEs themselves because they are independent of the candidate. *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 202-03 (1981) (op. of Blackmun, J.).

Second, *NRSC* did not decide between applying strict or closely-drawn scrutiny for party-coordinated expenditures, finding it "need not dwell on any subtle differences between the two tests" because the tests are very similar and the law failed both tests. *NRSC*, 225 L.Ed.2d at 1015. Even closely drawn scrutiny requires that a law be narrowly tailored to preventing quid pro quo corruption. *Id*. The Maine law isn't.

## III. "Constitutionally Permissible Objective"

*NRSC* reiterates *McCutcheon's* holding that preventing quid pro quo corruption and its appearance is the only constitutionally permissible objective of a law restricting political speech. *Id*. at 1017. Contributions to political parties that result in the contributor gaining "influence, ingratiation, gratitude and access" are not, and do not appear to be, quid pro quo corruption. *Id*. Rather, elected officials being responsive to constituents is a desirable and important aspect of representative democracy. *McCutcheon*, 572 U.S., at 192. "The line between *quid pro quo* corruption and general influence may seem vague at times, but the

distinction must be respected in order to safeguard basic First Amendment rights." *Id*. at 209. And "[i]n addition, 'in drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.'" *Id*. (*quoting WRTL II*, 551 U.S. at 457 (op. of Roberts, C.J.)).

**IV. "Interests are broader and more dispersed"**

Money given to a political party is not equivalent to that given directly to a candidate. *NRSC*, 225 L.Ed.2d at 1017-18. The party is free to spend the money as it sees fit. It might not spend the money on a particular candidate at all. Relying on *McCutcheon,* the Court reasoned that even when the political party spends money as the donor hopes, the party, not the donor, decides how and where the money is spent. *Id*. Thus, "the chain of attribution grows longer," and the meaningfulness of an individual contribution is reduced. *Id*. (*quoting McCutcheon*, 572 U.S. at 211).

Donations for IEs are, of course, even further removed from a candidate than donations to a political party. Where political party donations can be spent in coordination with a candidate, IEs cannot. IECs, such as Plaintiffs, support multiple candidates and make their

own decisions on who to support, how to provide the support, and at what level. There is no guarantee that a donation will be spent to support or oppose any particular candidate. When it is spent, it is not coordinated with or controlled by the candidate. Thus, the "chain of attribution" is even more attenuated for donations to IECs than to political parties.

## V. Earmarking

*NRSC* notes that earmarking, the process where a donor directs the use of a contribution to support a particular candidate, is a "serious" concern. *Id.* at 1018. It finds this circumvention concern adequately addressable by laws "restricting earmarking of funds over the contribution limits." *Id*. *NRSC* also rejects the concept that a donation can be viewed as an implicit earmark because even the likelihood that a party will spend the money as the contributor desires "is not enough to override the First Amendment and justify limits on political party speech," *id*. at 1020, "especially given a donor's lack of control over the funds once contributed to the party." *Id.* (*citing McCutcheon*, 572 U.S. at 210-11).

Laws can prohibit a candidate from soliciting funds for an IEC above candidate contribution limits. Donor and candidate expectations that IECs will use funds as desired "is not enough to override the First Amendment to justify limits" on IE donations "especially given a donor's lack of control over the funds once contributed" to an IEC. *Id.*

**VI. Relative Power**

*NRSC* recognizes that limitations on party spending weakened the relative power of political parties and caused money that would otherwise be directed to political parties, because the parties could coordinate (prior to BCRA), to be redirected to IECs. *Id.* at 1024-25. An implicit assumption is that by striking the party coordination limits, dollars will return to political parties and increase their power and influence compared to outside groups. The solution *NRSC* endorsed for the perception that there is too much money flowing outside the regulated system is to allow more money to flow through regulated entities. *Id.* at 1025 ("More speech is generally better than less speech").

An important aspect of *NRSC*'s treatment of the "relative power" of IECs is its acceptance of the constitutional right IECs have to raise and spend unlimited amounts. "[D]onors can and do send their funds to

Super PACs and other outside groups that have a First Amendment right receive and spend unlimited money to support their unlimited political speech." *Id. NRSC* cited to *SpeechNow.org* as the clearest statement of this proposition. It also cited to an opinion authored by then-Judge Kavanaugh, which held "non-profit groups may accept unlimited donations to their soft-money accounts." *Emily's List v. FEC*, 581 F.3d 1, 14 (D.C. Cir. 2009).

"[T]he First Amendment, as the Court has construed it, safeguards the right of citizens to band together and pool their resources as an unincorporated group or non-profit organization in order to express their views about policy issues and candidates for public office." *Id.* at 4. "[N]on-profit entities, like individual citizens, are constitutionally entitled to raise and spend unlimited money in support of candidates for elected office…." *Id.* (*citing Cal. Med.*, 453 U.S. at 202-03 (opinion of Blackmun, J.)).[1]

*Emily's List* also found controlling the Court's prior holding that placing "any limit [ ] on individuals wishing to band together to advance

[1] *Emily's List* explains that this aspect of Blackmun's opinion is controlling. *Emily's List*, 581 F.3d, at n.8.

their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 296 (1981). The Maine law recreates the same restraint on association. "[I]t cannot be allowed to hobble the collective expressions of a group." *Id*.

*NRSC* compared the relative power of IEs to political party coordinated expenditures in holding that because unlimited IE fundraising and expenditures are constitutionally mandated, political parties must be permitted unrestricted coordination to fulfill their role in our system of government. *NRSC*, 225 L.Ed.2d at 1025. The vastly greater sums given to IECs over political parties proved that political parties needed to be unleashed, not that IEs needed to be controlled.

## VII. "Statutory limits on coordinated expenditures by outside groups"

In a footnote, *NRSC* clarified that removing the limits on political party coordinated expenditures "does not address" whether limits on coordination by "outside groups" must also be lifted. *NRSC,* 225 L.Ed.2d at 1025, n.6. Political parties have an "especially strong First Amendment interest in working together with their candidates." *Id.*

Plaintiffs do not seek to coordinate with candidates or parties. However, the footnote highlights how IEC spending serves to prevent the appearance of quid pro quo corruption.

Three levels of prophylaxes prevent the appearance of corruption for coordinated party expenditures: base limits on individual contributions to candidates; earmarking rules; and disclosure requirements. *Id.* at 1021. For IECs, there are five layers. The first three are the same as in *NRSC*: base limits, earmarking rules, and disclosure rules. IECs face two additional restrictions: anti-solicitation rules and anti-coordination rules.

Base limits restrict the amount of money a donor can contribute to a candidate. Anti-solicitation rules prohibit a candidate from soliciting donations to an IEC (possibly at all, and certainly above the base limits). Earmarking rules prohibit a donor from earmarking IE donations for use for a particular candidate. Disclosure rules ensure that the government and public are aware of who donates to IECs. And anti-coordination rules prohibit IECs from coordinating with a candidate.

"Such a prophylaxis-upon-prophylaxis approach requires that we be particularly diligent in scrutinizing the law's fit." *Id*. An additional prophylaxis of limiting donations for IEs is "'disproportionate' and is not 'necessary' and 'narrowly tailored' to the Government's interest in preventing circumvention of the base contribution limits." *Id*. at 1021-1022. "Courts cannot simply say, 'what's the harm in allowing just one more regulation' when that regulation would limit freedom of speech. On the contrary, courts must preserve and protect the freedom of speech guaranteed by the Framers." *Id*. at 1022.

More than a third of Dinner Table Action's funding has come from donations of $5,000 or more. JA35. For Our Future has been funded solely by donations over that amount. JA37. The $5,000-limit enacted here severely limits Plaintiffs' speech rights, the rights of those with whom they associate, as well as the rights of all others who contribute to, or make IEs in Maine.

*NRSC* continues a trend of increasingly protecting political speech. There is no indication that the Court will stomach any effort to curtail IEs by abruptly reversing course to approve limits on the donations that fund them. *NRSC's* statement that IECs can raise unlimited funds

shows these donations are protected. Accordingly, the judgment below should be affirmed.

### VIII. The increased reporting threshold

The increase in the IE threshold necessary to trigger itemized reporting obligations does not impact the disposition of the constitutionality of the zero-dollar donation disclosure requirement. The threshold increase impacts when an entity is subject to reporting. 21-A M.R.S.A. § 1019-B(4)(B). It does not alter the threshold for which donations are reported. "[A]n itemized account of the total contributions from each contributor" is still required. *Id.*

The small increase in the reporting threshold from $250 to $1,000 exempts only de minimus reporters. The change has no impact on the reporting of the vast number of donors to entities which make IEs of amounts more than $1,000. And it does nothing to alleviate the burdens on Plaintiffs and their donors.

## CONCLUSION

*NRSC* confirms that the judgment of the District Court should be affirmed.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Charles Miller*
Charles Miller (1129194)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste. 801
Washington, D.C. 20036
Tel: (202) 301-9800
Fax: (202) 301-3399
cmiller@ifs.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 18 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)(7)(B)(iii), which complies with the requirements in the briefing order. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point typeface and Century Schoolbook type style.

*/s/ Charles Miller*
Charles Miller (1129194)